IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ASHLEY SCOGGIN,<br><br>Plaintiff,<br><br>vs.<br><br>BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, and individuals AMY WILLIAMS, TREV ALBERTS, and CHUCK LOVE, JR., in their individual capacities,<br><br>Defendants. | Case No. 4:24-cv-3039<br><br>**MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT AND FOR A FINDING OF GOOD CAUSE** |

Ashley Scoggin, Plaintiff in the above-captioned matter, pursuant to FED. R. CIV. P. 15 and 16, by and through her counsel of record, moves this Court for an Order granting leave to file a First Amended Complaint and a finding of good cause for requesting such leave after expiration of the deadline for amendments in the operative Order of Case Progression, showing as follows:

1.

This case challenges the initiation by an associate head coach of a Division I women's basketball team of a sexual relationship with an undergraduate player on the women's basketball team, and how the head coach and Director of Athletics responded to the revelation of that sexual relationship. The allegations of the Complaint specifically include Defendants' removal of Plaintiff from the basketball team, allegedly for dishonesty[1], after a lengthy and emotional interrogation of

[1] ***Complaint*** at ¶ 53.

Plaintiff by team members and WILLIAMS.[2]

2.

On July 2, 2024, Plaintiff served BRUN with written discovery requests. Those requests included Request for Production No. Request for Production No. 17, which sought

> all rules, policies, procedures and protocols for the University of Nebraska Cornhusker women's basketball team in effect from February 18, 2022 to the present. This includes, but is not limited to, the subjects of:

- team philosophy;
- team meetings;
- academic success;
- athletic medicine;
- social media;
- personal conduct;
- team travel;
- Name, Image & Likeness;
- communication with coaches;
- sexual/romantic relationships with employees, agents or volunteers of the Athletic Department;
- reporting misconduct; and
- any other rules, policies, procedures or protocols on any topic.

4.

BRUN objected to this Request, characterizing it as "irrelevant and unduly burdensome." In its objections, BRUN did not advise whether it had withheld documents pursuant to this Request.

[2] ***Complaint*** at ¶¶ 45-47.

5.

On January 28, 2025, Plaintiff sent BRUN a detailed effort to resolve BRUN's objections to Plaintiff's discovery requests, including Request No. 17. BRUN responded on February 7, 2025 that it would "stand on our objections."

6.

On August 15, 2025, counsel engaged in a meet-and-confer session, after which BRUN produced more documents on September 18, 2025; on September 30, 2025; on November 18, 2025; and on November 25, 2025. The documents produced as of November 25, 2025 had included the University of Nebraska Women's Basketball Team Handbook, the University of Nebraska Department of Athletics Student-Athlete Handbook and multiple iterations of the publicly-available University of Nebraska Board of Regents Policies.

7.

On November 7, 2025, the undersigned deposed University of Nebraska Title IX investigator Leslie Shaver. The subjects of the deposition included, *inter alia*, official policies that may have bearing on the claims and defenses herein.

8.

On December 4, 2025, the undersigned deposed Defendant ALBERTS for four hours (including breaks).[3] The subjects of the deposition included, *inter alia*, official policies that may have bearing on the claims and defenses herein.

9.

The next deposition scheduled was Plaintiff's deposition of WILLIAMS, which was set for

[3] Counsel are in the process of scheduling a date and time for the completion of ALBERTS' deposition.

December 22, 2025.

10.

On December 19, 2025, BRUN emailed the undersigned to advise that it had recently "discovered" additional policies. To that email, BRUN attached several versions of the University of Nebraska Student-Athlete Conduct Policy, including a version that appears to have been in effect during the events at issue herein.

11.

BRUN had not previously produced the University of Nebraska Student-Athlete Conduct Policy.

12.

The University of Nebraska Women's Basketball Team Handbook did not contain the University of Nebraska Student-Athlete Conduct Policy.

13.

The University of Nebraska Student-Athlete Handbook does not contain the University of Nebraska Student-Athlete Conduct Policy. A section within that document is entitled "Conduct," and reads:

> **Conduct Rules Sources**
> The department requires coaches, trainers and staff to conduct themselves in a way that creates a positive image of the people, values and traditions associated with the University, the Big Ten Conference and the NCAA. As a student-athlete, you are expected to uphold the same standards of conduct, including academic honesty, that have been adopted by the department and the University.
> **You may access the complete text of the student code of conduct and disciplinary procedures at the following site: http://stuafs.unl.edu/dos/code**.
> Additionally, the Athletic Department has developed an internal code of conduct to which student-athletes must adhere. These policies and procedures will be reviewed with and provided to student-athletes annually.

BRUN has never produced any "internal code of conduct." The student code of conduct and

disciplinary procedures are not the University of Nebraska Student-Athlete Conduct Policy produced on December 19, 2025.

14.

Had the undersigned known of the existence of the University of Nebraska Student-Athlete Conduct Policy before December 19, 2025, Plaintiff could have sought leave, pursuant to FED. R. CIV. P. 15, to amend the Complaint to allege a claim that Defendants violated ASHLEY's right to procedural due process in addition to the substantive due process, equal protection and Title IX claims. But BRUN did not produce it until December 19, 2025.

15.

Had the undersigned known of the existence of the University of Nebraska Student-Athlete Conduct Policy before December 19, 2025, that policy would have been discussed during Plaintiff's deposition of the University of Nebraska Title IX Investigator.

16.

Had the undersigned known of the existence of the University of Nebraska Student-Athlete Conduct Policy before December 19, 2025, she would have served requests for production relating to this policy.

17.

The undersigned has not failed to be diligent, within the meaning of Rule 15(a)(2) analysis. Request No. 17, served in July 2024, sought rules, policies, procedures or protocols that would apply to the women's basketball team. Given the allegations of the Complaint regarding Defendants' response to learning of LOVE's relationship with ASHLEY and Defendants' removal of ASHLEY from the team, BRUN also should have produced the University of Nebraska Student-Athlete Policy in response to Rule 26, which requires parties to produce "disputed facts alleged

with particularity in the pleadings."

18.

Attached to this Motion and marked as Exhibit "A" is a proposed First Amended Complaint, containing (starting at page 26) a Fifth Cause of Action for the violation of ASHLEY's right to procedural due process. The proposed amendments are highlighted in yellow for the Court's reference.

19.

Rule 15(a)(2) provides that "the court should freely give leave [to amend] when justice so requires." This presentation of facts fits that contingency.

