IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ASHLEY SCOGGIN, | ) | Case No. 4:24-CV-3039 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOARD OF REGENTS OF THE | ) | |
| UNIVERSITY OF NEBRASKA, and | ) | |
| Individuals AMY WILLIAMS, TREV | ) | |
| ALBERTS, and CHUCK LOVE, JR., In | ) | |
| their individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

---

**BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT**

---

Submitted by:

Susan K. Sapp, #19121
Lily Amare, #25735
CLINE WILLIAMS WRIGHT JOHNSON
    & OLDFATHER, L.L.P.
1900 U.S. Bank Building
233 South 13th Street
Lincoln, Nebraska 68508
Telephone: (402) 474-6900
Fax: (402) 474-5393
ssapp@clinewilliams.com
lamare@clinewilliams.com

AND

Bren H. Chambers, #23150
Vice President and General Counsel
University of Nebraska
3835 Holdrege Street
Lincoln, NE 68583-0745
(402) 472-1201
bchambers@nebraska.edu

Dated the 23rd day of January, 2026.

The Board of Regents of the University of Nebraska ("BRUN"); Amy Williams ("Williams"), in her individual capacity; and Trev Alberts ("Alberts"), in his individual capacity (collectively referred to as "Defendants"), respectfully submit this Brief in opposition to Plaintiff's Motion for Leave to Amend Complaint [Doc. No. 92].

## I.     __INTRODUCTION__

Plaintiff's proposed Fifth Cause of Action does not identify a new constitutional deprivation or meaningfully alter the issues before the Court. Instead, it reasserts an already-pleaded § 1983 due process theory by embedding extensive quotations from a Student-Athlete Code of Conduct Policy ("Conduct Policy") and recasting alleged departures from that policy as constitutional violations. [Doc. No. 92; Declaration of Keith Zimmer ¶¶ 2-4, Exhibit A, University of Nebraska Department of Athletics Student-Athlete Conduct Policy, 2021-22 ("Ex. A").] The Federal Rules of Civil Procedure do not permit amendment for that purpose. Where, as here, the operative complaint already asserts a procedural due process claim, and the proposed amendment neither alleges a new protected interest nor a distinct deprivation, leave to amend should be denied.

The proposed amendment is defective for multiple reasons. First, it pleads discovery—not a new constitutional claim—by attempting to constitutionalize internal procedures that do not create protected interests under § 1983.

Second, the proposed claim is futile as a matter of law for various reasons. BRUN is entitled to sovereign immunity and is not a "person" subject to suit under § 1983. The Conduct Policy is expressly discretionary and, under controlling Eighth Circuit precedent, cannot give rise to a protected liberty or property interest. The Conduct Policy expressly provides:

> All student-athletes are subject to the general University codes of conduct and disciplinary rules applicable to all other students. All student-athletes are also subject to team rules developed by the head coach of each sport and approved by the Director of Athletics. **The head coach of each sport has the authority to discipline, suspend and/or dismiss any student-athlete on his/her team in consultation with the head coach's sport administrator for violation of team rules separate and apart from proceeding under this Student-Athlete Conduct Policy.**

[Ex. A, p. 1 (emphasis added).]

Plaintiff also fails to allege any deprivation of a University-conferred benefit. [Doc. No. 1, *passim*.] In fact, the record affirmatively establishes that her scholarship, academic support, housing options, medical services, and institutional resources remained intact. [Declaration of Lily Amare ("Dec. of Amare"), ¶ 6, Exhibit D, Dep. of Ashley Scoggin ("Ex. D, Dep. of Plaintiff") at 32:23–33:16, 216:17–20, 224:2–6.] Removal from participation, standing alone, in intercollegiate athletics does not implicate procedural due process.

The amendment is further futile because the Conduct Policy was never triggered. Plaintiff does not allege conduct falling within the Conduct Policy's enumerated categories, and Defendants did not invoke or purport to apply this Conduct Policy. [Doc. No. 1; Doc. No. 18; Doc. No. 19; Dec. of Amare, ¶ 4, Exhibit B, Dep. of Amy Williams ("Ex. B, Dep. of Williams") at 12:13–14:23, 383:1–5; Dec. of Amare, ¶ 5, Exhibit C, Dep. of Keith Zimmer ("Ex. C, Dep. of Zimmer") at 158:7–15; Doc. No. 92, ¶¶ 135–38.] Finally, even if a protected interest could be hypothesized, the individual Defendants are entitled to qualified immunity because no clearly established law would have placed reasonable officials on notice that their conduct violated the Constitution. The proposed claim against Love independently fails because he was not a decision-maker, exercised no disciplinary authority, and is alleged to have been immediately suspended himself. [Doc. No. 1, ¶¶ 47, 51.]

In short, the proposed Fifth Cause of Action is duplicative, legally deficient, and futile. Allowing amendment would improperly expand the proceedings without adding a cognizable constitutional claim. The motion for leave to amend should therefore be denied.

## II.    FACTUAL BACKGROUND

Plaintiff was a student-athlete on the University of Nebraska–Lincoln ("University") Women's Basketball Team during the 2020–2021 and 2021–2022 academic years. [Doc. No. 1, ¶¶ 26, 27.] She participated pursuant to an athletic scholarship memorialized in a National Letter of Intent that provided tuition, fees, room, board, books, and other expenses up to the NCAA cost of attendance for 2020-21 and 2021-22. [Ex. D, Dep. of Plaintiff at 32:23–33:16.] The University paid Plaintiff's tuition, fees, room, board, and books both before and after her removal from the Women's Basketball Team, and Plaintiff does not allege otherwise. [Doc. No. 1, ¶ 26; Ex. D, Dep. of Plaintiff at 33:5–9, 216:17–20, 224:2–6.]

