IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

|  |  |
|---|---|
| ASHLEY SCOGGIN,<br><br>               Plaintiff,<br><br>   vs.<br><br><br>BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, AMY WILLIAMS, in her individual capacity; TREV ALBERTS, in his individual capacity; and CHUCK LOVEJR., in his individual capacity;<br><br>               Defendants. | **4:24CV3039**<br><br><br>**FINDINGS AND**<br>**RECOMMENDATION AND**<br>**ORDER** |

This matter comes before the Court on Plaintiff's Renewed Motion to Amend the Progression Order (Filing No. 77) and Motion for Leave to File a First Amended Complaint. (Filing No. 92). For the reasons set forth below, the Motion to Amend the Progression Order is denied. The Motion for Leave to Amend was referred to the undersigned for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the undersigned will recommend that the motion be denied as futile.[1]

## I.      BACKGROUND

Plaintiff Ashley Scoggin ("Scoggin") initiated this action on February 18, 2024, against the Board of Regents of the University of Nebraska ("BRUN"), Head Women's Basketball Coach Amy Williams ("Williams"), Vice Chancellor and Director of Athletics Trev Alberts ("Alberts"), and Associate Head Women's Basketball Coach Chuck Love, Jr.

---

[1] The undersigned magistrate judge files as a recommendation, rather than an order, because an order denying leave to file a claim within a proposed amended pleading based on futility is, like a Rule 12(b)(6) motion, dispositive. *See, e.g.*, *Jordan v. Omaha Public Power District*, 2024 WL 705953 (D. Neb. Feb. 21, 2024).

("Love"). (Filing No. 1). Plaintiff, a student-athlete on the women's basketball team, alleges that Love pursued an inappropriate sexual relationship with her and engaged in predatory conduct during her time on the team. She further alleges that Williams discovered the relationship but, rather than disciplining Love, permitted teammates to interrogate and mistreat Plaintiff, suspended her from the team in February 2022 for alleged dishonesty, and ultimately removed her from the roster, while Love was allowed to resign voluntarily. Plaintiff asserts that Alberts ratified Williams' decisions and failed to take corrective action, thereby contributing to her removal from the team and transfer to another school.

Based on these allegations, Scoggin brings claims under 42 U.S.C. § 1983 and Title IX. She asserts § 1983 claims for violations of her due process and equal protection rights, alleging that Williams and Alberts failed to adequately train and supervise staff, acted with deliberate indifference, and treated her less favorably than Love by removing her from the team while permitting him to resign. She also brings a Title IX claim against the university, alleging that it had actual knowledge of the misconduct, responded with deliberate indifference, created a hostile educational environment, and denied her educational benefits. Finally, she asserts an individual § 1983 claim against Alberts based on his alleged ratification of the challenged actions. (Filing No. 1).

A.    Initial Case Management and Discovery

The court entered a Final Progression Order on May 23, 2024, establishing deadlines for discovery, amendment of pleadings, expert disclosures, and dispositive motions. (Filing No. 24). The deadline to amend pleadings was August 1, 2024. The parties proceeded with discovery. On July 2, 2024, Plaintiff served written discovery requests, seeking, among other things, production of rules, policies, procedures, and protocols governing the women's basketball team. (Filing No. 92). BRUN produced documents it deemed responsive and asserted objections for overbreadth, relevance, and privilege. Defendants represent that they produced approximately 1,073 documents totaling 2,790 pages in their initial production and later supplemented that production, ultimately exceeding 3,000 pages of documents. (Filing No. 83).

The parties continued discovery, but disputes persisted concerning BRUN's production, assertions of privilege, and objections to certain categories of documents, including Title IX training materials, Name Image and Likeness ("NIL") agreements, and compensation information for student athletes. (Filing No. 77, Filing No. 83). However, neither party sought a discovery conference, sought leave to file a motion to compel, or otherwise requested court intervention for nearly ten months after Defendants' production.

B.    Amended Progression Order and Missed Deadlines

On February 21, 2025, upon Plaintiff's unopposed motion, the court entered an Amended Final Progression Order. (Filing No. 48). Although other deadlines were extended, the deadline to amend pleadings was not. The amended order extended Plaintiff's expert disclosure deadline from February 3, 2025 to July 2, 2025, and established a deadline of November 16, 2025 for filing motions to compel. (Filing No. 48).[2]

On July 2, 2025 (the new deadline for expert disclosures), Plaintiff again moved to extend the progression order deadlines by 180 days, citing an unresolved discovery dispute concerning BRUN's objections to document production. (Filing No. 55). That same day, Plaintiff's counsel contacted the undersigned chambers to schedule a discovery dispute conference. The court directed the parties to submit position statements and continue conferring regarding the dispute. Their respective position statements were received on July 9, 2025, and notably, Plaintiff did not raise any concerns in that submission about her expert designations. The court received additional email communication on July 22, 2025 and August 4, 2025, that the parties were continuing to work through their dispute without further court intervention. (Filing No. 82-12). Based upon those representations, the court denied Plaintiff's motion to extend the deadlines without prejudice pending resolution of the discovery dispute. (Filing No. 57). Defendants assert that on September 11, 2025, they served Plaintiff with a written compromise proposal addressing the disputed discovery categories, and that Plaintiff did not respond to that proposal before the relevant deadlines

---

[2] It is worth noting that Plaintiff first moved to extend the expert disclosure deadline 18 days after it expired. However, because the parties agreed to the extension, the court found good cause and granted it.

expired. (Filing No. 83). However, the parties did not contact chambers again and the court deemed the matter resolved.

