IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ASHLEY SCOGGIN, | Case No. 4:24-cv-3039 |
| Plaintiff, | |
| vs. | **PLAINTIFF'S OBJECTION TO AND APPEAL OF MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION AND ORDER** |
| BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, and individuals AMY WILLIAMS, TREV ALBERTS, and CHUCK LOVE, JR., in their individual capacities, | |
| Defendants. | |

Ashley Scoggin, Plaintiff in the above-captioned matter, by and through her counsel of record, pursuant to FED. R. CIV. 72 and NELR 72.2, objects to and appeals the Findings and Recommendations and Order of the Magistrate Judge dated March 4, 2026 (Filing #132). In support of this Objection, Plaintiff states:

**Motion for Leave to File an Amended Complaint**

1.

Title 28 U.S.C. § 636(b)(1) governs the standard of review when a party objects to a proposed findings of fact and recommendation by a magistrate judge. When a party objects to a magistrate judge's proposed findings and recommendations, the Article III judge makes a *de novo* determination of those portions to which objection is made."[1] The reviewing judge may "accept,

---

[1] *United States v. Azure*, 539 F.3d 904, 909 (8th Cir. 2008).

reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."[2]

2.

Under *de novo* review, a reviewing court makes its own determinations of disputed issues and does not decide whether the magistrate judge's proposed findings are clearly erroneous.[3] *De novo* review is non-deferential and requires an independent review of the matter.[4]

3.

For review of a magistrate judge's order deciding a nondispositive pretrial matter, a district judge "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law."[5]   A finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[6]

4.

Plaintiff objects to the Magistrate Judge's finding that "because Plaintiff does not plausibly allege both a stigmatizing public statement and the alteration of a recognized legal status, no liberty interest is implicated"; and the Magistrate Judge's conclusion that the proposed amendment is futile.

---

[2] 28 U.S.C. § 636(b)(1)(A).

[3] *Branch v. Martin*¸886 F.2d 1043, 1046 (8th Cir. 1989).

[4] *United States v. Backer*, 362 F.3d 504, 508 (8th Cir. 2004).

[5] FED. R. CIV. P. 72; *see also* 28 U.S.C. § 636(b)(1)(A)  ("A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law").

[6] *Lisdahl v. Mayo Found.*, 633 F.3d 712, 717 (8th Cir. 2011) (*quoting Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985).

5.

To determine futility, courts apply the same standard of legal sufficiency that is applied under Rule 12(b)(6): whether, in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief.[7]

6.

While BRUN enjoys sovereign immunity, its individual policymakers, to include ALBERTS and WILLIAMS, do not. No individual Defendant has been dismissed, or has yet sought dismissal.

7.

Plaintiff submitted her Motion for Leave to File Amended Complaint on January 2, 2026[8] and her Reply Brief and Reply Evidence on January 29, 2026.[9] Depositions continued in that time, to include completion of ALBERTS' deposition (and an opportunity to inquire about the Conduct Policy of ALBERTS, as he had not mentioned it in his December 4, 2025 deposition and its existence was unknown to Plaintiff as of then) and the depositions of LOVE, Senior Athletic Administrator Keith Zimmer, former student-manager Christian Eisenhaue[10], Title IX Coordinator Meagan Counley, former Associate Athletic Director for Compliance Jamie Vaughn and the 30(b)(6) designees that BRUN would permit. On February 16, BRUN also completed ASHLEY's

---

[7] 5 Wright & Miller Fed. Prac. & Proc. § 1357. *See also Polnac v. City of Sulfur Springs*, 555 F.Supp.3d 309, 340 (E.D. Tex. 2021) ("Whether Plaintiff is able to plead facts sufficient to contravene the independent-intermediary doctrine is indeterminable at this point, however, the Court is convinced that Plaintiff should have one final opportunity to try. If Plaintiff can, in fact, produce sufficient facts to cure the deficiencies contained herein, the Court could then delve into the other arguments presented by the Officers, including the contention that Plaintiff did commit the crimes alleged and the Officers' claim for qualified immunity").

[8] Filing # 92.

[9] Filing ## 112 and 113, respectively.

[10] Eisenhauer is the practice player referenced in ¶ 43 of the original Complaint, who obtained LOVE's room key from the front desk of the team's State College, PA hotel and used it to access LOVE's hotel room.

deposition, in which ASHLEY testified about the negative impact on her career goals of the events at issue herein.

8.

