IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

ASHLEY SCOGGIN,

Plaintiff,

v.

BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, and Individuals AMY WILLIAMS, TREV ALBERTS, and CHUCK LOVE, JR., In their individual capacities,

Defendants.

Case No. 4:24-CV-3039

**JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants Board of Regents of the University of Nebraska ("BRUN"), Amy Williams ("Williams"), Trev Alberts ("Alberts"), Chuck Love, Jr. ("Love"), pursuant to FED. R. CIV. P. 56 and Local Rules NECIVR 56.1(a) and 7.1, submit this Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment.

**I. THE PARTIES AND OTHER INVOLVED INDIVIDUALS; JURISDICTION.**

1. Plaintiff Ashley Kay Scoggin ("Scoggin" or "Plaintiff"), born in May 1998, is a former University of Nebraska-Lincoln ("University" or "UNL") student. [Declaration of Lily Amare ("Amare Decl.") ¶ 20, Ex. TTT (Player Profile) at p. 4.]

2. BRUN is a body corporate and instrumentality of the State of Nebraska operating the University. [NEB. REV. STAT. § 85-101 et seq.; Doc. No. 1, Complaint, at ¶¶ 7–8.]

3. Williams has served as Head Women's Basketball Coach at the University since April 12, 2016. [Declaration of Amy Williams ("Williams Decl.") ¶ 3.]

4. Alberts served as Director of Athletics at the University from July 2021 through March 2024. [Amare Decl. ¶ 4, Ex. DDD (Alberts' Answers to Plaintiff's Interrogatories, September 10, 2024); Amare Decl. ¶ 11, Ex. KKK (Dep. of Alberts, February 19, 2026) at 11:19-14:25, 13:1–3, 156:11-16.]

5. Charles Love, Jr. ("Love") served as Assistant Women's Basketball Coach from April 14, 2016, through May 2021, then as Associate Head Coach until his separation from employment on May 9, 2022. [Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 34:16-19, 73:16-23, 294:22–24.]

6. Love was 40 years old at the time of his deposition. [Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 220:19–25.]

7. Keith Zimmer ("Zimmer") served as Sport Administrator for Women's Basketball from approximately 2021 through 2024 and has served as Executive Associate Athletic Director for Life Skills since approximately 1989. [Declaration of Keith Zimmer ("Zimmer Decl.") ¶¶ 2 & 7, Ex. R (Zimmer Documentation) at pp. 1-2; Ex. JJJ (Dep. of Zimmer) at 17:24-24-17.]

8. Meagan Counley ("Counley") has served as Title IX Coordinator and Assistant Director of Institutional Equity and Compliance ("IEC") since approximately January 2020. She previously served as Title IX Investigator and Deputy Title IX Coordinator from 2016 through 2019, then as interim Title IX Coordinator beginning December 2019. [Declaration of Meagan Counley ("Counley Decl.") ¶¶ 3–4; Amare Decl. ¶ 12, Ex. LLL (Dep. of Counley) at 9:1–10:5, 14:1–15:25; Amare Decl. ¶ 13, Ex. MMM (Dep. of Shaver) at 8:1–9:10.]

9. Leslie Shaver ("Shaver") has served as Deputy Title IX Coordinator and Investigator in IEC since approximately 2021, having joined the University in July 2019 as a Civil Rights Investigator. [Declaration of Leslie Shaver ("Shaver Decl.") ¶¶ 3–4; Amare Decl. ¶ 13, Ex. MMM (Dep. of Shaver) at 6:25-9:24.]

10. Layton Brooks ("Brooks") serves as Director of Employee Relations and Talent Management in the University's Department of Human Resources. He has worked in human resources at the University for over 20 years. [Amare Decl. ¶ 18, Ex. RRR (Dep. of Layton Brooks 30(b)(6)) at 5:1 – 6:10.]

11. Jamie Vaughn ("Vaughn") served as Executive Associate Athletic Director for Compliance at the University from April 2016 to August 2024. In that role, Vaughn oversaw athletics compliance, served as a designated contact for sexual misconduct reporting within the Department of Athletics, and coordinated with the Title IX office during investigations. [Zimmer Decl., ¶ 4, Ex. O (Student-Athlete Handbook) at p. 22; Counley Decl., Ex. AA (Sexual Misconduct Reporting Training) at 5; Amare Decl. ¶ 14, Ex. NNN (Dep. of Vaughn) at 22:3-16, 34:14–36:24.]

12. This Court has jurisdiction over Plaintiff's claims to the extent those claims are asserted under 42 U.S.C. § 1983 alleging constitutional violations, and under Title IX, 20 U.S.C. § 1681. Venue is proper in this Court because all events about which Plaintiff complains occurred in Lincoln, Nebraska. [Doc. No. 1, Complaint, ¶¶ 1–6.]

## II. UNIVERSITY POLICIES

### A. THE SEXUAL MISCONDUCT POLICY AND PROCEDURES.

13. BRUN adopted Regents Policy RP-2.1.8 (the "Sexual Misconduct Policy"), which applied to all University community members regardless of sexual orientation or gender identity and to all education programs and activities under the University's jurisdiction. [Counley Decl. ¶ 4, Ex. X (Board of Regents Policies) at p. 7.]

14. For Title IX purposes, "education program or activity" included locations, events, or circumstances over which the University exercised substantial control over both the respondent and the context of the alleged harassment, and any building owned or controlled by a recognized student organization. [Counley Decl. ¶ 10, Ex. X (Board of Regents Policies) at pp. 7-8.]

15. The Policy required all University community members to maintain an environment free from sexual misconduct. Sexual misconduct—including domestic violence, dating violence, sexual harassment, sexual assault, sexual exploitation, and stalking—was

prohibited under University policy and against the law. [Counley Decl. ¶ 10, Ex. X (Board of Regents Policies) at p. 1.]

16. The Policy prohibited sexual harassment under both Title IX and Title VII. [Counley Decl. ¶ 10, Ex. X (Board of Regents Policies) at p. 10.]

17. The Policy defined "sexual harassment" as conduct on the basis of sex satisfying one or more of the following: (a) conditioning an aid, benefit, or service on participation in unwelcome sexual conduct; (b) unwelcome conduct so severe, pervasive, and objectively offensive that it effectively denies equal access to the University's education program or activity; (c) sexual assault; (d) dating violence; (e) domestic violence; or (f) stalking. [Counley Decl. ¶ 10, Ex. X (Board of Regents Policies) at p. 10.]

18. To qualify as Title IX sexual harassment, the conduct had to occur in the University's education program or activity and against a person in the United States. [Id.]

19. The Policy defined "consent" as "a freely and affirmatively communicated willingness to participate in particular sexual activity or behavior, expressed either by words or clear, unambiguous actions." Consent: (a) can be withdrawn at any time; (b) cannot be coerced or compelled by force, threat, deception, or intimidation; (c) cannot be given by someone incapacitated; and (d) cannot be assumed based on silence, absence of "no" or "stop," a prior or current relationship, or prior sexual activity. [Id. at 11.]

20. The Policy defined "retaliation" as intimidating, threatening, coercing, or discriminating against any individual for interfering with rights under the Policy or because the individual made a report, testified, assisted, participated, or refused to participate in an investigation, proceeding, or hearing. [Id. at 16.]

21. The Policy defined "actual knowledge" as notice of sexual harassment or allegations thereof to the Title IX Coordinator or any "Official with Authority"—defined as an official authorized to institute corrective measures on behalf of the University. The Employee Procedures identified Officials with Authority as: the President; Chancellors; Provost/Vice

Presidents and Vice Chancellors; and UNCA and Campus Title IX Coordinators. [Id. at 17; Counley Decl. ¶ 11, Ex. Y (Employee Procedures) at p. 4.]

22. Zimmer, Williams, Love and Alberts did not have the authority to institute corrective measures for allegations of sexual misconduct against an employee of the University. Their role was to report known or suspected sexual misconduct to IEC. [Zimmer Decl. ¶ 13; Counley Decl. ¶ 6, 7; Williams Decl. ¶ 15.]

23. While "Responsible Employees" were required to report known or suspected sexual misconduct to IEC, a report to a Responsible Employee who was not an Official with Authority did not constitute "actual knowledge" for Title IX purposes. [Counley Decl. ¶ 11, Ex. Y (Employee Procedures) at p. 4.]

24. The University had actual notice only when an individual reported to an Official with Authority. [Counley Decl. ¶ 11, Ex. Y (Employee Procedures) at p. 4.]

25. The Policy also defined "formal complaint," "incapacitated," "preponderance of the evidence," "confidentiality," and each category of prohibited conduct—including dating violence, domestic violence, sexual assault, sexual exploitation, and stalking. [Counley Decl. ¶ 10, Ex. X (Board of Regents Policies) at pp. 11 - 12.]

26. The Policy required prompt reporting of potential violations. Although the University did not limit the reporting timeframe, it encouraged reporting within 180 days of the last occurrence, noting that delay may impede evidence gathering. [Id. at 14.]

27. Pursuant to Regents Policy RP-2.1.8(B)(3), the President implemented the Procedures for Sexual Misconduct Reports Against Employees, dated November 11, 2021 (the "Employee Procedures"), which supplemented the Policy and described the grievance process for reports against employees. [Counley Decl. ¶ 10, Ex. X (Board of Regents Policies) at p. 15; Counley Decl. ¶ 11, Ex. Y (Employee Procedures) at 1–2.]

28. Under the Employee Procedures, the grievance process began only when a Complainant filed, or a Title IX Coordinator signed, a Formal Complaint. Absent a Formal

Complaint, the University could not initiate the grievance process. [Counley Decl. ¶ 11, Ex. Y (Employee Procedures) at 18; Amare Decl. ¶ 12, Ex. LLL (Dep. of Counley) at 110:17–111:14.]

29. Unless dismissed or resolved, the grievance process included a preliminary review, investigation, hearing, and appeal opportunity. [Counley Decl. ¶ 11, Ex. Y (Employee Procedures) at 18.]

30. The Title IX Coordinator or IEC investigators conducted investigations. The University bore the burden of gathering sufficient evidence for responsibility determination. [Counley Decl. ¶ 11, Ex. Y (Employee Procedures) at 24.]

31. During the investigation, the Investigator would meet separately with the Complainant and Respondent, provide each party an equal opportunity to identify witnesses and other evidence, and review all available pertinent evidence. [Counley Decl. ¶ 11, Ex. Y (Employee Procedures) at 24.]

32. Before completing the Investigative Report, the parties had at least ten University Days to review the evidence and submit written responses. The Investigator then prepared the Report, which was sent to the parties at least ten University Days before the hearing. [Counley Decl. ¶ 11, Ex. Y (Employee Procedures) at 24–26.]

33. After investigation, a hearing determined whether the Respondent violated the Policy. The Respondent was presumed not responsible until the process concluded. The hearing included live cross-examination by each party's advisor and was recorded or transcribed. [Counley Decl. ¶ 11, Ex. Y (Employee Procedures) at 27–36.]

34. Responsibility was determined by a preponderance of the evidence. [Counley Decl. ¶ 11, Ex. Y (Employee Procedures) at 27.]

35. If found responsible, sanctions ranged from warning to termination. Both parties could appeal. [Counley Decl. ¶ 11, Ex. Y (Employee Procedures) at 18, 27–36.]

36. The Title IX Coordinator could dismiss a Formal Complaint under certain circumstances, including: (i) written withdrawal by the Complainant; (ii) the Respondent no longer being enrolled or employed; or (iii) circumstances preventing sufficient evidence gathering. [Counley Decl. ¶ 11, Ex. Y (Employee Procedures) at 21–22.]

37. Upon dismissal, the Title IX Coordinator was required to provide a Notice of Dismissal within seven days explaining the reasons and appeal rights. [Counley Decl. ¶ 11, Ex. Y (Employee Procedures) at 21–22.]

**B. THE CONSENSUAL RELATIONSHIPS POLICY (RP-3.3.15).**

38. On June 25, 2021, the Board of Regents adopted Regents Policy RP-3.3.15, the "Consensual Relationships Policy," applicable to all faculty, staff, and other academic staff throughout the University System. [Counley Decl. ¶ 10, Ex. X (Board of Regents Policies) at p. 19 – 13.]

39. The Consensual Relationships Policy recognized that "[t]he inherent power differential in faculty or staff relationships with students can give rise to actual or perceived conflicts of interest as well as claims of abuse of authority, exploitation, bias or favoritism," and that "[a] romantic relationship that is considered by the faculty or staff member to be consensual may be perceived instead by the student to be coerced because of the power or influence held by the faculty or staff member." [Id. at 19.]

40. The Consensual Relationships Policy defined:

a. "Romantic Relationship" as "[a]ny relationship of a sexual, intimate, romantic, dating, or amorous nature, regardless of its length." [Counley Decl. ¶ 10, Ex. X (Regents Policies) at RP-121.]

b. "Supervisory or Evaluative Authority" as "[t]he power to control or influence another individual's academic advancement or employment through such means as making or affecting decisions related to admission, grades, assignments, participation in programs or projects, dissertations or research,

recommendations, financial aid, hiring, working conditions, compensation, promotion, discipline, or termination/expulsion." [Counley Decl. ¶ 10, Ex. X (Regents Policies) at RP-121.]

c. "Staff" as "[a]ny individual employed by the University in a non-faculty position, including academic-administrative, managerial-professional, and office and service staff members, but excluding other academic staff members and student employees."

[Id. at 20-21.]

