IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ASHLEY SCOGGIN,<br><br>Plaintiff,<br><br>vs.<br><br>BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, and individuals AMY WILLIAMS, TREV ALBERTS, and CHUCK LOVE, JR., in their individual capacities,<br><br>Defendants. | Case No. 4:24-CV-3039 |

---

ORAL DEPOSITION OF
TREV ALBERTS
FEBRUARY 19, 2026

---

ORAL DEPOSITION OF TREV ALBERTS, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on February 19, 2026, from 7:59 a.m. to 11:18 a.m., Nilda Codina, Notary in and for the State of Texas, recorded by machine shorthand, from Athletics Department of Texas A&M University, 161 Wellborn Road, College Station, Texas, 77030, pursuant to the Federal Rules of Civil Procedure, and the provisions stated on the record or attached hereto.

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:

Ms. Maren L. Chaloupka, Esq.
CHALOUPKA LAW, LLC
1906 Broadway
P.O. Box 1724
Scottsbluff, NE 69363-1724
Phone (308)270-5091
mlc@chaloupkalaw.net

Mr. Nathan T. Bruner, Esq.
BRUNER FRANK
5804 1st Avenue
P.O. Box 2230
Kearney, NE 68848-2230
Phone (308)455-1046
nbruner@nebraskalaw.net

FOR THE DEFENDANT:

Ms. Susan K. Sapp, Esq.
CLINE WILLIAMS WRIGHT JOHNSON &
OLDFATHER, L.L.P
1900 U.S. Bank Building
233 South 13th Street
Lincoln, NE 68508
Phone(402)474-6900
ssapp@clinewilliams.com

Ms. Denise E. Frost, Esq. (Via Zoom)
JOHNSON & MOCK, PC LLO
9900 Nicholas Street
#225
Omaha, NE 68114
Phone(402)685-5647
dfrost@johnsonandmock.com

Mr. Bren H. Chambers, Esq. (Via Zoom)
Deputy General Counsel
UNIVERSITY OF NEBRASKA
3835 Holdrege Street
Lincoln, NE 68583-0745
bchambers@nebraska.edu

I-N-D-E-X

PAGE
Appearances.....................................2
TREV ALBERTS
Direct Examination by Ms. Chaloupka.................6
Proceedings concluded..............................157
Witness signature/errata...........................158
Reporter's certificate.............................160

E-X-H-I-B-I-T-S

PAGE
Exhibit No. 457 Coach William's excerpt testimony....9
Exhibit No. 307 Part of Employment Agreement........11
Exhibit No. 371 Mr. Zimmer's notes..................20
Exhibit No. 311 Policy..............................28
Exhibit No. 415 Release.............................49
Exhibit No. 416 ....................................49
Exhibit No. 417 ....................................49
Exhibit No. 470 Email...............................63
Exhibit No. 421 Student Conduct Policy..............76
Exhibit No. 400 PowerPoint...................83 & 84
Exhibit No. 319 Email...............................87
Exhibit No. 320 Attach correspondence...............87
Exhibit No. 364 Megan Counley notes.................92
Exhibit No. 324 Email from Krissy Scoggin...........93
Exhibit No. 381 Email from Krissy Scoggin...........93

Exhibit No. 341A Separation agreement..............138
Exhibit No. 308 Email from Keith Mann..............140
Exhibit No. 393 University excerpted document......147

P-R-O-C-E-E-D-I-N-G-S

THE REPORTER: We are now on the record. Today's date is February 19, 2026. The time is 7:59 a.m.

Would all parties please state their appearances for the record and who they represent.

MS. CHALOUPKA: Maren Chaloupka and Nathan Bruner representing Ashley Scoggin.

MS. SAPP: Susan Sapp representing Board of Regents of the University of Nebraska, Trev Alberts and Amy Williams.

MS. FROST: Good morning. Denise Frost on behalf of defendant Chuck Love, Jr.

THE REPORTER: Who else do we have on Zoom?

MS. SAPP: General Counsel Bren Chambers and my law partner Lily Amare.

