IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ASHLEY SCOGGIN,<br><br>Plaintiff,<br><br>vs.<br><br>BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, and individuals AMY WILLIAMS, TREV ALBERTS, and CHUCK LOVE, JR., in their individual capacities,<br><br>Defendants. | Case No. 4:24-cv-3039<br><br>**BRIEF OPPOSING DEFENDANTS BRUN, WILLIAMS AND ALBERTS' MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION:

## "SHE WAS 23 YEARS OLD, ALMOST 24"[1]

BRUN's Brief in Support of Motion for Summary Judgment reflects the discordance between what BRUN, ALBERTS and LOVE know to be right and what they neither want to admit, enforce or prevent. They know that "coaches should never have sex with their athletes" is right; but there were costs then, and there are costs now, to admitting that truth. BRUN's perseveration on ASHLEY's age shows how we got to this place – and it confirms that as of July 2026, BRUN still does not take seriously the vulnerability of an undergraduate student or athlete to a predatory professor or coach.

In 2016, BRUN was providing its coaches with a "Commitment to Professional Conduct," in which coaches signed their understanding and agreement to abide by specified expectations for

[1] ***See*** Defendants' Brief Supporting Motion for Summary Judgment at 8, 21 ("***Plaintiff was 23, almost 24, at the time***" (emphasis in original), 20, 44, 45.

professionalism. Among those expectations was that coaches will "follow the UNL policy on consensual and domestic relationships," and that they understand that "staff members have a responsibility to avoid any apparent or actual conflicts of interest between their professional responsibilities and their personal interests in their relationships with those whom they supervise, evaluate, or over whom they exercise power and authority."[2] But the "UNL policy on consensual and domestic relationships" referenced therein does not exist. BRUN has never produced any such policy, and Plaintiff's public records request from UNL for all policies on consensual and domestic relationships effective between 2016 and 2022 yielded only the version of Policy 3.3.15 that BRUN passed in 2021.

Was there really a "UNL policy on consensual and domestic relationships" (and, if so, why hasn't it been produced)? When WILLIAMS and LOVE signed their Commitments to Professional Responsibility, were they and BRUN both so unserious about the expectations printed therein that no one produced, and no one asked to read, the "UNL policy on consensual and domestic relationships" so that WILLIAMS and LOVE would know what they were agreeing to?[3] Whatever the explanation, BRUN was aware in 2016 that coaches have the potential for conflicts involving "personal interests in their relationships with those whom they supervise, evaluate, or over whom they exercise power and authority."[4]

BRUN next documented its awareness that undergraduate students – regardless of their age – were emotionally, and thus sexually, vulnerable to the power and authority of faculty and

---

[2] ***Plaintiff's exhibit 333*** at 2; ***Plaintiff's exhibit 334*** at 2.

[3] This possibility is not far-fetched. ALBERTS testified that he signed his July 14, 2021 contract to become the University's Vice Chancellor and Director of Athletics without reading it (***Alberts depo. Vol. I***, 121:24), and then 15 months later, he signed his First Amended and Restated Employment Agreement without reading that (***Alberts depo. Vol. I*** 124:24).

[4] ***Plaintiff's exhibit 333*** at 2; ***Plaintiff's exhibit 334*** at 2.

staff in June 2021, when it approved Policy 3.3.15.[5] The fact that BRUN had no university policy that it can produce on this issue until June 2021 is itself striking. ***Plaintiff's exhibit 605*** shows that in the years before BRUN passed Policy 3.3.15, the College of Arts & Sciences at UNL and the campuses at UNK and Curtis had adopted their own policies prohibiting faculty-student relationships. The Curtis campus even included examples of dangerous grooming behaviors in its policy. [6] BRUN was then, and remains now, late to this recognition.

In June 2021, BRUN approved Policy 3.3.15. On paper, Policy 3.3.15 acknowledges that "an intimate or dating relationship between a faculty or staff member and a student can negatively impact the well-being of the student if the student feels pressured or coerced into the relationship or feels an inability to leave the relationship." [7] Per Policy 3.3.15, "[f]aculty members are prohibited from engaging in any romantic relationship with an undergraduate student, regardless of whether the faculty member has any supervisory or evaluative authority over that student."[8]

Or are they? BRUN enacted Policy 3.3.15 with no plan for even communicating it to the University community, much less training it. Even the Title IX Coordinator, Meagan Counley, was not trained in it.[9] Although they claimed to be familiar with Policy 3.3.15, no witness from the Department of Athletics can describe any training on Policy 3.3.15 (other than generalized references to "the Title IX training"), and BRUN has produced zero documents to show any training to faculty and/or the Department of Athletics on Policy 3.3.15. This is consistent with

---

[5] ***Plaintiff's exhibit 311*** at 6.
[6] ***Id.***
[7] ***Plaintiff's exhibit 311*** at 3.
[8] ***Plaintiff's exhibit 311*** at 4-5.
[9] ***Counley depo.*** 130:23.

Counley's acknowledgment that the Title IX office has only begun training Policy 3.3.15 to students "post-Ashley situation."[10]

BRUN's lack of training has translated into a lack of understanding of whether Policy 3.3.15 was a serious policy. Over a vale of objections, Counley testified:

Q: If there was a sexual relationship between a coach and a student-athlete, what would be the Title IX implications of that?

A: I think it would depend.

Q: On what?

A: On whether that relationship was consensual or whatever took place was welcome.

Q: How would it be consensual?

A: If they were able to give freely and affirmatively give consent, then . . .

Q: How would they be? She's an undergraduate. He's an employee.

A: I -- I think it's still possible.

Q: How so?

A: I think both things can be true at the same time.

Q: How so? Both of what can be true at the same time?

A: That there can be a consensual relationship, and there can also be a power dynamic in a relationship.

Q: How can it be consensual when Chuck Love is an employee with supervisory and evaluative capacity over an undergraduate student? Please enlighten me.

A: I don't -- I don't know. I don't have an example to give.

Q: What does the policy say?

---

[10] ***Counley depo.*** 131:01.

A: The prohibited consensual relationship policy says that type of relationship is prohibited.

Q: Right. Why is there any room to argue that it might be consensual given the clarity of that policy?

A: Again, because it's prohibiting relationships that people can consent to be in. It's just the University finds it, for good reason, to not be a good idea.[11]

Policy 3.3.15 does not say that such relationships are "not a good idea"; on paper, Policy 3.3.15 prohibits them, period. And, Policy 3.3.15 prohibits those relationships without regard to the age of the undergraduate. Yet Counley's Deputy Investigator, Leslie Shaver, believes that "the very existence of a faculty member sleeping with a student, not necessarily inappropriate from a Title IX perspective in my opinion."

At the Department of Athletics level, there is the same discordance between what leaders know to be true and what they were willing to admit, enforce and prevent. Assistant Athletic Director Keith Zimmer and WILLIAMS can say that coaches should never have sex with the athletes they are coaching.[12] Even LOVE can say this.[13] But ALBERTS, the Vice Chancellor for Athletics and Director of Athletics, could not say it[14]; and WILLIAMS' agreement to the simple truth of "coaches should never have sex with athletes" falls apart when she is asked to apply that abstract truth to real life:

Q: If the reason that Ashley was out of her room on the occasions that you identified at the outset of your deposition was because there was a sexual relationship with Coach Love, does that make her still in violation of your rules?

A: I don't know.[15]

---

[11] ***Counley depo.*** 193:20.
[12] ***Zimmer depo.*** 60:13; ***Williams depo.*** 60:21.
[13] ***Love depo.*** 128:23.
[14] ***Alberts depo. Vol. I*** 66:13.
[15] ***Williams depo.*** 130:03.

* * * * * *

Q: If Ashley was in a sexual relationship with Chuck Love, is she the one who should be faulted for breaking the trust?

A: I don't know.

Q: What does your Title IX training tell you?

A: I don't know. [16]

* * * * * *

A: [ASHLEY] was not punished for being in a situation. She was punished for breaking team rules and for lying about it continuously, over and over, multiple team rules on multiple team road trips that she --

Q: About what, though?

A: -- she eventually confirmed.

Q: About what?

A: As well as multiple lies. And it – that was the ultimate decision, the broken trust, the broken deceit to clarify that she could no longer participate –

Q: What were the lies about?

A: -- participate as a trusted member of the team, an active member of the team, but that we still wanted to support her in every way that we could.

Q: She wasn't lying about "I didn't come to practice today because I was sick"; right?

A: Correct.

Q: She wasn't lying about "I made mistakes on the court because I was sick" or something like that; true?

A: Correct.

Q: If she was in a sexual relationship with a coach, she was lying about a sexual relationship with a coach; right?

---

[16] ***Williams depo.*** 381:21.

A: I don't know.[17]

* * * * *

Q: Is it appropriate [for LOVE] to be asking [team member Jaz Shelley] what's going on in her personal life right now?

A: I don't know.

Q: If she discloses that she's dating a particular man on the men's team, what would be appropriate about Coach Love going to reveal what she told him to that man?

A: I don't know.

Q: Can we agree it's not appropriate?

A: I don't have an answer to that.[18]

* * * * * *

Q: Is there anything else concerning about an associate head coach suggesting to players of the opposite sex that he'll give them one-on-one workouts late at night when there is no one around?

A: Yeah, I don't know.[19]

* * * * * *

Q: Is there anything else concerning about an assistant coach somehow identifying while he is out of state that one of his recruits is there and then inviting her to go drink alcohol with him at 10:00 at night?

A: I don't know.[20]

* * * * * *

Q: Would it be appropriate if [LOVE] was talking to your practice players about members about women that he would like to "fuck"?

---

[17] ***Williams depo.*** 383:01.
[18] ***Williams depo.*** 211:01.
[19] ***Williams depo.*** 214:23.
[20] ***Williams depo.*** 218:17.

A: I don't know.

Q: In what world would it be appropriate for a coach to be talking to the practice players about whether he would like to fuck a particular woman?

A: I don't know.[21]

The summation would be that BRUN had coaches sign commitments to abide by policies that did not exist, and no one noticed. BRUN went to the trouble of approving what, on paper, is a consequential policy that sets clear boundaries about sexual relationships with undergraduates; but it didn't announce, communicate or train that policy, or ask the Title IX Coordinator to train it until "post-ASHLEY situation." Not just as late as 2022 but now in 2026, the Board of Regents of the University of Nebraska still cannot agree that coaches should never have sex with the athletes they coach; and leadership in the Department of Athletics would rather leave room for coaches to treat student-athletes like a convenient dating pool.

Policy 3.3.15 makes no exceptions to allow faculty and staff to date undergraduates who are 40 or 30 or 23 or 21 years old. The Policy that BRUN approved recognizes that "the inherent power differential in faculty or staff relationships with students can give rise to actual or perceived conflicts of interest as well as claims of abuse of authority, exploitation, bias or favoritism," without regard to whether the student is 40 or 30 or 23 or 21 years old.[22] Neither did the pre-June 2021 policies at UNK, the Nebraska College of Technical Agriculture, or the UNL College of Arts & Science. Neither does the NCAA Model Policy published in 2012 within Staying in Bounds: An

---

[21] ***Williams depo.*** 285:11.

[22] ***Plaintiff's exhibit 314*** at 3.

NCAA Model Policy to Prevent Inappropriate Relationships Between Student-Athletes and Athletic Department Personnel.[23]

BRUN's repetitive insistence that ASHLEY had agency, power and resources equal to LOVE's because she was being "23, almost 24 years old" is not supported by the policies it claimed to have in 2016 and eventually approved in 2021. Because the evidence shows BRUN's regard for its own policy to be unserious, however, it appears that BRUN's true policy is exactly we see in BRUN's Brief, to wit:

* As long as the student is "of age," coaches and, for that matter, faculty can treat students on their teams and in their classes as their personal dating pools;

* BRUN won't invest time or effort to train coaches and faculty otherwise;

* BRUN won't enforce the policy if someone violates it;

* BRUN will fight like hell to conceal its lack of training and enforcement; and

* If the students who are betrayed and broken by the coaches and faculty ask for accountability, what they can expect is BRUN's blame and shame.

With each mention of "23 years old"/"23, almost 24 years old," BRUN reveals its true policy.

**I.**

**SUMMARY JUDGMENT IS INAPPROPRIATE BECAUSE OF BRUN'S UNADDRESSED DISCOVERY ABUSE**

We acknowledge and understand the Court's emphasis on following the order of case progression; we also acknowledge that we should never have agreed to a progression order that terminated a party's ability to request documents and seek judicial intervention before the closure

---

23 ***Plaintiff's exhibit 462.***

of discovery. We must have assumed that no counsel would interpret those expirations as free reign to abuse the Rules of Discovery.

The United States District Court for the District of Utah has written:

> Vigorous representation of clients requires that the best facts be emphasized and that the worst facts be left for the other side to emphasize; but the truth-seeking process is more important than the duty of representation and is the context in which the duty of representation exists. Vigorous representation and selective emphasis of facts cannot be permitted to interfere with the truth-seeking mission of the courts. The rules of disclosure and discovery reflect the obligations of counsel and parties to be forthcoming, truthful, and cooperative as part of the larger goal of "the just, speedy, and inexpensive determination of every action."[24]

That has not happened in this case. Defendants' Motions for Summary Judgment thus present assertions that no genuine issue of fact remains to be tried, from the same people who made sure that some facts would never see sunlight.

The Federal Rules, and the Court, can and should presume that counsel and parties agree that "truth-finding is exactly the purpose of discovery."[25] The alternative view is that discovery is an exercise to be deflected and delayed until the deadline for motions to compel expires.[26] BRUN answered 1 out of 12 Interrogatories and 5 out of 39 Requests for Production without objection; BRUN also asserted 51 objections to the remaining 11 Interrogatories and 184 objections to the remaining Requests for Production of Documents.

---

[24] ***ClearOne Communications, Inc. v. Chiang***, 2008 WL 704228 at *5 (D. Utah 2008); ***see also Cassidy v. Cassidy***, 923 F.2d 856 at *2 (7th Cir. 1991) (*unpub. op.*) (referring to the truth-seeking process as the court's "most important function").

[25] ***Rodriguez v. Presbyterian Healthcare Servs.***, 2012 WL 12894833, at *14 (D.N.M. Apr. 3, 2012).

