IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ASHLEY SCOGGIN,<br><br>Plaintiff,<br><br>vs.<br><br>BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, and individuals AMY WILLIAMS, TREV ALBERTS, and CHUCK LOVE, JR., in their individual capacities,<br><br>Defendants. | Case No. 4:24-cv-3039<br><br>**BRIEF OPPOSING DEFENDANT LOVE'S MOTION FOR SUMMARY JUDGMENT** |

## LOVE'S CREDIBILITY

Among the truths that discovery herein has confirmed – in spite of the combined defense team's best efforts to the contrary – is the truth that the credibility of anything LOVE says is suspect. To those who had no reason to know better, LOVE was talented and dynamic. He was a rising star in the coaching world: by 2021, LOVE had interviewed twice for head coaching positions at other Division I schools.[1] In May 2021, BRUN promoted LOVE to Associate Head Coach and raised his salary in recognition of his ongoing ascent.

The public-facing LOVE was well-connected. Although Love created ***Plaintiff's exhibit 447*** after resigning from Nebraska, the claims he includes in this document are meaningful. He claims that he "represents" professional basketball players, and that he "developed 2 players that was drafted into the WNBA." As he advertised, he "[p]roduced consecutive Top 20 recruiting classes in the country via ESPN (University of Nebraska)"[2], and was the "[r]ecruiting coordinator

---

[1] ***Love depo.*** 55:15.
[2] ***Plaintiff's exhibit 458***.

that led our program to recruiting 2 back-to-back Top 20 recruiting classes in the country."[3]

While he was still on WILLIAMS' staff, WILLIAMS commended LOVE for his "vast recruiting responsibilities."[4] In 2019, WILLIAMS wrote:

> As we move into 2019-2020, we are shuffling some of the responsibilities around with the addition of staff and I would like to allow Chuck to move into a roll [*sic*] where he is thinking more like the head coach. Chuck will likely have a new specific area of emphasis for our team in practice and game settings, and although it has not officially been designated what aspect of the game will be the primary focus for Chuck, the goal is that he will be able to bring new drills, plays or theories to the table that will eventually help our team improve in one specific aspect of the game.[5]

In 2020, the year of ASHLEY's arrival at Nebraska, WILLIAMS wrote that

> Chuck continues to impact our program, most significantly in the areas of recruiting. He continues to cement relationships that will benefit the program. He is definitely building a solid foundation by establishing relationships that will prove beneficial in our ability to land the nation's top recruits.[6]

In 2021, WILLIAMS noted that LOVE "remains the most 'active' recruiter on staff as far as consistently working the phones and reaching out to coaches and contacts across the country to aid our recruiting efforts."[7]



---

[3] ***Plaintiff's exhibit 458***.
[4] ***Plaintiff's exhibit 340*** at 3.
[5] ***Plaintiff's exhibit 339*** at 5.
[6] ***Plaintiff's exhibit 340*** at 4.
[7] ***Plaintiff's exhibit 337*** at 3.

WILLIAMS had reason to know the rest. She invited LOVE onto her coaching staff in 2012. LOVE was close friends with WILLIAMS' husband, Lloyd, and WILLIAMS knew them to enjoy a weekly "guys night" in which they would stay out, by WILLIAMS' estimate, typically until about 1:00 a.m.[8] WILLIAMS and LOVE were known to be close.[9] So close, in fact, that team members and even student-managers believed WILLIAMS to defer to LOVE on substitution decisions during games.[10]



In April 2022, student-manager/practice player Christian Eisenhauer described LOVE to Deputy Title IX Investigator Leslie Shaver:

> I personally think that he was the best coach that we had, um, and had insight, like, during games. His insight to Coach Williams was, like, helped us win a lot of games. And just really high basketball IQ … I would say during the game he would be in Coach Williams' ear, like, the entire time just giving her suggestions. Um, calling out the other teams' plays, making, like, substitution recommendations, I guess you could say, um, about who needed to be in and who needed to come out, stuff like that … I just kind of wanted to say that by no means do I want either of Ashley or Coach Love to get in trouble, or was I, I wasn't out looking for reasons for them to be in trouble. Like I said, I have a ton of respect for Coach Love and he's been a huge mentor and, like, role model for me these last five years. Um, I even was going to ask him to write me a letter of recommendation for med school. And he's someone that I've gotten really close with and have a mean-, had a meaningful relationship with so I would never want to do anything that was going to hurt his reputation or his career.[11]

