IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ASHLEY SCOGGIN,<br><br>Plaintiff,<br><br>vs.<br><br>BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, and individuals AMY WILLIAMS, TREV ALBERTS, and CHUCK LOVE, JR., in their individual capacities,<br><br>Defendants. | Case No. 4:24-CV-3039 |

---

ORAL DEPOSITION OF
TREV ALBERTS
DECEMBER 4, 2025

---

ORAL DEPOSITION OF TREV ALBERTS, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on December 4, 2025, from 8:02 a.m. to 11:55 a.m., Nilda Codina, Notary in and for the State of Texas, recorded by machine shorthand, from Athletics Department of Texas A&M University, 161 Wellborn Road, College Station, Texas, 77030, pursuant to the Federal Rules of Civil Procedure, and the provisions stated on the record or attached hereto.



EXHIBIT
6
4:24-cv-3039

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:

Ms. Maren L. Chaloupka, Esq.
CHALOUPKA LAW, LLC
1906 Broadway
P.O. Box 1724
Scottsbluff, NE 69363-1724
Phone (308)270-5091
mlc@chaloupkalaw.net

Mr. Nathan T. Bruner, Esq.
BRUNER FRANK
5804 1st Avenue
P.O. Box 2230
Kearney, NE 68848-2230
Phone (308)455-1046
nbruner@nebraskalaw.net

FOR THE DEFENDANT:

Ms. Susan K. Sapp, Esq.
CLINE WILLIAMS WRIGHT JOHNSON &
OLDFATHER, L.L.P
1900 U.S. Bank Building
233 South 13th Street
Lincoln, NE 68508
Phone(402)474-6900
ssapp@clinewilliams.com

Ms. Denise E. Frost, Esq. (Via Zoom)
JOHNSON & MOCK, PC LLO
9900 Nicholas Street
#225
Omaha, NE 68114
Phone(402)685-5647
dfrost@johnsonandmock.com

Mr. Bren H. Chambers, Esq. (Via Zoom)
Deputy General Counsel
UNIVERSITY OF NEBRASKA
3835 Holdrege Street
Lincoln, NE 68583-0745
bchambers@nebraska.edu

I-N-D-E-X

PAGE
Appearances........................................2
TREV ALBERTS
Direct Examination by Ms. Chaloupka..................6
Proceedings concluded..............................203
Reporter's certificate.............................204

E-X-H-I-B-I-T-S

PAGE
Exhibit No. 370 Resume..............................12
Exhibit No. 407 Internet article....................13
Exhibit No. 412 Authorization of Release............33
Exhibit No. 406 Internet Article(Trev Alberts)......38
Exhibit No. 311 Board of Regents Policies...........64
Exhibit No. 402 Appendix C..........................92
Exhibit No. 382 Employment Contract................119
Exhibit No. 307 First Amended Employment Agreement.123
Exhibit No. 332 Coach William's Contract...........161
Exhibit No. 373 Bill Moose's document..............175
Exhibit No. 375 Women's Basketball Team Handbook...178
Exhibit No. 376 Team Handbook......................179
Exhibit No. 314 Skipped............................158
Exhibit No. 398 Trainings..........................190

P-R-O-C-E-E-D-I-N-G-S

THE REPORTER: We are on the record. Today's date is December 4th, 2025. The time is 8:02 a.m.

Would counsel please state their appearances and who they represent for the record, please?

MS. CHALOUPKA: Maren Chaloupka. And I represent Ashley Scoggin. With me is Nathan Bruner, who also represents Ms. Scoggin.

THE REPORTER: Thank you.

MS. SAPP: Susan Sapp. I represent the Board of Regents of the University of Nebraska, Trev Alberts and Amy Williams.

MS. CHALOUPKA: Can we make a record of who is here?

MS. SAPP: Oh, yes. And joining us by Zoom is Lily Amare, one of my law partners and Brent Chambers, General Counsel for the University of Nebraska.

THE REPORTER: Okay.

MS. CHALOUPKA: When Denise pops on just --

MS. SAPP: Well -- and Denise Frost represents Chuck Love. And she'll be getting on

momentarily.

THE REPORTER: Okay.

TREV ALBERTS,

Having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CHALOUPKA:

Q. I get chewed out if I don't ask the witness what their name is.

A. That's okay. My name is Trev Alberts.

Q. Thank you.

Who made the decision to remove Ashley Scoggin from the women's basketball team?

A. I don't recall specifically, who made the decision, other than when the incident happened we immediately engage, that's what we're taught, two things. The Title 9 Office and the Office of General Counsel.

And so athletic department personnel aren't experts in these types of areas. So the Office of General Counsel and the Office of Title IX worked on the process. And we followed their instructions.

Q. When you say, "the incident," are you referring to what happened at Penn State?

A. The entire process.

Q. Okay. I want to make sure that we're talking about the same thing. So incident would include -- when you say entire process, don't make me guess. Tell me what you're talking about.

A. Well, the moment there was a -- an understanding that a, an incident happened --

Q. Okay.

A. -- people are notified.

Q. And what incident are you referring to?

A. The incident I'm referring to is what happened at Penn State in the hotel room between a coach and one of our student athletes, actually. Yeah.

Q. All right. For purposes of today, I think -- and if we -- if we're saying the incident we can have a common understanding that that's what it is. I just don't want to misunderstand.

If you say incident you're referring to something, you know, willfully unrelated or something like that --

A. Well, yeah. Okay. I see what you're saying.

Q. -- shorthand.

A. Right.

Q. So you say, "We immediately engaged."

Who did the engaging?

A. So Keith Zimmer is the sport administrator

for women's basketball. So typically how these things worked is you have a head coach. Sport administrators work very, very closely with the individual sports. Generally, the head coach, if there is an incident, especially on the road when we're not there, and we don't know what's happening, we'll give a call to the sport administrator to make him or her aware. "Hey, this is what's happening."

And so ultimately then, generally, the chain of command is, this happened. And you're hoping -- and fortunately in this situation for us we had Keith, who is a very longstanding, experienced administrator.

And so Keith activated and immediately notified the right folks, who are the experts, to help guide us on what our response should be.

Q. How was he aware, to your understanding, that of the two people that needed to be engaged, Title IX was one and general counsel was the other?

A. It's just general common knowledge in college athletics. We are experts in certain things. We're not experts in these types of things --

Q. What about --

A. -- so we don't try to play expert.

Q. Apologize for interrupting.

What about this incident made Title IX one of

the people to contact as opposed to, you know, grounds and maintenance, or something like that?

A. I mean, I don't know specifically, other than, you know, it probably follows logic and common sense, right, that this type of situation, which would be very unusual, right, in college athletics, that these -- this incident.

So I can't speak for Keith. I'm not sure why, you know. What I recall is Amy being very concerned about her team and the feedback she was getting from her team. And her team, very upset. So that alerted Keith, when she contacted Keith.

Q. When Keith contacted the two offices that needed to be engaged was Ashley's -- Ashley Scoggin's status at that time removed from the team?

A. That I don't -- I don't think so, no.

Q. Okay. What's your understanding of when she was removed from the team?

A. I can't honestly tell you that I know that.

Q. What's your understanding of the reason that she was removed from the team?

A. I think my understanding was that there was a real concern from the rest of the team about the culture of the team and their ability to move forward as a team.

Q. Okay.

A. And that was a -- you know, I'm just -- I'm trying to -- I think it was a very emotional time for a lot of people. And the feedback that I remember hearing was the team said "We will not play if she's -- "and we will not play if Chuck is on the bench."

Q. So is it your understanding that the reason for her removal was -- I'm trying to not be too shorthanded in this, but team pressure?

A. I can't speak for Amy. You know, we generally -- now, there are certain circumstances, right. But we allow coaches to create their own roster.

Coaches are accountable to, you know, winning and losing. And they get to create their roster. And I think if -- you know, if I recall right it was Amy's strong feeling that there was no possible way, you know, that the team could progress in that scenario.

Q. Okay. And so -- and I know that your understanding may not be worded the same as someone else's. So I'm -- please understand I'm not trying to, I guess, compare answers at this point. I'm just trying to see how it unfolded.

Was -- am I correct in understanding that your understanding was the reason for her removal was

the team's sentiment on whether they could play with her still part of --
A. That would be unfair to say, Counsel. I -- listen, when this happened, we are smart enough in athletics, in every athletic department and mostly in the country, to know what our role is and what our lane is.
We turn it over to the Office of Title IX and Office of General Counsel. And we follow their lead. That's it.
Q. Does the Office of Title IX make a decision to remove a player from the team?
A. They make recommendations, yes.
Q. Okay. Is it your understanding that the Title IX office recommended removing Ashley Scoggin --
A. I am not aware of that.
Q. Okay.
A. I do no not how that worked.
Q. Same thing with Office of Legal Counsel.
Is your -- is it your understanding that there was a recommendation from counsel to remove Ashley from the team?
A. I cannot confirm that. I do not know that.
Q. Okay. So I've asked our court reporter to mark Exhibit 370.

MS. CHALOUPKA: Can you hand that to witness, please?

(Exhibit No. 370 marked.)

Q. (BY MS. CHALOUPKA) It should be familiar because it's your resume. And -- or at least I think it is. I guess my first question about it is, is it your resume?

A. Well, it's not really a resume, but yeah, it's a -- yeah.

Q. Or a professional summary?

A. Yep.

Q. How current is it? Is there anything that, if you loaded up today, you would add or subtract?

A. Well, only -- probably since my time here.

Q. What would you add, what would you subtract?

A. Well, I have not been the athletic director at Texas A&M for two years.

Q. Okay.

A. So there is --

Q. So you would change the dates?

A. Well, there's -- you know, what -- what's listed here is things that our staff engaged in and accomplishments of folks. We probably would have some in the top section of Texas A&M.

Q. Is there anything that you would add to your

resume now that pertains to Title IX? Like any writings, presentations, policy initiatives, anything like that?

A. No.

Q. Okay.

MS. CHALOUPKA: Let me mark -- this is going to be 407.

A. And you can just go ahead and give it to the witness. 407.

(Exhibit No. 407 marked.)

Q. (BY MS. CHALOUPKA:) Is 407 familiar to you?

A. I don't know what this is.

Q. I found it. And so I don't know, either, other than it's on the magical internet and -- which is a source of all reliable information. So I thought I would print it and ask you about it.

Do you have a -- you know, some sort of a relationship with this --

A. I do not have any agent. I don't have an agent.

Q. Right. Yeah.

A. I have no marketing agency.

Q. Okay.

A. I think a -- in my 17 years of doing this I made one presentation, but I do not -- I've never -- I

don't know who this is.
Q. This claims that you're speaking fee is 25, to $40,000.
Did you know you had that?
A. I did not know I had that.
Q. Now you do.
A. But maybe I need to do more of this.
Q. I was going to say now that you do -- and it also -- you know, it indicates, whoever wrote it, that your speech topics are leadership and action. So I was going to ask you about that presentation.
Do you have a presentation on leadership and action?
A. I've never -- I do not have a leadership and action presentation. And I'm sure what some -- what these folks do -- and we should go through there. I have no contracts, no agreements with any of these people. I'm sure they're putting stuff on there. If people wanted, then they would call me. I don't know.
Q. Of the 25 to 40, do you think you would get any of it --
A. Probably very little.
Q. -- from this outfit. Since they haven't told you that they're offering you up for sale?
A. Who is this again?

MS. CHALOUPKA: And please let the record reflect I am laughing as I'm saying this.

A. What is the company, though? I'm serious. WSB?

Q. (BY MS. CHALOUPKA) Some Washington Speakers Bureau. You've learned something today. You're welcome.

A. Okay. I need to get on that.

Q. Do you -- okay. Do have a -- I mean, I think you said you've spoken maybe a couple of times.

Did you give presentations when you were at Lincoln?

A. Yeah, there would be occasion when someone would say, you know, "Can you come speak to us about any variety of topics?"

Q. Yeah.

A. And -- you know. So I would share.

Q. Rules or organizations?

A. Yeah. A lot of times they would be corporate donors. Folks that --

Q. Okay.

A. -- you know, were already invested in the university, that you would make appearances on their behalf. But I didn't do a lot of it. You know, it was hard enough for me to do the job that I was supposed to

be doing.

I didn't do a lot of -- a lot of my colleagues are much more engaged in this space, speaking nationally, being on panels, doing all that.

Q. That's part of what I was wondering. Yeah.

A. Yeah, I don't -- I just -- I didn't grow up through the traditional route of athletic directors to -- you know. So all that connection stuff -- so I never really -- I've never really done that.

Now I am going -- I am going to do one pretty soon, that I was asked to do around the National Football Foundation deal, but I didn't do much of those.

Q. I'm guessing then the answer to my next question is, had you ever spoken on Title IX issues is probably no.

A. No.

Q. Okay. How would you describe -- you know, as you were saying, you didn't grow up in, you know, the traditional channels of this.

As it has evolved, how would you describe your approach to leadership?

A. Yeah. Well, my approach I know what I'm an expert at. And I know what I'm not an expert at. And so, you know, these jobs are evolving and very

challenging. And mostly it's driven around business, right.

It's -- so my job is to -- you know, obviously, you have to have a good team that is managing certain things. But you've got to find a way to have the resources necessary to fund the programs where it's not, you know, a challenge to the university.

And then you use university assets where they are so there's not redundancies. We do a lot of that. There isn't a separate legal counsel team within athletics.

That's just from central administration, Vernor Hall. The Title IX office -- we don't have a Title IX office. Now, we may have a liaison in athletics, who's the person that creates the relationship with campus.

But, you know, we -- that -- that's -- you know, it's -- you know what you're an expert in. Frankly I'm not sure what I'm an expert in. But I'm certainly not an expert in Title IX. And I'm not a lawyer.

Q. Did you feel, when you were at Nebraska, that your leadership approach fit your organizational structure and that was at the Department of Athletics?

A. According to whose evaluation?
Q. Yours.
Did you feel like you were a fit? The way that you approached leadership, did you feel like it fit within that structure?
A. Well, I hope so, you know. You know, you didn't get a lot of feedback on that, so --
Q. Do you feel so far that your approach is a fit at A&M?
A. Well, you hope so.
Q. Hope so.
A. You know. But I've not had anybody say one way or the other.
Q. Have you ever heard the term "servant leader"?
A. Yes.
Q. Is that a term that you would embrace for yourself?
A. Yes.
Q. How do you understand that term to mean?
A. Well, you -- you're here to help and serve other people.
Q. Me, too.
Do you expect your coaches to be servant leaders?

A. Yes. You hope.
Q. How does that -- we hope?
A. Yeah.
Q. How about your athletes?
A. It would be great if they were, but they're younger.
Q. They're younger. It's --
A. So they're growing.
Q. Maybe I should ask that question more gracefully.
Do you hope that your athletes are growing into servant leadership?
A. Yeah, it would be wonderful.
Q. If I understand it correctly, your son serves in the military, but you have not.
Am I correct on that?
A. Correct.
Q. Any other family service in the military besides your kid?
A. My daughter is married to a West Point graduate.
Q. Okay. How did you find all the West Pointers for one family?
A. Well, it was my son's -- he just decided he wanted to go to a service academy. And he chose West

Point. It was really driven by him.

Q. And the daughter's connection there, does she and her husband --

A. Yeah, Chase knew Riley. Yeah.

Q. Got it. When you were in college, what did you major in?

A. Communication studies.

Q. And how -- as you look back on it now, how do you think your college career influenced your approach to athletics administration?

A. Well, I think it -- you know, it has to have an influence, right. But I think, you know, it's the total picture of when you leave in 1993 until you arrive back in 2009.

So there was a whole lot of professional experiences, but certainly my experience as a student athlete in Nebraska was important and helped to shape it.

Q. How so? What influences took root and -- that you can look at today and say, "I think this is something that I learned or that I came to appreciate as a student athlete"?

A. Well, it's in any university. You're part of a team. You could be part of a team. You learn how to overcome adversity. The beautiful thing of athletics

is you get knocked down and you learn how to get back up. And so you have the -- an advantage over the rest of the world because most people have never had to go through that.

So I think that's really what it is. I think it's also getting, you know -- yeah. I just think it's just, you know, getting exposure to a wide group of people, maybe outside your normal sphere of influence. I think there's a lot of those types of positives.

Q. In -- I think I know the answer to this, but I also know I have a large tendency to get things wrong.

Which years did you play?

A. Well, I got there in 1989, but red-shirted my first year. So I was there -- well, I was there four and a half years because I graduated in '04, but I had five years of eligibility. So I left January of '94.

Q. Okay. That was going to be my next question, was how much eligibility?

A. Yeah. Yeah.

Q. During the years that you were with the team, how many of your teammates were removed from the team for one form or another of misconduct?

A. I don't know the answer to that. I mean, there were --

Q. Do you remember if there were any?
A. Oh, yeah.
Q. Who stands out? I mean, I know that LP's domestic assault was after your time.
A. Yeah.
Q. But he was suspended, not removed, right?
A. Yeah. I don't know -- I wasn't involved in any of that decision-making. I don't -- you know, I don't list individuals, but there certainly were guys. I mean, there's a wide range of different behavior, whether it's, you know, academics, failure to --
Q. I'm focusing on the misconduct end of this.
A. Misconduct?
Q. Because I know academics is a full separate -- not separate, but it's not an area that I'm focused on.
A. Well, how do you define misconduct? I mean, it's like failing a drug test?
Q. Violation of rules.
A. Rules. Yeah.
Q. Criminal behavior, et cetera.
A. Yeah, we had several of those.
Q. Yeah.
A. But I'm not sure --
Q. But they were removed or were -- permanently

removed or were they just suspended pending something or other?

A. That I don't know. I don't know if they left on their own. I don't know if they were suspended by -- or kicked out. I don't know. I know -- I knew of the suspension obviously, but then certain guys didn't come back. So --

Q. Right.

A. Yeah.

Q. So I'm taking you back in time. And we're about the same age. So I will grant a little grace for early onset Alzheimer's; that comes to us occasionally at this age.

If you recall -- and I know your understanding you at the time was as a player, not as a coach or coaching staff.

A. Yeah.

Q. To your understanding, who determined whether a player was going to be removed as you perceived it, as a 20-year-old?

A. Well, at that time -- you know, when you're a player I suppose, you know, the person that you interact with at all is your coach. That's it. What the coach is communicating, or who they're communicating with or being directed by, I suppose that

when you're 20 years old, you really don't know the answer to that.

Q. That was kind of what I was wondering --

A. Yeah.

Q. -- is how much information would you get. And obviously football is going to be one of the largest teams there.

A. Yeah.

Q. But would it -- you know, would it -- if something like that happened, would it come to you through the head coach? Would it come through your position coach? Would it -- you know, would there be a formal communication of saying, "Okay team," you know, "Mr. X is no longer going to be involved with us, carry on," or, you know, whatever the communication would be, or would you just kind of intuit it? As best you recall.

A. As best I recall, I don't recall -- I really don't recall how any of those situations were handled. You know, it was also just a different time.

Q. Right.

A. You know, there were -- it was just a -- it was a different time. There was no internet. There was no cell phones. There is no social media. So I don't know.

But I don't recall formerly having coaches, you know, doing a lot of communication about it, but I just don't know. I'm sorry.
Q. As I said, I grant grace for the vagaries of the 55-year-old brain, but --
A. I was just trying to survive to be honest with you.
Q. You smile as you say that, but tell me what you mean.
A. It was hard.
Q. Yeah.
A. It was hard.
Q. Well, you were a full-time player, full-time student?
A. Yeah. You know, I don't have a lot of time to -- I wasn't worrying about -- I was just trying myself to survive in the classroom, and survive, you know, as a player.
Q. Was there ever an occasion that you recall that the team, or a portion of the team, was refusing to play or threatening to refuse to play?
A. In the football team?
Q. Correct.
A. Not that I recall.
Q. Which years were you a captain?