WHEREFORE, Plaintiff respectfully asks this Court to SUSTAIN Plaintiff's Motion for Leave to File First Amended Complaint, and to enter such other and further orders as are appropriate for the addition of the Fifth Cause of Action.

ASHLEY SCOGGIN, Plaintiff,

By: *[/s/ Maren L. Chaloupka]*

Maren Lynn Chaloupka, #20864
Chaloupka Law, LLC
1906 Broadway
P.O. Box 1724
Scottsbluff, NE 69363-1724
(308) 270-5091
mlc@chaloupkalaw.net

-AND-

Nathan J. Bruner – NSBA # 23629
Bruner Frank Schumacher
5804 1st Avenue
P.O. Box 2230
Kearney, NE 68847
(308) 455-1046
nbruner@nebraskalawfirm.net

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing instrument has been sent via CM/ECF on this 2nd day of January 2026, to the following:

Denise E. Frost
Johnson & Mock, PC LLO
9900 Nicholas Street, #225
Omaha, NE 68114
dfrost@johnsonandmock.com

Bren H. Chambers
Deputy General Counsel
University of Nebraska
3835 Holdrege Street
Lincoln, NE 68583-0745
bchambers@nebraska.edu

Susan K. Sapp
Lily Amare
Cline Williams Wright Johnson & Oldfather, L.L.P.
1900 U.S. Bank Building
233 South13th Street
Lincoln, NE 68508
ssapp@clinewilliams.com
lamare@clinewilliams.com

*/s/ Maren Lynn Chaloupka*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ASHLEY SCOGGIN,<br><br>Plaintiff,<br><br>vs.<br><br>BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, and individuals AMY WILLIAMS, TREV ALBERTS, and CHUCK LOVE, JR., in their individual capacities,<br><br>Defendants. | Case No. 4:24-cv-3039<br><br>**FIRST AMENDED COMPLAINT** |

Ashley Scoggin, Plaintiff in the above-captioned matter, by and through her counsel of record, for her cause of action against Defendants, alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1.

This case is brought to redress a hostile educational environment, pursuant to 42 U.S.C. § 1983, Title IX of the Education Amendments of 1972 and 20 U.S.C. § 1681(a). It arises from a professional coach initiating a sexual relationship with a student-athlete on his team, and from the response of the University of Nebraska and its athletic leadership to the confirmation of that relationship.

2.

Ashley Scoggin is a citizen and resident of Dallas, Oregon and Las Vegas, Nevada. At all relevant times, she was a student of the University of Nebraska-Lincoln, residing in Lincoln,

EXHIBIT
A

Nebraska.

3.

The Board of Regents of the University of Nebraska (hereinafter "NU") is the organizational entity responsible for governing and operating the University of Nebraska and its programs, including its Athletic Department. During all material times, NU received federal funding for its academic programs and activities.

4.

Defendant Amy Williams is a citizen and resident of Lincoln, Nebraska. She is and was at all relevant times the Head Coach of the University of Nebraska Cornhusker women's basketball team. WILLIAMS' actions relating to this matter were within the course and scope of her employment, and were under color of state law. Defendant Chuck Love, Jr. was at all relevant times a citizen and resident of Lincoln, Nebraska, and was the Associate Head Coach of the University of Nebraska Cornhusker women's basketball team. Just so, LOVE's actions relating to this matter were within the course and scope of his employment and were under color of state law.

5.

Trev Alberts is a citizen and resident of Lincoln, Nebraska. He is and was at all relevant times the Vice Chancellor and Director of Athletics for the University of Nebraska. All of ALBERTS' actions relating to this matter were within the course and scope of his employment, and under color of state law.

6.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. The events at issue transpired in Lincoln, Nebraska and under the supervision of Defendants where the University of Nebraska Cornhusker women's basketball team traveled as part of its

official schedule and service to the University of Nebraska. Venue is proper in this Court.

## FACTUAL BACKGROUND

### WILLIAMS, LOVE AND THE CORNHUSKER WOMEN'S BASKETBALL TEAM

7.

Amy Williams and Chuck Love coached together for at least a decade. In 2011-12, LOVE was an assistant coach for the men's basketball team at Rogers State University in Oklahoma, while WILLIAMS was the head coach of the women's basketball team. After that season, WILLIAMS and LOVE spent four years coaching together at the University of South Dakota, where WILLIAMS was the head coach for the women's team and LOVE was one of her assistants.

8.

NU hired WILLIAMS as head coach of the Cornhusker women's basketball team in 2016. WILLIAMS brought LOVE to Nebraska as an assistant on her coaching staff.

9.

As head coach for the University of Nebraska Cornhusker women's basketball team, WILLIAMS had a duty and a responsibility not just to win games and develop players' skills and abilities, but also to establish and maintain an educational and athletic environment that is free of sexual harassment. WILLIAMS was a policymaker and decisionmaker for the Cornhusker women's basketball team. She had the authority to create and enforce rules and policies for governance of her team, and she did so.

10.

NU also had authority to create rules and policies for governance of Cornhusker teams. NU appointed ALBERTS as the Vice Chancellor and Director of Athletics in July 2021. In that role, ALBERTS had a duty and responsibility not just to win games and to promote the University

of Nebraska Department of Athletics, but also to establish and maintain an educational and athletic environment that is free of sexual harassment. ALBERTS was and is a policymaker and decisionmaker for the Department of Athletics. He had and has the authority to create and enforce rules and policies for governance of the Department of Athletics, its employees and the student-athletes of NU's athletic teams.

11.

Over the decade that they coached together as professional colleagues, WILLIAMS and LOVE became close friends. LOVE socialized with WILLIAMS and also socialized with WILLIAMS' husband.

12.

Although LOVE was married, LOVE pursued sexual relationships with students.

13.

Before August 2021, WILLIAMS knew or should have known of LOVE's pursuit of sexual relationships with students. The community of their coaching staff was tightknit, as was the community of coaching staff and student-athletes.

14.

Sexual relationships between professional coaches and student-athletes are always improper.

15.

Sexual relationships between professional coaches and student-athletes were known in 2021-22 to be always improper. Such relationships are not "equal." The inherent difference in power between the professional coach and the student-athlete makes conventional conceptions of "consent" inapplicable. A coach makes decisions about a student-athlete's playing time. The

coach can mentor or ignore, praise or humiliate, elevate or discard the student-athlete. The coach can exercise enormous influence, positively or negatively, over the student-athlete's goals and dreams. When the sexual relationship is secret, that dynamic increases the stress and pressure on the student-athlete even more. The student-athlete is vulnerable to shame, vulnerable to fear, and vulnerable to the plans of a predatory coach who assures the student-athlete that the student-athlete is "special" and worthy of this perilous relationship. These relationships are, furthermore, harmful to the team, as the coach can advance the interest of one student-athlete over others on the team, and any success for that student-athlete can be perceived as the result of sexual favors for the coach.