In February 2022, Plaintiff was removed from participation in the Women's Basketball Team. [Doc. No. 1, ¶¶ 50–53, 55, 94; Doc. No. 92, ¶¶ 135, 137, 138, 140; Ex. D, Dep. of Plaintiff at 216:17–20, 224:2–6.] There is no allegation that she was expelled or suspended from the University or removed from academic programs. [Doc. No. 1; Doc. No. 92.] Plaintiff's scholarship and all associated educational and institutional benefits remained intact after her removal from the team. [Ex. D, Dep. of Plaintiff at 216:17–20, 224:2–6.] Plaintiff testified under oath that she was expressly told the University would continue to support her scholarship through graduation, along with academic, medical, and life skills services, and that she understood that commitment at the time her removal was communicated to her. [Ex. D, Dep. of Plaintiff at 216:17–20, 224:2–6, 236:17-237:25.]

4

Plaintiff further acknowledged that she retained access to student-athlete support services, including athletic medicine, the training room, academic support, life skills programming, and related athletic department resources. [*Id.* at 237:17–25.] With respect to housing, Plaintiff testified that the University offered multiple University-funded options, including student housing with roommates and a University-paid hotel. [*Id.* at 237:10–16.] Plaintiff declined those options based on personal comfort and safety concerns, not because housing assistance or any other benefit was withdrawn. [*Id.*]

The decision to remove Plaintiff from active participation was made by Williams, pursuant to team rules. [Ex. B, Dep. of Williams, at 12:13–14:23, 383:1–5.] Both Williams and Keith Zimmer (Sports Administrator) testified that the decision was because of violations of team rules and a breakdown of trust within the team—not allegations of serious nonacademic misconduct as set forth in the Conduct Policy. [*Id.*; Ex. C, Dep. of Zimmer at 158:7–15; Doc. No. 92, ¶¶ 135–38.] They further confirmed that participation on the team is a privilege conditioned on compliance with team rules. [Ex. C, Dep. of Zimmer at 154:24–155:10.]

The Conduct Policy was not invoked, applied, or relied upon in connection with Plaintiff's removal from the team. [Doc. No. 1; Doc. No. 18; Doc. No. 19; Ex. B, Dep. of Williams at 12:13–14:23, 383:1–5; Ex. C, Dep. of Zimmer at 158:7–15; Doc. No. 92, ¶¶ 135–38.] The policy applies only to allegations of serious nonacademic misconduct and vests threshold applicability entirely in the discretion of the Director of Athletics. [Ex. A, pp. 2, 3.] Plaintiff does not allege that she engaged in conduct falling within the policy's enumerated categories, and Defendants have never asserted that the policy governed their actions. [Doc. No. 1, Doc. No. 18, Doc. No. 19.]

It is true that the Conduct Policy itself was not provided to Plaintiff's counsel until later in this litigation. The policy was produced during discovery in December 2025 after

Defendants' counsel discovered this policy, and it was disclosed promptly upon receipt. [Dec. of Amare, ¶ 3.] That timing does not alter the legal posture of this case. The Conduct Policy did not apply to Plaintiff, did not govern the challenged decision, and did not confer any entitlement to continued athletic participation or to any particular disciplinary process. [Doc. No. 1; Doc. No. 18; Doc. No. 19; Ex. B, Dep. of Williams at 12:13–14:23, 371:9-375:1, 383:1–5; Ex. C, Dep. of Zimmer at 158:7–15; Doc. No. 92, ¶¶ 135–38.] Its later production does not create a protected interest, supply a deprivation, or undermine Defendants' futility or qualified-immunity defenses.

At all times relevant, Plaintiff retained her scholarship, tuition, academic standing, medical access, and institutional support. [Ex. D, Dep. of Plaintiff at 216:17–20, 224:2–6 237:10–25.] The only change was her removal from active participation on the basketball team. [Doc. No. 1, ¶¶ 50–53, 55, 58, 64, 66, 67, 94; Doc. No. 92, ¶¶ 135, 137, 138, 140; Ex. D, Dep. of Plaintiff at 215:9–216:20, 249:3-14.] Plaintiff does not identify any Nebraska state-law authority recognizing a constitutional right to participate in intercollegiate athletics, nor any relevant case—state or federal—holding that NIL opportunities constitute a protected property interest.

These undisputed facts frame the proposed amendment and confirm that the Fifth Cause of Action does not allege a new constitutional deprivation, does not cure any pleading deficiency, and cannot survive dismissal as a matter of law.

### III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 15(a) states, "[t]he court should freely give leave [to amend a complaint] when justice so requires." FED. R. CIV. P. 15(a)(2). However, in this circumstance, Rule 16(b)'s good-cause standard governs, rather than Rule 15(a)'s liberal amendment standard, because Plaintiff seeks to amend the pleading after the deadline established by the Court's scheduling order. *See Sherman v. Winco Fireworks,*

6

*Inc.*, 532 F.3d 709, 716 (8th Cir. 2008) ("Rule 16(b)'s good-cause standard governs when a party seeks leave to amend a pleading outside of the time period established by a scheduling order, not the more liberal standard of Rule 15(a).") (citing *Popoalii v. Corr. Med. Servs.,* 512 F.3d 488, 497 (8th Cir. 2008)). "To permit district courts to consider motions to amend pleadings under Rule 15(a) without regard to Rule 16(b) 'would render scheduling orders meaningless and effectively ... read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure.'" *Id.* (quoting *Sosa v. Airprint Sys., Inc.,* 133 F.3d 1417, 1419 (11th Cir. 1998)).

Moreover, even if Rule 15(a) applied, "[t]he policy favoring liberal allowance of amendment does not mean that the right to amend is absolute." *Kozlov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 394 (8th Cir. 2016). "A district court may deny leave to amend 'if there are compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment.'" *Reuter v. Jax Ltd., Inc.*, 711 F.3d 918, 922 (8th Cir. 2013) (quoting *Sherman,* 532 F.3d at 715).