C.     Status Conference and Renewed Motion to Extend

On November 18, 2025, the court held a routine telephonic status conference. The parties informed the court that, despite not contacting the court again following the denial of Plaintiff's prior motion to extend, the discovery dispute remained ongoing, and Plaintiff intended to file a motion to compel. By that time, the written discovery deadline, the motion to compel deadline, and the expert disclosure deadline had expired. (Filing No. 48).

During that conference, Plaintiff also raised, for the first time, the prospect of retaining and disclosing expert testimony, notwithstanding the expert disclosure deadline expired over four months earlier without any expert designation. Plaintiff represented that unresolved discovery issues impeded her ability to retain an expert. She did not provide information to the court identifying the type of expert she intended to retain, the subject matter of any proposed testimony, or any efforts undertaken prior to the deadline to locate or consult with an expert. No motion to compel had been filed regarding the discovery dispute prior to the deadline and no request for extension of the expert disclosure deadline had been granted. Plaintiff orally moved to extend the expired deadlines, which the court denied for lack of good cause or excusable neglect. However, the court granted Plaintiff leave to further confer with defense counsel and to file a formal motion to extend the deadlines, with supporting evidence, by December 3, 2025. (Filing No. 75).

Plaintiff timely filed her Renewed Motion to Amend the Progression Order on December 2, 2025. (Filing No. 77). She renewed her argument that unresolved privilege issues, incomplete document production, and written discovery disagreements prevented her from conducting depositions and disclosing experts. She further contends that enforcement of the expert deadline would operate as a severe sanction and that fairness favors adjudication on the merits. Defendants oppose the motion, arguing that Plaintiff failed to act diligently, missed the expert disclosure and motion to compel deadlines,

allowed discovery disputes to languish for months without further action, and failed to respond to a detailed compromise proposal Defendants sent to her on September 11, 2025. (Filing No. 83). Defendants contend that any prejudice from enforcing the deadlines was the result of Plaintiff's own inaction. (Filing No. 83, Filing No. 84). Plaintiff filed a reply on December 29, 2025, six days after the deadline. Defendants subsequently moved to strike the reply brief as untimely, which was granted on January 2, 2026. (Filing No. 91).

D.    Late Produced Conduct Policy and Proposed Amendment

On December 19, 2025, after the deadline to amend pleadings expired and written discovery had closed, BRUN produced a University of Nebraska Student-Athlete Conduct Policy (the "Conduct Policy"), claiming it was only recently discovered. (Filing No. 94-1, Exhibit K). Neither the Women's Basketball Team Handbook nor the Department of Athletics Student Athlete Handbook contain the Conduct Policy. (Filing No. 92). Plaintiff asserts that the Conduct Policy materially changes the posture of this case. She alleges that this policy required the Athletic Director, not the head coach, to determine whether the policy applied, to oversee a neutral factual inquiry, decide discipline, and provide appeal rights. According to Plaintiff, Williams removed her from the team without invoking or following the Conduct Policy, Alberts failed to enforce it, and the university maintained a custom of disregarding or inconsistently applying its terms. (Filing No. 92). BRUN takes issue with each of these arguments, responding that the Conduct Policy does not apply to Plaintiff's removal from the team, did not alter the authority of the head coach to make team decisions, and was not required to be invoked under the circumstances alleged. BRUN further contends that the policy's late production was inadvertent and non-prejudicial, that Plaintiff's claims remain legally deficient regardless of the policy, and that amendment or additional relief is unwarranted. (Filing No. 108)

Relying on the Conduct Policy, Plaintiff now seeks leave to add a fifth cause of action to her complaint, also pursuant to § 1983, for alleged violations of procedural due process. (Filing No. 92). She asserts that Defendants failed to follow mandatory procedures and thereby deprived her of protected interests without constitutionally adequate due

process. Defendants oppose the amendment as futile, arguing sovereign immunity bars the claim against BRUN, the individual defendants are entitled to qualified immunity, the Conduct Policy does not create a protected property or liberty interest, and the proposed claim is duplicative of existing due process theories. (Filing No. 108).[3]

## II.    LEGAL STANDARDS

The motions now before the court arise only because the relevant deadlines have expired. Plaintiff seeks to amend her complaint after the amendment deadline and to extend other lapsed progression deadlines. Federal Rule of Civil Procedure 16 therefore governs. Rule 16 provides that a scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). This rule reflects the court's interest in ensuring that "at some point both the parties and the pleadings will be fixed." *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 497 (8th Cir. 2008). To establish good cause under Rule 16(b), the movant must show that the deadlines "cannot be met despite [its] diligent efforts." *Bradford v. DANA Corp.*, 249 F.3d 807, 809–10 (8th Cir.2001). The primary measure of good cause is the movant's diligence in attempting to meet deadlines. *Albright ex rel. Doe v. Mountain Home Sch. Dist.,* 926 F.3d 942, 951 (8th Cir. 2019); *see also Rosillo v. Holten*, 2014 WL 7357308, at *5 n.2 (D. Minn. Dec. 23, 2014) ("[I]n a Rule 16(b) good cause analysis, a lack of prejudice to [the nonmovant] does not undo the consequences of [the movant's] lack of diligence").

In assessing diligence in the context of extending deadlines, courts examine when the moving party became aware of the circumstances allegedly necessitating modification, what steps the party took to address those circumstances within the existing schedule, and

---

[3] Notably, the court previously addressed some the sufficiency of Plaintiff's constitutional allegations in this action in its order granting Defendants' Motion to Strike Plaintiff's jury demand. (Filing No. 50). Therein, the undersigned observed that Plaintiff had not clearly alleged the violation of a constitutional right in her § 1983 claim against Alberts and concluded that the allegations instead resembled a tort claim. The district court affirmed, concluding that Plaintiff failed to plead a constitutional violation under § 1983 and that the allegations did not establish a cognizable federal constitutional claim. (Filing No. 54).

whether the party promptly sought relief from the Court once compliance proved impracticable. *See Hartis v. Chicago Title Ins. Co.*, 694 F.3d 935, 948 (8th Cir. 2012); *Rahn v. Hawkins*, 464 F.3d 813, 822 (8th Cir. 2006). The focus remains on the movant's efforts to comply with the Court's deadlines, not on the importance of the additional discovery sought. *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716 (8th Cir. 2008).