There remains a pending dispute over Notices of 30(b)(6) Deposition that Plaintiff filed on January 29, 2026.[11]   Counsel for BRUN and the undersigned met and conferred on March 6, 2026; counsel for BRUN advised that she would talk to her client and get back to the undersigned.   The undersigned has not heard from BRUN on this dispute since then.

9.

From the date of the events at issue in this case through February 4, 2026, LOVE denied having a sexual relationship with ASHLEY, and BRUN, WILLIAMS and ALBERTS endorsed his denial.[12]   At his February 5, 2026 deposition, LOVE for the first time admitted that he had a sexual relationship with ASHLEY.[13]

10.

ALBERTS acknowledges that coaches are supposed to be conflicted out of administration of the Conduct Policy when a student-athlete is accused of non-academic misconduct.   He further acknowledges that if a coach interferes with the process set forth in the Conduct Policy, that "complicates" the whole point of the Conduct Policy.   But during the entirety of ALBERTS' July 2021 – March 2024 tenure at the University of Nebraska, the Conduct Policy was never used.

---

[11] Filing ## 114 – 118.
[12] *Answer of Defendant LOVE* (Filing #19) at ¶ 38; *Answer of BRUN, WILLIAMS and ALBERTS* (Filing # 18) at ¶ 38.
[13] "Ashley gave me head."

11.

We respectfully disagree with the Magistrate Judge's conclusion that because the Conduct Policy was created by the University of Nebraska Department of Athletics, it does not create a federal constitutional right.[14]    The procedures at issue in *Quinn v. Doherty*[15], cited by the Magistrate Judge, were actual Minnesota state statutes and associated regulations[16]; the plaintiff, a grandmother, was insisting that the statutes should give her standing to participate in termination of parental rights proceedings, when the statutes gave no such right to grandparents.

12.

In contrast, in its disposition of a defense motion for partial summary judgment in *Doe v. University of Nebraska*[17], this Court analyzed whether alleged non-compliance with the University of Nebraska Student Code of Conduct, including the University of Nebraska–Lincoln Response to Allegations of Student Sexual Conduct, was actionable under 42 U.S.C. § 1983.   The plaintiff alleged that the University violated his rights by not allowing him to cross-examine his accuser, and to offer evidence about her mental health, at the University Conduct Board hearing.   While this Court found that the rights the plaintiff invoked were not clearly established at the time of the events of *Doe*,[18] this Court did not dispose of those claims on the grounds cited by the Magistrate Judge herein, *i.e.*, that University policy cannot create a federal constitutional right.   To the contrary, this Court wrote that "a liberty interest may arise from the Constitution itself, by reason

---

[14] *Findings and Recommendations* (Filing # 132) at 14.
[15] *Quinn v. Doherty*, 637 F. Supp.3d 647 (D. Minn. 2022).
[16] *Quinn*, 637 F. Supp.3d at 660 ("The Eighth Circuit has held that Minnesota's child-welfare statutes and associated regulations "do not create a constitutional liberty interest").
[17] *Doe v. University of Nebraska*, 451 F.Supp.3d 1062 (D. Neb. 2020).
[18] *Id.* at 1119 "While there is some support for Plaintiff's argument that he was denied due process by not being allowed to confront or cross-examine Jane Roe, Defendant Anaya and her colleagues cannot be held personally liable for this alleged constitutional violation because the law was not clearly established at the time of their actions").

of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies."[19]

13.

As the Magistrate Judge notes, "the Conduct Policy provides that the Director of Athletics "shall, in good faith and using reasonable judgment, decide whether the policy applies."   We respectfully disagree with the Magistrate Judge's opinion that the Conduct Policy "expressly preserves administrative discretion rather than eliminating it."[20]   Our focus is on the first word in the quoted language:   *shall*.   Meaning, the decision about application of the policy *shall* be made, and it *shall* be made by the Director of Athletics:

- The coach does not decide for herself that the policy doesn't apply to whatever misconduct her athlete is accused of and she doesn't even need to ask the Director of Athletics; and

- Nor is "no decision by anyone, one way or the other" an option.

This language does not "preserve administrative discretion."[21]   The decision shall be made, and it shall be made by ALBERTS.   The remainder of the Conduct Policy reiterates multiple times that coaches are not to be involved due to conflicts of interest.

---

[19] *Id.*, 451 F. Supp.3d at 1101.

[20] *Findings and Recommendations* (Filing #132) at 15.