41. Section IV.A of the Consensual Relationships Policy prohibited four categories of romantic relationships:

a. Faculty members were prohibited from engaging in any romantic relationship with an undergraduate student, regardless of whether the faculty member had any supervisory or evaluative authority over that student;

b. Faculty and staff members were prohibited from engaging in any romantic relationship with a graduate or professional student within their same academic unit, or over whom they had or might reasonably be expected to have any direct or indirect supervisory or evaluative authority;

c. Other academic staff members were prohibited from having any institutional responsibilities over students with whom they currently had, or previously had, a romantic relationship; and

d. Faculty, staff, and other academic staff members were prohibited from exercising direct or indirect supervisory or evaluative authority over any employee or student with whom they currently had, or previously had, a romantic relationship.

[Id. at 21.]

42. The Consensual Relationships Policy required staff to "report in writing to their campus Director of Human Resources whenever they engage in a romantic relationship that potentially could violate this policy." [Id. at 21-22.]

43. Staff could request an exception, which would be "reviewed on a case-by-case basis and will be granted only if all potential risks associated with that relationship can be avoided through the development of a conflict management plan." [Id. at 22.]

44. Section IV.E stated that violations—"including engaging in a prohibited relationship, failing to properly report a relationship, or failing to adhere to a conflict management plan"—could result in disciplinary action "in accordance with the University's disciplinary policies," taking into account "the unique and relevant facts of each case," with possible consequences "including without limitation mandatory training or counseling, written warning, suspension, demotion, loss of privileges, or even expulsion or termination." [Id.]

**C. THE STUDENT-ATHLETE HANDBOOK.**

45. The University of Nebraska Athletics Department published a Student-Athlete Handbook each academic year. The opening page stated that "[s]tudent-athletes are responsible for being familiar with and abiding by the information presented in the Student-Athlete Handbook." [Zimmer Decl. ¶ 4, Ex. O (Student-Athlete Handbook) at p. 1.] The Handbook was distributed to student-athletes at a beginning-of-year team meeting. [Id.]

46. The Student-Athlete Handbook's "Conduct" section required coaches, trainers, and staff to "conduct themselves in a way that creates a positive image of the people, values and traditions associated with the University, the Big Ten Conference and the NCAA." Student-athletes were expected to uphold the same standards, including academic honesty. The Handbook stated that the Athletics Department "has developed an internal code of conduct to which student-athletes must adhere" and that "[t]hese policies and

procedures will be reviewed with and provided to student-athletes annually." [Zimmer Decl. ¶ 4, Ex. O (Student-Athlete Handbook) at p. 18.]

47. The Student-Athlete Handbook addressed discrimination, harassment, relationship violence, and acquaintance rape, and directed student-athletes who believed they were being harassed or subjected to discrimination to contact IEC. [Id. at 18.] The Handbook also stated that UNL "complies with all local, state and federal laws prohibiting discrimination, including Title IX, which prohibits discrimination on the basis of sex." [Id.]

48. The Student-Athlete Handbook encouraged "any person subject to sexual misconduct to report the conduct" to law enforcement and to the University's Title IX office, and it provided a phone number to the Title IX Office. It also provided a link to reporting options and resources. [Id.]

49. The Student-Athlete Handbook was physically distributed to every roster member at the beginning-of-year team meeting, explaining that "the academic counselor, since it was an academic handbook and a planner combined, they distribute this to every member on the roster" at the beginning-of-year meeting "so that way they can use it as a daily planner as well as the student-athlete handbook." [Amare Decl. ¶ 10, Ex. JJJ (Dep. of Zimmer) at 116:24-119:25; Zimmer Decl. ¶ 6, Ex. Q (New Student-Athlete Orientation Meeting Invitation).]

50. The 2020–21 beginning-of-year team meeting agenda for Women's Basketball confirms "Student-Athlete Planner distribution" as an agenda item. [Amare Decl. ¶ 22, Ex. VVV (Player Handbook Team Meeting Notes) at p. 26.]

**D. WOMEN'S BASKETBALL TEAM RULES.**

51. Head Coach Williams developed and distributed team-specific handbook and rules for the Women's Basketball program each season (the "Team Rules"). [Amare Decl. ¶ 9, Ex. III (Dep. of Williams, December 18, 2025) at 78:12–79:25, 90:2–4; Amare Decl. ¶ 6,

Ex. FFF (Dep. of Scoggin Vol. I) at 41:8–50:25 (confirming receipt and review of Team Rules for both seasons).]

52. Scoggin received the Team Rules for both the 2020–2021 and 2021–2022 seasons, and meetings were held to review them. [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 41:8–50:25; Amare Decl. ¶ 22, Ex. VVV (Player Handbook Team Meeting Notes) at p. 26.]

53. The Team Rules emphasized team values including love, accountability, trust, consistency, communication, commitment, unity, and relentlessness. [Williams Decl. ¶¶ 6, 7, Ex. PP (2020-2021 Team Rules), Ex. QQ (2021-2022 Team Rules).]

54. The "Trust" section of the Team Rules stated: "Trust is essential to an effective team, because it provides a sense of safety. When team members feel safe with each other, they feel comfortable to open up, take appropriate risks, and expose vulnerabilities." It warned that "[a] team without trust isn't really a team, it is a group of individuals often making disappointing progress." [Williams Decl. ¶¶ 6, 7, Ex. PP (2020-2021 Team Rules) at p. 6, Ex. QQ (2021-2022 Team Rules) at p. 5.]

55. The "Communication" section stated: "Being honest and consistent in all communication within the program will foster that trust between members of the team and among the program." [Williams Decl. ¶¶ 6, 7, Ex. PP (2020-2021 Team Rules) at p. 8, Ex. QQ (2021-2022 Team Rules) at pp. 5-6.]

56. The Team Rules contained a "Coaches Pet Peeves" section identifying behaviors antithetical to team values. The first behavior listed was "Telling Lies." [Williams Decl. ¶¶ 6, 7, Ex. PP (2020-2021 Team Rules) at p. 13, Ex. QQ (2021-2022 Team Rules) at p. 10.] Additional items included "Making excuses," "Lip service," "Poor communication," and "Not handling things 1 v 1 (talking negatively behind the scenes)." [Id.]

57. The Team Rules contained seven enumerated rules. Rule 1: "Don't Break the Law. Husker women's basketball players will abide by all State and Federal laws, NCAA

rules, Big Ten policies, as well as the University of Nebraska Code of Conduct and Athletic Department policies. It is your responsibility to familiarize yourself with each of these laws, rules, documents, and policies." [Williams Decl. ¶¶ 6, 7, Ex. PP (2020-2021 Team Rules) at p. 14, Ex. QQ (2021-2022 Team Rules) at p. 9.]

58. Rule 2: "No alcohol, smoking or vaping on campus or at team functions or at any point when representing the University of Nebraska. Also, refer to Rule #1 if you are underage." [Id.]

59. Rule 3: "No illegal drug use. Nebraska Athletics has a comprehensive Drug Screening policy that will be followed." [Id.]

60. Rule 4: "Attendance and being on time is mandatory at class, zooms, workouts, study hall, appointments, and scheduled tutor sessions." [Id.]

61. Rule 7: "Be respectful to professors, counselors, support staff, coaching staff, managers and each other. Disrespectful and inappropriate behavior will not be tolerated." [Id.]

62. The Team Rules stated: "Any violation of team rules will be addressed on a case by case basis and the coaching staff will meet and decide whether upper administration, or other professional staff such as academics, compliance, athletic medicine, sports psychology, etc. need to be brought into the fold for next steps. Possible consequences could include verbal/written warnings, extra conditioning activities, extra academic activities, counseling, community service, suspension or dismissal from practice, competition or team activities, dismissal from the team, expulsion from the University, or cancellation of basketball scholarship." [Id.]

63. The Student-Athlete Handbook provided that head coaches would establish "specific requirements for dress, individual conduct, curfews and free-time activities" for team travel. [Zimmer Decl. ¶ 4, Ex. O (Student-Athlete Handbook) at p. 27.]

64. In 2021–22, the Women's Basketball program maintained a curfew and lights-out requirement for team travel. [Amare Decl. ¶¶ 8, 9, Ex. III (Dep. of Williams) at 81:21–82:14, 114:14-116:16, 118:11–16, 321:8–322:19, Ex. HHH (Dep. of Love, February 4, 2026) at 89:25–90:21.]

65. During the relevant period in 2021 and 2022, Amanda Hart ("Hart") provided players with travel itineraries and room assignments ahead of or upon arrival at team travel destinations. The itinerary included the designated curfew and lights-out time. [Hart Decl. ¶ 5.]

66. The itinerary for the Penn State trip on February 16–17, 2022, designated "11:00pm- Lights out" for the evening of February 16. [Hart Decl. ¶ 6, Ex. N (Penn State Itinerary).]

### E. Student-Athlete Conduct Policy.

67. The Athletics Department maintained a Student-Athlete Conduct Policy specifying "the higher standard of conduct expected and required of student-athletes" and the procedures for responding to allegations of non-academic misconduct. [Zimmer Decl. ¶ 5, Ex. P (Conduct Policy) at p. 1.]

68. The Conduct Policy stated that "[t]he privilege provided to student-athletes to voluntarily participate in intercollegiate athletics at the University of Nebraska creates special obligations and responsibilities" and required student-athletes to "avoid conduct detrimental to the integrity of and public confidence in the University." [Zimmer Decl. ¶ 5, Ex. P (Conduct Policy) at p. 1.]

69. The Conduct Policy applied only when a student-athlete "has been alleged to have committed, charged with, or arrested for serious nonacademic misconduct." The Student-Athlete Conduct Policy identified specific categories of serious nonacademic misconduct triggering its procedures, including causing physical injury to another person, harassment, hazing, delivering or possessing illegal drugs, driving under the influence, theft,

weapons possession, and "conduct that undermines or puts at risk the integrity and reputation of the University." [Zimmer Decl. ¶ 5, Ex. P (Conduct Policy) at p. 2.]

70. The Director of Athletics had sole discretion to determine applicability "in good faith and using reasonable judgment." [Zimmer Decl. ¶ 5, Ex. P (Conduct Policy) at p. 3.]

71. The Conduct Policy expressly preserved the head coach's independent disciplinary authority over team rule violations: "[t]he head coach of each sport has the authority to discipline, suspend and/or dismiss any student-athlete on his/her team in consultation with the head coach's sport administrator for violation of team rules ***separate and apart*** from proceeding under this Student-Athlete Conduct Policy." [Zimmer Decl. ¶ 5, Ex. P (Conduct Policy) at p. 1.]

72. The Conduct Policy does not govern sexual misconduct allegations. It "neither substitutes nor preempts the University's Title IX procedures," and allegations of sexual misconduct—including sexual assault, sexual harassment, dating violence, domestic violence, and stalking—"fall under the jurisdiction of the University of Nebraska's Office of Institutional Equity and Compliance." [Zimmer Decl. ¶ 5, Ex. P (Conduct Policy) at p. 2.]

73. Accordingly, "[t]he Athletics Department will not independently investigate any allegations of sexual misconduct," and student-athletes accused of sexual misconduct "are subject to the same disciplinary process and sanctions as all University students." [Zimmer Decl. ¶ 5, Ex. P (Conduct Policy) at p. 2.]

74. The Director of Athletics' determination of whether the Conduct Policy applied was "final" and "not subject to appeal." [Zimmer Decl. ¶ 5, Ex. P (Conduct Policy) at p. 2.]

75. Plaintiff's Complaint did not allege that she "has been alleged to have committed, charged with, or arrested for serious nonacademic misconduct." [Doc. No. 1.]

76. Rather, Scoggin alleged in her Complaint that Williams removed her from the team for "a violation of team rules." [Doc. No. 1, ¶ 60.]

## III. GENERALLY, ABOUT TRAININGS PROVIDED BY THE UNIVERSITY

77. Since at least 2015, the University's Office of IEC has provided in-person training to members of the Athletics Department regarding Title IX matters. [Amare Decl. ¶ 17, Ex. QQQ (Dep. of Counley 30(b)(6)) at 19:8-16.]

78. In August 2015, IEC developed a "Coaching and Title IX" presentation under Title IX Coordinator Susan Foster, tailored specifically for athletic coaching staff. The training covered Title IX definitions, the Sexual Misconduct Policy, reporting obligations of "Responsible Employees," the 2014 NCAA Resolution on sexual violence, and UNL's reporting protocol. [Counley Decl. ¶ 14, Ex. BB (Coaching and Title IX PPT) at pp. 1 - 19; Amare Decl. ¶ 17, Ex. QQQ (Dep. of Counley 30(b)(6)) at 6:7-22.]

79. The "Coaching and Title IX" training included hypothetical scenarios, including: "You hear rumors that an athletic staff member is having an inappropriate relationship with a student athlete. What should you do? What will IEC do?" [Counley Decl. ¶ 14, Ex. BB (Coaching and Title IX PPT) at p. 17.]

80. The "Coaching and Title IX" training stated: "As Coaches, you are all 'Responsible Employees.' All known or suspected sexual misconduct matters must be immediately reported to IEC. IEC will investigate. No one else should initiate, conduct, involve, impede" any such investigation. [Counley Decl. ¶ 14, Ex. BB (Coaching and Title IX PPT) at p. 7.]

81. Members of the Athletics Department have "continued to be trained" on an "annual basis" since 2015 that "IEC will investigate and no one else should initiate, conduct, involve or impede." [Amare Decl. ¶ 17, Ex. QQQ (Dep. of Counley 30(b)(6)) at 19:3-17.]

82. Effective March 2021, the University launched mandatory online Sexual Misconduct Prevention and Response Training for all students, faculty, and staff, aligned with recommendations from the Chancellor's Collaborative on Sexual Misconduct. All University community members received an email requiring completion within 30 days.

Students who did not complete the training could be restricted or delayed in registering for future courses. [Amare Decl. ¶ 28, Ex. AAD (Nebraska Today, "University launches sexual misconduct training for all students, employees" February 26, 2021); Amare Decl. ¶ 13, Ex. MMM (Dep. of Shaver) at 30:1-31:6.]