THE REPORTER: Thank you.

TREV ALBERTS,

Having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CHALOUPKA:

Q. It's a different context than this case, but I've seen a quote from you in which you said that

"Leadership is really critical." I think that context was when you were making the transition from Nebraska to Texas A&M.

Tell me when you say leadership is really critical, what's -- what are you thinking?

A. I think -- I think having a leader is really critical.

Q. And probably also being a leader?

A. Yeah. I mean, in the context of that quote, it was leadership is really important, like, knowing who your -- who your boss is going to be. Right.

Q. Would it also apply to being a boss, being a leader and stepping up and showing leadership?

A. I think you could make that leap. Sure.

Q. In a crisis especially, I'm guessing.

A. Sure.

Q. When we were here in December, your testimony was, "The feedback that I remember hearing is the team said, 'We will not play if she's," meaning Ashley, and 'We will not play if Chuck is on the bench.'"

I take -- I take it that the feedback you heard came from Coach Williams?

A. No. The feedback I heard came from Keith Zimmer.

Q. From Mr. Zimmer.

A. Yeah.
Q. Where did he get it from?
A. I'm assuming from Amy.
Q. So when, you know, when you heard that the team would not play if Ashley is involved, what concerns did that cause you for Coach Williams' leadership of her team?
A. It didn't cause me concern for Coach Williams. My concern, primarily, was exactly what I communicated to Keith; is make sure that all of the right people have been communicated with about the situation so that we have the proper guidance necessary to make good decisions and wise decisions as an athletic department.
Q. I take it that you did not contact Amy Williams and say, you know, something like, You are a Division 1 coach at, what was then, a Power 5. Program, you need to exercise leadership with your team.
A. I did not.
Q. I take it you also didn't say anything, like, Remind your players of their own contracts with this University; no play, no scholarship, no benefits, correct?
A. I did not.

Q. I take it you didn't say anything like, Remind your players that you're the coach. You run this program, not them. True?

A. I did not.

Q. So did Mr. Zimmer tell you who exactly had said, "We won't play?"

A. He did not. Not that I recall.

Q. Let me hand you what's marked in a different deposition. This is going to be Exhibit 457.

(Exhibit 457 marked.)

Q. (BY MS. CHALOUPKA) This is an excerpt of Coach Williams' testimony when I asked her who was refusing to play.

Have you seen this before?

A. Have I seen this?

Q. Correct.

A. No. I don't believe so.

Q. If you look at the bottom of the second page of that document, I asked line 19 who specifically said "I won't play if Ashley's on the team."

And go ahead and take a moment and read what Coach Amy said in response. Read it to yourself.

(Witness complies.)

Q. (BY MS. CHALOUPKA) Have you seen what Coach Amy's testimony was?

A. I did, yeah.
Q. As of February 22, 2022, to your knowledge, Amy Williams had never removed a player from her team without a finding of a rule violation, true?
MS. SAPP: Objection, foundation.
If you know.
A. I don't know the answer to that question. I just --
Q. (BY MS. CHALOUPKA) I'm saying to your knowledge.
A. To my knowledge?
Q. Right.
A. Not off the top of my head, no.
Q. And to your knowledge, Coach Williams had never removed a player from her team for just not getting along with other players, true?
MS. SAPP: Objection, foundation. Form. Assumes facts not in evidence.
A. I don't know. Not that I'm aware of. I don't know.
Q. (BY MS. CHALOUPKA) To your knowledge, no coach within the department had ever removed a player from her team without a rule violation, true?
MS. SAPP: Objection, foundation, form.

A. Any coach in the athletic department? That would be untrue.

Q. (BY MS. CHALOUPKA) While you're there?

A. I don't know all the specifics, but I'm very clear and confident we've had players who've been removed from the team. I don't know exactly all the details surrounding it, but the coaches have, you know, have the ability to manage their roster. That's a part of what they do.