[26] There is support for the allowance of motions to compel after a discovery deadline expires. ***See, e.g., McFadden v. Ballard, Spahr, Andrews & Ingersoll LLP***, 243 F.R.D. 1, 11 (D.D.C. 2007) ("While Plaintiffs motion was filed after the deadline for discovery had expired, it seeks to compel answers and documents that were demanded during the discovery period. I know of no provision of the Federal Rules of Civil Procedure that would condemn Plaintiffs claim as untimely. Indeed, if such a motion could not be filed after the discovery period, it would create an incentive to delay responses and then 'run out the clock'"); ***Ruiz v. U.S. Protect***, 2008 WL 11395490 (S.D. Tex. 2008); ***Seals v. Leath***, 2021 WL 7083330 (M.D. Ala. 2021);

Even BRUN's few objectionless responses contained more gamesmanship than substance. For example, Plaintiff asked Defendants to produce

> the specific 'University rules and policies' that you allege ASHLEY admitted to violating. Be sure to identify, in your Response, the bates numbers of the pages you are producing in response to this specific Request.

Defendants' response was "see documents bates-labelled BRUN_00002339 – BRUN_00002455 and BRUN_00002497 – BRUN_00002609." The 238 pages that Defendants produced consisted of multiple duplicate copies of the entire team handbook for 2020-2021 and 2021-2022, including "Team Rules" and "Pet Peeves" but also recipes for chicken stir-fry, an advertisement for a meditation app, weight room policies, inspirational quotes and "Meet the Media". Defendants did not identify the specific rule or policy that was the basis for removing ASHLEY from the team.

This approach cannot consistent with the "spirit of discovery" envisioned by the Advisory Committee. The summary judgment process asks a non-movant to admit statements of fact written by the movant. A response of "admit" requires Plaintiff to assume that there is no discoverable evidence to dispute each statement; we cannot make that assumption. BRUN never intended to provide a privilege log for the privileges it asserted in response to Plaintiff's Interrogatories and Requests for Production (First Set), and it never has. BRUN never intended to disclose whether it withheld documents pursuant to its 184 objections, and it never has.

BRUN has withheld facts more effectively than the undersigned has discovered it. Whether that is an outcome to which lawyers should aspire is a question for another forum. For the purposes of this Motion, it does create challenges to the claim that there are no genuine issues of material fact.

## II.

## GENUINE ISSUES OF FACT REMAIN REGARDING PLAINTIFF'S SECOND CAUSE OF ACTION (TITLE IX)

*Standard of Review*

Throughout this section, BRUN argues that the applicable legal standard is whether the harassment was so "severe, pervasive, and objectively offensive." This Court has advised BRUN in at least two other recent cases that that standard does not apply in a Title IX case involving teacher-on-student harassment.[27] Coach-on-student athlete harassment is akin to teacher-on-student; there are no allegations in this case arising from student-on-student harassment. Hence the standard ASHLEY must meet was that Defendant was "(1) deliberately indifferent, (2) to known acts of discrimination, (3) which occurred under its control." [28]

A response to reports of actual harassment demonstrates deliberate indifference when the response is clearly unreasonable in light of the known circumstances.[29] Deliberate indifference includes "an official who is advised of a Title IX violation refuses to take action to bring the recipient into compliance[30]," and such indifference "must either directly cause the abuse to occur or make students vulnerable to such abuse …"[31]

A. Refocusing on the Title IX Claims in Plaintiff's Complaint

As a preliminary matter, the actual Title IX violations alleged in Plaintiff's Complaint are not about how the Title IX Coordinator investigated a formal complaint brought by a complainant or conducted a hearing. Nor does ASHLEY challenge the dismissal of her Title IX Complaint in

---

27 ***See Doe v. BRUN et al.***, 2026 WL 2607361 at *6 n. 4.

28 ***Doe v. BRUN et al.***, 2026 WL 2607361 at *6 n.4 (*citing* ***Shrum ex rel. Kelly v. Kluck***, 249 F.3d 773, 782 (8th Cir. 2001); ***Gebser v. Lago Vista Indep. Sch. Dist.***, 524 U.S. 274, 281 (1998).

29 ***Maher v. Iowa State Univ.***, 915 F.3d 1210, 1213 (8th Cir. 2019).

30 ***Gebser*** at 290.

31 ***Shrum*** at 782.

May 2022, when she had graduated and LOVE had resigned. Nor does ASHLEY claim that LOVE's sexual harassment continued after February 16, except to the extent that LOVE continued pressuring her to tell no one about the sexual relationship.[32]

The specific violations alleged in the Complaint are:

> NU's failure to enact and enforce policies prohibiting and preventing coaches from sexually pursuing student-athletes, and to appropriately correct WILLIAMS' actions resulted in ASHLEY, on the basis of her sex, being excluded from participation in, being denied benefits of, and being subjected to discrimination in NU's education program in violation of Title IX.
>
> NU failed to take immediate, effective remedial steps to resolve the complaint of sexual harassment. Instead it acted with deliberate indifference toward ASHLEY. It ratified WILLIAMS' behavior in Pennsylvania and WILLIAMS' decision to punish ASHLEY instead of demonstrating that sexual relationships between professional coaches and student-athletes are an abuse of power.[33]

Defendants have included arguments in their Brief that are inapposite to the actual claims Plaintiff pled and evidence Plaintiff developed.

B. <u>Genuine Issues of Fact Remain as to Whether LOVE's Conduct Was Unwelcome</u>

Plaintiff did not allege that the University erred in finding, in a Policy 2.1.8 proceeding, that LOVE's conduct was not unwelcome. This is because there was no process from which such a finding could have been made. Counley dismissed ASHLEY's March 11, 2022 formal Title IX complaint without reaching a finding, due to LOVE's May 8, 2022 resignation. And weeks before ASHLEY filed her complaint, Counley had already punted on responding to Jamie Vaughn's report, as she "felt she should visit with UNL Legal Counsel due to the high profile nature to help make a determination if this should be a Title IX investigation or otherwise."[34]

---

[32] ***Ashley Scoggin depo.*** 194:16.
[33] ***Complaint*** at ¶¶ 88, 89, 91.
[34] ***Plaintiff's exhibit 371*** at 2.

To the extent that BRUN is leading with the claim that LOVE's predation was "not unwelcome" (and BRUN is doing exactly that): issues of fact remain as to whether BRUN, acting through Counley, made an assessment on February 17 that LOVE's conduct was not unwelcome, and thus in some manner not deserving of IEC's review. By the time that Counley told Keith Zimmer that "she should visit with UNL Legal Counsel due to the high profile nature to help make a determination if this should be a Title IX investigation or otherwise,"[35] Counley had not even attempted to reach out to ASHLEY. Counley testified

> Q: You had made a decision before the time you talked to Keith Zimmer on the morning of the 18th that the Title IX coordinator was not going to open an investigation; true?
>
> A: Yes. I believe so.
>
> Q: You had made that decision without even attempting to contact Ashley Scoggin; true?
>
> A: I -- yes.
>
> Q: You had made that determination without talking to any of the teammates; true?
>
> A: Yes.
>
> Q: You hadn't even talked to Coach Williams by that time; true?
>
> A: True.[36]

Vaughn had called Counley because he identified what was reported to him – which is then what Vaughn reported to Counley – to be a Title IX situation.[37] He testified that the report bore the potential to be sexual misconduct:

> A: Potential because [ASHLEY] was reported to be in his bed under

---

[35] ***Plaintiff's exhibit 371*** at 2.
[36] ***Counley depo.*** 227:11.
[37] ***Vaughn depo.*** 164:09.

the covers.

Q: That would be a major concern, wouldn't it?

A: It was a concern for me, yes.

Q: A female athlete, male coach would obviously would be a concern?

A: I would say any athlete in a coach's bed, under the covers. Not by gender. Just the fact that -- why are you under the covers in that person's room.

Q: Yeah. It can happen in any sexuality.

A: Yeah.

Q: The concerns would include a power differential, right?

A: Yeah. I mean, he's a coach. She's a student-athlete.[38]

Counley admits that it "crossed my mind" that LOVE and ASHLEY may be in a sexual relationship.[39]

But Counley fixated on the "high profile nature" of a coach and a student-athlete, and erred on the side of "maybe it was consensual". She reached this conclusion without interviewing anyone with more than third-hand knowledge. She reached this conclusion when she could not even explain or defend it:

Q: How can it be consensual when Chuck Love is an employee with supervisory and evaluative capacity over an undergraduate student?

A: I don't – I don't know. I don't have an example to give.[40]

---

[38] ***Vaughn depo.*** 164:13.
[39] ***Counley depo.*** 196:09.
[40] ***Counley depo.*** 195:06.

Counley had neither direct nor even circumstantial evidence that LOVE's sexual behavior was "not unwelcome" – but she shut the door not just on trying to find out, but on protecting the student from the harms that Counley knows can chill a victim of sexual harassment from disclosing.

Long before February 2022, the United States Supreme Court wrote that "the fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit []. The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'"[41] The question of whether particular conduct was, in fact, unwelcome "presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact."[42]

The Supreme Court has downplayed the labels "quid pro quo" and "hostile work environment" as categories of sexual harassment: "[t]o the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general, the terms are relevant when there is a threshold question whether a plaintiff can prove discrimination."[43] The Supreme Court's holding of ***Gebser v. Lago Vista Indep. Sch. Dist.***[44] broadly encompasses both of those "types" of sexual harassment.

---

[41] ***Meritor Savings Bank v. Vinson***, 477 U.S. 57, 68 (1986).
[42] ***Gerald v. University of Puerto Rico***, 707 F.2d 7, 17 (1st Cir. 2013).
[43] ***Burlington Indus., Inc. v. Ellerth***, 524 U.S. 742, 753 (1998).
[44] ***Gebser v. Lago Vista Indep. Sch. Dist.***, 524 U.S. 274, 291 (1998).

*Quid quo* sexual harassment -- i.e., when tangible adverse action results from an underling's refusal to submit to a higher-up's sexual demands -- is, by its very nature, intentional unequal treatment based on sex.[45]

LOVE acknowledges:

Q: There was never not a power disparity between you and Ashley? You were always her coach, she was always your player; true?

A: I was the coach, Ashley was the player.

Q: The whole time; true?

A: Yes.

Q: There was always a power difference between you; true?

A: I was always her coach.

Q: That's not the question I asked. There was always a power difference between you; true?

A: Yes.[46]

LOVE claims that "we both knew what we were doing[47]," but LOVE also insisted for just short of two years that he did not have sex with ASHLEY.[48]

C. Genuine Issues of Fact Remain Regarding the University's Actual Knowledge

BRUN Policy 2.1.8 defines "actual knowledge" as "notice of … allegations of sexual harassment to the University's Title IX Coordinator or any official of the University who has authority to institute corrective measures on behalf of the University." The same policy defines

---

[45] ***Burlington Indus., Inc. v. Ellerth***, 524 U.S. 742, 753-54 (1998).
[46] ***Love depo.*** 299:18.
[47] ***Love depo.*** 238:20.
[48] ***Plaintiff's exhibit 351***; Answer of LOVE (Filing #19).

"notice" to include, without being limited to, "a report of sexual harassment to the Title IX Coordinator."[49]

*1) Counley*

On the evening of February 17, 2022, Executive Associate Athletics Director for Compliance Jamie Vaughn called Title IX Coordinator Meagan Counley and told her, per Counley's notes:

> Jamie Vaughn called Counley and advised there was a situation reported to him involving a Women's Basketball athlete and coach. Jamie advised a parent on the team called him and told him that Chuck Love, the Associate Head Coach, has been in a "relationship" with Ashley Scoggin. Jamie reported the Head Coach, Amy Williams, was told about it right before the game, and team was planning to "revolt." Jamie advised that late last night (2/16/22), some of the athletes on the team came up with a plan to confront Chuck and Ashley. Ashley was not in her room and was suspected to be in Chuck's room. A player on the team called Chuck and made up a situation that she needed his help with and lured him away from his room. Other athletes on the team went down to the front desk and got a key for Chuck's room, claiming they were the occupants of his room. The athletes then used the key, to key into Chuck's room, where they located Scoggin in Chuck's bed, under the covers. Jamie advised the parent told him that Scoggin was not clothed at one point, but later stated she was. The parent also informed Jamie that the athletes recorded the confrontation with Scoggin in Chuck's room. Parents and the athletes are upset about the situation and were demanding action. Upon learning about the situation, Coach Williams suspended Scoggin and Love from the game on 2/17/22.[50]

It is hard to conceive a more obvious example of actual knowledge than what Vaughn's call conferred to Counley.

The reason that Vaughn passed this information along to Meagan Counley on the night of February 17 was because he identified it as a Title IX concern. Asked whether this information included a relationship that has the potential to be sexual, Vaughn answered:

A: Potential because she was reported to be in his bed under the covers.

---

[49] ***Plaintiff's exhibit 314*** at 5.
[50] ***Plaintiff's exhibit 364*** at 1.

Q: That would be a major concern, wouldn't it?

A: It was a concern for me, yes.

Q: A female athlete, male coach would obviously would be a concern?

A: I would say any athlete in a coach's bed, under the covers. Not by gender. Just the fact that -- why are you under the covers in that person's room.

Q: Yeah. It can happen in any sexuality.

A: Yeah.

Q: The concerns would include a power differential, right?

A: Yeah. I mean, he's a coach. She's a student-athlete.[51]

Counley agreed that it "crossed my mind" that, based on Vaughn's report, there may have been a sexual relationship between a coach and a student-athlete.

When asked what the Title IX implications would be of a sexual relationship between a coach and a student-athlete, Counley said "it depends,

D. Genuine Issues of Fact Remain Regarding Whether the University Was Deliberately Indifferent

As of February 17, 2022, the effective version of 34 C.F.R. § 106.44 stated that

> [a] recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent. A recipient is deliberately indifferent only if its response to sexual harassment is clearly unreasonable in light of the known circumstances.[52]

---

[51] ***Vaughn depo.*** 164:13.

[52] 34 C.F.R. § 106.44(a).

A formal complaint is not a condition precedent to trigger the requirement to "respond promptly in a manner that is not deliberately indifferent."[53] When Vaughn reported to Counley what Counley documented in her notes[54], that report should have engaged the University to take the minimal action required to clear the "deliberately indifferent" bar.