---

[8] Transcript of Amy Williams interview at 10.
[9] ***Eisenhauer depo.*** 113:18.
[10] ***Plaintiff's exhibit 330*** at 15; ***Plaintiff's exhibit 369*** at 4; ***Plaintiff's exhibit 360*** at 11, 12; Transcript of Nailah Dillard interview at 7; Transcript of Ruby Porter interview at 12, 15; ***Plaintiff's exhibit 366*** at 8.
[11] ***Plaintiff's exhibit 360*** at 11, 12,

The public-facing LOVE was the version who recruited ASHLEY, responding to the mass email she sent to hundreds of Division I coaches within 10-15 minutes.[12] That was the LOVE who told ASHLEY that they could work out during covid, and who told her they needed to find a court that was "LOW LOW KEY" so they would not be caught violating covid practice rules.[13] This was also the LOVE who gave ASHLEY extra workouts throughout the 2020-2021 season, during which ASHLEY started every game and played an average of just under 32 minutes per 40-minute game.[14]

The public-facing LOVE invited ASHLEY, in the summer of 2021, to work in his office.[15] The public-facing LOVE invited ASHLEY to meet him late at night in a Costco parking lot; and then late at night in the Speedway parking lot. And after those late-night meetups, the public-facing LOVE had trapped ASHLEY:

> Q: You said earlier you felt trapped. Tell me about that.
>
> A: Obviously, when you're at the school that your little self always imagined you could be at, you're playing on a big stage, a Power 5 school, you're on a scholarship, all your dreams are in one place, you work your whole life to get to that point, when something threatens that, you roll with the punches. I mean, like I said, I just wanted to play basketball. And so when the one thing is causing you a whole lot of pain and agony and it flips your whole life around, even though you love it, that's why it was crazy.
>
> Q: Why didn't you ask somebody for help?
>
> A: I couldn't trust anybody around me. I was supposed to keep it -- I was supposed to keep it a secret. He told me I couldn't tell anybody.
>
> Q: Did you agree to that?
>
> A: Yeah. If I told somebody, I thought I'd get kicked off the team way before

---

[12] Transcript of Ashley Scoggin interview at 24.
[13] Ex. AAC at 17, 18.
[14] ***Plaintiff's exhibit 310*** at 8.
[15] Transcript of Ashley Scoggin interview at 2.

> that, way before it actually happened. I'd lose my scholarship. I couldn't graduate. I was not even full-time credits because it was my last semester.[16]

ASHLEY felt trapped by the public LOVE. Unbeknownst to ASHLEY at that time, there was also the private LOVE, whom recruits and team members, including ASHLEY, did not see. The private LOVE got sued for collections while coaching for Nebraska, three or four times.[17] While he was coaching for Nebraska, LOVE at least twice had his paychecks garnished[18], and he doesn't remember whether WILLIAMS ever talked to him about that.[19] The private LOVE was evicted from his rental house in Lincoln with a staggering $34,000 in unpaid rent[20], and left behind another $33,000 in damage to the rental house, resulting in a $67,000 judgment that he had not paid any of as of his February 2026 deposition.[21]

Pressed to explain his claim that he "represents 12 elite collegiate players at the Division I level," LOVE admitted that he is not a registered athlete agent, and that he uses the term "represents" to mean "player development."[22] Asked to identify the players he has developed and placed in Division I programs, LOVE acknowledged that one of those players is his son; he initially claimed that the others were clients of his youth basketball program, Love In Basketball, and he specifically named current Nebraska Cornhusker Braden Frager as one of the college players for whose ascension LOVE is responsible. Pressed further, LOVE admitted that Braden Frager was not someone who actually paid LOVE for his services; Frager just worked out with LOVE's son[23] and paid LOVE, at most, for a few sessions.