A. Just my senior year.
Q. Just senior year.
What was the captain's relationship to the coach at that time?
A. Well, I mean, how do I describe it? You know, the -- Coach Osborne had what was called the Unity Council.
Q. I was just going to ask if that --
A. Yeah.
Q. -- was developed while you were playing.
A. Yeah, I was -- it was I think in my junior year. May surprise you or may not. I wasn't on the Unity Council, which is weird.
But I -- yeah, I don't -- there was no real formal roles for the captain. The Unity Council was actually the group that would -- the coach kind of empowered when you want to have a student voice. You know, "Hey, what is your experience like, what" -- you know, those types of things.
I mean, our general role was we spoke to the team before the game after the coaches left. And we went to the mid-field for the coin flip. That was the extent of it.
Q. And you got to be captain?
A. Yeah. And it was a -- it was a team. The

team voted on it.
Q. I take it --
A. That's why it was considered an honor.
Q. I take it the captain did not tell the coach what to do?
A. No, no. I will also say this. Back to the world was different. You know, in my day you did what -- when my dad said, "Do it because I said so," you did it. When the coach says, "Do it," it's different today. Kids have a -- more of a voice.
Q. How so?
A. Does that makes sense? Well, just -- I mean, the coach is -- what I think coaches have learned is that student-led leadership on the team, if it's good, you might have a better chance of winning.
Q. And what if it's bad?
A. Then you have to do it as a coach.
Q. Okay. And when you do "it," when -- meaning what? Are there times that the coach has to say, "We're not doing this?"
A. I'm talking competitively. Yeah, I'm talking like culture competitively.
Q. Okay.
A. Like --
Q. I understand.

A. -- you know -- so --
Q. Saying that there's a negative element here, and "I as the head coach -- I'm not going to endorse this."
Is that ever -- you know, is that something you would expect of a head coach, if there's a negative element amongst the team?
A. I would expect that if there are cultural issues in the team, that the rest of the team has concerns with, that he or she would be willing to meet with them, work with them, to try to find a solution, yeah.
Q. If they can't reach a compromise, what options does the coach have?
A. Well, generally, then, what a coach would do is --
If he or she is struggling with it, they will then work with the support administrator. That's part of what the reason a support administrator will do, especially if they're a veteran sport administrator, is they work with a coach to try to help solve through the problems. And generally there's a -- it just keeps elevating if you can't find a solution.
Q. Have you found in your years -- now, I'm including at UNO now, as well.

But through your positions as athletic administrator that good leadership from the top helps to prevent these kinds of -- you know, a negative element from taking root and starting to fester?

A. Yeah. I mean, I think you can make that argument.

Q. Did you ever have thoughts about career -- a career in coaching?

A. I did for about five minutes. When I finished playing I met with Coach Osborne and I had lunch at the training table. And I asked him about coaching. And he said, no, which I took as that meant I would be a bad coach.

Q. Oh.

A. No, he said that "You are a family guy and this would not be the right scenario for you." And I said, "Okay." So that was over.

Q. Out of the coaches that you worked with in your playing years, so I'm including NFL as well, who do you maintain contact with the most?

A. I have --

Q. Currently?

A. -- occasional conversations with my position coach. It's kind of died down since I came to Texas A&M to be honest with you.

I've had some communication with the defense coordinator, Charlie McBride, Tony Samuel. Of course Coach Osborne. Not a lot of communication with -- my NFL career was so short and unremarkable. Not a lot of communication with anybody from the Colts.

Q. Of the folks that you've just mentioned, is there anyone that you look to more than the others as, you know, if I had a tough issue that I was thinking through, you know, who would I go to as in north star?

A. Yeah, for me, you know, most of it -- what I always did was -- it wasn't specific to coaches. But whether I was at UNO or -- and even here, I was -- I actually got this idea from Mr. Buffet.

He said, "You need to create a kitchen cabinet." And so you get four or five people that -- and it's not very often. But you have four or five people, that when difficult things come up you can sort through them with them. Most of them wouldn't be these types. They're all business-oriented things.

Q. Who's in your cabinet these days?

A. People here. Regions donors.

Q. In the -- in this area?

A. Yeah.

Q. And when we say, "here," we're talking about Texas.

When you were at Nebraska, who was the salt and pepper you would reach for?
A. Donors.
Q. Okay. In particular -- was there one that you would reach for more than the others if you needed a north star?
A. No, no. I mean, you know, part of it is, you know, at that -- those -- the conversation I was having with them is we were working on very big projects, like the stadium project.
Q. Right.
A. It would have been all business projects. You never -- you know, none of these types of conversations would have been with --
Q. Okay. What -- when you your in college, was there an allegation that you had committed any kind of sexual misconduct?
A. Not that I'm aware of.
Q. Between '89 and '95, did you have any contact with campus police?
A. The only contact I had with campus police was the Scott Baldwin situation.
Q. Okay. And at that time you were a player?
A. Yeah.
Q. Were you -- did you have direct involvement

in that or was it more of a what do you know kind of --
A. No, I was directly involved in that.
Q. Directly involved.
Outside of Mr. Baldwin's bad situation, was there any claim that you had committed some kind of misconduct toward a female student athlete?
A. No.
Q. Did campus police contact you to request an interview for any purpose other than the Baldwin episode?
A. No.
Q. Anyone in the Department of Athletics ever advise you that campus police was making inquires about you or saying that police wants to visit with you?
A. No.
Q. Did you ever hire counsel, or was counsel hired for you, between '89 and '95?
A. No.
Q. Hal Anderson was not some -- you didn't get to make trip over to Hal Anderson's office in those years?
A. I was aware of him, but I -- no.
Q. Were you ever accused of violating campus rules?
A. Not that I'm aware of.

MS. CHALOUPKA: This is going to be Exhibit 412.

THE REPORTER: 412?

MS. CHALOUPKA: Yes. I should have gone to the court reporter first.

THE REPORTER: Counsel, do you mind if I ask you -- could you speak up a little?

MS. CHALOUPKA: Yes.

THE REPORTER: Maybe I'm hard of hearing. I had a hard time hearing you.

MS. CHALOUPKA: I have a nasally voice. That's probably --

THE WITNESS: Here comes the train.

MS. CHALOUPKA: And now I really have to yell.

(Exhibit No. 412 marked.)

Q. (BY MS. CHALOUPKA:) Would you be willing to sign an authorization for a release of information from campus police? And I will send everything I get directly to Ms. Sapp.

Is that something you're willing to do?

THE REPORTER: For what, I'm sorry.

Q. (BY MS. CHALOUPKA:) Is that something you would be willing to do?

MS. SAPP: We can take this under

advisement, okay? I don't -- he's never seen this before, never considered it. I think he's entitled to get --

MS. CHALOUPKA: Okay.

MS. SAPP: -- legal advice on whether he wants to allow that or not.

MS. CHALOUPKA: Okay. That's a fair solution.

Q. (BY MS. CHALOUPKA:) When you finished your playing career, am I correct that you did some work in investment banking?

A. Well, I didn't really do any work in investment banking. I was there for a month, yeah.

Q. You were not Jaime Diamond?

A. No, no, no, no.

Q. Okay.

A. And I didn't know who that was at that point.

Q. A month. I take it that you quickly concluded that this was not your professional trajectory?

A. No. Actually, I got a phone call from my football playing agent, that the president of CNN had called and asked if I would consider joining their sports team on commentary for college football.

Q. So your pivot into broadcasting, which

actually would connect to your college major, actually came pretty quick after you were done playing, it sounds like?

A. Yeah.

Q. Where were you living down there?

A. Lincoln.

Q. Lincoln. Got down playing, came back to Lincoln, spent a month investment banking, and then moved into communications again?

A. Yeah.

Q. What -- I take it -- this is a stupid question, but I take it that that was an enticing offer.

What was it about communications that spoke to you?

A. It wasn't so much about communication. It was more, you know, my enjoyment of college football.

Q. Being paid to talk, analyze --

A. Still have some connection to it and --

Q. Okay.

A. Yeah.

Q. Did you stay in Lincoln while you were working in broadcasting?

A. I did the first year, yeah.

Q. And then moved to --

A. But it was challenging to get from Lincoln to Atlanta easily. So we were only there a year.

Q. I lived in Atlanta after Lincoln, as well. So I recall the -- and was before they had suitcases that rolled. So I don't know why it took them so long to invent those.

In your broadcasting career, did you supervise staff?

A. No.

Q. Did you ever have to prepare a budget?

A. No.

Q. Okay. How would you describe your roles -- I know you worked for a couple of different organizations -- your roles when you were working in broadcasting?

A. I was an independent contractor.

Q. Okay. So you would arrive when you needed to.

What preparation would you have to do for that, other than --

A. We --

Q. -- being informed on the state of college football, but --

A. Yeah, it just depends on -- it depends on what you're doing. If you're doing studio shows, then,

you know, you're making phone calls to coaches, various topics.

If you're doing actually games, then, you know, you're -- you will have sessions when you're interviewing the coaches. You're talking about specifically the game. So it was just different.

You know, when I first started it was just studio work. So that was mostly done from home. We would have phone calls with the producers and the directors to talk about topics.

And then you'd make some phone calls and prepare yourself for when you went down. And then you'd get a rundown of different blocks and -- you know.

And then as you progress -- and then you're doing games. And at one point I did studio shows two days in the middle of the week. I did a college football game on CBS on Saturday. And I did an NFL game on Westwood One radio on Sunday.

Q. What was your weekend during those years?

A. I didn't have one.

Q. Was it -- I was going to say was it Monday afternoon from 3:00 to 5:00 or --

A. Yeah. I think it was Monday.

Q. No, because you had a game?

A. Monday -- I would get back either Monday at noon on Monday night. And I would leave first thing Wednesday morning.
Q. Which aspect of broadcasting -- you -- you've told us about, you know, studio work, game work, et cetera.
Which one did you enjoy the most?
A. Probably the games.
Q. How come?
A. Just -- you're just around the environment. The game --
Q. Yeah.
A. You know, the studio is just in a 60-degree dark little room with three cameras. It's not real.
MS. CHALOUPKA: So I will -- I'm going to pull out -- this is going to be Exhibit 406.
(Exhibit No. 406 marked.)
A. What -- that's a great headline.
Q. (BY MS. CHALOUPKA:) Yes.
A. Thank you.
Q. If I do an internet search on myself, I'm sure I'm not going to like what I find. So yeah, this is an article that again comes from the magic internet. I had highlighted a line in here on the first page.
It said, "We are trying to be three guys in

the frat house talking football." And I'm smiling at you as I say that. Tell me what you had meant by that at the time.

A. Well, first of all, I wasn't in a frat. So I don't know what that is. I don't know.

What year is this?

Q. You had a lot of stuff to do those years.

A. 2000. 20 years ago.

Q. Yeah.

A. The idea is, you know -- it's a level of comfort. It's -- you know, you want to be able to have the kind of chemistry with the host and the other analysts that you're just, you know -- it would be like water cooler talk that would happen ordinarily for other people as they talk about football.

Q. You're not being asked to give opinions on what the Federal Reserve is going to do this week or something like that?

A. No. No.

Q. Were you -- I think you were -- you're starting to give me the answer to this.

But I take it you were more on the commentary end, less in the investigative journalism end?

A. Yeah. There was no investigative journal.

Q. Okay. I was going to ask.
Did you ever report on relationships between coaches and athletes in the years that you worked in broadcasting, whether they were good relationships, abusive relationships, anything like that?
A. Generally, we did not. Those were -- that was not part of our role.
Q. Not your role. Okay. It was reported, I think in that article, but some other places, too, that your termination from ESPN came after you had refused to report for work.
Is that a fair summary? I understand that there was complexities, but is that a fair summary of it?
A. I would say it's not a fair -- I mean, it's -- I won't go into all the nuance, but, you know.
Q. Who made the decision to terminate your employment? You don't have to give me the name if you want, but what was the role that made that decision?
A. I don't know.
Q. Do you recall how much time passed --
A. It was a mutual decision.
Q. Okay.
A. Yeah.
Q. Do you remember how much time passed between

the decision that you weren't going to go to work and the decision to separate from ESPN? Was it like an instant thing? Was it over weeks?

A. One more time. I'm sorry.

The question was what?

Q. How much time passed between whenever you were supposed to report for work and when the decision was mutually made, that we're going to go separate ways? Was it a matter of hours, days, weeks?

A. I would say days.

Q. Okay.

A. Yeah.

Q. Was there ever a determination by anyone that your separation was wrongful, that you should have been retain and that the position that you had taken was a -- was the righteous position?

And when I say determination I mean by -- either internally at ESPN, by a a judge, an EEOC, anything like that?

A. No.

Q. Okay. Did you feel like that was a situation that could have been averted with different leadership over your head?

A. Probably not.

Q. Probably not.

How come?
A. It wasn't a good fit for me.
Q. Okay. All right. In the years that you have been in executive positions, so since 2009 --
A. 2009, yeah.
Q. Yeah. How -- have you had employees who did not report for work or, you know, said they're not going to do whatever job it is they've been tasked to do?
A. Not that I can recall.
Q. Okay. Do you feel like your approach to leadership has helped to head off situations like that --
A. Oh, I don't know.
Q. -- I'm guessing that not every single person that has worked for you has been sunshine and puppy dogs, and --
A. Well, no. No. I mean, I think you --
Q. Yeah.
A. You know, hopefully you grow and you learn. And, you know, I mean -- but yeah. I mean, I -- it's hard. Yeah, not everybody -- when you're in a leadership position not everybody likes you.
Q. I've heard that.
Do you feel like your approach has helped to

head off situations where somebody is drawing a line in the sand on you and saying, "I'm just not going to do what my job is?"
A. I don't recall having that experience.
Q. So between aught 5 and aught 9 you were out of ESPN, what companies were you working for in those years before you went to UNO?
A. I went from ESPN to CBS Sports Network, but it was called CSTV at the time.
Q. Okay.
A. And then they were purchased by CBS.
Q. Okay. Was the internet and streaming beginning to be invented in those years?
A. Yeah.
Q. And more channels than the 13 that I grew up with?
A. Yeah. Yeah. You were seeing some, you know, changes in how live sporting events were distributed. Definitely some changes, yeah.
Q. I was going to say I know there's obviously been evolution since then.
So you were with CST?
A. CSTV.
Q. CSTV.
A. It was a start up that saw an opportunity

that ultimately CBS purchased.
Q. And then got eaten up by CBS?
A. Yeah.
Q. Then is that who you were with when UNO's position came calling your name?
A. Yes.
Q. Okay. During your broadcasting career, were you ever accused of sexual harassment, sexual misconduct, anything like that? I have read a bio of you that said -- I wrote it down.
"After turning down overtures from his alma mater to work in athletics administration Mr. Alberts got a call from University of Nebraska at Omaha about the director of athletics job."
Had you been receiving overtures from UNL to work in athletic administration pre-2009?
A. Yes.
Q. What were those?
A. In 2008 Coach Osborne was name interim athletic director. And he called me and asked me if I would consider working in college athletics.
Q. And you said no to Tom Osborne?
A. And I went through the whole process with him. I participated with him in the hiring of Bo Pelini.

Q. Okay. What was your role?
A. I didn't have a specific role. Just I --
Q. Advisor or --
A. Not advisor, but I assembled as much information as I could. I was trying to be helpful. It was he and Harvey Pearlman's hire, but he asked me to come to the Atlanta Hilton down by the airport to meet with he and Harvey.
And so I did. And I didn't know why I was there, you know. And so -- but in the end, you know, the coach was still the interim. And, you know, at one point -- I didn't know what the job was going to be. I didn't know what the salary would be.
But he wanted me to come to the press conference for Bo Pelini. So I went to Lincoln, to the press conference. And of course all the media thought I was there to be a coach. I wasn't there to be coach.
He wanted me to meet with several people in the department, administrators, and a football coach. Again, I had never worked for anybody but myself. So when I met with some of the folks it was pretty clear they didn't want me joining the athletic department.
Q. How so?
A. Well, at that time I think there were several in there that hoped that they would become the athletic

director.

Q. Okay.

A. I wasn't even --

Q. That they succeed Coach Osborne?

A. Yeah, because coach wasn't -- he was an interim.

Q. Okay.

A. No. But nobody knew at that time he was going to serve for five years.

Q. That was going to be my next question. Go ahead.

A. And so after just -- it was just hard. It was like middle of the year. It was January, I think. And our kids were in school. And I just -- I told them, I said, "I can't -- I'm not coming."

Q. The Mojo was not right?

A. It didn't feel right.

Q. So your involvement at that time was -- it sounds like it was limited to the Pelini search and hire.

And then you backed away?

A. Moved on. I went back to CBS.

Q. Yeah. So how did UNO reach out to you?

A. I had a Board of Regents member reach out and say, "Hey, you probably was aware that it didn't work

out in Lake Edinson." You know, "Would you consider serving your university?"

And I said, "Well, you're going to talk about UNO." I didn't know anything about UNO. I didn't even know they had an athletic department. I didn't -- you know.

So they asked if I would consider it. So my wife had softened a little bit about moving. She really liked Marietta, and so --

Q. She liked having spring?

A. Yes. She liked --

Q. Which doesn't exist?

A. Like she likes it here.

Q. Yeah.

A. So she -- so we went and, you know, I think they had -- you know, they had some -- again, I was naive and I probably didn't understand the challenges they had, you know. They had very significant financial challenges.

And I didn't realize that until after I took the job. But -- so, yeah, I -- primarily because I was tired of the travel and tired of missing all of our children's events, I took a job that paid half as much on a two-year contract, and gave up the four-year contract.

Q. And stayed for eight years? Well, no.
A. 12.
Q. 12. Yeah, my math was not my major in college.
Did -- who was the Regent that had made that first contact to you?
A. I think it was Tim Claire.
Q. And did he become a -- like a point of contact for you after you took the job? And I don't know, liaison might be too fancy of a word for it, but --
A. No. He -- you know, the board -- it's always a challenge. It's the same challenge here. The board is technically the board who just hires the chancellor or president.
And then they're supposed to -- but in athletics it's hard because fans -- fandom and donors, and -- so there is some interaction. But really, they were very limited regent athletic director interaction at UNO.
(Train horn blasting.)
Q. (BY MS. CHALOUPKA:) At UNO did you make reports to the Board of Regents on a routine basis or --
(Reporter clarification.)

BY MS. CHALOUPKA:
Q. Did you make reports to the Board of Regents when you were at UNO?
A. If we were asked to make presentations we would. It was very atypical.
Q. Okay. That was going to be my next question, is that you weren't scheduled to present at each monthly meeting or anything like that?
A. No.
Q. Okay. Did you go through a formal process to step into that role at UNO, as in like a background check, interviews, thing's like that?
A. I did do all the interviews. I had to interview with the chancellor. I do not know. I'm assuming and I'm sure that the -- you know, any -- everybody that the university hires, they do -- they have policies about background checks and all those types of things.
Q. Do you remember whether you signed releases for background checks at -- back in 2009?
A. I don't know.
Q. Were there -- do you recall whether there were other applicants for that position?
A. I think so. I think publicly there were -- they listed maybe three other individuals.

Q. Did you ever have a moment of thinking, "I'm going from having never worked in athletic administration to now being the director of athletics for a D2, you know, viable D1 university, is this audacious to think" --
A. Not really.
Q. Not really. Tell me where your confidence came from.
A. Well, I knew I would do the work to learn.
Q. I would guess it was drinking from the fire hose?
A. Yes.
Q. And was the fire hose ever shut off in the 12 years you were there?
A. It slows down. You certainly learn, you know, but -- you know, it -- college athletics changes every day. You never -- you know, it's always evolving. It's always a challenge.
Q. NIL was a twinkle in NCAA's eye back in 2009, if that?
A. Yeah.
Q. It was --
A. We had a chance to act, but we didn't, so...
Q. Yeah, I was going to say it was Ernie Chambers asking the legislature to pay athletes back

then.

When you became director of athletics at UNO, did your duties include preparation of a budget?

A. Yes.

Q. Had you ever prepared a budget for anything other than your household before?

A. No.

Q. So how did you learn to do that with the fire hose on?

A. Well, you know, at universities obviously it's -- you don't work in the silos, you know. You have to -- of course, university has a full business and finance --

Q. I was going to say a finance team?

A. A team, yeah. So you work with them. You try to anticipate what revenues are going to be from the NCAA distributions. A little bit different there. I think at the time, 60 percent of the budget was subsidized through university operating funds, student fees, taxpayer dollars.

And so that's what led to all of the work with the folks in the community about how do we find a way to solve the financial challenge that UNO had. But all of the budget preparation at UNO was a collaboration between athletics.

We would have a business -- we had a business manager. And her job was to, you know -- but she was in daily contact with the business office at UNO.

Q. Would I be correct in understanding what you're telling me, that your role in the budget would be more of the vision? You know, what do we want to accomplish with this budget as opposed to the number crunching?