16.

WILLIAMS knew that sexual relationships between professional coaches and student-athletes harm student-athletes. She knew that sexual relationships (even if perceived as romantic) between coaches and student-athletes result from a coach's abuse of professional ethics, status and power. She knew that for a coach to foment a secret sexual relationship with a student-athlete is extraordinarily harmful to the student-athlete's emotional health and to the student-athlete's ability to meaningfully participate on the team and in academics and activities. And, she knew that student-athletes are vulnerable to the special attention of a coach.

17.

WILLIAMS maintained LOVE on her coaching staff. LOVE brought value to WILLIAMS' staff through his coaching and recruiting abilities. LOVE was also WILLIAMS' personal friend and WILLIAMS' husband's personal friend. WILLIAMS prioritized those facts over the risk that LOVE would harm the student-athletes on her team.

18.

WILLIAMS put no restrictions on LOVE's interactions with student-athletes. Nor did the NU Department of Athletics place restrictions on coaches' interactions with student-athletes that would prevent sexual predation.

19.

As the head coach of the Cornhusker women's basketball team, WILLIAMS enacted rules and policies for the governance of the team. But the rules and policies WILLIAMS enacted did not include rules and policies to establish and enforce boundaries as to sexual relationships between coaches and student-athletes. She did not provide training for either her coaching staff or her student-athletes to prevent sexual harassment/predation or to create an organizational climate in which student-athletes could feel free to say "no." She did not provide training or procedures for student-athletes to report sexual harassment/predation in a confidential setting and without fear of retaliation. She enacted no rules or policies that were reasonably designed to decrease the likelihood of sexual harassment/predation by employees of the student-athletes on her team.

20.

NU did not require WILLIAMS to enact rules and policies to protect student-athletes from coaches pursuing sexual relationships. Nor did the NU Department of Athletics itself establish rules and policies to establish and enforce boundaries as to sexual relationships between coaches and players, or to decrease the likelihood of sexual harassment/predation by employees of Cornhusker student-athletes.

21.

Appendix C of University of Nebraska-Lincoln Department of Intercollegiate Athletics Policy on Standards of Professional Performance for Athletic Staff and Rules of Procedure for

Disciplinary Action includes a definition of "Misconduct" that exposes an employee of the Department of Athletics to discipline. There is a broad and non-specific prohibition on unethical conduct; but the nineteen specific examples of "Misconduct" (such as gambling and not cooperating with the University's drug testing policy) do not demonstrate a clear expectation that employees must not have sexual relationships with student-athletes.

22.

In May 2021, WILLIAMS promoted LOVE to Associate Head Coach.

23.

LOVE had an expansive role on the coaching staff of the Cornhusker women's basketball team. During games, WILLIAMS collaborated with LOVE on substitutions, timeouts, what plays to run, and adjustments to make on the floor. LOVE also recruited new players, and he served as an academic coach for multiple student-athletes on the team.

24.

Between games, LOVE offered to coach individual workouts with student-athletes who wanted extra skill work, before or after official team practice. His focus included skill development with guards and posts.

25.

LOVE was perceived to have influence with WILLIAMS in terms of which student-athletes had playing time, which student-athletes were recognized as hard workers and team players, and the like.

## Ashley Scoggin

26.

LOVE recruited ASHLEY to transfer to the Cornhusker women's basketball team in 2020.

ASHLEY joined the team on an athletic scholarship as a redshirt sophomore guard with a special talent for three-point shooting. Her scholarship included tuition, access to trainers, access to a sports psychologist, medical care, a housing allowance, access to a nutritionist and the "training table" for meals, as well as other benefits.

27.

ASHLEY had a successful 2020-2021 season, and in 2021 was a finalist for the NCAA Division I Junior College Transfer of the Year. By February 2022, ASHLEY had had 51 consecutive starts for the Cornhuskers. Her career three-point percentage ranked seventh at that time in Nebraska Cornhusker women's basketball history.

28.

In the summer of 2021, ASHLEY secured an academic internship with the University of Nebraska Department of Athletics. ASHLEY was interested in becoming a coach when she finished her playing eligibility, and an internship at which she could learn about the coaching role and coaching leadership would be helpful in that goal.

29.

In the first week of ASHLEY's internship, she was given a table in a conference room for workspace. Toward the end of that week, LOVE approached ASHLEY and invited her to do her work at a small table in his office. ASHLEY accepted the invitation, and mostly worked in LOVE's office throughout the rest of her internship.

30.

Working in LOVE's office resulted in LOVE spending much more time around ASHLEY, one-on-one. He asked her about her long-distance romantic relationship, her dreams and aspirations to work as a coach, what kind of alcohol she liked and other personal matters. ASHLEY

enjoyed what, at the time, she felt as a burgeoning familiarity and friendship with someone who could mentor her as an athlete and a future coach.

### LOVE Grooms Ashley for a Secret Sexual Relationship

31.

LOVE began to ask ASHLEY to go out for drinks with him. He advised her that other players on the Cornhusker women's team had gone out for drinks with him, and now, he said, it was "your turn."

32.

LOVE also began messaging ASHLEY directly through SnapChat. This included contacting her late at night and asking her to meet him for drinks. Sometimes LOVE would tell her that he was out drinking with WILLIAMS' husband and he would invite ASHLEY to join them. ASHLEY did not accept the first several invitations to meet LOVE for drinks.

33.

When ASHLEY eventually did accept one of LOVE's SnapChat invitations, they met in the parking lot of a Costco, after midnight. LOVE told ASHLEY he had just left the bars. They sat in the car and talked. LOVE chided ASHLEY about not bringing alcohol and asking her, "if I leave for a different school, will you come with me?"

34.

A few days later, LOVE invited ASHLEY to meet him and WILLIAMS' husband for drinks; she declined. LOVE then asked ASHLEY to meet just him. They again met very late at night at the Costo parking lot. This time, ASHLEY brought alcohol as LOVE had suggested. LOVE kissed ASHLEY and asked her, "have you ever done anything with a coach before?"

35.

This interaction left ASHLEY feeling torn and trapped. LOVE had already offered and given her mentoring, individual practice sessions, academic coaching, and the implied promise of support of her career. It was now undeniable that LOVE wanted a sexual relationship.