Futility is an independent basis for denying a plaintiff's motion for leave to amend. *In re K–tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 899 (8th Cir. 2002). The amendment may be denied on the basis that the proposed amendment would not survive a motion to dismiss. *In re Acceptance Ins. Cos., Inc., Sec. Litig.*, 352 F.Supp.2d 928, 935 (D. Neb. 2003). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligations to provide the grounds

of his entitlement to relief requires more than labels and conclusions") (internal citations and quotation marks omitted). However, when applying the Rule 12(b)(6) standard in a futility analysis, "courts generally do not weigh the substance of the proposed amendment to the same extent as would be appropriate under Rule 12(b)(6)." *Williams v. BNSF Ry. Co.*, No. 4:20-CV-04070, 2021 WL 6061799, at \*2 (W.D. Ark. Feb. 2, 2021) (citing *Cmty. Voice Line, LLC v. Great Lakes Commc'n Corp.*, 295 F.R.D. 313, 321 (N.D. Iowa 2013), *aff'd sub nom. Cmty. Voice Line, L.L.C. v. Great Lakes Commc'n Corp.*, No. C 12-4048-MWB, 2014 WL 272646 (N.D. Iowa Jan. 23, 2014); *Schlief v. Nu-Source, Inc.*, No. CV 10-4477 (DWF/SRN), 2011 WL 13140709, at \*1 (D. Minn. Aug. 22, 2011)).

When considering a motion to dismiss, the Court must ordinarily confine its analysis to the four corners of the complaint and ignore all materials outside the pleadings. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). However, the Court may consider "some materials that are part of the public record or do not contradict the complaint . . . as well as materials that are necessarily embraced by the pleadings." *Id.* "Documents necessarily embraced by the pleadings include those whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Smith v. Cent. Platte Nat. Res. Dist.*, No. 4:14-CV-3230, 2017 WL 6813133, at \*2, n.1 (D. Neb. Oct. 26, 2017), *aff'd,* 735 F. App'x 227 (8th Cir. 2018).

Furthermore, the amendment should be denied on its merits if the asserted claims are clearly frivolous. *Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690, 695 (8th Cir. 1981); *see also Popp Telcom v. Am. Sharecom, Inc.*, 210 F.3d 928, 944 (8th Cir. 2000) (explaining that while a district court may consider the likely merits of a proposed amendment when ruling on a motion for leave to amend, denial on that basis is appropriate only where the proposed claims are clearly frivolous) (citing *Buder,* 644

F.2d at 695); *Karl's Inc. v. Sunrise Computers, Inc.*, 901 F.2d 657, 659 (8th Cir. 1990) ("A court should deny leave to amend pleadings because of a perceived unlikelihood of succeeding on the merits only when the party asserts clearly frivolous claims.").

## IV.  ARGUMENT

### A.  THE PROPOSED AMENDMENT LACKS GOOD CAUSE, AND IT PLEADS DISCOVERY, NOT A NEW CONSTITUTIONAL CLAIM.

Plaintiff cannot show good cause for this proposed amendment because the operative complaint already asserts a due process claim under 42 U.S.C. § 1983 against Williams and Alberts. [Doc. No. 1, ¶¶ 69–78.] The proposed amendment does not identify a new constitutional right, a new deprivation, or a distinct course of conduct. [*See* Doc. No. 92.] Instead, it merely repackages an already-pleaded due process theory by relabeling it as a new count and expanding the caption to "all Defendants." [*Id.*] That relabeling does not alter the scope of the claim or supply a legally distinct basis for liability.

There is no good cause for Plaintiff's proposed amendment because the alleged procedural due process violations were known, or at a minimum, reasonably could have been known, at the outset of the litigation. The operative Complaint itself reflects Plaintiff's reliance on a policy-based due process theory. [*See, e.g.*, Doc. 1. ¶¶ 19–21, 40, 62, 69, 71, 77, 81, 88.] Yet, Plaintiff chose to assert a procedural due process claim only against Williams and Alberts, and not against Love or BRUN. [*Id.*] That strategic choice does not constitute good cause to amend at this late stage.

Nor does the timing of Defendants' production of the Conduct Policy suggest bad faith. Defendants' counsel produced the Conduct Policy the day after it was discovered. [Dec. of Amare, ¶ 3.] Defendants' counsel were not aware of the Conduct Policy until December 18, 2025, and it was produced to Plaintiff on December 19, 2025. [*Id.*] Prompt production upon discovery negates any inference of bad faith.

9

The undisputed testimony further confirms that Defendants had no reason to withhold the Conduct Policy in bad faith because it played no role in the decision at issue. Williams testified that Plaintiff was removed from the Women's Basketball Team for repeated violations of team rules—specifically, breaking curfew and a breakdown of trust stemming from dishonesty—and not for any conduct governed by the Conduct Policy. [Ex. B, Dep. of Williams at 30:13–23, 12:13–14:23.] Williams further testified that her decision was based on the team rules, not the Conduct Policy. [*Id.* at 12:13–14:23, 371:9-375:1[1], 383:1–5.]

Keith Zimmer's testimony corroborates this understanding. Zimmer testified that the governing authority in this context was the team rules established by the head coach and that participation on the team is conditioned on compliance with those rules. [Ex. C, Dep. of Zimmer at 154:24–155:10.] He further confirmed that Williams relied on those team rules—rather than the Conduct Policy—when removing Plaintiff from the roster. [Ex. C, Dep. of Zimmer at 157:23–158:15.]

Because the Conduct Policy played no role in the challenged decision, its existence—and the timing of its production—does not support any inference of bad faith. Nevertheless, Defendants produced the Conduct Policy promptly once located in response to a discovery request, notwithstanding that relevance for discovery purposes is broader than relevance to the merits of Plaintiff's claims. Plaintiff's attempt to rely on the timing of production of the Conduct Policy to excuse the delay in seeking amendment or to establish good cause is unavailing.

Even if the Court finds that the Conduct Policy was relevant (it is not), such finding does not provide grounds for Plaintiff to amend the Complaint. Rather than pleading a new constitutional violation, the proposed amendment relies almost entirely

---

[1] The exhibit referenced therein (exhibit 421) is the Conduct Policy. [*See* Ex. B, Dep. of Williams at 4.]

on alleged deviations from the Conduct Policy and extensive quotations of that policy. [*See* Doc. No. 92.] As discussed in detail below, discretionary internal policies do not create independent constitutional rights, and alleged failures to follow such policies do not give rise to a procedural due process claim under § 1983. The Fifth Cause of Action therefore does not advance a new legal theory; it merely reframes alleged policy noncompliance in an effort to restate a due process claim already before the Court.