This diligence requirement applies equally when a party seeks to amend a pleading after the scheduling order deadline expires. In that circumstance, the court must determine whether the movant has shown good cause under Rule 16 before it considers Rule 15. *See Popoalii,* 512 F.3d at 497; *Sherman,* 532 F.3d at 716. Good cause to amend a complaint after the deadline has passed "may be shown by pointing to a change in the law, newly discovered facts, or another significant changed circumstance that requires amendment of a party's pleading." *Ellingsworth v. Vermeer Mfg. Co.*, 949 F.3d 1097, 1100 (8th Cir. 2020) (*citing Hartis,* 694 F.3d at 948).

If the movant satisfies Rule 16's good cause requirement, the Court must then apply Rule 15. Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Unless there is a good reason for denial, such as "undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment" leave to amend should be granted. *Doe v. Cassel*, 403 F.3d 986, 990-91 (8th Cir. 2005). "[W]hen the court denies leave on the basis of futility, it means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Hintz v. JPMorgan Chase Bank, N.A.,* 686 F.3d 505, 511 (8th Cir. 2012). Whether to grant a motion for leave to amend is within the sound discretion of the district court. *Popoalii,* 512 F.3d at 497.

### III.    ANALYSIS

**A.    Motion for Leave to Amend the Complaint**

The court will first address Plaintiff's motion for leave to amend her complaint and will then address her request to extend case progression deadlines. Plaintiff seeks leave to add a fifth cause of action based on the disclosure of the Conduct Policy. In the new proposed claim, Plaintiff alleges that she "had a protected interest in her status as a member of the Cornhusker women's basketball team" including scholarship, housing, academic support, athletic training, Name Image and Likeness ("NIL") eligibility, and other benefits, and was deprived of this interest "without being afforded the minimum level of due process required under the University of Nebraska Department of Athletics Student-Athlete Conduct Policy." (Filing No. 92, at pp. 31-39). She further alleges that Defendants acted under color of state law and denied her procedural due process by failing to follow mandatory procedures, acting arbitrarily and without a neutral factual inquiry. (Filing No. 92, at p. 36). Because the deadline to amend pleadings expired on August 1, 2024, the court first considers whether Plaintiff has satisfied Rule 16.

1.    Fed. R. Civ. P. 16

Under Rule 16, Plaintiff must demonstrate good cause and the primary measure of good cause is the movant's diligence. *Sherman*, 532 F.3d at 716. Here, the parties agree Defendants first disclosed the Conduct Policy on December 19, 2025, well after written discovery had closed. (Filing No. 94-1, at paras. 13-14). Plaintiff represents that prior to this disclosure, no witness had identified the policy and its contents were unknown. (Filing No. 94-1, at paras 10-16). Although the parties previously engaged in discovery dispute conferrals, the record does not reflect that the Conduct Policy was identified or produced before December 19, 2025. Notably, the proposed amendment relies extensively on the policy's language to frame her new claim. (Filing No. 92, at p. 31-39).

Moreover, the Conduct Policy was exclusively in BRUN's possession, and the record does not indicate that Plaintiff had independent access to it before Defendants

produced it. (Filing No. 94-1, at pp. 2-3). Plaintiff then filed the present motion approximately two weeks after receiving the policy. In light of this timing, the court finds that the late disclosure of the Conduct Policy constitutes newly revealed evidence sufficient to satisfy Rule 16(b) and that Plaintiff acted diligently upon its receipt. *See Hartis*, 694 F.3d at 948. The court therefore finds good cause and proceeds to Rule 15.

2.     Fed. R. Civ. P. 15

Even when Rule 16's good cause standard is satisfied, leave to amend may be denied if the proposed amendment would be futile. An amendment is futile if the proposed complaint could not withstand a motion to dismiss under Rule 12(b)(6). *Hintz,* 686 F.3d at 511. To "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court therefore accepts Plaintiff's well-pleaded factual allegations as true and determines whether the proposed amended complaint plausibly alleges a constitutional violation.

Defendants argue that the proposed Fifth Cause of Action is futile because it does not identify a new constitutional deprivation, fails to allege deprivation of a protected interest, improperly relies on internal policy language, and is barred by sovereign immunity as to BRUN and by qualified immunity as to the individual defendants. For the following reasons, the court agrees.

a.   *Sovereign Immunity - BRUN*

The court first considers whether the proposed claim may proceed against BRUN and finds that it may not. The Eleventh Amendment shields state entities from suit in federal court absent waiver or valid congressional abrogation. *Allen v. Cooper,* 589 U.S. 248, 253 (2020).* Section 1983 does not abrogate Eleventh Amendment immunity, and states and their arms are not "persons" subject to suit under § 1983. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989). State universities and their governing boards are arms

of the state and are entitled to sovereign immunity. *Does 1-2 v. Regents of the Univ. of Minnesota*, 999 F.3d 571, 583 (8th Cir. 2021) (*citing Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 695 (7th Cir. 2007)). This court has likewise recognized that BRUN and the University of Nebraska are immune from suit under the Eleventh Amendment. *See Doe v. Univ. of Nebraska*, 451 F.Supp.3d 1062, 1101 (D. Neb. 2020).