[21] *See, e.g., Dane v. Mickelson*, 797 F.2d 574, 577 (8th Cir. 1986) ("The key question is whether the statutes, regulations, or policy statements articulate substantive standards or criteria that guide the officials' exercise of discretion.   An important factor that must be considered in determining whether a state law meets this test is whether the law contains language of a mandatory character, such as 'shall' or 'must' … It is true that there is no mandatory language in the statute requiring the Board to grant parole if it finds some particular number or combination of these criteria fulfilled. However, such language is not a prerequisite to the creation of a liberty interest; its import is that it serves as an indicator of whether substantive criteria limit official discretion, the ultimate test of whether a liberty interest has been created").

14.

By its terms, the Conduct Policy "applies" – not "might apply" or "could apply, in someone's discretion – "when a student-athlete has been alleged to have committed, charged with, or arrested for serious nonacademic misconduct involving, but not limited to the following …"  The categories that follow include "conduct that undermines or puts at risk the integrity and reputation of the University" and "repeated acts of misconduct, different than the aforementioned examples of misconduct, that raise the concerns addressed by this policy …"

15.

When ASHLEY's teammates ran their "caper" and caught ASHLEY under the covers in LOVE's room late at night, there was the live potential for harm to the reputation of the Department of Athletics:   LOVE was a then-35-year-old married associate head coach; ASHLEY was a 23-year-old student-athlete.   And to the extent that ASHLEY is the one who committed misconduct relative to the sexual relationship, there were "repeated" acts of "conduct that undermines or puts at risk the integrity and reputation of the University," in the words of the Conduct Policy.

16.

While the Conduct Policy also provides that "[t]he head coach of each sport has the authority to discipline, suspend and/or dismiss any student-athlete on his/her team in consultation with the head coach's sport administrator for violation of team rules separate and apart from proceeding under this Student-Athlete Conduct Policy," the "rules" written by WILLIAMS in her team handbook do not include the bases Defendants now cite for removing ASHLEY from the

team.[22]   The "team rules" clause does not supersede the mandate that an intentional decision must be made about application of the Conduct Policy, and that the decision must be made by the Director of Athletics.   And, the substantive predicates within the Conduct Policy (quoted above) prevent the Director of Athletics from denying application, and the protected processes, of the Conduct Policy for no reason at all.[23]

17.

We disagree with the Magistrate Judge's conclusion that the proposed First Amended Complaint does not meet the minimum requirements to plead a violation of ASHLEY's liberty interest.   The completion of ASHLEY's testimony happened after this Court took under advisement Plaintiff's Motion for Leave to File Amended Complaint – and her description of the impact of these events on her professional goals is meaningfully similar to the stigma-plus damages developed at an evidentiary hearing in *Kroupa v. Nielsen*[24].   With respect, we would suggest that the Magistrate Judge should have found that whether Defendants violated ASHLEY's liberty interest under a stigma-plus is not 12(b)(6) question (at least, not without leave to amend) – it is a question whose disposition warrants the review of actual evidence.

18.

*Kroupa* clearly establishes the right at issue herein.

---

[22] Which were lying, and breaking curfew.   WILLIAMS did not take into account that the reason ASHLEY broke curfew and lied was because she was in a secret sexual relationship with her coach.

[23] *See Olim v. Wakinekona*, 461 U.S. 238, 249 (1983) (there is no constitutionally-protected liberty interest if the decisionmaker is not required to base its decisions on objective and defined criteria," and can instead "deny the requested relief for any constitutionally permissible reason or for no reason at all").

[24] *Kroupa v. Nielsen*, 731 F.3d 813 (8th Cir. 2013).

19.

We take also issue with the Magistrate Judge's finding that ASHLEY did not have a protected property interest.

**Renewed Motion to Amend Progression Order**

20.

Unlike the Motion for Leave to File Amended Complaint, this Motion is non-dispositive. We recognize that this Court's review of the Magistrate Judge's decision on the Renewed Motion to Amend Progression Order is thus much more deferential. Nonetheless, Plaintiff objects to the Magistrate Judge's decision on this Motion as well.

21.

The Magistrate Judge is correct, as is BRUN, that the undersigned missed the deadline to request amendment to the progression order before the deadline for disclosure of expert witnesses. But in addition to showing the undersigned's derelictions, the record of communications also shows a long and slow-moving consistent pattern on BRUN's part: object to everything regardless of the propriety of the discovery request, and put the burden on the discovering party to do something about it.