83. The student training module, "U Got This!", developed by Catharsis Productions, covered topics including how culture influences sex and relationships, consent, stalking, and campus resources. The training took approximately one hour to complete. [Amare Decl. ¶ 28, Ex. AAD (Nebraska Today, "University launches sexual misconduct training for all students, employees" (2/26/21)).]

84. The faculty and staff training module, "Report=Support," also developed by Catharsis Productions, took approximately 40–45 minutes to complete annually. The training covered definitions of sexual misconduct, reporting responsibilities under Title IX, how to respond to disclosures, and available resources. Participants were reminded that "[a]ll individuals are expected to promptly report conduct that may violate the University's Sexual Misconduct Policy to the University" and directed to report to Counley or Vaughn. [Counley Decl. ¶ 12, Ex. Z at pp. 1 - 14; Counley Decl. ¶ 13, Ex. AA at 13–15.]

## IV. WILLIAMS' EMPLOYMENT AT NEBRASKA

85. Williams' coaching career prior to Nebraska included: Graduate Assistant Coach at the University of Nebraska-Kearney (1998–2000), where she earned her Master of Arts in Education in Sports Administration in 2002; Assistant Coach at the University of Texas-San Antonio (2000–2001); Assistant Coach at Oklahoma State University (2001–2005); Assistant Coach at the University of Tulsa (2005–2007); Head Coach at Rogers State University (NAIA) (2007–2012); and Head Coach at the University of South Dakota (2012–2016). [Farrell Decl. ¶ 6, Ex. F (NCAA Infractions Background Check); Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 7:11-8:15, 40:13-18, 173:14-18, 177:1-7, 178:1–25, 183:1–25, 188:1 – 189:25.]

86. In April 2016, Williams was hired as Head Women's Basketball Coach at the University, with her appointment beginning April 12, 2016. [Amare Decl. ¶ 21, Ex. UUU (Williams Contract); Williams Decl. ¶ 3.]

87. As part of the hiring process, on or about April 8, 2016, the University requested an NCAA infractions background check on Williams under both her maiden name (Amy Gusso) and married name (Amy Williams). The NCAA responded that it "does not have individual record files concerning any past major (level I or level II) infractions or penalties" for either name. [Farrell Decl. ¶ 6, Ex. F (NCAA Infractions Background Check).]

88. Williams had never had a romantic or sexual relationship with a player as a coach, did not know anyone who did (other than the allegations contained in this lawsuit), and had never worked for or played for a program where there was an allegation of sexual harassment. [Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 61:7–25, 73:1–17.]

89. Prior to February 2022, Williams did not receive any report or complaint of inappropriate sexual or romantic behavior between Love and a student-athlete. [Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 325:1–25, 338:1–25; Williams Decl. ¶ 13, Ex. WW at p. 1.]

90. From 2016 to present, there were no complaints or grievances alleging that Williams failed to appropriately respond to allegations of sexual harassment of a student by a coach, other than Plaintiff's allegations against Love. [Id.]

91. Williams received annual Title IX training throughout her tenure at the University. She testified that she attended "a Title IX training every year where we go through about an hour-long presentation where they talk through different examples of sexual misconduct and things." [Williams Decl. ¶ 14; Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 28:15–32:6.]

92. Williams confirmed that "[i]nappropriate sexual/romantic relationships were addressed within the various Title IX training courses" and that the training taught her to

"recognize and report" conduct that may violate the Sexual Misconduct Policy. [Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 31:4–32:12.]

93. Williams completed five separate Title IX-related trainings during 2021–2022: UNL Sexual Misconduct Prevention and Response Training (March 2021); Report=Support (May 2021); UNL Sexual Misconduct Prevention and Response Training (April 2022); UNL Faculty/Staff Sexual Misconduct Prevention and Response Training Introduction (April 2022); and Report=Support (April 2022). [Williams Decl. ¶ 14.]

## V. ALBERTS' EMPLOYMENT WITH THE UNIVERSITY

94. Alberts served as Vice Chancellor and Director of Athletics at the University of Nebraska-Lincoln from July 2021 until March 2024. [Doc. No. 1, ¶¶ 5, 10.]

95. Prior to his appointment at the University, Alberts served as Vice Chancellor for Athletic Leadership and Management (Director of Athletics) at the University of Nebraska-Omaha from approximately 2009 to 2021. [Amare Decl. ¶ 12, Ex. LLL (Dep. of Counley) at 169:20–25.]

96. Prior to February 2022, Alberts did not receive any report or complaint of inappropriate sexual or romantic behavior between Love and a student-athlete. [Amare Decl. ¶ 11, Ex. KKK (Dep. of Alberts, February 19, 2026) at 20:1–12, 55:1–25 – 56:1–10; Amare Decl. ¶ 4, Ex. DDD (Alberts' Answers to Plaintiff's Interrogatories, September 10, 2024).]

97. Alberts completed comprehensive Title IX training upon joining UNL. [Amare Decl. ¶ 4, Ex. DDD (Alberts' Answers to Plaintiff's Interrogatories, September 10, 2024).]

98. Alberts attended the following Title IX trainings in 2021 and 2022: UNL Sexual Misconduct Prevention and Response Training (July 2021); Report=Support (September 2021); UNL Sexual Misconduct Prevention and Response Training (August 2022); UNL Faculty/Staff Sexual Misconduct Prevention and Response Training Introduction (August 2022); and Campus Security Authorities – Who, What, Why and Where (October 2022). Alberts confirmed that "[i]nappropriate sexual/romantic relationships were addressed

within the various Title IX training courses" and that he also attended NCAA-mandated training related to Title IX compliance. [Amare Decl. ¶ 4, Ex. DDD (Alberts' Answers to Plaintiff's Interrogatories, September 10, 2024).]

99. Alberts understood his responsibility under Title IX was to report suspicious matters to compliance and Title IX experts, rather than to investigate himself. When asked about his response to potential Title IX issues, Alberts stated: "[W]e are very intentional about knowing what our role is. And so our role is to report and to allow the people at the University who are experts in those areas to guide, direct and help us." [Amare Decl. ¶ 11, Ex. KKK (Dep. of Alberts) at 17:1-18:15.]

100. He further testified that "if we think that's happening, that's when we are encouraged, but trained to report it to the experts. We're not experts in this. I'm not an expert in that area, and I don't make that judgement." Alberts confirmed that upon becoming aware of a potential concern, "we will immediately report it to the Title IX office." [Amare Decl. ¶ 11, Ex. KKK (Dep. of Alberts) at 17:1-18:19, 55:1–25, 76:1–20.]

## VI. LOVE'S EMPLOYMENT WITH THE UNIVERSITY

### A. COACHING BACKGROUND AND HIRING PROCESS.

101. Prior to Nebraska, Love held the following coaching positions: Graduate Assistant Coach (men's basketball), Northwestern Oklahoma State University (2008–2009); Assistant Coach (men's basketball), Wayland Baptist University (2010–2011); Volunteer Assistant Coach (boys' basketball), Alva High School, Oklahoma (2009–2010); Assistant Coach (men's basketball), Rogers State University (NAIA) (2011–2012); and Assistant Coach (women's basketball), University of South Dakota (2012–2016). [Farrell Decl. ¶ 6, Ex. F (NCAA Infractions Background Check); Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 56:1 – 59:25.]

102. Williams first met Love at Rogers State University, where she was head women's basketball coach and Love was on the men's basketball coaching staff. [Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 181:11–182:15; Doc. No. 1, ¶ 7.]

103. In 2012, when Williams was hired as Head Coach at the University of South Dakota, she offered Love a position on the women's basketball staff. Love accepted and coached under Williams at South Dakota from 2012 through 2016. [Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 180:1–25, 183:1–25; Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 58:1 – 59:25; Doc. No. 1, ¶ 7.]

104. Before Love started at South Dakota, Williams had "very clear conversations with him" about transitioning to women's basketball, emphasizing that "it would be really important that he just took safe measures to be with multiple people if he was going to be instructing athletes" and that "it was really important that he would protect himself by having other people involved." [Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 53:5–25.]

105. In April 2016, when Williams was hired at Nebraska, she brought her coaching staff—Love, Tandem Mays ("Mays"), and Tom Goehle ("Goehle"). [Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 188:25-189:25, 207:1–25; Doc. No. 1, ¶ 8.]

106. The Athletics Department completed its standard hiring checklist for Love's onboarding, including background checks, NCAA infractions checks, signed offer and acceptance letters, Code of Conduct documents, and payroll paperwork. [Farrell Decl. ¶ 7, Ex. G (Athletics New Hire Approvals and Checklist for Hiring of Love).]

107. On or about April 8, 2016, the University requested an NCAA infractions background check on Love. The NCAA responded that it did not have individual record files concerning any past major (level I or level II) infractions or penalties for Love. [Farrell Decl. ¶ 6, Ex. F (NCAA Infractions Background Check).]

108. On April 15, 2016, University Human Resources confirmed that criminal history background checks on Love were clear. [Farrell Decl. ¶ 8, Ex. H (Background Check Result for Love).]

109. No documents or testimony produced in this litigation show that Love engaged in any inappropriate intimate relationship with a student prior to his time at the University. Love testified that he had never had a sexual or romantic relationship with any player at any program he coached prior to his relationship with Scoggin—not at the University of South Dakota, not at Rogers State University, and not at any other program. [Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 131:21 – 132:25.]

110. Love did not grade Scoggin's performance, athletically or academically. [Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 114:15-20; Farrell Decl. ¶ 9, Ex. I (Love's Contract).]

111. Scoggin likewise testified that she had no information about Love having had a romantic or sexual relationship with any other player at any other school. [Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 300:23–301:4.]

**B. CONTRACTUAL AND PROFESSIONAL OBLIGATIONS.**

112. On or about April 25, 2016, Love signed a Contract of Employment ("Love's Contract"), memorializing his terms of employment with the University as an Assistant Women's Basketball Coach, designated as managerial-professional staff. [Farrell Decl. ¶ 9, Ex. I (Love's Contract) at p. 3.]

113. Section 2(b)(1) of Love's Contract required Love "[t]o faithfully and conscientiously perform the duties assigned by the Head Coach, and to maintain the high moral and ethical standards commonly expected of Coach as a representative of the University." [Farrell Decl. ¶ 9, Ex. I (Love's Contract) at p. 1.]

114. Section 2(c) of the Love Contract provided: "Coach agrees that academic progress and achievement of student-athletes is of the highest importance. Coach agrees to adhere to the University's standards and policies for the academic performance of its

student-athletes in Coach's recruitment, supervision and coaching of players. Coach agrees to follow conscientiously any directives from the Head Coach, the Director of Intercollegiate Athletics, or other duly authorized administrative officers of the University concerning such matters." [Farrell Decl. ¶ 9, Ex. I (Love's Contract) at p. 2.]

115. Section 6 of the Love Contract required Love to "perform job duties in strict compliance with (a) rules and regulations of the National Collegiate Athletic Association (NCAA), (b) rules and regulations of the Big Ten Conference or any subsequent successor conference, and (c) applicable rules and regulations of the University." [Farrell Decl. ¶ 9, Ex. I (Love's Contract) at p. 3.]

116. The Love Contract incorporated as Appendix C the University of Nebraska-Lincoln Department of Intercollegiate Athletics Policy on Standards of Professional Performance for Athletic Staff and Rules of Procedure for Disciplinary Actions (the "Standards Policy"). [Farrell Decl. ¶ 9, Ex. I at pp. 4, 14-19.]

117. Section 2(a) of the Standards Policy required that "[a]thletic staff members shall perform their duties and personally comport themselves at all times in a manner consistent with good sportsmanship and with the high moral, ethical and academic standards of the University. Each senior athletic staff member shall at all times exercise due care that all personnel and students under their supervision or subject to their control or authority shall comport themselves in like manner." [Farrell Decl. ¶ 9, Ex. I (Love's Contract) at p. 15.]

118. Section 4(a) of the Standards Policy listed seventeen enumerated grounds for termination or suspension for cause, including: "(2) Material, significant or repetitive violation or breach of any governing athletic rule, any University regulation, or any state or federal law or regulation;" and "(4) Fraud or dishonesty in the performance of duties of University employment." [Farrell Decl. ¶ 9, Ex. I (Love's Contract) at pp. 15-17.]

119. In May 2016, Love signed a "Commitment to Professional Conduct and Confidentiality—Athletics Department Staff" (the "Professional Conduct Commitment"). [Farrell Decl. ¶ 10, Ex. J (Professional Conduct Commitment); Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 115:12 – 116:25.]

120. By signing, Love acknowledged that it was his "responsibility to review and understand the policies and procedures of the University of Nebraska-Lincoln" and UNL Human Resources, and "additionally, to be aware of and follow unit specific policies and procedures within UNL Athletics." [Farrell Decl. ¶ 10, Ex. J (Professional Conduct Commitment) at p. 1.]

121. The Professional Conduct Commitment required Love to "notify my supervisor regarding any activity, including unlawful acts, that may erode the confidence, trust and integrity entrusted to me to perform my job duties." [Farrell Decl. ¶ 10, Ex. J (Professional Conduct Commitment) at p. 1.]

122. In the Professional Conduct Commitment, Love agreed to "use the highest standard as to the appropriate behavior relative to alcohol consumption and the laws pertaining thereto," acknowledging that "consumption of alcohol in a manner that impairs judgment or leads to illegal or inappropriate behavior sets a poor example for student-athletes and does not represent UNL Athletics well." [Farrell Decl. ¶ 10, Ex. J (Professional Conduct Commitment) at p. 2.]