Q. Sure. Sure.

A. Yeah.

Q. Maybe I will make the question a little more clear. To your knowledge, player's have not been removed the team when they can produce if the reason is just not getting along, true?

MS. SAPP: Objection, form, foundation.

A. Yeah. I'm not aware of that.

MS. CHALOUPKA: Okay. Let's mark this as Exhibit 307, please.

(Exhibit No. 307 marked.)

Q. (BY MS. CHALOUPKA) I believe we looked at this in December, Mr. Alberts. It's Exhibit 307, and appended to it is Appendix C. It was part of your employment agreement. You can locate that, please.

A. Okay.

Q. And within Appendix C -- I'll find exactly will where it is. Under Disciplinary Action for Cause, there's a Subsection D that says that "Misconduct includes engaging in any unethical or immoral conduct regardless of where that conduct occurs that refers or relates to or impacts the athletic staff members ability to perform duties on behalf of the University."

The one after that, Subsection E says, "Engaging in any conduct regardless of where that conduct occurs that impugns, harms or undercuts the reputation of the department or the University."

My question there is, when you were serving at the University, how -- what was the reputation of the department at the time you were serving?

A. I suppose that depends on whose perspective or perception it is, but I think --

Q. For purposes of --

A. -- by and large it was relatively strong, hopefully.

Q. Yeah. And for purposes of this appendix, I mean, it's -- I mean, if we're talking about the 2020s, where it's not reputation for being a current national champion. It's a different reputation that we're talking about, true?

A. Correct.
Q. And so how would you describe that in those years that you were there, '21 through '24?
A. I think reputationally it was -- you're not talking about wins and losses --
Q. Right?
A. -- is that what you're saying.
Q. Right. Yeah.
A. Reputationally I think it was strong.
Q. Strong for what?
A. For trying to be an athletic department that is operating professionally and appropriately.
Q. Ethically?
A. Yup.
Q. Morally?
A. Yup.
Q. Good leader of young people?
A. Doing our best.
Q. Doing your best.
When this document talks about reputation, I'm thinking about a term that we hear more now in 2026. Is reputation similar to a brand?
A. Yeah. I think reputational risk can certainly impact the brand value. Right?
Q. Okay. I know brand is kind of a marketing

term, so I don't think they're quite interchangeable. But getting refocused, it's not just theoretically. University does have a legitimately interest in maintaining a positive reputation for itself.

A. For a variety of reasons.

Q. What are some of those reasons?

A. Well, your brand value and your reputational is directly tied to revenue in a lot of areas.

Q. Obviously, yeah.

A. So for business it's probably pretty important. I think recruiting and retention of players, that's part of it.

Q. Recruiting and retention of coaches and staff as well?

A. Yeah.

Q. When you arrived in July of 2021, did you feel like the department was adequately staffed for management of reputation and brand?

A. I don't know that the day I got there that was the top priority, but I would say, yeah, there were plenty of people.

Q. Okay. Yeah. When the dust settled you had --

A. Yeah.

Q. -- obviously we were in the news last week.

Mr. Nuse's book. And I read in some of that coverage that he had let a lot of people go shortly -- you know, toward the end of his tenure.

Did you rehire anybody that had been let go by your predecessor?

A. No.

Q. That you remember at least.

What was the role of the professionals in media communication like Keith Mann, for example, in the task of caring for the reputation of the department?

A. Yeah. I mean, Keith would be the expert in the specific things relative to perhaps the football program or competition. But like the rest of these, when incidents or issues happen that were really outside the scope of the athletic department's expertise, other people were obviously brought in to review and make sure that what was communicated, what we were doing, was appropriate and fit the profile of what our responsibility was.

Q. I take it that you felt it was reasonable for the department of athletics to want to protect and caretake for its image and reputation?