Instead, Counley found an excuse to punt. Counley, who had served in the role of Title IX Coordinator since 2019 does not ordinarily visit with the Office of General Counsel to determine whether a report "should be a Title IX investigation or otherwise."[55] She testified:

Q: Do the regulations of Title IX change if the report has a high-profile nature?

A: No.

Q: The rights of the student involved do not change if the report has a high-profile nature; correct?

A: Correct.[56]

Policy 2.1.8 has no different application if there is a "high profile nature" to a case[57]; nor does Policy 3.3.15[58]; nor does Executive Memorandum No. 39-Procedures for Sexual Misconduct.[59] There is nothing in the Office of Civil Rights regulations for Title IX that alters a student's rights if a case has a "high profile nature."[60]

Counley's position that this was not a Title IX matter makes even less sense when juxtaposed against her offer of "supportive measure Supportive measures, as defined 34 C.F.R. 106.30,

---

[53] ***O'Regan v. Central Bucks Sch. Dist.***, 2025 WL 242480 at *2 (E.D. Pa. 2025).
[54] ***Plaintiff's exhibit 364*** at 1.
[55] ***Counley depo.*** 210:24.
[56] ***Id.*** 212:04.
[57] ***Id.*** 214:04.
[58] ***Id.*** 214:04.
[59] ***Id.*** 213:24.
[60] ***Id.*** 214:12.

> are designed to restore or preserve equal access to the recipient's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the recipient's educational environment, or deter sexual harassment.[61]

"Restore or preserve" necessarily implies that "equal access" has been impaired. If a student needs information about meeting graduation requirements, financial assistance or help deciding which class to take, the provision of that information is not "supportive measures" within the meaning of 34 C.F.R. 106.30. The "supportive measures" Counley identified in her February 18 email to ASHLEY are for a student whose access to a program or activity has been impaired.

Vaughn's and Zimmer's call show Counley's actual knowledge; the fact that Counley offered "supportive measures" confirms her actual knowledge. The idea that Title IX is somehow suspended for a "high profile" case is absurd and unsupportable. If there are questions of fact about whether Counley had received a report to which she must respond in a manner that is not deliberately indifferent, it is BRUN's prevarications that created any such questions.

E. Genuine Issues of Fact Remain as to Whether BRUN's Deliberate Indifference Made ASHLEY Vulnerable to Harm

*1) Counley*

In her previous career in law enforcement, Title IX Coordinator Meagan Counley learned how the integrity of testimonial evidence can be contaminated if someone intimidates a witness.[62] She agrees that in a case like this, in which there is an allegation of sexual misconduct by a University employee, contamination of evidence via intimidation "could be" a concern.[63] For example, if the victim of sexual misconduct has already been shamed and humiliated, the prospect

---

[61] 34 C.F.R. § 106.30(a).
[62] ***Counley depo.*** 208:02.
[63] ***Counley depo.*** 208:10.

of answering questions about what happened can feel intimidating.[64] And, as Counley knows, a victim of sexual harassment may worry about repercussions of disclosing to anyone, and how the disclosure will blow back on her.[65]

Counley understood these truths to be generally true; but she also understood that the specific allegations that Vaughn made known to her bore every potential to deter ASHLEY from disclosing LOVE's sexual relationship with her:

> Q: If [ASHLEY] had just been through a completely out-of-control meeting the day before, which was preceded by people breaking into the room where she was at, videoing her and yelling "you're sick," can you see how that would impact a sexual harassment victim's trust that her school would do right by her?
>
> A: It could.[66]

"It could," and it did. WILLIAMS rewarded the team for its deceptive "elaborate scheme" by allowing the team members to question ASHLEY for two to three hours, with LOVE present and WILLIAMS and the rest of her staff looking on, in an inquiry that was

> emotional and tearful and very intense. There was crying and yelling and people questioning me and fact-checking me in real time on their phones. Coach Love was there in the room and that made it even harder because he had told me multiple times to never tell. So I did not think I could tell the truth in that moment but I also didn't know what to do or say. When the interrogating was going on, [WILLIAMS] didn't do anything to stop it and neither did the other coaches, including Coach Love. [WILLIAMS] said she didn't think Coach Love did anything but she didn't stick up for me.[67]

By the time ASHLEY saw Counley's February 18, 2022 email, she no longer trusted the University due to the events at Penn State[68]:

> Q: You said that you didn't trust them. You didn't feel safe, and because of all

[64] ***Counley depo.*** 157:08.
[65] ***Counley depo.*** 46:06.
[66] ***Counley depo.*** 251:01.
[67] ***Ashley Scoggin depo.*** errata sheet/198:25.
[68] ***Ashley Scoggin depo.*** errata /219:22.

of the other things you had experienced you didn't feel like you could tell them the truth. What are the other things that you had experienced in that sentence?

A: In the interrogation at Penn State, that was humiliating. That was one of the hardest things I have ever had to go through as an athlete, as a person. And so when you are humiliated in front of teammates, coaches, of course you are not going to want to go back to them and tell them anything.

Q: Why didn't you just tell the truth in that team meeting?

A: Because Coach Love was like if anybody ever asks, you tell them no; you tell them nothing ever happened no matter what. So in that meeting it -- what was I supposed to say? He's right in front of me.[69]

*2) Williams*

It is ironic that WILLIAMS blamed ASHLEY for "breaking trust" among WILLIAMS' team.[70] WILLIAMS excused a scheme orchestrated by her team members and her student-manager/practice player that was so outrageous that even Counley could identify it to be "deceptive" and harmful to the "team dynamic."[71] Counley testified that the team members' deceptive scheme would impact ASHLEY by way of "embarrassment, fear, distrust."[72] Counley acknowledged that the impact on ASHLEY would include humiliation, shame, and feeling unprotected.[73]

And that was exactly the impact on ASHLEY. Every choice WILLIAMS made on February 17, in contradiction of her Title IX training to report and not investigate, increased the risk that ASHLEY would be chilled from participating in the Title IX process at a time when, if Title IX means anything, its protections should have been critical. WILLIAMS gave ASHLEY

---

[69] ***Ashley Scoggin depo.*** 267:25.
[70] ***Williams depo.*** 12:13.
[71] ***Counley depo.*** 191:04.
[72] ***Counley depo.*** 19
[73] ***Counley depo.*** 19

zero reason to believe that disclosing the sexual relationship with LOVE would save her from what was to come; instead, WILLIAMS gave ASHLEY every reason to assume that disclosure of the sexual relationship would only hurt her even worse. WILLIAMS showed ASHLEY that ASHLEY absolutely could not trust her University.

F. BRUN's "Disparate Impact" Argument

Among BRUN's arguments for summary judgment is that "[d]isparate impact claim is not a cognizable Title IX claim." We did not intend to make a "disparate impact" claim in the manner that BRUN seems to think.

## II.

## MOSER V. STATE DOES NOT BAR ASHLEY'S CLAIMS

We are certainly aware of ***Moser v. State***[74] and its progeny, which stripped victims of sexual misconduct of any vehicle for accountability in tort where the misconduct was committed by a State actor, and even if committed by a third party whom the State (or political subdivision) otherwise had a duty to stop. We did not file suit in Lancaster County District Court because of ***Moser*** and its progeny.

On this point, Defendants claim that "[t]his is not a case about sexual misconduct; it is a case about whether the University should have done more to prevent a secret, consensual relationship between adults." That is Defendants' frame and, apparently, its unofficial-but-true policy; but the United States Supreme Court has rejected the idea that if sex is "voluntary," it is

[74] ***Moser v. State***, 948 N.W.2d 194 (Neb. 2020).

therefore consensual.[75] BRUN's frame is also rejected by Title IX Coordinator Meaghan Counley[76], former Executive Director for Compliance Jamie Vaughn[77], and current Director of Human Resources Layton Brooks.[78]

The United States District Courts regularly preside over employment actions, Title IX actions and civil rights actions that challenge the constitutionality of forcing another person to have sex. The Nebraska Supreme Court did not have the ability to immunize WILLIAMS, ALBERTS and LOVE from the constitutional consequences of their choices. With a record now before this Court had not been created as of March 12, 2025[79], this Court may consider the constitutional implications of LOVE's, WILLIAMS' and ALBERTS' actions and decisions to not act.

## III.
## GENUINE ISSUES OF FACT REMAIN REGARDING PLAINTIFF'S FIRST CAUSE OF ACTION (42 U.S.C. § 1983)

A. Genuine Issues of Fact Remain Regarding Failure to Train and Supervise

*1) Policy 3.3.15*

In August 2020, the Task Force on Profession Conduct created a working draft of what became Policy 3.3.15. The working draft did not include a training provision, but at least it had a provision for communication of the policy so that students, faculty and staff would know it exists:

> All colleges, departments, and programs shall publicize this policy to students, faculty and staff at the beginning of each academic year, and to new undergraduate

---

[75] ***Meritor Sav. Bank v. Vinson***, 477 U.S. 57, 68 (1986).
[76] ***Counley depo.*** 90:22.
[77] ***Vaughn depo.*** 84:20.
[78] ***30(b)(6) Person most knowledgeable in Department of Athletics employees engaging in sexual misconduct*** 6/29/26 (Brooks) 57:19.
[79] ***See*** Filing #50.

> and graduate students, new instructors (including lecturers and undergraduate and graduate TAs), and new faculty and staff.[80]

But for reasons unclear, that provision was not included in the final draft that BRUN approved. Asked whether the deletion of the "Communication" section was a choice or an oversight, BRUN's designee answered only that "not every policy has specific language on how it will be communicated or trained." Thus BRUN approved Policy 3.3.15 without any procedure or mechanism for training this new policy to the University community.[81]

BRUN's designee did not know what training on this policy was ever provided to University of Nebraska faculty and staff.[82] Nor was BRUN's designee aware of any records of how, if at all, BRUN communicated Policy 3.3.15 to faculty and staff upon its approval.[83] There have been discussions between the Office of Institutional Equity & Compliance and the Department of Human Resources about who, as between the two offices, should be presenting training on Policy 3.3.15, but that question was never answered. Meagan Counley of IEC testified that "I remember it ending that HR was not doing a training on it and it wasn't our policy to train on."[84]

Per BRUN's designee, the only way that students were made aware of the approval of Policy 3.3.15 was that "like all of [BRUN's] policies, they are publicly available."[85] Counley is not aware of any training provided to students on Policy 3.3.15 before February 2022.[86] Counley testified that

---

[80] ***Plaintiff's exhibit 606*** at 3.
[81] ***30(b)(6) Person most knowledgeable in the approval process and adoption of Policy 3.3.15*** (Drew Nielsen, 6/26/26) 77:02.
[82] ***30(b)(6) Person most knowledgeable in the approval process and adoption of Policy 3.3.15*** (Drew Nielsen, 6/26/26)159:07.
[83] ***30(b)(6) Person most knowledgeable in the approval process and adoption of Policy 3.3.15*** (Drew Nielsen, 6/26/26) 158:02.
[84] ***Counley depo.*** 132:08.
[85] ***30(b)(6) Person most knowledgeable in the approval process and adoption of Policy 3.3.15*** (Drew Nielsen, 6/26/26)158:21.
[86] ***Counley depo.*** 131:10.

the only way for students to learn about Policy 3.3.15 was to "read the Board of Regents policies, I suppose."[87]

The text of Policy 3.3.15 states that it "applies to all faculty, staff and other academic staff members employed anywhere within the University System."[88] Asked whether there any room in the "Prohibited Relationships" section for a coach and an undergraduate student-athlete to have a relationship, by the wording of Policy 3.3.15, then-Executive Director for Compliance Jamie Vaughn answered that "in that highlighted language[89], there doesn't appear to be any room for exception."[90] ALBERTS, WILLIAMS, Title IX Coordinator Meagan Counley and BRUN's designee as the person most knowledgeable on the drafting of Policy 3.3.15 agree that Policy 3.3.15 applies to relationships between coaches and student-athletes.[91], even though the text of the policy is silent on its application to the Department of Athletics.

BRUN has never produced anything that shows that it actually trained Policy 3.3.15 to the Department of Athletics. Asked whether she was trained on Policy 3.3.15, Nebraska women's basketball head coach WILLIAMS answered "not outside of the Title IX training,"[92] and she could provide no details of any training specific to Policy 3.3.15. WILLIAMS did not know who trained

---

[87] ***Counley depo.*** 131:18. The full document of the Board of Regents Policies, to which BRUN cited in its answers-over-objections to multiple Requests for Production, is approximately 250 pages long and covers topics ranging from the governance of the Board of Regents to abortion to property management to external financing for the University system.
[88] ***Plaintiff's exhibit 311*** at 3.
[89] Referring to "[f]aculty members are prohibited from engaging in any romantic relationship with an undergraduate student, regardless of whether the faculty member has any supervisory or evaluative authority over that student."
[90] ***Vaughn depo.*** 113:08.
[91] ***Alberts depo. Vol. I*** 66:08; ***Williams depo.*** 74:01; ***Counley depo.*** 139:24; ***30(b)(6) Person most knowledgeable in the approval process and adoption of Policy 3.3.15*** (Drew Nielsen, 6/26/26) 60:19.
[92] ***Williams depo.*** 74:04.

her assistant coaches (including LOVE) on Policy 3.3.15.[93] She does not know whose job it was to make sure that her assistant coaches understand that Policy 3.3.15 does apply to coaches.[94]

The impact of not training the University community is evident in the testimony of ALBERTS, the Vice Chancellor for Athletics at the time of these events. While Policy 3.3.15 states that "the inherent power differential in faculty or staff relationships with students can give rise to actual or perceived conflicts of interest, as well as claims of abuse of authority, exploitation, bias or favoritism,"[95] ALBERTS believes this would be true of coach relationships with students only "in certain circumstances … it just depends on what the relationship is."[96]

*2) Coaches Must Not Have Sex with Athletes*

BRUN not only completely failed to train anyone – at all – on Policy 3.3.15, but also completely failed to train the Department of Athletics under any other policy that coaches must not have sex with student-athletes. Title IX Coordinator Meagan Counley testified:

> Q: Before July of 2021, what steps was your office taking to educate student-athletes on the subject of sexual relationships between coaches and student-athletes?
>
> A: I don't believe any.
>
> Q: If your office was not administering that training, who was?
>
> A: I don't know.
>
> Q: What steps was your office taking to educate coaches and trainers and other employees on the subject of sexual relationships between coaches and student-athletes?
>
> A: I don't know of any specific to that.