---

[16] ***Ashley Scoggin depo.*** 115:19.
[17] ***Love depo.*** 297:02.
[18] ***Love depo.*** 297:06.
[19] ***Love depo.*** 297:08.
[20] ***Love depo.*** 71:02.
[21] ***Love depo.*** 70:24.
[22] ***Love depo.*** 32:14.
[23] ***Love depo.*** 33:24.

The truth about LOVE's NBA contacts is that they consist of a college roommate who is a strength coach for the Denver Nuggets and a friend who has some position with the Miami Heat – and that's all.[24] Student-manager/practice player Christian Eisenhauer did say that "Coach Love is really good with words."[25]

Asked whether it troubles him that, when he resigned from Nebraska, he received $136,000.00 plus money to pay his lawyer and ASHLEY received nothing, LOVE's response encapsulated his selfishness: "I don't think you can put a price on a career."[26]

The real LOVE is cowardly, fraudulent and selfish; the LOVE that the Cornhusker women's basketball team, ASHLEY included, knew was dynamic, well-connected and persuasive. Those qualities, while ASHLEY thought they were real, trapped her:

> [LOVE] was my coach, meaning he had influence with things that were important in my career, like Coach Williams. My perception was that Coach Love had influence in the starting lineup and substitutions. My perception was also that Coach Love had influence with programs and organizations where I might go after I finish my college playing career.[27]

## I.

## LOVE'S VIOLATION OF ASHLEY'S SUBSTANTIVE DUE PROCESS RIGHTS

***Rogers v. City of Little Rock***, 152 F.3d 790 (8th Cir. 1998) was brought under 42 U.S.C. § 1983 by a woman whom the defendant officer had stopped for a broken taillight. When the woman could not produce current proof of insurance, the officer followed her home and entered her house, ostensibly for her to find that documentation. When she still could not find proof of insurance, the defendant replied that he would let her off but that she owed him one.

---

[24] ***Love depo.*** 25:19.
[25] ***Plaintiff's exhibit 360*** at 8.
[26] ***Love depo.*** 288:10.
[27] ***Ashley Scoggin depo.*** errata/116:23.

The officer began touching and kissing the plaintiff and told her to undress. He then told her that she did not have to have sex with him; at the same time, however, he continued to insist that she disrobe. The officer then had sexual intercourse with her. The plaintiff was frightened and did not know what else to do.

She sued the officer and the city that employed him. The officer, like BRUN and WILLIAMS and ALBERTS and LOVE, said that the plaintiff consented to sex for her own interests. The trial court found that the plaintiff was afraid of what might happen if she didn't cooperate with a police officer, and that he coerced her into intercourse. The court also found that the officer was acting under color of state law at the time; and that he was liable under § 1983 because he had violated the plaintiff's substantive due process rights. The officer appealed, maintaining that the plaintiff consented to intercourse with him. ***Id.*** at 794.

Preliminarily, the United States Court of Appeals for the Eighth Circuit found that the trial court was correct to analyze the evidence through the lens of U.S. CONST. amend. XIV rather than U.S. CONST. amend. IV, observing that the sexual assault invaded not only the plaintiff's privacy, but "the most private area of her body."[28] The officer's act was, the Circuit wrote, "a violation of the most intimate kind of bodily integrity. He forced himself into her body at a time and in a way that could not be considered part of any legitimate police function."

Citing ***City of Sacramento v. Lewis***[29] the ***Rogers*** court observed that "the core of the substantive due process concept is protection against arbitrary action and against the exercise of power without any reasonable justification in the service of a legitimate governmental objective."[30]

---

[28] ***Rogers***, 152 F.3d at 796.
[29] ***City of Sacramento v. Lewis***, 523 U.S. 833 (1998).
[30] ***Rogers***, 152 F.3d at 797.

In that vein, the officer's act was "an intentional act that produced constitutional injury and that was an arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice," properly analyzed via the right to substantive due process.[31]

Relevant to all Defendants' insistence that because LOVE did not physically force her, ASHLEY *ipso facto* "consented" to sex, the ***Rogers*** court rejected the officer's claim that there could be no due process violation because he did not use violence. In support of his "consent" argument, the officer pointed to testimonial admissions by the plaintiff:

- That the officer told her she did not have to have sex with him;
- That she did not ask him to stop or physically resist his advances;
- That she took her own clothes off; and
- That he did not threaten or harm her.