A. Yeah. My job is strategy. My job is trying to find new creative revenue streams. My job is to figure out, you know, how do we reduce expenses, eliminate redundancy of expenses where appropriate, understand where athletics is going, understand where the membership is, is there an opportunity for us to, you know, strategically position ourselves.

And then, you know, through facilities. How are we able to generate more self-generated revenue. The goal was to flip the 60/40. 60/40 subsidized versus, you know, self-generated and how do we get to a point where we're generating 60 percent of the revenue and subsidize 40 percent.

Q. Were you able to do that at UNO?

A. We did.

Q. And how did Title IX fit within your UNO director of athletics responsibilities?

A. Yeah. So same thing that would be -- as here or in Lincoln. You know, Title IX office specifically would handle -- but we have to have a working understanding of how Title IX works relative to, you know, the three prongs and the mandate about participation and undergraduate profile, and then what our athletic department looks like.

So in our planning, especially as we -- when we looked at Division 1, you know, it was the participation opportunities and the numbers. Those are the types of things we would be working through.

And then you worked with your perspective conference of a summit league in the NCAA's. This is a -- you know, it was a real coordinated effort between everybody to understand, to make sure that you're compliant with Title IX from an athletics participation perspective.

Q. Before you took that job, had you had reasons to handle Title IX issues in your -- you know, any previous part of your life before 2009?

A. No.

Q. How did you get learned up on it? Did you have to take some classes? Did you open the big book of Title IX -- or put it on audio and start listening, or how did you get up to speed on what you knew you

were going to need to know?

A. Yeah, there's -- you know, I mean, there -- there's a lot of -- when you say Title IX, there's a lot of different nuances to what Title IX is, right.

Q. Right. It's huge.

A. There's -- but from -- mostly from an athletics perspective, what we handle, and what we still do here, right, is you're trying to understand what does the undergraduate population look like and how do you reflect that in athletics.

And there's three ways you can get there, right. There's three prongs. So it was actually the process of how we -- working with the community group it was more self-taught to be quite honest with you. Because I was working with business leaders and solving the business strategy.

And on the other hand I had a three-ring binder that I was educating because, you know, they didn't understand Title IX, had never heard of it. And from their perspective, straight businessmen and women, they thought --

Q. "They" meaning the business leaders?

A. Community folks, right.

Q. Okay.

A. We would look at the financials and say,

"Well, look, this is pretty easy, we should just drop every sport, but hockey because it's the only one that makes money."

So I had to be prepared to help them understand that that's not possible. There's sports requirements. There's -- so, you know, a lot of that was, you know -- the NCAA does Title IX training.

I mean, there -- there's -- it's not the Title IX training that -- you know, that the university does in terms of that specific stuff, but it's more relative to being compliant with the federal mandate. So I would say it's probably a combination of those types of things.

Q. Outside of what you just described, did -- in the years that you were serving at UNO, did you have any Title IX issues that -- you know, that required more than just making sure that you're compliant?

In other words, did anyone make a claim that in some manner their rights under Title IX were not being heeded?

A. I don't recall.

Q. Okay.

A. But that doesn't mean there wasn't. I don't remember.

Q. How did relationships between coaches and

athletes fit into your responsibilities at UNO?
A. You know, no different than other places in terms of how do --
Q. How often did you have to manage issues between coaches and athletes at UNO?
A. From time to time.
Q. Let's say in a year.
A. I mean, it -- well, it was different there because we -- you know, we did some pretty tough stuff. We discontinued sports.
Q. Right. Right.
A. So those challenges were different than your typical day-to-day, you know, because you're dealing with affected student athletes, parents, families, the whole university process.
Q. Expectations?
A. Yeah.
Q. Was there ever a time that you -- while you were at UNO, that there was an allegation of abuse of any sort by a coach?
A. I don't think so.
Q. How about an allegation of rule violations by a coach, whether it's NCAA rules, some other rules?
A. Oh, yeah. Yeah. When I first got to UNO, there was no compliance department.

Q. Ah.
A. And at some point the NCAA said, "Stop sending us stuff. We're going to stop looking backwards, we're going to focus on" -- so we created --
Q. A compliance department?
A. This is NCAA compliance.
Q. Right. So -- and tell me about becoming the vice chancellor for athletics in 2014.
Did that -- was that a job that somebody else had been holding before 2014, and then they Marco Rubio'ed it onto you so that now you had two completely full-time jobs at once instead of one?
A. No.
Q. And one was already probably an 80-hour a week job?
A. No. What it was is -- what we were trying to do -- we were engaged in some very, you know, important things for the university. We went to Division 1. We were building a hockey arena.
There were decisions that needed to be made, that I didn't feel comfortable having unilateral decision-making as the athletic director to be totally honest.
We were making decisions about, you know, what was going to be in Baxter Arena and there was a

cost to it. There would be -- you know, as you're going through construction, and you're looking at contingency.

So what we wanted to do was -- so it was reflective of being at the table with the other vice chancellors. I was not an academic, I was not a -- it was the chancellor and the other -- the vice chancellor for business and finance, the senior vice chancellor for academic affairs, myself and the chancellor. It was like four or five people.

And so it was allowing the university more broadly to make decisions because what we were doing in athletics was not just impacting athletics. It was going to impact the broader campus.

Q. So this was -- when you became the vice chancellor for athletics, it was for UNO, not the entire university athletics system?

A. Right. Just UNO.

Q. Okay. My co-counsel, who unlike me, actually did play college ball, gives me a follow-up question.

Did -- do we understand your question -- your answer about the compliance, that UNO is making a lot of self-reports to NCAA?

A. Who is?

Q. Did -- were you -- did I -- is what you were

telling me about the compliance department that you established, that UNO was making a lot of self-reports to NCAA, and NCAA eventually said you need to --

A. Yeah, so what I was -- I should have gave more detail.

Q. Yeah.

A. So when we went to move to Division 1, right -- this is why the NCAA will no longer allow you to have a Division 1 program and then the rest Division 2.

Historically Division 2 doesn't have the resources to have a sophisticated compliance department. Division 1, right --

Q. It's expected?

A. It's expected. So those programs like, you know, Wisconsin and Minnesota, who were running a hockey program, felt like some of the schools that were smaller, who weren't investing in it, were all those kids really -- it was more about eligibility.

You know, were they really eligible to play. And so there's a whole eligibility center, that if you don't have a coordinated -- so when I got there, I believe that there were some students athletes that we -- you know, we brought in a young man from Iowa state to help us create a compliance department.

And he found some -- going backward some student athletes that actually competed, that probably shouldn't have even competed. They were not -- they did not go through the eligibility center correctly. So that -- it was more eligibility.

And so after we did that they said, "Okay, we get it. Let's just make sure going forward we have" -- because we were -- you know, we were just trying to find things that we needed to correct.

Q. Were there areas other than eligibility? Like, were there any allegations of misconduct that UNO was self-reporting?

A. No.

Q. Or violations in areas other than eligibility?

A. It was all eligibility.

Q. Okay.

A. The NCAA is mostly interested in making, you know -- the membership wants to make -- you know, to see if it's an even playing field. You know, it's --

Q. So going back to becoming the vice chancellor, did you get a second contract when you stepped into the vice chancellor job, you know, on top of your director of athletics contract, or was it all enveloped into one contract?

A. I believe I got three different contracts when I was there. My first contract was a two-year contract.
Q. Right.
A. And then I think after a year they might have given me a five-year contract. I'm not sure. I've got to -- I would have to --
Q. It may have been rolled into one document?
A. Yeah, there was no formal approval.
Q. They didn't touch you on both shoulders with a scepter and say --
A. No. No. It was an effort to try to bring university leadership together to make decisions together. That was all it was driven by.
Q. You served on a strategic planning committee while you were at UNO; is that right, for the whole system?
A. Oh, yeah. I think with Hank Bounds, maybe.
Q. Okay. In that strategic planning exercise, do you remember who facilitated that exercise?
A. I think they hired a consultant.
Q. Okay. Do you remember whether any of the goals and initiatives that emerged from that exercise had to do with -- specifically with the department of athletics?

A. I don't think so.
Q. Do you remember whether any of the goals and initiatives specifically had to do with relationships between students and employees of the university, whether it's coaches, whether it's professors, et cetera?
A. I don't think so. I don't recall.
Q. While you were at UNO, did the department of athletics there conduct exit interviews with athletes?
A. Yes.
Q. For what purpose?
A. I'm trying to think if that is part of the NCAA compliance recommendation. We give student athletes -- I don't believe it's mandatory. I may have this wrong.
But it gives them an opportunity to give us feedback on their experience, things that we did well, maybe we could have done better.
Q. Was the data used in any way, like when we're -- you know, when need to hire a new coach, would they pull out the exit interviews to see, you know, if there was a common theme or anything like that?
A. We -- yeah, we would like for common things. The challenge is just -- just like we said in leadership, you will always have -- every team, there

will be will a couple students athletes that aren't happy. 99 percent of it is that they're not playing as much as they would like to. It's all about playing time.

And so what you're really looking for is themes on, you know, if a coach is being hostile toward the -- if the whole team is -- it's really easy to see pretty quickly that yeah, these two are just disenfranchised because their career had not gone the way that they had hoped competitively.

Q. Yeah. I -- I'm involved with an organization where we had to review evaluations of participants that identified one person as being inappropriate with a lot of our participants being -- you know, hitting on them in ways that were making it uncomfortable, things like that. So, you know, I've seen how trends like that can emerge.

A. Uh-huh.

Q. And I've seen how maybe you're not looking for the trend, but you notice it just because you're doing that.

What -- was there at UNO like a dedicated time at -- you know, after reviewing, after completing all the exit interviews, to sit down and say, okay is there anything here that arises more than I didn't give

enough time on the court or enough time on the field?
A. Generally the sport administrators would be responsible for that.
Q. Okay. And they report to you if they saw anything concerning?
A. Yeah.
MS. CHALOUPKA: Okay. Let me mark -- this is -- this was used in a previous deposition, but you haven't seen it. So this is going to be 311. Let's put a sticker on it.
(Exhibit No. 311 marked.)
Q. (BY MS. CHALOUPKA:) So there is a policy that starts at the bottom of the second page here, 3.3.15, Consensual Relationships. And I'll give you a moment to look through. And I promise there's going to be no quizzes on this, but just to --
A. Good.
Q. (BY MS. CHALOUPKA:) I'm deeply disappointed you haven't committed every word to memory. Okay.
A. Good.
Q. Now I can quiz you on the contents.
A. Okay. I will know it all.
Q. I have high expectations. My understanding is that this policy was adopted on June 25th of '21, which would have been not long before you moved from

UNO to UNL.

Before its adoption, in your role as director of athletics and vice chancellor for athletics, did you know that this policy was in development? Had you heard anything administratively about this being in development?

A. Not that I can recall.

Q. Okay. Did you get trained on this policy at some point, whether it was in your final days at UNO or your first days at UNL?

A. We just did all of the required training that the university sent out. And I think -- I don't know, but I'm assuming that each campus had the same training and requirement.

So we, from time to time, would get an email that said we have to do these required trainings. And so we did the training.

Q. How did those work in the summer of '21? Was it Zoom training, was it someone coming to your conference room to put on a presentation?

A. I recall them being done both ways. There were some that were, you know, done through video. And then you would click through and answer questions. There was that kind of training.

And then -- and I don't know if it was just

augmented training or whether it was -- it was in replace of that. But then we also had presentations from Title IX experts about it in person, as well.
Q. Do you -- okay.
Do you have a specific memory of what the training on this policy was like?
A. I don't.
Q. Okay. The Board of Regents has acknowledged that this policy does apply to and is followed when it comes to relationships between coaches and student athletes. Would you agree with that?
A. Yes.
Q. And so, you know, that turns us then to the matter at hand. The college coaches should never have sex with the student athletes that they are coaching, true?
A. I don't know the answer to that.
Q. Why not?
A. Well, I mean, you know, it just depends, especially now with eligibility where there's nuance right. There is -- we had COVID years. We have student athletes that are 25, 26 years old, you know.
So we have coaches who are 27, 28, right. Clearly if there is a -- if there is an assumption or if we think that's happening, that's when we are not

encouraged, but trained to report it to the experts. We are not experts in this. I'm not an expert in that area. And I don't make that judgement.

Q. What kind of expert do you think you need to be, to be able to say that coaches should not have sex with student athletes? What kind of expert do you think that requires?

A. Well, there's more to it than that. There's rights. So what we are told is, since that's not your expertise give it to the people who are experts in each of these areas, not only the Title IX Office, but Office of General Counsel.

So that's where we do our job, we let the office of Title IX, and then we let the lawyers dictate. And so they drive all of the decision-making. And we listen to them.

Q. Well, let's look back at Policy 311, or Exhibit 311, the Consensual Relationship Policy. If you look at the second page of that document, I've highlighted some language that says, "If the inherent power differential in faculty or staff relationships with students can give rise to actual or perceived conflicts of interest, as well as claims of abuse of authority, exploitation, bias or favoritism."

And that would be true with athlete coaches,

and student athletes as well, correct?
A. Yeah. I think in certain circumstances, sure.
Q. Why not in all circumstances?
A. Well, I mean, it just depends on what the relationship is.
Q. Like how?
A. As I said earlier, it depends on -- you've got -- you have coaches who have certain age -- I mean, when I was at UNO we had a -- I don't know if -- you have young staff members. You have people that are 24, 25 years old.
You know, we don't get involved, nor do I try to monitor. I have no idea what's going on with relationship. If something happens, and it becomes -- and we think maybe we should -- we forward it to the Title IX office, and we forward it to the lawyers.
Q. What policy tells you when you need to do that?
A. It's the -- I don't know that there is a specific policy. What it is, is we are trained to let the experts who are trained in these areas do their job. That -- this is outside of my scope of understanding.
Q. Do you have experts that tell you, for

example, that coaches at the University of Nebraska may not gamble?
A. Do we have experts that tell us --
Q. Let me put that differently.
You have a policy that says "coaches at the University of Nebraska may not gamble," correct?
A. I don't know if they still have a -- I don't know what --
Q. They did when you were --
A. Okay.
Q. I mean, it was in your contract, right?
A. Well, yeah.
Q. Okay. And that's --
A. The rules on gambling have changed a little bit, as you know.
Q. Sure. Yes.
A. We're now allowing student athletes to gamble.
Q. Yeah, yeah. Well, maybe I'll make it a little easier then. DUI.
There was a clause in the department of athletics appendix which was appended to your contract that said you can't get a DUI, right, and you can't have illegal drugs, right?
A. Yeah.

Q. And you didn't need to get an expert for that. If someone's caught with cocaine, this is a no brainer, right?
A. Yeah. But we still had those situations. And even in those situations --
Q. Uh-huh.
A. -- you don't just unilaterally act because there are --
Q. Sure.
A. There are, you know, HR, you know, realities. There's Title IX realities, potentially.
Q. Sure.
A. And some of these hit areas that we don't even know about. So when those types of things happen, again, what we do -- every step of the way I will tell you that I -- like most athletic departments do, especially in 2025, is we give it to the experts.
Q. But there is a policy -- or there was when you were there, a policy that said coaches can't have drugs, can't be taking illegal drugs, right?
A. It would be good if they didn't, yeah.
Q. And it was written in a policy, wasn't it? True?
A. Yes.
Q. Okay. So there are areas that the department

of athletics is perfectly comfortable saying this is a bright line rule, true?

A. Yes. And all of our contracts are -- they're not written by the athletic department, they're written by general counsel.

Q. But they're used by the athletics department?

A. Correct.

Q. And those contracts did not say -- and they did not say you can't have sex with the athletes you're coaching, true?

A. True.

Q. So how often was that happening, that coaches were having sex with the athletes they were coaching while you were at -- let's start with UNO. How often was that happening?

A. I have no idea.

Q. How often was that have happening at UNL?

A. I have no idea.

Q. I should be clear on that,

Too. When you were director of athletics at -- in Lincoln was that over the entire system, UNK, UNO, Curtis?

A. Was I what?

Q. Was the director of athletics over the entire university system?

A. No.
Q. Just UNL?
A. Just UNL.
Q. Okay. So looking back at Exhibit 311, if you go to the, let's see, third page of this -- no, fourth page of the document, you'll see highlighted language under the term "Prohibited Relationships."
Where it says that, "Relationships between faculty and undergraduate students faculty -- undergraduate students" -- and it says, "Faculty members are prohibited from engaging in any romantic relationship with an undergraduate student regardless of whether the faculty member has any supervisory or evaluative authority over that student".
Right?
A. Uh-huh.
Q. It doesn't say that there's nuance, does there?
A. I think there is -- faculty.
Q. Right.
A. Yeah, I don't -- is this written for the academic folks or what is this --
Q. Well, your -- the Board of Regents has acknowledged that this applies to athletic department employees?

A. Okay.

Q. Now, we can keep looking through this here. Down at the bottom of the page it says, "Faculty, staff, and other academic staff members are prohibited from exercising direct or indirect supervisory or evaluative authority over employee -- any employee or student with whom they currently have or previously had a romantic relationship." Right. Now, you had said is this academic or not.

What about a coach athlete relationship would be different from the concerns that are addressed when it says faculty and student?

A. I'm not aware of any.

Q. They would be the same, correct?

A. I think you can make that lead.

Q. Okay. And it's not just me making that lead.

We would agree that it's the same, right?

A. The policy doesn't say that, but I see what you're saying, yes.

Q. Okay. And if you -- you know, we keep looking at the fifth page here. There's a section here that says that, "Faculty and academic staff members are required to report it in writing if they engage in a romantic relationship that could potentially violate this policy. Staff members have to report to their

campus director of HR."

This would also apply to college athletes and -- I mean, to college coaches and athletes, correct?

A. I don't know.

Q. It doesn't have an exception written into it, does it?

A. It does not.

Q. And you're not aware of any conversations, any other document that said this only applies for academic side college athletes and -- or college coaches?

A. I am not aware of that.

Q. Okay. And the reason why is because the concerns are the same. If there's a difference in position and a difference in authority, that's where we have concerns about, is this relationship a coercive one, correct?

A. Yes.

Q. That's true with academics and it's true with faculty -- or with coaches and athletes, true?

A. Yeah. I think that's fair.

Q. If a coach pursues sexual relationships with an athlete on his team, this is a potentially predatory act, true?

MS. SAPP: Objection, form of the question. Argumentative.
A. I don't know what that means.
Q. (BY MS. CHALOUPKA:) Do you know what predatory means?
A. Yes. But I don't know what the --
Q. Okay.
A. You know -- okay. Keep going.
Q. Well, so the question was --
A. Your battery is about to die.
Q. Yeah. Oh,
THE REPORTER: Can we go off the record for a little bit?
MS. CHALOUPKA: Yeah.
THE REPORTER: We're going off the record at 9:21 a.m.
(Off the record.)
THE REPORTER: Going back on the record at 9:21 a.m.
Q. (BY MS. CHALOUPKA:) I think the question that was pending was if a coach pursues sexual relations with an athlete on his team, this is potentially a predatory act, true?
MS. SAPP: Objection, form of the question, argumentative.

Q. (BY MS. CHALOUPKA:) Go ahead.
MS. SAPP: You can answer if you understand.
A. I don't feel comfortable answering the question because I don't know exactly what that means.
Q. (BY MS. CHALOUPKA:) Well, help me out.
What is confusing you about it? I -- I'll acknowledge that I'm crediting you with a high level of understanding. You're the director of athletics at a major program. And so I do credit you with a lot of understanding of this stuff. So tell me what is confusing you.
A. Maybe you're crediting me too much.
Q. Well, I'm assuming that the universities that have hired you have done well in not hiring a dummy. So...
A. Some would argue they didn't.
Q. So tell me what's confusing about this question.
A. So tell me the question again. I'm sorry.
Q. If a coach is pursuing sexual relations with an athlete on his team, this is potentially a predatory act?
A. Yeah, I think you could say that.
Q. Okay. Why is that?

A. Well, I mean, why is it predatory, because he is a pursuing a student athlete.

Q. And they're in different positions of power, correct?

A. Correct.

Q. If a coach is a sexual predator the athlete who has sex with him should not have negative consequences for giving into the predator, true?

MS. SAPP: Objection, form of the question, argumentative, assumes facts not in evidence.

A. If -- one more time.

What was the question?

Q. (BY MS. CHALOUPKA:) If a coach is a sexual predator, the athlete who has sex with him should not have negative consequences to her career for giving into the predator, true?

MS. SAPP: Same objection.