36.

ASHLEY was also afraid that if she reported LOVE, WILLIAMS would retaliate against her. She was aware of LOVE and WILLIAMS' close relationship, and LOVE's importance to WILLIAMS on her coaching staff. In her time on the Cornhusker women's basketball team, ASHLEY had observed WILLIAMS to lose her temper unpredictably, to insert herself arbitrarily into seemingly minor personality conflicts amongst team members, and to otherwise demonstrate loose boundaries.

37.

ASHLEY did not feel that she could tell anyone that LOVE had kissed her or of his inappropriate comments to her. LOVE was sharing with ASHLEY information that would not ordinarily be shared with players, such as discussions and even disagreements he had with WILLIAMS over game strategy and personnel decisions. LOVE, acting in the course and scope of his employment and under color of state law, created the perception for ASHLEY that he could "make her or break her" in terms of her participation on the women's basketball team and her future.

## THE SEXUAL RELATIONSHIP BETWEEN PROFESSIONAL COACH AND STUDENT-ATHLETE

38.

The relationship turned sexual. When LOVE wanted to have sex, he expected ASHLEY

to be available and willing. Because LOVE was married and ASHLEY did not live alone, this involved sexual relations in different locations in University of Nebraska Department of Athletics facilities. It also included summoning ASHLEY to his hotel room when the team traveled to road games.

39.

ASHLEY was a keeper of this secret, making excuses when she would have to leave a room or a gathering because LOVE had summoned her to meet him for sex. LOVE expected her to become available whenever he texted or messaged her.

40.

ASHLEY believed, correctly, that others were aware of something inappropriate going on between her and LOVE. She did not know how to stop the situation. She continued to fear that WILLIAMS would blame ASHLEY for WILLIAMS' Associate Head Coach initiating this relationship. She feared that WILLIAMS would retaliate against her. She was also concerned that WILLIAMS' husband, who was a personal friend of LOVE, was posting suggestive emojis on ASHLEY's social media account.

41.

LOVE began to pressure ASHLEY to participate in a sexual "threesome" with him and an undisclosed second man. She refused. After she refused, ASHLEY felt like she was given less playing time during games.

**FEBRUARY 17, 2022: THE SEXUAL RELATIONSHIP IS CONFIRMED**

42.

The team traveled to State College, Pennsylvania to play Penn State on February 17, 2022.

43.

On the night before the game, members of the team and practice players created a ruse to successfully confirm and record on video ASHLEY's presence in LOVE's hotel room. This ruse included a practice player falsely representing himself as LOVE to a desk clerk in order to obtain LOVE's room key; it ended in two team members confronting ASHLEY in LOVE's room. They reported their findings and showed their video recording to WILLIAMS. LOVE instructed ASHLEY to deny anything improper, and he told her that he would talk to WILLIAMS.

**WILLIAMS PUNISHES ASHLEY FOR LOVE'S ABUSE OF POWER**

44.

Upon receiving this report, WILLIAMS took no measures to protect ASHLEY's confidentiality or to advise ASHLEY of her rights. She took no measures to meaningfully explore whether what had been reported to her was the result of an abuse of power, ethics and status by LOVE. She did not exercise leadership to address the emotionality of the situation, the confrontation that was reported to her, or the likelihood that her student-athlete was sexually exploited by her Associate Head Coach.

45.

The next day, WILLIAMS called a team meeting before the game. At the meeting (which lasted multiple hours), WILLIAMS invited the team members to interrogate both ASHLEY and LOVE. With WILLIAMS' encouragement, the team members assailed ASHLEY, screaming and crying and using profanity. Both ASHLEY and LOVE denied anything improper. The team members then accused ASHLEY of lying. ASHLEY felt panicked, trapped and profoundly ashamed. She could not, in that setting with LOVE inches away and watching her, admit the truth of what had been happening.

46.

WILLIAMS cast ASHLEY in the role of a seducer and a liar. She allowed the players to berate and accuse ASHLEY for hours. She did not redirect or counsel the players that what they had seen may be the result of an abuse of power by her Associate Head Coach.

47.

WILLIAMS told the group that she would allow the team to decide how to handle the situation. Following the emotionality of the team, WILLIAMS suspended ASHLEY from the team and suspended LOVE with pay.

48.

After the meeting but while they were still in Pennsylvania, one of ASHLEY's teammates told ASHLEY "if you ever say anything, [LOVE] loses his job."

49.

LOVE contacted ASHLEY and urged her to claim that she was mentally ill.

## NU AND ALBERTS RATIFY WILLIAMS' PUNISHMENT OF ASHLEY

50.

ASHLEY traveled back to Lincoln with the team, though without any offers of or actual support. The next day, a member of the administration of the Department of Athletics told ASHLEY that she could, if she wished, talk with a "resource lady" in the "Resource Department." ASHLEY was not informed of her rights under Title IX at that time. WILLIAMS met with ASHLEY that day, together with other members of the administration of the Department of Athletics, and confirmed to ASHLEY that she was removed from the team.

51.

Nebraska sports media soon learned that WILLIAMS had removed ASHLEY from the

team and had, at the same time, suspended LOVE with pay. WILLIAMS' decision was published in statewide and, eventually, national media. The humiliation and shaming for ASHLEY from the reporting of this non-coincidence of events has endured. At the same time, NU, WILLIAMS and ALBERTS were aware of the media attention and speculation that these events were precipitated by an improper sexual relationship. NU, WILLIAMS and ALBERTS were motivated to avoid scandal and embarrassment to the Cornhusker women's basketball program, instead of being motivated to protect its student-athlete, ASHLEY. NU, WILLIAMS and ALBERTS allowed the speculation and perception to fester that ASHLEY was "equally to blame" or otherwise had done something improper, when they should have sent a clear message that it is always improper for a professional coach to pursue a sexual relationship with a student-athlete.

52.

ASHLEY advised her parents of her removal from the team. She was still afraid and ashamed to disclose LOVE's relationship with her, but she advised her parents that her removal was based on suspicion of a sexual relationship with LOVE. Her parents traveled from Oregon to Lincoln to accompany ASHLEY to a scheduled meeting of ALBERTS, WILLIAMS, and two other administrators of the Department of Athletics.

53.

At that meeting, ALBERTS was unfamiliar with ASHLEY's history with the women's basketball team and her performance over the preceding two seasons. He endorsed WILLIAMS' claims that ASHLEY was removed for dishonesty.

54.