Merely recharacterizing existing allegations or changing the caption of a claim does not create an independent cause of action. Courts in this circuit deny leave to amend where a proposed claim is duplicative or seeks to repackage an existing theory under a new label. *See Avery v. E&M Servs., LLC*, No. 1:18-CV-258, 2022 WL 22906698, at *5–6 (D.N.D. May 9, 2022) (denying leave to amend where proposed claim was duplicative and did not create an independent basis of liability); *Reuter v. Jax Ltd.*, 711 F.3d 918, 922 (8th Cir. 2013) ("Duplicative and frivolous claims are futile"). A claim is frivolous where it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Here, the proposed Fifth Cause of Action functions in the same manner as the rejected amendment in *Avery*: it does not allege a new constitutional deprivation but instead attempts to restate an existing theory—already pleaded—by invoking additional background material and policy language. The proposed Fifth Cause of Action does not create an independent basis for liability; it merely seeks another route to litigate the same alleged theory and harm.

To the extent the proposed amendment is styled as against "all Defendants" in an apparent effort to broaden the case or cure pleading deficiencies, that effort fails for the independent reasons discussed below. As explained *infra*, the proposed claim is futile as to BRUN due to sovereign immunity; it fails as a matter of law because the

11

Conduct Policy is discretionary and does not create a protected property or liberty interest; it fails because Plaintiff does not allege a deprivation of any University-conferred benefit; it fails because no clearly established right is implicated, entitling the individual Defendants to qualified immunity; and it fails as to Love because he was not a decision-maker and is not alleged to have exercised any disciplinary authority as to the decision to remove the Plaintiff from the Women's Basketball Team.

The structure and content of the proposed Fifth Cause of Action confirm that its purpose is not to plead a new constitutional claim, but to embed evidentiary material—internal policy language and alleged procedural irregularities—into a standalone count in hopes of expanding discovery and reshaping the litigation. The Federal Rules of Civil Procedure do not permit amendment to add a claim that has no independent legal basis and merely seeks to transform evidentiary details into a standalone cause of action. *See Avery*, 2022 WL 22906698, at 6.

For these reasons, and for the additional reasons set forth below, the proposed Fifth Cause of Action pleads discovery rather than a new constitutional claim and does not warrant amendment of the complaint.

**B.    BRUN IS ENTITLED TO SOVEREIGN IMMUNITY, RENDERING THE PROPOSED FIFTH CAUSE OF ACTION AGAINST BRUN FUTILE.**

The proposed Fifth Cause of Action is independently futile as to BRUN because BRUN is entitled to sovereign immunity under the Eleventh Amendment and therefore cannot be sued for damages under 42 U.S.C. § 1983.

As an arm of the State of Nebraska, BRUN enjoys immunity from suit in federal court absent an express waiver or valid congressional abrogation—neither of which is present here. The U.S. Supreme Court, Eighth Circuit Court, and the Nebraska Supreme Court have held state entities enjoy sovereign immunity under the Eleventh Amendment and general state sovereign immunity, absent consent. *See Allen v. Cooper,*

589 U.S. 248, 253 (2020); *Church v. Missouri*, 913 F.3d 736, 742 (8th Cir. 2019); *Jill B. v. State*, 297 Neb. 57, 66, 899 N.W.2d 241, 250 (2017). A state's sovereign immunity "derives both from common law tradition and constitutional design." *Carroll v. Douglas Cnty., Nebraska*, No. 8:21-CV-233, 2021 WL 4504334, at *6 (D. Neb. Oct. 1, 2021) (citing *Alden v. Maine*, 527 U.S. 706, 733 (1999)).

BRUN is a state agency, entitled to state sovereign immunity under both the constitutional designs of the Eleventh Amendment to the U.S. Constitution and the Nebraska Constitution, and under common law. *See Doe v. Univ. of Nebraska*, 451 F.Supp.3d 1062, 1101 (D. Neb. 2020) (holding BRUN and the University are entitled to sovereign immunity).

"A waiver of sovereign immunity is found only where stated by the most express language of a statute or by such overwhelming implication from the text as will allow no other reasonable construction." *Burke v. Bd. of Trustees of Nebraska State Colleges*, 302 Neb. 494, 502, 924 N.W.2d 304, 311 (2019). It is a well settled principle that "statutes purporting to waive the protection of sovereign immunity are to be ***strictly construed in favor of the sovereign and against waiver***." *Edwards v. Douglas Cnty.*, 308 Neb. 259, 267–68 (2021) (emphasis added).

Section 1983 does not abrogate Eleventh Amendment immunity, and Nebraska has not consented to § 1983 suits against BRUN. Accordingly, BRUN cannot be held liable for damages under § 1983, regardless of how Plaintiff labels the claim or the factual allegations asserted.

The proposed amendment underscores the futility of adding BRUN as a defendant to a procedural due process claim. Plaintiff attempts to premise liability on BRUN's approval of, or alleged failure to enforce, the Conduct Policy. [Doc. No. 92.] But sovereign immunity is jurisdictional and does not turn on the substance of the allegations.

Nor can Plaintiff circumvent sovereign immunity by recharacterizing the claim as one for procedural due process or by invoking a "custom or policy" theory. *Monell*-style liability applies only to municipalities and other local governmental entities; it has no application to state entities protected by the Eleventh Amendment. BRUN, as an arm of the State of Nebraska, is not a "person" subject to suit under § 1983, and theories of liability premised on institutional customs, practices, or ratification cannot overcome sovereign immunity.

The governing case law confirms this distinction. *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978), and its progeny—including *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988); *Soltesz v. Rushmore Plaza Civic Center*, 847 F.3d 941 (8th Cir. 2017); *Strickland v. Kansas City*, No. 4:23-CV-00313-DGK, 2024 WL 117348 (W.D. Mo. Jan. 10, 2024); and *Shape v. Barnes County*, 396 F. Supp. 2d 1067 (D.N.D. 2005)—all address municipal liability under § 1983 and the circumstances under which a city or county may be held responsible for constitutional violations arising from official policies, customs, or ratification by final policymakers. None of those decisions extend *Monell*-style liability to state agencies entitled to Eleventh Amendment immunity. *See Hubbard v. Witherington*, No. 6:24-CV-6151, 2025 WL 2590263, at *2 (W.D. Ark. Sept. 8, 2025) ("*Monell* governs claims against municipalities or local governments and does not apply to claims against state governments.").