Here, Plaintiff identifies no waiver or applicable congressional abrogation. Because BRUN is an arm of the State and not a "person" under § 1983, the proposed claim is barred as to BRUN. An amendment would therefore be futile as to that defendant. The court next turns to whether the proposed claim may proceed against the individual defendants.

b. *Qualified Immunity – Individual Defendants*

Defendants Williams, Alberts, and Love, in their individual capacities, assert qualified immunity. Qualified immunity shields public officials from liability for civil damages unless "(1) the facts alleged by the plaintiff establish the violation of a constitutional right; and (2) the right was clearly established at the time of the official's alleged misconduct." *Murphy v. Schmitt*, 143 F.4th 914, 918 (8th Cir. 2025). The doctrine balances two important interests: "the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Courts may address either prong first. *Id.* at 236. Because qualified immunity requires a statutory or constitutional violation, the court begins there.

i. *No Protected Property Interest*

The threshold question is whether Plaintiff plausibly alleges a protected property interest in continued membership on the basketball team. Section 1983 relief "is predicated on the denial of a right or interest protected by the Constitution." *Dover Elevator Co. v. Arkansas State Univ.*, 64 F.3d 442, 445 (8th Cir.1995). Accordingly, analysis of a

procedural due process claim begins with identifying the specific interest allegedly violated. *Id.* at 445-46.

To establish a protected property interest in a benefit, a plaintiff must demonstrate "more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). Property interests are not created by the Constitution itself, but instead arise from independent sources such as state law, contracts, or institutional policies. *Id.* The Eighth Circuit has not recognized a protected property interest in continued participation in intercollegiate athletics and has expressly declined to resolve the issue. *Does 1-2*, 999 F.3d at 583 n.2. This court has likewise noted skepticism. *See Fluitt v. University of Nebraska*, 489 F. Supp. 1194, 1201 (D. Neb. 1980). No controlling precedent in this circuit establishes such an entitlement.

Against that legal backdrop, the court turns to the allegations of the complaint. Plaintiff asserts a protected interest in continued team membership and its associated benefits, such as tuition scholarship, housing, academic services, NIL eligibility, and access to mentoring. (Filing No. 92, at p. 31-32). Even accepting those allegations as true, they do not establish a legitimate claim of entitlement under *Roth*. Plaintiff identifies no statute, regulation, contract, or university policy guaranteeing continued roster status or team participation, nor does she allege that her athletic scholarship was revoked or that any defined financial benefit previously provided was withdrawn. At most, she alleges an expectation of continued athletic participation on the team. Under *Roth*, such an expectation, without an independent source of entitlement grounded in contract, statute, or policy, is insufficient to establish a protected property interest.

This conclusion is consistent with the court's prior rulings in this matter. In connection with Defendants' Motion to Strike Plaintiff's jury demand, the undersigned observed that Plaintiff had not clearly alleged the violation of a constitutional right in her § 1983 claim against Alberts and concluded that the allegations instead resembled a tort claim. (Filing No. 50.) The district court affirmed, holding that Plaintiff failed to plead a

constitutional violation under 42 U.S.C. § 1983 and that the allegations did not establish a cognizable federal constitutional claim. (Filing No. 54.) Although those rulings arose in the context of determining Plaintiff's entitlement to a jury trial, both necessarily addressed whether Plaintiff plausibly alleged a constitutional deprivation.

Although the Eighth Circuit has not definitively resolved this issue, other courts addressing similar claims have likewise declined to recognize participation in intercollegiate athletics as a constitutionally protected property interest. *See, e.g., Colorado Seminary v. NCAA*, 417 F. Supp. 885, 895 (D. Colo. 1976), aff'd, 570 F.2d 320 (10th Cir. 1978) (rejecting claim that intercollegiate athletics constitutes a property interest); *Knapp v. Northwestern University*, 101 F.3d 473 (7th Cir. 1996), cert. denied, 520 U.S. 1274 (1997) (holding that the possibility of a professional career is "too speculative" to constitute a present economic interest); *Justice v. National Collegiate Athletic Association*, 577 F. Supp. 356, 366 (D. Ariz. 1983) ("Participation in intercollegiate athletics is not a constitutionally protected interest."). These decisions, while not binding, reflect a consistent judicial reluctance to recognize athletic participation, standing alone, as a constitutionally protected entitlement.

Plaintiff argues that many of these authorities are outdated in light of the evolving NIL landscape in college sports. That argument however does not materially alter the analysis at this stage. Plaintiff identifies no authority establishing that NIL opportunities are guaranteed by state law or university policy, nor that she was contractually entitled to any specific NIL compensation. As pleaded, her NIL-related benefits remain contingent and speculative. Under *Roth*, speculative economic opportunities do not, without more, transform athletic participation into a protected entitlement.

Plaintiff's reliance on out-of-circuit authority such as *Radwan v. Manuel,* 55 F.4th 101 (2d Cir. 2022), and *Shannon v. Board of Trustees of University of Illinois*, 2024 WL 218103 (C.D. Ill. Jan. 19, 2024) is likewise unavailing. Those cases do not recognize a freestanding constitutional right to participate in intercollegiate athletics. Rather, they involved alleged deprivation of distinct, identifiable property interests, such as revocation

of scholarship funds or breach of express contractual guarantees. In *Radwan*, the Second Circuit carefully distinguished between participation in athletics, which was not constitutionally protected, and scholarship benefits that may qualify as a property interest if supported by specific contractual terms. Likewise, *Shannon* turned on allegations concerning scholarship status and contractual rights, not mere removal from team participation. Here, Plaintiff does not plead revocation of a guaranteed scholarship, breach of a specific contractual provision, or the loss of any independently protected financial interest.