22.

Case progression is important. Finding the truth should be at least as important – and where there is substantial evidence that a responding party's strategy is to obstruct and "run out the clock," our respectful suggestion is that this circumstance supports a different outcome than adherence to the progression order.

23.

For example:   as the record on the Renewed Motion to Amend Progression Order shows, Plaintiff's first set of written discovery included 39 Requests for Production.   BRUN responded to those 39 Requests for Production with 184 objections.   To 9 requests, BRUN responded "will supplement," but did not actually do so for another 9 months.   With those objections, BRUN included 16 assertions of privilege, but to this day has refused to provide a privilege log.   Only in reference to 1 of the 184 objections did BRUN indicate whether it was withholding documents pursuant to its objections – which the disclosure of the Conduct Policy nearly a year later would indicate that BRUN was and perhaps still is withholding documents, without acknowledging the same as required in Rule 34.   Out of the 12 Interrogatories in Plaintiff's first written discovery requests, BRUN asserted 51 objections, including six assertions of privilege.

24.

When the undersigned submitted an extensively-reasoned effort to BRUN in an attempt at resolution, BRUN's reply (also in the record for this Motion) was that "we are inclined to stand on our objections" – period.   The Magistrate Judge's interpretation of the delay by the undersigned in contacting the court on July 2 was that "it was not unreasonable for Defendants to believe that the objections would stand and that the dispute had effectively been resolved or otherwise abandoned."

25.

The undersigned acknowledges the passage of time from "we are inclined to stand on our objections" until the undersigned's contact to this Court on July 2.   But by the time the Renewed Motion to Amend Progression Order (and Motion for Leave to File Amended Complaint) went under advisement, and the record of discovery delays and problems was now before the Court, the

pattern of BRUN's objections and delays should have been of greater concern than case progression.  If it is "it was not unreasonable for Defendants to believe that the objections would stand and that the dispute had effectively been resolved or otherwise abandoned," is it also not unreasonable for Defendants to believe that if they can generate a sufficient mountain of objections, then they can run out the clock and never have to comply with the Federal Rules of Discovery?

26.

We also do respectfully disagree that the number of documents, or pages, that BRUN actually did produce is evidence of good-faith participation in discovery.   The creation of a motion to compel under circumstances like these is time-consuming for many reasons, one of which is that it becomes necessary to count the numbers of duplicate pages and duplicate documents, and blank pages, to respond to assertions of "look how many pages we produced!"

27.

Plaintiff reached out to this Court on July 2, 2025 (the same day as her expert witness disclosure deadline).  Given the seriousness of BRUN's obstruction and non-compliance with Rules 34 and 26(b)(5), and given only one prior request for an amended progression order, there should have been some room between "allow the parties to completely abandon any notion of case progression" and "deny any further extensions of the missed deadlines."

28.

Case progression is important, and the undersigned should have done better on that point. At the same time, there should be no incentive for a party-defendant to object to everything, force

the discovering party to initiate the extensive process leading up to and including a motion to compel[25], and see if they can "run out the clock."

WHEREFORE, ASHLEY respectfully objects to, and requests this Court's review of, the Findings and Recommendations of the Magistrate Judge dated March 4, 2026.

ASHLEY SCOGGIN, Plaintiff,

By:   /s/ *Maren Lynn Chaloupka*
Maren Lynn Chaloupka – NSBA # 20864
Chaloupka Law LLC
1906 Broadway
P.O. Box 1724
Scottsbluff, NE   69363-1724
(308) 270-5091
mlc@chaloupkalaw.net

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing instrument has been sent via CM/ECF on the 17th day of March 2026, to the following:

Denise E. Frost
Johnson & Mock, PC LLO
9900 Nicholas Street, #225
Omaha, NE   68114
dfrost@johnsonandmock.com

Bren H. Chambers
Deputy General Counsel
University of Nebraska
3835 Holdrege Street
Lincoln, NE   68583-0745
bchambers@nebraska.edu

Susan K. Sapp
Lily Amare
Cline Williams Wright Johnson & Oldfather, L.L.P.
1900 U.S. Bank Building
233 South13th Street
Lincoln, NE 68508
ssapp@clinewilliams.com
lamare@clinewilliams.com

    /s/ *Maren Lynn Chaloupka*

---

[25] Orders to responding parties to pay attorney's fees associated with the discovering party's motion to compel are not common, in the undersigned's experience.   This burden is all on the discovering party.