123. The Conduct Commitment also required Love to "maintain appropriate, professional relationships with staff and student-athletes," stating that "[i]nappropriate relationships with students ***will not be*** tolerated." [Farrell Decl. ¶ 10, Ex. J (Professional Conduct Commitment) at p. 2.]

124. Love was further required to "avoid any apparent or actual conflict of interest between their professional responsibilities and their personal interests in their relationships with those whom they supervise, evaluate or over whom they exercise power or authority."

And, not to "use unprofessional or abusive language, . . . make a threat, or behave in a threatening manner to any University employee, student or visitor . . . ." [Farrell Decl. ¶ 10, Ex. J (Professional Conduct Commitment) at p. 2.]

125. In June 2021, Love was promoted from Assistant Coach to Associate Head Coach. The position was created as a title change with a salary increase, but Love continued to report directly to Williams. [Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 223:1 – 224:25; Farrell Decl. ¶ 11, Ex. K (Love Contract for Associate Head Coach Position).]

126. At Husker women's basketball games, Love, along with Mays and Goehle, were on the sidelines with Williams. Love, Mays, and Goehle offered Williams their observations and recommendations about player performance and substitutions. Only Williams decided which players should play or be substituted, and game plays. Only Williams chooses the roster, not the assistants. [Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 224:6-225:25; Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 12:18-24, 87:4-17, 87:6-88:8.]

127. On May 13, 2021, Love executed an Addendum to his Contract of Employment (the "2021 Addendum"), promoting him to Associate Head Coach for Women's Basketball. [Farrell Decl. ¶ 11, Ex. K (Love Contract for Associate Head Coach Position).]

128. The 2021 Addendum stated: "All other terms, provisions, and conditions set forth in the [original] Contract that are not directly changed by this Addendum shall remain unaltered and in full force and effect." Love represented and warranted that he had "thoroughly read and considered all aspects of this Addendum" and was "voluntarily entering into this Addendum without duress or coercion of any kind." [Farrell Decl. ¶ 11, Ex. K (Love Contract for Associate Head Coach Position) at p. 2.]

### C. TRAININGS COMPLETED BY LOVE.

129. Love received training on how sexual relationships between coaches and players can cause problems and received paperwork on it. [Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 135:1–8, 138:1–25.] Love knew that coaches should never have sex with the

student-athletes they are coaching. When asked whether a college coach should ever have sex with the student-athletes they are coaching, Love testified: "They should not." When asked whether there should be an exception if the athlete came on to the coach, Love testified: "I wouldn't want it to happen in my program, no." [Id. at 129:1 – 130:11.]

130. When asked what training the University's Athletics Department provided specific to sexual relationships between coaches and athletes, Love recalled attending a meeting with students, staff, and faculty on Title IX. [Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 138:1–25.] Love acknowledged being trained on Title IX issues relating to sexual relationships between coaches and players. When asked whether he had "ever had any training on how sexual relationships between coaches and players can cause problems," Love answered: "I know I've been trained on it. I know I've received paperwork on it." [Id. at 135:1–8.]

131. From 2016 to the present, Love received training at the University on sexual abuse conduct, harassment, NCAA certification, media training, and professional development relating to RP-3.3.15 (the Consensual Relationships Policy). [Amare Decl. ¶ 5, Ex. EEE (Love's Answers to Plaintiff's Interrogatories and RFP, September 10, 2024).]

132. Love also watched training videos at the beginning of the year with students, faculty, and staff discussing sexual harassment. [Id.]

133. Love knew about the University's Consensual Relationships Policy and understood it to prohibit romantic relationships between coaches and student-athletes. When asked whether the policy applied to coach/student relationships, Love testified: "Yes, it does." Love understood the policy to mean "you can't have a relationship, a romantic relationship, with an undergrad student." [Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 156:1 – 157:14.]

### D. PERFORMANCE EVALUATIONS AND PROMOTION TO ASSOCIATE HEAD COACH

134. Williams completed annual performance evaluations of Love for each season from 2016–2017 through 2020–2021, rating his overall job performance positively each year. [Williams Decl. ¶¶ 8–12, Ex. RR (Love Annual Performance 2016-17), SS (Love Annual Performance 2017-18), Ex. TT (Love Annual Performance 2019-20); Ex. UU (Love Annual Performance 2020-21); Ex. VV (Love Annual Performance 2021-22).]

135. Each evaluation included a dedicated "Student-Athlete Experience" section incorporating quantitative ratings from the student-athletes on a 4.0 scale. Love's scores on the metric "Overall, I have a favorable view of my primary assistant coach" were consistently strong: 3.50 (2016–17), 3.50 (2017–18), 3.67 (2018–19), and 3.67 (2019–20). [Williams Decl. ¶¶ 8–12, Ex. RR (Love Annual Performance 2016-17) at p. 3, SS (Love Annual Performance 2017-18) at p. 3, Ex. TT (Love Annual Performance 2019-20); Ex. UU (Love Annual Performance 2020-21) at p. 2-3.]

136. In addition to formal annual evaluations, Williams engaged in ongoing evaluation of her assistant coaches throughout the season. Williams testified: "[T]hroughout the season we are having constant communication about what's going good, what needs to improve, just regular verbal communication throughout the season. And then at the end of every season we fill out an evaluation of things that we feel like overall went well and things that need to improve, and then we meet to discuss the stuff that was put into that evaluation." [Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 284:1–9.]

### E. NO PRIOR HISTORY OF SEXUAL MISCONDUCT.

137. There is no evidence that Love had a sexual or romantic relationship with any player (other than the allegations by Scoggin)—not at the University of Nebraska, not at the University of South Dakota, and not at any other program where he coached. [Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 131:21 – 132:25.]

138. Scoggin testified that she had no information about Love having had a romantic or sexual relationship with any other player at any other school. [Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 300:23-301:1.]

## VII. ASHLEY SCOGGIN'S BACKGROUND

### A. Pre-University Athletic and Medical History

139. Scoggin attended Westview High School in Portland, Oregon, where she played varsity basketball. In summer 2015, prior to her senior season, Scoggin suffered a torn ACL in her left knee during a game, requiring ACL reconstruction surgery in September 2015. Scoggin missed her entire senior season. [Amare Decl. ¶ 20, Ex. TTT (Player Profile) at p. 4; Amare Decl. ¶ 30, Ex. AAF (Nebraska Orthopedic History and Physical) at p. 3.]

140. Scoggin graduated from Westview High School in June 2016 and took a gap year during 2016–2017 to continue ACL rehabilitation before enrolling in college. [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 19:8–23.]

141. In fall 2017, Scoggin enrolled at Salt Lake Community College and joined the women's basketball team. [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 20:5 – 21:12.]

142. On November 17, 2017, six games into her first season at Salt Lake Community College, Scoggin suffered a right knee injury during a game against Trinity Valley Community College, ending her season. [Amare Decl. ¶ 32, Ex. AAH (SLCC Records and NJCAA Letter) at p. 1.]

143. On November 21, 2017, Dr. Scott Grewe at Orthopedics Northwest diagnosed Scoggin with a right knee ACL tear and complex lateral meniscus tear. [Amare Decl. ¶ 31, Ex. AAG at 2–3.]

144. On January 15, 2018, Dr. Grewe performed a right knee arthroscopy and ACL reconstruction on Scoggin. [Amare Decl. ¶ 31, Ex. AAG (Orthopedic Northwest Records) at pp. 1–2; Amare Decl. ¶ 32, Ex. AAH (SLCC Records and NJCAA Letter) at 1.]

145. Scoggin did not compete for the remainder of the 2017–2018 season. [Amare Decl. ¶ 20, Ex. TTT (Player Profile) at 3-4.]

146. On June 8, 2018, the NJCAA granted Scoggin medical hardship status; the 2017–2018 season did not count against her eligibility. [Amare Decl. ¶ 32, Ex. AAH (SLCC Records and NJCAA Letter); Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 21:10 – 22:17.]

147. After being cleared to return to activity in June 2018, Scoggin continued to experience instability in her right knee. Dr. Travis Maak at the University of Utah evaluated Scoggin on October 25, 2018, and determined that her ACL graft had failed and she had medial and lateral meniscus tears. [Amare Decl. ¶ 34, Ex. AAJ (University of Utah Records).]

148. On November 7, 2018, Dr. Maak performed a revision ACL reconstruction on Scoggin. [Amare Decl. ¶ 34, Ex. AAJ (University of Utah Records).]

149. On September 17, 2019, Scoggin underwent arthroscopic partial medial meniscectomy on her right knee and partial lateral meniscectomy on her left knee. [Amare Decl. ¶ 34, Ex. AAJ (University of Utah Records).]

150. In connection with both the 2018 revision surgery and the 2019 meniscectomy procedures, Dr. Maak discussed with Scoggin the potential increased risk for arthritis after meniscal injury. [Amare Decl. ¶ 34, Ex. AAJ (University of Utah Records).]

151. In April 2019, a Move2Perform musculoskeletal screening at Salt Lake Community College placed Scoggin in a "moderate deficit" injury risk category, indicating she was more likely than her peers to lose time from her sport due to injury. [Amare Decl. ¶ 33, Ex. AAI (Move2Perform Record) at p. 1.]

152. In November 2019, Scoggin was cleared to return to play. [Amare Decl. ¶ 20, Ex. TTT (Player Profile) at p. 4; Amare Decl. ¶ 34, Ex. AAJ (MAAK_00000433, Progress Note (11/7/19)) at 1.]

## B. ENROLLMENT AT THE UNIVERSITY, ATHLETIC SCHOLARSHIP, AND BASKETBALL CAREER.

153. On April 30, 2020, Scoggin signed a National Letter of Intent with the University for the 2020–2021 and 2021–2022 academic years, providing a full athletic grant-in-aid covering tuition, fees, room, board, books, and other expenses up to the NCAA cost of attendance. [Amare Decl. ¶ 19, Ex. SSS (NLI and Big Ten Tender of Financial Aid); Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 32:16– 34:22.]

154. In May 2020, Scoggin arrived in Lincoln, Nebraska, and enrolled in the summer. [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 38:12–19.]

155. Scoggin's Big Ten Tender of Financial Aid, signed May 1, 2020, expressly conditioned her athletic scholarship on compliance with the rules in the University of Nebraska Student-Athlete Handbook. [Amare Decl. ¶ 19, Ex. SSS (Big Ten Tender of Financial Aid).]

156. The University disbursed approximately $80,421.94 in athletic financial aid to Scoggin: $11,803.40 for Summer 2020; $32,828.81 for the 2020–2021 academic year; and $35,789.73 for the 2021–2022 academic year. [Brown Decl. ¶¶ 5–7, Ex. B (Financial Aid Disbursement Record, 2019 – 2020), Ex. C (Financial Aid Disbursement Record, 2020 – 2021), Ex. D (Financial Aid Disbursement Record, 2021 – 2022).] Scoggin also received $846.66 in reimbursements from the NCAA Student Assistance Fund. [Johnson Decl. ¶ 6, Ex. YY (NCAA Student Assistance Fund Application).]

157. Scoggin confirmed receiving a copy of the Team Rules for both the 2020–2021 and 2021–2022 seasons. [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 41:8–50:25; Williams Decl. ¶¶ 6, 7, Ex. PP (2020-2021 Team Rules), Ex. QQ (2021-2022 Team Rules).]

158. On August 14, 2020, Scoggin signed the NCAA Division I Student-Athlete Statement for the 2020–21 academic year, affirming that the institution provided her with a copy of the Summary of NCAA Regulations and an opportunity to ask questions about those materials. [Johnson Decl. ¶ 7, Ex. ZZ (NCAA Student-Athlete Statement (2020–21)).] On

August 13, 2021, Scoggin signed the same statement for the 2021–22 academic year. [Johnson Decl. ¶ 8, Ex. AAA (NCAA Student-Athlete Statement (2021–22)).]

159. By signing the NCAA Student-Athlete Statements, Scoggin certified that she had knowledge of and understood the application of Division I regulations as they relate to eligibility to participate in intercollegiate athletics. [Johnson Decl. ¶ 7, Ex. ZZ (NCAA Student-Athlete Statement (2020–21)); Johnson Decl. ¶ 8, Ex. AAA (NCAA Student-Athlete Statement (2021–22)).]

160. Scoggin signed NCAA compliance and eligibility forms on August 14, 2020, and August 13, 2021, certifying that she would abide by all applicable NCAA, Big Ten Conference, and institutional rules and uphold the ethical conduct standards set forth by the institution. [Johnson Decl. ¶¶ 7–8, Exs. ZZ and AAA.]

161. During the 2020–2021 season, Scoggin appeared in 26 games and started all 26, averaging 8.4 points per game while shooting 40.2% from the field and 37.1% from three-point range. [Amare Decl. ¶ 20, Ex. TTT (Player Profile).] The team finished 13–13 overall and 9–10 in the Big Ten, advancing to the Round of 16 in the WNIT postseason tournament. [Williams Decl. ¶ 12, Ex. VV (2020–21 Assistant Coach Performance Evaluation).]

162. During the 2021–2022 season, prior to her removal from the team in February 2022, Scoggin appeared in 25 games and started all 25, averaging 8.4 points per game while shooting 39.8% from the field and 42.0% from three-point range—ranking third in the Big Ten in three-point percentage. Scoggin's playing time, minutes, and starting status remained consistent with her 2020–2021 season throughout the period of the alleged relationship. [Amare Decl. ¶ 20, Ex. TTT (Player Profile).]

163. Scoggin's per-game playing time in the 2020–2021 and 2021–2022 seasons was nearly identical, with no marked change regardless of when she had sexual contact with Love. [Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. II, February 16, 2026) at 282:23-283:17; Amare Decl. ¶ 20, Ex. TTT (Player Profile).]