A. Yeah.

Q. If a player fakes an injury, does the coach

have responsibility for that?
MS. SAPP: Objection, form; foundation, unduly vague.
A. If a player fakes an injury?
Q. (BY MS. CHALOUPKA) Yeah. You're not supposed to do that, right?
A. It's called fainting and it happens every Saturday in football.
Q. Right.
A. It's pretty hard to manage.
Q. Sure.
A. So conference-wide I stepped in to try to help manage it because it's pretty hard to manage whether it's an actual injury or not.
Q. Are coaches expected to send messages that you're not supposed to do that?
A. Yeah. I think that would be a part of what a coach's responsibility, hopefully, that they're doing that, yeah.
Q. Part of their leadership, right?
A. Yeah.
Q. Okay. I'll take it a step further. If a player punches another player, does the coach have responsibility for that?
MS. SAPP: Same objections.

A. Sure. I mean, I think in effort the manage that, yeah.

Q. (BY MS. CHALOUPKA) In terms of their status in the department of athletics, Chuck Love and Ashley Scoggins were not equal, true?

A. Correct. One was a coach and one was a player.

Q. Did Ashley Scoggin have responsibility for Chuck Love's behavior?

A. No.

Q. Did Chuck Love have responsibility for Ashley Scoggin's behavior?

MS. SAPP: Objection, form.

A. Not entirely. I mean, I supposed what's specific to basketball he could have an influence, yeah.

Q. (BY MS. CHALOUPKA) For the years that you were serving as director of athletics at University Nebraska Lincoln, how would you assess your management of Title IX related issues?

A. Well, I'm wise enough to understand that I'm not an expert. And so, as I said, in December, you know, we are very intentional about knowing what our role is. And so our role is to report and to allow the people at the University who are experts in those areas

to guide, direct and help us, frankly.

Q. So with that said, how would you assess -- if you were doing a self-evaluation as part of a performance evaluation, how would you assess your management of Title IX related issues when you were at Nebraska?

A. I'm trying to recall. I don't know if -- we didn't have a lot of -- we mandated Title IX training, which everybody participated in. And so I would, you know -- look, I'm sure there's always areas you could perhaps do a better job, but I think for us we wanted to allow those that were experts in those area to help direct us and help us understand.

Q. How would you rate how well you made that a priority?

MS. SAPP: Objection, form. Foundation.

A. It was a priority, like, a whole lot of other priorities in the department.

Q. (BY MS. CHALOUPKA) Does the name Tracy Jenson mean anything to you? Is that a familiar name for any reason?

A. I don't think so.

Q. Ring any bells? Not while you were there. In 1996 she was a member of the Spirit Squad, and she

fell and broke her neck. And I don't know if just hearing anecdotally about the story that rings any bells.

A. I know that an incident happened, but I'm not sure of specifics, yeah.

Q. You were on the east coast at that point.

A. Yeah.

Q. Yeah. She's in my mind in part because her birthday is today, and she had a case against the University. My dad was Bob Chaloupka. My dad represented Tracy. He absolutely loved the Huskers. He loved cheering for you when you were playing. He -- my dad was the guy that would yell at the TV not because he's mad at the team, but because he's mad at the announcers because I remember him yelling, "be supportive," and then he turned down the sound and turned on the radio instead so we could listen to the bulk of it.

And so, you know, it's -- and yet when Tracy got hurt, he took her case as much as he loved the Huskers because he wanted to do what was right. And today is when my dad went to be with Jesus. So same thing as Tracy's birthday --

A. I'm sorry.

Q. -- and I'm sorry, I'm just bringing her

into -- and him into the room for a minute.

When did you first hear of suspicions that a Nebraska coach was having a sexual relationship with student athletes?

MS. SAPP: Objection to the form of the question as to suspicions.

A. Well, you know, the first that I was made aware was the call that I got from Keith Zimmer saying that there was this incident that happened on the road.

At that point, you know, the details were very murky and cloudy and nobody really knew. All he told me is this is happening. I'm going -- I'll report back what I find out.

I encouraged him, which of course he had way more experience than me, to make sure all the right people are available. And that's, I think, the first time that I was made aware.

MS. CHALOUPKA: This is 371.

(Exhibit No. 371 marked.)