---

[93] ***Williams depo.*** 74:06.
[94] ***Williams depo.*** 74:08.
[95] ***Plaintiff's Exhibit 311*** at 2.
[96] ***Alberts depo. Vol. I*** 67:17.

Q: If your office was not administering that training, who was?

A: I don't know.[97]

Before February 2022, Executive Director for Compliance, Jamie Vaughn had never asked the University administration to provide training specific to coach-athlete sexual relationships.[98] ALBERTS, the Vice Chancellor for Athletics, never requested training for the Department of Athletics on the prevention of abuse and exploitation by coaches.[99] WILLIAMS never requested that the administration provide training on safe boundaries between coaches and athletes.[100] She was "trusting that the [Title IX] training they were receiving was adequate,"[101] but she never asked to see the trainings provided by the Title IX office to her student-athletes, so that she could see if it really was adequate (it wasn't).[102]

None of the Title IX training produced by BRUN addresses safe boundaries between coaches and athletes.[103] While ASHLEY was at Nebraska, BRUN provided no training about what people are supposed to do if they have suspicions of a sexual relationships between a University of Nebraska employee and an athlete.[104] The Department of Athletics had the ability to advocate to BRUN for training it knew was needed[105]; but there is no evidence that ALBERTS ever did so.

This is not because the idea of a coach sexually exploiting an athlete was so far-fetched that

---

[97] ***Counley depo.*** 168:19.
[98] ***Vaughn depo.*** 129:08.
[99] ***Alberts depo. Vol. I*** 98:03.
[100] ***Williams depo.*** 65:22.
[101] ***Williams depo.*** 66:05.
[102] ***Williams depo.*** 65:13.
[103] ***Plaintiff's exhibit 398*** (also identified as Exhibit AA to Defendants' Joint Index of Evidence in Support of Defendants' Motion for Summary Judgment) at 34; ***Plaintiff's exhibit 326***; ***compare Plaintiff's exhibit 459*** and ***Plaintiff's exhibit 460***.
[104] ***Eisenhauer depo.*** 96:08.
[105] ***Alberts depo. Vol. I*** 78:24.

no one at the Department of Athletics could possibly have imagined that it even happens. ALBERTS was aware that coaches having sex with athletes is something that happens.[106] So was WILLIAMS.[107] WILLIAMS understood that when coaches have sex with athletes, that harms the athlete[108] and the team.[109] But while she put together team notebooks containing everything from "Pet Peeves" to "Meet the Media" to recipes for chicken stir-fry, WILLIAMS included zero information about how coaches should never have sex with their student-athletes. Asked why not, WILLIAMS said "I just feel like it was understood."[110] Apparently "Don't Break the Law" must not have been "understood," as WILLIAMS did write that into her handbooks[111] – but nothing about coaches having sex with athletes.

WILLIAMS agrees that coaches should periodically participate in training on sexual harassment, including training on sexual contact with athletes.[112] She agrees that athletes should be trained, and in fact should be directed, to report potential sexual harassment by a coach, whether it is happening to a teammate or to the athlete herself.[113] And yet WILLIAMS never requested that the University administration provide training on safe boundaries between coaches and athletes.[114] She was "trusting that the training they were receiving was adequate," referring to "a part of the Title IX training."[115]

But none of the Title IX training that was actually presented did not address coaches having

---

[106] ***Alberts depo. Vol. I*** 82:09.
[107] ***Williams depo.*** 93:15.
[108] ***Williams depo.*** 131:18.
[109] ***Williams depo.*** 131:12.
[110] ***Williams depo.*** 91:07.
[111] ***Plaintiff's exhibit 376*** at 2.
[112] ***Williams depo.*** 65:02 – 06.
[113] ***Williams depo.*** 65:08.
[114] ***Williams depo.*** 65:22.
[115] ***Williams depo.*** 66:05.

sex with student-athletes. The individuals who had the ability to change that were WILLIAMS as the head coach, and ALBERTS as the Vice Chancellor for Athletics and Director of Athletics. They didn't.

The Title IX office did give the Department of Athletics generalized training on Title IX reporting requirements; but there is a genuine issue of fact as to its effectiveness. Throughout the University community including the Department of Athletics, all faculty, staff and students had ostensibly been trained to avoid conducting an "investigation" of suspected sexual misconduct before reporting it to the Title IX office for a fair and neutral investigation.[116] This was because of the specialized training of the Title IX office[117], and the need to "attempt[] to avoid any conflict of interest or bias, ensuring neutrality and impartial investigation."[118] This was also to avoid retraumatizing someone who has experienced trauma.[119]

But between the late night of February 16 and February 22, WILLIAMS, her coaching staff and Zimmer all disregarded that training entirely. Very shortly after the team's elaborate scheme to break into LOVE's room confirmed that ASHLEY was there, the team told WILLIAMS' coaching staff. The coaching staff did not notify the Title IX Coordinator (nor did they notify WILLIAMS); nor did the coaching staff make any effort to locate and check on ASHLEY, as far as their April 2022 Title IX interviews reflect.[120] Instead, the coaching staff "actually called in [LOVE] to confront him about it … kind of just saying, 'hey, this is what's being brought to the table.'"[121]

---

[116] ***Plaintiff's exhibit 399*** at 28; ***Counley depo.*** 105:07-19.
[117] ***Counley depo.*** 105:11.
[118] ***Counley depo.*** 105:13.
[119] ***Counley depo.*** 105:17.
[120] Transcript of Logan Seiser interview; ***Exhibit 368***.
[121] Transcript of Logan Seiser interview at 3.

On February 17, WILLIAMS learned from the team captains about their elaborate scheme and what they had found. Whether WILLIAMS learned this at 7:00 a.m.[122] or 11:30 a.m.[123], she, too, did not notify the Title IX Coordinator. WILLIAMS' coaching staff, her team members and student-manager/practice player[124], Executive Athletic Director for Compliance Jamie Vaughn[125] and Human Resources Director Layton Brooks[126] all identified the circumstance of a student-athlete in her coach's locked hotel room at midnight to be potential sexual misconduct. As Jamie Vaughn personally demonstrated on the night of February 17, suspected sexual misconduct has to be reported to the Title IX Coordinator. WILLIAMS' excuse for investigating instead of reporting, ***i.e.***, that she did not realize that this was a possible sexual misconduct situation, is not reasonable.

In the days that followed, Assistant Athletic Director Keith Zimmer also attempted to investigate. In his meeting with ASHLEY, WILLIAMS and Pat Logsdon, "asked [ASHLEY] several times, 'is there anything else we need to know about you, your relationship with Chuck, anything that he may have done, anything inappropriate? Before Coach Williams tells you your status on the team, is there anything else we need to know or any way we can better support you?'"[127] Zimmer pursued these questions even though he has been trained, annually, that only the Title IX Investigator can investigate.[128]

---

[122] ***Eisenhauer depo.*** 129:12.
[123] ***Plaintiff's exhibit 362*** at 1.
[124] ***Eisenhauer depo.*** 95:06, 110:01; ***Plaintiff's exhibit 358*** at 1-2; ***Plaintiff's exhibit 365*** at 6.
[125] ***Vaughn depo.*** 164:13.
[126] ***30(b)(6) Person most knowledgeable in Department of Athletics employees engaging in sexual misconduct*** 6/29/26 (Brooks) 57:25.
[127] ***Zimmer depo.*** 159:11.
[128] ***Zimmer depo.*** 122:21; ***Plaintiff's exhibit 326***.

With the exception of Vaughn, there was a consistent failure among the adults in charge of the women's basketball team, from the Deputy Sport Administrator down to the coaching staff, to follow the Title IX training to avoid investigating suspected sexual misconduct and just report. But when asked what consequence WILLIAMS received for not following the Title IX requirement to report, not investigate, ALBERTS answered, "zero."[129] And while, post-February 2022, Title IX Coordinator Meghan Counley provided refresher training on the reporting process to the members of the women's basketball team[130], she did not provide refresher training on the reporting process to the women's basketball coaching staff.[131]

How did so many officials associated with one team of the University of Nebraska Department of Athletics completely fail their training? Perhaps they didn't actually attend the training; maybe there is some other reason that the training simply was not effective for the women's basketball team, coaches and staff. It may have to do with the lack of consequence for violating that training. Whatever the cause, the summation challenges BRUN's claim that "Plaintiff cannot establish failure to hire, train, and supervise."[132] The consistency of failure of training, from team members through coaches and staff through WILLIAMS and up to Zimmer, raises a genuine issue of material fact.

*3) The Student-Athlete Conduct Policy*

Nor does BRUN train the Student-Athlete Conduct Policy to anyone. By its terms, the Conduct Policy has the important purposes of giving student-athletes notice of "the standards of

---

[129] ***Alberts depo. Vol. II*** 129:12.

[130] ***30(b)(6) Person most knowledgeable in the development, approval and use of the training entitled "Sexual Misconduct Reporting for Athletic Staff"*** (Counley) 11:15.

[131] ***30(b)(6) Person most knowledgeable in the development, approval and use of the training entitled "Sexual Misconduct Reporting for Athletic Staff"*** (Counley) 11:11.

[132] BRUN's Brief in Support of Motion for Summary Judgment at 25.

required behavior expected of student-athletes[133]," and of providing student-athletes with a fair procedure that "will develop the facts to the point that actions taken under this policy are based on sufficiently credible information."[134] Allegedly, this is to "demonstrate that the University will take allegations of misconduct seriously," but also "to treat student-athletes fairly."[135] The other stated purpose of the Conduct Policy is to "assure confidence in the integrity of the process by minimizing the potential for conflict of interest on the part of administrators, coaches and student-athletes."[136]

The overriding theme of the Conduct Policy – mentioned four times in nine pages -- is its recognition that the involvement of an athlete's coach in the investigation of alleged misconduct presents a conflict of interest that is destructive to fairness.[137] The development of the Conduct Policy may have happened within a few years[138] before the development of ***Plaintiff's exhibit 400***, a Title IX training created by Nebraska's Office of Institutional Equity & Compliance that, per BRUN's designee, may never have actually been presented to anyone.[139] Within ***Plaintiff's exhibit 400*** is an excerpt of a story from the Omaha World-Herald that reported:

> In 1995. when star Husker defensive lineman Christian Peter was sued by a former student who alleged he raped her twice, it was then-football coach Tom Osborne who decided Peter should remain on the field. Peter, the coach said, had complied with a team-ordered counseling program and should stay on the team, even though he earlier had been sentenced to 18 months of probation for groping another woman in a Lincoln bar.
>
> Many criticized the approach: a coach standing in judgment over one of his star

---

[133] ***Plaintiff's exhibit 421*** at 1.
[134] ***Plaintiff's exhibit 421*** at 2.
[135] ***Plaintiff's exhibit 421*** at 1-2.
[136] ***Plaintiff's exhibit 421*** at 2.
[137] ***Alberts depo. Vol. II*** 121:24.
[138] ***See*** Index of Evidence in Support of Plaintiff's Motion for Leave to File Amended Complaint (Filing #94), Exhibit "J" to the Affidavit of Maren Lynn Chaloupka at 199.
[139] ***30(b)(6) Person most knowledgeable in the development, approval, and use of the training entitled "Coaching and Title IX" depo.*** 10:23.

> athletes Sports Illustrated published an article on the Peter case and other Huskers facing criminal trouble under the headline "Coach and Jury."[140]

Meagan Counley, designated by BRUN as the "person most knowledgeable" about this training document[141], did not know whether some decision was made, or policy enacted, in 2015 to remove coaches from investigating reports of misconduct.[142] BRUN has never produced any such policy other than the Student-Athlete Conduct Policy, versions of which bear dates beginning in 2018.[143]

BRUN's designee agreed, however, that an inference could be made that the reason for the decision described in the World-Herald story on that page was a concern that a coach cannot be presumed to be truly impartial.[144] Not coincidentally, the text of the Student-Athlete Conduct Policy purports to take the investigation and disposition of serious academic misconduct completely out of the hands of the student-athlete's coach. The Conduct Policy defines "serious academic misconduct" to include criminal activity, but it is not limited to criminal activity: that definition also includes non-criminal conduct that "undermines or puts at risk the integrity and reputation of the University," and "[r]epeated acts of misconduct, different than the aforementioned examples of misconduct, that raise the concerns addressed by this policy."[145]

The process of investigation and disposition set forth in the Conduct Policy does not begin with the head coach's decision about whether it applies. Nor does the process begin with anyone's assumption about whether it does or not apply. Per the text of the Conduct Policy, the process

---

[140] ***Plaintiff's exhibit 400*** at 11.
[141] ***30(b)(6) Person most knowledgeable in the development, approval, and use of the training entitled "Coaching and Title IX" depo.*** (Counley 2/6/26) 05:23.
[142] ***30(b)(6) Person most knowledgeable in the development, approval, and use of the training entitled "Coaching and Title IX" depo.*** (Counley 2/6/26)08:13.
[143] ***See*** Index of Evidence in Support of Plaintiff's Motion for Leave to File Amended Complaint (Filing #94), Exhibit "J" to the Affidavit of Maren Lynn Chaloupka at 199.
[144] ***30(b)(6) Person most knowledgeable in the development, approval, and use of the training entitled "Coaching and Title IX" depo.*** (Counley 2/6/26)09:04.
[145] ***Plaintiff's exhibit 400*** at 2.

begins not with the investigation, but with an actual decision, by the Director of Athletics, on whether the Conduct Policy does or does not apply to the allegations in question:

> Q: [The Conduct Policy] provides specifically for a decision made by the Director of Athletics whether the policy applies, true?
>
> A: Yes.
>
> Q: If a coach interferes with that process, that could undermined confidence in the integrity of the process, true?
>
> A: I'm sorry. One more time with the question.
>
> Q: If a coach interferes with the process as set forth in the Student Conduct Policy, that undermines the whole point of the Student Conduct Policy, right?
>
> A: It complicates it.[146]

It is undisputed that if ALBERTS ever made a dedicated decision that the Conduct Policy did not apply to the allegations against ASHLEY, that decision did not happen until some unspecified time after WILLIAMS had commenced her February 17 investigative activities.