He also pointed to the fact that the local prosecutor declined to charge him with a crime, as well as the fact that the Internal Affairs Division of his agency did not sustain her complaint.[32]

Citing the United States Supreme Court's decision in ***Leyra v. Denno***[33], the ***Rogers*** court wrote that the plaintiff "was able to establish a due process violation absent physical force because such violations can be based on mental coercion.[34] The district court had rejected the "consent" defense, noting that the officer had told multiple versions of what happened on the day he assaulted the plaintiff, and that his claim that he had to follow the plaintiff around her house out of fear that she was armed was inconsistent with consensual sex. The Circuit upheld the district court's

---

[31] ***Id.***
[32] ***Id.*** at 798.
[33] ***Leyra v. Denno***, 347 U.S. 556, 558 (1954).
[34] ***Rogers***, 152 F.3d at 798. ***See also Tyson v. Sabine***, 42 F.4th 508 (5th Cir. 2022); and ***Abeyta v. Chama Valley Indep. Sch. Dist.***, 77 F.3d 1253, 1256 (10th Cir. 1996) (rejecting "that psychological abuse absent physical contact or a threat to bodily integrity is not a deprivation of constitutional rights").

finding, noting that it was supported by "the trial transcript and giving due weight to the fact that the trial court is in a superior position to evaluate the credibility of witnesses."[35]

***Rogers*** supports finding that questions of fact remain as to LOVE's liability, which is akin to the officer's liability in ***Rogers***. In meaningful ways, ASHLEY's testimony parallels the testimony of the plaintiff of ***Rogers***. The rights that LOVE violated were clearly established as of February 2022.

Genuine issues of material fact remain as to LOVE's violation of ASHLEY's substantive due process rights. LOVE testified:

> Q: Did Ashley ever do you wrong in any way, in your opinion?
>
> A: Do me wrong?
>
> Q: Right.
>
> A: I don't think so, no.
>
> Q: Do you think she deserves for you to do right by her?
>
> A: Does she deserve for me to do right by her?
>
> Q: Right. As a man that would write on his mirror: "Abide in me and I in you. As a branch cannot bear fruit of itself, except it abide in a vine, no more can ye."[36] Does she deserve for you to do right by her?
>
> A: I'm most definitely the coach, and I'm responsible for stopping any type of -- yeah. I take -- I take responsibility for not stopping anything.[37]

---

[35] ***Id.*** (*citing* ***Bush v. Marshalltown Med. & Surg. Ctr.***, 123 F.3d 1130, 1134 (8th Cir. 1997)).

[36] Earlier in his deposition, LOVE testified about having used a Sharpie to scrawl scriptural references on his bathroom mirror, which his landlord photographed after evicting LOVE and assessing the damage LOVE left behind. (***Love depo.*** 70:19.)

[37] ***Love depo.*** 243:17.

But that admission shows that LOVE takes responsibility for far too little. In blaming ASHLEY for the increasing familiarity of their relationship in the summer of 2021, LOVE acknowledges that there was never a time when he showed ASHLEY's texts to WILLIAMS and said, "look at these and tell me if you think something's not appropriate."[38] It is undisputed that in the summer of 2021, LOVE and ASHLEY were not in a sexual relationship – and whatever ASHLEY texted, that did not mean that she wanted to enter a secret sexual relationship with her coach, any more than a woman who smiles at a man in a bar *ipso facto* wants to have sex with him.

LOVE testified:

Q: You would not have had that relationship with Ashley Scoggin if not for her being on the University of Nebraska Cornhusker women's basketball team; true?

A: I wouldn't have known Ashley if -- if I wasn't coaching at the University of Nebraska at that time.

Q: It does not trouble you that a player that you were having a sexual relationship with got kicked off the team after she was found under the covers in your room; true?

A: It bothers me if anyone got kicked off.