A. If the sexual predator -- then -- okay. But walk through it again.

Q. (BY MS. CHALOUPKA:) Yeah.

A. I'm slow.

Q. If a coach is a sexual predator the athlete who gives into the predator should not have negative consequences for having given into the predator, true?

MS. SAPP: Objection, form, assume

facts not in evidence, improper hypothetical.
A. Yeah. I mean, sure.
Q. (BY MS. CHALOUPKA:) Okay. And a director of athletics can make sure that his department doesn't put negative consequences on an athlete who gives into a sexual predator, true?
A. Not necessarily true. Because the athletic -- the director of athletics and the athletic department is directed by the Office of General Counsel and the Title IX office. Those decisions aren't made by the athletic director.
Q. The director of athletics can advocate though, can't it?
A. Oh, absolutely.
Q. All right.
A. Yeah.
Q. And the director of athletics and the department of athletics can also do training on the front end to try to prevent these types of situations?
A. Not the athletic department. All training is done by the office of Title IX as directed by the university and its policies, and Board of Regents.
Q. And they can advocate for the training that they know is going to be needed, true?
A. Sure, yeah.

Q. The department of athletics can?
A. Yeah.
Q. Okay. And if a director of athletics is paying attention to trends, to lawsuits against universities, things like that, they can even bring that to the Office of General Counsel or the Title IX coordinator's attention and say, "I don't want us to get into one of those situations like we're having at Penn State."
A. You can do a lot of different things.
Q. Right.
A. But that's atypical.
Q. Well, you know, they could tell you to piss in a row, but they also might say, "Thanks for bringing that to our attention," right?
A. It's just -- that's not how it works.
Q. Okay.
A. That's not how the structure of the university works.
Q. So if you did think that a type of training was needed for your department, what would be the process by which you would try to get that implemented?
A. Again --
Q. At Nebraska?
A. We are not experts in this. We don't even

know what training is needed. We allow the experts who have been hired specifically as experts in this area to serve the university. All of their training is in this area.

Q. I get that. I actually am listening to you. And I have heard you say that.

But can -- you know, what would be a process if you as the person, who they trust enough to hire as the director of athletics -- if you said, you know, I'm seeing this in the stuff that I am an expert in --

A. Yeah.

Q. -- and I think I need to bring it to you all's attention --

A. If I --

Q. -- what would be the process?

A. If I thought there was a -- you know, a systemic issue of -- what was your word? Predatorial -- yeah, we would call the office of Title IX and make them aware.

Q. How about if you just wanted to prevent it, make sure that our university is out in front, that we're taking a stand and saying, "This ain't going to happen here, this may have happened at Penn State, it is not going to happen at the university"?

A. I am confident in the University of Nebraska

leadership and the people that are in those offices, that they're the experts and we will follow their direction.

Q. And you won't even advocate for -- it?

MS. SAPP: Objection, form.

Q. (BY MS. CHALOUPKA:) -- true?

A. Why would -- I trust their judgement, I trust their ability, and I trust the roles that they are --

(Reporter clarification.)

MS. SAPP: Objection, form.

A. You know, I trust the people in the roles to direct us.

Q. (BY MS. CHALOUPKA) And thus you would not advocate for a course of training, true?

A. I don't have to advocate. We had all kinds of training. They trained us. We followed their training schedule.

Q. When you were at UNO, did your department have a policy of zero tolerance for sex between coaches and athletes?

A. I'm not aware of that.

Q. Did you ever receive reports of an employee of the department of athletics at UNO having sex with a student athlete?

A. I don't believe so.

Q. As a director of athletics in those years, as you're moving from D2 to D1, did you learn of cases in other programs involving coaches and staff having sex with athletes at other schools, even anecdotally?
A. I can't recall any specific ones. But, you know, nationally were there stories out, probably.
Q. Yeah, you don't --
A. But I don't --
Q. You know, Major Applewhite in those years had a sexual encounter with a student trainer in 2009. I think the year that you started at UNO, if I got my years right. Bobby Petrino had crashed his motorcycle with a young woman that was not his wife on the back. And then I think it was one of his --
A. I remember that, yeah.
Q. -- yeah. Les Miles when he was at LSU. It wasn't an issue of a sexual relationship, but he got in really big trouble at LSU for sexually harassing women students that were working in his department.
And I'm guessing you were aware of that?
A. I'm not aware of that.
Q. Penn State, surely you were aware of that situation?
A. Yes.
Q. Yeah. I credit you with this, that you

didn't need a first case to happen on your watch in order for you to know, at least generally, that predatory coaches can cause harm to student athletes.

You didn't need to have something blow up in your face first to be able to see that that happens at other programs and is harmful; is that true?

A. Well, yeah. I don't think it's illogical to think that most people would understand that, you know, that type of person is not productive to the athletic department, yeah.

Q. Right.

A. Yeah, that's pretty much common sense.

Q. And you didn't need a first case because as a a director of athletics, especially one that's -- that hadn't come up through those channels, but is wanting to do a good job, that you're staying informed on issues that major programs have to grapple with, right?

A. Yeah, I mean, the job at UNO is way different than the job in Lincoln.

Q. Sure.

A. And the job at Lincoln is way different than this job. So there's nuance to all that. But, again, it's a -- these are very complicated bureaucracies that we work within.

And the way it works right, wrong, or

indifferent is as I told you 100 times, we are very much communicated with in athletics, that our lane is our lane.

And our lane is -- you know, is mostly business and competitive. And we allow the university and their experts to do their job. They train us.

Q. Uh-huh.

A. And basically what they're training us to do is to do the best we can to understand. If there's something we need to tell them you guys need to -- reporting.

Q. Was there someone at UNO who was tasked with making sure that Title IX was being complied with other than the Title IX coordinator for the whole university? You mentioned earlier that sometimes programs will have a liaison?

A. Yeah. Each campus has their own Title IX office.

Q. Sure.

A. So it's not just the system.

Q. Right, but did the department of athletics at UNO have a liaison to Title IX coordinator?

A. Yeah.

Q. Who was that?

A. I think it changed. Traditionally, it is the

senior woman's administrator because the senior woman's administrator is the one that's advocating to make sure that the Title IX participation numbers for the females are, you know, compliant with one of the three prongs. So I'm trying to --

Q. Is that the case at UNL, as well?

A. Yes.

Q. Okay. While you were at UNO, what training did you personally obtain in the subject of proper boundaries between coaches and athletes?

A. Whatever training they gave us. I completed --

Q. Can you remember anything specifically on that issue?

A. No. All of the training that was sent.

Q. Did you ever seek out guidance on the subject of sexual relationships between coaches and athletes from any of the organizations that study that kind of thing?

A. Not that I'm aware of.

Q. Are you familiar with the Women's Sports Foundation? Are you -- and you're shaking your head.

Is that a no?

A. I don't -- I'm not sure what that is.

Q. Okay. Are you familiar with U.S. Center for

SafeSport?
A. No.
Q. Okay. So to back up a little bit, add a -- when did UNO become D1?
A. It would have been in -- I think the formal board vote was maybe April of 2011.
Q. Okay. So before you became vice chancellor?
A. Yes.
Q. Okay. At a D1 school, what are the organizational purposes of a department of athletics?
A. The organizational purposes.
Q. Back then. I know that things change every day, but --
A. What do you mean? Why did they have an athletic department in the university?
Q. Right.
A. Well, it's the brand investment of UNO. It's a way of bringing alumni back to your campus. It's -- you know, it's all of those things.
Q. And that would be true at UNL, as well?
A. Yes.
Q. Correct me if I'm wrong on this.
My understanding is that one major difference, even in this world of NIL, between a professional sports organization and a college

department of athletics, is that the college department of athletics has an educational mission, as well?

A. Correct.

Q. Okay. And in the educational mission the department has a purpose of protecting student athletes, true?

A. Yeah.

Q. Which would include -- in the protection it would include promoting that educational mission through educational minimum standards for example, right?

A. Yeah. There's requirements about eligibility through both the conference and the NCAA.

Q. It would also include helping student athletes in their academic progress, right?

A. Yes.

Q. Making sure that game and travel schedules don't interfere with -- to the extent possible?

A. As best we can, yeah.

Q. Yeah. Protecting students from harmful practices, like we're going to have practice hours 60 hours a week, right?

A. Yeah, we're not allowed to do that. It's called care over.

Q. Right. Temperature regulations would fall in

there, too, right? And protecting the student athletes and their educational mission also includes preventing abusive behavior by coaches, true?
A. Yes.
Q. Which could be physical, could be sexual, you know, different variety, correct?
A. Sure.
Q. And we can agree that sexual advances by coaches harm student athletes, true?
MS. SAPP: Objection, form of the question. Argumentative. Assumes facts not in evidence.
A. I would -- I could understand that, yeah. But I don't know that every person's perspective would be that way.
Q. (BY MS. CHALOUPKA:) Well, obviously it wasn't for Chuck Loves, but --
MS. SAPP: Move to strike.
Q. (BY MS. CHALOUPKA:) But as a matter of policy -- well, let me ask this differently.
If a coach develops a relationship that is personal and private, and secret with one of the athletes on his team, that creates problems, true?
MS. SAPP: Objection, form of the question.

A. I agree. I don't know anything about his relationship. So I really can't speak to what his relationship was, his intent or --
Q. (BY MS. CHALOUPKA:) Sure.
A. -- what her reaction to said relationship was.
Q. And in that last question I wasn't mentioning Chuck in particular.
A. Okay.
Q. I was referring to in -- you know, as a matter of things that athletic directors know.
If a college coach, director, you know, develops a relationship that is private and personal, and secret, would the athlete --
A. And we become aware of it, we will immediately report it to the Title IX office.
Q. -- and the reason why is what?
A. Is because we want to make sure that any policies the university has are not being broken.
Q. Is it also to protect the athlete?
A. Oh, sure.
Q. Okay. Because a relationship like that is harmful to the athlete, correct?
MS. SAPP: Objection, form of the question. Argumentative. Assumes facts not in

evidence.

A. Yeah, I -- it depends on the situation.

Q. (BY MS. CHALOUPKA:) So is -- does NCDA -- or NCAA say coaches can have sex with athletes, it just depends?

A. I don't -- I'm not aware of what the -- I don't know if NCAA speaks specifically to that.

Q. Has -- are you aware of any authority out there, whether it's been -- you know, sports journals or anything like that, people that study this stuff that have said this is permissible, it depends?

A. I'm not aware of -- it's not -- I'm not an area of expertise -- I'm not an expertise -- I am not a person of expertise in this area, so I have not studied it.

Q. I get that. So I have a better understanding, is it your feeling that departments of athletics don't have a role in protecting athletes from coaches that want to have sex with them? Is that all on the Title IX office that's over in another building in your field?

A. We absolutely have a role.

Q. Okay.

A. And our role is, you know, we're dealing with a 1,000 people every day. All humans, right. Just

like me, perfectly imperfect. And so when and if there is something that's concerning or we're not sure whether this -- we immediately tell the Title IX office or whoever at the university is in charge, and they handle it because I'm not an expert at it. And I probably won't -- I probably will fail in it?

Q. How about the prevention aspect? Do you have a role in preventing it in the direct -- in -- the department of athletics, does it have a role in preventing it instead of just waiting for something to blow up?

A. We -- role is to do exactly what the university says in terms of all the training. It's not just me doing the training. Our coaches do the training.

We follow all of the training by the university. So it's the proactive, making sure that the coaches are getting the training and doing that. That can be a role, yes.

Q. (BY MS. CHALOUPKA:) Adults can sexually abuse other adults, true?

A. I'm not an expert in it. I don't have --

Q. You don't know the answer to that?

A. I would assume that's the case. But, again, I'm not an expert in sexual assault or sexual abuse.

Q. Well, at the University of Nebraska you had responsibilities when it came to the policies like the one we just looked at, Exhibit 311, right? Did you -- on consensual relationships.

You had responsibilities there, correct?

A. Sure.

Q. Okay. And so you were entrusted to understand it, at least, to the extent of being able to say that it is true that an adult can sexually abuse another adult, true?

A. I believe my responsibility is to know that there is a policy. And my responsibility is to follow all of the training that the university gives us, to make sure we have as best we can a department of compliance.

And when and if there is any question of whether that's actually the case, to make sure that the experts are aware of it and managing it for us. And we follow their lead.

Q. Now, the policy that we looked at does not say that it only applies to people that are under the age of 21 or under the age of 19, or something like that, correct?

A. Correct.

Q. As written, it applies to all students and

all faculty, true?

A. It appears, yes.

Q. Sexual abuse is a concern in any context where one adult holds power over another, true?

MS. SAPP: Objection, form of the question. Assumes facts not in evidence. Vague.

A. What was the question again?

Q. (BY MS. CHALOUPKA:) Sexual abuse is a risk in any context where one adult wants to have sex with someone they have power over, true?

MS. SAPP: Same objections.

A. Sure.

Q. (BY MS. CHALOUPKA:) And I take it, Mr. Alberts, you're not going to claim that there is some age at which a student athlete is no longer at risk for sexual abuse from someone that's got authority over them, right?

MS. SAPP: Same objections.

A. I would say this, you know, while not naming any names. When I was at UNO we had a worker who was 26 years old and another student who was in a masters program who is 24. Okay. So technically according to you -- your -- this person has power.

You respond and report it to Title IX, is this an issue. It's not an issue because it was a

consensual relationship that the two of them have. So that's a different -- that's why I'm trying to say there is a little nuance to it.

It's not 100 percent that if that person is in this position that it is -- he or she is a predator to the other person.

Does that make sense?

Q. (BY MS. CHALOUPKA:) Does the policy that the Board of Regents introduced, approved and introduced, say that there's nuance?

A. I'm not an expert. I'm not a lawyer. And I'm not an expert on policy.

Q. No, but you --

A. So it's not for my interpretation.

Q. But you had to follow it, true?

A. Right.

Q. And it says that faculty will not have relationships with undergraduates, true?

A. That's what it says.

Q. Not that there's nuance, right?

A. That's what it -- the policy says.

Q. So let's pull out Exhibit 402. Let me -- I think this has not been previously marked.

A. Thank you.

(Exhibit No. 402 marked.)

Q. (BY MS. CHALOUPKA:) I had referenced 402 before, but now putting this in front of you, this, I take it, familiar to you?
A. Appendix C.
Q. Yeah. And I think this is in the -- this is the -- as it was written in 2021 and 2022, I believe.
What were the reasons that you had to work with Appendix C during your time as director of athletics in Nebraska?
A. I don't recall any.
Q. It lists on page 2 different kinds of misconduct that can make a staff member eligible for discipline, right? Correct?
A. Correct. Sorry.
Q. Yeah.
A. I didn't know there was a question there.
Q. And that included, you know, some of the examples I used before.
Using drugs, being drunk at a game, stuff like that, right?
A. Correct.
Q. And it -- as it's written, it doesn't say there's nuance for DUI or there's nuance for refusing to take a drug test, right?
A. The only thing I see, Counselor, is the form

and severity of any discipline will be determined by the university on a case by case basis taking into consideration a variety of factors.
Q. Sure.
A. That would be the only nuance that I would see as part of what you're saying. There's no nuance.
Q. Right. I mean, if a finding is made that a coach is drunk at a game, for example, if that is found to have happened, that is something that is listed here as can make you eligible for discipline, true?
A. Correct.
Q. If a finding is made that a coach has -- or a staff member has driven under the influence of alcohol or drugs, that it is written -- now it is determined here that that is something that can be harmful to the department, true?
A. Correct. The university may discipline the staff member who --
Q. Right.
A. -- engages in this.
Q. Sure.
A. Right.
Q. And then it lists the things that puts you in that eligibility, true?
A. Correct.

Q. There's nothing written here that says zero tolerance for coaches having sex with athletes?
A. Not that I see.
Q. Okay. Does A&M currently have a zero tolerance policy for coaches having sex with athletes?
A. I don't know the answer to that question.
Q. Who does, if you don't?
A. The office of Title IX.
Q. Well, how about your department? Does your department have a --
A. Oh, yeah. We --
Q. -- policy that says coaches do not have sex with the athletes?
A. I don't know that we have that policy specifically.
Q. In -- so in 2021 and 2022, what was Nebraska's program for preventing abuse and exploitation by coaches?
A. The training that the university gave us.
Q. And I have seen copies of training that the university has provided.
A. Uh-huh.
Q. I didn't see anything that specifically spoke to preventing abuse and exploitation by coaches.
Do you remember specific training on that

issue?

A. I don't recall specific training.

Q. Did you ever request training on the prevention of abuse and exploitation by coaches?

A. No.

Q. Do you believe that there is a benefit to -- in terms of management of a program to setting expectations on a front end?

A. Sure. But I -- I'm not an expert in that area. So that's why I let the university do that.

Q. Sure.

A. So they set the expectations. We follow the university's policies. We do not create policies nor can we are create policies that are separate from the university policies.

Q. I've heard that. And for example, in Appendix C expectations are set.

It says you're not going to come to a game drunk, right? True?

A. Yeah. All of these expectations, the -- Appendix C is written by the Office of General Counsel in consultation with the university. These are not directed by the athletic department.

Q. Okay.

A. Yeah.

Q. Where do you think the Office of General Counsel gets these ideas that go into Appendix C?
A. I don't know. You have to ask them.
Q. Well, they may be about to become witnesses. So they will send you the thank you note if that becomes -- if that happens.
Tell me, was there any training for players, for athletes, while -- in 2021 or 2022 about abuse and boundaries by coaches in your department?
A. I don't recall.
Q. Do you know what the term "grooming" means in the context of sexual activity?
A. Generally, yeah.
Q. Okay. One person is gradually preparing another to accept --
A. Yeah.
Q. -- some kind of special attention, and then it becomes sexual, right?
A. Right.
Q. In the context of coaches and student athletes, what kind of behavior can constitute grooming?
A. I mean, again, I'm not an expert at grooming, but I would assume --
Q. Good.

A. -- it would be, you know, repeated efforts to communicate outside the norm of what a coach would be doing.
Q. Outside of the coach's instructional activities?
A. Right, right. Yeah.
Q. One-on-one activities away from practice games --
A. Sure.
Q. -- would be an example. One-on-one drinking alcohol with the athlete --
A. Sure. That would be abnormal.
Q. At A&M is -- yeah. Say again.
A. That would be abnormal.
Q. I was going to ask at A&M is there a bright line on that one, coach can't go out drinking with an athlete?
A. I don't know that we have a policy. I think it's pretty much intuitive that that's not --
Q. Not good?
A. Not normal.
Q. How about one-on-one coaching that is secret, like in violation of time limits, rules? Would that be something --
A. Yeah. We wouldn't be supportive of that.

Q. And that is something that could lead to grooming, correct?
A. Sure.
Q. How about calling or texting an athlete for non-instructional purposes?
A. Yeah. I mean, there is -- there might -- obviously, I know what you're saying.
Q. Yeah.
A. But there's also -- there is texting and calling with other stuff that isn't grooming, that's not instructional. So it's not fair to say we would -- there are -- you know, lots of our students are dealing with other things. Academic, mental health, those kinds of things.
I know the context of what you're saying it in, but I'm just saying there is communication with coaches and student athletes outside of, you know, their developmental academic piece, or athletic piece, that doesn't necessarily mean it's grooming.
Q. Do you remember any specific training while you were at Nebraska that was provided to coaches on where that line is between, you know, checking in, "I know you had a rough week" versus something that's not appropriate?
A. I don't know the specific -- but those

trainings did entail that type of stuff. A lot of times what the trainings were is they would have a situation. And then it was a test. You have a situation, and then here are the --

Q. Give me an example of a training that you -- a specific training you recall. Because I haven't seen anything like that yet.

A. Okay. Well, it took about -- depending on how quickly you got to the answers, it was 40 -- 30 to 45 minutes long. And a lot of it was first instruction.

It was -- and then it was second scenarios. In this case, if you did this, and this, and this, what of these four is the appropriate response or all of the above.

So I don't recall the specifics about the exact question, but that -- those were the types of things that we all completed.

Q. Okay. And do you recall, in those types of things that you all completed, anything that specifically pertained to safe boundaries between coaches and athletes? Do you have a specific memory of that?