ALBERTS did not redirect or correct WILLIAMS. He did not advise ASHLEY that if the Associate Head Coach had pursued a sexual relationship with her, then that was an abuse of power

and ethics. ALBERTS never acknowledged that coaches must not pursue sexual relationships with student-athletes. There was no discussion of whether LOVE had done anything wrong such that ASHLEY ended up in LOVE's hotel room. Per ALBERTS and WILLIAMS, ASHLEY was a liar who deserved to be punished.

55.

ASHLEY's parents asked what rule ASHLEY had broken, to warrant her removal from the team. WILLIAMS answered that ASHLEY lied and that is why she was removed. WILLIAMS then began to cry.

56.

By that time, ASHLEY and LOVE still had not admitted that the suspicions of a sexual relationship were well-founded. ASHLEY was too frightened and ashamed. WILLIAMS was correct in assessing that ASHLEY was concealing the sexual relationship, but she chose to punish ASHLEY rather than acknowledge that this could not have happened if her Associate Head Coach had not abused his position on her coaching staff.

57.

ALBERTS was polite and courteous, but he did not exercise leadership over this situation. He told ASHLEY and her parents that WILLIAMS could decide who she wanted on her team.

58.

This was the equivalent of WILLIAMS giving ALBERTS a layup: by allowing WILLIAMS to punish ASHLEY for LOVE's abuse of power, ALBERTS was able to quiet the chatter and media coverage of LOVE's and ASHLEY's removal from the team, and to refocus attention on the team's performance, recruiting and other Department of Athletics matters.

## THE DAMAGE DONE

59.

ALBERTS and WILLIAMS maintained LOVE on paid suspension for the remainder of the semester.

60.

There was no discipline for the practice squad member who had dishonestly posed as LOVE to illicitly obtain a key to LOVE's room from the hotel desk clerk in State College, Pennsylvania. ALBERTS and the University of Nebraska did not investigate whether WILLIAMS knew that her players and a practice squad member were running a caper to confirm ASHLEY's presence in LOVE's hotel room, or why the players ran this caper rather than communicate with WILLIAMS about their concerns.

61.

ALBERTS did not order an investigation of the situation. Until Ashley brought a Title IX complaint on March 11, 2022, there was no formal investigation into the events in State College. Nor was there a formal investigation of what events led up to the players confronting ASHLEY in LOVE's hotel room. Nor was there a formal investigation of WILLIAMS' conduct after the players reported to her ASHLEY's presence in LOVE's hotel room.

62.

LOVE remained on the payroll of the University of Nebraska until May 13, 2022, when he resigned. After receipt of his resignation, the Title IX Coordinator advised ASHLEY that they had dismissed ASHLEY's Title IX complaint without completing the pending investigation. The Department of Athletics did not conduct its own investigation of how an Associate Head Coach was able to initiate a sexual relationship with a student-athlete, or of how WILLIAMS addressed

the situation on and after February 17, 2022.

63.

ASHLEY lost her housing, because she shared an apartment with a teammate. The University gave her options of either moving into an on-campus apartment with multiple roommates she didn't know, or else paying on her own for a more expensive single room.

64.

ASHLEY asked her professors to let her complete the semester online, because she was not comfortable attending class in person due to media coverage of her removal from the team and the prospect of encountering people associated with the team. Most professors agreed; one refused, until after ASHLEY had filed a Title IX complaint. This added to ASHLEY's extreme stress.

65.

ASHLEY also lost access to physical therapy/training assistance that she had been receiving as a member of the basketball team. When she began work on transferring to another program, she discovered that access to her game film had been disabled, and she had to ask that this access be restored so that other programs could review her game film.

66.

Meanwhile, sports media had extensively reported ASHLEY's removal from the team and the not-coincidental timing of LOVE's paid suspension. A reasonable coach at another program would question whether to recruit ASHLEY to their team in light of this coverage.

67.

While NU persuaded the last professor to allow ASHLEY to complete her semester online and eventually restored her access to her game film, it did not correct her removal from the Cornhusker women's basketball team, nor did it correct her punishment for concealing the sexual

relationship that grew from LOVE's abuse of his authority. This damage is done.

68.

The University of Nebraska continued to identify LOVE as Associate Head Coach of the women's basketball team on the website of the Department of Athletics for nearly a year thereafter. ASHLEY transferred from Nebraska.

**FIRST CAUSE OF ACTION**

**42 U.S.C. § 1983 - WILLIAMS AND ALBERTS**

69.

WILLIAMS and ALBERTS are charged with the responsibility and duty properly hire, train and oversee coaches in the Department of Athletics, including LOVE. This duty includes promulgation and enforcement of rules, policies and training prohibiting sexual relationships with student-athletes. It especially includes responding immediately to notice that a professional coach is pursuing or engaging in a sexual relationship with students.

70.

WILLIAMS' and ALBERTS' duty includes a duty to train her professional coaching staff in the proper, improper and abusive use of the coach's position of authority. It includes a duty to train NU's professional coaching staff to maintain appropriate boundaries with student-athletes, and that a sexual relationship with a student-athlete is always improper. It includes a duty to train the professional coaching staff on the importance of reporting potential boundary violations against student-athletes. It includes a duty to train student-athletes as well on how to report and seek help if a coach is violating professional boundaries and pursuing a sexual relationship.

71.

WILLIAMS and ALBERTS failed to promulgate adequate training, rules and regulations

prohibiting coaches from sexual relationships with student-athletes, and further failed to instruct and train LOVE that sexual relationships with student-athletes are always improper, are always an abuse of power and will not be tolerated.

72.

WILLIAMS and ALBERTS established through tacit authorization or explicit instruction a policy or custom of allowing coaches to violate appropriate professional boundaries with student-athletes. That policy was enacted and enforced with deliberate indifference in the constitutional rights of persons effected thereby.

73.

WILLIAMS' and ALBERTS' custom of failing to properly train and control Department of Athletics coaches, including LOVE, and its failure to ensure that coaching staff does not groom or pursue student-athletes for sexual relationships, amounts to deliberate indifference to the rights of student-athletes, including the rights of ASHLEY herein.

74.

WILLIAMS' and ALBERTS' custom and policy of allowing coaches to abuse their authority to groom student-athletes for sexual relationships, and their failure to properly train and enforce policies for coaches and student-athletes on this point was so reckless that misconduct involving sexual misconduct by coaches was inevitable as of September 2021.

75.