Accordingly, allegations framed in terms of institutional "custom," "policy," or ratification cannot supply a basis for § 1983 liability against BRUN, and amendment premised on such theories would be futile as a matter of law.

14

**C.**  **PLAINTIFF FAILS TO ALLEGE A DEPRIVATION OF ANY CONSTITUTIONALLY PROTECTED INTEREST NECESSARY TO TRIGGER PROCEDURAL DUE PROCESS, RENDERING THE FIFTH CAUSE OF ACTION FUTILE AS A MATTER OF LAW.**

A procedural due process claim under 42 U.S.C. § 1983 turns on two questions: (1) whether the challenged state action deprived the plaintiff of a constitutionally protected liberty or property interest; and (2) if so, what process was constitutionally due before that deprivation occurred. *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013); *Does 1–2 v. Regents of the Univ. of Minn.*, 999 F.3d 571, 581 (8th Cir. 2021).

At the threshold, state action must distinctly alter or extinguish "a right or status previously recognized by state law, removing that interest from the recognition and protection previously afforded by the State." *Kroupa*, 731 F.3d at 818. Absent a protected liberty or property interest, no procedural due process protections attach, and the inquiry ends.

### 1.  Participation in collegiate athletics does not constitute a constitutionally protected interest.

Courts have long held that participation in interscholastic and intercollegiate athletics does not constitute a liberty or property interest protected by the Due Process Clause.

Under The Board of Regents of State Colleges v. Roth, 408 U.S. 564, 575 (1972), property interests are not created by the Constitution itself but arise only where a person has a legitimate claim of entitlement grounded in independent sources of law—not a unilateral expectation or abstract desire for a benefit. The nature of the interest, not its perceived importance, controls the due process analysis. *See Roth*, 408 U.S. at 570–71 (1972) ("[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake.").

Consistent with *Roth*, courts have repeatedly rejected procedural due process claims premised on exclusion from athletic participation. In *Mitchell v. Louisiana High*

*School Athletic Association*, the Fifth Circuit held that participation in athletics is a privilege falling outside the protection of the Fourteenth Amendment, and held "for better or worse, the due process clause of the fourteenth amendment does not insulate a citizen from every injury at the hands of the state." 430 F.2d 1155, 1157–58 (5th Cir. 1970).

In addition, in *Albach v. Odle*, 531 F.2d 983 (10th Cir. 1976), the Tenth Circuit emphasized that while education as a whole may be protected, its "myriad activities" cannot be dissected into separate constitutional entitlements. Based on that reasoning, the Court held:

> Participation in interscholastic athletics is not a constitutionally protected civil right. [citation omitted]. The supervision and regulation of high school athletic programs remain within the discretion of appropriate state boards, and are not within federal cognizance under 42 U.S.C. § 1983 unless the regulations deny an athlete a constitutionally protected right or classify him or her on a suspect basis.

*Id.* at 984–85. *See also Dallam v. Cumberland Valley School District*, 391 F.Supp. 358 (M.D. Pa. 1975) (holding "there exists no constitutionally protected property interest in competing for a place on a high school athletic team, and reasoning to hold otherwise would too greatly strain the concept of property.").

Although *Mitchell* and *Albach* arose in the high-school context, courts have consistently extended their reasoning to collegiate athletics, finding no meaningful constitutional distinction between the two.

Courts addressing collegiate athletics have followed the same approach. In *Colorado Seminary v. NCAA*, 417 F.Supp. 885 (D. Colo. 1976), *aff'd*, 570 F.2d 320 (10th Cir. 1978), the court rejected the claim that participation in intercollegiate athletics constituted a property interest, even where athletes argued that athletics served as a pathway to professional careers. The Court held that such interests were speculative and insufficient. *See Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 109 (4th Cir.

16

2011) ("[T]he interest of the student athletes in participating in intercollegiate sports was not constitutionally protected."); *Angstadt v. Midd–West Sch. Dist.,* 377 F.3d 338, 344 (3d Cir. 2004) (holding student had no liberty or property interest in participating in interscholastic athletics); *Miami Univ. Wrestling Club v. Miami Univ.,* 302 F.3d 608, 615 (6th Cir.2002) ("There is no constitutional right to participate in intercollegiate athletics."); *Brindisi v. Regano,* 20 Fed.Appx. 508, 511 (6th Cir. 2001) (same); *Awrey v. Gilbertson,* 833 F.Supp.2d 738, 741–42 (E.D. Mich. 2011) (no property interest to participate in college sports); *Hall v. NCAA,* 985 F.Supp. 782, 799 (N.D.Ill.1997) ("There is no property or liberty interest in participating in interscholastic athletics."); *Knapp v. Northwestern Univ.,* No. 95 C 6454, 1996 WL 495559, at *2 (N.D. Ill. Aug.28, 1996), *rev'd on other grounds,* 101 F.3d 473, 7th Cir. 1996), *cert. denied,* 520 U.S. 1274, (1997) ("While participation in intercollegiate basketball has been recognized as a training ground for a professional basketball career, the possibility of obtaining that professional basketball career is too speculative to even constitute a present economic interest."); *Justice v. Nat'l Collegiate Athletic Ass'n,* 577 F.Supp. 356, 366 (D. Ariz. 1983) ("Participation in intercollegiate athletics is not a constitutionally protected interest.").

Defendants are unaware of any Nebraska state-court decision recognizing a constitutional right to participate in intercollegiate athletics.