The undersigned does not purport to resolve definitively whether, under different facts or contractual provisions, continued participation in intercollegiate athletics could give rise to a protected property interest. It holds only that, on the face of the complaint and under the authorities presently before it, Plaintiff has not plausibly alleged such entitlement. Her procedural due process claim therefore fails at the first prong of the qualified immunity analysis.

### ii.    No Protected Liberty Interest

Plaintiff likewise fails to establish a protected liberty interest. Injury to reputation, standing alone, does not implicate the Due Process Clause. *Paul v. Davis*, 424 U.S. 693, 701, 711 (1976). However, when state action both damages a person's reputation and "distinctly altered or extinguished" a "right or status previously recognized by state law," procedural due process protections may be triggered. *Kroupa v. Nielsen,* 731 F.3d 813, 818 (8th Cir. 2013) (*quoting Paul*, 424 U.S. at 701, 711). This framework is commonly referred to as the "stigma plus" test. To satisfy that standard, a plaintiff must plausibly allege (1) a stigmatizing public statement and (2) alteration of a recognized legal status. *Id.*

Measured against that standard, Plaintiff's allegations again fall short. Although she asserts that she was interrogated, shamed, and humiliated by her teammates, she does not allege that Defendants publicly made any false or stigmatizing statements about her. (Filing No. 92, at p. 39). Nor does she allege that Defendants altered or extinguished a legal status

previously recognized by state law. Rather, her allegations concern the manner in which she was removed from the team and the internal consequences that followed.

For substantially the same reasons discussed above, the proposed amended complaint also fails to plausibly allege the requisite "plus." Plaintiff's references to speculative NIL-related consequences do not identify the loss of a recognized legal status. At most, they describe potential economic effects flowing from reduced athletic participation. But again, the Constitution protects recognized legal interests, not speculative economic expectations tied to athletic visibility. *See Paul*, 424 U.S. at 701-2; *Kroupa*, 731 F.3d at 818. Accordingly, because Plaintiff does not plausibly allege both a stigmatizing public statement and the alteration of a recognized legal status, no liberty interest is implicated. This claim likewise fails the first prong of the qualified immunity analysis.

### iii.    Conduct Policy Does Not Create a Constitutional Entitlement

Plaintiff alternatively alleges that the Conduct Policy itself created a constitutionally protected entitlement. According to Plaintiff, the policy mandated the Athletic Director, not the head coach, determine applicability, oversee a neutral inquiry, impose discipline, and provide appeal rights, and that Defendants failure to follow those procedures violated due process. (Filing No. 92, at paras. 135-138). Even accepting that the policy imposed mandatory procedures, that theory does not plausibly establish a constitutional violation for two reasons.

First, state-created procedures do not themselves create federal constitutional rights. In *Quinn v. Doherty*, 637 F. Supp. 3d 647, 660–61 (D. Minn. 2022), the court explained that the Due Process Clause protects substantive interests, not an expectation that state officials will comply with internal procedures. *Id.* (quoting *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 794 F.3d 1327, 1333 (11th Cir. 2015)); *see also Shango v. Jurich*, 681 F.2d 1091, 1100–01 (7th Cir. 1982) ("[A] state created procedural right is not itself a liberty interest within the meaning of the Fourteenth Amendment[.]") Thus, even assuming the

Conduct Policy imposed mandatory procedures, deviation from those procedures does not establish a constitutional violation absent the deprivation of a protected interest. As *Quinn* cautioned, "Constitutionalizing every state procedural right would stand any due process analysis on its head." *Id.* at 661.

Second, state regulations create a protected interest only when they (1) place substantive limitations on official discretion and (2) contain explicit mandatory language requiring a particular outcome if defined predicates are met. *William v. Nix*, 1 F.3d 712, 717 (8th Cir. 1993)). Here, the Conduct Policy provides that the Director of Athletics "shall, in good faith and using reasonable judgment, decide whether the policy applies." (Filing No. 94-1, at para. 18, Ex. A). This language expressly preserves administrative discretion rather than eliminating it. The policy further authorizes the Athletic Director to determine whether allegations are supported by the greater weight of the evidence and to select from a range of possible dispositions. Nothing in the policy guarantees continued team membership or requires a particular disciplinary result. On the contrary, the policy characterizes participation in intercollegiate athletics as a privilege and subjects student athletes to additional disciplinary authority exercised outside the policy. (Filing No. 94-1). Accordingly, even accepting Plaintiff's allegations as true, the Conduct Policy does not transform discretionary athletic participation into a constitutionally protected property or liberty interest.

Taken together, Plaintiff's theories, whether framed as deprivation of continued team membership, loss of reputational standing, or failure to comply with the Conduct Policy, do not plausibly allege the violation of a protected property or liberty interest under the Fourteenth Amendment. The complaint describes, at most, removal from intercollegiate athletic participation and alleged noncompliance with internal procedures. Accordingly, Plaintiff has not plausibly alleged the violation of a constitutional right and thus has not satisfied the first prong of the qualified immunity analysis at this stage.

iv.     *No Clearly Established Right*

Even assuming *arguendo* that the proposed amendment could be read to allege the deprivation of a protected interest, Plaintiff has not identified clearly established law placing Defendants on notice that their conduct violated Plaintiff's rights. The court therefore turns to the second prong of the qualified immunity inquiry. Even where a constitutional violation is adequately alleged, public officials are entitled to qualified immunity unless existing precedent has placed the constitutional question "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). A right is clearly established only when existing precedent has so clearly defined the statutory or constitutional right such that every reasonable official would understand that what he is doing violates that right. *Id.* at 741. The court evaluates that question based on the law in effect at the time of the challenged conduct.