164. On May 14, 2022, Scoggin graduated from the University with a Bachelor of Science in Education and Human Sciences, with a major in Child, Youth and Family Studies (Human Development and Family Science option) and a minor in Sociology, earning a cumulative GPA of 3.191. [Booton Decl. ¶ 4, Ex. A (Official UNL Undergraduate Academic Record).]

165. On June 30, 2022, the University notified Scoggin that her athletic grant-in-aid would not be renewed for the 2022–2023 academic year because she had graduated in May 2022, exhausted her eligibility at the institution, and entered the NCAA Transfer Portal. [Brown Decl. ¶ 8, Ex. E (Scholarship Cancellation Letter and Appeal Process).]

166. The cancellation letter informed Scoggin that she had the right to request a hearing before the University's Athletics Appeals Committee within ten days, pursuant to NCAA Bylaw 15.3.2.3. [Brown Decl. ¶ 8, Ex. E (Scholarship Cancellation Letter and Appeal Process).] Scoggin did not request a hearing or appeal the non-renewal. [Brown Decl., ¶ 9.]

### C. SCOGGIN'S POSITIVE RELATIONSHIP WITH COACHING STAFF AT THE UNIVERSITY.

167. Scoggin testified that her relationship with Coach Mays was positive. Scoggin stated Coach Mays was "supportive" and "friendly," and that she "liked her." [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 65:8–20.]

168. Scoggin had no concerns with Coach Mays. [Id.]

169. Scoggin described Coach Goehle as "friendly." [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 65:19-66:18.]

170. Scoggin had no concerns about her relationship with Coach Goehle. [Id.]

171. Scoggin described her relationship with Hart, the team's Director of Operations, as "cordial," "supportive," and "friendly." [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 66:15 – 67:5.]

172. Scoggin had no concerns or issues with Hart. [Id.]

173. Williams maintained regular contact with Scoggin throughout her time at Nebraska. [Williams Decl. ¶ 15 at p. 2, Ex. XX (Text Messages: Williams and Scoggin).]

174. Text messages between Williams and Scoggin show Williams regularly checked in on Scoggin's well-being and performance, including sending holiday greetings and birthday wishes. [Williams Decl. ¶ 15 at p. 2, Ex. XX (Text Messages: Williams and Scoggin).]

175. On December 25, 2020, Williams texted Scoggin: "Merry Christmas Ashley! Hope you are enjoying being home! You have certainly deserved some days at home!" [Williams Decl. ¶ 15 at p. 2, Ex. XX (Text Messages: Williams and Scoggin) at p. 14.]

176. On March 22, 2021, Scoggin texted Williams: "Hey coach! Just wanted to wish you a happy birthday!" Williams responded: "Thanks so much Ashley! I appreciate you reaching out! I want to say thank you for all your hard work this season! You deserve some time off! I'm so proud of you and everything you have done…all the summer school classes, etc. It has been a trek, but worth it!" Scoggin replied: "You're welcome! Thank you for making my fi[r]st year here a good one! Wouldn't have been possible if you didn't make things happen with my acedemics in the beginning! Got to love it though, time to get ready for next year, we are going to go dancing! That's right sister!" [Williams Decl. ¶ 15 at p. 2, Ex. XX (Text Messages: Williams and Scoggin) at pp. 16–17.]

177. On January 10, 2022, Scoggin texted Williams that she was "super sore" but hopeful her shoulder injury would improve. Williams replied: "Prolly going to take constant treatment and babying for a few weeks here. Make sure you are communicating clearly with how you are doing. I think it is a good sign that it is better than yesterday … hopefully it just keeps getting better each day … Love you Ash. So glad you are a Husker." [Williams Decl. ¶ 15 (at PDF p. 2), Ex. XX (Text Messages: Williams and Scoggin) at p. 22.]

178. Scoggin responded: "Love you coach! It will, just have to stay on top of it! So happy I'm a Husker!!" [Williams Decl. ¶ 15 at p. 2, Ex. XX (Text Messages: Williams and Scoggin) at p. 22.]

179. In a recorded radio interview on January 31, 2022—two weeks before the Penn State incident—Scoggin stated that Nebraska had a "coaching staff that cares" and that they cared about players "off the court too." Scoggin expressed that it was important to her to be able to go into the coaches' offices, watch film, and ask them how their day was going. [Amare Decl. ¶ 36, Ex. AAL (Transcript of January 31, 2022 Radio Show with Scoggin and Scoggin Family).]

180. On February 4, 2022—approximately 13 days before the Penn State incident—Scoggin met with Dr. Brett Woods and discussed her performance anxieties. Dr. Woods documented that Scoggin "felt supported and reassured by her brother" and, after speaking with her coaches about her fears, "felt understood by the coaching staff." [Amare Decl. ¶ 35, Ex. AAK (UNL Mental Health Records) at p. 2.]

### D. Sport Psychology Services During Scoggin's Time at the University

181. On February 15, 2021, Scoggin began sport psychology services with Dr. Brett Woods, a licensed sport psychologist employed by University Athletic Medicine. [Amare Decl. ¶ 35, Ex. AAK (UNL Sport Psychology Records).]

182. Scoggin attended 16 appointments between February 15, 2021, and February 4, 2022, which included the entire period of her alleged sexual relationship with Love (September 2021 through February 2022). [Amare Decl. ¶ 35, Ex. AAK (UNL Sport Psychology Records).]

183. Scoggin testified she felt "pretty comfortable" with Dr. Woods. [Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 317:1–8.]

184. Scoggin's therapy records show she expressed empowerment to assert her needs and identify what she wanted in a future partner. Records from Scoggin's therapy

session in July 2021 noted her discussion of issues pertaining to her sexual health history and its impact on her relationships, both romantic and platonic. [Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 316:15-25, 317:1-8, 20-25, 318:1-2, 322:24-25, 323:1-8, 17-25, 324:1-22, 329:14-24, 332:9-25, 333:1-3.]

185. Scoggin did not discuss, mention, or disclose any aspect of her relationship with Love to Dr. Woods. When asked to confirm that "although you were having ready access to Dr. Woods and the entire counseling section there, you didn't talk to any of them about your relationship, the dimensions of it, with Coach Love," Scoggin answered: "I did not talk to anyone." [Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 336:3-10.]

186. Dr. Woods' records reflect that Scoggin's sessions were coded as "Other Counseling or Consultation" for "mental skills training" (ICD-9 Code V65.40). Dr. Woods did not diagnose Scoggin with any mental health condition during her time at the University. [Amare Decl. ¶ 35, Ex. AAK (UNL Sport Psychology Records).]

## VIII. THE PENN STATE TRIP

### A. THE EVENTS OF FEBRUARY 16 – 17, 2022.

187. The Nebraska Women's Basketball team traveled to State College, Pennsylvania, for a game against Penn State on February 17, 2022. [Hart Decl. ¶ 6, Ex. N (Penn State Itinerary).]

188. The team departed Lincoln at 5:00 p.m. on February 16, 2022, arrived at Penn State Aviation at approximately 8:30 p.m., and checked into the Hyatt Place State College at approximately 8:50 p.m. The itinerary designated 11:00 p.m. as lights out. [Hart Decl. ¶ 6, Ex. N (Penn State Itinerary).]

189. Prior to the Penn State trip, teammates observed Scoggin leaving her assigned hotel room late at night on road trips, often not returning until 4:00 a.m. or later. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 1; Amare Decl. ¶ 15, Ex. OOO (Dep. of Eisenhauer) at 59:9–60:20.]

190. Scoggin told her trip roommates she was leaving to see a "JUCO teammate" or "JUCO friend"—a claim she repeated on multiple road trips. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 1.]

191. Teammates became suspicious because Scoggin claimed to have former junior college teammates in nearly every city the team visited, which seemed implausible given that Salt Lake Community College was "halfway across the country" from the Big Ten cities where Nebraska played. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 1; Amare Decl. ¶ 15, Ex. OOO (Dep. of Eisenhauer) at 59:9–60:20, 65:5–22.]

192. In her deposition, Scoggin admitted that she lied to her roommates, "usually" telling them she was going to see a JUCO teammate. When asked, "Do you remember what you told your roommates about your whereabouts so you didn't have to disclose that you were in Coach Love's room?" Scoggin answered: "I usually said it was always a JUCO teammate." [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 173:18–25, 174:10–21, 199:3–13.]

193. On the evening of February 16, 2022, at Penn State, Scoggin told her roommate, Student-Athlete 4, that she was leaving to stay with a "JUCO friend" who had gotten a hotel nearby. Teammates, already suspicious from previous trips, followed Scoggin to the elevator. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 1.]

194. On February 16, 2022, teammates also noticed that Love was no longer in his originally assigned room on their floor and that a maid was cleaning that room. Some players confirmed at the front desk that Love had changed rooms to a different floor away from the team. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 1; Amare Decl. ¶ 15, Ex. OOO (Dep. of Eisenhauer) at 57:8–59:10, 149:16-18.]

195. Student-Athlete 1 knocked on Love's hotel room door to speak with him about her mother's birthday. No one answered, though Love and Scoggin were inside. Student-Athlete 1 called Love, who left the room to meet her in the lobby, leaving Scoggin in the

room. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 1; Williams Decl. ¶ 13, Ex. WW (Williams Documentation), at 1.]

196. After Love left, Student-Athlete 2 and Student-Athlete 3 obtained a key card for Love's room from the front desk by stating they wanted to leave something in the room for him. They entered and found Scoggin in Love's bed, under the covers, with the lights off and the TV on. Scoggin was clothed and had an overnight bag. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 1; Counley Decl. ¶ 15, Ex. CC (IEC Documentation) at p. 1; Amare Decl. ¶ 15, Ex. OOO (Dep. of Eisenhauer) at 57:8–58:15, 107:3–18.]

197. Williams first learned of the February 16 events at approximately 9:29 a.m. on February 17, 2022, when Love called her hotel room. [Williams Decl. ¶ 13, Ex. WW (Williams Documentation), at 1; Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 314:1–25, 318:19-319:25.]

198. In this 9:29 a.m. call, Love stated to Williams that Scoggin contacted him the night before because "she needed to talk to him about some things" and that "because he was on a zoom call with his wife...she could come talk to him in his room." [Williams Decl. ¶ 13, Ex. WW at p. 1.]

199. In the call, Love told Williams Scoggin's parents had asked him to keep a special eye on Scoggin because her sister was struggling with mental health issues. [Williams Decl. ¶ 13, Ex. WW at 1.]

200. In the call, Love asked Williams whether he should address the team. [Williams Decl. ¶ 13, Ex. WW at 1.]

201. During this call, in retrospect, Love "failed to disclose many important details about what happened at this time." [Williams Decl. ¶ 13, Ex. WW at 1.]

202. Prior to this call, Williams had no knowledge of or reason to suspect any inappropriate relationship between Love and Scoggin. [Williams Decl. ¶ 13, Ex. WW at 1; Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 314:1–315:25, 319:1–25, 325:1–25, 338:1–25.]

203. At approximately 11:30 a.m. on February 17, 2022, Williams met with team captains. [Williams Decl. ¶ 13, Ex. WW at 1.]

204. Williams asked if there was "a distraction going on," and the captains indicated they had "real concerns about the relationship between Ashley and Coach Love." The captains provided additional details that made Williams "realize that this was a bigger team deal" than Love had disclosed. Williams told the captains she would touch base with Scoggin individually and later hold a team meeting. [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1.]

205. Between 11:45 a.m. and 12:15 p.m. on February 17, 2022, Williams met individually with Scoggin. Scoggin denied anything inappropriate, stating "they are making a big deal out of nothing" and that she had gone to Love's room "to talk through some things." Williams testified Scoggin "was very adamantly in denial that [anything inappropriate] was happening" and that Williams "still did not know the full extent of what had transpired. [Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 335:1 – 337:25, 346:1 – 348:25, 357:1 – 359:21; Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1.]

206. Williams has never seen the video taken in the room by the players who entered Love's room. [Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 14:21-15:12.]

207. At approximately 12:15 p.m. on February 17, 2022, Williams convened a team meeting with all players, coaching staff (including Love), and practice player/manager Christian Eisenhauer ("Eisenhauer"). [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1; Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 1.]

208. At the team meeting, the coaches and players sat in a circle. Scoggin and Love did not sit near each other. They said nothing about their sexual relationship. Love said nothing derogatory about Scoggin. [Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 265:1-3,15-17; Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 347:7-48: 25, 359:12-21.]

209. The meeting lasted at least two hours and "there was a lot of emotion and tears." [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1.]

210. Both Love and Scoggin acknowledged being together in his room after midnight and that Scoggin was at one point in his bed, but both denied anything inappropriate. [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1; Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 1.]

211. When confronted at the team meeting about why he changed rooms, Love stated "this time like the toilet didn't work." When asked why Scoggin was in his bed, Love "denied it" or "acted confused and was, like, oh, I didn't know she was in my bed." Scoggin said "yeah…that one's on me. Like, I crawled into his bed after he left." When teammates asked why, Scoggin's explanation was "I was cold." [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1.]

212. Scoggin testified she never told anyone about the relationship. When asked whether she told anyone—"Not your sister, not a friend, not a whisper anywhere?"—Scoggin confirmed: "No." [Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 264:5–20.]

213. By the end of the team meeting, multiple players expressed that they did not feel comfortable playing with Scoggin or being coached by Love. [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1; Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 1.]

214. Players expressed significant trust issues with Scoggin, who they considered to have lied to them multiple times about her whereabouts and broken team rules by leaving the room after lights out and staying out, doing something, all night. [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1; Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 1.]

215. Williams suspended both from the Penn State game. [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1.]

216. After the team meeting, Williams concluded she needed to report the situation to her sport administrator and to people "above me that are more prepared to handle this situation." [Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 325:1-328:25, 345:1–25.]