Q. (BY MS. CHALOUPKA) My understanding is that you probably would have gotten a voicemail first and then called him back when you were available. Does that sound like it recalls with your memory?

A. It's probably right.

Q. Mister, these are notes from Keith Zimmer,

and his first reference of you starts at the bottom of first page of this exhibit. And says that you returned a call to him at about 6:20 in the evening.

Do you remember where you had gone in this time frame?

A. I'm sorry, I don't.

Q. Do you remember if it was University business or were you escaping temporarily?

A. So when did he --

Q. This would have been on 17th of February of 2022.

A. I don't know.

Q. So he -- what he writes is he informed you of a situation and that Coach Love is suspended for the game and Ashley Scoggin not playing.

When it says "about the above situation," what did that include from that first call that you had? You said it was murky, but what definition were you seeing through the murk in that first call?

A. Yeah. It was basically that clearly something happened. There were accusa -- there were concerns about certain things. The players had expressed things to Coach Williams. He needed some time to figure out what was actually going on. Lot's of -- you know, he's not there himself either.

would go out upon a 10:45 a.m. basketball meeting. I think Exhibit 415 might be that release; am I correct?

A. Yup.

Q. Tell me about that release.

A. Well, I think back to your previous, you had inquiries, and so we had to say something. And so we worked with both of those offices that I represented earlier.

Q. Title IX and legal counsel?

A. Yeah. To have a statement that, you know, acknowledge the situation, and that's what was agreed upon.

Q. What Title IX's input to what we have now marked a 415?

A. I don't know what that input was. I was not part of any of those conversations.

Q. So Mr. Zimmer writes that you indicated communication, central administration, media director should happen from Keith Mann and that he would once again call Lonnie Green and President Carter.

That makes it sound as if you had some communication by that point with Mr. Green, with Chancellor Green, and President Carter. Does that refresh your memory?

A. Yeah. What this is referring to is we don't

send anything out of athletics, at least that was the policy there. It isn't a call to Ronnie Green or Ted Carter. It's Keith Mann working with their communications folks, so making sure that all the communication that comes out, if it's not some benign, you know, is first approved and understood by those offices as well. So I don't think Keith Mann reached out to Ted Carter.

Q. That's -- I was going to ask. Who is the "he" there? Is it Mr. Mann or is it yourself?

A. Yeah.

Q. By that point, what had opinion your communications with Chancellor Green about the situation?

A. I think it was just the specifics of what was alleged what happened as best we could and that all of the right people at the University are involved in helping us manage through the process.

Q. Did he ask questions of you?

A. No.

Q. How about President Carter?

A. Not that I recall.

Q. When you spoke with them, was it -- this is such a 2026 question -- was it a three-way call or do you think it was separate calls to each of those

gentlemen?

A. I don't recall having a specific conversation with either of them. Now, that doesn't mean that, you know, we would be in meetings. At this point, everybody is aware of this situation. When you talk about the Board of Regent members, there's no specifically liaison to athletics, but we're in meetings all the time. I mean, people were aware, but I can't recall any formal sit-down meetings or calls to directly discuss the situation.

Q. Including any calls with individual members -- from individual members of the board?

A. Not that I recall. Now, that doesn't mean if I'm having a different conversation about some other topic that it didn't come up, but I don't recall that.

Q. Mr. Zimmer writes that you still felt strongly that moving -- poor English -- still felt strongly that possibly moving forward to immediate termination was a better option, correct, and agreed to take a few days upon his return to Lincoln for further decision, coverage and guidance would be best, and to move forward with a plan.

Termination for what?

A. I mean, you know, again, my initial reaction would have been that -- that termination was

appropriate.

Q. For what?

A. For Chuck.

Q. Well, yeah. But would it be for cause?

A. I don't know about that. I'm not talking about the definition.

Q. Right. But termination because he did -- fill in the blank?

A. Termination because of the situation that happened on the road in the hotel room.

Q. So what moved you from immediate termination, feeling strongly toward immediate termination, to I'm going let this sit for a few days for further discussion?