How are the purposes of the Conduct Policy accomplished, when the Conduct Policy is so obscure that for eighteen months of the discovery process herein, BRUN forgot its existence: BRUN did not produce the Conduct Policy with Rule 26 Disclosures, with its September 10, 2024 discovery responses or at any time between then and its eventual production date of December 2025. The only explanation BRUN has given for its December 2025 production has been that

> Counsel for Defendants discovered the University of Nebrsaka [*sic*] Department of Athletics Student-Athlete Conduct Policy (the 2021-22 version is attached to Keith Zimmer's declaration as Exhibit A) on December 18, 2025, and it was provided to Plaintiff's counsel on December 19, 2025.[147]

---

[146] ***Alberts depo. Vol. II*** 83:25.
[147] Affidavit of Lily Amare (Filing #107-3) at ¶ 3.

"Counsel discovered"? Couldn't one of the individual Defendants, or Zimmer, or Vaughn, or any of the Declarants that signed Declarations in support of Defendants' Motion for Summary Judgment, have identified it for "Counsel" before December 2025, such as ALBERTS or WILLIAMS or LOVE at the time they signed their discovery responses?

The obscurity of the Conduct Policy may not be coincidental to the fact that the Department of Athletics does not actually ever use it. ALBERTS testified:

> Q: In the time that you were at Nebraska, so July of '21 through March of '24, how many times do you recall that [Conduct Policy] being invoked into the process that was ascribed and that being followed?
>
> A: I don't recall any -- any other time.[148]

One possible reason for the non-use of the Conduct Policy is that no other athletes were accused of any form of "serious nonacademic misconduct" between ALBERTS' arrival on July 14, 2021 and his departure on March 14, 2023; but there was at least one other episode of non-academic misconduct among Husker athletes in that period, that being the citation of Myles Farmer, a safety on the football team, for DUI on November 6, 2022.[149] Per www.huskers.com, after Farmer's DUI, he missed just one game (Michigan). Farmer returned to the field for two more games in the 2022 season, and (after pleading guilty to DUI in February 2023) the Department of Athletics then honored Farmer by placing him on the 2023 Tom Osborne Citizenship Team, before Farmer graduated in May 2023.

Apparently ALBERTS never made a decision, one way or the other, on whether the Conduct Policy applied to Farmer's DUI arrest. Despite that the definition of "serious academic misconduct" in the Conduct Policy specifically includes "driving under the influence," it appears

---

[148] ***Alberts depo. Vol. II*** 156:12.
[149] ***See*** Myles Farmer court documents/www.huskers.com record.

that ALBERTS never made the call that the Conduct Policy applied to Farmer, never engaged the Executive Associate Athletics Director for Compliance for a "prompt factual inquiry," and never made a decision regarding discipline after reviewing the report on the "prompt factual inquiry."[150] Per www.huskers.com, this all worked out well for Myles Farmer.

If it is true that ALBERTS did not even make a decision whether the Conduct Policy applied to Myles Farmer's case, then there is a case for the second possible reason for the Conduct Policy's non-use. Specifically, that the Conduct Policy, like BRUN Policy 3.3.15, is lip service only. Its important purposes, and its disavowing of coach involvement, read well to anyone who actually sees it. But there is no serious intent to actually follow it. There is no serious intent to even tell student-athletes it exists. As long as an argument can be made (as it was here[151]) that issue was "violation of team rules" and not "serious academic misconduct," then the coach can keep on keeping on, regardless of even the most obvious conflicts of interest.

If the Conduct Policy were more than lip service, it would appear in the University of Nebraska Student-Athlete Handbook; it does not.[152] If the Conduct Policy were more than lip service, then Keith Zimmer, an Assistant Athletic Director who has worked at the Department of Athletics for 39 years, would not confuse the Conduct Policy with the Student Code of Conduct; he did.[153] Zimmer would not base his own failure to advise ASHLEY of the Conduct Policy on a claim that it was "referenced within the Team Rules[154]", when he should know that it is not. If the Conduct Policy were more than lip service, it would be provided to student-athletes[155]; it was

---

[150] ***Plaintiff's exhibit 421*** at 3, 5.
[151] ***Alberts depo. Vol. II*** 78:22;
[152] ***Plaintiff's exhibit 373***.e
[153] ***Zimmer depo.*** 115:21-116:25; 117;03.
[154] ***Zimmer depo.*** 159:02.
[155] The link in the Student-Athlete Handbook that Zimmer referenced in his deposition goes to the University of Nebraska Student Code of Conduct, not the Department of Athletics Student-Athlete Conduct Policy.

not.[156] Zimmer's vague memory that maybe at some time, "a hyperlink with the Student-Athlete Code of Conduct was sent to every student-athlete"[157] has not been supported by any documentary evidence to confirm that whether the Student-Athlete Conduct Policy was ever sent to ASHLEY and, if so, when that happened.[158]

If the Conduct Policy were more than lip service, ALBERTS would train coaches on it; per WILLIAMS, he did not. [159] If the Conduct Policy were more than lip service, ALBERTS would require coaches to train their team members on the Conduct Policy; he did not.[160] If the Conduct Policy were more than lip service, WILLIAMS would include it or at least reference it in her team notebooks; she does not.[161] WILLIAMS believes, inaccurately, that the Conduct Policy appears in the University of Nebraska Student-Athlete Handbook, which is given to all student-athletes.[162]

The Department of Athletics must have had some reason for creating the Conduct Policy, with its clear purposes and its promises of a conflict-free process that begins with the Director of Athletics determining that the serious misconduct alleged either does, or does not, fall within the Conduct Policy. The evidence raises a genuine, and serious, question of material fact as to how the Conduct Policy can ensure that a student-athlete is "treated fairly and provide[d] procedures that will develop the facts to the point that actions taken under this policy are based on sufficiently credible information," if the very existence of the Conduct Policy is kept secret from the very student-athletes whose fairness it allegedly protects.

*4) Supervision*

---

[156] ***Zimmer depo.*** 121:18.
[157] ***Zimmer depo.*** 117:23.
[158] ***Zimmer depo.*** 117:23.
[159] ***Williams depo.*** 371:23.
[160] ***Alberts depo. Vol. II*** 85:22.
[161] ***Williams depo.*** 372:01.
[162] ***Williams depo.*** 372:16.

In May 2021, shortly before ASHLEY began her summer internship with WILLIAMS and her staff, WILLIAMS wrote the following about LOVE in his annual performance evaluation:

> Chuck has made the biggest leap with growth of anyone on our staff and really utilized the extra time that the pandemic created to grow as a coach and teacher. After shifting to the responsibility of overseeing our player basketball skill development, he has made a major impact of the growth we have seen and the progress we have made. This has allowed him to touch each of our athletes and they are all comfortable seeking his help outside of practice for additional work.[163]

WILLIAMS insists that she had no reason to suspect that LOVE was grooming, and then sexually exploiting, ASHLEY. Like her insistence that she had no idea that ASHLEY's presence in LOVE's room at midnight might be a sign of sexual misconduct, WILLIAMS' claim that she saw nothing because there was nothing to see is not supported by the observations of people who spent as much time around ASHLEY and LOVE as WILLIAMS did.

Willful ignorance is not an excuse for failure to supervise. Asked whether there is anything concerning about an assistant coach somehow identifying, while he is out of state, that one of his recruits was there and then inviting the recruit to go drink alcohol with him at 10:00 p.m., WILLIAMS answered, "I don't know."[164] As of 2022, WILLIAMS did not prohibit her coaches from drinking alcohol with her team members.[165] WILLIAMS professed to not know whether it can be a form of grooming when a coach tells a student-athlete to keep secrets.[166] She does not know whether secret late-night one-on-one workouts between a coach and a student-athlete, outside of NCAA hours restrictions, can be a form of grooming.[167] She does not know if the coach giving a student-athlete a secret language and special numbers that are meaningful only to the two

---

[163] ***Plaintiff's exhibit 337*** at 3.
[164] ***Williams depo.*** 218:07.
[165] ***Williams depo.*** 142:18.
[166] ***Williams depo.*** 232:18.
[167] ***Williams depo.*** 308:01.

of them – which LOVE did with ASHLEY -- would be a form of grooming.[168]

Plaintiff's Separate Statement of Material Facts sets forth what team members saw, including a student-manager/practice player who described himself to Deputy Title IX Investigator as WILLIAMS' "right hand man."[169] A summary would be that team members noticed that LOVE "definitely gave ASHLEY the most attention outside of practice."[170] Team members noticed that LOVE and ASHLEY "would all stay after practices and workouts and stuff and do their own workout."[171] Team members saw LOVE's one-on-one workouts with ASHLEY "before the gym, in the gym, after the gym, shooting, those kind of things. The game day shot. They were really close."[172]

Months before LOVE made his first overtly sexual approach to ASHLEY, team members noticed that ASHLEY had covered LOVE's office door with motivational quotes.[173] WILLIAMS saw that too[174], and she knew ASHLEY was doing her internship work in LOVE's office.[175]

The team members were suspicious enough that on February 17, 2022, they ran what Counley later characterized as an "elaborate scheme" involving multiple layers of deception and curfew-breaking, wherein they were willing to obtain and use a key to the Associate Head Coach's room under false pretenses because they worried that without hard evidence, LOVE would lie his way out of the situation.[176] Thus there is a question of fact on the issue of supervision: if that many team members identified (correctly) signs of a sexual relationship and WILLIAMS truly did

---

168 ***Williams depo.*** 308:16.
169 ***Plaintiff's exhibit 360*** at 2.
170 ***Plaintiff's exhibit 360*** at 11.
171 Transcript of Nailah Dillard interview at 5, 9.
172 Transcript of Ruby Porter interview at 8.
173 Transcript of Ruby Porter interview at 9; ***Plaintiff's exhibit 333*** at 3.
174 ***Williams depo.*** 262:16.
175 Transcript of Amy Williams interview at 4.
176 ***Eisenhauer depo.*** 112:13.

not, then WILLIAMS is either dangerously untrained or dangerously unfit to supervise a coaching staff.

WILLIAMS has no explanation for her failure to see what was there to be seen. For example:

> Q: If [team member] Nailah Dillard told the Title IX investigator that the team noticed that Ms. Scoggin and Coach Love would stay around when practice ended and have their own workout, would you disagree with that?
>
> A: I don't know what the team ...
>
> Q: If that's accurate, if the team noticed it and you didn't, why would that be?
>
> A: I don't know.[177]

WILLIAMS has not testified that LOVE was simply that talented of a deceit, or that LOVE and ASHLEY were careful to never be alone together in a way that others would notice. WILLIAMS instead takes the position that "I said I didn't see anything, and that's good enough." That might be true if she were the only witness; her team members' reports, however, raise a question of fact that precludes summary judgment on this point.

B. Genuine Issues of Fact Remain Regarding Defendants' Violation of ASHLEY's Right to Procedural Due Process[178]

A § 1983 procedural due process claim turns on (1) whether a state actor's decision impacted a protected liberty or property interest, and if so, (2) what process was constitutionally due.[179] A plaintiff must first demonstrate that she was deprived of life, liberty or property by

---

[177] ***Williams depo.*** 297:06.

[178] Plaintiff acknowledges this Court's ruling in its September 9, 2026 Memorandum and Order (Filing #206), but is providing argument both to preserve her record for further review, and because BRUN does not consider the Court's September 9 Order to have conclusively addressed Plaintiff's due process claims.

[179] ***Kroupa v. Nielsen***, 731 F.3d 813, 818 (8th Cir. 2013) (*quoting* ***Mathews v. Eldridge***, 424 U.S. 319, 332-33 (1976)).

government action.[180] Protected liberty interests may arise from two sources: the Due Process Clause of the Fourteenth Amendment, and the laws of the States.[181]

*1) Genuine Issues of Fact Remain Regarding ASHLEY's Property Interest*

In a claim for the violation of a plaintiff's right to procedural due process, the plaintiff must show:

- She had a life, liberty, or property interest protected by the Due Process Clause;
- She was deprived of this protected interest; and
- The state did not afford [her] adequate procedural rights prior to depriving [her] of the property interest.[182]

Property interests are created not by the Constitution, but "existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."[183]

The plaintiff of ***De La Torre*** was an 18-year-old high school soccer player. He sued the Minnesota State High School League and two officers of the Organization for violations of his Fourteenth Amendment right to due process under 42 U.S.C. § 1983. The plaintiff asserted that he had a property interest in playing varsity soccer following a transfer from, and back into, his high school.[184] Thus the plaintiff's claim failed because he was unable to direct the court to any independent source establishing a property interest; but that is not true herein.

But Nebraska statutes clearly establish ASHLEY's property interest. On November 4, 2020, NEB. REV. STAT. § 48-3603 codified into law a collegiate student-athlete's property rights in

---

180 ***Phillips v. Norris***, 320 F.3d 844, 846 (8th Cir. 2003).
181 ***Persechini v. Callaway***, 651 F.3d 802, 806 (8th Cir. 2011).
182 ***DeLaTorre v. Minnesota State High School League***, 202 F. Supp.3d 1046 (D. Minn. 2016).
183 ***Bd. of Regents of State Colls. v. Roth***, 408 U.S. 564, 577 (1972).
184 ***Id.*** at 1048-50.

their "name, image, or likeness rights or athletic reputation."[185] Neb. Rev. Stat. § 48-3603 was born out of LB962 in the 106th Legislature in 2020. The bill's introducer, Senator Megan Hunt, announced the legislative intent of § 48-3603:

> LB 962 allows college athletes at Nebraska's public and private schools to earn money from their name, image, and likeness rights, or athletic reputation. This bill permits athletes to sign with a licensed agent and protects them from retaliation for receiving compensation. If a postsecondary or athletic association punishes a student-athlete for pursuing compensation for the name, image, and likeness rights, a student may seek damages and injunctive relief.[186]

The plaintiff of ***De La Torre*** was missing what ASHLEY has: a state law establishing a specific property right. There was, in 2016, no independent Minnesota law providing athletes with a property interest in playing varsity soccer. In contrast, starting in 2020 and continuing through Ashley's removal from the University of Nebraska women's basketball team, Nebraska law has provided an independent right, as a "college [athlete] at Nebraska's public and private schools", to earn money from her name, image, and likeness rights, or athletic reputation.[187]

Legislative committee history from the hearings on LB962/§ 48-3603 further supports Nebraska's intent to create a property interest for college athletes like ASHLEY. Before the Business and Labor Committee, Senator Hunt testified:

> LB962 is about the right of every student to work, to participate in the free market, and to have the same freedoms as their peers on college and university campuses. I brought this bill to empower student-athletes to make the most of their gifts and talents. Student-athletes are the only college students prohibited from earning an income for their skills or talent.[188]
>
> Less than 2 percent of college students will go on to the professional level; 98 percent of college athletes will never, ever compete in a pro game. And so college is usually the only time that an athlete can earn income from their sports status, if

---

[185] NEB. REV. STAT. § 48-3603(1).
[186] Stmt. Of Intent 2020 Neb. Laws LB962.
[187] ***Id.***
[188] Bus. & Labor Comm. Hearing on 2020 Reg. Sess. LB962 Pg. 2 of 102 (February 5, 2020).