Q: It's not about anyone. I'm talking about the one that you were getting oral sex from. It does not trouble you that a woman – a player, excuse me, from your team that you were having a sexual relationship with was kicked off the team after she was found in your room; true?

A: Yes.

Q: It does trouble you or it does not?

A: It does.

---

[38] ***Love depo.*** 219:13.

Q: What did you do to man up and fight for her?

A: I felt like we were both -- I think everything that happened throughout the investigation, me being suspended, me losing my job, I just felt like everything was fair.[39]

The truth is that to WILLIAMS' coaching staff right after the elaborate caper, to WILLIAMS, and then in the two- to three-hour inquiry on the afternoon of February 17, LOVE allowed ASHLEY to be questioned, fact-checked and accused while he sat and watched.

LOVE took zero responsibility for the fact that when the team members and student-manager/practice player broke into his room with an illicitly-gained key, ASHLEY was there. Instead, he railed at the team members for not trusting him.[40] If anything, LOVE made it worse for ASHLEY. Per Video Coordinator Logan Seiser, LOVE "was kind of deflecting everything away and deflecting a lot of stuff to Ashley, kind of asking why or if she could prove whether there was messages between her and her supposed college or juco friend that she's talking about. Yeah, I mean, it was really a gaslight sort of display, to be quite honest."[41]

Per ***Rogers***, ASHLEY's right to not be coerced into a secret sexual relationship with her coach was clearly established as of 1998. LOVE's Motion for Summary Judgment should be denied.

## LOVE'S ARGUMENT #2

LOVE argues that he is entitled to Rule 12(b)(6) dismissal or Rule 56 summary judgment on Plaintiff's claim under Title IX. But ASHLEY did not assert a claim against LOVE individually under Title IX.[42] She couldn't if she wanted to.

---

[39] ***Love depo.*** 285:06.
[40] ***Ashley Scoggin depo.*** 203:13.
[41] Transcript of Logan Seiser interview at 6.
[42] Complaint at ¶¶ 85-93.

"The fact that Title IX was enacted pursuant to Congress's spending power is evidence that it prohibits discriminatory acts only by grant recipients."[43] Employees, like LOVE and WILLIAMS, are not grant recipients. Title IX does not support an action against school employees in their individual capacities.[44] Hence, the Third Cause of Action pertains to BRUN only.

ASHLEY SCOGGIN, Plaintiff,

By: */s/ Maren L. Chaloupka*

Maren Lynn Chaloupka, #20864
Chaloupka Law, LLC
1906 Broadway
P.O. Box 1724
Scottsbluff, NE 69363-1724
(308) 270-5091
mlc@chaloupkalaw.net

-AND-

Nathan J. Bruner – NSBA # 23629
Bruner Frank Schumacher
5804 1st Avenue
P.O. Box 2230
Kearney, NE 68847
(308) 455-1046
nbruner@nebraskalawfirm.net

---

[43] ***Rowinsky v. Bryan Indep. Sch. Dist.***, 80 F.3d 1006, 1012 (5th Cir. 1996), *cert. denied* 519 U.S. 861 (1996).
[44] ***Kinman v. Omaha Public School Dist***., 171 F.3d 607 (8th Cir. 1999).

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the above Brief contains 17,659 words. No part of this brief was written using generative artificial intelligence, as I do not use generative artificial intelligence.

*/s/ Maren Lynn Chaloupka*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing instrument has been sent via CM/ECF on this 21st day of October 2026, to the following:

Denise E. Frost
Johnson & Mock, PC LLO
9900 Nicholas Street, #225
Omaha, NE 68114
dfrost@johnsonandmock.com

Bren H. Chambers
Deputy General Counsel
University of Nebraska
3835 Holdrege Street
Lincoln, NE 68583-0745
bchambers@nebraska.edu

Susan K. Sapp
Lily Amare
Cline Williams Wright Johnson & Oldfather, L.L.P.
1900 U.S. Bank Building
233 South13th Street
Lincoln, NE 68508
ssapp@clinewilliams.com
lamare@clinewilliams.com

*/s/ Maren Lynn Chaloupka*