A. I don't have a specific memory because I'm not a coach. And so I don't know if maybe that -- it

doesn't mean there -- that we didn't have it, but my -- you know, I'm a -- my perspective is not as the coach.
Q. Sure.
A. So -- and I can't honestly tell you. There may have been different educational steps for the coaches than some of the staff. I don't know that, though.
Q. Do -- would talking to the athlete about the coaches own personal matters be a form of grooming?
A. Could be.
Q. How about isolating the athlete from other people?
A. Certainly.
Q. Because coaches do have a lot of power over the athletes on their team, true?
A. Well, the power they have is playing time.
Q. Right. How much the player does or doesn't have, right, which -- and you've already shared that a lot of times in exit interviews you've got athletes that are grumpy about not having had more. And sometimes it's on the merits. If they simply aren't that good --
A. Uh-huh.
Q. -- the coach isn't going to put them in. But the coach gets to decide how much they're on the field

and on the court, right?
A. My experience is the coach wants to be keep his or her job. So they are going to -- they could be wrong, but they are going to put the people on the court or field that gives them the best reasonable chance to win the game.
Q. Within the ultimate decision of playing time a coach can also mentor an athlete or not, right?
A. Yes.
Q. They can put attention and time into developing the athlete or not, right?
A. Sure.
Q. They can give positive recommendations for an athlete or not, right?
A. Sure.
Q. They can also give negative recommendations, true?
A. Uh-huh.
Q. If the athletes earns it, right?
A. Yeah.
Q. They can put an athlete into contact with professional connections that may be important for the athlete's future, true? Yes?
A. Yes.
Q. You need to answer out loud.

And the coach can remove the player from the team, true?
A. Sure, yes.
Q. The coach's word on that is going to be the final word unless the director of athletics has a reason to step in, true?
A. Correct.
MS. SAPP: Just to clarify, we're talking about head coach or any coach?
MS. CHALOUPKA: Any coach. Yeah, any coach that's influential.
A. Well, the way it works, the head coach has final authority over his or her roster.
Q. (BY MS. CHALOUPKA:) Right.
A. Yeah, it would be unfair for the administration to hold a coach accountable on wins and losses, but not allow them to create a roster.
Q. Sure.
And the coach, the head coach, is going to be, presumably, trusting the input of his or her assistance, true?
A. Sure.
Q. Okay. Are you aware of -- let me back this up. You gave me an example earlier of a worker at UNO that was having a relationship with a master student,

or was that a student athlete?
A. I think her eligibility -- yeah.
Q. Okay. And was the worker a coach?
A. No, staff member.
Q. Staff member.
Did that worker have supervisory authority over that student?
A. In a sense because she also -- Division 2, she's also an employee and worked in the department.
Q. Okay. Did they report their relationship on the front end?
A. I don't recall.
Q. Are you aware of any sexual relationships between coaches and student athletes that were always out in the open, never secrecy, never any secrecy, full transparency with the rest of the team, and the coaching staff that, "Just you all know, me and this athletes are dating"? Anything like that? Have you ever heard of that happening?
A. I don't recall any.
Q. I mean, sexual relationships between coaches and athletes that are secret, that's part of the harm, isn't it?
A. Yes.
Q. And it doesn't just harm the athlete in

particular, it's also harmful to the team, true?
A. The culture of the team.
Q. Culture of the team.
The team may feel betrayed, true? Yes?
A. Yes.
Q. The team may start paying more attention to how much playing time is this person getting compared to myself, true? Is this person getting preferential treatment?
A. Yes.
Q. It can interfere -- if it's an assistant it can interfere with the relationship between the team and the head coach even, true?
A. Yes.
Q. And wondering, "Why aren't you doing something about this, I'm not getting my minutes," or, you know, whatever it is, true?
A. Yes.
Q. And so -- and it can distract from the focus of the student athlete who is in that relationship, true?
A. Yes.
Q. I mean, the focus of the student athlete should be on developing in their skill and contributing to the team, and helping to win the game, true?

A. Correct.
Q. Have I got that about right?
A. Yeah.
Q. It should not be -- they shouldn't be distracted with, "Does anyone suspect that me and the coach are having sex"?
A. Correct.
Q. Or they shouldn't be worrying about -- they shouldn't be distracted with is his wife going to find out, true?
A. True.
Q. And for the teammates that -- you know, that are not in the sexual relationship with the coach, their feelings of betrayal are going to be understandable. They're not in a position to sort everything out and say, "Oh, this is a perfectly healthy, mature relationship," when they maybe competing for those minutes, true?
MS. SAPP: Objection, form. Assumes facts not in evidence. Vague.
A. Yeah. I mean, I understand. I don't know what -- I don't know how they felt. I can't speak for the students.
Q. (BY MS. CHALOUPKA:) Do you -- have you learned over the years that you've been in athletics

administration, and even backing up to when you were an athlete, why it is that athletes who are being abused don't immediately report it?

A. I don't have any experience in that.

Q. Do you remember -- I'm going take you back to 2000 when Bobby Knight got caught on video. It was back before everything was being videoed. Bobby Knight was caught grabbing a player by the neck and shoving him.

Do you remember that incident vaguely?

A. Yeah, I remember that. Yeah.

Q. Okay. It turns out that that was not the first instance of Coach Knight getting physical with his players.

A. Uh-huh.

Q. Does the -- you know, what would be -- as someone that's been an athlete -- and it sounds like -- thank heavens you were not in an abusive coach relationship, what would be your understanding of why an abused athlete would not immediately report it to police or administration, or whomever?

MS. SAPP: Objection, foundation. Form.

A. I have no idea because I --

Q. (BY MS. CHALOUPKA:) Would you fault an

athlete who is being abused for not immediately reporting it the first time it happened?

MS. SAPP: Objection, form.

A. We don't fault anybody. We try to serve them.

Q. (BY MS. CHALOUPKA:) And why would you not fault a -- an athlete who does not immediately report it the first time abuse happens?

A. Well, you know, our job is to understand and learn more. I mean, that -- that's the whole process, is we do try to -- again, we're dealing with young people.

They all go through various challenges. You know, we're trying help them navigate forward even if they've had challenges. So, you know, it's best to try to -- and that's why I think we engage all these other departments on campus who see different perspectives, who --

Q. Sure.

A. -- can understand it better.

Q. When a player has been abused by a coach and has not immediately reported it to you, the fact that they didn't report it immediately does not mean it wasn't abuse, correct?

MS. SAPP: Objection, form of the

question. Foundation.
Q. (BY MS. CHALOUPKA:) It doesn't vitiate everything else that's --
A. That doesn't mean it still didn't happen, correct.
Q. Okay.
THE REPORTER: Counsel, I hate to interrupt.
MS. CHALOUPKA: Yes.
THE REPORTER: It's 10:00 o'clock. If we could --
MS. CHALOUPKA: Yeah, let's --
THE WITNESS: She's going to the bathroom.
MS. CHALOUPKA: I can go on forever. Let's take a little break.
THE REPORTER: I just need a restroom break.
MS. CHALOUPKA: Yeah.
THE REPORTER: Okay. Going off the record at 10:00 a.m.
(Off the record.)
THE REPORTER: Going back on the record at 10:13 a.m.
Q. (BY MS. CHALOUPKA:) When did you Coach Jaime

Von (phonetic) down here? I saw his sign on his door.
A. Oh, yeah?
Q. Yeah.
A. So Jaime -- he called me shortly after I left. And that he didn't believe -- I don't want to speak for Jaime, but he was going to look for other opportunities. Yeah. We didn't have anything open.
And then we had a young man who left to go be a deputy at Tulsa. He had an internal role. A little bit different than what Jaime was doing.
Q. I was going to ask you about that.
A. Yeah. So Jaime was compliance. And so now he's -- kind of oversees all the internal operations.
Q. Okay.
A. Compliance would report up through him.
Q. Got it.
A. And so he and Corin made the move.
Q. Made the move.
Before July of 2021 had you ever made inquiries about moving from UNO to the same role at UNL?
A. No.
Q. Was it a similar situation to how the UNO job came about, that you were approached and said, "We have -- we're about to make a change," or "we have made

a change, are you interested?"

A. I had been at the University of Nebraska Omaha for quite a while. And they kept changing athletic directors in Lincoln.

Q. Uh-huh. Yes.

A. And all I ever told them was I work for the University of Nebraska. I really enjoyed my job at Omaha. And I --

Q. Serve at the pleasure of the president?

A. "I serve at the pleasure of the university. And if there's an area that you think I could be helpful, great. I'm happy to consider it." But I wasn't interested in, you know, interviewing with some search firm from Boston. So --

Q. There was a search committee?

A. Well, there -- yeah, they always hire -- you know, there -- there's always search firms involved to, you know -- to have -- to ascertain what the level of interest is.

But the reality is when you have sitting ADs other places you can't be out applying for other jobs or you're going to put your own job at risk.

Q. Right. Your contract even said something to that effect. I've worked with search committees before on the hiring end, not on the being hired end.

A. Yeah.
Q. When you -- when we get to the summer of 2021 did you go through the search committee?
A. A search committee did call me and asked me to arrange for a meeting. Asked if I would consider having a conversation with Chancellor Green.
Q. Okay. Did you ever see a plan for the search committee of -- you know, that identified how they were going to do their job, what they were looking for, anything like that?
A. (Witness nods.)
Q. Who was your first contact regarding the opening at that position?
A. The search firm.
Q. The search firm.
They got a hold of you?
A. Uh-huh.
Q. And who was your first university contract -- contact about this?
A. Ronnie Green.
Q. Mr. -- Dr. Green. In the course of -- so it sounds like that process was quite different from the process that led to the UNO job.
No search firm with the UNO if I followed you right?

A. Yeah, I don't think that UNO had a search firm. You know, the smaller schools, it's much different. You know, you would -- I mean, they would publicly list the four finalists.

And then each one would come to campus for two days and meet all these people. And that's not practical in a place like Lincoln.

Q. And so in working with the search firm, did you sign authorizations for background checks?

A. I'm certain they did.

Q. Do you have to be rechecked?

A. I think so, yeah.

Q. Did you interview more than once?

A. I interviewed both on the pump phone and in person, and then also with President Carter.

Q. So the two people with whom you interviewed were with Dr. Green and President Carter. Okay.

Does the search firm have somebody attending or participating in the interviews?

A. They're more facilitating the logistics.

Q. Got it.

Did you feel at the time that you had, through your UNO experience, gained the experience, training, education, professional contacts that you were going to need to step up to this bigger role?

A. At that time I didn't know. I didn't know what the job would be. I certainly knew it would be different.

Q. Ready for a different fire hose to drink from?

A. Different set of challenges.

Q. Uh-huh.

A. But the benefit was it was the same Board of Regents, the same university system. So there was some -- you know, some cross over, if you will. There was some benefit to that.

Q. You had come through by that point -- if I'm getting my Nebraska history right, come through the issues with Regents of discontinuing the football program at UNO, for example.

That was resolved by the time you -- by the time that the position at Lincoln came open?

A. Well, that was resolved in 2011.

Q. Yeah. So --

A. Okay. Are we talking about all of the drama surrounding it or -- I mean, that lasted to --

Q. The legal term of drama, yes.

A. -- 2013 or something. Yeah.

Q. Yeah. I -- but you'd had -- you come through that. And it hadn't -- I guess my point is it sounds

like it had not harmed your credibility with the Board of Regents or your relationship with them.

They still felt that this was a -- that you were -- that you -- you know, even if it was an unpopular decision to some people, players, that you were doing this for a proper reason?

A. Yes. I can't speak for the Board of Regents.

Q. Yeah.

A. I'm not sure that they all liked me.

Q. So after the interviews with Dr. Green and President Carter, did you have -- were you present for any of the discussion with the Board of Regents?

Because I assume they made the final -- they acted on the recommendation to hire you from Dr. Green and/or President Carter?

A. Yes. No, I did not have any interaction with the board.

Q. Okay. You got a call saying congratulations?

A. Yeah, we got a -- I got a call that said to be in the office at this time and we're doing a press conference.

Q. In any of your interviews, do you remember questions that would pertain to Title IX?

A. Other than -- not specific to Title IX, you know, but just general, you know, are you committed.

You know, that -- those generally would, you know, the ability to compliance.

The questions, to be totally frank, were probably a little bit different with Ted and Ronnie just because of the familiarity and being in the system.

Q. Which is understandable. They -- by that point -- how much interaction had you had, if we break that down into two with Dr. Green, by the time you get to 2021? Is he someone that you would have weekly contact with, monthly?

A. Prior to my hiring?

Q. Right.

A. Oh, no, no. I had a lot of contact with Ted.

Q. Okay.

A. Because Ted was the president. And he was over all the systems. So if we were -- you know, as we tried to do -- we were doing a lot of capital projects and building.

And so there was an approval process with business affairs. And then ultimately the board, the president. So, you know, I would see Chancellor Green. And he would sometimes be in the meetings, but he was representing Lincoln and I was representing Omaha.

Q. When you become the director of athletics in

Nebraska, was -- eventually President Carter became your direct report; is that correct?

A. Correct.

Q. But not right away?

A. Right.

Q. Close to the end.

Who was your direct report at first?

A. Ronnie Green, Chancellor Green.

Q. Okay. I can pull out your contract. I had thought that initially it said you were going to report to a vice chancellor. And I was going to ask you which one, but --

A. Oh, I didn't know that.

Q. -- maybe I'm mistaken. My memory may be faulty. This is going to be 382.

(Exhibit No. 382 marked.)

Q. (BY MS. CHALOUPKA:) So I think this is your first contract, the 2021 contract.

A. Yes.

Q. Okay. And --

A. Who does it say I report to?

Q. I -- let's see. Somewhere in here I had gotten it into my moldy brain that it was vice chancellor --

MS. SAPP: Paragraph 7, directly

accountable to the chancellor.

MS. CHALOUPKA: Ah, there it is. Thank you.

A. In these rules it would be very unusual to not report directly to the chancellor presently.

Q. (BY MS. CHALOUPKA:) Right. When you took the job you were -- also -- it was director of athletics and also as vice chancellor for department of athletics, or for athletics?

A. I think that's correct.

Q. Okay. All one job?

A. Wait a minute here.

Did they name me vice chancellor at Lincoln?

Q. The internet claims you were, and the internet is never wrong.

A. Well, my title here is University Director of Division of Athletics. I can't remember. It doesn't really matter.

Q. Yeah.

A. But I was on the -- yeah, yeah.

Q. Would you have regarded those as two different jobs?

A. Not really. What -- there's no difference in pay. What it really is, is trying to -- you know, bigger schools, what's hard is the athletic department

ends up in this little -- we run a business. It's really hard.

The academic strategy is way different than business. And so sometimes those can be at cross purposes and it's a challenge. So the effort of bringing the athletic director in is not so much about -- you know, it's just more symbolic of trying to integrate athletics into the whole university system.

It's communication and strategy. It's -- you know, it's -- what's hard for them is to hear through social media things that are happening in athletics and vice versa.

Q. Uh-huh. Among your responsibilities in your contract includes communications. I've seen this at the bottom of page 3, going to the top of page 4, that radio appearances, appearances on Husk Division, other sponsorship development projects, or support. And then Appendix B goes into more detail about the Husk --

A. Yeah.

Q. -- Division aspect of it; is that right? So you were -- when was your first -- if you signed this agreement on July 13th, when was your first day on the job? July 14th. Pardon me.

A. So I signed the contract in the athletic director's office. It was sitting like this on the

table. I never read it, I never saw. I signed the contract, which was a really dumb --

Q. I was going to say --

A. My wife was not happy with me. It just was a -- it happened very quickly. I went to the deal. Chancellor Green was there along with -- who was the -- why am I forgetting his name? The vice chancellor for business and finance now. He was his -- he was Ronnie's chief of staff at the time.

MS. SAPP: Zellemie?

A. Zellemie, yeah. So I didn't even know what my salary was going to be, which if I'm totally honest I was a little irritated that it was way less than the previous guy, but it was fine.

So I signed the contract at 8:00 something. I don't know what time it was. And we had a press conference at 11:00 or something.

Q. And --

A. So I went to work.

Q. Went home and read the contract for the first time when a year or two later -- I'm smiling as I say that, but --

A. I mean, I don't have -- I mean, some of the people in my role, they have -- you know, they have agents or they have -- I don't have --

Q. Uh-huh.
A. I never had any.
Q. I was just going to ask you, were you -- was this a situation where you were represented by counsel --
A. No.
Q. -- where you were negotiating other terms or things like that?
A. There was no negotiation.
Q. There was not.
A. Because --
Q. Here's the contract --
A. Yes.
Q. -- here's where to sign? Okay.
MS. CHALOUPKA: I'm going to -- this is Exhibit 307. And this is -- 307 is your 2023 contract.
(Exhibit No. 307 marked.)
Q. (BY MS. CHALOUPKA:) And the reason I pulled this one out is because of its Exhibit C -- or its Appendix C, if you want to zoom down to that.
A. Okay.
Q. On the second page of Exhibit C, or Appendix C, look down at Subsection G.
A. Okay.

Q. So somewhere between 2021, when you had started this job, and 2023, the policy that is now marked as Exhibit 11, or 311, on consensual relationships, Board of Regents Policy 3.3.15, got added into Appendix C.
A. Uh-huh.
Q. "Failing to abide by that policy by engaging in any relationship of a sexual, intimate, romantic dating, et cetera nature with a student athlete for whom the staff member has supervisory or evaluative authority unless otherwise permitted."
Do you remember what -- do you remember when Exhibit -- this subsection got incorporated into Appendix C?
A. I don't have any idea.
Q. Do you know why it was incorporated?
A. I do not.
Q. Who do you think would know the answer to that?
A. General counsel.
Q. Okay. Did you notice that it was added in when you signed it?
A. No.
Q. Did you read your second contract more than you read your first one?

A. No.
Q. And --
A. I trusted my university, and I was an alum, that they would treat me fair.
Q. How come? You think they've all -- you know, is that an expectation that all alums should have for the university, to be treated fair?
A. It's what I felt about my university.
Q. You had mentioned before that if there was a systemic problem of sexual predators you -- that's something that might -- if I heard you right, if there's a systemic problem that might lead you to go to the Board of Regents or to general counsel, or someone, to say we need to do something, have some training or something, what's systemic?
Like how many would -- does it -- how many issues of predatory coaches do there need to be before you would make that kind of request?
MS. SAPP: Objection, foundation.
A. I have no idea.
Q. (BY MS. CHALOUPKA:) More than one? More than --
MS. SAPP: Same objection.
Q. (BY MS. CHALOUPKA:) Go ahead.
MS. SAPP: Speculation.

A. Again, I just really depend on the resources that the university has, and the experts have. So --
Q. (BY MS. CHALOUPKA:) But you had said if there was something systemic you would advocate?
A. Sure.
Q. So that's what I'm trying to understand because it was your phrase. What -- you know, what --
A. I'm not aware. I don't know what it is because I -- I'm not aware that I've ever participated in any systemic issues like that.
Q. So does that mean that nothing -- you -- it -- there's not a call for you to approach the university and advocate if there's one, that one is okay?
A. No, that doesn't even matter.
Q. Okay. So --
A. It means that I need to do exactly what I'm informed and I'm trained to do, which is to report it to the authorities.
Q. Sure.
A. And the people in power, control of that area.
Q. Which wasn't the question that I asked, though. The question was -- you know, you had mentioned that if there was a systemic problem you

would approach them and say, "We need to do something." I'm trying to find out --
     A.   You asked if -- is it -- you asked me if it was reasonable if you ascertain there was a systemic issue, that you would raise it.  And I said yes, that would be reasonable.
     Q.   I don't think I used the term "systemic," but we'll find out at when it's typed up.
     A.   Yeah.
     Q.   So when you started in this new role who was onboarding you?
     A.   Who was onboarding me?
     Q.   Yeah.
     A.   You know, typically the way it works is you have both -- in Lincoln they do have an HR.  The head of HR, Jane Ferrell, she works with the campus HR folks, you know.
          So I don't remember specifically.  I mean, as you can imagine, the day I took the job and went to work I can't honestly tell you all I -- that was happening behind the scenes with all the people who were onboarding.
     Q.   Do you have any specific memories of the onboarding -- of activities that you would characterize as onboarding?

A. No. You know, just all of, you know, the selections about retirement. You know, all those typical things when you start a new job, you get. But I don't remember any specifics about, you know -- I didn't -- there was no two-day seminar on onboarding, no.

Q. Was there anyone who sat down and reviewed policies with you?

A. No.

Q. How about anyone that sat down to review open projects with you?

A. Well, some internal staff. We'd have, you know, probably the capital projects team would come down and say, "Here's," you know, "where this project is."