When she received notice that LOVE was pursuing sexual relationships with student-athletes, WILLIAMS failed to dismiss LOVE from her coaching staff or to recommend to the Director of Athletics that LOVE be dismissed. Furthermore, once WILLIAMS and then ALBERTS received notice of LOVE's specific predation on ASHLEY, they failed to take sufficient

remedial action. WILLIAMS' and ALBERTS' affirmative acts and failures were the moving force for and/or a direct causal link to and/or proximately caused the pattern of sexual harassment suffered by ASHLEY, and were so extreme and egregious as to shock the conscience.

76.

By pursuing a secret sexual relationship with a student-athlete, LOVE deprived ASHLEY, while acting under color of law of the rights, of the privileges and immunities secured by the Constitution and laws of the United States, including the right to be free from intrusions to her bodily integrity. LOVE's actions were so extreme and egregious as to shock the conscience.

77.

WILLIAMS, ALBERTS and LOVE intentionally, willfully and without justification deprived ASHLEY of her rights, privileges and immunities secured to her by the Constitution and the laws of the United States, including but not limited to, her rights to due process and to be free from sexual abuse as provided by the Fourteenth Amendment of the Constitution and her right to privacy and to be free from violations of bodily integrity as protected by the Fourth, Fifth, Ninth and Fourteenth Amendments of the Constitution, in violation of 42 U.S.C. § 1983.

78.

As a direct and proximate result of such deprivation, ASHLEY suffered invasion of her bodily integrity and physical injury, and suffered and continues to suffer indignity, humiliation, severe emotional distress and mental anguish.

**SECOND CAUSE OF ACTION**

**42 U.S.C. § 1983 - WILLIAMS AND ALBERTS**

79.

ASHLEY's right to Equal Protection of the Laws guaranteed by the Fourteenth

Amendment to the United States Constitution was clearly established at all relevant times to this Complaint.

80.

WILLIAMS and ALBERTS had a duty, themselves and through their agents, to treat ASHLEY and other female student-athletes equally and to provide ASHLEY with an equal access to education and educational benefits of the University of Nebraska.

81.

WILLIAMS and ALBERTS had the authority and responsibility to ensure that ASHLEY and other student-athletes were protected from gender based sexual harassment and abusive sexual relationships by employees of the NU Department of Athletics. This included the responsibility to enact, train and enforce policies and procedures prohibiting professional coaches from pursuing sexual relationships with student-athletes, including reporting procedures.

82.

Prior to LOVE grooming and initiating a sexual relationship with ASHLEY and the confirmation of that relationship, WILLIAMS knew and/or reasonably should have known that LOVE engaged in inappropriate and/or sexual conduct with one or more student-athletes and that such conduct and/or the propensity for such conduct subjected student-athletes like ASHLEY to disparate treatment and interfered with their established constitutional rights to an equal education. Yet, WILLIAMS failed to take proper action.

83.

Even after the relationship was brought to their attention, WILLIAMS and ALBERTS limited the consequences to LOVE to paid suspension and allowing LOVE to voluntarily resign, while kicking ASHLEY off the team immediately.

84.

WILLIAMS and ALBERTS recklessly placed ASHLEY, an identifiable victim as a member of the Cornhusker women's basketball team coached by LOVE, in a position of danger by their failures.

## THIRD CAUSE OF ACTION

### VIOLATION OF TITLE IX – 20 U.S.C. § 1681 *et seq.*

85.

NU's failure to protect ASHLEY as described above was so severe, pervasive, and objectively offensive that it deprived ASHLEY of access to educational opportunities and/or benefits provided by the school.

86.

NU created and/or subjected ASHLEY to a hostile educational environment in violation of Title IX, because:

a. ASHLEY was a member of a protected class;

b. ASHLEY was subjected to sexual harassment by an employee, LOVE;

c. NU failed to implement policies that would have prevented and appropriately remedied the sexual harassment by its employee, LOVE; and

d. NU affirmatively punished ASHLEY for the sexual harassment of its employee and her coach, LOVE.

87.

NU and its officials also had knowledge that sexual relationships between coaches and student-athletes are always improper and harmful to the student-athlete. By no later than February 17, 2022, NU and its officials had actual knowledge of LOVE's pursuit of a sexual relationship with ASHLEY. NU also had knowledge of the resulting harm when it allowed WILLIAMS to punish

ASHLEY for LOVE's abuse of power.

88.

NU's failure to enact and enforce policies prohibiting and preventing coaches from sexually pursuing student-athletes, and to appropriately correct WILLIAMS' actions resulted in ASHLEY, on the basis of her sex, being excluded from participation in, being denied benefits of, and being subjected to discrimination in NU's education program in violation of Title IX.

89.

NU failed to take immediate, effective remedial steps to resolve the complaint of sexual harassment. Instead it acted with deliberate indifference toward ASHLEY. It ratified WILLIAMS' behavior in Pennsylvania and WILLIAMS' decision to punish ASHLEY instead of demonstrating that sexual relationships between professional coaches and student-athletes are an abuse of power.

90.

NU persisted in its actions and inaction, even though it knew that ASHLEY was suffering.

91.

NU engaged in a policy, pattern and practice of behavior designed to discourage student-athletes who have been groomed into sexual relationships by coaches from seeking help, and from pursuing completion of their degrees at NU and involvement in on-campus activity after being groomed into sexual relationships by their coaches.

92.

This policy, pattern and practice constituted disparate treatment of female student-athletes, and had a disparate impact on women.

93.

ASHLEY has suffered and will continue to suffer damage. She has lost educational benefits

and other benefits of being a starter on the Cornhusker women's basketball team, as a direct and proximate result of NU's deliberate indifference to her rights under Title IX.

**FOURTH CAUSE OF ACTION**

**42 U.S.C. § 1983 - ALBERTS**

94.

ALBERTS ratified WILLIAMS' decision to remove ASHLEY from the team, punishing her for LOVE's predation. He did not order an investigation into LOVE's predation. He did not order an investigation into whether WILLIAMS was aware that LOVE presented a risk of sexual predation to student-athletes. He did not order training for employees on the subject of sexual relationships between professional coaches and student-athletes, nor did he clarify Department of Athletics policy to say in clear terms that professional coaches must not pursue sexual relationships with student-athletes. He instead encouraged ASHLEY to leave NU, sending the message that the problem was ASHLEY. He allowed LOVE to resign voluntarily.

95.

ALBERTS still has made no substantive changes to protect student-athletes from sexually predatory coaches. He has ratified the violation of ASHLEY's rights. The ratification of WILLIAMS' wishes demonstrates where student-athletes stand if a professional coach sexually preys on them.

**FIFTH CAUSE OF ACTION**

**42 U.S.C. § 1983 – ALL DEFENDANTS**

96.