Here, Plaintiff alleges only that she was removed from the Women's Basketball Team. [Doc. No. 1, ¶¶ 50–53, 55, 58, 64, 66, 67, 94; Doc. No. 92, ¶¶ 135, 137, 138, 140; Ex. D, Dep. of Plaintiff at Ex. D, Dep. of Plaintiff at 215:9–216:20, 249:3-14.] She does **not** allege that the Defendants withdrew her scholarship, tuition, fees, housing assistance, academic support, medical services, or any other institutional benefit. [Doc. No. 1; Doc. No. 92; Ex. D, Dep. of Plaintiff at 216:17–20, 224:2–6; 236:17–237:25.]

Any attempt by Plaintiff to claim that she was deprived of a protected educational or financial interest beyond team participation is frivolous. "[A] motion to amend should be denied on the merits [] if it asserts clearly frivolous claims or defenses." *In re Cattle & Beef Antitrust Litig.*, No. CV 22-2903, 2024 WL 4355119, at *5 (D. Minn. Sept. 30, 2024) (quoting *Becker v. Univ. of Nebraska*, 191 F.3d 904, 908 (8th Cir. 1999)). A claim is frivolous where it "lacks an arguable basis either in law or in fact." *Neitzke*, 490 U.S. at 325. As Plaintiff's own sworn testimony makes clear, such a theory is flatly contradicted by the record and foreclosed by her admissions, warranting denial of leave to amend on the basis that it is frivolous.

Plaintiff's testimony establishes that the University expressly confirmed her scholarship and continued access to academic, medical, and life skills support through graduation. [Ex. D, Dep. of Plaintiff at 216:17–20, 224:2–6, 236:17–237:25.]

As reflected in Plaintiff's deposition testimony, Plaintiff confirmed that she signed a National Letter of Intent providing a full grant, including tuition, fees, room, board, books, and other expenses up to the NCAA cost of attendance, which covered 2020-21 and 2021-22 academic years. [*Id.* at 32:23–33:12.]

Upon her removal from active participation, Plaintiff testified that she was expressly told the University would continue to support her scholarship through graduation, along with the academic and life skills services that accompany it, and that she understood that commitment at the time it was made. [*Id.* at 216:17-20, 224:2–6, 236:17–237:25.] Indeed, Plaintiff admitted that the University paid her tuition, fees, room, board, and books during those periods. [*Id.* at 33:13–34:12.]

With respect to housing, Plaintiff acknowledged that the University did provide housing and offered multiple University-funded options, including student housing with roommates and a hotel paid for by the University. [*Id.* at 237:10–16.] Plaintiff testified

that she declined those options based on her personal comfort and safety concerns—not because housing assistance was withdrawn. [*Id.*]

Plaintiff also acknowledged that she was reminded again that she retained continuing access to all student-athlete services, including athletic medicine, the training room, academic support, life skills programming, compliance services, and related athletic department resources, and confirmed that she saw that statement reflected in the written materials provided to her. [*Id.* at 237:17–25.]

Finally, Plaintiff testified that Trev Alberts expressly told her the University would honor her scholarship through graduation. [*Id.* at 224:2–6.]

In short, the following excerpt from Plaintiff's deposition testimony summarizes her understanding of, and what was expressly communicated to her by the University upon her removal from participation on the Women's Basketball Team:

> Q.   Were you told that the university would support your scholarship up to your graduation in May and the academic and life skill services that go with it?
>
> A.   They did tell me that, yes.

[*Id.* at 216:17–20.] This testimony is dispositive. It confirms that Plaintiff retained her scholarship, tuition, fees, room, board, academic support, medical access, and institutional services, and that no University-conferred benefit was withdrawn. Plaintiff was removed only from active participation on the Women's Basketball Team.

Removal from athletic participation—without loss of scholarship or educational benefits—does not alter a right or status previously recognized by state law and therefore does not implicate a constitutionally protected liberty or property interest. Plaintiff's own admissions foreclose any procedural due process claim as a matter of law.

19

Plaintiff's reliance on modern name, image, and likeness ("NIL") opportunities does not alter this analysis. NIL compensation is inherently contingent, speculative, and dependent on third-party market forces—not guaranteed by state law or University policy. As with speculative professional opportunities, the possibility of NIL income does not create a legitimate claim of entitlement. See *Roth*, 408 U.S. at 575.

At most, NIL reflects a unilateral expectation of potential economic benefit, which is insufficient to trigger procedural due process protections. Courts have consistently rejected attempts to constitutionalize such speculative opportunities tied to athletic participation, as discussed *supra*.

Nor can Plaintiff plausibly claim otherwise, as such claim would be frivolous. As Plaintiff admitted in her own deposition, NIL opportunities are inherently speculative and not capable of calculation. Indeed, Plaintiff expressly acknowledged that she ultimately made more NIL money at UNLV (the school she went to after she graduated from the University) and that, had she remained at the University, "there was no way of me knowing how much NIL money I was going to get … [t]here's no way to calculate that." [*See* Dep. of Plaintiff at 249:20 – 250:15, 252:13 – 253:7.] At the very least, there was no University-promised NIL opportunity. Plaintiff's own testimony thus strongly undercuts any non-speculative theory of NIL-related damages.

Because Plaintiff cannot establish the deprivation of a protected property or liberty interest, her procedural due process claim fails as a matter of law.

### 2.     The discretionary nature of the Conduct Policy forecloses any constitutional entitlement.

As the Eighth Circuit has repeatedly recognized, "discretionary policies … do not bestow upon individuals protected property interests." *Habhab v. Hon*, 536 F.3d 963, 968 (8th Cir. 2008) (quotation omitted). Property interests protected by procedural due process "are not created by the Constitution but, rather, are created and their

dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.* (quoting *Forrester v. Bass*, 397 F.3d 1047, 1054 (8th Cir. 2005)). Where a policy leaves decision-makers with meaningful discretion, it cannot give rise to a legitimate claim of entitlement.

Applying that principle, the Eighth Circuit in *Habhab* rejected a claimed property interest arising from inclusion on a police towing rotation list because dispatchers retained discretion in assigning work. 536 F.3d at 968. The court emphasized that discretion defeats entitlement: even where a policy creates expectations, it does not create a constitutional property interest unless it meaningfully constrains official judgment. The same reasoning was reaffirmed in *Mulvenon v. Greenwood*, 643 F.3d 653, 658 (8th Cir. 2011), and again in *Robbins v. Becker*, 794 F.3d 988, 993–94 (8th Cir. 2015), where the court reiterated that discretionary decision-making precludes due process protection.