Here, Defendants suspended Plaintiff from the team in February 2022. At that time, neither the Supreme Court nor the Eighth Circuit recognized that a student-athlete possessed a constitutionally protected interest in continued participation in intercollegiate athletics. To the contrary, in *Does 1-2 v. University of Minnesota*, the Eighth Circuit observed:

> Federal courts are split on whether participating in intercollegiate athletics is a constitutionally-protected property or liberty interest, an issue we have not decided. *See Kroupa*, 731 F.3d at 820 and 823 (Bye, J., dissenting). Even if the 'ability to pursue…athletic participation' is a protectable interest, an issue we again need not decide, the right was not clearly established at the time the Does were suspended in 2016 and therefore [Defendants] are entitled to qualified immunity from these claims…

*Id.*, 999 F.3d at 583, n. 2. That case was decided on June 1, 2021, less than a year before Plaintiff's February 2022 suspension, and expressly declined to recognize a constitutional right to intercollegiate athletic participation, noting a split of authority and concluding the right was not clearly established. No intervening authority changed that conclusion before

16

February 2022.[4] At most, this authority confirms that the law remains unsettled. Where controlling precedent acknowledges a split of authority and declines to recognize the asserted right, qualified immunity must necessarily follow, making Plaintiff's proposed Fifth Cause of Action futile.

### c. *No Individual Involvement - Love*

Plaintiff's proposed procedural due process claim also fails as a matter of law as to Defendant Love because the amendment does not plausibly allege his personal involvement in the asserted constitutional deprivation. Liability under 42 U.S.C. § 1983 is personal in nature and requires direct involvement in the alleged constitutional deprivation. *Marsh v. Phelps Cnty.*, 902 F.3d 745, 754 (8th Cir. 2018). A defendant may not be held liable under § 1983 on a theory of respondeat superior. *Ashcroft*, 556 U.S. at 676. Instead, a plaintiff must plead facts showing that the official "made, directed, or knowingly participated in" the challenged conduct. *Glick v. Sargent*, 696 F.2d 413, 414–15 (8th Cir. 1983).

Here, the complaint does not allege, nor does it credibly suggest that Love had authority over or participated in the decision to suspend or remove Plaintiff from the team. On the contrary, Plaintiff alleges that Love himself was suspended once the relevant information came to light. (Filing No. 1, at paras. 47, 51). The Conduct Policy likewise vests disciplinary authority exclusively in the Director of Athletics and does not confer decision-making authority on assistant coaches such that any mandatory language would have applied to Love. (Filing No. 94-1, at p. 1). Absent factual allegations that Love made, directed, influenced, or knowingly participated in the challenged decision, Plaintiff cannot establish the personal involvement required to state a claim under § 1983. *Ashcroft*, 556

---

[4] *Does 1-2* preceded the Supreme Court's decision in *NCAA v. Alston*, 594 U.S. 69 (2021) by about three weeks, but nothing in *Alston* addressed, much less established, a constitutional property or liberty interest in continued participation in intercollegiate athletics. *Alston* instead concerned antitrust limits on NCAA compensation rules but did not recognize a Fourteenth Amendment entitlement to athletic participation.

U.S. at 676. Accordingly, the proposed claim would also not survive a Rule 12(b)(6) motion on these grounds and is therefore futile as to Love.

### d. *No New Constitutional Deprivation*

Even if the personal involvement and immunity defects are set aside, the proposed amendment would still be futile because it does not identify any new constitutional deprivation. Absent a distinct deprivation of a protected property or liberty interest, no new constitutional claim arises. Federal courts consistently reject attempts to convert alleged violations of internal rules into constitutional claims where the underlying governmental action remains unchanged. *See Ebmeier v. Stump,* 70 F.3d 1012, 1013–14 (8th Cir. 1995); *Gardner v. Howard,* 109 F.3d 427, 430 (8th Cir. 1997).

The operative complaint already asserts a due process claim arising from Plaintiff's removal from the team. (Filing No. 1, at paras. 44–51). As discussed, the proposed Fifth Cause of Action does not identify a separate governmental act, termination of enrollment, revocation of scholarship, suspension from the university, or any newly arising protected interest. Instead, it relies on the same removal decision by quoting the Conduct Policy and alleging noncompliance with its procedures. (Filing No. 92, at p. 31). Plaintiff's explanation that the Conduct Policy was produced late addresses timing, but not the nature of the amendment (which is still removal from team participation).

Although the proposed Fifth Cause of Action is now framed expressly as procedural due process, it does not materially alter the nature of the alleged conduct. As explained above, the Constitution protects recognized legal entitlements grounded in state law, contract, or clearly defined limitations on official discretion. It does not protect expectations of continued athletic participation or adherence to internal procedures. Because the proposed amendment identifies no distinct deprivation of a protected interest, it would not survive a motion to dismiss under Rule 12(b)(6). Leave to amend is therefore denied as futile.

For these reasons, the undersigned recommends that Plaintiff's Motion for Leave to Amend the Complaint be denied. Sovereign immunity bars the proposed claim against BRUN. As to the individual defendants, Plaintiff has not plausibly alleged the deprivation of a protected property or liberty interest, nor has she identified clearly established law recognizing the asserted right at the time of the challenged conduct. In addition, the proposed amendment does not allege sufficient personal involvement by love to support liability under § 1983.