217. At approximately 4:30 p.m. on February 17, 2022, Williams called Zimmer to inform him of the information that had emerged and her decision to suspend Love and Scoggin for the game. [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1; Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 1; Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 325:1–25, 328:1–25, 345:1–25.]

218. At approximately 5:00 p.m. on February 17, 2022, Zimmer received a voicemail from Vaughn who had been contacted by a parent expressing concern about the incident and stating he had seen video. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 1.]

219. At approximately 6:20 p.m. on February 17, 2022, Zimmer briefed Alberts by phone. Alberts stated there was "obvious poor decision making by Coach Love and bad judgment that was very inappropriate likely leading toward eventual termination." [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at pp. 1-2.]

220. Alberts directed Zimmer to begin working with Keith Mann on a press release about Love's status. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at pp. 1-2.]

221. The Nebraska versus Penn State game was at 7:00 p.m. on February 17, 2022. Love stayed at the hotel. Scoggin traveled to the arena with the team but did not play; she remained in a coach's private locker room during the game. [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1; Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 1; Amare Decl. ¶ 29, Ex. AAE (Omaha World-Herald (2/19/22)).]

222. Love did not go with the team to the Penn State game. [Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 265:1–25.]

223. At 9:00 p.m. on February 17, 2022, Williams spoke with Zimmer about Love flying home separately. [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1; Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 3]

224. At 11:00 p.m., Williams called Love to inform him that Zimmer indicated the situation would likely be a Title IX investigation and asked if he had any further information. Love continued to maintain that his wife was on Zoom when Scoggin first came to his room and was aware Scoggin was there. [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1.]

225. The team's flight was late, and the team did not depart until after midnight. The team returned to Lincoln at approximately 3:00 a.m. on February 18, 2022. Scoggin traveled back with the team. [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1; Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 1.]

226. Love was not permitted to return with the team. Love flew home separately on a commercial flight on February 18, 2022. [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1; Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 3.]

## B. THE UNIVERSITY'S RESPONSE TO THE PENN STATE INCIDENT AND SCOGGIN'S REMOVAL FROM THE TEAM

227. On February 17, 2022, Vaughn called Title IX Coordinator Counley, reporting a situation involving a Women's Basketball athlete and coach. Vaughn relayed that a parent stated Love had been in a "relationship" with Scoggin, the head coach had been informed before the game, teammates had confronted them, and players entered Love's room and found Scoggin in Love's bed under the covers. [Counley Decl. ¶ 15, Ex. CC (IEC Documentation) at p. 1.]

228. On the morning of February 18, 2022, with no confirmed sexual encounter and both Love and Scoggin denying any sexual relationship or inappropriate relationship, Counley assessed that, at that time and based on the information then available, the matter "does not warrant Title IX investigation" and classified it as an HR matter for Athletics.

[Counley Decl. ¶ 15, Ex. CC (IEC Documentation) at p. 2; Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 3; Amare Decl. ¶ 12, Ex. LLL (Dep. of Counley) at 88:1–15, 142:1–10, 210:1–15, 234:15-236:15, 249:1–10.]

229. Counley sought to meet with Scoggin to offer an opportunity to provide information and to provide her with support and resources. [Counley Decl. ¶ 15, Ex. CC (IEC Documentation) at p. 2; Amare Decl. ¶ 12, Ex. LLL (Dep. of Counley) at 235:10-236:18.]

230. At Counley's request, Zimmer called Scoggin and arranged an in-person meeting at 12:30 p.m. on February 18 in the Compliance Conference Room "to learn of resources and support." [Counley Decl. ¶ 15, Ex. CC (IEC Documentation) at p. 2; Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 3; Amare Decl. ¶ 12, Ex. LLL (Dep. of Counley) at 233:1–236:20; Amare Decl. ¶ 10, Ex. JJJ (Dep. of Zimmer, January 5, 2026) at 142:1–146:10.]

231. Before the scheduled meeting, Scoggin called Zimmer and declined to meet, stating "there was no purpose in meeting, and she did not see a need." Zimmer told Scoggin that was her choice but that the information could be helpful. Scoggin declined. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 3; Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 298:5–18.]

232. Following Scoggin's refusal to meet, Counley emailed Scoggin at 11:25 a.m. on February 18, 2022, providing detailed information about campus resources and support: "I understand you do not want to meet me with, and I respect that. I wanted to provide you with some information about resources and support available to you. If you change your mind in the future and would like to discuss any of the information I've included below, please let me know, and I am happy to setup a time to speak with you or connect you with resources." [Counley Decl. ¶ 16, Ex. DD (Counley Email to Scoggin).]

233. Counley's email detailed multiple confidential support resources: (1) the Center for Advocacy, Response, & Education (CARE); (2) Counseling and Psychological

Services (CAPS); (3) Student Legal Services (SLS); (4) University Police (UNLPD); and (5) Counley's own office, Institutional Equity and Compliance (IEC). Counley expressly offered to meet if Scoggin changed her mind. Scoggin did not respond. [Counley Decl. ¶ 16, Ex. DD (Counley Email to Scoggin).]

234. On February 18, 2022, Love was formally suspended with pay via conference call with Zimmer and Jane Farrell ("Farrell"), Athletics HR Director. Love asked when he would be interviewed, maintaining he did nothing wrong other than using bad judgment. [Farrell Decl. ¶ 12, Ex. L (Letter Suspending Love).]

235. On February 18, 2022, Alberts issued a formal suspension letter to Love: "Commencing today and until further notice, you are being relieved of your coaching responsibilities, you are not to have any form of contact (whether in-person, by telephone, or through electronic communications) with any current student-athletes, coaches, or staff members within the Department of Intercollegiate Athletics either on or off campus, and you are not to come onto the University's campuses." [Farrell Decl. ¶ 12, Ex. L (Letter Suspending Love).]

236. The only exceptions to Love's suspension conditions were that he could come onto campus to utilize the University's Employee Assistance Program and could communicate directly with Zimmer, who served as his point of contact during the suspension. [Farrell Decl. ¶ 12, Ex. L (Letter Suspending Love).]

237. Love was directed to cooperate fully with any investigation. [Farrell Decl. ¶ 12, Ex. L (Letter Suspending Love).]

238. Around 5 p.m. on February 18, 2022, Zimmer met with Scoggin, Williams, and Senior Woman Administrator Pat Logsdon. Zimmer stated that due to Scoggin's acknowledged conduct (lying about whereabouts, violation of team rules) and the loss of trust within the team, they were considering removing her from the team unless she had additional information. Scoggin indicated she had nothing additional to share and

acknowledged being in Love's room after midnight and under his bed covers but still denied anything inappropriate had occurred. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 5; Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1; Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 216:1–18, 224:5–22, 236:15–237:10; Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 298:1–15.]

239. At that meeting, Scoggin was offered the opportunity to provide additional information. She declined. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 5; Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 1; Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 216:3–15, 224:8–18, 236:11 – 237:8; Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 298:5–18.]

240. Scoggin testified at her deposition she "was not in a position to really tell anyone as to what happened." [Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 298:5–18.]

241. Zimmer informed Scoggin of the decision to permanently remove her from the roster. Scoggin stated she was "not surprised and feel it would not work for me to be a member of the team moving forward." [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 5.]

242. The University confirmed Scoggin would retain her scholarship through graduation and access to academic support, athletic medicine, training room, life skills programming, compliance services, and student-athlete resources. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 5.]

243. Scoggin asked what would be released publicly. Zimmer informed her there would be no media releases or public disclosures and the information would be kept internal. Scoggin requested assistance maintaining her reputation and character; Zimmer agreed. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 5.]

244. The University issued a statement that "Nebraska women's basketball associate head coach Chuck Love has been suspended with pay effective immediately. This is a personnel matter and there will be no additional comment at this time." [Zimmer Decl. ¶ 8, Ex. S (Statement to be Issued).]

245. On February 19, 2022, at approximately 10:45 a.m. team meeting, Zimmer informed the team that Scoggin was no longer an active roster member and Love had been placed on paid administrative leave. The team was advised that the University would continue to support Scoggin through degree completion with the resources in the student life complex. [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at pp. 3 – 5; Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 5.]

246. At the team meeting, Zimmer challenged the team to be respectful of all communications regarding the matter moving forward as well as appropriate with potential interactions with Scoggin in the future as she is welcome to resources in Student Life Complex. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 5.]

247. On or about February 21, 2022, Human Resources began investigating the matter and conducted interviews to determine whether Love violated other policies (other than Title IX). [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 8.]

248. On February 21, 2022, HR conducted a Zoom meeting with Zimmer and Williams for a detailed review. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 8.]

249. On February 24, 2022, Human Resources (Brooks) conducted Zoom interviews with five players as well as Williams. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 8.]

250. On February 25, 2022, Brooks from University HR provided an update to Farrell. Brooks indicated the interviews with the student-athletes went well. HR was deciding whether to interview Scoggin and planned to interview Love the week of March 7th,

with the report to be finalized around March 10th or 11th. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 9.]

251. On February 20, 2022, Scoggin's parents, Craig and Krissy Scoggin, emailed Alberts requesting a meeting and reinstatement. Alberts returned the call and stated the bond and trust with the team was beyond repair. [Zimmer Decl. ¶ 7 & 9, Ex. R (Zimmer Documentation) at p. 7 & Ex. T (Communication from Scoggin's Parents).]

252. On February 22, 2022, a meeting was held with Alberts, Zimmer, Logsdon, Williams, Scoggin, and her parents. The Scoggin family maintained nothing sexual occurred and characterized the incident as an "error in judgement" and a "teachable moment," contending the incident should not have warranted Scoggin's removal. Alberts reaffirmed the University's commitment to supporting Scoggin through graduation but not as an active team member and indicated that the decision whether to allow Scoggin to return to the team was Coach Williams' to make. [Williams Decl. ¶ 13, Ex. WW (Williams Documentation) at p. 4; Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 8.]

253. At this meeting, Scoggin's mother told University officials it was none of their business who her daughter has a relationship with, and that if her daughter wants to be in the assistant coach's room after midnight, that is her business. [Amare Decl. ¶ 16, Ex. KKK, (Dep. of Alberts) at 102:11–19, 105:12–15.]

254. On February 22, 2022, Alberts, Williams, Zimmer and Jeffrey Griesch drafted a public statement that may be used in response to media inquiries: "We are aware of the recent speculation and conjecture from several media sources and the public surrounding our women's basketball program. This has been an emotional time for many within our program. Unfortunately, we are not at liberty to provide any context, share additional facts or discuss in further detail. What we will do is continue to support Ashley Scoggin by honoring her scholarship, making all resources available to her that are provided to each of

our student-athletes, and helping her pursue future academic, athletic or career endeavors." [Zimmer Decl. ¶ 10, Ex. U (Draft Public Statement).]

255. On February 23, 2022, Zimmer conducted a conference call with Scoggin regarding housing. Patrick Kelly and Jena Johnson from the Compliance Office participated, along with Scoggin's parents. Scoggin indicated she did not want to return to her apartment. Scoggin was told Athletics would pay for alternate housing on campus. Johnson stated she would follow up with available options. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 9; Johnson Decl. ¶ 9, Ex. BBB (Johnson Email to Scoggin Regarding Housing Options).]

256. That same day, Jena Johnson sent Scoggin a detailed email outlining multiple housing options. Option 1 offered assistance working with Student Legal Services to break the lease. Option 2 offered to move Scoggin to on-campus housing where Athletics would pay the bill, with two sub-options: (a) Guest Housing in Selleck Hall, a single room with no contract required, or (b) a 2 or 4 bedroom apartment. Johnson offered to arrange tours of any facilities, provided contact information, and stated she was available by cell phone even while out of the office. [Johnson Decl. ¶ 9, Ex. BBB (Johnson Email to Scoggin Regarding Housing Options).]

257. Johnson also stated that if Scoggin kept her lease but had concerns about her roommate not paying her portion of the rent, Scoggin should contact Johnson directly. Johnson provided her personal cell phone number for follow-up. [Id.]

258. Scoggin testified that the University did provide housing options: "They did provide housing. They did mention that they were willing to give me, like, a hotel that was paid for by them. Also, I could live with four or three other roommates in student housing. But at the time, again, I was majorly concerned for my own safety and was not comfortable with those options." [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 237:5–25.]

259. On February 24, 2022, Sheri Hastings, Scoggin's academic counselor, attempted to reach Scoggin by text and phone to offer academic support services. Hastings

was unsuccessful. [Zimmer Decl. ¶ 11, Ex. V (Academic Support and Eligibility Requirements).]

260. On February 25, 2022, Hastings followed up with an email to Scoggin: "I was not successful in reaching you yesterday, so I wanted to follow-up with an email. Please know that I am here to continue to serve you and provide any academic support services that you need. Don't hesitate to stop by my office, call or email if you have any questions or need any academic assistance." Hastings also advised Scoggin of the importance of completing her courses and graduating to maintain eligibility if she chose to transfer. [Zimmer Decl. ¶ 12, Ex. W (Academic Progress, Support and Eligibility).]

261. On February 28, 2022, Patrick Kelly from Compliance informed Zimmer that Scoggin had not come in to follow up on the housing options previously emailed by Jena Johnson. Zimmer sent Scoggin a text message "urging her to meet with Patrick and or Jena to make arrangements for alternative housing." Scoggin did not respond. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 10.]

262. On March 1, 2022, Kelly confirmed that Scoggin still had not reached out to him or Jena Johnson regarding alternative housing arrangements. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at p. 10.]

263. On March 8, 2022, Hastings emailed Scoggin regarding a progress report from her CYAF 382 course, asking whether Scoggin had any concerns about the accommodations her professor had offered. Scoggin did not respond. [Zimmer Decl. ¶ 12, Ex. W (Academic Progress, Support and Eligibility).]