A. To allow the people that were directing us to understand better what the rationale for the recommendations is.

Q. So the people who are directing us is specifically whom?

A. Well, I mean, again, it's we're working with the Title IX office.

Q. So I'm breaking you down a little bit on this. Did you have direct communications Ms. Counley --

MS. CHALOUPKA: And that's spelled

injury?

A. Not that I'm aware of.

Q. Would there be a problem if a coach was instructing a player to lie, to do something dishonest?

MS. SAPP: In general?

MS. CHALOUPKA: Sure.

A. That's not what you would hope your coaches would do.

Q. If a coach had directed Mr. Chappell to feign and injury, would you fault Mr. Chappell for the fact that apparently he didn't refuse since there was an investigation and a finding and all of that? Do you fault Mr. Chappell for not just telling the coach to pound sand?

A. Mr. Chappell had been dealing with a pretty significant calf injury for several weeks and was trying to get off the field because his leg hurt. And he tried to tell the coach, and the coach was trying to tell him, which we do in football, if you're injured, get down. It was a timing issue. There was no nefarious intent by the coach to tell him to lie. It was trying to help him understand how to manage actually being injury.

Q. Did A&M go ahead and pay the $50,000 fine?

A. I'm not aware of that.

Q. Was Coach Elko reprimanded by the SEC?
A. I don't believe so.
Q. I take it Mr. Chappell was not removed from the team?
A. No.
Q. So let me pull out Exhibit 421.
(Exhibit No. 421 marked.)
Q. (BY MS. CHALOUPKA) I take it you are familiar with this policy?
A. Yes.
Q. Was a version of this policy in effect at UNO when you were there?
A. At UNO?
Q. Correct.
A. I think so. Probably wasn't quite as detailed as this.
Q. I was wondering if this was a system-wide policy for the whole Nebraska system or if it was --
A. I don't believe so.
Q. Unique to -- okay.
It is not system-wide in the sense that it applies to all students; it is unique to athletics?
A. Correct.
Q. So there's actually language here on the

first page towards bottom. It says, "A separate department conduct policy in addition to University and team rules is necessary because allegations of student athlete misconduct generally receive more scrutiny and public attention."

I take it you don't disagree with that?

A. No.

Q. It goes on to say, "Failure to handle these matters appropriately may undermine the public trust in a University and Therein impair it's ability to carry out its mission of teaching, research, public service."

I take it you don't disagree with that either, correct?

A. Correct.

Q. And those are important purposes, right, everything we just read.

A. Sure.

Q. Fairness to student athletes is important, right?

A. Yes.

Q. Minimizing conflicts of interest is important, right?

A. Yes.

Q. And if you go to the next page when you're

A. I think I -- when I first got hired, I went and met with each head coach individually, and sometimes that corresponded with stopping by if they were practicing. So I think it's -- I think I did, but I didn't regularly attend practice, no.

Q. Did you know going into this meeting what Ashley's baseline was in terms of how she normally acts, how she acts if she's stressed, that kind of thing?

A. No.

Q. Did you -- by that point, had you made any inquiries about whether Ashley had been engaged with sports psychology at any point?

A. I did not.

Q. Did you ever suggest to Mr. Zimmer or anyone else, call sports psychology, see if there's someone they had that could attend this meeting, anything like that?

A. No. I don't recall that.

Q. Were you aware that Ashley had reported prior trauma from what Dr. Woods referred to as a power differential between a coach and Ashley?

A. No.

Q. Did -- not Coach Love, but someone before that.

Did anyone at this meeting tell Ashley if the coach was having sex with you, it is not your fault?

A. Not that I recall.

Q. Did anyone tell Ashley if your coach was having sex with you, you're not in trouble?

A. No. That wasn't the tenure of the meeting.

Q. Tell what you recall about this meeting. Let me back it up. About how long do you think it lasted?

A. Maybe 30 to 45 minutes.

Q. What do you recall from it?

A. What I recall was Ashley's mom did a lot of the initial talking. Ashley was very quiet. And her mom was apoplectic that this was even an issue. It was none of the university's business if her daughter -- nothing happened, and there is no issue here, and why are we -- why is the University involved here? And she said, it is none of the business -- it is none of the business of any of you in this room who her daughter has a relationship with.