> we give them the chance."
>
> Further, student-athletes are much more likely to suffer injuries that impact them beyond their college years. Sixty-seven percent of former NCAA Division I athletes suffer major injuries and 50 percent reported chronic college sports injuries, nearly double the rate of nonathletes. These injuries can have a devastating impact on even a star athlete's ability to earn money for their athletic talents.
>
> You also don't have to be a man to benefit from this legislation … When we have this social media economy and we're prohibiting athletes from participating in this economy, we're actually really impacting women, people in underrepresented groups and not letting them have access to that market is a big problem.[189]

ASHLEY fits Senator Hunt's description. She had a narrow window to profit off of her skill: she was a starter on the Nebraska basketball team, she had chronic injuries, and she is a woman. ASHLEY's time at Nebraska was her best chance to "make the most of [her] gifts and talents."[190] In the words of Senator Hunt, LB 962/§ 48-3603 was

> a truly nonpartisan, nonpolitical issue. It's a free market issue, it's a rights issue, and it's about economic freedom for students.[191]

The right to engage in the free market and to enjoy economic freedom is a right that is well established:

> It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose subject only to such restrictions as are imposed upon all persons of like age, sex and condition. This right may in many respects be considered as a distinguishing feature of our republican institutions.[192]

The Nebraska Legislature did not wait for the Eighth Circuit to revisit its 1970's-era holdings regarding a student-athlete's property rights: it bestowed those rights to student-athletes in Nebraska legislatively. The economic rights created by NEB. REV. STAT. § 48-3603 are a

---

[189] Bus. & Labor Comm. Hearing on 2020 Reg. Sess. LB962 Pg. 2 of 102 (February 5, 2020).
[190] ***Id*** at p. 2 of 102.
[191] *Id*. at Pg. 4 of 102.
[192] ***Dent v. State of W.Va***., 129 U.S. 114, 121 (1889).

legitimate claim of entitlement.

2) *Genuine Issues of Fact Remain Regarding ASHLEY's Liberty Interest*

While injury to reputation alone is not sufficient to support a § 1983 claim,[193] reputational harm coupled with "some more tangible interests such as employment," can together suffice to invoke the procedural protection of the Due Process Clause.[194] Stigma is established where the plaintiff is accused of actions involving dishonesty, immorality and the like.[195]

In ***Owen v. City of Independence, Mo.***[196], the United States Court of Appeals for the Eighth Circuit wrote that

> in determining whether a government employer has deprived its employee of a liberty interest in the termination of employment, the crucial issue is whether the government employer, in connection with the termination of government employment, including a refusal to rehire or reemploy, makes a charge which might seriously damage the employee's standing and reputation in the community.[197]

BRUN argues that because its official statement on February 19, 2022 was anodyne, *ipso facto* WILLIAMS and ALBERTS did not cause stigma to ASHLEY. That argument deflects from what the Nebraska Department of Athletics knew would happen on February 17, when WILLIAMS removed both LOVE and ASHLEY from the Penn State game with no explanation.

The fact that both LOVE and ASHLEY were absent was noticed by national media outlets (to include ESPN, CBS Sports and Fox Sports), and was broadcast "immediately" over the internet.[198] Social media began to repeat these reports just as immediately.[199] By February 18,

[193] ***Paul v. Davis***, 424 U.S. 693, 712 (1976).
[194] ***Id.*** at 701.
[195] ***Winegar v. Des Moines Indep. Cmty. Sch. Dist.***, 20 F.3d 895, 899 (8th Cir. 1994).
[196] ***Owen v. City of Independence, Mo.***, 560 F.2d 925, 935 (8th Cir. 1977), *vacated and remanded on other grounds,* 438 U.S. 902 (1978).
[197] ***Owen*** at 935.
[198] ***Pearson depo.*** 102:11, 191:09.
[199] ***Pearson depo.*** 68:14, 82:01.

2022, people were talking about whether there was a sexual relationship between LOVE and ASHLEY:

> It was talked about. Because people were talking about it. It's the rumor of -- and that's kind of how social media works now. If a player is suspended, immediately there are trolls who jump out to say, it's this, this, this, or this. Whether it has no bearing on the truth at all. They just put things out there, because that's just what they do.[200]

Local and national media outlets were investigating whether "there was a situation between ASHLEY and a coach … there was a relationship issue, an occurrence, between ASHLEY and a coach."[201]

A sample of the media coverage of ASHLEY's and LOVE's concurrent removal from the team is included in our Evidence Index, and is detailed in Plaintiff's Separate Statement of Facts. Some of the online media reports allowed readers to post comments, and the comments were horrid.[202] That in turn spawned hundreds of vile and hateful messages sent directly to ASHLEY's social media pages, not to mention over 500 "friend" requests from random men.[203]

To the extent that Defendants argue that WILLIAMS removed ASHLEY for the totally legitimate reason of violating curfew and lying, our response is that the "you broke curfew and lied" excuse is a pretext – especially visible when one compares how WILLIAMS treated the male student-manager/practice player Christian Eisenhauer, who obtained LOVE's room key under false pretenses while out of his room long after curfew. Eisenhauer suffered zero consequences:

Q: Were there any consequences to you for being out after curfew?

A: No.

---

[200] ***Pearson depo.*** 101:02.
[201] ***Pearson depo.*** 103:24, 104:10.
[202] Media Coverage of Removal from Team at 54-63.
[203] Plaintiff's Supplemental Responses to Defendants' – Board of Regents of the University of Nebraska, Amy Williams and Trev Alberts – First Set of Requests for Production of Documents.

Q: Were there any consequences to you for lying to the front desk personnel at the Hyatt Place Hotel?

A: No.

Q: You still received all your pay?

A: Yes.

Q: And all benefits that went along with your position as a team manager?

A: Yes.[204]

"You broke trust, that's why we removed you" was a pretext.

A plaintiff can demonstrate pretext "by showing that it was unlikely an employer would have acted on the basis of the proffered reason."[205] This does not mean that the employee must show that "the proffered explanation had no basis in fact" and was conjured completely out of thin air: rather, a plaintiff can show pretext by showing that "it was not the employer's policy or practice to respond to such problems in the way it responded in the plaintiff's case."[206]

*3) Genuine issues of fact remain as to WILLIAMS' and ALBERTS' actual knowledge*

ALBERTS acknowledged that the response shown in media coverage, and described by Derrick Pearson, was predictable:

Q: It was reasonable, I take it, to assume that with both Coach Love and Ms. Scoggin suddenly gone from the game, people were going to notice, right?

A: I suppose the media or somebody could recognize that something was atypical.

Q: Nebraska being what it is, if they notice, they're going to start asking questions, right?

---

[204] ***Eisenhauer depo.*** 137:03.
[205] ***Erickson v. Farmland Indus., Inc.***, 271 F.3d 718, 727 (8th Cir. 2001).
[206] ***Id.***

A: Yeah. I would assume.

Q: Interest the department and the people involved with it is almost recreational in Nebraska. It's a big interest.

A: Sure.

Q: People would ask if there was an improper relationship, right?

A: Some might.[207]

But ALBERTS gave no instructions to Zimmer, and made no attempt to instruct WILLIAMS directly, regarding ASHLEY's wellbeing. He gave no directions to keep ASHLEY on the bench, or to do anything else that would make her and LOVE's concurrent disappearance less obvious.

To be sure, every subsequent step WILLIAMS took on February 17 after the team captains informed her of the elaborate caper made the eventual media and social media uproar more inevitable. Her timely report to a competent Title IX investigator would have resulted in directives to protect ASHLEY's rights – but WILIAMS did not make a timely report. WILLIAMS did not talk to the Title IX Coordinator at all. WILLIAMS did conduct her own investigation and then, absolving the team of its own rule violations and abusive behavior, she deputized team members as her investigators for two to three hours, going on for so long that the team missed its scheduled shootaround.

That was time that should have been spent in contact with a competent Title IX Coordinator. That time should have been spent with a competent Title IX Coordinator advising ASHLEY of her rights and checking on her immediate wellbeing. Every choice WILLIAMS made between her meeting with the team captains and when the team boarded the bus to the arena without ASHLEY made the social media explosion that followed more unavoidable.

---

[207] ***Alberts depo. Vol. II*** 34:08.

*4) Defendants, through their own actions, chilled ASHLEY from availing herself of due process*

As the Title IX Coordinator at the University of Nebraska, Meaghan Counley understands that victims in the Title IX setting may be afraid of disclosing the sexual misconduct to which they were subject.[208] Counley understands that a victim who has never disclosed the sexual harassment or sexual assault to anyone may be feeling pressures, anxieties, and concerns of "what happens if I just empty the bucket right now?"[209] Counley understands that a victim may be worried about repercussions of disclosing to anyone, and how the disclosure will blow back on her.[210]

Counley also knows that for victims of sexual misconduct, the thought of setting in motion the process of a Title IX investigation can feel intimidating.[211] If the victim of sexual misconduct has already been shamed and humiliated, the prospect of answering questions about what happened can feel intimidating.[212] The ability of a victim of sexual misconduct to participate in a Title IX investigation can be impacted by feelings of uncertainty about whether confidentiality will be honored, and whether they will experience retaliation for participating in the investigation.[213] As Counley well knows, the ability of a victim of sexual misconduct to participate in a Title IX investigation can be impacted by worries about the long-term consequences.[214]

Hence the reason that the Title IX training administered by Counley's office directs people that they must not conduct their own investigations before reporting suspected sexual misconduct to the Title IX office. There is a need to "attempt[] to avoid any conflict of interest or bias,

---

[208] ***Counley depo.*** 46:03.
[209] ***Counley depo.*** 62:21.
[210] ***Counley depo.*** 46:06.
[211] ***Counley depo.*** 157:01.
[212] ***Counley depo.*** 157:08.
[213] ***Counley depo.*** 157:14.
[214] ***Counley depo.*** 158:01.

ensuring neutrality and impartial investigation."[215] There is also a need to avoid retraumatizing someone who has experienced trauma.[216]

Deputy Title IX Investigators, including Leslie Shaver, undergo training in trauma-informed interviewing techniques, which are "supposed to be sensitive to individuals who have experienced trauma"[217], and which "allow people to answer questions in ways that potentially gather information that is less the result of a leading type of question."[218] In Counley's opinion, trauma-informed interviewing is the proper method to use in interviewing a student who has been pressured into sex.[219] Counley knows that if, instead of using trauma-informed interviewing methods, an interviewer uses an approach that is more accusatory, that can cause guilt or shame for the victim[220]; and that, in turn, can impact the quality of the disclosure that the victim is able to give.[221]

But WILLIAMS has not received training in trauma-informed interviewing.[222] WILLIAMS has not been trained as a Title IX investigator, or received training in any issues of conducting a Title IX investigation.[223] WILLIAMS did not advise ASHLEY that she might in fact be a victim of sexual misconduct.[224] WILLIAMS never considered how hard it would be to tell your mentor and coach that you have been in a sexual relationship with her associate head coach.[225] WILLIAMS never considered what pressures ASHLEY was under at that point.[226]

---

[215] ***Counley depo.*** 105:13.
[216] ***Counley depo.*** 105:17.
[217] ***Shaver depo.*** 45:24.
[218] ***Shaver depo.*** 46:16.
[219] ***Counley depo.*** 60:19.
[220] ***Counley depo.*** 61:06.
[221] ***Counley depo.*** 61:12.
[222] ***Williams depo.*** 35:25.
[223] ***Williams depo.*** 35:22.
[224] ***Alberts depo. Vol. II*** 122:20.
[225] ***Williams depo.*** 388:20.
[226] ***Williams depo.*** 389:01.

There is zero evidence that any of the team members had been trained in trauma-informed interviewing. There is also zero reason to give WILLIAMS the benefit of the doubt and assume she was running the two- to three-hour inquiry in a way that would not chill ASHLEY from disclosing the sexual relationship. What support for such an assumption could there be, when WILLIAMS cannot answer these questions:

> Q: If the reason that Ashley was out of her room on the occasions that you identified at the outset of your deposition was because there was a sexual relationship with Coach Love, does that make her still in violation of your rules?
>
> A: I don't know.[227]
>
> * * * * * *
>
> Q: If Ashley was in a sexual relationship with Chuck Love, is she the one who should be faulted for breaking the trust?
>
> A: I don't know.
>
> Q: What does your Title IX training tell you?
>
> A: I don't know. [228]

Counley agrees that in a case like this, in which there is an allegation of sexual misconduct by a University employee, contamination of evidence via intimidation "could be" a concern.[229] It "could be" and it should have been. WILLIAMS' betrayal showed ASHLEY that she could not trust "a single person around me."[230]

ASHLEY's instinct that she could not trust the Title IX Coordinator was, in fact, correct: ASHLEY did not know at the time, but Counley had already decided on the night of February 17,

---

[227] ***Williams depo.*** 130:03.
[228] ***Williams depo.*** 381:21.
[229] ***Counley depo.*** 208:10.
[230] ***Ashley Scoggin depo.*** 216:10.

without interviewing any witnesses, that the Title IX office would not even open an investigation due to the "high profile nature" of the matter.[231] ASHLEY's communications from then on out were with WILLIAMS, WILLIAMS' direct report Keith Zimmer, and WILLIAMS' boss, ALBERTS. Who among them should she have trusted?