Q. It's kind of --

A. You know, "Here is how much money." We had the Go Big project, which was a very public 350 million dollar project that we were tasked to raise 115 million. And publicly it was out there that we had raised it. And the reality is we had raised 30 million. So it was just stuff like that.

Q. Were you going to be working with different donors in this role, than the donors that you had worked with in the UNO rule?

A. To be adding on the donors, yeah.
Q. Okay.
A. So there was some cross over. Some of the same donors I worked with in Omaha also would be involved here, but then there were some new donors that -- you know, more Lincoln-oriented that weren't part of our western part of the state --
Q. Yes.
A. -- that were part of UNO's -- yeah.
Q. That's kind of what I was wondering --
A. Yeah.
Q. -- is whether the UNO donors were so UNO-focused that they were no longer in your cabinet, I guess.
A. Oh, no, no, no. They were -- there was a couple that were disappointed that I left, but those are pretty strong relationships. So they came with me.
Q. Supportive enough of the overall mission?
A. Yeah.
Q. Okay.
A. They cared about the university.
Q. Was there -- in your onboarding days, was there like a team by team or sport by sport review where you're going through one at a time and discussing the status, the performance challenges, that kind of

thing?
A. No.
Q. It just came to you as it came to you, it sounds like.
Did you have --
A. The primary focus the day I walked in the job was obviously football. And it was the challenge of managing -- you know, the primary revenue driver of the department was faltering.
Q. That's what I was going to say, yeah.
A. That was where all the focus was.
Q. Getting the fan base mollified for -- to see if we can do things differently. And football was coming right up.
You had three weeks before fall camp, something like that?
A. Spring ball was, you know, starting in April.
Q. Wait. I thought you started in July.
A. Oh, that was in July. Okay. Yeah, that's -- yes, it was. Okay. Yeah, fall camp would have started shortly -- I knew that practice was starting at some point.
Q. So you came -- yeah, you came here with --
A. Yeah, yeah, yeah, yeah.
Q. -- spring ball about ready to jump down your

throat probably?
A. Yeah. That was the pits.
Q. So when -- was there ever a point where you started saying, "Okay. I'm going have one-on meetings -- one-on-one meetings with coaches other than football staff?
A. Yeah. I did that immediately when I got there. I met with every head coach individually in their offices.
Q. All that's what I was wondering.
A. Yes. Yes. Just to introduce myself, tell them, "How can I be helpful, obviously, work through your sport administrator, but I want you to know that you have" -- they have my information if I can be helpful to them.
Q. Did you know much about your predecessors approach to leadership of the department?
A. I didn't. I just read what I read on the paper.
Q. And, you know, what I read in the paper is -- I mean, it sounds like you tried to set a different tone and that he was maybe not very transparent, if I'm interpreting correctly some of the criticisms I read of him.
Did you --

A. I can't speak about it. I don't -- I wouldn't do that.

Q. Let me ask a better question.

Did you identify any cultural issues within the department that you -- in your opening month, let's say, you were there, that you wanted to try to change?

A. Yeah. I mean, I sent some -- you know, some cultural issues. We had so much turnover. Typically, what happens is every AD who comes, he or she brings their four people. And ultimately I felt like, in my first meeting with the executive team, there were three different factions. And --

Q. Which would be?

A. -- there would be an AD, an old school Nebraska action. An AD who was previous. And then Bill brought in two or three people. And I just felt like that there wasn't a great unity of purpose between the group.

Q. Okay. And so that was a cultural issue that you could identify quickly?

A. Yeah, administratively.

Q. Administratively. How are we going to keep the people happy that are still missing on the band?

A. Yeah.

Q. What can we do to bring them back.

Had you ever meat Coach Williams before -- in person before you stepped into this role?
A. I don't think so. Now, she was at South Dakota. No, no. No -- yes, I had met her. So she was -- man I can't believe -- I almost forgot that. She was the head coach at Rogers --
Q. Roger State?
A. Some -- Roger State University. And I interviewed her for women's basketball, UNO.
Q. Oh, okay.
A. And we did not hire her.
Q. Okay.
A. And then she got the job at South Dakota. And our coach didn't do very well. So clearly I did a really bad job of hiring because she did a great job at South Dakota which led to getting the job.
Q. In 2016?
A. Yes.
Q. So she had been here five years by the time you stepped into the AD role at Lincoln?
A. If that's the timeline, yeah.
Q. Did she remember you?
A. I don't know.
Q. If she did she was graceful about it?
A. Yeah. No. Yeah, she wasn't mean.

Q. Okay.
A. I mean, she --
Q. Do you remember about when you would have had your one-on-one introductory meeting with Coach Williams if you started July 14?
A. They were all relatively in the first month. You know, I tried to do that immediately.
Q. Did you bring employees from UNO?
A. No.
Q. No.
Did you find that there were people at the UNL department of athletics that you already knew either from their UNO contacts or other periods of time?
A. Keith Zimmer was my academic counselor when I was a student athlete.
Q. Okay. Anyone else?
A. Dennis LeBlanc.
Q. Okay. Had been around for a while?
A. Was there at the same time. Pat Logston, was -- who was retiring about the time I came in as senior women's administrator.
Q. Was there a senior men's administrator?
A. (Witness nods.)
Q. How come there was a senior women's

administrator?

A. It's just how the NCAA -- you know, in the old days you used to have -- the athletic department would have men's athletics where you would have two athletic directors.

You'd have the athletic director on the men's side and the athletic director of women's athletics. And eventually, just through, you know, the realities of the operation, those were combined into having one athletic director.

But years and years ago -- I don't know how, but through the NCAA a role of the senior women's administrator was created. You're not required to have it, but most schools do have it.

Q. Was there -- was that role always at UNO while you were there?

A. Yes.

Q. And it was always at Nebraska UNO --

A. Yes.

Q. -- when you were there? So once your first week of insanity had passed, and you were up and running, who were your most frequent contacts within the department for your day-to-day business?

A. I really rely on the executive team.

Q. Okay. So the deputy athletic directors, the

associates, and the senior associates?

A. Yeah. There -- you know, we did a little bit different -- I don't do all the -- that's what the other people -- did all these -- there -- there's all these layers of bureaucrats.

Q. I was going to ask you to explain the titles to me.

A. Yeah. So, you know, there's -- the deputies are considered -- I mean, it -- it's just nuts in our industry. We've got a senior deputy, an executive associate deputy.

Q. Yes.

A. And I was trying to bring unity to the department. So I eliminated all of -- first of all, we did make some -- I eliminated several administrative positions, which I felt was just administrative bloat that was -- you know, a lot of people don't like to make cuts.

So they just keep bringing people in. And that adds to the dysfunction because people aren't actually working. So I got rid of all the titles. And the executive team, they were all executive associate athletic directors.

And what I try to do is have somebody who is an expert in every area. There's a senior women's

administrator. There's the compliance person. There would probably be a marketing person. There's the CFO. Everybody in the table, just like this table, same here, is an expert. I have a -- hopefully a --

Q. What was your process for what you're describing? Did you have to go through counsel to do that? Did you have to go through President Carter or Dr. Green, or --

A. That would have still been when I was with Dr. Green. I would have -- you know, I would have worked on an initial plan. I would have run it by. There was an informal presentation.

But you would have communication with the chancellor. My intention is to, you know, make this change here's my rationale. And that sounds --

Q. You didn't protest?

A. No protest.

Q. Okay.

A. And so then I go to the HR. And we try to figure out how is the best way to do this. And then ultimately general counsel is involved because there's generally a separation agreement.

Q. I was just going to ask if it was a -- if -- did this result in some people losing their jobs?

A. Yes.

Q. Okay. When approximately did you do that? You started in July.
A. I don't know. It was relatively early.
Q. Okay.
A. Yeah.
Q. You've already said that obviously the first priority was football.
Was there any other informal process by which you decided how to familiarize yourself with the other sports within the jurisdiction of the department? Like "I'm going to save" -- you know, "I'm going to go seasonally, I'm going to do basketball in the first week of October," or anything like that?
A. No. Just -- you know, the initial meeting with the coaches. We have regular head coaches meeting monthly.
Q. Okay.
A. Monthly head coaches meeting. We have support administrator meetings outside of the executive staff. And those can be weekly or -- the executive staff met each week. Presumably still does.
You know, in terms of them just being present you -- I went to every football, home and away. And I tried to go to as many home events for every -- all of our sports, you know, so you have a presence. You're

not coaching. You're not, but you're, you know --
Q. I was going to ask that.
Had -- you know, in addition to meeting with Coach Williams did you observe practices of the women's basketball team?
A. I would occasionally -- I think I -- not as much as I would have liked, but I would occasionally try. I think I did once or twice, just pop in.
Q. How about game attendance?
A. I went to a lot of games.
Q. There's a lot more basketball games, especially when we count the men's and women's, than there is football?
A. Yeah. I was at the games a lot.
Q. Okay. Did you ever attend teams meetings for the women's team, women's basketball team?
A. No.
Q. Did you meet one-on-one with any of the assistants?
A. No.
Q. On any of the sports other than maybe football?
A. Not that I can recall.
Q. Your context --
A. I met with Doc. Fred made -- when we made

some changes with coaches leaving, but not -- it's really -- the sport administrator really is involved in that kind of level.

Q. What happens at the head coach's meetings?

A. Well, it -- you know, those can be about anything. You know, right now we always will send out to the head coaches -- send in some -- if you have agenda items you would like to have discussed.

But mostly it's my chance to -- you know, to relay information for, in this case, the SCC athletic directors over here for Commissioner Sankey. They -- all the national stuff.

How -- you know, a lot of it is budget-oriented. How we're managing scholarships. The senior women's administrator might make a presentation about Title IX in participation, of what the roster numbers are, and what they look like, and what we need to do over here. You know it's -- that's generally what it is.

Q. After the Penn State incident in February of 2022, was there discussion at the head coaches meeting of the situation with Coach Love and Ashley Scoggin?

A. No. Not that I'm aware of.

Q. Did anyone ask to put that on the agenda?

A. No.

Q. Did you ask to put it on the agenda?
A. No.
Q. Who runs the head coaches meeting?
A. I run the head coaches meeting.
Q. Okay. Back to what you were doing to get up and running.
When your -- what -- about when did your direct report change from Dr. Green to President Carter? Was it changed before you signed the 2023 agreement in November? I think it was. I think that --
A. Yeah.
Q. I think --
A. What was happening was we were -- there's so much change so fast nationally, even now, that it was an effort to streamline decision-making.
Q. Okay. Was it a change you requested?
A. Yes.
Q. And did you get any push back on it?
A. I don't -- nothing to me. I don't think Chancellor Green loved it.
Q. I remember reading about it in the news and wondering what it was about. And so say more about to streamline decision-making. What -- tell me a little more about that.

A. Well, the problem -- and it's no different than here. The problem is in athletics you need to make, sometimes, very quick decisions that include risks.

You might be, you know, hiring a coach. And sometimes, you know, you can't wait for a committee to get together to see whether or not we're going to -- so, you know, a lot of times, you know, the final approval is always the board. The board is in charge. They have a fiduciary responsibility.

So I had always found it -- you know, the old way is, you know, you go to chancellor, and you say, "Hey, I got this idea," or "we're trying to work on this."

And then you're hoping that he or she then translates that well to the president. And you're hoping then that the president translates that. And by the time you get there it's a mess. It takes forever.

Q. It's -- I was going to say two weeks have gone by.

A. They've gone by. And so the idea was, "Hey, look, if you all are the decision-makers, anyway, it doesn't mean to disrespectful to the chancellor, but I just want to know who's in charge."

"Tell me who's in charge, who can make the

decision. I make the recommendation. I don't make the final decision. I educate and advocate, but you all make the decision and we move forward."

Q. Obvious example.

Had the -- had you obtained board approval to fire Coach Frost?

A. Had I --

Q. Before it was officially done?

A. Yes.

Q. And was that --

A. I don't that it's a formal -- so it's a little bit different. The board -- there's a difference. There is some nuance between what is required for them to formally approved and what is the heads up, they don't like to be surprised kind of deal.

Q. Yeah. That's kind of what I'm getting at.

A. Yeah.

Q. I mean, had there been a vote by the Board of Regents?

A. I don't believe so.

Q. Okay. Was that when you still had a direct report to Dr. Green or had it -- had the change been made to go directly to President Carter by then, if you remember?

A. I don't know the exact dates. All I know is

that Chancellor Green and Ted Carter were actively participating in the process.

Q. Okay. Whether it was --

A. It was not one or the other.

Q. Okay. I take it you felt like that change to your direct report was a positive change?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Is your direct report here, the assistant president of A&M?

A. It is currently -- so it's different here. It's the opposite. So it's the president. The chancellor is the assistant. So it's the opposite of Lincoln. So I currently report -- and right now he's interim. And I report to the campus president.

Q. Structurally it's the same, different titles, though?

A. Correct.

Q. Okay. I asked you this question about UNO. I will ask it again for UNL.

Was there a member of the Board of Regents who was like a routine or a primary contact for the department of athletics at Lincoln?

A. No. But there would be probably -- as is the

case on this board. There's usually three or so that are really, really interested in athletics. And so my experience has been if, you know -- as you -- you know, they're -- they'll call you.

Technically the structure is I shouldn't be engaging with the board. And it really frustrates the presidents and the chancellors because they run -- right? But, you know --

Q. But if they call and ask questions --

A. I have no choice but to answer.

Q. -- you don't want to say -- you know, click and hang up?

A. "Go call the president."

Q. Right.

A. So I -- you know. But I don't think it's fair to say there was one in particular. I think, you know, there were several. And then Nebraska is probably different.

There probably were more than one or two. I mean, there were four -- half or more. They're very interesting.

Q. Yeah. And that was sort of what I was getting at, is whether someone was designated, you know.

A. I don't believe anybody was designated.

Q. Okay.
A. I'll be honest. I was pushing.
Q. For a designation?
A. I was pushing. None of this matters, you know. But I still think it's the right thing to do. You have business and finance. You have academic affairs.
And as high profile as athletics is, why you don't you have an athletic affairs subcommittee, I believe that's for the future, for you to help them. But -- and I want to do that here, too, because, you know, you need you need help.
Q. Because it involves a lot of money, it involves a lot of planning. And I take it that at Nebraska, and probably here, someone whose primary interest is the med center, which I'm not disparaging, is going to have different focus than somebody whose primary interest is --
A. Sure.
Q. -- rebuilding the stadium?
A. Sure.
Q. Something like that.
Do you remember approximately how many employees were working for the department of athletics when you were there? Was it like 200 or 300?

A. It was 300 plus.
Q. Were there interns, you know, at the bachelors level, graduate level, elsewhere?
A. I don't know if they would be considered interns. We had student workers.
Q. Yeah.
A. Yeah.
Q. That's kind of what I'm wondering. I --
A. I don't know how they were designated through HR, but --
Q. Do you know -- and maybe you are not the right person -- where an internship was -- would have been structured within the department of athletics?
Is that something that was sport by sport, coach by coach? If you know.
A. Yeah, I think there was probably some -- like for instance, it wasn't always formalized, and Adrian Martinez came to me and said, "Hey, can I just -- can I shadow your business office for the next three weeks?" Like that's not a formal internship, but he was around, right. Like --
Q. That's kind of what I'm wondering.
A. Yeah. So -- now, there also was a more formal -- you know, if it included pay, I mean, HR was very much involved and, you know, those types of

things.

Q. Had to be?

A. Had to be, yeah.

Q. Was it -- you're giving the example of Mr. Martinez.

Was it common for you to have direct contact with athletes while you were director of athletics?

A. Yes. And it just depended on --

Q. Some more than others?

A. Some more than others. You know, I mean, football players felt very comfortable. I did try to --

Q. They knew you knew their sport?

A. -- yeah.

Q. That's all, yeah.

A. Yeah. I did try to -- I enjoyed interactions with student athletes. They created a deal where once a month I would have about six to eight student athletes come for coffee in my office.

And we would just talk. And give them an opportunity. And try to stay connected to the people that we're trying serve.

Q. Do you remember any particular connections with members of the women's basketball team in the years that you were there that stand out?

A. Not really.
Q. Before your departure, did the department of athletics endeavor to create professional opportunities for student athletes who were interested in careers in administration, sports administrations?
A. I think we've always had -- you know, the thing we always tell them is, you know, when they come to Nebraska we're here to serve you, but when you are done with your eligibility we're not going anywhere. Like use your network.
You know, they -- the -- most of the student athletes, as I did, developed really strong relationships. Some of them would be -- the coach is a coach-player relationship, but the real meaningful relationships sometimes are with the athletic trainers, or the academic support, the life skills. The people that are outside of the competition.
So I wouldn't be -- I don't know specifically about that effort. But I wouldn't be surprised at all if there wasn't a very specific effort to do that. So I don't know the answer to that question.
Q. So how -- what policies did you have to go through the formal Board of Regents vote process to get approval? I mean, how much of a -- how much management versus micro management, did you feel they were doing

for you?
Were you -- did you have a certain amount of latitude to say, you know, "We're going to buy this many paper clips this month without having to get a board vote," or were they, you know, active to the point of -- where you felt like it was appropriate to consult them, you know, daily?
A. Well, part of it is just understanding, you know, what their expectations are. Initially, when you come -- I mean, you know, we -- I actively engaged with general counsel.
I asked one of the members of their team to spend two, three days in our office just because -- to help us understand what does he do. What is the state law with all these -- I can't keep up with all that stuff.
And I learned that the hard way at UNO. You can't unilaterally make decisions. You know, there are policies and procedures. So I needed help in knowing what those were, what needed to go to the board, what didn't need to go to the board.
Q. That's kind of what I'm getting at.
A. Yeah.
Q. How -- so in --
A. General counsel directed all that.

Q. Okay. And if you were going to give me a summary of what needed to go to the board and what did not need to go to the board, can you give me some categories of things that absolutely needed to go to the board?

A. Most of those were all driven through financials. So if you're going to spend X amount of dollars on the coaching salary, or if you're going to spend x amount on a capital project, those needed formal board approval.

Q. Better not be announcing to the state that you're going to rebuild the stadium without getting --

A. That's right.

Q. Okay.

A. They like to approve that.

Q. They enjoy that.

What are some categories of things that the board doesn't need to have their finger on every single pulse of? Like if you wanted to make a change at a deputy administrator position?

A. Yeah, we didn't go to the board.

Q. Okay. That's kind of --

A. Yeah.

Q. -- what I'm going to.

A. Yeah.

Q. If you want to create a position, would that be something --
A. I would work with my direct report.
Q. Okay.
A. And then, you know, they would probably have a feel on is this -- it's not a formal board approval, but, "Hey, just giving you a heads up. The athletic department is going to be announcing volleyball day in Nebraska."
Q. Okay.
A. Okay. And our plan is we are going to make it a school at home day, or whatever, because of traffic. It's not -- the board doesn't approve that stuff, but the board would be very disappointed not to be aware.
Q. To learn about it in the media?
A. Yes.
Q. Got it.
Did you -- you've mentioned the -- it sounds like the reduction of some bloat at the mid level position.
Did you create any new positions that were -- that you would be at the mid level?
A. These weren't mid level. These were the executive team.

Q. Okay. Executive. Did you create any new executive team. And I don't think I quite figured this out yet.
Under your leadership was your executive team -- what were the titles? Was it all then called executive associate or what?
A. Executive associate, athletic director.
Q. Okay.
A. Because what you had -- the reason you had in-fighting is you had three different tiers of people.
Q. Did one of them answer to another?
A. I don't know how Bill had it set up. But for me, all the executive team reports to me.
Q. Here's an example. You know, this is not your executive team. But Coach Love was an assistant coach. The spring before you came to Nebraska he became an associate head coach.
A. Uh-huh.
Q. My understanding -- and I'll ask this -- I would expect Coach Williams to have more of the details on that, but was that the position was created, that there had not been a previous associate head coach.
A. Generally how those things work is you'll have another university try to hire your coach.
Q. Ah.

A. And so one of the ways of retaining your coach is a title change, which I don't know if that's the case in this situation.
Q. Yeah. Understood.
A. But -- and then there's an avocation for a salary commensurate with that.
Q. Something that makes staying attractive?
A. Right.
Q. During your tenure, did you hire any executive team members? Well, did you hire executive team members or did you -- in the time that you were there, did your executive team stay the same, other than to reduce the bloat?
A. No. I hired a new CFO, Doug Evalt who was the vice chancellor for business and finance at the med center, he came on board.
Q. Did you hire anyone for your executive team that was a woman?
A. Yes. We hired -- replaced Pat Logston with a new senior women's administrator with Markita Armstead.
Q. Okay. Were there any other women on the executive team beside the women's administrator?
A. Let me see here. Yeah. I don't think so.
Q. During your tenure, did men coach women's sports in Nebraska?