In February 2022, ASHLEY had a protected interest in her status as a member of the Cornhusker women's basketball team. As a member of the team, ASHLEY received a tuition

scholarship, housing assistance, academic support services, access to weight training, access to life skills training, access to the training table, access to sports medicine facilities, eligibility for Name, Image & Likeness income, access to professional coaching and mentoring for her development as a basketball player, and other benefits that have historically helped student-athletes succeed in life after their college careers end.

97.

In February 2022, the University of Nebraska Department of Athletics Student-Athlete Conduct Policy ("Conduct Policy") was in full force and effect.

98.

The purposes of the Conduct Policy include, *inter alia*:

> To treat student-athletes fairly and provide procedures that will develop the facts to the point that actions taken under this policy are based on sufficiently credible information.
>
> To assure confidence in the integrity of the process by minimizing the potential for conflict of interest on the part of administrators, coaches and student-athletes.

99.

The Conduct Policy applies "when a student-athlete has been alleged to have committed, charged with, or arrested for serious nonacademic misconduct," to include "[c]onduct that undermines or puts at risk the integrity and reputation of the University" and "[r]epeated acts of misconduct, different than the aforementioned examples of misconduct, that raise the concerns addressed by this policy."

100.

The Conduct Policy provides that "the Director of Athletics, shall, in good faith and using reasonable judgment, decide whether the policy applies," and that "the Director of Athletics is

responsible for determining the Athletics Department's review and discipline of student-athletes for misconduct."

101.

The Conduct Policy explains that "the integrity of the Director of Athletics is such that the public, student-athletes, and all those concerned about these decisions should have trust that he or she will always try to do what is right."

102.

The Conduct Policy further explains that "[t]he increased public attention that tends to focus on allegations of misconduct by student-athletes requires a process that will be fair to the student-athlete and responsive to legitimate public concerns. … [The Conduct Policy] also emphasizes the importance of treating student-athletes fairly; a purpose which is best advanced when there are appropriate procedures to develop the facts that are the basis for disciplinary action."

103.

If the Conduct Policy applies, the Department of Athletics may, but need not, suspend the student-athlete pending factual inquiry, although the student-athlete's name will remain on the squad list during the factual inquiry.

104.

The Conduct Policy specifically provides that the head coach for the student-athlete does not make the suspension decision.

105.

If the Conduct Policy applies, it provides a procedure for a fair and neutral factual inquiry to determine whether the allegations of misconduct are true and, if so, what discipline, if any, is

appropriate.

106.

The Conduct Policy does not provide for fact-finding by the head coach or teammates.

107.

The Conduct Policy provides that at the direction of the Director of Athletics, the Executive Associate Athletics Director for Compliance or his designee shall promptly manage and inquire into the facts.

108.

The Conduct Policy does not provide for the head coach determining whether the allegations of misconduct are founded, unfounded, inconclusive, etcetera.

109.

The Conduct Policy provides that when the factual inquiry has been completed, the information will be provided to the Director of Athletics and her or she shall decide whether the allegations of misconduct are supported by the greater weight of the evidence to support disciplinary action under the Conduct Policy.

110.

The Conduct Policy clarifies that the Director of Athletics shall make the decision about discipline and disposition. The Conduct Policy provides for a range of dispositional measures (from "apology" to "reprimand" to "dismissal from the athletic program").

112.

The Conduct Policy provides that "the Student-Athlete Has the Right to Appeal the Discipline and Disposition," to include the right to retain counsel for the appeal.

113.

As the Conduct Policy further explains, "[t]he head coaches, mainly based on conflict of interest grounds, shall not be involved in the inquiry or decision making involving their teams relative to these matters and this policy."

114.

Per the Conduct Policy, after the disposition and any appeal, should the student-athlete make the Director of Athletics aware of new information not considered in the original decision, they may, at their discretion, re-open the process, investigate the new information and may issue a revised decision, which shall be subject to appeal in the same manner as the original decision.

115.

BRUN approved the Conduct Policy.

116.

The Department of Athletics did not publish the Conduct Policy in its University of Nebraska Student-Athlete Handbook.

117.

In a section entitled "Conduct," the University of Nebraska Student-Athlete Handbook provides a link to the student code of conduct and disciplinary procedures applicable to all University of Nebraska students, but not a link to the Conduct Policy. The "Conduct" section only states that "the Athletic Department has developed an internal code of conduct to which student-athletes must adhere. These policies and procedures will be reviewed with and provided to student-athletes annually."

118.

WILLIAMS did not publish the Conduct Policy in the University of Nebraska Women's Basketball Team Handbook, which she created.

119.

Nor did WILLIAMS reference the Conduct Policy anywhere within the University of Nebraska Women's Basketball Team Handbook.

120.

Nor did WILLIAMS review the Conduct Policy with her team, including ASHLEY, at any time before February 22, 2022.

121.

Nor did ALBERTS review the Conduct Policy with student-athletes at any time between his arrival at the University of Nebraska Department of Athletics and February 22, 2022.

122.

During the events described *infra* at ¶¶ 45 – 47, WILLIAMS did not give ALBERTS an opportunity to determine whether the Conduct applied.

123.

During the events described *infra* at ¶¶ 45 – 47, WILLIAMS did not advise ASHLEY of the provisions of the Conduct Policy, or of the procedural rights described within the Conduct Policy.

124.

WILLIAMS suspended ASHLEY from the team without following the procedures of the Conduct Policy.

125.

LOVE, for his part, also took no steps to advise ASHLEY of the provisions of the Conduct Policy.

126.

WILLIAMS knowingly and recklessly proceeded with the events of described *infra* at ¶¶ 45 – 47 despite her knowledge of the Conduct Policy.

127.

Alternatively, instead of training WILLIAMS and LOVE on the existence and operation of the Conduct Policy at any time between their arrival in 2016 and February 2022 and enforcing the Conduct Policy with consistency, the Department of Athletics, with BRUN's approval, practiced a custom and unwritten policy of not following or enforcing the Conduct Policy, and/or following and enforcing it inconsistently and arbitrarily, to the detriment of student-athletes like ASHLEY.

128.

When ALBERTS learned of the events described *infra* at ¶¶ 42 – 47, ALBERTS took no steps to follow the Conduct Policy in correction of WILLIAMS' actions.

129.

During the events described *infra* at ¶¶ 50 – 58, ALBERTS took no steps to follow the Conduct Policy.

130.