By its express terms, the Conduct Policy is discretionary and does not create any mandatory process or entitlement. [*See* Ex. A.] The policy emphasizes that participation in intercollegiate athletics is a privilege, not a right, and expressly subjects student-athletes to University-wide codes of conduct, team rules developed by head coaches, and separate disciplinary authority exercised outside the Conduct Policy. [Ex. A, p. 1.] The policy does not mandate that it apply in every instance of alleged misconduct. In fact, the Conduct policy expressly provides:

- o All student-athletes are subject to the general University codes of conduct and disciplinary rules applicable to all other students.

- o All student-athletes are also subject to team rules developed by the head coach of each sport and approved by the Director of Athletics.

- o The head coach of each sport has the authority to discipline, suspend and/or dismiss any student-athlete on his/her team in consultation with the head coach's sport administrator for violation of team rules

21

> ***separate and apart from proceeding under this Student-Athlete Conduct Policy***.

[Ex. A, p. 1.]

The Conduct Policy further explains that a separate departmental conduct policy exists not because it displaces team or University discipline, but because allegations involving student-athletes may draw heightened public scrutiny. [*Id.*] Nothing in the policy mandates its application in every instance of alleged misconduct, nor does it displace the head coach's authority to discipline for violations of team rules. [*See id.*]

Critically, the Conduct Policy vests threshold applicability entirely in the discretion of the Director of Athletics, providing that the Director "shall, in good faith and using reasonable judgment, decide whether the policy applies." [*Id.* at 3.] Where a policy leaves such discretion intact, it cannot give rise to a legitimate claim of entitlement.

Furthermore, Plaintiff does not allege—and Defendants have never asserted—that Plaintiff engaged in conduct falling within the categories that trigger application of the Conduct Policy. [Doc. No. 1; Doc. No. 18; Doc. No. 19; Ex. B, Dep. of Williams at 12:13–14:23, 383:1–5; Ex. C, Dep. of Zimmer at 158:7–15; Doc. No. 92, ¶¶ 135–38.] The policy applies only when a student-athlete is alleged to have committed serious nonacademic misconduct, such as physical injury, threats, harassment, hazing, drug offenses, theft, weapons violations, or conduct undermining the integrity and reputation of the University. [Ex. A, p. 2.] Plaintiff does not plead facts bringing her conduct within any of these enumerated categories, nor does the complaint allege that Defendants invoked or purported to apply the Conduct Policy in disciplining her. [*See* Doc. No. 1, Doc. No. 92.] To the contrary, Plaintiff alleges that the stated reasons for her removal were lying and breaking curfew. [Doc. No. 92, ¶ 135–38.]

In short, the Conduct Policy preserves judgment, flexibility, and individualized assessment at every stage of the disciplinary process. [*See* Ex. A.] It neither mandates its own application nor displaces other sources of disciplinary authority. [*Id.*] To the contrary, it expressly recognizes that a head coach retains independent authority—subject to consultation with the sport administrator—to discipline, suspend, or dismiss a student-athlete for violations of team rules, separate and apart from any proceedings under the Conduct Policy. [Ex. A, p. 1.]

Under controlling Eighth Circuit precedent, a policy that leaves officials with this degree of discretion—particularly one that was never invoked in the first instance—cannot give rise to a constitutionally protected liberty or property interest. Plaintiff therefore cannot plausibly allege that the Conduct Policy entitled her to continued athletic participation, a specific disciplinary process, or any particular outcome. Because discretionary policies do not create constitutional entitlements, any procedural due process claim premised on alleged violations of the Conduct Policy fails as a matter of law.

**D.    THE INDIVIDUAL DEFENDANTS (INCLUDING DEFENDANT LOVE) ARE ENTITLED TO QUALIFIED IMMUNITY, RENDERING THE FIFTH CAUSE OF ACTION FUTILE.**

Even assuming arguendo that Plaintiff could establish a deprivation of protected interest, the individual Defendants are entitled to qualified immunity. State officials sued in their individual capacities are shielded from liability unless their conduct violated a constitutional right that was clearly established at the time of the alleged conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982).

The qualified-immunity analysis asks two questions: whether a constitutional violation occurred and whether the right at issue was clearly established in the specific factual context. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Williams v. Jackson*, 600 F.3d 1007, 1012 (8th Cir. 2010). Courts may address these questions in any order, and the

inquiry must be undertaken at the earliest possible stage of litigation. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). It is not enough that a right be established in an abstract sense; rather "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wagner v. Jones*, 664 F.3d 259, 273 (8th Cir. 2011). The question of whether the Plaintiff has sufficiently alleged a violation of a clearly established right is a question of law, see *Siegert v. Gilley*, 500 U.S. 226, 232 (1991), and should be decided at the earliest possible stage of the litigation, see *Mathers v. Wright*, 636 F.3d 396, 399 (8th Cir. 2011), making opposition to the proposed amendment on grounds of futility based on qualified immunity particularly appropriate at this juncture.

Here, Plaintiff cannot satisfy either prong of the qualified-immunity analysis. As set forth above, which Defendants incorporate herein Section IV.C as though fully set forth herein, no constitutional violation occurred because Plaintiff lacked a protected liberty or property interest in continued participation in intercollegiate athletics. But even if such an interest could be assumed, it was not clearly established at the time of the challenged conduct.

The Eighth Circuit's decision in *Does 1–2 v. Regents of the University of Minnesota* is directly instructive. There, the Court rejected procedural due process claims arising from pre-hearing suspensions of student-athletes, holding that—even assuming athletic participation or related academic restrictions implicated a protected interest—the plaintiffs failed to allege a clearly established right to pre-deprivation process. 999 F.3d 571, 583 n.2 (8th Cir. 2021). The court emphasized that "[e]ven if the 'ability to pursue … athletic participation' is a protectable interest, an issue we again need not decide, the right was not clearly established," entitling university officials to qualified immunity. *Id.*

(citing *Austin v. Univ. of Or.*, 205 F.Supp.3d 1214, 1221–22 (D. Or. 2016), *aff'd*, 925 F.3d 1133 (9th Cir. 2019)).