**B.    Renewed Motion to Amend Progression Order**

The court next addresses Plaintiff's Renewed Motion to Amend the Progression Order. (Filing No. 77). Although both motions arise in different procedural contexts, they independently require application of Rule 16's good cause standard. As noted above, once a deadline expires, a scheduling order "may be modified only for good cause and with the judge's consent[.]" Fed. R. Civ. P. 16(b)(4). The primary measure of good cause is the movant's diligence in attempting to comply with the scheduling order. *Albright ex rel. Doe, 926 F.3d at 951*. The court does not ask whether counsel worked hard. The question is whether the deadlines could not reasonably have been met despite diligent efforts. *See Hartis, 694 F.3d at 948*. If the movant fails to show diligence, the court need not consider prejudice. *Bradford, 249 F.3d at 809*.

1.    Plaintiff's Showing of Diligence

With that framework in mind, the court turns to Plaintiff's showing. Plaintiff argues that she diligently progressed the case and urges the court to consider the totality of her efforts. She points to her workload, the volume of discovery in this case, technological challenges encountered while coordinating with Plaintiff's family, and disputes with opposing counsel. (Filing No. 79-1). She further emphasizes that she personally reviewed the discovery produced and undertook substantial efforts to advance the litigation. The court has not ignored counsel's efforts. Managing complex discovery requires time and coordination. Even so, Plaintiff acknowledges that the press of other business, standing

alone, is insufficient to establish good cause. (Filing No. 79-1, at para. 2). Rule 16 requires more than evidence of general effort. It requires a demonstration that specific deadlines could not be met despite diligent attempts to comply. On this record, Plaintiff has not made that showing.

### 2.    The Record Undermines a Finding of Diligence

Several aspects of the record independently undermine Plaintiff's assertion of diligence. Defendants argue that Plaintiff did not miss isolated deadlines, but nearly every material deadline set in the case. (Filing No. 83, at pp. 10–11). The record lends weight to that argument. Written discovery responses were delayed, in some instances, by several months. (Filing No. 82-1, at paras. 6-7). Those delays necessarily affected subsequent deadlines, including the scheduling of depositions and disclosure of expert witnesses. While discovery in complex litigation often requires coordination, extended delays in responding to written discovery are difficult to reconcile with Rule 16's diligence requirement. Progression orders are intended to structure litigation in advance, not to be adjusted after delay has already occurred.

Plaintiff's handling of the discovery disputes further illustrates the point. Defendants served objections to Plaintiff's document requests in September 2024. Plaintiff waited to raise concerns until January 28, 2025, approximately four months later. (Filing No. 82-1, at paras. 24-25, Filing No. 81-10). Defense counsel promptly responded. Plaintiff then waited another five months, until June 26, 2025, to revisit the issue. (Filing No. 82-1, at paras. 25-26, Filing No. 82-10). Given those gaps of inactivity, it was not unreasonable for Defendants to believe that the objections would stand and that the dispute had effectively been resolved or otherwise abandoned.

The objections later resurfaced in July 2025. Plaintiff again moved to extend the progression deadlines on July 2, 2025, the same day her expert disclosure deadline expired. (Filing No. 55). The motion did not identify any specific need to extend the expert deadlines but instead relied solely on the ongoing discovery dispute concerning BRUN's

document production. After the parties submitted position statements addressing that dispute, no further follow up occurred. No submission referenced expert disclosures or suggested that expert designation remained an impediment independent of the discovery dispute. The court subsequently contacted the parties *sua sponte* regarding the status of the dispute and the parties advised that they were working toward resolution without additional court intervention. (Filing No. 82-12).  Based on those representations, and in the absence of any other request concerning expert testimony, the court denied the motion to extend and reasonably understood the discovery issue to be resolved. The prospect of expert testimony was not meaningfully revisited until the November status conference.

Plaintiff now argues that additional documents produced in September 2025, after the expert disclosure deadline, affected her ability to prepare expert testimony, particularly regarding NIL damages. (Filing No. 78). However, the procedural history also does not support that explanation. From the outset, the complaint alleged economic and educational harm arising from her suspension and removal from the team.  (Filing No. 1, at paras. 26, 63–67, 93, 99). Any effort to quantify those alleged losses, whether framed in terms of scholarship value, lost athletic opportunities, reputational impact, or potential NIL-related earning capacity, flowed from theories apparent in her initial pleading.

The original progression order, entered May 23, 2024, set the expert disclosure deadline for February 2025, which was later extended at Plaintiff's request to July 2, 2025. Plaintiff therefore had more than a year from the filing of the complaint, and several additional months under the amended schedule, to determine whether expert testimony was necessary and to prepare a timely designation. The September 2025 production does not alter the fact that the damages theories were evident long before the expert deadline expired.

Even accepting that additional documents were produced in September 2025, written discovery remained open at that time. To the extent Plaintiff contends the September production was incomplete or deficient under Rule 34, the proper course was to seek timely relief from the court. Plaintiff could have again requested prompt court

intervention, leave to file a motion to compel pursuant to the court's case management practices, or moved for targeted relief tied specifically to expert disclosures. (Filing No. 48). She did not do so.

The contrast with the Conduct Policy disclosure is instructive. Upon receiving that supplemental disclosure, Plaintiff promptly moved for leave to amend her complaint and demonstrated that the amendment deadline could not have been met despite her diligence. The court concluded above that Rule 16's good cause standard was satisfied as to that request, although it finds that doing so would be futile. No comparable showing has been made here. Plaintiff identifies alleged discovery deficiencies, but does not demonstrate that she was unable to seek relief within the existing progression deadlines.