264. On March 17, 2022, Zimmer asked Jena Johnson to inquire with Scoggin about housing when she came to clear her lockers: "would you please ask her what she is doing for housing and find out for certain if she wants the on-campus options we have offered her but never heard back from her on." [Johnson Decl. ¶ 11, Ex. CCC (Johnson Follow Up Email to Scoggin Regarding Housing Options and Locker Matters)].

265. On March 18, 2022, Patrick Kelly and Jena Johnson met with Scoggin to assist her in clearing her lockers at the PBA and Devaney facilities. When asked about housing, Scoggin stated she was "currently staying with a family friend" and "did not need UNL HOUSING support and further discussion regarding her housing should be directed to her lawyer." [Johnson Decl. ¶ 11, Ex. CCC (Johnson Follow Up Email to Scoggin Regarding Housing Options and Locker Matters)].

266. On March 25, 2022, Vaughn sent a follow-up email to Scoggin (copying Chaloupka and Shaver) summarizing topics discussed in a prior phone conversation and confirming Scoggin's continued access to Athletic Department services. Vaughn wrote: "As we discussed, you continue to have access to all student services in the Athletic Department, including, but not limited to Athletic Medicine and the Training Room, Academic Support, Life Skills, Compliance, etc. If you have questions about any of the services, please let me know." [Shaver Decl. ¶ 11, Ex. MM (Email Correspondence) at p. 22.]

267. Scoggin did not disclose the sexual relationship to her parents until shortly after the February 22 meeting with Alberts. [Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 309:10 – 310:5.]

268. Prior to March 11, 2022, neither she nor her parents went back to the University to correct the information Scoggin had repeatedly given—that nothing inappropriate had happened. [Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at pp. 1-11; Counley Decl. ¶ 9.]

269. Scoggin testified she never told anyone at the University about the romantic or sexual relationship with Love prior to March 11, 2022. [Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 264:5–20, 337:3–10.]

270. When asked, "Did you ever tell anyone about your relationship, your sexual relationship with Chuck Love?" Scoggin answered: "No." When asked, "Not your sister, not

a friend, not a whisper anywhere?" Scoggin answered: "No." [Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 264:5–20.]

271. Prior to March 11, 2022, IEC did not receive any report or complaint of sexual misconduct or sexual harassment involving Love. [Counley Decl. ¶ 8.]

272. Prior to March 11, 2022, no Official with Authority (as defined in Paragraph 26 above) received any allegation, report, or complaint of sexual misconduct or sexual harassment against Love. [Counley Decl. ¶¶ 6, 7 & 9; Amare Decl. ¶ 9, Ex. III (Dep. of Williams) at 325:1–25, 338:1–25.]

273. Until March 11, 2022, Scoggin denied anything inappropriate occurred with Love. [Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 264:5–20; Williams Decl. ¶ 13, Ex. WW (Williams Documentation), at 1; Zimmer Decl. ¶ 7, Ex. R (Zimmer Documentation) at pp. 1-11.]

274. Zimmer testified that had Scoggin disclosed the sexual relationship at the February 22 meeting, "the whole direction would have changed." [Amare Decl. ¶ 10, Ex. JJJ (Dep. of Zimmer) at 159:1–25.]

## IX. TITLE IX COMPLAINT AND INVESTIGATION; SCOGGIN'S REQUEST OF SUPPORT TO TRANSFER.

275. On March 11, 2022, Scoggin's attorney, Maren Lynn Chaloupka, filed a formal report of sexual misconduct with Counley on Scoggin's behalf. [Counley Decl. ¶ 17, Ex. EE (Chaloupka Email to Scoggin).]

276. The report alleged that Love initiated a sexual relationship with Scoggin beginning in September 2021; grieved the tolerance of Love's misconduct and the discipline imposed on Scoggin; and requested specific remedies including online class accommodations, access to game film, and assistance retrieving Scoggin's belongings from the athletic facilities. [Counley Decl. ¶ 17, Ex. EE (Chaloupka Email to Scoggin).]

277. On March 11, 2022, Scoggin also filed a formal Title IX complaint and Release of Authorization with Shaver. [Shaver Decl. ¶ 6, Ex. GG (Formal Complaint and Authorization).]

278. Shaver, an experienced and trained investigator, was assigned to investigate the Complaint. [Shaver Decl. ¶ 3-6.]

279. On March 15, 2022, Shaver conducted an initial phone call with Scoggin and Chaloupka, during which Shaver explained the investigation process, gathered preliminary information regarding the allegations, and discussed available supportive measures. [Shaver Decl. ¶ 6-8, Ex. HH (Investigation Summary).]

280. On March 21, 2022, Shaver sent a Notice of Allegations to Love and Scoggin. [Shaver Decl. ¶ 8 Ex. II (Notice of Allegations to Love), Ex. JJ (Notice of Allegation to Scoggin).]

281. The Notices identified specific allegations of sexual conduct occurring from approximately late September 2021 through February 16, 2022, including: (1) kissing Scoggin after contacting her on Snapchat; (2) receiving oral sex from Scoggin in the Speedway parking lot; (3) engaging in oral sex and sexual intercourse with Scoggin approximately every Thursday evening at various locations, including Love's office and the locker room; (4) requesting Scoggin sleep in his hotel room during away games; and (5) instructing Scoggin to deny that anything had ever happened between them after teammates discovered her in his room at Penn State. [Shaver Decl. ¶ 8 Ex. II (Notice of Allegations to Love), Ex. JJ (Notice of Allegation to Scoggin).]

282. On April 14, 2022, Scoggin was interviewed by the Title IX office as part of the formal investigation and provided additional details of alleged conduct. [Title IX Notice of Allegations (Updated, 4/18/22)]. [Shaver Decl. ¶ 8 Ex. KK (Updated Notice of Allegations to Scoggin), Ex. LL (Notice of Allegation to Love).]

283. On April 18, 2022, Shaver sent an updated Notice of Allegations to Scoggin and Love. The updated Notice reflected additional details from Scoggin's April 14 interview,

including that Love and Scoggin engaged in oral sex and sexual intercourse approximately one to four times per week from late September 2021 through February 16, 2022 at various locations (including Love's home, Scoggin's apartment, Love's office, and the locker room); that Love gave Scoggin cash and gifts for Christmas and Valentine's Day; and that Love requested Scoggin sleep in his hotel room during every away game except the Iowa game. [Id.]

284. On March 15, 2022, Chaloupka requested on Scoggin's behalf that the Athletic Department's Compliance Office facilitate getting Scoggin into the NCAA transfer portal as a supportive measure during the Title IX investigation. [Shaver Decl. ¶ 11, Ex. HH (IEC Investigation Summary) at p. 1, Ex. MM (Email Correspondence).]

285. On March 15, 2022, Shaver sent a supportive measures request to Professor Patty Kuo on Scoggin's behalf, requesting that Scoggin be permitted to complete her CYAF 382-001 course remotely for the remainder of the semester, including alternative arrangements for testing that would not require a presence on campus, and that any absences since February 18, 2022 be excused. [Shaver Decl. ¶ 12, Ex. NN (Email Exchange regarding Academic Support).]

286. On March 17, 2022, Professor Kuo proposed a supportive measures plan for Scoggin to complete the course remotely, which included: (1) waiving all in-person attendance penalties from February 18, 2022 onward; (2) providing Scoggin with the TA's course notes after each class; (3) converting her exam to a timed open-book 50-question multiple choice exam to be taken via Canvas from March 29–30, in lieu of in-person testing at the DLC; and (4) modifying all remaining group project work for individual remote completion, to protect Scoggin's identity. Scoggin confirmed the accommodation was acceptable on March 18, 2022. [Shaver Decl. ¶ 12, Ex. NN (Email Exchange regarding Academic Support).]

287. On March 17, 2022, Scoggin confirmed that the accommodations Professor Kuo made would work for her going forward. [Shaver Decl. ¶ 12, Ex. NN (Email Exchange regarding Academic Support).]

288. On March 16, 2022, Shaver contacted Vaughn regarding the remaining support request. [Shaver Decl. ¶ 11, Ex. HH (IEC Investigation Summary) at p. 1.]

289. On March 16, 2022, within approximately two hours of Shaver's request, Vaughn responded with the required transfer portal documents—the Notification of Transfer Form and the NCAA Transfer FERPA Form—along with a link to the required NCAA educational video. Shaver immediately forwarded the forms and instructions to Scoggin and Chaloupka. [Shaver Decl. ¶ 11, Ex. MM (Email Correspondence).]

290. On March 17, 2022, Vaughn confirmed that Williams was "supportive of Ashley's desire to enter the transfer portal and that she wishes her the best." On March 24, 2022, Williams sent a formal email to Vaughn confirming: "Per our conversation, I am fully aware that Ashley Scoggin is entering the transfer portal and I am fully supportive of her in her pursuit in the portal." [Shaver Decl. ¶ 11, Ex. MM (Email Correspondence); Shaver Decl. ¶ 14, Ex. HH (IEC Investigation Summary) at p. 2; Amare Decl. ¶ 23, Ex. WWW (Email Exchange with Williams Regarding Support).]

291. On March 31, 2022, Shaver requested CCTV surveillance footage from Bryan Meehan covering every Thursday evening from late September 2021 through February 18, 2022, for the facilities utilized by women's basketball, including outside of coaches' offices and outside of the locker room. This request was based on information from Scoggin's interview. On April 8, 2022, Shaver received surveillance footage from Meehan and had investigator Jerrell Norman assist in reviewing the volume of video evidence. [Shaver Decl. ¶ 14, Ex. HH (IEC Investigation Summary) at pp. 6 - 8.]

292. Beginning in early April 2022, Shaver sent Witness Participation Request letters to twenty-seven individuals who may have had information relevant to the

investigation, including players, coaching staff, and other personnel. Shaver followed up with witnesses who did not respond to initial requests. [Shaver Decl. ¶ 13, Ex. HH (IEC Investigation Summary) at pp. 8-15.]

293. Between April 7 and May 5, 2022, Shaver conducted witness interviews with eighteen individuals who agreed to participate. Six individuals declined to participate or did not respond. [Shaver Decl. ¶ 13, Ex. HH (IEC Investigation Summary) at pp. 8-15.]

294. During the witness interviews, Shaver explained the investigation process, gathered information, and documented witness accounts. [Shaver Decl. ¶ 13, Ex. HH (IEC Investigation Summary).]

295. Shaver obtained video evidence. [Shaver Decl. ¶ 14, Ex. HH (IEC Investigation Summary) at pp. 5, 14.]

296. On April 26, 2022, Shaver emailed Love and his attorney, Kathleen Neary, asking if Love planned to respond to the allegations, explaining that whether he responded or not, he could still provide evidence and names of witnesses. [Shaver Decl. ¶ 9, Ex. HH (IEC Investigation Summary) at pp. 12-15.]

297. On May 4, 2022, Shaver received a written response from Love generally denying the allegations. Shaver confirmed receipt and explained that Love could provide evidence and names of witnesses for Shaver to contact. [Shaver Decl. ¶ 9, Ex. HH (IEC Investigation Summary) at p. 15.]

298. On April 28, 2022, Scoggin signed the Notification of Transfer Form and the NCAA Transfer Portal Signature Page. The Notification of Transfer Form confirmed that Scoggin would continue to have access to Academic Services, Life Skills, and Compliance for the remainder of the semester and would retain access to Athletics Medicine to rehabilitate injuries sustained while an active member of the team. That same day, Scoggin completed the NCAA Division I Student-Athlete Transfer Module. [Shaver Decl. ¶ 17, Ex. MM (Email Correspondence).]

299. At 3:37 p.m. on April 28, 2022, the NCAA confirmed that Scoggin's information was "now visible on the NCAA Transfer Portal for any NCAA coaches to contact the student-athlete about transferring." Within minutes, Vaughn emailed Chaloupka and Scoggin confirming portal entry and offering to submit Scoggin's medical hardship request to the Big Ten Conference. [Shaver Decl. ¶ 17, Ex. MM (Email Correspondence).]

300. On May 9, 2022, Love resigned from his coaching position at UNL, effective immediately. On May 10, 2022, Love's attorney, Kathleen Neary, emailed Shaver stating: "Coach Love resigned from his UNL coaching position, effective yesterday." [Shaver Decl. ¶ 15, Ex. OO (Email from Kathleen Neary to Shaver).]

301. In connection with his resignation, Love entered into a Separation Agreement and Release with BRUN, in which he agreed not to apply for employment or reemployment with the University or any other university within the University of Nebraska System. The University and all other universities within the University of Nebraska System have the right to reject any application for employment or reemployment that Love may submit in violation of this Agreement. [Farrell Decl. ¶ 12, Ex. M (Separation Agreement and Release) at p. 1.]

302. Love was not involved in any way in Scoggin's communication with Williams, Alberts, Zimmer, or any other athletic department employee regarding Scoggin's suspension or termination from the women's basketball team. [Farrell Decl. ¶ 12, Ex. L (Letter Suspending Love).]

303. At the time of Love's resignation, the Title IX investigation was still ongoing. Title IX Coordinator Counley testified that her reason for dismissing the complaint was that Love "was no longer employed and agreed to never be employed by the University again." [Amare Decl. ¶ 12, Ex. LLL (Dep. of Counley) at 262:1–15.]

304. On May 14, 2022, Scoggin graduated from UNL with a Bachelor of Science in Education and Human Sciences (Child, Youth and Family Studies), with a cumulative GPA

of 3.191 — her scholarship having been honored through graduation as promised. [Booton Decl. ¶ 4, Ex. A (Official UNL Undergraduate Academic Record).]

305. On May 16, 2022, Title IX Coordinator Counley dismissed Scoggin's Title IX complaint. [Counley Decl. ¶¶ 18, Ex. FF (Dismissal Letter from Counley).]