Q. Sexual relationship or relationship?

A. She said relationship --

Q. What else?

A. And that nothing happened in the room.

Q. What else did she say?

A. And her dad wanted her to be back on the team. And I communicated that the decision was made, that the coach has the right with her roster to have on the team who she wants on the team, and Amy has made the decision that she's not on the team, and she's got that authority.

But, we, in athletics will do everything we can to help you. So if you need help with a transfer report or resource like sports psychology, if you need -- and then her dad brought up an issue with her living arrangements, that here roommate she felt uncomfortable with and she felt hostile.

And I agreed in the meeting that we would take care of her lease. So we paid for her to be able to move out where she felt like she was threatened or she didn't like that living arrangement. So other than letting her have a roster spot on the team, we tried to be responsive to every request that they had.

Q. What was the reason that was stated for Ashley being uncomfortable staying with her roommate?

A. I don't remember the details other than she just felt uncomfortable with her, said she did not want to live with her. And her dad said it would be very meaningful if we would allow her to move out. Of course there's a financial cost to them. They didn't

think it was fair that they bear that, so I agreed to pay it.

Q. Did these seem like people who had a lot of money.

MS. SAPP: Objection, foundation.

A. No -- I don't know.

Q. (BY MS. CHALOUPKA) Ashley had applied for some assistance with a vehicle at one point. Do you remember that?

A. To us, she did?

Q. Yeah.

A. I wasn't aware of that, I don't think.

Q. Did -- was it -- you know, were you aware at that time that the roommate was the person that came in the door with the phone out in the door of Coach Love's room and videoing and saying "you're sick, you're sick," things like that?

A. I wasn't aware of those details, but I knew that there was a strained relationship between the two.

Q. And that after -- after the Penn State game that the roommate had made some comment to Ashley about, you know, how this could end Coach Love's career. Were you aware that that had been said by the roommate?

A. No.

Q. Aware that the roommate had sent a text to Ashley that said something to the effect of "you're dead to me"?

MS. SAPP: Objection, form. Foundation, unclear as to timing that happened before.

A. Yeah. I'm not aware.

Q. (BY MS. CHALOUPKA) What else was said that you recall?

A. That seemed to be the primary. I'm would be really frank with you. I was stunned at what I heard from mom.

Q. What's the worst thing she said?

A. That it was none of our business. That if her daughter wants to be in the assistant coach's room after midnight, that's her business. She's an adult and she can make that decision.

Q. What else?

A. That was the thing that was probably most on my -- but, you know, it was -- it started out. I don't believe Ashley talked much. She did -- they did ask her if she -- it seemed by the end that, you know, dad felt a little bit more comfortable that, you know, that we were getting confident that we could help her get into the portal, support her academically and all the other areas and take care of her financial concerns.

So, I think, at the end it felt like it was about everything we could do based on challenging circumstances.

Q. What else do you recall specifically being said whether by Ms. Scoggin or Mr. Scoggin or Ashley?

A. No. That's -- that's primarily what I remember.

Q. Who was in the role of kind of directing the discussion? Was it you or was it Mr. Zimmer, or who was -- seemed to be in that facilitator role?

A. I don't know that anybody -- I think primarily probably Keith. He was the one that was most intimately involved with it. But I don't think there was -- I can't say that Keith was, you know, walking through an agenda. It was not a -- I mean, it was just a conversation and it bounced around.

Q. Did you have the sense that he had had direct communication with either Ms. Scoggin or Mr. Scoggin?

A. Don't know.

Q. What do you recall Coach Williams saying during this?

A. She just spoke specifically to the team and her decision and why it was her decision based on breaking team rules and such that Ashley would not be on the roster anymore, but that she care for her,

A. I would have a cursory understanding, but I'm not an expert in those areas.

Q. Someone like Mr. Vaughn would report back to you what he'd seen?

A. Yeah, or -- and report to coaches, you know, changes in rules.

Q. In the time that you were in Nebraska, do you ever recall a time that Mr. Vaughn would tell you about a suggestion, an idea, anything like that that you said, I don't want to do that?