WILLIAMS' decisions on February 17 chilled ASHLEY from participating in the Title IX process at the time when she most needed that process. WILLIAMS gave ASHLEY every reason to assume that disclosure of the sexual relationship would only hurt her even worse, and every reason to know that she could not trust her University. ASHLEY did not have the privilege of ALBERTS, who testified that he did not need to read his employment agreements before signing because "I trusted my university, and I was an alum, that they would treat me fair."[232]

*5) Genuine issues of fact persist as to whether Defendants' conduct shocks the conscience*

There is a meaningful distinction between this case and the facts in the unpublished opinion of ***Doe v. Estate of Eckerson***: the engagement of the plaintiff of **Eckerson** in the sexual relationship was voluntary. As noted in Plaintiff's Response to Defendants' Statement of Undisputed [*sic*] Facts, we do not accept BRUN's conception of "consensual" as "any sex in which the woman is not forcibly held down and penetrated." Even BRUN's employees do not ascribe to that conception of consent.

Speaking of the meaning of "consent" in Policy 2.1.8, Title IX Coordinator Meagan Counley testified:

> Q: If the victim is under pressure to tolerate quid pro quo sexual harassment, does that mean they consented?
>
> A: No.

---

[231] ***Counley depo.*** 227:11.
[232] ***Alberts depo. Vol. I*** 125:03.

Q: If the victim is afraid to tell anybody about quid pro quo sexual harassment, does that mean the victim consented?

A: No.

Q: Consent is a more complicated subject than just "did someone hold her down and force her to have sex by physically restraining her"; correct?

A: Correct.[233]

Similarly, then-Executive Director for Compliance Jamie Vaughn testified:

Q: If we're going to go to one end of the spectrum where male coach physically holds female student down and forces her physically to have sex, that would be a clear case of no consent; is that right?

A: No. It's not a clear case.

Q: Tell me why not.

A: What if the female likes to be held down during sex.

Q: And this would be acceptable in the context of a coach and student athlete?

A: No. Not in that context.

Q: Why not? What makes it different?

A: The fact that one is a coach and one is a student athlete and they're having sex.

Q: What if she likes to be held down?

A: That's a different conversation if it's not a coach and a student athlete.

Q: What is it about the relationship of a coach and student-athlete that changes how we look at the idea of consent?

A: You say the expectation of the behavior of a coach is not to be in a sexual relationship with a student athlete.

Q: Once a sexual relationship has arisen, it creates a conflict of roles for the coach; is that right? Lover, coach, mentor?

---

[233] ***Counley depo.*** 90:22.

> A: I think it creates a conflict for both parties.[234]

Asked who would be harmed if a student-athlete were in a sexual relationship with her coach, Director of Human Resources Layton Brooks added:

> A: Whatever it means to say that this is a consensual relationship -- right? -- it -- I would still argue that it is -- it would be harmful to not only the team, to the student.[235]

Only BRUN translates "not held down and forcibly penetrated" as "*ipso facto* consensual."

ASHLEY could not say no because "[i]f I told somebody, I thought I'd get kicked off the team way before that, way before it actually happened. I'd lose my scholarship. I couldn't graduate. I was not even full-time credits because it was my last semester."[236] Given what happened when WILLIAMS finally did learn of the relationship, who is to say that ASHLEY was wrong? No Defendant has credibility in saying "if you only would have come to us immediately, we would not have blamed you."

## IV.
## SECOND CAUSE OF ACTION (§ 1983 – WILLIAMS AND ALBERTS)

Title IX was "not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights."[237] Actions brought under § 1983, "based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional gender discrimination in schools." including in the case of school officials' inadequate responses to allegations of sexual harassment.[238] ASHLEY had a clearly established

---

[234] ***Vaughn depo.*** 84:20.
[235] ***30(b)(6) Person most knowledgeable in Department of Athletics employees engaging in sexual misconduct*** 6/29/26 (Brooks) 57:19.
[236] ***Ashley Scoggin depo.*** 115:19.
[237] ***Fitzgerald v. Barnstable Sch. Comm.***, 555 U.S. 246, 257 (2009).
[238] ***Id.*** at 258.

right to be free from discrimination on the basis of sex pursuant to the Equal Protection Clause of the Fourteenth Amendment; and, she has alleged in the Second Cause of action that Defendants ALBERTS and WILLIAMS either were personally involved in that discrimination, or that their wrongful actions were causally connected to ASHLEY's constitutional deprivations.

The Equal Protection Clause prohibits a state from denying to any person within its jurisdiction the equal protection of the laws, which "is essentially a direction that all persons similarly situated should be treated alike." A plaintiff must demonstrate that she has been treated differently due to her membership in a protected class and that the unequal treatment stemmed from discriminatory intent." "It is well established that a showing of discriminatory intent or purpose is required to establish a valid equal protection claim." To establish discriminatory intent, a plaintiff must show "that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group."

Both ALBERTS and WILLIAMS had "the responsibility to enact, train and enforce policies and procedures prohibiting professional coaches from pursuing sexual relationships with student-athletes, including reporting procedures." Neither one of them fulfilled that responsibility. There was no such policy.

Per WILLIAMS, the specific "team rule" that ASHLEY violated was "the rule violation of breaking curfews," and "breaking trust, being dishonest."[239] Although the 2022-23 version of the team handbook that WILLIAMS creates includes "travel rules"[240] that specifically address assigned rooms and curfew, there were no "travel rules" in the 2020-2021 and 2021-2022 versions of

[239] ***Williams depo.*** 12:13.
[240] ***Plaintiff's exhibit 420*** at 3.

WILLIAMS' team handbooks[241], and no rules about assigned rooms and curfew elsewhere in those versions of the team handbooks.

"Being dishonest," WILLIAMS' other reason for removing ASHLEY from the team, also does not appear under "team rules." "Lying" is listed as a "coaches [*sic*] pet peeve," on the next page after "team rules." Asked how she decided what is a rule and what is merely a pet peeve, WILLIAMS explained that "pet peeves" are

> kind of, just, are something that were maybe a little more we can address to try to kind of try to correct, whereas the team rules are a little more -- I don't know. I am not really sure how I determined between the two.[242]

But it is undisputed that in the same event of February 16, student-manager/practice player Christian Eisenhauer left his room after curfew and told a substantial lie, that being that there was a legitimate need for him to enter LOVE's hotel room. Eisenhauer testified:

> Q: So what happened next?
>
> A: When Kendall [Coley] got the text [from LOVE] saying "yes, meet me in the lobby," the girls sent me down to the front desk to get Coach Love's room key so that when he left, the girls could go in and see -- basically just see if Ashley was there.
>
> Q: What girls told you to go down there?
>
> A: Like, Mi'Cole [Cayton], Bella [Cravens], the two [team members Trinity Brady and Nailah Dillard] on FaceTime.
>
> Q: Had you been told by any of the Nebraska coaching staff that you were under the direction of the Nebraska women's basketball players?
>
> A: No.
>
> Q: They weren't your supervisors?
>
> A: Correct.

---

[241] ***Plaintiff's exhibit 376***; ***Williams depo.*** 126:14;

[242] ***Williams depo.*** 81:08.

Q: So when you went down to the desk you said, "I am Christian Eisenhauer; I need the key to Coach Love's room"?

A: Yes. I said "I am Christian. I am part of the Nebraska women's team, and we have something that we want to leave in Coach Love's room, like, for him. Could we get a room key."

Q: All right. So was there a plan to leave something in the room for him?

A: No.

Q: That part was not true?

A: Correct.

Q: Were you wearing Nebraska gear when you were a part of this on February 16th?

A: More than likely.

Q: Why did you agree to lie?

A: So that we could get to the bottom of it and rule stuff out and finally have an answer.

Q: Was there any part of your job as a student manager to investigate any matter on behalf of the University of Nebraska?

A: No.[243]

And yet, Eisenhauer also testified that he suffered zero consequences for obtaining and using LOVE's room key under false pretenses (wearing his Husker gear) and breaking curfew.[244] No one on the team, or in the Department of Athletics, or Human Resources or the Office of General Counsel even asked to interview Eisenhauer about his actions.[245]

---

[243] ***Eisenhauer depo.*** 106:22.
[244] ***Eisenhauer depo.*** 137:14.
[245] ***Eisenhauer depo.*** 138:02.

WILLIAMS had no explanation for the disparity in how she treated ASHLEY versus how she treated Eisenhauer:

Q: Does it break team rules to falsify your identity to get an associate head coach's room key?

A: I mean, I don't think it falls under the conduct that we expect within our team rules.

Q: Is there any rule violation involved with using a room key obtained under false pretenses to enter a coach's room without permission?

A: I mean, once again, I don't think it falls under the behavior that we expect.

Q: Is there a rule violation, is what I asked?

A: I am unsure.[246]

The male student-manager/practice player, wearing Husker gear, lies to a hotel clerk about his need for a coach's room key, then helps his teammates use that key to enter the coach's room without permission and without notifying the head coach of their elaborate scheme – and WILLIAMS sees no problem.

At the same time, WILLIAMS delivers a swift and harsh punishment to the woman student-athlete whom LOVE never should have had sex with, who felt "trapped" and unable to get out of the relationship with LOVE, all under the auspice of "breaking curfew, breaking trust, being dishonest."[247] ASHLEY had the right to equal protection, and the outcome of the events of February 17 was not equal protection.

## V.
## FOURTH CAUSE OF ACTION: RATIFICATION[248]

---

[246] ***Williams depo.*** 342:14.
[247] ***Williams depo.*** 12:13.
[248] We acknowledge this Court's Order of March 12, 2026 on BRUN's Motion to Strike Jury Demand (Filing #50). That Order did not strike the entire Fourth Cause of Action, but only the demand for a jury trial. To the extent that

We disagree with Defendants' assertion that liability for ratification of a civil rights violation lies only with the municipality, and not with the individual. The United States Court of Appeals for the Eighth Circuit has held that an individual supervisor incurs § 1983 liability for a violation of a federally protected right when the supervisor is personally involved in the violation "or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation"[249]: "The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see."[250]

***Wagner v. Jones*** was a § 1983 case filed by a politically-conservative plaintiff who alleged that a law school dean discriminated against her in violation of her First Amendment rights of political belief and association, by not hiring her as a full-time instructor. She appealed the dismissal of her case on qualified immunity. The law school dean argued that it was the faculty committee, not her, that recommended not hiring the plaintiff; that she always adopts the faculty's recommendation; and that the faculty did not recommend hiring the plaintiff for reasons unrelated to her political beliefs.

But the Circuit found that the plaintiff presented a jury question of whether the dean had direct involvement through her alleged non-involvement. It observed that the dean "apparently did nothing to ensure that the faculty did not impermissibly consider [the plaintiff's] politics in making its recommendation as to whom she should hire even though [the dean] was present for

---

Defendants now claim that Order was a merits ruling, because that Order predated the development of deposition testimony from ALBERTS, and from other witnesses about ALBERTS' actions, we respectfully ask this Court to allow this argument, supported by the evidence now in the record.

249 ***Wagner v. Jones***, 664 F.3d 259, 275 (8th Cir. 2011)

250 ***Ottman v. City of Independence, Mo.***, 341 F.3d 751, 761 (8th Cir. 2003).

the faculty discussion."[251] When an associate dean contacted the dean to ask if the plaintiff's politics played a role in the decision to not hire her, the dean

> apparently completed no further investigation other than speaking to [the associate dean]. More importantly, [the dean] took no steps to ensure that the faculty did not take [the plaintiff's] political associations and beliefs into consideration when the faculty voted on whether to recommend her for an adjunct LAWR position. [The dean] supported [the plaintiff] serving as an adjunct instructor because she asked [another employee] to follow up with [the plaintiff] to determine whether she was interested in the adjunct position. But [the dean] refused to hire [the plaintiff] and instead relied on the faculty's recommendations. [The dean] did not provide [the plaintiff] with any explanation as to why she chose not to hire her for any of the adjunct positions.[252]

Noting that "a supervisor may be held individually liable under § 1983 if [s]he directly participates in the constitutional violation[253]," the ***Wagner*** court reversed the district court's decision to confer qualified immunity on the dean. The plaintiff's claim was based on the dean's own actions and omissions during the hiring process; and on allegations that even though the dean was on notice that the plaintiff's political beliefs may have impermissibly affected the faculty's hiring recommendation, she still refused to hire the plaintiff.[254] On that finding, the Circuit remanded the case for trial.

The Circuit reiterated (and cited) that holding of ***Wagner*** in ***Livers v. Schenck***[255], in affirming that the sheriff who employed a crime scene investigator who fabricated blood evidence could not be held liable for respondeat superior or ratification. The appellant had cited ***City of St. Louise v. Praprotnik***[256] and ***Speer v. City of Wynne, Ark.***,[257] which the Circuit found

---

[251] ***Id.*** at 274.
[252] ***Id.***
[253] ***Id.*** at 275 (*citing and quoting* ***Riehm v. Engelking***, 538 F.3d 952, 962-63 (8th Cir. 2008) and ***Brockinton v. City of Sherwood***, 503 F.3d 667, 674 (8th Cir. 2007)).
[254] ***Id.***
[255] ***Livers v. Schenck***, 700 F.3d 340 (8th Cir. 2012).
[256] ***City of St. Louise v. Praprotnik***, 458 U.S. 112 (1988).
[257] ***Speer v. City of Wynne, Ark.***, 276 F.3d 980 (8th Cir. 2002).

unhelpful: it held that ***Praprotnik*** and ***Speer*** were inapposite because they involved municipal, rather than individual, liability. To base the sheriff's individual liability on a case about municipal liability, held the Circuit,

> would violate the principle that a supervisor who does not directly participate in an employee's constitutional violation can only be liable for the violation when it was caused by the supervisor's failure to train or supervise his or her employees properly.[258]

But Plaintiff has pled, and now developed evidence to support, ALBERTS' individual liability for his direct acts of ratification. ALBERTS' role in this case is not just one of vicarious liability, as was the role of the sheriff in ***Livers***. He had his own duties and responsibilities, he had his own conversations, he took his own actions and he made his own decisions.