A. Yeah.
Q. Yeah. Belated question. You had John Cook, you had -- et cetera, Coach Love?
A. Yeah.
Q. Did women coach men's sports?
A. Not generally, no.
Q. As an athletic director, going over your three different positions there, what initiatives have you introduced to increase the influence of women's voices in sports administration?
A. I don't have any formal initiatives other than our executive team here looks a little bit different.
Q. Yeah. A little bit -- yeah, here, referring to A&M?
A. Yes.
Q. Have you hired to the executive team since you've been here?
A. We did a similar thing. There was a lot of bloat.
Q. Reduction?
A. Yes. And then what I do -- this is outside of -- what I like to do to change the culture of work is find the people who are actually doing the work. And then I elevate them. It just so happens we were

fortunate here, that a lot of the people in those areas happen to be females. And so --

Q. And so --

A. You know --

Q. -- different team here?

A. The only person I've hired is Jaime.

Q. Got it.

Exit interviews are done at Nebraska as they were at UNO?

A. In student athletes you mean?

Q. Correct. Yeah.

A. I believe so, yes.

Q. Am I correct in understanding that while you were the director of athletic at UNL you lead the department in a strategic planning process there?

A. Yes.

Q. Tell me about that process.

A. Well, Keith Zimmer led it. I asked Keith -- he had a particular passion for it. And he actually came to me. And he said, "Hey, we have not updated our strategic plan for a long time. I think it would be great, and I'd be happy to lead it if we did it." And he said, "I think we should engage all of our staff." And I said, "Great." So we did.

Q. Would that be the coaches?

A. Yes, coaches were involved. Not -- I don't believe all of the coaches were involved, but there were -- we tried to keep the job of trying to bring some diversity to the -- you know, who was all involved.

So everybody was represented. Everybody had a chance to try to weigh in on, you know, kind of where we thought -- where they thought we were, where we needed to go, and how we needed to get there, and how we would reflect the values.

Q. How long was the process? Was it something that took place all in one -- not compressed, but in one setting, or was it something --

A. Oh, no, it was multiple. Yeah.

Q. Okay. Yeah. I was going to say the last strategic planning process I was involved in took place over a total of a year?

A. No, it wasn't --

Q. But with more intensity within a period of a month.

A. Yeah.

Q. A lot of planning leading up to that month.

A. And we had a -- we hired a consulting company to kind of help us a little bit. It wasn't a big, you know, consulting -- I didn't want the consultants

dictating it. I wanted it to be organically driven through the department.

Q. Uh-huh.

A. But I don't know how long it took. But I also was not interested in creating a strategic plan because this had been my experience, that everybody puts on their shelf and nobody looks at again.

Q. Yeah.

A. I am president of an organization right now that just went through process. And so that is, you know, on my agenda every month, is, you know, where are we with each of our timed goals.

Q. Do you remember if Coach Williams participated?

A. I don't.

Q. Do you remember if any assistants participated?

A. I don't.

Q. Was a written plan produced from that process?

A. Yes.

Q. Was that something that had to be submitted for approval? Was the plan itself submitted for approval to the Board of Regents?

A. No.

Q. Do you recall what some of the major strategic initiatives were that developed from that process? Would that have included the capital program, or the capital projects?

A. Yeah, that would include capital projects. Primarily, though, you know, when I took over there was a real frustration with the competitive success across the board in the department.

So we were trying to -- I think we had finished 45th and the director's cup. And it was -- you know, with the amount of resources we were spending it was hard to understand why we couldn't competitively be more successful. So a lot of our focus was on --

Q. Performance?

A. How are we on performance. How do we close the performance gap, what are the resources needed to get there. So --

Q. I think you're answering what my next question is, but I want to make sure.

Do you recall whether any part of the plan addressed relationships between coaches and athletes?

A. I don't believe so. Title IX was addressed in the sense of, you know, rosters participation. The traditional Title IX, you know --

Q. Uh-huh. Were there written job descriptions

for coaches that were separate from the contracts while you were there?

A. I don't think so.

Q. There was incorporated within the contracts?

A. Whatever general counsel gave us is what we used.

Q. Did you have input for the term of the coaching contracts?

A. Only the business terms.

Q. Tell me what you mean by that.

A. Number of years, salary.

Q. Okay.

A. And bonuses.

Q. If you had reservations about retaining a coach, could you direct the addition of terms to that contract? So, you know, expectations that this coach either will do this or will not do that?

A. Yeah.

Q. Okay. I'm not going to ask you to breach any confidentialities, but were there times that you did that at Nebraska?

A. Performance-driven, yes.

Q. Okay. That would be based on team's performance over the course and season?

A. Yes.

Q. Okay. Do you remember directing any other kinds of terms, like personal conduct terms, anything like that?
A. I don't recall.
MS. CHALOUPKA: So I'm going mark Exhibit 332. This is going to be Coach Williams' contract.
(Exhibit No. 332 marked.)
(Reporter clarification.)
A. See, here is the vice chair of the Board of Regents right now. This is what --
Q. (BY MS. CHALOUPKA:) At A&M, I assume?
A. Yeah.
Q. It's not something for Nebraska?
A. But this is the point that -- he happens to be very interested in athletics.
Q. Ah. Okay. I've given you 332. This is Coach Williams' 2016 contract. So I understand it pre-dates you. But I -- you know, many of the terms are pretty similar as your contracts evolved.
On the first page, page 1 under section 2, under duties, it says that, "She shall be responsible to the director of intercollegiate athletics for the direct supervision and administration."
I take it that means that as director of

athletics you were Coach Williams' direct report; is that correct?
A. Correct.
Q. Okay. Underneath that, "Her duties include to faithfully and conscientiously perform the duties of head women's basketball coach and maintain the high moral and ethical standards commonly expected."
Was this a section that you maintained during your tenure at UNL?
A. Okay. Excuse me. Say that again. Like is --
Q. Yeah.
Did you maintain that section in the contracts that you administered as UNL?
A. Did I maintain --
Q. Yeah.
Did you ever --
A. -- these are Coach Williams' requirements or what do you mean? Did I --
Q. Let's go back to it. It says --
MS. SAPP: Are you saying did he keep it in there?
MS. CHALOUPKA: Right. Yeah.
A. Oh, did it stay in the contract?
Q. (BY MS. CHALOUPKA:) Right.

A. I have no idea. I didn't do the contracts.
Q. Where would a head women's basketball coach look for guidance as to the high moral and ethical standards commonly expected of a head coach?
A. Well, if she had questions about it she probably first would talk to Keith, sport administrator, and say, "What does that mean?" Most of the coaches, including Amy, are represented by counsel. So like an agent. So I don't know if the question was asked there. I don't know.
Q. You raised -- you just raised something that I should ask for clarity on.
Are most agents -- or were at that time -- were most agents that were representing the coaches themselves attorneys, if you knew?
A. I think many are, but I don't know that all of them are.
Q. So when this section says that she is to maintain high moral and ethical standards, is that just for herself or does it include setting expectations for her staff, her athletes, people working with her?
A. I don't know what that means.
Q. On the second page there is a reference here to academic progress saying that the coach agrees that academic process -- progress and achievement of the

student athletes is of the highest importance.
I take it that would be another section that stayed in while you were director of athletics?
A. I don't know.
Q. Let me mark another exhibit here -- which I can't because I wrote down the wrong number.
I have seen a reference to academic teams for the women's basketball team where players were assigned to a particular assistant or Coach Williams as being on an academic team.
First of all, do you have any idea what I'm talking about? I'm saying that with a smile on my face.
A. You mean -- so her roster -- some of the student athletes have this academic counselor and some had this one; is that what --
Q. As a -- as an assistant? Say, one of the assistant coaches?
A. Oh, I see what you're saying.
Q. Yes.
A. So Amy has her own like internal policy about what assistant coaches help each student --
Q. Correct.
A. I got you.
Q. Yes. I marked it. I did not run it off

correctly, but I'm holding this up, holding up my laptop right now to show you the document I was thinking of, which, you know, breaks down the team into --
A. Okay. Yeah.
Q. -- assignments of a coach and how many -- four players apiece or something like that.
Is that something that all of the sports did while you were director of athletics?
A. I'm not aware if any of them did it.
Q. Is that something that a head coach may decide to innovate and --
A. Yeah, the coach has the autonomy to make that kind of decision.
Q. That's kind of what I was getting at, is that how -- you know, the degree of involvement you would have. I take it the assignment that I've just shown you is not something that had to be submitted to you for approval?
A. No.
Q. Or the Board of Regents. Okay.
(Reporter clarification.)
A. No. Sorry.
Q. Or correct at least?
A. Correct. No.

Q. At an academic institution like D1 school, is a coach an educator?
A. I don't know the answer to that.
Q. Do they educate the players on their sports, their play, their ethics, their anatomy, things like that?
A. They're certainly trying to help grow them as people. I think there's some personal accountability and responsibility of those students, too. Not everybody -- not all of my former teammates chose to take advantage of the opportunities, right.
Primarily coaches are -- yeah, they're responsible for all of that. They're also -- but they're primarily hired and/or fired based on their ability to perform competitively.
Q. So go to the next page of Coach Williams' contract. There's a section there about the coach has the authority consistent with university personnel and NCAA regs subject to direct -- approval by the director. The coach's authority to hire and discharge assistants and other employees. So tell me how that worked while you were serving as director of athletics.
Did a head coach have to consult with you before hiring someone they wanted to hire?
A. The only consultation -- they would consult

with the sport administrator. So those were the details that they worked on. The only thing where I would get involved is if there was a dollar figure amount that required approval and possibly approval from the board.

Q. I'm going to guess that that would primarily happen within the football program as opposed to maybe anything else?

A. No. I mean, you would be surprised where --

Q. If you're hiring --

A. -- some of those basketball salaries have gone. And volleyball, as well. But yeah, I think primarily football.

Q. At that time?

A. Yeah.

Q. If there is an assistant who needs to discharged, and the coach don't want to discharge that person, does this paragraph mean that the coach doesn't have to, that the coach can tell you, "I like this assistant, you can pound sand, I don't want to fire him".

A. It wouldn't work that way, it would work more with the coach -- the sport administrator would sit down with the coach, talk through it, try to understand it.

You know, it just depends on what the situation is. If it's a coach that we don't believe is very good at his or her job, that's one thing. If there is conduct that's different, then, you know -- then that's where all the other entities come in.

Like the Atlanta office and the Office of General Counsel, and how that handled. But it wouldn't be a unilateral decision by the coach to say yes or no. There would be more people involved.

Q. There is a clause in Coach Williams' contract that I've seen in some of the other ones produced in this case, including yours, saying, "The coach ain't going to engage in discussions with -- about coach's perspective employment with other employers without first notifying director."

While you were director of athletics, did Coach Williams ever notify you that she was engaging in discussions with perspective other employers?

A. Not that I'm aware of.

Q. Okay. Annual evaluations are also mentioned in the coaching contracts.

Is that -- is an annual evaluation a written document?

A. I believe so, yes.

Q. Did you evaluate Coach Williams between the

time you came and the time you left? Did you have annual evaluations?

A. Keith Zimmer does that, the sports administrator.

Q. Okay. Did you have to review, approve anything like that with the sports administrator's annual evaluations?

A. The only thing I ever approved was when her contract was adjusted. Keith would work on all of that, make a recommendation. And again, as a head coach with board approval, that's when I would be involved. I was involved on the business terms of the contracts.

Q. Could you direct the sport administrator to include certain issues in the evaluation? If you were aware of a concern, you know, "This coach has had too many players that are leaving: For example. You know, "You need to ask about that," that kind of thing?

A. Yeah. I -- as the athletic director, I'm not involved in those daily grandular details. That's why you have sport administrators.

Q. Yeah.

A. So it's really primarily their responsibility. They would understand that. They would know that. If there was an issue where the coach

resisted that, perhaps it could be elevated, but it, you know, rarely was.

Q. Was women's basketball considered to be a revenue support in 2021, '22?

A. No.

Q. It was not.

How about when you left?

A. I don't believe so.

Q. I take it that your expectations for a coach at Nebraska are not lower based on how much revenue their sport earns; is that correct?

A. No.

In terms of competitive success or --

Q. Right.

A. Well, there is nuance to that. You have to make strategic decisions about where you're going to invest your resources. If the University of Nebraska -- they chose years ago to become a dominant volleyball program, right.

Taking nothing away from the coaches who've coached there, they have twice the resources that everybody else has. It's a fact. Nebraska invests in women's basketball. They don't invest in women's basketball like Yukon does, or South Carolina, or -- so those are the types of decision-making strategic -- so

just to be clear.
Q. How about -- you know, do your expectations for coaches' personal conduct change based on whether it's a revenue sport?
A. No.
Q. I would take it that you expect a Nebraska coach to be a strong leader regardless of whether it's a revenue sport or not?
A. You would hope.
Q. It would be your expectation?
A. Yeah.
Q. You would expect the coach to be professional regardless of whether their sport is revenue or not?
A. Yes.
Q. And Title IX applies regardless of whether it's revenue?
A. Yeah.
Q. I also take it you would expect a Nebraska coach to be a strong leader regardless of whether they're a man or a women?
A. Yes.
Q. Did you know Lloyd Williams, which was Coach Williams' husband? Did you ever meet him?
A. I think when I first got there she introduced him to me at one point, but I don't know.

Q. In passing --
A. Yeah.
Q. -- at most?
A. Yeah.
Q. Okay. Who --
A. I mean, I would see him at games. He would come to games, obviously.
Q. Which person on your executive team would have overseen benefits that were provided to assistants?
A. Benefits provided to the assistants.
Q. Would that be a finance person or HR, or --
A. Was it contractual benefits, you mean?
Q. Yeah. Like for example, did Nebraska provide phones for assistants or pay their bills, or anything like that?
A. No. I believe they -- no.
Q. No.
A. That went away. There was an effort to get rid of cars and phones, and all these like, you know -- there were years and years -- in the 80's, right, when salaries were way different, there were -- you would try to create these additional fringe benefits that made it worth doing.
Well, as salaries changed it was not logical

to think that somebody needs to have a car provided, which, you know, some of the car dealers liked doing it because they got access to take -- you know, there was -- but it created some challenges.

So that happened prior to my arrival. I think there was an effort -- there was still some car dealership stuff, but the university went away from those things.

Q. If I remember right salaries were kind of unique for a while cause Coach Osborne simply hadn't asked for much.

And unlike, you know, all the great egos of the world -- and maybe conditioned Nebraska a little bit to -- you know, "This is how much we need to pay," whereas, you know, down in the SCC or someplace else like that, they don't have Coach Osborne there. They had people saying, "Show me the money."

A. Yeah, I don't know.

Q. Yeah. Did Nebraska try to -- when you were there were you in a phase of expanding benefits to assistants or contracting them?

A. I don't know that we had any strategy around that.

Q. Okay.

A. I'm trying to think. We were -- what I

remember is through general counsel we were trying to gain some consistency around benefits.

The problem is when you're trying to hire a coach and he or she has an agent, if you're not careful you have 12 different contracts with 12 different bonus structures, which creates a lot of challenge. So that's the only thing I really remember, is that we were trying hard to, you know --

Q. I was going to ask about that, whether there was -- whether it was uniform or if there were -- you know, between sports there was something that had to be unique.

A. Well, you would like to be uniform. The reality is the coaches are in a position of, you know, leverage at that point. So oftentimes, you know, I guess you -- what you can do is on the second contract, you know, you can try to fix some of those things.

But as you're trying to acquire talent sometimes it's challenging. But we -- I just remember that HR and general counsel worked hard to try to create some consistency around the benefits piece.

Q. On the subject of Coach Osborne, were you ever involved with the TeamMates?

A. Yeah.

Q. Were you a mentor in TeamMates?

A. Yes.
Q. Was that while you were director of athletics?
A. Yes.
Q. So fairly recently, up until when you departed to come to Texas?
A. Well, no I wasn't. My mentee -- I'm trying to think. I don't think I was in Lincoln. He -- I was in Omaha the whole time.
Q. Okay.
A. But he had graduated. And I just -- I still was involved. I would go to some things that Suzanne and others would put on, but I didn't have a mentee because I was drinking from the fire hose.
Q. But remained supportive of the organization?
A. Oh, sure.
MS. CHALOUPKA: So let me mark Exhibit 373.
(Exhibit No. 373 marked.)
Q. (BY MS. CHALOUPKA:) I take it this looks familiar to you?
A. Yes.
Q. Okay. And I take it you wrote every single word in it yourself?
A. No. This is Bill Moose's.

Q. You inherited this?

A. Okay.

Q. I don't know if it was Bill Moose's. So this is the 2021. I've recently gotten some other editions of this. Let me find the bates page for you to look at. Go to Bates page, I think, 2104.

A. Okay. I think I got it here.

Q. And there's highlighted language in here, but there's also just a section on discrimination harassment. My understanding is that this is the language and the material provided to student athletes that would address sexual relationships between coaches and athletes.

Can you tell me where in the language we're looking at, we would see something that specifically addresses sexual relationships from coaches and their students?

A. I'm sorry. I don't know anything about this. This is the first time I've ever seen this.

Q. If that language were similar to the student handbook when you were present, possibly identical, would you be familiar with it?

A. I don't know that I've seen the student handbook.

Q. Did you have to approve the student handbook?

A. No.
Q. Do you know if the Board of Regents approved it?
A. No. They didn't.
Q. Okay. So I'm going to move to a slightly different topic.
Within your department, did different sports have different team rules, team policies?
A. Yeah.
Q. Was that something that you required of coaches, to set out a slate of team rules, or was it just allowed if the coach wished to do that?
A. Yeah, we generally allowed the coach to try to create the culture that he or she feels is really important to help them be competitively successful, which is why we had the sport administrators involved, to make sure the communication with the student athletes have the open line of communication. That's why we do those, you know, exit interviews when they graduate, looking for trends, those types of things.
Q. Did the Board of Regents have to approve the team rules --
A. I don't believe so.
Q. -- that a coach would write?
A. No.

Q. Okay. Did you have to approve the team rules?
A. No.
MS. CHALOUPKA: Let's mark this as 375, please.
(Exhibit No. 375 marked.)
Q. (BY MS. CHALOUPKA:) My understanding is this is the team handbook for the women's basketball team.
As you look at that, and please take your time doing so, my question is going to be, did you approve this?
A. I did not.
Q. And do you have any knowledge of whether this is something the Board of Regents needed to approve?
A. I don't believe the Board of Regents would be approving this.
Q. Why is it your belief that this is not something the Board of Regents would need to approve?
A. I don't think that's the type of policy that they're engaged in.
Q. Okay. Yeah. I mean, that -- I didn't mean to sound like a trick question or something. That was basically what I was getting at. This is below the level of where the Board of Regents gets involved, if I'm understanding right.

As you look through this tell me if you see anything that relates to sexual relationships between coaches and athletes.

A. I don't believe so, although you could make the leap on a couple of them relative to accountability and stuff, but I don't see anything specific, no.

Q. Do you see anything here that relates to rules for travel?

A. I don't. Is this the only thing that --

Q. Well, I'm about to hand you something else.

A. Okay.

Q. But there were a few different collections of materials.

MS. CHALOUPKA: So this is going to be 376.

(Exhibit No. 376 marked.)

A. Is this the next iteration?

Q. (BY MS. CHALOUPKA:) Different section, I believe, of the same book I believe.

A. Oop, sorry.

Q. And giving you the sneak preview, my questions will be do you see anything here that relates to sexual relationships between coaches and athletes?