During the events described *infra* at ¶¶ 50 – 58, ALBERTS took no steps to advise ASHLEY of the provisions of the Conduct Policy, or of the procedural rights described within the Conduct Policy.

131.

ALBERTS knowingly and recklessly proceeded with the events of described *infra* at ¶¶ 45 – 47 despite his knowledge of the Conduct Policy.

132.

Alternatively, instead of training ALBERTS on the existence and operation of the Conduct Policy at any time between when he became Director of Athletics at the University of Nebraska-Omaha and February 2022 and enforcing the Conduct Policy with consistency, BRUN practiced a custom and unwritten policy of allowing the Department and Director of Athletics to either not follow or enforce the Conduct Policy, and/or to follow and enforc it inconsistently and arbitrarily, to the detriment of student-athletes like ASHLEY.

133.

BRUN did not direct ALBERTS or WILLIAMS to advise ASHLEY of the provisions of the Conduct Policy; BRUN did not direct ALBERTS to follow the provisions of the Conduct Policy.

134.

Defendants, and each of them, violated ASHLEY's right to procedural due process, to her damage.

135.

There is no precedent in the Department of Athletics for removing a player from a team for the alleged offense of violating curfew; nor does the Student Athlete Handbook provide student-athletes notice that the alleged offense of violating curfew is punishable by removal from the team.

136.

While WILLIAMS has written "travel rules" for the University of Nebraska Women's Basketball Team Handbook since the events alleged herein, there were no such rules published for members of the Cornhusker women's basketball team as of February 2022. Any such rules were, at best, communicated orally and inconsistently.

137.

To the extent that the true reason WILLIAMS removed ASHLEY from the team really was ASHLEY's alleged violation of curfew, and was not a reason borne from WILLIAMS' conflict of interest, there is no precedent in WILLIAMS' coaching career for removing a player from the team for curfew violations.

138.

To the extent that the true reason WILLIAMS removed ASHLEY from the team really was that ASHLEY "lied," and was not a reason borne from WILLIAMS' conflict of interest, that reason would be pretextual, and would willfully and recklessly ignore the circumstances of the "lies," ***i.e.***, that ASHLEY was afraid and ashamed to disclose LOVE's relationship with her.

139.

Had WILLIAMS followed the Conduct Policy instead of allowing the events described *infra* at ¶¶ 42 – 47 to transpire as they did, that would have prevented the lasting impact to ASHLEY of being interrogated, shamed and humiliated by her teammates for two to three hours with no advocate and no advisement of her rights, in the acute wake of the revelation that LOVE had initiated a sexual relationship with her, with WILLIAMS watching and participating and in the presence of the remaining coaching staff, a practice player and LOVE present.

140.

Had Defendants followed the Conduct Policy instead of allowing the events described *infra* at ¶¶ 42 – 58 to transpire as they did, ASHLEY would not have been removed from the Cornhusker women's basketball team.

## PUNITIVE DAMAGES

141.

In addition to compensatory damages, ASHLEY makes a claim for punitive damages against defendants available for the First, Second and Fourth Causes of Action in an amount to be proven at trial for the willful and wanton acts and omissions of Defendants, to include violation of her civil rights as alleged herein. The acts and omissions of Defendants in this case were so gross and culpable in nature that they constitute reckless indifference and wanton disregard for the law and for the safety of NU students, including ASHLEY. Defendants committed the acts and omissions alleged herein and subjected ASHLEY to improper treatment that caused ASHLEY to suffer harm so serious that no person should be expected to endure it. Defendants' actions should be punished, and an example should be made so that these actions and omissions are not repeated.

142.

This instance of reckless and callous indifference to ASHLEY'S safety and constitutional rights should be punished through the imposition of punitive damages so as to make an example of conduct that will not be tolerated.

## ATTORNEY'S FEES

143.

As a result of defendants' actions as alleged herein, ASHLEY has been required to retain the services of attorneys and are entitled to a reasonable amount for attorney's fee pursuant to 42 U.S.C. § 1988 for those violations covered by the Civil Rights Act.

## DAMAGES

144.

The acts and omissions of Defendants as set forth above have resulted in serious damage to

ASHLEY. ASHLEY thus seeks recovery for the following damages:

a. Compensatory damages in an amount to be proven at trial, for ASHLEY's physical and mental pain and suffering, past and future, the loss of her place on the Cornhusker women's basketball team, inconvenience, and expense, past and future;

b. Compensatory damages for the violation of ASHLEY's rights under the federal and state Constitutions;

c. Punitive damages relative to the First, Second and Fourth Causes of Action to punish and deter the reprehensible conduct alleged in this Complaint;

d. Attorney's fees; and

e. The costs of this action and such other and further relief as this Court deems equitable and proper.

**WHEREFORE,** Plaintiff prays for judgment against the defendants as follows:

A. Plaintiff prays for damages in an amount which will fairly and justly compensate for the violation of ASHLEY's civil rights, her pain and suffering and other consequential damages flowing from the violations and torts set forth herein;

B. Punitive damages in the First, Second, Fourth and Fifth Causes of Action in an amount sufficient to adequately punish defendants and to deter future conduct of the type alleged in this Complaint;

C. For attorney's fees pursuant to 42 U.S.C. § 1988; and

D. For the costs of this action and for such other and further relief as this Court deems equitable and proper.

ASHLEY SCOGGIN, Plaintiff,

By: */s/ Maren L. Chaloupka*

Maren Lynn Chaloupka, #20864
Chaloupka Law, LLC
1906 Broadway
P.O. Box 1724
Scottsbluff, NE 69363-1724
(308) 270-5091
mlc@chaloupkalaw.net

-AND-

Nathan J. Bruner – NSBA # 23629
Bruner Frank Schumacher
5804 1st Avenue
P.O. Box 2230
Kearney, NE 68847
(308) 455-1046
nbruner@nebraskalawfirm.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing instrument has been sent via CM/ECF on this 2nd day of January 2026, to the following:

Denise E. Frost
Johnson & Mock, PC LLO
9900 Nicholas Street, #225
Omaha, NE 68114
dfrost@johnsonandmock.com

Bren H. Chambers
Deputy General Counsel
University of Nebraska
3835 Holdrege Street
Lincoln, NE 68583-0745
bchambers@nebraska.edu

Susan K. Sapp
Lily Amare
Cline Williams Wright Johnson & Oldfather, L.L.P.
1900 U.S. Bank Building
233 South13th Street
Lincoln, NE 68508
ssapp@clinewilliams.com
lamare@clinewilliams.com

*/s/ Maren Lynn Chaloupka*