The Eighth Circuit further noted the absence of any state-law authority recognizing athletic participation as a right "recognized and protected by state law," underscoring that officials cannot be charged with violating a right that has not been clearly defined by governing precedent. *Id.*

That reasoning applies with equal force here. Plaintiff identifies no controlling authority—state or federal—establishing that removal from active participation on a collegiate athletic team, without loss of scholarship or educational benefits, violates procedural due process. The Supreme Court has repeatedly cautioned that rights must not be defined at a high level of generality; rather, the contours of the right must be sufficiently clear that a reasonable official would understand that the challenged conduct was unlawful. *Wagner v. Jones*, 664 F.3d 259, 273 (8th Cir. 2011).

Given majority case law rejecting due process claims based on athletic participation—and the absence of any authority recognizing NIL opportunities as a constitutionally protected property interest—no reasonable official would have understood that removing a student-athlete in 2022 from a team under these circumstances violated a clearly established constitutional right. Holding otherwise would improperly constitutionalize routine disciplinary decisions and unduly restrict administrators' discretion. *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999).

Accordingly, because Plaintiff has failed to allege the violation of a constitutional right—much less a clearly established one—the individual Defendants are entitled to qualified immunity. The proposed Fifth Cause of Action is therefore futile as a matter of law.

### E. THE FIFTH CAUSE OF ACTION IS FUTILE AS TO LOVE BECAUSE HE WAS NOT A DECISION-MAKER AND EXERCISED NO DISCIPLINARY AUTHORITY.

Plaintiff's procedural due process theory fails as a matter of law as to Love because the complaint does not allege—nor could it plausibly allege—that Love was a decision-maker with respect to Plaintiff's suspension or removal from active participation. Liability under 42 U.S.C. § 1983 requires personal involvement in the alleged constitutional deprivation. *Marsh v. Phelps Cnty.,* 902 F.3d 745, 754 (8th Cir. 2018). A defendant cannot be held liable for a procedural due process violation absent allegations that he had authority over, or participated in, the decision that allegedly deprived Plaintiff of a protected interest. *Id.*

The Conduct Policy confirms this defect. By its express terms, the policy vests decision-making authority exclusively in the Director of Athletics, with limited administrative functions delegated to compliance personnel at the Director's direction. Ex. A, p. 3.] The policy does not confer any authority on assistant or associate coaches to determine whether the policy applies, to impose discipline, or to control the disciplinary process. [*See id.*] Nor does the policy contemplate any role for coaches in adjudicating alleged misconduct, particularly given the policy's express concern about conflicts of interest. [*Id.* at 6.]

Consistent with the policy, the Complaint does not allege that Love applied the Conduct Policy, invoked it, or exercised any authority under it. [Doc. No. 1, ¶ 47.] To the contrary, Plaintiff's own allegations state that Love was immediately suspended once the relevant information came to light. [Doc. No. 1, ¶¶ 47, 51.] Those allegations affirmatively negate any inference that Love acted as a decision-maker or participant in the alleged disciplinary process where Plaintiff was removed from the Women's Basketball Team.

Because Plaintiff does not allege that Love made, directed, influenced, or participated in any decision to suspend or remove Plaintiff from active participation— and because the Conduct Policy provides no role for him in that process—Plaintiff cannot establish the personal involvement required to state a procedural due process claim against Love. Any such claim therefore fails as a matter of law and should be dismissed.

This conclusion is reinforced by well-settled § 1983 principles. Individual-capacity claims under § 1983 cannot proceed based on vicarious liability, generalized allegations of institutional oversight, or respondeat superior. To survive dismissal, a plaintiff must plausibly allege that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The Eighth Circuit requires a showing that a defendant either directly participated in the alleged violation or failed to supervise or train subordinates in the face of known constitutional violations. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010).

As the Eighth Circuit has repeatedly emphasized, "the doctrine of respondeat superior is inapplicable to actions brought pursuant to § 1983." *Glick v. Sargent*, 696 F.2d 413, 414–15 (8th Cir. 1983). Government officials may not be held liable for constitutional violations based solely on their position or association with others. *Rogers v. King*, 885 F.3d 1118, 1122–23 (8th Cir. 2018) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Iqbal*, 556 U.S. at 676).

Accordingly, because Plaintiff fails to allege the requisite personal involvement, authority, or decision-making by Love, the proposed procedural due process claim against him is legally deficient and futile.

## V.    **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny

Plaintiff's Motion for Leave to Amend Complaint.

Dated this 23rd day of January, 2026.

> BOARD OF REGENTS OF THE
> UNIVERSITY OF NEBRASKA, and
> Individuals AMY WILLIAMS, TREV
> ALBERTS, Defendants
>
>
> By:    /s/ Lily Amare
>        Susan K. Sapp, #19121
>        Lily Amare, #25735
>        Cline Williams Wright
>          Johnson & Oldfather, L.L.P.
>        1900 U.S. Bank Building
>        233 South13th Street
>        Lincoln, NE 68508
>        (402) 474-6900
>        ssapp@clinewilliams.com
>        lamare@clinewilliams.com
>
>             AND
>
>        Bren H. Chambers, #23150
>        Vice President and General Counsel
>        University of Nebraska
>        3835 Holdrege Street
>        Lincoln, NE 68583-0745
>        (402) 472-1201
>        bchambers@nebraska.edu

### **CERTFICATE OF COMPLIANCE**

I, Lily Amare, hereby certify that this Brief complies with the limits set forth in NECivR 7.1(d). Further, based on the Word Count function of Microsoft Word 2013-word processing software, applied to include all text, including the caption, headings, footnotes, and quotations, I certify this Brief contains 8,132 words.

> /s/    Lily Amare
> Lily Amare

**CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties.

/s/    Lily Amare
Lily Amare