Plaintiff's reliance on *Bamburg v. Union Pacific Railroad Co.*, 2024 WL 3276191 (D. Neb. July 2, 2024) is misplaced. In *Bamburg*, the court granted a limited extension of the Daubert motion deadline after previously undisclosed medical records were produced days before the deadline and in connection with a provider's deposition. The late disclosure raised legitimate concerns about the completeness of other medical opinions and the foundation of related vocational and economic expert testimony. The court found the movant acted diligently in seeking the records and promptly requested relief once the new information surfaced. Because the extension was brief, trial remained months away, and any additional motion practice constituted ordinary litigation expense, the court concluded that good cause existed to modify the scheduling order. The court noted in particular that newly disclosed evidence materially affected expert review and fairness favored a narrowly tailored adjustment. *Id.*

The circumstances here are very different. The relevant deadlines had already expired several months before Plaintiff sought relief, and no comparable last minute disclosure triggered the request. The potential need for expert testimony was apparent from the face of the complaint. Although Plaintiff mentioned expert testimony at a November 2025 status conference, she did not seek expedited or targeted relief upon learning new information in September 2025, nor did she move to modify the schedule before deadlines

22

lapsed. Unlike *Bamburg*, this is not a narrowly tailored response to an unexpected development that threatened imminent compliance with an existing deadline. It is an effort to reopen multiple expired deadlines after extended periods of inactivity. *Bamburg* reaffirms that Rule 16 permits limited modification where a party acts diligently in response to newly disclosed information. It does not support retroactive relief where deadlines expired without timely action.

The same pattern appears in Plaintiff's motion practice. Defendants filed a Motion to Strike Plaintiff's Jury Demand on January 17, 2025. (Filing No. 42, Filing No. 44). Plaintiff's response was due January 31, 2025. None was filed. More than two weeks after the deadline passed, Plaintiff sought leave to respond out of time. (Filing No. 49). The request was denied for failure to demonstrate excusable neglect or good cause. (Filing No. 49). Plaintiff likewise filed an untimely reply in connection with the present motion. (Filing No. 86). Defendants moved to strike the untimely filing, which was granted. (Filing No. 91). These repeated lapses across discovery deadlines and briefing reflect more than an unavoidable complication. They reflect sustained failure to comply with the court's scheduling orders.

An isolated oversight may be excusable. A sustained pattern is not. The court's deadlines are not aspirational and when multiple deadlines expire without timely action, the resulting prejudice cannot fairly be attributed to circumstance alone. The cumulative record does not reflect an unavoidable complication in discovery. It reflects repeated failures to adhere to the court's schedule and Rule 16 does not permit that history to be reframed as good cause.

### 3.    The Conduct Policy

The late disclosure of the Conduct Policy does not change this analysis. As discussed above, the court concluded that Plaintiff acted diligently in seeking leave to amend the complaint once the policy was produced. That ruling addresses the amendment of pleadings, but the Rule 16 inquiry in this context is narrower and deadline specific. The

relevant question here is whether the expert disclosure and other progression deadlines could not have been met despite diligent efforts.

Plaintiff does not explain how the contents of the Conduct Policy suddenly require expert testimony, nor does she demonstrate that the policy's late production prevented her from timely identifying or retaining experts. The proposed Fifth Cause of Action concerns alleged procedural deficiencies in her removal from the team, which were related issues already raised in her initial pleading. It does not involve technical matters that demand expert opinion. The policy's production also does not justify reopening other expired deadlines. While it is true that late produced evidence can, in appropriate circumstances, warrant narrowly tailored relief, such as that in *Bamburg*. But that relief again requires a specific showing that the information was previously unavailable, material, and that the moving party acted promptly to seek correction before deadlines expired. On this record, the Conduct Policy does not meet that standard. It may explain the timing of the amendment motion, but it does not establish good cause to reopen other deadlines that have already passed.

4.    Prejudice and Fairness

Plaintiff also argues that fairness considerations and potential prejudice warrant extension of the expert disclosure deadline. She contends that exclusion of expert testimony would operate as a significant consequence and notes that no trial date has been set. This matter does not arise under Rule 37. The court is not imposing an evidentiary sanction. The issue is whether an expired scheduling deadline should be modified under Rule 16(b)(4). That determination turns on diligence.

The absence of a trial date does not relieve the parties of their obligation to comply with progression deadlines. Rule 16 is intended to promote the orderly management of litigation. Scheduling orders may be modified only for good cause. *See Bradford v. DANA Corp.*, 249 F.3d at 809. If the lack of a trial setting alone justified reopening expired deadlines, scheduling orders would carry little meaning. General assertions of prejudice do

24

not substitute for diligence. Moreover, reopening expert disclosure at this stage, after the deadline has expired and other progression dates have passed, would require adjustment of related deadlines and delay resolution of the case. On this record, Rule 16 does not support modification of the existing schedule.

In sum, this case has now been pending for nearly two years. Plaintiff had multiple opportunities to comply with existing deadlines or to timely seek modification before those deadlines expired. The court recognizes counsel's efforts and workload, but Rule 16 sets an exacting standard, and Plaintiff has not satisfied it. Plaintiff's motion to extend the expired deadlines is therefore denied. The court also declines to extend the remaining unexpired deadlines, as the parties each declined the opportunity to do so during the recent status hearing. In particular, the court inquired as to the current state of case progression and discovery. The parties advised that there remained only four more depositions and they agreed to take those depositions out of time. The parties further advised that absent amendment of the complaint, no further progression deadline extensions are necessary. (Filing No. 131). In light of those representations, the court denies Plaintiff's Motion to Amend the Progression order in its entirety.

For these reasons, IT IS ORDERED that Plaintiff's Renewed Motion to Amend Progression Order (Filing No. 77) is denied.

IT IS RECOMMENDED to the Honorable Susan M. Bazis, United States District Court Judge that Plaintiff's Motion to Amend the Complaint (Filing No. 92) be denied.

Dated this 4th day of March, 2026.

BY THE COURT:

s/ Ryan C. Carson
United States Magistrate Judge