306. The dismissal letter to Scoggin stated: "Your complaint was dismissed because Respondent resigned from his employment, and is no longer affiliated with the University or a participant in any University-related program or activity." Counley sent a separate dismissal letter to Love, stating the complaint against him was dismissed because he was "no longer employed or affiliated with the University." [Id.]

307. Prior to dismissing the Complaint, Shaver confirmed that Scoggin had not applied for a graduate school and confirmed that Scoggin had graduated from the University. [Shaver Decl. ¶ 11, Ex. HH (IEC Investigation Summary) at p. 15.]

308. The dismissal letters to both Scoggin and Love advised of the right to appeal the dismissal within seven University Days (no later than May 25, 2022) based on: (i) a procedural irregularity that affected the outcome of the matter; (ii) the discovery of new evidence that was not reasonably available at the time of the dismissal and that could affect the outcome of the matter; or (iii) a conflict of interest or bias by the Title IX Coordinator, designee, or Investigator. [Counley Decl. ¶¶ 18, Ex. FF (Dismissal Letter from Counley.]

309. No appeal was filed by either party. The Shaver Investigation Timeline confirms: "Notices of Dismissal were sent to Complainant and Respondent. IEC is closing this case. The matter has been dismissed because Respondent is no longer affiliated with the university, and no appeals have been filed." [Counley Decl. ¶ 19; [Shaver Decl. ¶ 11, Ex. HH (IEC Investigation Summary) at p. 15.]

## X. FACTS CONCERNING THE NATURE OF THE RELATIONSHIP

310. In September 2020, Scoggin initiated contact with Love, texting: "Hey, coach. When we gonna get this work in, LOL?" The exchange included discussion of meeting at a

"low, low key" court where "we don't need any eyes on us," which Scoggin attributed to COVID-19 workout restrictions. [Amare Decl. ¶ 27, Ex. AAC (Scoggin-Love Text Messages) at p. 276; Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 92:5 – 96:18.]

311. Love did not make or imply threats, retaliation, or adverse consequences to Scoggin if she did not have sexual contact with him. [Amare Decl. ¶ 27, Ex. AAC (Scoggin-Love Text Messages).]

312. Love did not use or threaten to use physical force against Scoggin to have sexual contact with him. [Dep. of Scoggin Vol. I, at 144:23-25, 145:1.]

313. In summer 2021, Scoggin completed a four-week internship with the Athletic Department. [Dep. of Scoggin Vol. I, at 6:1 – 98:12, 144:23-25, 145:1.]

314. During that internship, Scoggin alleges that Love asked her personal questions about her dating history. Scoggin did not tell Love she was uncomfortable with those questions. [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 96:1 – 98:12, 121:8–15.]

315. In June 2021, Scoggin and Love exchanged personal text messages. Scoggin texted Love "I did it," informing him she had broken up with her boyfriend. No sexual contact occurred between them at that point. [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 120:9 – 122:19; Amare Decl. ¶ 27, Ex. AAC (Scoggin-Love Text Messages).]

316. In July 2021, Scoggin texted Love "SECOND BASE" with emojis, telling him about kissing someone on the football team. Love responded, "You're gonna drive me crazy." [Amare Decl. ¶ 27, Ex. AAC (Scoggin-Love Text Messages).]

317. In mid-September 2021, the first physical contact occurred between Love and Scoggin. When Love asked Scoggin via Snapchat to meet him and another person at a bar, Scoggin declined, stating: "No, thank you." But, Scoggin agreed to meet with him in a parking lot instead. When Love asked Scoggin to bring alcohol, she refused, stating: "I don't drink and drive." There is no evidence that Scoggin suffered any negative consequence for

these refusals. [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 130:3 – 133:15, 138:11 – 139:8.]

318. During the relationship, Scoggin demonstrated her ability to refuse Love's requests on multiple occasions without negative consequence. When Love asked Scoggin multiple times to participate in a threesome, she testified: "I did tell him no to a threesome because he had asked me multiple times, and I told him to stop asking me." There is no evidence Love retaliated or reduced her playing time in response to this refusal. [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 152:21 – 153:4; Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 345:17 – 346:3.]

319. Using her cell phone, Scoggin sent nude and semi-nude photographs of herself to Love. Scoggin took the photos herself. [Dep. of Scoggin Vol. I, at 154:9-20, 155:13-18.]

320. Scoggin never told Love "no" or refused to engage in sexual contact with him. [Dep. of Scoggin Vol. I, at 144:23-25, 150:15-16.]

321. Scoggin produced no evidence that she was incapable of consenting to sexual contact with Love. To the contrary, Scoggin testified that she refused to expand the sexual encounters to include a third person when Love asked. [Dep. of Scoggin Vol. I, at 150:15-16, 152-153.]

322. Scoggin and Love did not seek a permanent relationship with each other. [Dep. of Scoggin Vol. I, at 82:2-12, 146:15-18.]

323. Two or three Husker women's basketball team players saw Scoggin and Love together at a Lincoln Chipotle restaurant. They were not engaged in sexual or romantic acts. They soon left without interacting with the other players. [Dep. of Scoggin Vol. I, at 175:19-25, 176:1-25.]

324. During the period of their sexual contact with each other, outward indicia of the professional interaction between Scoggin and Love did not change. Scoggin continued to attend classes, train, and play as she had before, with the exception of recuperating from

injuries unrelated to Love. Love continued to interact with Williams and the women's basketball team as always, aiding players and attending games. [Dep. of Scoggin Vol. II, at 283:1-3.]

325. Scoggin admitted to acting "like his girlfriend." [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 146:12–22.]

326. Scoggin testified she never told Love she did not want to act like his girlfriend. When asked, "Did you ever tell him, 'I don't want to be your girlfriend' or 'I don't want to act like your girlfriend'?" Scoggin answered: "I never told him I didn't want to." [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 146:15–18.]

327. When asked whether she considered saying no to the first meeting at the Speedway parking lot, Scoggin testified: "No, I didn't." [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 142:15–20.]

328. Scoggin testified that Love never stated she had to engage in sexual conduct to play basketball. When asked, "Did he say anything that made you believe you had to engage in a sexual relationship with him in order to play basketball?" and counsel clarified, "was there a point where he actually spelled it out, black and white, 'you have to sleep with me or you're getting benched'?" Scoggin answered: "If it was black and white, no." [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 84:9–25.]

329. When asked to identify any statement Love made "hinting" at a connection between sexual contact and basketball, Scoggin did not identify any specific statement. [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 84:9 – 86:23.]

330. Scoggin did not tell Love she was uncomfortable with his personal questions during the internship. [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 98:5–12.]

331. Scoggin agreed to keep the relationship secret and did not disclose it to anyone at the University prior to March 11, 2022. [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I)

at 144:8–19, 194:5–15; Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 264:5–20, 337:3–10.]

332. On February 16, 2022, when Love suggested Scoggin tell the University "that you have a mental illness and that you needed to be by yourself," Scoggin refused, testifying: "I looked him dead in the face, and I said, 'I'm not saying that.'" [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 193:9 – 194:8.]

333. In his deposition, Love admitted that he engaged in sexual contact with Scoggin. When asked about sexual contact at the Speedway parking lot, Love testified: "We both wanted to participate." [Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 239:1–22.]

334. Love testified that he and Scoggin both "knew the difference between right and wrong and what we were doing" and "knew the consequences." [Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 281:2–21.]

## XI. SCOGGIN'S POST-UNIVERSITY CAREER

335. On May 31, 2022, UNLV awarded Scoggin a full athletic financial aid scholarship for Women's Basketball for the 2022–2023 academic year, totaling $45,834. [Amare Decl. ¶ 24, Ex. XXX (UNLV Athletic Financial Aid Award).]

336. In June 2022, Scoggin enrolled at UNLV in a Master's program in Intercollegiate and Professional Sport Management and joined the UNLV Women's Basketball team. [Amare Decl. ¶ 24, Ex. XXX (UNLV Athletic Financial Aid Award); Amare Decl. ¶ 25, Ex. YYY (Unofficial UNLV Transcript).]

337. Because of a knee injury, Scoggin played only partial season for 2022-23 season. [Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 294:8-294:22.]

338. During the 2023–2024 season at UNLV, Scoggin appeared in 31 games, started 30, and averaged 22.4 minutes and 7.4 points per game. [Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 294:8-295:17.]

339. UNLV renewed Scoggin's full athletic scholarship for the 2023–2024 academic year, totaling $46,933. [Amare Decl. ¶ 24, Ex. XXX (UNLV Athletic Financial Aid Award).]

340. Scoggin had NIL contracts while at UNLV. [Amare Decl. ¶ 26, Ex. ZZZ (UNLV NIL).]

341. In May 2024, Scoggin graduated from UNLV with a Master of Education degree in Intercollegiate and Professional Sport Management, maintaining a 3.566 cumulative graduate GPA. [Amare Decl. ¶ 24, Ex. XXX (UNLV Athletic Financial Aid Award), Ex. YYY, Unofficial UNLV Transcript).]

342. Scoggin attended mental health counseling sessions at UNLV. [Amare Decl. ¶ 37, Ex. AAM (UNLV Mental Health Records).]

343. Her UNLV records indicated that Scoggin told UNLV staff that she received counseling at the University regarding alleged sexual abuse by Love. However, Scoggin's University medical records show no such disclosure. Scoggin never reported sexual abuse by Love to University counseling staff. [Id.]

344. Scoggin has sought no mental health counseling since leaving UNLV. [Amare Decl., Ex. GGG (Dep. of Scoggin Vol. 2) at 282:6–8.]

345. Since graduating from UNLV, Scoggin has worked at a local gym in Oregon near where she grew up and her family lives. Scoggin is employed as a personal trainer. [Amare Decl. ¶ 7, Ex. GGG (Dep. of Scoggin Vol. 2) at 284:12–285:10.]

346. Scoggin has not applied for employment as a coach at any level of athletics. Nor does she volunteer anywhere in that capacity. [Amare Decl., Ex. GGG (Dep. of Scoggin Vol. 2) at 337:12–18.]

347. In discovery, Scoggin produced no evidence of special damages she allegedly suffered as a result of Love's acts. [Amare Decl., ¶ 39.]

348. The combined value of Scoggin's UNLV athletic scholarships over two years exceeded $92,767. [Amare Decl., Ex. XXX (UNLV Athletic Financial Aid Award), Ex. YYY, Unofficial UNLV Transcript).]

349. Scoggin testified she received approximately $200 in NIL compensation at UNL (from one deal with ALLO Communications) and approximately $5,450 in NIL compensation at UNLV. [Amare Decl., Ex. FFF (Dep. of Scoggin Vol. I) at 249:12–252:18.]

350. Scoggin agreed she received "substantially more NIL at UNLV" than at UNL. [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 252:5–12.]

351. Scoggin testified she could not calculate what NIL income she would have earned at UNL had she remained, stating: "there was no way of me knowing how much NIL money I was going to get at UNL if I stayed" and "no way to calculate that." [Amare Decl. ¶ 6, Ex. FFF (Dep. of Scoggin Vol. I) at 252:10–20.]

352. Scoggin did not designate an expert witness or provide expert testimony regarding any claimed NIL losses, lost employment income, or other economic damages. Scoggin also did not designate any expert witness or provide expert testimony regarding any diagnosis or any expert opinion causally connecting such diagnosis to the alleged claims against Defendants or alleged damages in this case. [Amare Decl. ¶ 38.]

## XII. MISCELLANEOUS

353. Love made no public statement regarding his sexual relationship with Scoggin until Love's deposition on February 4, 2026. [Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 238:14–25; Amare Decl. ¶ 29, Ex. AAE (Omaha World-Herald (2/19/22)).]

354. Love and the University official made no public statement confirming the sexual relationship. [Amare Decl. ¶ 8, Ex. HHH (Dep. of Love) at 238:14–25; Amare Decl. ¶ 29, Ex. AAE (Omaha World-Herald (2/19/22)).]

355. Scoggin's attorney revealed the sexual relationship between Scoggin and Love in public court filings on February 18, 2024 and March 17, 2026. Love has never publicly

disclosed the relationship. [Doc. No. 1; Doc. No. 1 in *Scoggin v. Zimmer*, et al., Case No. 4:26-cv-3053 (D. Neb.).]

356. Zimmer is not aware of any allegations of sexual misconduct made by a student-athlete against a coach at the University, other than the Scoggin matter. [Zimmer Decl. ¶ 14.]

357. Vaughn testified that he does not recall instances of coach and a student-athlete sexual or romantic relationship. [Amare Decl. ¶ 14, Ex. NNN (Dep. of Vaughn) at 162:10-163:6]

358. From 2016 to February 2022, no student-athlete of the University submitted a report to IEC alleging that a coach had engaged in sexual misconduct towards them. [Counley Decl. ¶ 8.]

Dated this 31st day of July 2026.

BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, and Individuals AMY WILLIAMS, TREV ALBERTS, Defendants

By: /s/ Lily Amare
Susan K. Sapp, #19121
Lily Amare, #25735
Cline Williams Wright
Johnson & Oldfather, L.L.P.
1900 U.S. Bank Building
233 South13th Street
Lincoln, NE 68508
(402) 474-6900
ssapp@clinewilliams.com
lamare@clinewilliams.com

AND

Bren H. Chambers, #23150
Vice President and General Counsel
University of Nebraska
3835 Holdrege Street
Lincoln, NE 68583-0745
(402) 472-1201
bchambers@nebraska.edu

By: /s/ Denise Frost
Denise E. Frost, #18794
JOHNSON & MOCK, PC LLO
9900 Nicholas Street, # 225
Omaha, NE 68114-2249
(402) 346-8856
dfrost@johnsonandmock.com

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties.

/s/ Lily Amare
Lily Amare