A. We didn't normally operate that way. We brought -- individual executive staff members would bring items to a table like this, and we would work through them together. And if we couldn't agree, then I would make the decision. But I didn't unilaterally often. It's just not how we choose to lead.

Q. My question was clumsy on that. If Mr. Vaughn brought you something that came from NCAA, I take it that there was not a time that you would remember where you ever said, find a way to work around this?

A. Yeah. No, I don't --

Q. Okay.

A. -- typically do that.

Q. I can ask a question comprehensively if you

give me -- give me just a couple minutes to talk to my co-counsel.
A. Okay.
THE REPORTER: Going off the record at 11:13 a.m.
(Off the record.)
THE REPORTER: Going back on the report at 11:16 a.m.
Q. (BY MS. CHALOUPKA) I did forget to ask you --
A. Okay.
Q. -- one more question about the student conduct policy. In the time that you were at Nebraska, so July of '21 through March of '24, how many times do you recall that policy being invoked into the process that was ascribed and that being followed?
A. I don't recall any -- any other time.
MS. CHALOUPKA: Okay. I think that's all the other questions I had. So I'm done with 13 minutes to spare unless you have questions.
MS. SAPP: I'll reserve my questions.
Denise, do you have any questions?
MS. FROST: No, I do not.
MS. SAPP: Okay. We would like to read and sign the deposition before it's disseminated, please.

THE REPORTER: Before we go off the record, counsel on Zoom are there any copies that would like to be ordered?

(Ms. Sapp's copy for Mr. Alberts deposition was confirmed in Mr. Vaughn's deposition.)

MS. FROST: I would like to get just a condensed transcript, please.

THE REPORTER: Okay.

MS. CHALOUPKA: And, Denise, I'm going to email you the exhibits that I used between now and when we started with Mr. Vaughn's deposition.

MS. FROST: Awesome. Thank you.

THE REPORTER: Going off the record at 11:18 a.m.

(Proceedings concluded.)

WITNESS CORRECTIONS AND SIGNATURE

Please indicate changes on this sheet of paper, giving the change, page number, line number and reason for the change. Please sign each page of changes.

PAGE/LINE CORRECTION REASON FOR CHANGE

Trev Alberts

I, TREV ALBERTS, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____________________________

TREV ALBERTS

STATE OF TEXAS )

COUNTY OF _____________ )

Before me,_____________, on this day personally appeared TREV ALBERTS, known to me (or proved to me under oath through_____________) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this, ______ day of ______________, 2026.

____________________________

Notary Public, State of Texas

My Commission Expires:____________________________

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ASHLEY SCOGGIN,<br><br>Plaintiff,<br><br>vs.<br><br>BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, and individuals AMY WILLIAMS, TREV ALBERTS, and CHUCK LOVE, JR., in their individual capacities,<br><br>Defendants. | Case No. 4:24-CV-3039 |

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF
TREV ALBERTS
FEBRUARY 19, 2026

I, NILDA CODINA, Notary in and for the State of Texas, hereby certify to the following:

That the witness, TREV ALBERTS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30 (e)(1) that the signature of the deponent:

____X_____was requested by the deponent or a party before the completion of the deposition and returned within 30 days from the date of receipt of the transcript. If returned, the attached Changes and

Signature Page contains any changes and the reason therefor;

___________was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.

Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Subscribed and sworn to on this 10th day of March, 2026.

_________________________
NILDA CODINA
Notary in and
for the State of Texas
My Commission No. 12878135-3
Expires: 10/24/2027
ASSOCIATED COURT REPORTERS
Firm Registration No. 29
425 Austin Avenue
Suite 1206
Waco, TX 76701
Phone(254)753-3330