From Zimmer, ALBERTS learned that a coach had a student-athlete in his room; he gave no orders for the student-athlete's protection, instead reflexively sending the case to "the experts" – which, as it turns out, are the Title IX Coordinator and the Office of General Counsel, which does not have any duty of care whatsoever toward ASHLEY.[259] Before midnight on February 17, the Title IX Coordinator had already decided to not open an investigation, without interviewing a single witness, and to instead call the Office of General Counsel. From there, ALBERTS knowingly deferred to WILLIAMS' choices without even asking her anything like "why was one of your student-athletes in your associate head coach's room after midnight"; and when ALBERTS met with ASHLEY, WILLIAMS, Keith Zimmer and the Scoggins, ALBERTS had already determined that nothing ASHLEY could say at that meeting would change his determination to allow WILLIAMS to remove ASHLEY from the team.

---

[258] ***Livers***, 700 F.3d at 357.

[259] ***Alberts depo. Vol. I*** 06:08.

Although he knew WILLIAMS was suspending ASHLEY from the team as of February 17, ALBERTS did not engage the process of the Student-Athlete Conduct Policy, which he acknowledges begins with an actual, intentional decision by the Director of Athletics about whether the policy does or does not apply. ALBERTS never directed WILLIAMS or Zimmer to advise ASHLEY of the Conduct Policy, and on February 22, his choice was to not advise ASHLEY of the conduct policy that day.

That is not just respondeat superior liability. As a Vice Chancellor of Athletics who thinks that sex between coaches and athletes can be just fine, ALBERTS took affirmative steps that, like the dean of ***Wagner***, ratified WILLIAMS' and LOVE's violations of ASHLEY's rights.

## VI.
## QUALIFIED IMMUNITY

Just last week, the United States Court of Appeals for the Eighth Circuit rejected a claim that the absence of a case with "fundamentally similar facts" required a finding that the right violated was not clearly established. Quoting then-Judge Gorsuch, the Circuit wrote that

> "sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing." Indeed, given how clear the law is, it would have been surprising to find one.[260]

In that case, the "obviously unlawful thing" was a judge's placement of children in a holding cell when, after the judge approved a custody arrangement, the children had refused to go with the custodial parent.

### A. <u>WILLIAMS</u>

---

[260] ***Rockett v. Eighmy***, 2026 WL 3057717 at *4 (8th Cir. 2026) (*quoting and citing* ***Browder v. City of Albuquerque***, 787 F.3d 1076, 1082 (10th Cir. 2015); and *District of Columbia v. Wesby*, 583 U.S. 48, 64.

That judge's conduct, while unprecedented in this Circuit, nonetheless was "obviously unlawful"; just so, for WILLIAMS to defy years of Title IX training to "report, don't investigate" at the expense of her student-athlete is obviously unlawful. Her interest was to avoid hard questions about losing control of her team, to protect LOVE's status as a valued Associate Head Coach or both. At the expense of the student-athlete in LOVE's hotel room, WILLIAMS absolved the team for its "elaborate scheme" without questions. At the expense of the student-athlete in LOVE's hotel room, WILLIAMS ignored her staff's decision to investigate instead of report. At the expense of the student-athlete in LOVE's hotel room, WILLIAMS redirected the attention and questions away from herself.

Assistant Athletic Director Keith Zimmer talked to no one who was at Penn State except WILLIAMS.[261] When Zimmer reported to ALBERTS, he told ALBERTS that "the team said, 'we will not play if she's,' meaning Ashley, and 'we will not play if Chuck is on the bench.'"[262] That alarmist claim came only from WILLIAMS.[263] Zimmer conveyed it, and ALBERTS leveraged it as his excuse to allow WILLIAMS to remove ASHLEY from the team.

Even WILLIAMS acknowledges that if the team really had given her an ultimatum, she could have exercised actual leadership and told the team, "if you are not comfortable playing, I am sure one of the other girls would be happy to take your minutes"[264]; but the truth is that the team did not say "we will not play if . . ." No member of the team threatened to refuse to play if ASHLEY remained on the team.[265] Only Bella Cravens said that she did not feel "comfortable" moving forward with LOVE coaching "or, you know, playing with ASHLEY with the discontent that is

---

[261] ***Plaintiff's exhibit 371*** at 1.
[262] ***Alberts depo. Vol. I*** 10:04; ***Alberts depo. Vol. II*** 07:23.
[263] ***Alberts depo. Vol. II*** 125:25.
[264] ***Williams depo.*** 364:13.
[265] ***Williams depo.*** 363:19.

happening."[266] WILLIAMS was not threatened by Cravens' discomfort.[267] But she led Zimmer to believe that the team had backed her into a corner where she had no choice except to immediately remove both LOVE and ASHLEY from the team's sight – and that is what Zimmer passed along to ALBERTS.

In that moment, WILLIAMS chose herself over her student-athlete, a high-producing and hardworking player whom WILLIAMS knew sought to follow in WILLIAMS' footsteps as a coach. WILLIAMS' Associate Head Coach had groomed ASHLEY into a sexual relationship in plain sight of whoever was paying attention, and WILLIAMS had let that happen. When her team ran an "elaborate scheme" and generated video evidence to force WILLIAMS to act, WILLIAMS saved herself – and in so doing, she threw her student-athlete out of the metaphoric boat. Her conduct was "obviously unlawful[268]": the fact that this course of events was so bizarre that it may not have precedent in the Circuit should not translate into a free pass.

B. <u>LOVE</u>

***Rogers v. City of Little Rock***, 152 F.3d 790 (8th Cir. 1998) was brought under 42 U.S.C. § 1983 by a woman whom the defendant officer had stopped for a broken taillight. When the woman could not produce current proof of insurance, the officer followed her home and entered her house, ostensibly for her to find that documentation. When she still could not find proof of insurance, the defendant replied that he would let her off but that she owed him one.

The officer began touching and kissing the plaintiff and told her to undress. He then told her that she did not have to have sex with him; at the same time, however, he continued to insist

266 ***Williams depo.*** 363:21.
267 ***Williams depo.*** 364:21.
268 ***Rockett v. Eighmy***, 2026 WL 3057717 at *4 (8th Cir. 2026) (*quoting and citing* ***Browder v. City of Albuquerque***, 787 F.3d 1076, 1082 (10th Cir. 2015); and *District of Columbia v. Wesby*, 583 U.S. 48, 64.

that she disrobe. The officer then had sexual intercourse with her. The plaintiff was frightened and did not know what else to do.

She sued the officer and the city that employed him. The officer, like BRUN and WILLIAMS and ALBERTS and LOVE, said that the plaintiff consented to sex for her own interests. The trial court found that the plaintiff was afraid of what might happen if she didn't cooperate with a police officer, and that he coerced her into intercourse. The court also found that the officer was acting under color of state law at the time; and that he was liable under § 1983 because he had violated the plaintiff's substantive due process rights. The officer appealed, maintaining that the plaintiff consented to intercourse with him. ***Id.*** at 794.

Preliminarily, the United States Court of Appeals for the Eighth Circuit found that the trial court was correct to analyze the evidence through the lens of U.S. CONST. amend. XIV rather than U.S. CONST. amend. IV, observing that the sexual assault invaded not only the plaintiff's privacy, but "the most private area of her body."[269] The officer's act was, the Circuit wrote, "a violation of the most intimate kind of bodily integrity. He forced himself into her body at a time and in a way that could not be considered part of any legitimate police function."

Citing ***City of Sacramento v. Lewis***[270] the ***Rogers*** court observed that "the core of the substantive due process concept is protection against arbitrary action and against the exercise of power without any reasonable justification in the service of a legitimate governmental objective."[271] In that vein, the officer's act was "an intentional act that produced constitutional injury and that was an arbitrary exercise of the powers of government, unrestrained by the established principles

---

[269] ***Rogers***, 152 F.3d at 796.
[270] ***City of Sacramento v. Lewis***, 523 U.S. 833 (1998).
[271] ***Rogers***, 152 F.3d at 797.

of private right and distributive justice," properly analyzed via the right to substantive due process.[272]

Relevant to all Defendants' insistence that because LOVE did not physically force her, ASHLEY *ipso facto* "consented" to sex, the ***Rogers*** court rejected the officer's claim that there could be no due process violation because he did not use violence. In support of his "consent" argument, the officer pointed to testimonial admissions by the plaintiff:

- That the officer told her she did not have to have sex with him;
- That she did not ask him to stop or physically resist his advances;
- That she took her own clothes off; and
- That he did not threaten or harm her.

He also pointed to the fact that the local prosecutor declined to charge him with a crime, as well as the fact that the Internal Affairs Division of his agency did not sustain her complaint.[273]

Citing the United States Supreme Court's decision in ***Leyra v. Denno***[274], the ***Rogers*** court wrote that the plaintiff "was able to establish a due process violation absent physical force because such violations can be based on mental coercion.[275] The district court had rejected the "consent" defense, noting that the officer had told multiple versions of what happened on the day he assaulted the plaintiff, and that his claim that he had to follow the plaintiff around her house out of fear that she was armed was inconsistent with consensual sex. The Circuit upheld the district court's finding, noting that it was supported by "the trial transcript and giving due weight to the fact that

---

[272] ***Id.***
[273] ***Id.*** at 798.
[274] ***Leyra v. Denno***, 347 U.S. 556, 558 (1954).
[275] ***Rogers***, 152 F.3d at 798. ***See also Tyson v. Sabine***, 42 F.4th 508 (5th Cir. 2022); and ***Abeyta v. Chama Valley Indep. Sch. Dist.***, 77 F.3d 1253, 1256 (10th Cir. 1996) (rejecting "that psychological abuse absent physical contact or a threat to bodily integrity is not a deprivation of constitutional rights").

the trial court is in a superior position to evaluate the credibility of witnesses."[276]

***Rogers*** supports finding that questions of fact remain as to LOVE's liability, which is akin to the officer's liability in ***Rogers***. In meaningful ways, ASHLEY's testimony parallels the testimony of the plaintiff of ***Rogers***. The rights that LOVE violated were clearly established as of February 2022.

C. ALBERTS

Please see "IV. RATIFICATION," infra, for the discussion of ALBERTS' affirmative acts and the application of ***Wagner v. Jones***, 664 F.3d 259, 275 (8th Cir. 2011)

## VII.
## DAMAGES

As to general damages, we acknowledge the Supreme Court's holding in ***Cummings v. Premier Rehab, PLLC***.[277] Insofar as the United States Court of Appeals for the Eighth Circuit has disposed of Title IX cases since the issuance of ***Cumming*** in 2022[278], it is somewhat surprising that neither the Supreme Court nor the Circuit has not yet addressed this issue. Our response to BRUN's argument is that we are preserving our right to present evidence of, and recover, non-economic damages in the event that one of those Courts does identify a distinction between the Rehabilitation Act and Title IX.

But we do not concede that the absence of an expert witness on NIL earnings means that therefore, ASHLEY cannot possibly recover damages for NIL earnings. BRUN fought hard to prevent Plaintiff from deposing its NIL designees, but its NIL designees explained capably how

---

[276] ***Id.*** (*citing* ***Bush v. Marshalltown Med. & Surg. Ctr.***, 123 F.3d 1130, 1134 (8th Cir. 1997)).
[277] ***Cummings v. Premier Rehab***, 596 U.S. 212 (2022).
[278] ***See Doe v. Board of Trustees of Nebraska State College***, 78 F.4th 419 (8th Cir. 2023).

ASHLEY's NIL earnings in the 2021-22 school year are not a yardstick for what women's basketball players earned at Nebraska in the 2022-23 and 2023-24 school years. That ASHLEY earned more money at UNLV than in 2021-22 at Nebraska means, per Jonathan Bateman, nothing.

And as hard as BRUN fought to depose Derrick Pearson, Pearson testified as a fact witness who happens to own a radio station in Lincoln that employs student-athletes and guides student-athletes toward NIL opportunities. One of those student-athletes, in 2021-22, was ASHLEY. Pearson testified that but for the events of February 17, 2022, ASHLEY would have continued to receive a stipend of $200/month for appearances on The Ticket, an amount that increased over the remaining years of ASHLEY's eligibility.[279] Through their appearances at The Ticket, student-athletes then became exposed to as many as five restaurant/bar/business appearances per week, usually for $200 and a meal for a 30-minute appearance.[280] Other opportunities are set forth in Plaintiff's Separate Statement of Facts, as provided by Pearson and by BRUN's designees. Pearson testified that he would have continued to feature ASHLEY, and pay her, if not for the events of February 17.

That isn't coming from an expert, but it is competent testimony that ASHLEY lost financial earnings opportunities. That suffices to present a question of fact that precludes summary judgment on this issue.

---

[279] ***Pearson depo.*** 40:24.
[280] ***Pearson depo.*** 166:14, 165:02.

ASHLEY SCOGGIN, Plaintiff,

By: */s/ Maren L. Chaloupka*
Maren Lynn Chaloupka, #20864
Chaloupka Law, LLC
1906 Broadway
P.O. Box 1724
Scottsbluff, NE 69363-1724
(308) 270-5091
mlc@chaloupkalaw.net

-AND-

Nathan J. Bruner – NSBA # 23629
Bruner Frank Schumacher
5804 1st Avenue
P.O. Box 2230
Kearney, NE 68847
(308) 455-1046
nbruner@nebraskalawfirm.net

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the above Brief contains 17,659 words. No part of this brief was written using generative artificial intelligence, as I do not use generative artificial intelligence.

*/s/ Maren Lynn Chaloupka*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing instrument has been sent via CM/ECF on this 21st day of October 2026, to the following:

Denise E. Frost
Johnson & Mock, PC LLO
9900 Nicholas Street, #225
Omaha, NE 68114
dfrost@johnsonandmock.com

Bren H. Chambers
Deputy General Counsel
University of Nebraska
3835 Holdrege Street
Lincoln, NE 68583-0745
bchambers@nebraska.edu

Susan K. Sapp
Lily Amare
Cline Williams Wright Johnson & Oldfather, L.L.P.
1900 U.S. Bank Building
233 South13th Street
Lincoln, NE 68508
ssapp@clinewilliams.com
lamare@clinewilliams.com

*/s/ Maren Lynn Chaloupka*