A. So is -- was this given to all the coaches, as well, or is this just the student athletes?

Q. Well, my understanding is that this was given to the team. I don't know if it was distributed to the coaches.
A. Okay. Yeah, I don't know, either.
Q. You don't know, either. Okay.
Do you see anything in here that relates -- that sets out rules for travel?
A. I do not. COVID Policy.
Q. Happy time for everybody.
So Nebraska was Coach Williams' sixth coaching job. I think it was her third head coach job. First Power 5 job.
A. Uh-huh.
Q. What were your expectations for her as you start this role as, you know, a head coach and a Power 5?
A. If I recall this correctly, and I'd have to look, I think the results were okay, but not elite. And it is part of the reason why I put Keith Zimmer as the sport administrator for women's basketball.
I felt like Amy was a younger coach that could really benefit from a veteran administrator who had worked with a lot of different coaches. And so my expectation was that we wanted a higher level.
Q. Did you have anticipation that women's

basketball could become a revenue sport at Nebraska?
A. No.
Q. Not really?
A. No.
Q. Other leadership expectations of her, you know, other than that she could benefit from mentoring from a veteran?
A. Uh-huh.
Q. You know, more specifically, what did you want to see from her in terms of leadership?
A. I was primarily focused on competitive success.
Q. Performance.
Did you know that all of Coach Williams' assistants had come with her from USD?
A. I did not.
Q. Do you know that now?
A. Now I do because you told me.
Q. Yeah, because I just told you.
A. Yeah.
Q. I'm clever that way.
What did you observe about the strength of her relationships with her assistants?
A. They seemed to work well together. I just remember one of her assistants got another opportunity.

And I remember Keith strongly advocating for us to match the offer because he wanted to keep the staff intact because they seemed to have good chemistry and camaraderie, and they were working well together.

Q. Do you remember whether that was Coach Mays, who is a woman, or Coach Goehle, who was a man?

MS. CHALOUPKA: G-O-E-H-L-E --

A. No. It was the director of ops, I believe.

Q. (BY MS. CHALOUPKA:) -- okay. Amanda Arch?

A. Yeah.

Q. Got. Had --

A. I think she was given an opportunity of being an on the court coach. We didn't have a spot for that, so we, you know --

Q. Found other ways to --

A. -- we just increased her salary probably beyond what the directors of ops role required.

Q. Had you identified any areas of growth and improvement other than competitiveness for how Coach Williams ran her program?

A. No.

Q. When did you first hear that Coach Love had engaged in inappropriate contact with students at previous positions?

MS. SAPP: Objection, form.

A. At previous positions?
Q. (BY MS. CHALOUPKA:) Yeah.
MS. SAPP: Objection, form of the question. Foundation. Assumes facts not in evidence. Calls for speculation.
MS. FROST: I will join that objection.
Q. (BY MS. CHALOUPKA:) Prior to Nebraska is what I mean.
MS. SAPP: Same objection.
A. I never heard any of that.
Q. (BY MS. CHALOUPKA:) If Coach Williams were aware that Coach Love had engaged in inappropriate contact with students at a previous coaching position, should she have brought him to the University of Nebraska?
MS. SAPP: Same objections.
MS. FROST: Same objection.
A. I'm not sure I can answer that.
Q. (BY MS. CHALOUPKA:) Well, what reason -- what policy reason would support bringing an assistant to your program if you, as a coach, knew that he had engaged in inappropriate contact with students previously?
MS. SAPP: Same objections.

MS. FROST: Same objection.
A. I can't speak for what Coach Williams was thinking, what she knew, what she didn't know. I have no idea.
Q. (BY MS. CHALOUPKA:) Not asking you to right now. This is a different question.
If she were aware that he had engaged in inappropriate contact with students at a previous position, she should not have brought him to Nebraska, true?
MS. SAPP: Same objections.
MS. FROST: Join.
A. I wasn't at Nebraska when she brought him.
Q. (BY MS. CHALOUPKA:) That's not the question I asked.
(Reporter clarification.)
A. I wasn't at Nebraska when she brought him.
Q. (BY MS. CHALOUPKA:) See. And if I had asked you, "Were you at Nebraska when she brought him" you would have given the perfect answer to that.
A. Right.
Q. That's not what my question was.
My question was, if she did know, regardless who the director was, she shouldn't have brought him, true?

MS. SAPP: Same objections.
MS. FROST: Join.
A. I wouldn't have.
Q. (BY MS. CHALOUPKA:) Because?
A. But I'm not the coach.
Q. Because?
A. Because why?
Q. "I would not have brought him," why?
A. I -- if I felt that there were substantive allegations that might negatively impact the culture of my team I probably wouldn't have made that. But I'm not a coach.
Q. Okay.
A. I've never been a coach. And I've never hired an assistant coach.
Q. Sure. I get that.
But you're the director of athletics?
A. Right.
Q. And per Coach Williams' contract, you know, her hiring and discharge is -- you know, it does go through you.
So if she had known that he had engaged in inappropriate contact, can we agree that she shouldn't have brought him?
MS. SAPP: Same objections.

A. Yeah, I --

MS. FROST: Join.

THE REPORTER: Is that Ms. Frost?

MS. CHALOUPKA: Yes.

MS. FROST: Yes.

THE REPORTER: Thank you, sorry.

A. Yeah. Like I said, I wouldn't. I'm not Amy Williams. I don't know what was in her mind. I can't speculate about what that time was. I wasn't the athletic director. I don't know how he was hired. I don't know what she knew.

Q. (BY MS. CHALOUPKA:) Sure. And the question was hypothetical, but I hear all of your provices (phonetics)?

A. It's hard for me to answer to a hypothetical.

Q. I bet you do it all the time, but we'll keep moving.

A. I try hard not to.

Q. As the director of athletics, had you had any reasons for direct interaction with Coach Love before February 18th of 2022?

A. No.

Q. What did you know about his role with the women's program?

A. I know he was an assistant coach that Amy

valued. I don't know if he's a good coach. I don't know if he's a good recruiter. I don't know.

MS. CHALOUPKA: So I'm keeping an eye on the clock. And I think I can squeeze -- we're going to have to come back, obviously, but I think I can squeeze in a few more questions before we move to the -- you know, what you had described as the incident.

MS. SAPP: How long do you think you would need to finish this up? I don't want us -- I don't want to have to travel back again.

MS. CHALOUPKA: Say again.

MS. SAPP: I do want us to all have to travel back again.

MS. CHALOUPKA: I don't, either, but I understand that Mr. Alberts has a hard stop. And I don't want to be disrespectful of that. So, you know, it's -- it will be --

MS. SAPP: If we can free him up at 12:30.

MS. CHALOUPKA: I've got an outline that's going to take up my allowable time, so --

MS. SAPP: All right. Can we agree that if we resume, we resume by Zoom?

MS. CHALOUPKA: No, I think I'm going

to need to come back. And I apologize because I know that means you're going to have to, too. I'll think about it, Susan.

I don't want to commit one way or the other now, but I -- but I will say I'm not ruling out either way.

MS. SAPP: If we can free up until like 12:45, does that --

MS. CHALOUPKA: No.

Okay. I'm going to mark Exhibit 314. Save that. So I've obviously written down the wrong one. Let me skip ahead, then.

(Exhibit No. 314 marked.)

Q. (BY MS. CHALOUPKA:) When you stepped into this role as director of athletics --

A. Lincoln?

Q. Lincoln.

A. Oh, yeah.

Q. I take it you knew there had been allegations of abusive behavior by prior coaches?

MS. FROST: I'm going to object on foundation and form.

MS. SAPP: Join.

A. With who?

Q. (BY MS. CHALOUPKA:) Connie Yori, Y-O-R-I.

A. No. I was not --
Q. Not familiar with that?
A. -- privy to any of that information.
Q. Were you director of athletics at UNO when Coach Yori was terminated?
A. Yes.
Q. Did you make yourself aware of the reasons why?
A. No.
Q. How about the allegations that had been made in 2019 against Rhonda Revelle, R-E-V-E-L-L-E?
A. I was aware of them. I don't know any of the details of it.
Q. And how about if there had been allegations that Bill Pelini even was, that was obviously before your time, but that he had been, you know, intemperate?
A. There's always -- there's -- there will always be rumors and innuendos at Nebraska.
Q. Sure. Right. And some -- and if the rumors are true they have to be acted on, right?
A. Yeah, if you can validate them.
Q. So am I correct then in understanding that you did not -- when you came to Nebraska you did not train yourself up on what those events were with these allegations that had led to termination of Ms. Yori,

you know, a pretty major investigation for Ms. Revelle, for example?

A. No.

Q. Was --

MS. CHALOUPKA: Let me mark Exhibit 400. Nope, we already did Exhibit 400. 398.

THE REPORTER: What number?

MS. CHALOUPKA: 398.

(Off record discussion.)

(Exhibit No. 398 marked.)

Q. (BY MS. CHALOUPKA:) Handing you 398 --

A. Uh-huh.

Q. -- and asking you if this is a familiar training to you. And if -- let me tell you why I'm asking, Mr. Alberts. A few of the trainings that have been produced don't -- if they have dates, I'm not finding them.

And so the best I can do is just ask, does this look familiar to you as something that was used during your time?

A. I don't know. I do remember Mark Pierce speaking to our entire department, all of our staff. I don't know if this is the slide deck he used.

Q. Did you speak to your staff more than once, if you remember?

A. No.
Q. Okay. Associate to the chancellor. And he -- I'm guessing, he had some connection to the Office of Institutional Compliance. I'm seeing IEC on that page of Exhibit 398.
What was your understanding of Mr. Pierce's role? Was he a trainer for you or some --
A. I don't know that he was a trainer. I think it was more -- exactly, it's the reporting stuff. We're -- this is our office, these are the people. It was more just communication --
Q. Let me ask you some quick questions about whether rules existed on a few different points at the time that you were there.
As I understand it, before February of 2022 at least, there were no rules that govern direct contact between coaches and student athletes; is that correct?
MS. SAPP: Objection, form. Foundation.
A. I don't know.
Q. (BY MS. CHALOUPKA:) Could a coach make direct contact with an athlete about any subject they wanted?
A. No. I don't think so.
Q. Where were the rules that would clarify that?

A. I'm not aware.
Q. Before February of 2022, there were no rules, as I understand it, about coaches contacting their athletes by social media; is that true?
A. I don't know.
Q. Could a coach direct message an athlete on social media at any hour of the night?
A. I don't know. I mean in theory, I guess, right.
Q. I mean as far as any rules prohibiting it. I take into there weren't any.
A. I'm not aware of them.
Q. Before February of 2022, I understand there were no rules that governed one-on-one time between coaches and student athletes; is that true?
A. Yeah.
Q. If Amy Williams had come to you in January of 2022, and said --
A. Another hypothetical.
Q. Yup, it is. Roll with it. You're a high level guy. If she had come to you before January, or in January of '22, and said "My assistants and I do one-on-one outings with our players, we'll take a player out for dinner, we'll take a player out for coffee," would you say that's fine?

MS. SAPP: Objection, form of the question. Foundation. Unduly vague.
You can answer if you can.
A. I might ask some additional questions. Say, "What are we doing," about you I don't that we'd have a policy against it.
Q. (BY MS. CHALOUPKA:) I take it that your concerns either would go away or not go away depending on an answer like, "Well, we do this at the beginning of every year, we" -- you know, "just to find out what the players' goals are" --
A. I think context would be important, yeah.
Q. Right, yeah, context. And it's -- if it's scheduled through our -- you know, through the director of operations and it's on everyone's calendars as opposed to, "Hey, we finished practice, it's 9:00 o'clock, why don't you come with me to" --
A. Right, correct.
Q. Yeah.
Suppose Amy Williams came to you and said, "My associate head coach has extra one-on-one practices with my point guard," would you have said that's fine?
MS. SAPP: Same objections.
MS. FROST: Objection, form and foundation.

A. You know, while it's not broadly normal I'm not saying it never happens where a student would ask for additional instruction, but I don't think it's broadly done in college athletes.

Q. (BY MS. CHALOUPKA:) Would you have -- is this another situation where you would have some follow-up questions?

A. Yeah, probably.

Q. For example, not exceeding hours limits, right --

A. Yeah.

Q. -- would be one condition?

A. Certainly you don't want break incident rules.

Q. And, "We want to make sure that you're not doing this at 11:00 o'clock at night," for example?

A. Yeah.

Q. Suppose Coach Williams said, "My associate head coach takes players out for alcoholic drinks one at a time -- "

A. Yeah, that --

Q. -- one player, not one drink?

MS. FROST: Object to the form and the foundation of that question.

MS. SAPP: Same objection.

Q. (BY MS. CHALOUPKA:) Would you have approved that? Would you have said, "Cool?"
A. No.
Q. Why not?
A. That wouldn't be appropriate.
Q. Because why?
A. Because that's not the role of the coach, the role -- that's -- you know, that's -- that piece of the relationship doesn't make sense.
Q. And that can lead to trouble?
A. It could.
Q. Suppose Amy Williams had come to you to say, "My associate head coach is sending private messages to one of my players through Snapchat, is this okay," what would you have said?
MS. FROST: Objection, form and foundation.
MS. SAPP: Same objections.
Q. (BY MS. CHALOUPKA:) What would you have said?
A. I don't know anything about Snapchat. I've never used it.
What does that mean?
Q. You don't -- clearly you're not a criminal defense lawyer. It is the femoral social media platform in the which messages disappear.

A. Oh, very nice.
Q. Yeah.
A. So not like a text. It doesn't live.
Q. It doesn't live like a text, no.
So would you --
A. So you're saying would it by appropriate for the coach to snapping -- chatting at a student athlete?
Q. Correct.
A. It would be unusual.
Q. Would you have questions?
A. Yeah.
Q. Let me ask, also, were there rules in your department before February of '22 about coaches giving personal gifts to athletes?
A. I have no idea.
Q. How about exchanging photographs with athletes? Was there rules on that?
A. Not that I'm aware of. I don't know if there are.
Q. Were there -- I'm going to ask a different question. Again, watching the clock.
What procedure was in place in 2021, 2022, to guide a student athlete whose assistant coach sends her a text at midnight to invite out for a drink?
A. Yeah. Well --

MS. FROST: Objection, form and foundation. Sorry, sir.

THE WITNESS: Oh, you're okay.

MS. SAPP: Same objections. Assumes facts not in evidence, improper hypothetical.

A. What happens is -- and that's why the sport administrators spend so much time with the team, is you develop a relationship with the players. Okay. And so the consistent communication is, if you have any issues or concerns, bring them to my attention. So that's where the trust is created between the administration, the sport administrator and the players.

Q. Who is to -- the communication to who is bringing to your attention, the -- to the sport administrator or to the coach, or to whom?

A. If -- what we teach the players is if the players have issue, if they have concerns, if they -- at first try to work it with their coach. If that doesn't work, then come to the support administrator.

And then you go to the athletic director, and then you go to the chancellor. There's just this whole -- that's just how it works. And so -- but the sport administrator -- he or she needs to develop the kind of trust. That's why they spend so much time there, so that the students feel comfortable talking to

them, so that they're available.

Q. Okay. And so what you have just described, how are -- how do you know that that was communicated to the women's basketball team in 2021, '22?

A. I think you'd have to ask Keith Zimmer that.

Q. Okay. Would that procedure be in place to guide a student athlete whose coach invites her to meet him at a private place at midnight?

MS. SAPP: Same objections.

MS. FROST: Join.

A. I don't know. Again it's -- you know, you're hoping that there's a little personal responsibility on the other side. And if there's discomfort, that that person has to trust in the sport administrator, to come forward and say, "I feel uncomfortable."

Q. (BY MS. CHALOUPKA:) When you say, "on the other side," meaning on the part of the student athlete?

A. The student athlete, yeah.

Q. Can you imagine why a student athlete would be torn on whether to report an assistant coach, or even a head coach, inviting -- you know, texting her after -- you know, at -- late at night to invite her for a drink or a private meeting?

A. Sure.

MS. SAPP: Objection.
Before the answer, interpose an objection. Foundation, speculation, hypothetical, form.
Q. (BY MS. CHALOUPKA:) Why --
MS. FROST: And I would join in that objection.
Q. (BY MS. CHALOUPKA:) Why -- you know, why would you imagine that that would -- that an athlete would be torn about whether to report that?
MS. SAPP: Same objection.
MS. FROST: Join.
A. I don't know. I -- I've never been in that situation. I don't know what a student athlete might be thinking. If I felt uncomfortable or wondered what was happening, I would say something. First I'd say something to the coach, and then probably to the support administrator.
Q. (BY MS. CHALOUPKA:) I mean, I'm being crass here, but I take it that there was never a time when you were a student athlete, that a coach tried to have sex with you, fair?
A. It's actually not true.
Q. Not true.
Football coach?

A. No.
Q. Okay. Did a coach -- you know, of course I'm curious, but coach of what?
A. You know, it doesn't have to just be a coach. It could be in the broader context of the university.
Q. Okay. So what is the -- when you're saying broader context of the university, tell me what you're referring to so I don't have to guess.
A. No, it could be -- it -- what I'm saying is it doesn't have to just be a coach.
Q. Okay.
A. It could be a staff member. It could be anybody.
Q. Anybody is the same as a coach who has supervisory authority over the player?
A. Yeah. Anybody in a similar type of role, right.
Q. Okay. I mean -- well, supervisory authority is supervisory authority?
A. Right.
Q. So who is it that -- you know, what was the role that was trying to get you to have sex with them?
A. I'm not talking about me personally.
Q. Okay.
A. I'm talking about that can happen and has

happened.
Q. Okay. And I'm going back to what your answer was, that, yes, this had happened to you.
Did you --
A. No, not to me. That had happened.
Q. Okay. Not to you, but it had happened to --
A. Right. That happens in departments.
Q. Okay. So back to why would a students be torn about whether to report it? Why can you -- why would you imagine that it would be difficult to decide that --
A. I don't know.
MS. SAPP: Same objections.
A. I mean, I suppose they might be concerned that, you know, it would bring negative attention to the team, that someone would get mad at them. I don't know. I can't put myself --
Q. (BY MS. CHALOUPKA:) Someone could get mad at them and it could impact their playing time?
A. Yeah, I suppose.
Q. Has -- during your time at the university, did the department of athletics ever put out statements that retaliation for reporting misconduct will not be tolerated?
MS. SAPP: Objection, foundation,

form.

MS. FROST: Join.

A. Did the what now? Did the university put out statements against student athletes?

Q. (BY MS. CHALOUPKA:) Did the department put out statements that retaliation for reporting misconduct will not be tolerated?

MS. SAPP: Same objections.

A. I'm not aware of that.

MS. CHALOUPKA: Okay. This is as good a breaking time as any, Susan and Denise.

THE WITNESS: No, that's perfect.

MS. CHALOUPKA: Yeah. Well, I'm highly skilled from that point.

THE REPORTER: Still on the record?

MS. CHALOUPKA: No, unless Susan or Denise needs to stay on the record for a minute.

THE REPORTER: Ms. Frost, Ms. Susan, do you want me on the record?

MS. FROST: I have no further need.

THE REPORTER: Okay.

MS. SAPP: We can go off the record.

THE REPORTER: Okay. And before I do that, I apologize, was there going to be any copies ordered? As the firm says, we have to get it on the

record.

MS. CHALOUPKA: I would like the -- yeah, digital only. I don't need a hard copy. And full size because my eyes are old.

MS. SAPP: I would like a copy, please.

THE REPORTER: Okay.

MS. CHALOUPKA: We're adjourned. We will figure out logistics for finishing this up.

Mr. Alberts, thank you.

THE WITNESS: Thank you.

THE REPORTER: Ms. Frost, did you want a copy, I'm sorry?

MS. FROST: Yes, please. Just a condensed transcript. Electronic only is fine.

THE REPORTER: Okay.

Anybody else?

MS. FROST: Thank you.

THE REPORTER: Thank you.

Off the record at 11:55 a.m.

(Proceedings adjourned.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

ASHLEY SCOGGIN, )
)
Plaintiff, )
) Case No.
) 4:24-CV-3039
vs. )
)
BOARD OF REGENTS OF THE )
UNIVERSITY OF NEBRASKA, and )
individuals AMY WILLIAMS, TREV)
ALBERTS, and CHUCK LOVE, JR., )
in their individual )
capacities, )
)
Defendants. )

REPORTER'S CERTIFICATE
DECEMBER 4, 2025

I, Nilda Codina, Notary in and for the State of Texas, hereby certify to the following:

That the witness, TREV ALBERTS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

_____ was requested by the deponent or a party before the completion of the deposition returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

__X___ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.

Further, I am not a relative or employee of any attorney of record in this case, nor do I have a financial interest in the action.

Subscribed and sworn to on this the 20th day of December, 2025.

Nilda Codina
_____________________________
NILDA CODINA
Notary in and
For the State of Texas
My Commission No. 12878135-3
Expires: 10/24/2027
ASSOCIATED COURT REPORTERS
Firm Registration No. 29
1225 North Loop West
Suite 327
Houston, Texas 77008
Phone: (713) 626-2629