IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

ASHLEY SCOGGIN, )
)
Plaintiff, )
) Case No.
) 4:24-CV-3039
vs. )
)
BOARD OF REGENTS OF THE )
UNIVERSITY OF NEBRASKA, and )
individuals AMY WILLIAMS, TREV)
ALBERTS, and CHUCK LOVE, JR., )
in their individual )
capacities, )
)
Defendants. )
)

---

ORAL DEPOSITION OF
TREV ALBERTS
FEBRUARY 19, 2026

---

ORAL DEPOSITION OF TREV ALBERTS, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on February 19, 2026, from 7:59 a.m. to 11:18 a.m., Nilda Codina, Notary in and for the State of Texas, recorded by machine shorthand, from Athletics Department of Texas A&M University, 161 Wellborn Road, College Station, Texas, 77030, pursuant to the Federal Rules of Civil Procedure, and the provisions stated on the record or attached hereto.



EXHIBIT
7
4:24-cv-3039

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:

Ms. Maren L. Chaloupka, Esq.
CHALOUPKA LAW, LLC
1906 Broadway
P.O. Box 1724
Scottsbluff, NE 69363-1724
Phone (308)270-5091
mlc@chaloupkalaw.net

Mr. Nathan T. Bruner, Esq.
BRUNER FRANK
5804 1st Avenue
P.O. Box 2230
Kearney, NE 68848-2230
Phone (308)455-1046
nbruner@nebraskalaw.net

FOR THE DEFENDANT:

Ms. Susan K. Sapp, Esq.
CLINE WILLIAMS WRIGHT JOHNSON &
OLDFATHER, L.L.P
1900 U.S. Bank Building
233 South 13th Street
Lincoln, NE 68508
Phone(402)474-6900
ssapp@clinewilliams.com

Ms. Denise E. Frost, Esq. (Via Zoom)
JOHNSON & MOCK, PC LLO
9900 Nicholas Street
#225
Omaha, NE 68114
Phone(402)685-5647
dfrost@johnsonandmock.com

Mr. Bren H. Chambers, Esq. (Via Zoom)
Deputy General Counsel
UNIVERSITY OF NEBRASKA
3835 Holdrege Street
Lincoln, NE 68583-0745
bchambers@nebraska.edu

I-N-D-E-X

PAGE
Appearances....................................2
TREV ALBERTS
Direct Examination by Ms. Chaloupka..................6
Proceedings concluded.............................157
Witness signature/errata..........................158
Reporter's certificate............................160

E-X-H-I-B-I-T-S

PAGE
Exhibit No. 457 Coach William's excerpt testimony....9
Exhibit No. 307 Part of Employment Agreement........11
Exhibit No. 371 Mr. Zimmer's notes..................20
Exhibit No. 311 Policy..............................28
Exhibit No. 415 Release.............................49
Exhibit No. 416 ....................................49
Exhibit No. 417 ....................................49
Exhibit No. 470 Email...............................63
Exhibit No. 421 Student Conduct Policy..............76
Exhibit No. 400 PowerPoint....................83 & 84
Exhibit No. 319 Email...............................87
Exhibit No. 320 Attach correspondence...............87
Exhibit No. 364 Megan Counley notes.................92
Exhibit No. 324 Email from Krissy Scoggin...........93
Exhibit No. 381 Email from Krissy Scoggin...........93

Exhibit No. 341A Separation agreement..............138
Exhibit No. 308 Email from Keith Mann..............140
Exhibit No. 393 University excerpted document......147

P-R-O-C-E-E-D-I-N-G-S

THE REPORTER: We are now on the record. Today's date is February 19, 2026. The time is 7:59 a.m.

Would all parties please state their appearances for the record and who they represent.

MS. CHALOUPKA: Maren Chaloupka and Nathan Bruner representing Ashley Scoggin.

MS. SAPP: Susan Sapp representing Board of Regents of the University of Nebraska, Trev Alberts and Amy Williams.

MS. FROST: Good morning. Denise Frost on behalf of defendant Chuck Love, Jr.

THE REPORTER: Who else do we have on Zoom?

MS. SAPP: General Counsel Bren Chambers and my law partner Lily Amare.

THE REPORTER: Thank you.

TREV ALBERTS,

Having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CHALOUPKA:

Q. It's a different context than this case, but I've seen a quote from you in which you said that

"Leadership is really critical." I think that context was when you were making the transition from Nebraska to Texas A&M.

Tell me when you say leadership is really critical, what's -- what are you thinking?

A. I think -- I think having a leader is really critical.

Q. And probably also being a leader?

A. Yeah. I mean, in the context of that quote, it was leadership is really important, like, knowing who your -- who your boss is going to be. Right.

Q. Would it also apply to being a boss, being a leader and stepping up and showing leadership?

A. I think you could make that leap. Sure.

Q. In a crisis especially, I'm guessing.

A. Sure.

Q. When we were here in December, your testimony was, "The feedback that I remember hearing is the team said, 'We will not play if she's," meaning Ashley, and 'We will not play if Chuck is on the bench.'"

I take -- I take it that the feedback you heard came from Coach Williams?

A. No. The feedback I heard came from Keith Zimmer.

Q. From Mr. Zimmer.

A. Yeah.
Q. Where did he get it from?
A. I'm assuming from Amy.
Q. So when, you know, when you heard that the team would not play if Ashley is involved, what concerns did that cause you for Coach Williams' leadership of her team?
A. It didn't cause me concern for Coach Williams. My concern, primarily, was exactly what I communicated to Keith; is make sure that all of the right people have been communicated with about the situation so that we have the proper guidance necessary to make good decisions and wise decisions as an athletic department.
Q. I take it that you did not contact Amy Williams and say, you know, something like, You are a Division 1 coach at, what was then, a Power 5. Program, you need to exercise leadership with your team.
A. I did not.
Q. I take it you also didn't say anything, like, Remind your players of their own contracts with this University; no play, no scholarship, no benefits, correct?
A. I did not.

Q. I take it you didn't say anything like, Remind your players that you're the coach. You run this program, not them. True?

A. I did not.

Q. So did Mr. Zimmer tell you who exactly had said, "We won't play?"

A. He did not. Not that I recall.

Q. Let me hand you what's marked in a different deposition. This is going to be Exhibit 457.

(Exhibit 457 marked.)

Q. (BY MS. CHALOUPKA) This is an excerpt of Coach Williams' testimony when I asked her who was refusing to play.

Have you seen this before?

A. Have I seen this?

Q. Correct.

A. No. I don't believe so.

Q. If you look at the bottom of the second page of that document, I asked line 19 who specifically said "I won't play if Ashley's on the team."

And go ahead and take a moment and read what Coach Amy said in response. Read it to yourself.

(Witness complies.)

Q. (BY MS. CHALOUPKA) Have you seen what Coach Amy's testimony was?

A. I did, yeah.
Q. As of February 22, 2022, to your knowledge, Amy Williams had never removed a player from her team without a finding of a rule violation, true?
MS. SAPP: Objection, foundation.
If you know.
A. I don't know the answer to that question. I just --
Q. (BY MS. CHALOUPKA) I'm saying to your knowledge.
A. To my knowledge?
Q. Right.
A. Not off the top of my head, no.
Q. And to your knowledge, Coach Williams had never removed a player from her team for just not getting along with other players, true?
MS. SAPP: Objection, foundation. Form. Assumes facts not in evidence.
A. I don't know. Not that I'm aware of. I don't know.
Q. (BY MS. CHALOUPKA) To your knowledge, no coach within the department had ever removed a player from her team without a rule violation, true?
MS. SAPP: Objection, foundation, form.

A. Any coach in the athletic department? That would be untrue.

Q. (BY MS. CHALOUPKA) While you're there?

A. I don't know all the specifics, but I'm very clear and confident we've had players who've been removed from the team. I don't know exactly all the details surrounding it, but the coaches have, you know, have the ability to manage their roster. That's a part of what they do.

Q. Sure. Sure.

A. Yeah.

Q. Maybe I will make the question a little more clear. To your knowledge, player's have not been removed the team when they can produce if the reason is just not getting along, true?

MS. SAPP: Objection, form, foundation.

A. Yeah. I'm not aware of that.

MS. CHALOUPKA: Okay. Let's mark this as Exhibit 307, please.

(Exhibit No. 307 marked.)

Q. (BY MS. CHALOUPKA) I believe we looked at this in December, Mr. Alberts. It's Exhibit 307, and appended to it is Appendix C. It was part of your employment agreement. You can locate that, please.

A. Okay.
Q. And within Appendix C -- I'll find exactly will where it is. Under Disciplinary Action for Cause, there's a Subsection D that says that "Misconduct includes engaging in any unethical or immoral conduct regardless of where that conduct occurs that refers or relates to or impacts the athletic staff members ability to perform duties on behalf of the University."
The one after that, Subsection E says, "Engaging in any conduct regardless of where that conduct occurs that impugns, harms or undercuts the reputation of the department or the University."
My question there is, when you were serving at the University, how -- what was the reputation of the department at the time you were serving?
A. I suppose that depends on whose perspective or perception it is, but I think --
Q. For purposes of --
A. -- by and large it was relatively strong, hopefully.
Q. Yeah. And for purposes of this appendix, I mean, it's -- I mean, if we're talking about the 2020s, where it's not reputation for being a current national champion. It's a different reputation that we're talking about, true?

A. Correct.
Q. And so how would you describe that in those years that you were there, '21 through '24?
A. I think reputationally it was -- you're not talking about wins and losses --
Q. Right?
A. -- is that what you're saying.
Q. Right. Yeah.
A. Reputationally I think it was strong.
Q. Strong for what?
A. For trying to be an athletic department that is operating professionally and appropriately.
Q. Ethically?
A. Yup.
Q. Morally?
A. Yup.
Q. Good leader of young people?
A. Doing our best.
Q. Doing your best.
When this document talks about reputation, I'm thinking about a term that we hear more now in 2026. Is reputation similar to a brand?
A. Yeah. I think reputational risk can certainly impact the brand value. Right?
Q. Okay. I know brand is kind of a marketing

term, so I don't think they're quite interchangeable. But getting refocused, it's not just theoretically. University does have a legitimately interest in maintaining a positive reputation for itself.

A. For a variety of reasons.

Q. What are some of those reasons?

A. Well, your brand value and your reputational is directly tied to revenue in a lot of areas.

Q. Obviously, yeah.

A. So for business it's probably pretty important. I think recruiting and retention of players, that's part of it.

Q. Recruiting and retention of coaches and staff as well?

A. Yeah.

Q. When you arrived in July of 2021, did you feel like the department was adequately staffed for management of reputation and brand?

A. I don't know that the day I got there that was the top priority, but I would say, yeah, there were plenty of people.

Q. Okay. Yeah. When the dust settled you had --

A. Yeah.

Q. -- obviously we were in the news last week.

Mr. Nuse's book. And I read in some of that coverage that he had let a lot of people go shortly -- you know, toward the end of his tenure.

Did you rehire anybody that had been let go by your predecessor?

A. No.

Q. That you remember at least.

What was the role of the professionals in media communication like Keith Mann, for example, in the task of caring for the reputation of the department?

A. Yeah. I mean, Keith would be the expert in the specific things relative to perhaps the football program or competition. But like the rest of these, when incidents or issues happen that were really outside the scope of the athletic department's expertise, other people were obviously brought in to review and make sure that what was communicated, what we were doing, was appropriate and fit the profile of what our responsibility was.

Q. I take it that you felt it was reasonable for the department of athletics to want to protect and caretake for its image and reputation?

A. Yeah.

Q. If a player fakes an injury, does the coach

have responsibility for that?

MS. SAPP: Objection, form; foundation, unduly vague.

A. If a player fakes an injury?

Q. (BY MS. CHALOUPKA) Yeah. You're not supposed to do that, right?

A. It's called fainting and it happens every Saturday in football.

Q. Right.

A. It's pretty hard to manage.

Q. Sure.

A. So conference-wide I stepped in to try to help manage it because it's pretty hard to manage whether it's an actual injury or not.

Q. Are coaches expected to send messages that you're not supposed to do that?

A. Yeah. I think that would be a part of what a coach's responsibility, hopefully, that they're doing that, yeah.

Q. Part of their leadership, right?

A. Yeah.

Q. Okay. I'll take it a step further. If a player punches another player, does the coach have responsibility for that?

MS. SAPP: Same objections.

A. Sure. I mean, I think in effort the manage that, yeah.

Q. (BY MS. CHALOUPKA) In terms of their status in the department of athletics, Chuck Love and Ashley Scoggins were not equal, true?

A. Correct. One was a coach and one was a player.

Q. Did Ashley Scoggin have responsibility for Chuck Love's behavior?

A. No.

Q. Did Chuck Love have responsibility for Ashley Scoggin's behavior?

MS. SAPP: Objection, form.

A. Not entirely. I mean, I supposed what's specific to basketball he could have an influence, yeah.

Q. (BY MS. CHALOUPKA) For the years that you were serving as director of athletics at University Nebraska Lincoln, how would you assess your management of Title IX related issues?

A. Well, I'm wise enough to understand that I'm not an expert. And so, as I said, in December, you know, we are very intentional about knowing what our role is. And so our role is to report and to allow the people at the University who are experts in those areas

to guide, direct and help us, frankly.

Q. So with that said, how would you assess -- if you were doing a self-evaluation as part of a performance evaluation, how would you assess your management of Title IX related issues when you were at Nebraska?

A. I'm trying to recall. I don't know if -- we didn't have a lot of -- we mandated Title IX training, which everybody participated in. And so I would, you know -- look, I'm sure there's always areas you could perhaps do a better job, but I think for us we wanted to allow those that were experts in those area to help direct us and help us understand.

Q. How would you rate how well you made that a priority?

MS. SAPP: Objection, form. Foundation.

A. It was a priority, like, a whole lot of other priorities in the department.

Q. (BY MS. CHALOUPKA) Does the name Tracy Jenson mean anything to you? Is that a familiar name for any reason?

A. I don't think so.

Q. Ring any bells? Not while you were there. In 1996 she was a member of the Spirit Squad, and she

fell and broke her neck. And I don't know if just hearing anecdotally about the story that rings any bells.

A. I know that an incident happened, but I'm not sure of specifics, yeah.

Q. You were on the east coast at that point.

A. Yeah.

Q. Yeah. She's in my mind in part because her birthday is today, and she had a case against the University. My dad was Bob Chaloupka. My dad represented Tracy. He absolutely loved the Huskers. He loved cheering for you when you were playing. He -- my dad was the guy that would yell at the TV not because he's mad at the team, but because he's mad at the announcers because I remember him yelling, "be supportive," and then he turned down the sound and turned on the radio instead so we could listen to the bulk of it.

And so, you know, it's -- and yet when Tracy got hurt, he took her case as much as he loved the Huskers because he wanted to do what was right. And today is when my dad went to be with Jesus. So same thing as Tracy's birthday --

A. I'm sorry.

Q. -- and I'm sorry, I'm just bringing her

into -- and him into the room for a minute.

When did you first hear of suspicions that a Nebraska coach was having a sexual relationship with student athletes?

MS. SAPP: Objection to the form of the question as to suspicions.

A. Well, you know, the first that I was made aware was the call that I got from Keith Zimmer saying that there was this incident that happened on the road.

At that point, you know, the details were very murky and cloudy and nobody really knew. All he told me is this is happening. I'm going -- I'll report back what I find out.

I encouraged him, which of course he had way more experience than me, to make sure all the right people are available. And that's, I think, the first time that I was made aware.

MS. CHALOUPKA: This is 371.

(Exhibit No. 371 marked.)

Q. (BY MS. CHALOUPKA) My understanding is that you probably would have gotten a voicemail first and then called him back when you were available. Does that sound like it recalls with your memory?

A. It's probably right.

Q. Mister, these are notes from Keith Zimmer,

and his first reference of you starts at the bottom of first page of this exhibit. And says that you returned a call to him at about 6:20 in the evening.

Do you remember where you had gone in this time frame?

A. I'm sorry, I don't.

Q. Do you remember if it was University business or were you escaping temporarily?

A. So when did he --

Q. This would have been on 17th of February of 2022.

A. I don't know.

Q. So he -- what he writes is he informed you of a situation and that Coach Love is suspended for the game and Ashley Scoggin not playing.

When it says "about the above situation," what did that include from that first call that you had? You said it was murky, but what definition were you seeing through the murk in that first call?

A. Yeah. It was basically that clearly something happened. There were accusa -- there were concerns about certain things. The players had expressed things to Coach Williams. He needed some time to figure out what was actually going on. Lot's of -- you know, he's not there himself either.

Q. Right.
A. And so it was a bit of the challenge, you know, just because of the distance.
Q. Something had happened meaning what?
A. We didn't know.
Q. Well, like a payoff, like drugs, like --
A. No, no. There was -- clearly it was a situation --
Q. Relation?
A. -- between the coach and the player and wondering, you know, what is the truth around it. Those kind of things.
Q. The concern was that their may be an inappropriate relationship; is that the summation?
A. Yes.
Q. Okay. And you said, "things the players had said." What, again, what definition were you seeing through the murk as of that first call? What kind of things had been said to -- by the players?
A. There -- there -- that the players were concerned that there was an inappropriate relationship, and they were very frustrated. You know, it was a team that was getting towards the end of the year. They were, you know, fighting to win. They felt like it was disruptive to the team chemistry. It was, you know,

unfair to them.
Q. They're not getting minutes, right?
MS. SAPP: Objection, form. Foundation.
A. No. It was -- you know Ashley played. She was a good player.
Q. (BY MS. CHALOUPKA) She produced.
A. Yeah. She was a good player. They were -- they were -- they were just frustrated that it was going to impact the chemistry of the team and hurt them from winning and losing, which was really important to them and, you know, so...
Q. What was -- what did Mr. Zimmer indicate was his source of information by that point? Is it Amy or --
A. I don't recall. You know, my assumption would be Amy because I don't think at that point Keith would have been able to talk to individual players or Coach Love.
Q. So as he's telling you this, if we heard a -- if we had a microphone, you know, broadcasting how you're processing this in the moment, what are your first thoughts?
A. My first thoughts would be, "This is a new one for me." This year at that time would have been

year 14, I suppose, and had not -- had not ever heard anything like that.

So you're just trying to understand. And first thought is "I'm really glad that -- because that was one of the decisions that we did make, is we assigned sport administrators based on certain programs. Amy had a good program, but we were trying to help take the program to the next level. And Keith was a season. I was grateful that Keith was involved because I knew Keith had --

Q. Had been there before either of us was born.

A. Yeah. He was -- he was my academic counselor.

Q. Was he?

A. Yeah. So Keith is a man of integrity and a hard worker. And so I just knew that if Keith was managing the process, he knew exactly all the contacts on campus. He knew what needed to be done. So I had a level of trust with Keith.

Q. If it was a -- and I take it you know by now that Coach Love has admitted that there was a sexual relationship?

A. I am aware now, yes.

Q. The suspicions turned out to be warranted, correct?

A. Yeah.

Q. So at that time if, you know, if it was a sexual relationship, if what you were suspecting was actually happening, where would -- what -- what would that mean in terms of concerns for the department at that time?

MS. SAPP: Objection to the form of the question.

A. I think it's of high concern.

Q. (BY MS. CHALOUPKA) If we were going to have a list of like the top five reasons this would be a concern, what -- what would some of those reasons be?

A. Well, I mean, I think, you know, for all the reasons previously communicated, right? I mean, this is obviously very disruptive to the team. It would be inappropriate behavior of the coach.

Q. Unprofessional?

A. You'd be concerned about the student athlete, right. Reputational, all of those things, yeah.

Q. So what Keith writes here is that "After hearing the details, you had felt there was obviously poor decision-making by Coach Love and judgment that was very inappropriate likely leading to eventual termination."

I know these are Mr. Zimmer's words, not

yours, but let me break that down. The obvious poor decision-making, whether that was your words or his summary of it, would have been what?

A. The report was eventually that, you know, that she was in Chuck's room after midnight.

Q. In his bed.

A. Yes.

Q. And the bad judgement that was very inappropriate would be the same? It's the other side of the same coin, or is there more than that?

A. Ask that again. I'm sorry, I didn't quite follow?

Q. When the other part that -- that was written here by Keith was bad judgement that was very inappropriate, that would be just more of the same about what was poor decision-making by Coach Love?

A. Yeah.

Q. So what, in that moment -- again, I'm taking you back to the microphone going and you're broadcasting your thoughts about what do I need to do, who do I need to talk to, et cetera. What responsibilities did you feel for yourself in that moment?

A. Well, my responsibility is to make sure that all the reporting happens. To make sure that the

people, both in the Title IX office as well as the office of general counsel is going to have to guide and direct us through this.

This is not -- this is not a situation, A, we have any experience in, number one; and, number two, we're not an expert in. So our job is to allow the people who have been hired to manage those things do their job.

Q. Does compliance have a role? Is that another -- another office that needs be roped into this?

A. They have a role. You know, it's -- a lot of times the compliance office serves as a liaison to some of the offices on campus like the Title IX office. We don't have our own --

Q. That's kind of what I was wondering.

A. -- yeah. We don't have our own specific Title IX office within athletics.

Q. But there's interface there?

A. Yes.

Q. Okay. And at the time that was Mr. Vaughn?

A. Yes.

Q. At the time had that been the kind of communications that he had done in the past having interfaced with Title IX when needed?

A. Yeah. Jaime would be --
Q. Fast --
A. Yes.
MS. CHALOUPKA: Let's mark this as 311.
(Exhibit No. 311 marked.)
MS. CHALOUPKA: Susan, I keep giving you copies of these.
MS. SAPP: I appreciate it. I didn't bring them.
MS. CHALOUPKA: You can stack them up.
MS. SAPP: It's helpful.
(Off record discussion.)
Q. (BY MS. CHALOUPKA) Did this policy, which is called the consensual relationships policy, did that add to your responsibilities in any way in this moment?
A. Yes. I believe that, you know, these are all University policies and Board of Regent policies that leaders are -- that -- that all fall under.
Q. And what -- if there had been a sexual relationship by Coach Love and Ashley Scoggin at that time, who, as between the two of them, was required by the policy to report it to HR or to you as their vice chancellor or whomever?
A. Between Ashley and the coach?

Q. Correct.
A. I would assume that would be the coach.
Q. Now, Keith had written in his notes that this was likely leading toward eventual termination. Is that something that you had expressed in that first call, and maybe not in those terms, but some terms?
A. Yeah. I mean, I think your initial reaction is it is incredulous that, that would happen. And, you know, that would not be -- that would not be behavior that would be considered appropriate in any situation.
Q. In that call, what questions did you ask about what Amy Williams had done so far that day?
A. Well, the initial call, I don't believe -- I think the initial call was more to make me aware of the incident and what happened.
Q. Sure.
A. I don't know that Keith had all the details then either. I think the subsequent one was I'm going to try to talk to Amy and get more details.
I don't know that the first call I had all that, but I think in subsequent calls as he tried to learn more and to decipher through what actually happened. So I don't think the first time he called me I probably had that level of detail.
Q. So what questions did you ask for him to find

out about what Amy had done to that point?

A. I didn't ask him any specific questions.

Q. Were you concerned that for a matter of this seriousness, she went through Mr. Zimmer instead of contacting you directly?

A. No. It's not atypical also because I think Amy was a student athlete while Keith was the academic counselor too. It's a little bit of a different relationship, you know, for -- so I think there was probably a comfort level. Sport ADs, there's a reason why they're in those roles. They work really hard to develop relationships where you can have those kinds of communications with them, the coaches.

Q. I'm trying to picture what the -- the family tree of Mr. Zimmer as long as he's been there --

A. It's a lot.

Q. Yeah. Would include at this point. It's probably a big 'ole tree?

A. Yes, it is.

Q. One of the things he reported to you in that first call is that Ashley was not playing due to misconduct; is that right?

A. Yes.

MS. SAPP: Objection to the form of the question.

Q. (BY MS. CHALOUPKA) What misconduct as far as what Mr. Zimmer expressed at that time?
A. I think it was, you know, rules violation for the team, breaking curfew, those types of things that...
Q. In that call, did he tell you about the video?
A. No.
Q. Did Ashley have a history -- well, first of all, did you know who she was? I don't mean that to be demeaning question, but --
A. No, I know who she was as a --
Q. -- you have a lot of athletes under your jurisdiction.
A. I went to their games.
Q. Yeah.
A. But I don't recall any specific -- other than, you know, great job, I didn't have any specific interaction with her.
Q. Yeah. I was going say you hadn't had a reason for a particular interaction with Scoggin to that point?
A. No.
Q. As of that call base on what Mr. Zimmer told you, what investigation had been done at that point?

MS. SAPP: Objection, form of the question as to investigation.

A. What had been done? I'm not aware of what, if anything, happened.

Q. (BY MS. CHALOUPKA) Did you get an idea of how Ms. Scoggin got into the coach's room, in that call?

A. I did not. Not that I recall, I'm sorry.

Q. So based on this initial call -- I'm still focusing right on the point where you're off the plane taking a call, getting godbsmacked.

A. Uh-huh.

Q. I take it that one of the thoughts in your mind was the potential that a coach of this department may have sexually exploited a student athlete of this department, true?

A. Yeah. I was -- you know, I didn't know where the details would lead, but clearly at a minimum in my mind a student athlete in the room of a coach, assistant or head, is not appropriate behavior.

Q. I take it you felt some responsibilities in that moment even if you weren't sure what they were going to look like manifested to protect that student athlete?

A. Yeah.

Q. Was there a reason at that point to get

sports psychology engaged?
A. Well, I remember, if I'm recalling right Keith -- I think the team was obviously very rattled. You know, there was a growing level of frustration. Again, I'm remembering this secondhand from Keith or whoever, but that there was behavior that was not consistent with the values of what the team had all agreed that they were going to conduct themselves, and that there was a consistent effort to what the team thought was that Ashley was lying to them. And it culminated into this sort of deal where they decided to figure it out. I think if sport psychologist, if I recall right, was, you know, you have two different situations here. First of all, you have the team, but then you also have Ashley. So we always no matter -- at most state schools we would do that here. Immediately we offer the services of a sport psychologist who are there to try to --
Q. Conflict resolution?
A. -- right. To try to help student athletes.
Q. Did you ask Mr. Zimmer if there was any way to find out whether this particular student athlete had worked with sports psychology before?
A. I didn't.
Q. Would there have been?

A. We don't mandate student athletes use sports psychology. We give them the option --

Q. Right. But would there have been a way to find out as far as you know without any kind of violations of confidentiality whether she had worked with sports psychology before that date?

A. I don't know the answer to that question.

Q. It was reasonable, I take it, to assume that with both Coach Love and Ms. Scoggin suddenly gone from the game people were going to notice, right?

MS. SAPP: Objection, form, foundation. Calls for speculation as to what other people think.

A. I -- I suppose the media or somebody could recognize that something was atypical.

Q. (BY MS. CHALOUPKA) And Nebraska being what it is, if they notice, they're going to start asking questions, right?

MS. SAPP: Objection form of the question.

A. Yeah. I would assume.

Q. (BY MS. CHALOUPKA) Interest the department and the people involved with it is -- is almost recreational in Nebraska. It's -- it's a big interest.

A. Sure.

Q. Yeah.
MS. SAPP: Objection, form of the question. It's not a question.
Q. (BY MS. CHALOUPKA) People would ask if there was an improper relationship, right?
A. Some might. I don't -- I can't -- I don't what other people were asking or thinking.
Q. But in terms of what you're looking down -- looking at in this moment, you know, there was a potential for harm to the reputation of the department, true?
MS. SAPP: Objection, form of the question. Calls for speculation.
A. Yeah. You could -- you could make that -- you know, you could make that leap. I will say I don't think anybody was talking about reputational risk at that moment. It was trying to decipher through a very unique situation.
Q. (BY MS. CHALOUPKA) Whether talking about it or just thinking about it, though, it was a risk, true?
MS. SAPP: Objection, form of the question.
A. I suppose it was.
Q. (BY MS. CHALOUPKA) When you have a female starter and a male coach who, when the Penn State

tip-off begins, they're both missing, right?
A. Correct.
Q. Male coach is married, right?
A. That's my understanding.
Q. And she's a pretty girl. He's a handsome man. People might wonder and start talking about things like that, true?
MS. SAPP: Objection, form, foundation.
A. Could, yeah.
Q. (BY MS. CHALOUPKA) And nobody's talking about this much, that she's white and he's black.
MS. SAPP: Objection, form.
Q. (BY MS. CHALOUPKA) Also something that might be noticed, right?
MS. SAPP: Objection, form. Foundation, argumentative and offensive.
Q. (BY MS. CHALOUPKA) Go ahead.
A. Yeah. I don't know how to respond to that.
Q. Well, I think the talk would be offensive. I actually agree with Susan on that point. It would be, but --
MS. SAPP: No. Your question is offensive.
MS. CHALOUPKA: No.

MS. SAPP: Just clarifying the record.
MS. CHALOUPKA: I asked him whether that's something that it was considered that people would talk about.
MS. SAPP: Objection, form. Foundation, argumentative.
Q. (BY MS. CHALOUPKA) So wherever -- I don't -- I know you've said you don't remember where you were. Did you give any consideration to coming back earlier than what you had planned to deal with this situation?
A. No.
Q. What was Ashley's status with the team as of that first call with Mr. Zimmer?
A. That, I don't know, because I don't know what had been communicated. I think the plan was, if I recall, was to communicate clearly on what the goal was an the objective and then to make sure that the offices were comfortable with what our decision-making was.
Q. Did -- in that call, did Mr. Zimmer tell you there had already been a lengthy inquiry involving the team, the coaches, the student manager, obviously, Ashley and Mr. -- and Coach Love?
MS. SAPP: Objection, form of the question. Assumes facts not in evidence.
A. I don't -- I don't recall. I mean, I was

eventually made aware. I don't know if it was in the first call or when that happen.

Q. (BY MS. CHALOUPKA) Do you remember from whom you learned about that event?

A. I think from Keith.

Q. From Mr. Zimmer?

A. Yeah.

Q. Did Mr. Zimmer tell you in that first call -- let me ask it differently.

Did you ask him whether he had reported yet to the Title IX coordinator?

A. I didn't. Although, I believe almost immediately in our conversation that topic came up. And so this was immediately to involve the universities Title IX office as well as any communication, anything we do needs to include the office of general counsel as well.

Q. Did you make a report to the Title IX coordinator?

A. I did not.

Q. Logan Brooks testified last week that if there was a report that the consensual relationships policy maybe may have been violated, that his office, the HR office, side with connecting with Title IX, would come down on the side of connecting Title IX.

And I take it that was concerning you as well, get in touch with Title IX?

MS. SAPP: Layton Brooks. She's talking about Layton Brooks. She said Logan.

THE WITNESS: Oh, Layton Brooks.

A. That I would -- I'm so sorry, the question. So that I would want them connected, Title IX and HR?

Q. (BY MS. CHALOUPKA) Right.

A. Correct. Yeah.

Q. And so in that call, what steps did you take to protect Ms. Scoggin?

A. I didn't make the call to HR or Title IX.

Q. Did you take any steps yourself protecting Ms. Scoggin whether it's making calls, giving directives, anything like that?

A. All Keith and I talked about was make sure we include all of the right folks who can help walk us through to ensure that we are doing right by both the coach, our student athletes, our team, as well as Ashley.

Q. Did you communicate with any member of the Board of Regents that night?

A. No.

Q. How about with Dr. Carter?

A. Ted, I don't think he's got a doctorate yet,

but he would like it if it was.
Q. President Carter, let's go with President Carter.
A. I'm not sure where -- if it was Chancellor Green or President Carter, typically, and I don't recall the specifics of that, but when these types of things happen, you just give a heads up to those folks that this is happening and they're going to ask the same question: Is the university's people involved in it --
Q. Right.
A. -- and are they managing it? The answer is yet. But I don't recall a specific call to Ted Carter.
Q. And how about to Chancellor Green?
A. That don't recall that either, I'm sorry. But I would have to believe I did.
Q. I have not seen a memo or an email or anything like that that notifies the Board of Regents. Are you aware -- did you ever have direct contact with any member of the board or with, you know, with whoever is the liaison between the board of Regents to athletics in the vein of a notification of this event?
A. Not that I can recall.
Q. Okay. The do you expect that your head coaches are going to understand the social media

platforms that the youngs use?

A. Well, it's challenge for all of us. Right? They -- I think we do the best that we can to try to educate them on the impact on their own brand value, especially now in this world that they are in. But I don't know how -- I know I'm not very successful at it, so I don't know how successful the coaches are. Some are probably better than others.

Q. Have you figured out what Snapchat is?

A. I'm aware of Snapchat, yes.

Q. Yes, I'm saying this with a smile on my face as I am not on it, but it comes up enough that I'm familiar with it.

I assume that you have learned that Snapchat messages self-delete?

A. Yes.

Q. Did you ever issue any kind of a policy or directive that coaches do not use Snapchat to communicate with student athletes?

A. Not that I'm aware of.

Q. Can you think of a reason why a coach would need use a self-deleting app to communicate with student athletes?

A. It's probably not the vehicle that I would use, but I don't understand it, so...

Q. Can you see risks coming from coaches using a self-deleting app to communicate with student athletes?
A. Sure. There's always risk between interaction with coaches and students, especially using those type of communication tools.
Q. Like what?
A. What would the risk be in using Snapchat?
Q. A self-deleting app, yeah.
A. Well, I suppose information that you did or didn't want gets deleted, right?
Q. If there's any kind of an improper communication or a violation, the evidence goes poof, right?
A. Yes.
Q. Do you remember talking to anyone else that night after you finished your call with Mr. Zimmer that related to Coach Love and Ashley Scoggin?
A. Not that I recall.
Q. So the next day I think you were still wherever you were at. According to Mr. Zimmer's notes, Exhibit 371, he called you at about noon, it looks like Friday the 18th. So I'm looking here at page --
A. Okay.
Q. Let's see, page 4, 12:00 noon, phone call with Trev Alberts. And he says, "You have requested an

update on the situation and indicated we have the green light on drafted release."

It was a little unclear in the writing whether you indicated we had the green light or Mr. Zimmer indicated we had the green light. Do you remember?

A. Keith called me to inform me that he had that the -- the program had the green light to issue the release based on the review from University personnel or whatever.

Q. Release on what?

A. I'm assuming that release would be confirming something whether it be, you know, a status of the coach or Ashley. I don't know exactly.

Q. Something to do with Mr. Love and Ms. Scoggin.

A. The incident, yes.

Q. Yeah. When it says, "We have the green light," are you the one that gives the green light? Is Mr. Mann the one that does the green light; do you know?

A. No. The green light would, in this situation would come from the Title IX office with review of the lawyers being heard.

Q. When you review draft releases, what are you

watching for other than, obviously, accuracy?
You don't want to say the team won if the team lost or something like that. But what else are you watching for if someone gives you a draft to review before approval?
A. I don't generally review the drafts of...
Q. Is that handled through media communications?
A. Yeah.
Q. Okay. Did you suggest any language for a draft release relating to Ashley Scoggin?
A. Not that I recall.
Q. So for Mr. -- from Mr. Zimmer's notes, he says, "The plan was to call Coach Love and to make him aware of his employment status with a follow-up letter."
So what was Coach Love's employment status at that point?
A. That he -- I'm trying to remember exactly.
Q. Other than he was still in fact employed, but beyond that?
A. Yeah. He was employed, but he would no longer be coaching.
Q. So was he suspended? Am I using the right term correctly?
A. Yeah. I'm trying think if it was suspended

with pay or how it was...
Q. My understanding is he was -- I've seen the term suspended with pay, but I didn't know if there was any other internal term that department would have used at that point in the this progression of events.
A. Yeah. I don't know. I just know that there's a process. He was under contract. I believe there's a process that, you know...
Q. And so Mr. Zimmer says he had heard from Coach Williams who indicated that Coach Love and Coach Maze were visiting and there was some discussion of Coach Love voluntary resignation.
Mr. Zimmer writes, he asked you for your thoughts on that. You said you would be supportive and still compensate him through the end of June of that year.
First of all, do you remember -- is that an accurate summary of what you -- what you and Mr. Zimmer had discussed that day?
A. Yeah. I think at that point Keith and others were trying to think through what are all the viable options, you know. And, you know, he presented multiple ideas. And, you know, I trust Keith. And I said, "Keith, I'm supportive of what you think is the right thing and moving forward."

Q. Do you remember what some of the other options were?
A. I don't. I just remember that his employment contract, there were constraints around that based on his employment contract.
Q. Why were you willing to compensate Mr. Love through the end of June if he would resign?
A. That was the recommendation that came from Keith as well as those others that were involved in it.
Q. What was it based on?
MS. SAPP: Objection, foundation.
A. I don't know. I'm assuming it was contractual obligations, but that's unfair for me to say because I don't really know.
Q. (BY MS. CHALOUPKA) I just want you to say what you remember.
A. Yeah. I don't remember.
Q. Do you remember in this conversation, did Mr. Zimmer suggest doing anything to protect Ashley?
A. Yeah. We were -- my recollection was that we were -- we were really trying hard to get Ashley comfortable going to Title IX to talk to the experts.
Q. What were they doing to get her comfortable doing that?
A. I don't know other than repeated efforts.

But Keith, I think, was the primary just because of the relationship, you know. He works -- he worked with the student athletes. They knew him. I think most of those were from him. I think at one point they had a meeting set up, and then she didn't go to it, which there was frustration there because they were trying to get her to participate, frankly.

Q. Can you think of any reasons why she would not have been comfortable going to Title IX?

MS. SAPP: Objection, foundation. Calls for speculation.

A. I don't know.

Q. (BY MS. CHALOUPKA) Did Mr. Zimmer express any thoughts on why she may not have been comfortable going to Title IX?

A. Not that I'm aware of.

Q. By call number 2, the call we're talking about now on the 18th, do you think you knew about the inquiry that took place before the Penn State game with the team involved, the coaches involved, student manager involved, Ashley and Coach Love?

A. Was that the team meeting?

Q. Uh-huh.

A. Yes.

Q. You think by that point you had been made

aware of that?
A. I think that's a reasonable assumption.
Q. Can you think of anything about that meeting that might lead to a level of discomfort for Ashley to go to Title IX?
MS. SAPP: Objection, foundation. He wasn't there.
A. I don't know.
Q. (BY MS. CHALOUPKA) Was the meeting described to you?
A. I'm trying to remember. I mean, I didn't really get a lot of descriptive words other than, you know, it was a chaotic situation, a lot of unknowns. And there was an effort to, like, bring people together and try to figure out what was going on. But I don't know the specifics of what was said in the meeting, why it originated or what the outcomes of it were.
Q. At that point, your information about the meeting was still just coming from Mr. Zimmer; is that right?
A. Yes. I believe so.
Q. You had not talked to Coach Williams yet in this point of the progression?
A. I don't believe so.
MS. CHALOUPKA: Okay. We'll mark a

couple of exhibits here. It's going to be 416 and 417.
(Reporter clarification.)
MS. CHALOUPKA: Yeah, 416.
I'm going to mark 415 while I'm at it, too.
(Exhibit Nos. 415, 416 and 417 were marked.)
Q. (BY MS. CHALOUPKA) I've handed you 416 and 417. By this point, the media is beginning to report on this and ask questions; is that right?
MS. SAPP: Objection, form of the question. Vague as to time.
Q. (BY MS. CHALOUPKA) In the days following your first advisement of this.
A. Yeah.
Q. Do you remember being contacted or being notified that TMZ was asking for comment?
A. Yeah, I don't. So there's a Nebraska athletic director email address that does not go directly to me. It's -- because otherwise it would be a disaster after a football loss, so...
Q. Were you made aware of that --
A. I don't recall.
Q. -- by the poor person that does have to get those emails?

A. I don't recall. I'm sure at that point I was aware that the news is out, right?
Q. Yeah.
A. Yeah.
Q. TMZ, probably not the -- not a current candidate for Pulitzer in reporting, but attempts to report things that are splashier, right?
A. Yeah.
Q. Were you aware that Derek Pearson was inviting comments on his radio show on this situation?
A. I was not.
Q. Did anyone from the Board of Regents in the days -- let's say the week following your first advisement of this, anybody from the Board of Regents reach out to your directly to ask you questions?
A. Not that I recall.
Q. How about anyone from University Administration other than President Carter and Chancellor Green?
A. Not that I recall.
(Reporter clarification.)
MS. CHALOUPKA: Green.
Q. (BY MS. CHALOUPKA) Do you remember what else you did on February 18th, which is the day after your first advisement, that would have had anything to do

with Ms. Scoggin and Coach Love, whether it was calls, emails, texts?

A. I don't -- I don't --

Q. Anything.

A. I don't remember.

Q. Teamworks, we learned about this. Mr. Zimmer has described it as messaging platform that is used within the Athletic department.

A. Yes.

Q. Was that used at UNO when you were there, or was it a UNL specific platform?

A. It was -- it's a platform that has gained a lot of momentum, and it may have been available. But there's a cost to it, and we didn't have a lot of money, you know. So I don't believe we used Teamworks; or if we did, it was coming on very late as we --

Q. It was an early generation of Teamworks --

A. Yeah. It's -- yeah. It's getting better all the time.

Q. As I understand it, it's a system by which coaches and players can send direct messages to each other through Teamworks; is that right?

A. Yeah. Typically the coaches use it to communicate broadly about maybe what the schedule is, the travel schedule. Compliance can -- you know, it's

a platform that the students go to. So it's a way of communicating that's -- everything is coordinated and consolidated into one platform for them.

Q. If Mr. Zimmer said that coaches and players can send direct messages individually to each other, would have any reason to disagree with that based on your memory of Teamworks?

A. Yeah. I -- that's probably a feature it has.

Q. Did you ever direct that your coaches limit their digital communications with players to Teamworks so that everyone's using the same app?

A. No.

Q. So if we go to the next day, which is the 19th of February, according to Mr. Zimmer's notes it look like you get a call from him about 8:50 a.m. or so -- I'm looking at Exhibit 371.

A. Yup.

Q. -- informing you that Mr. Love has decided he's not interesting in resigning.

So when you get that advisement, what's in your mind? If we're hearing the microphone broadcasting your thoughts, what are they?

A. That Chuck is not interested in resigning, is that what your question was, I'm sorry.

Q. Yeah. What was your reaction when you

learned that?
A. I don't recall what was on my mind other than I think at -- I don't know if at that point, but both of them were complaining that nothing happened.
Q. And does that mean that you have to accept -- is there any policy or guideline that said that if both of them say nothing happened, the athletics has to accept that?
A. I don't know that there are specific guidelines regarding that.
Q. It indicates here Mr. Zimmer had revisited the sequence and detail of events. Was he obtaining more detail by this point, two days after the first call that he had shared with you?
A. Yeah. I think as he continued to get more information, you know, he was able to more effectively communicate what he thought happened.
Q. Do you know what his sources of information were by that point?
A. I don't. I'm assuming that Coach Williams was the primary one, but I'm not sure if there was additional -- if there was additional individuals.
Q. Okay. What Mr. Zimmer writes is that he had gained your approval on a release indicating that a copy would be sent to the executive team in advance and

would go out upon a 10:45 a.m. basketball meeting. I think Exhibit 415 might be that release; am I correct?
A. Yup.
Q. Tell me about that release.
A. Well, I think back to your previous, you had inquiries, and so we had to say something. And so we worked with both of those offices that I represented earlier.
Q. Title IX and legal counsel?
A. Yeah. To have a statement that, you know, acknowledge the situation, and that's what was agreed upon.
Q. What Title IX's input to what we have now marked a 415?
A. I don't know what that input was. I was not part of any of those conversations.
Q. So Mr. Zimmer writes that you indicated communication, central administration, media director should happen from Keith Mann and that he would once again call Lonnie Green and President Carter.
That makes it sound as if you had some communication by that point with Mr. Green, with Chancellor Green, and President Carter. Does that refresh your memory?
A. Yeah. What this is referring to is we don't

send anything out of athletics, at least that was the policy there. It isn't a call to Ronnie Green or Ted Carter. It's Keith Mann working with their communications folks, so making sure that all the communication that comes out, if it's not some benign, you know, is first approved and understood by those offices as well. So I don't think Keith Mann reached out to Ted Carter.

Q. That's -- I was going to ask. Who is the "he" there? Is it Mr. Mann or is it yourself?

A. Yeah.

Q. By that point, what had opinion your communications with Chancellor Green about the situation?

A. I think it was just the specifics of what was alleged what happened as best we could and that all of the right people at the University are involved in helping us manage through the process.

Q. Did he ask questions of you?

A. No.

Q. How about President Carter?

A. Not that I recall.

Q. When you spoke with them, was it -- this is such a 2026 question -- was it a three-way call or do you think it was separate calls to each of those

gentlemen?

A. I don't recall having a specific conversation with either of them. Now, that doesn't mean that, you know, we would be in meetings. At this point, everybody is aware of this situation. When you talk about the Board of Regent members, there's no specifically liaison to athletics, but we're in meetings all the time. I mean, people were aware, but I can't recall any formal sit-down meetings or calls to directly discuss the situation.

Q. Including any calls with individual members -- from individual members of the board?

A. Not that I recall. Now, that doesn't mean if I'm having a different conversation about some other topic that it didn't come up, but I don't recall that.

Q. Mr. Zimmer writes that you still felt strongly that moving -- poor English -- still felt strongly that possibly moving forward to immediate termination was a better option, correct, and agreed to take a few days upon his return to Lincoln for further decision, coverage and guidance would be best, and to move forward with a plan.

Termination for what?

A. I mean, you know, again, my initial reaction would have been that -- that termination was

appropriate.
Q. For what?
A. For Chuck.
Q. Well, yeah. But would it be for cause?
A. I don't know about that. I'm not talking about the definition.
Q. Right. But termination because he did -- fill in the blank?
A. Termination because of the situation that happened on the road in the hotel room.
Q. So what moved you from immediate termination, feeling strongly toward immediate termination, to I'm going let this sit for a few days for further discussion?
A. To allow the people that were directing us to understand better what the rationale for the recommendations is.
Q. So the people who are directing us is specifically whom?
A. Well, I mean, again, it's we're working with the Title IX office.
Q. So I'm breaking you down a little bit on this. Did you have direct communications Ms. Counley --
MS. CHALOUPKA: And that's spelled

C-O-U-N-L-E-Y --
Q. (BY MS. CHALOUPKA) At the Title IX office?
A. I did not.
Q. How about with the assistant chancellor there Mark Pierce?
A. I did not.
Q. Okay. So when we're saying with the Title IX office, who are you talking to?
A. I'm talking to Keith.
Q. Just to Mr. Zimmer?
A. Right.
Q. Okay. Who is he talking in the Title IX office, at that point?
A. I'm presuming that he's speaking with those folks in the Title IX office in coordination with the lawyers and general counsel --
Q. Did he give you names --
A. -- and HR, I guess.
Q. -- names of who he was talking to?
A. He did not.
Q. So what did he tell you about what the Title IX office was telling him?
A. The only thing that I remember is, in effort to try to -- and at this point as my recollection is, that both Ashley and Chuck claimed nothing happened.

There was nothing that happened. There was nothing inappropriate.

And so there was a repeated effort by Keith and the office of Title IX to meet with Ashley and tell her what can we do to -- you know, I don't know exactly how those go. I've not been a part, of you know -- but it was a repeated effort to try to get her to engage with the Title IX office to report.

Q. Did you have an understanding at that time of -- well, first of all, did the potential enter your mind that -- that this young woman maybe intimidated out of contacting Title IX?

A. No.

Q. Have you ever heard that sometimes that happens, people who have been sexually abused?

A. I --

MS. SAPP: Objection form of the question. Assumes facts not in evidence.

A. I can understand that, but I'm not an expert. I don't -- yeah.

Q. Yeah. I know you're not a mental health guide or a sexual assault special victims detective or whatever. But when you say, "I understand that," just on your layman's understanding, your educated layman's understanding, why would you think that would be?

MS. SAPP: Objection, form, foundation. Calls for speculation.
Q. (BY MS. CHALOUPKA) Why would you think she would be intimidated?
A. I don't know. I can't speak to what -- I don't know what -- I understand it, but I don't know what -- what's going on, you know, what their thought process is.
Q. Was someone telling you that the University was powerless to do anything unless Ashley and/or Coach Love admitted that there was a sexual relationship?
A. No.
Q. Okay. What could the University do without -- without them admitting to the sexual relationship?
MS. SAPP: Objection, foundation.
A. I don't know.
Q. (BY MS. CHALOUPKA) Did the University have a need to take action, if -- you know, if there's reason to -- reason for concern of a sexual relationship between a coach and an athlete, is there a reason to take -- for the University to feel the need to do something?
MS. SAPP: Objection to the form of the question.

A. Again, we were working with the experts in this area. I don't know the answer to that question.

Q. (BY MS. CHALOUPKA) Right. I'm asking what you understand. Did you have understanding that Title IX coordinator has the authority to open a file herself and do her own investigation even if the victim doesn't come forward?

MS. SAPP: Objection, foundation.

A. I'm learning that now.

Q. (BY MS. CHALOUPKA) Okay. In 2026.

Okay. So you said -- when we were talking about what moved you towards taking a few days for further discussion, one thing you said was the Title IX coordinator was one of the people you were talking about. Who were the other people that Mr. Zimmer was in contact with at that point?

A. I don't know other than I would assume somebody from HR and possibly from the office of general counsel.

Q. When we're saying HR, are you referring to athletics HR or the University HR --

A. Well, yeah. I would say it's athletics HR. Jane, while very skilled herself -- I'm not diminishing her skills -- we didn't have an independent HR strategy. It was working in consultation with broader

University.

Q. Okay. And then legal counsel, what was your understanding of what Mr. Zimmer told you of legal counsel's contribution?

A. That I don't know. I can't define that.

Q. What questions do you remember asking at that point? This is the phone call at noon on February 19th.

A. What questions do I remember asking?

Q. Right.

A. I would just say by then it was very evident to me that there was lot of nuance and a simple decision -- this wasn't the athletic director's decision to make. Frankly, it was a nuance to reality that we needed to allow, like I said in December, the experts to direct us.

Q. When you say nuance, what do you mean by that?

A. Clearly a student athlete was in a hotel room of an assistant coach. Those are clear facts. And at this point, both vehemently deny anything happened in said room.

Q. Okay. So where's the nuance?

A. The nuance is there's a lot of details. There's a lot of things that happened that on the one

hand if you made a decision here, it's going to impact, have an unintended consequence here. Those are all decisions that -- that need to be made by the experts in Title IX, HR, and OGC that really is beyond our scope.

Q. When you say "our," you mean athletics?

A. Yes. I without put myself in personally.

MS. CHALOUPKA: Mark 470.

(Exhibit No. 470 marked.)

Q. (BY MS. CHALOUPKA) It looks like you got email that morning on the 19th from -- at the bottom we've got Mr. Zimmer saying he was going to meet the team, and then above that you have an email from Mr. Vaughn saying, "I've been communicating with Amy. They're going to activate one of their non-coaching staff members into a coaching role due to extenuating circumstances."

Did you understand extenuating circumstances to mean this ongoing situation involving --

A. Yes.

Q. -- Coach Love.

Okay. Did they need another assistant besides Coach Maze and Coach Gailly?

A. Yeah. So the NCAA has limitations on the number of active coaches, and a lot of times it has to

do with actually recruiting. So if you're not a bench coach, there's some limitations on communication to prospects.

And so I'm sure that when she -- in Amy's mind -- I don't want to speak for Amy, but when she was down a coach, we can petition the NCAA to have a non-coaching coach step into a coaching role to fulfill some of the duties that Chuck was previously doing.

Q. Is that considered to be a -- like an interim type of situation?

A. Yeah. You're elevating another person who doesn't have on-floor responsibility. But my assumption is -- now, that there's a time limit to that. Of course Amy could decided in the future --

Q. To keep --

A. -- to elevate that person and name them assistant coach.

Q. It's a way to make sure you don't have to call Scottsbluff High School and see if by any chance a coach wants to come and step in on short notice.

A. Well, I don't know if you've looked at the bench. There's plenty of coaches in college basketball. So there's -- we don't need to call anybody. There's about 12 of them over there. But they're limited to the responsible they can do per NCAA

rule.

Q. Got it. Do you remember doing anything else on that day, the 19th, that had to do with Coach Love and Ashley Scoggin, talking to anyone, emailing, texting?

A. I can't remember back -- I don't recall.

Q. I was going say Snapchatting. I take it you don't use Snapchat.

A. No.

Q. Are your kids too old to use Snapchat?

A. They don't use it anymore. Yeah. They're older.

Q. I was going to say the Army probably does not use Snapchat.

A. No.

Q. Okay. Back to Mr. Zimmer's notes. On the 20th of February of 2022 --

A. Yup.

Q. -- I'm seeing that you had called to report to Mr. Zimmer that Ashley's mom and dad were calling him?

A. Yup.

Q. Okay. Tell me -- I'll stop there and just say what do you remember about getting calls from Mr. and Mrs. Scoggins?

A. Yeah. I can't recall if I -- if it was directly to me or -- I don't recall the specifics of that. But I remember they wanted to meet. So I called Keith. I'm just asking for updates. Where are we in this process? What other information do I need to know?

Q. Okay. And so what Keith had written first was that "Prior to his return call, he wanted me to review the interaction with Ms. Scoggin when it was agreed she could no longer be an active member of the team, which she was in agreement with."

When was it that Ashley Scoggin -- well, let me ask it differently. Under what circumstances did Ashley Scoggin agree that she could no longer be member of the team?

MS. SAPP: Objection, foundation. He wasn't there.

A. Yeah. I don't know. That's -- Keith can answer that, but I wasn't in that conversation.

Q. (BY MS. CHALOUPKA) What did he tell you when you talked to him?

A. I can't recall the specifics of our conversation other than -- other than he -- you know, he would just give me updates. He was constantly continuing to try to interface with Ashley and

understand, you know, what she wanted, what she needed, how we could support her. She was still in school.
You know, beyond that I don't -- I was just trying to get a basic understanding of where are we in this process before sitting in a meeting with parents that I have no idea about really what's going to happen.
Q. Was she still on the team at that point?
A. I don't believe so.
Q. Did you talk with the Scoggins by phone that you can recall before you met with them in person?
A. I don't recall that, but that does not mean I didn't.
Q. So take a look back at Mr. Zimmer's notes. And I'm not assuming that this means yes. I just want to ask what you recall. This is back to 19th or the 20th. Excuse me. There, at 1:30 p.m. it says, "Trev called back." We're on page 7 of this document. The Bates stamps number is 2078. "Indicated he visited with parents. They are wanting their daughter to be reinstated. Indicated that during meeting with myself, Pat and Coach Williams, she was abruptly kicked off the team and did not agree to this maintaining she did nothing wrong, reiterated bond with team and trust is beyond repair."

Let me move backwards on this. Do you recall who reiterated the bond with the team and the trust is beyond repair? Is that something that you would have reiterated to Mr. Zimmer or that Mr. Zimmer reiterated to you?

A. Mr. Zimmer reiterated to me --

Q. Okay.

A. -- that Amy probably reiterated to Mr. Zimmer, yeah.

Q. Is that something that you -- does this recall -- does this refresh your memory about whether you had talked to the Scoggins on the phone?

A. I don't remember, but --

Q. Not much?

A. -- no.

Q. Do you remember whether you reiterated to them that the bond with the team and trust was beyond repair?

A. No. I didn't -- if anything if I had a call, that I was trying to gather information from them about, you know, their perspective.

When it says -- let's see here. "Indicated that during meeting with myself, Pat" -- yeah. I believe that was I indicated to Keith that that's the conversation they had with Ashley. Right?

Q. They, meaning Mr. Zimmer --
A. Pat, yeah.
Q. -- Pat and Coach Williams?
A. Yeah.
Q. Would there be any reason for Ashley to stick around if those professionals had told her that the bond with the team and trust was beyond repair?
MS. SAPP: Objection, foundation. Calls for speculation.
A. Yeah. I mean, I don't know.
Q. (BY MS. CHALOUPKA) I mean, back when you were playing if Coach Osborne told you that for some reason you had done something and now the bond between -- with the team and the trust was beyond repair, I take it that would have been hard for you to hear?
A. Yeah.
Q. So a few days pass when you first learned about this. Do you know whether by this time sports psychology had been engaged, or anybody that's trained in conflict resolution groups?
A. Don't know that answer.
Q. Was Jack (phonetic) Stark a Regent at that point?
A. When did he get elected?
Q. That's what I'm trying to remember off the

top of my head. When you were playing, I remember reading --
A. Yeah.
Q. -- because back in those days the Omaha World Herald delivered to Scottsbluff, that he would be engaged to help work out conflict on the team --
A. Yeah.
Q. -- and things like that or just moderate team discussions. Do you know if anyone like that had been engaged for the women's basketball team?
A. I'm not aware of that.
Q. Had you given any direction to get somebody that could engage a conflict resolution professional?
A. Other than our sports psychologist, no.
Q. And had you given direct to sports psychology?
A. No. I thing that was update from Keith, that he had engaged sports psychology to reach out to the women's basketball theme.
Q. What about with Ashley?
A. I Believe the same thing.
Q. Had he engaged them to work out something with Ashley and the team? I want to make sure my question is encompassing.
A. Oh, I see what you're saying. I don't know

about that. My recollection from Keith was Ashley was not responding to communication.

Q. Did -- what leadership had Amy exercised at that point to repair Ashley's bond with the team and the trust?

MS. SAPP: Objection foundation.

If you know.

A. I don't know.

Q. (BY MS. CHALOUPKA) Did you ever meet with the team for any reason?

A. I did not.

Q. Did you ever suggest meeting the team yourself?

A. I did not.

Q. So this -- and what was happening in these days was a decision to remove a starter from the rooster in the middle of the season, right?

A. I can't recall. I didn't think Ashley was a starter. She played meaningful minutes.

Q. She had started 53 games in a row.

A. Well, you have better information that I have. I'm sorry. I knew she could shoot the three-pointer.

Q. If I'm correct that she was a starter, and I take it that a decision to remove a starter from any

team roster mid season is a big decision.

MS. SAPP: Objection to the form of the question as to vague.

A. I assume it would be for a coach, yes.

Q. Not a decision that would be made frequently; true?

A. Not typically.

Q. And as far as you know, Coach Williams had never done that, true.

MS. SAPP: Objection, foundation, leading.

A. Not in my two-year experience with her.

Q. In your time at UNO, do you remember starters being removed mid season?

A. I can't recall all 12 years.

Q. Nothing stands out --

A. Actually, yeah. We did. We had a hockey player that had some behavioral things that were disruptive to the team and he was removed.

Q. Was he a starter?

A. Yes.

Q. Do you remember his name?

A. Yup. Mr. White.

Q. And that would have been obviously women's hockey team. So if you were there until 2012 or --

gees, you started in 2012.

A. No. I started in 2009.

Q. 2009 -- I don't know what 2012 is any mind for -- and moved over to Lincoln '21, when do you think that was or do you have any recollection.

MS. SAPP: I'm going to stop you. We can't talk about other student situations.

A. Yeah. I'm sorry. I don't know.

MS. SAPP: He can't answer anymore questions about that.

Q. (BY MS. CHALOUPKA) As of that year, did every removal of an athlete from a team involve a meeting with team member's parents and the director of athletics?

A. I think each situation is different.

Q. What did you meet with Mr. White's parents?

A. I don't believe so.

Q. In the time you've been at A&M, have there been athletes removed from a team, any teams?

A. Yes. The rules changed and we now have rooster limits, so we've had to remove students from rosters because of roster limits.

Q. Have you had to meet with their parents when you remove them?

A. It just depends on the student.

Q. Any that you recall --
A. Yes. Asking --
Q. -- parent meetings?
A. Not meetings, more phone calls.
Q. In October of last year, Tyreek Chappell had feigned an injury in the fourth quarter of the Arkansas game. I guess you remember that.
A. Yeah.
Q. Violated SEC rules, correct? And it's also just dishonest, true, feigning injury?
A. Yes. If it's indeed feigning an injury.
Q. It doesn't look like -- I tried to do some research. It doesn't look like Mr. Chappell was removed from the team. Am I correct in that?
A. No.
Q. It looks like he continued to play in every game after that, true?
A. Correct.
Q. Did SEC determine that the coaching staff directed Mr. Chappell to feign an injury?
A. I don't believe so.
Q. Did the SEC fine A&M $50,000 for that event?
A. I can't recall the specifics of that.
Q. Did A&M determine which member of the coaching staff apparently give direction to feign and

injury?
A. Not that I'm aware of.
Q. Would there be a problem if a coach was instructing a player to lie, to do something dishonest?
MS. SAPP: In general?
MS. CHALOUPKA: Sure.
A. That's not what you would hope your coaches would do.
Q. If a coach had directed Mr. Chappell to feign and injury, would you fault Mr. Chappell for the fact that apparently he didn't refuse since there was an investigation and a finding and all of that? Do you fault Mr. Chappell for not just telling the coach to pound sand?
A. Mr. Chappell had been dealing with a pretty significant calf injury for several weeks and was trying to get off the field because his leg hurt. And he tried to tell the coach, and the coach was trying to tell him, which we do in football, if you're injured, get down. It was a timing issue. There was no nefarious intent by the coach to tell him to lie. It was trying to help him understand how to manage actually being injury.
Q. Did A&M go ahead and pay the $50,000 fine?
A. I'm not aware of that.

Q. Was Coach Elko reprimanded by the SEC?
A. I don't believe so.
Q. I take it Mr. Chappell was not removed from the team?
A. No.
Q. So let me pull out Exhibit 421.
(Exhibit No. 421 marked.)
Q. (BY MS. CHALOUPKA) I take it you are familiar with this policy?
A. Yes.
Q. Was a version of this policy in effect at UNO when you were there?
A. At UNO?
Q. Correct.
A. I think so. Probably wasn't quite as detailed as this.
Q. I was wondering if this was a system-wide policy for the whole Nebraska system or if it was --
A. I don't believe so.
Q. Unique to -- okay.
It is not system-wide in the sense that it applies to all students; it is unique to athletics?
A. Correct.
Q. So there's actually language here on the

first page towards bottom. It says, "A separate department conduct policy in addition to University and team rules is necessary because allegations of student athlete misconduct generally receive more scrutiny and public attention."

I take it you don't disagree with that?

A. No.

Q. It goes on to say, "Failure to handle these matters appropriately may undermine the public trust in a University and Therein impair it's ability to carry out its mission of teaching, research, public service."

I take it you don't disagree with that either, correct?

A. Correct.

Q. And those are important purposes, right, everything we just read.

A. Sure.

Q. Fairness to student athletes is important, right?

A. Yes.

Q. Minimizing conflicts of interest is important, right?

A. Yes.

Q. And if you go to the next page when you're

looking a the purposes of conduct policy, they include exactly those things; treating student athletes fairly, assuring confidence in the integrity of the process by minimizing the potential for conflicts of interest.

So another important purpose is not just the actual integrity of the process, but confidence for anyone who is watching and wanting to know if there's a real process, right?

A. Yes.

Q. Showing onlookers that the department is bing fair to everyone involved?

A. Correct.

Q. So who determines whether this policy applies? And you can go to the third page for what it says. Under deciding whether the conduct policy applies, it says, "Except in situations involving alleged sexual misconduct, which are the jurisdiction of office of IEC, the director of athletics shall in good faith and using reasonable judgment decide whether the policy applies." Right?

A. Yeah. The policy didn't apply. It was a team -- it was a -- from our understanding, it was a breaking of team rules and breaking curfew, and so it was the team rules that applied.

Q. When did you make that determination that the

policy doesn't apply?
A. Based in consultation with the folks that we were working with on campus.
Q. When?
A. I can't give you a specific date.
Q. Amy agrees she did not call you and she didn't even call Keith until, you know, depending on who you believe, anywhere from 9 to 14 hours after she was notified, right?
MS. SAPP: Objection, form, foundation, argumentative as to who is believed, assumes facts not in evidence.
Q. (BY MS. CHALOUPKA) I'm going to reword this. We agree that you were not given an opportunity to determine whether the -- whether this policy applied at the outset of these events, true?
MS. SAPP: Objection, form, foundation as to outset.
A. Yeah. Nobody directed me that I wouldn't have a choice of deciding.
Q. Nobody directed me that I wouldn't have a choice.
A. I'm sorry. You said you didn't have a choice.
Q. No. You were not given an opportunity was

what I used.

A. Yeah. Nobody communicated that I wouldn't be given an opportunity to make a decision. Does that make sense? Sorry.

Q. Okay. By the time you learned these events were in motion, they had been in motion for about 18 hours, true?

MS. SAPP: Objection, form, foundation, assumes facts not in evidence, unduly vague.

A. I don't know at the time. I'm sorry.

Q. It appears that the caper to break into the room was sometime around midnight on the 16th moving into the 17th, correct?

MS. SAPP: Objection, form of the question, assumes facts not in evidence, the caper into breaking into the room.

A. Yeah. I knew the incident happened. I knew it was after midnight. I don't know the exact timeline.

Q. And I take it you were aware that assistant coaches were learned of that event of going into the room with a video finding Ashley there soon thereafter?

MS. SAPP: Objection, assumes fact not in evidence, form, foundation.

A. Yeah. I don't know when the rest of the folks who were intimately involved with women's basketball were made aware. Like, it's a fair assumption it was relatively soon after the event.

Q. And I take it you have become aware that sometime between 7:00 a.m. and 9:29 a.m. Amy Williams became aware of these events, true?

MS. SAPP: Objection, form, foundation, assumes facts not in evidence.

A. Yes, at some point.

Q. And that she did not contact anybody at athletics until after this team meeting in the afternoon, true?

MS. SAPP: Objection, form of the question, foundation.

A. Yeah. I don't know what the timeline was of when she called Mr. Zimmer or when she talked to the team.

Q. Except that you know that it was after she had the team meeting, correct, because you were told about it when you first talked to Mr. Zimmer?

A. Yeah. I knew that she had the team meeting. I wasn't aware of what the timeline was of when she communicated with Keith and when she had the meeting with her team.

Q. And by that time, Ashley was accused of misconduct, true?

MS. SAPP: Objection, form, foundation, assumes facts not in evidence.

A. I don't what she was accused -- I don't know if there was any communication about what she was accused of.

Q. (BY MS. CHALOUPKA) I think by that point she was being accused of lying, true?

MS. SAPP: Objection, form, foundation, argumentative.

A. I think the primary thing was breaking curfew and team rules --

Q. (BY MS. CHALOUPKA) Correct.

A. -- that Amy had communicated. And then, yes, being in a hotel room with an assistant coach after midnight.

Q. Right.

A. In his room, I guess.

Q. In his room and under his covers, true?

A. Yeah. I don't know the details about what was happening in the room other than he was in the room.

Q. At no point -- strike that.

None of this had been brought to your

attention until after Amy had begun her own inquires, true?

MS. SAPP: Objection, form, foundation, assumes fact not in evidence, argumentative. It was a team meeting. He said that a million times.

A. Yeah. I don't know what the timeline was or what was communicated in there.

Q. (BY MS. CHALOUPKA) Well, you know when you were called, correct?

A. Right.

Q. And in that call, which we've now talked about pretty extensively, there was no discussion of the policy that's written in Exhibit 421, correct?

A. Not in that call, no.

Q. There was not a reference to, you know, Amy should have let me know if Ashley's being accused of misconduct that could get her removed from this team, true?

A. No.

Q. Now, the other exhibit I want to pull out is 400.

(Exhibit No. 400 marked.)

Q. (BY MS. CHALOUPKA) Before I go to 400, still on 421, a couple of other question on that. 421, the

student conduct policy, it provides specifically for a decision made by the director of athletics whether the policy applies, true?

A. Yes.

Q. And if a coach interferes with that process, that could undermined confidence in the integrity of the process, true?

MS. SAPP: Objection, form, unduly vague, assumes facts not in evidence.

A. I'm sorry. One more time with the question.

Q. (BY MS. CHALOUPKA) If a coach interferes with the process as set forth in the student conduct policy, that undermines the whole point of the student conduct policy, right?

MS. SAPP: Same objections.

A. It complicates it.

Q. (BY MS. CHALOUPKA) I mean, because coaches are supposed to be basically conflicted out of Exhibit 421, the student conduct policy, true?

MS. SAPP: Objection, form, foundation, misstates the policy.

A. Yeah. I don't -- I can't speak to what Amy's thought process was.

Q. (BY MS. CHALOUPKA) I didn't ask you that in question.

A. What her meeting was with the team.

Q. I did ask you that question. I said, Coaches are supposed to be conflicted out of the process that is described in 421, true?

A. Yes.

MS. SAPP: Same objection.

Q. (BY MS. CHALOUPKA) On Exhibit 400, if you go to 11th page that, there's an excerpt in this PowerPoint slide, and this was used in 2015, about when the student policy -- conduct policy was enacted. The point was to remove coaches from this equation specifically because of potential conflicts of interest, right?

A. Yes.

Q. Now, looking back at the student conduct policy, it was not part of the student athlete handbook, true?

A. I don't believe so.

Q. And it wasn't in the team handbook either, was it?

A. I don't know.

Q. And you did not require the coaches to train their player about the existence of the student conduct policy, true?

A. No.

Q. Correct?
A. Correct.
MS. CHALOUPKA: This would be a good time for a break.
THE REPORTER: Going off the record at 9:38 a.m.
(Off the record. )
THE REPORTER: Going back on the record at 9:45 a.m.
Q. (BY MS. CHALOUPKA) So Coach Love was suspended with pay. I take it it was pending investigations so the department properly investigates whatever was being alleged; is that fair?
A. I think that's fair, yes.
Q. And the suspension with pay would continue for as long as it took to complete that investigation?
A. That's -- yes.
Q. Not just the pay, but also insurance and whatever?
A. Other benefits, correct.
Q. Okay. Was this a punishment suspension or an investigatory suspension?
A. I don't know that that determination had been made at that point.
Q. Was there anyone advocating, let's say in the

week following the revelation of these events, was there anyone advocating for termination?
A. My initial --
Q. Other than yourself.
A. Yeah. My initial response was, but not that I recall.
Q. Do you recall whether there was anyone advocating in the opposite direction; in other words, allowing him to return to coaching?
A. No. There was -- I don't recall anybody advocating for that.
Q. It sounds like there was consensus that the suspension with pay should go on during this investigation.
A. That was the recommendation we were given.
Q. I take it that you were eventually made aware that Coach love was now saying he was not going to resign. I think we actually covered that in one of those emails; is that right?
A. That's correct.
(Exhibit Nos. 319 and 320 were marked.)
Q. (BY MS. CHALOUPKA) Okay. Let me give you Exhibit 319 and 320.
A. Thank you.
Q. 319 and 320 were your communications, one

being the email and the other being the attached correspondence from yourself to Coach Love, right?
A. Correct.
Q. And the inappropriate conduct that you reference that that letter was what?
A. The incident in the hotel room.
Q. Having a female player in the hotel room under the covers after midnight?
A. Correct.
Q. Did you obtain approval from Board of Regents to formalize this suspension?
A. Not the Board of Regents, no.
Q. Chancellor -- Chancellor Green or President Carter?
A. I don't know if they were communicated with. We -- this was the same -- the same process and people involved in all of it, yeah.
Q. Had someone told you go ahead and formalize this; it's let's green lit?
A. Correct.
Q. Who told you that?
A. The office of general counsel and the Title IX. It was the group of people working on it.
Q. Who told you directly? If Title IX -- I thought you said you were not in direct contact with

Title IX, so --
A. Yeah. I'm trying to --
Q. Who was it that said, Mr. Alberts, you can go ahead with this?
MS. SAPP: Objection, foundation.
If you know.
A. I'm trying to remember. I don't know. She wasn't involved, but Audrey Polt, I had her in the office two to three days a week from the office of general counsel because she worked with us on contracts and stuff, so I don't think it was her. Somehow some way we were given the letter that was to be --
Q. Approved?
A. Delivered yeah.
Q. In this letter you directed Coach Love to refrain from contact with any current student athletes, coaches or athletic staff; is that correct?
A. Correct.
Q. And that is critical in order to keep the investigation fair and neutral, true?
A. Yes.
Q. Did you learn whether Coach Love abided by that direction?
A. I have not.
Q. With Ashley being off the team at that point,

was she included in the no-contact directive?
A. I don't know.
Q. What was the reason for designated yourself as the point of conduct during his suspension?
A. I don't know the answer to that.
Q. Did he ever reach out to you, Mr. Love ever reach out to you, during his suspension?
A. No.
Q. Do you know whether he ever reached out to your designee Mr. Zimmer, and did Mr. Zimmer pass anything like that along to you?
A. I'm not aware.
Q. Was this an HR matter or Title IX matter as you understood it?
A. I don't know.
Q. Is there any other way that you would categorize this other than HR or Title IX, any other bucket that would fall --
A. Not that I can think of.
Q. At any time -- you may have answered this, but I want to make sure I understand. Had you resolved before you met with Scoggins family, had you resolved that there were no Title IX implications for a coach having a sexual relationship with a student athlete?
A. I hadn't resolved anything other than that.

Q. Had you determined that there would not be Title IX implications if there was a sexual relationship there? Does that question make sense?
A. Yeah. I think it makes sense. The answer is no.
Q. Had not resolved?
A. No.
Q. Was there a point at which you did resolve the answer to that question, whether there are Title IX implications for a coach having a sexual relationship with a student athlete?
A. No. Again, I think the chief challenge was, A, communication with Ashley and, B, you know, insistence from both side that nothing happen.
Q. Your explanation there tells me that my question wasn't clear.
The question is, if there was a relationship, would there be Title IX implications from it?
A. Yeah.
Q. And did you resolve the answer to that question?
A. Yeah. I don't know that. That's why I'm not involved in that. That's not my area of expertise, and so I --

Q. Did anyone you were consulting with say we've answered that question?

A. Not that I'm aware of.

Q. So by -- let me pull out Exhibit 364.

A. Thank you.

(Exhibit No. 364 marked.)

Q. (BY MS. CHALOUPKA) This is another document you did not write. I've learned that these are notes of Megan Counley who is the Title IX coordinator. And I'm going be looking at the second page of this document. And Ms. Counley refers to herself in the third person there as Counley.

A. Uh-huh.

Q. As I am -- I'm looking for exactly where the spot was on this page. Here it is. There's a bullet point that says, "Counley returned Keith's call" on second page. Do you see that?

A. Yes.

Q. About midway through that paragraph she writes, "Counley informed Keith that IEC would not be initiating an investigation based on the reported information at this time. Counley advised the matter seemed to be more appropriate for HR/athletics to address, but Counley would like to meet with Ashley if she was willing to offer support and resources."

Was -- I'm taking you back a little bit, a day earlier to the 18th. Did Mr. Zimmer make you aware that it had been cited that Ms. Counley had informed him that this matter seemed more appropriate for HR/athletics and her office would not initiate an investigation at this time?

A. Yes. I don't recall the exact timeline. But, again, I think that that frankly was as a result of the responses of both parties that nothing happened.

Q. And what do you think that -- what are you basing that thought on? You said I think that was result of. Why do you think that? Who told you that?

A. Well, I never talked to her, so it would have to be Keith. So Keith is probably relaying to me, you know, what he's hearing from campus partners.

Q. Let's mark this as Exhibit 324, please. This is 381.

(Exhibit Nos. 324 and 381 were marked.)

Q. (BY MS. CHALOUPKA) So 324 is an email from Krissy, K-R-I-S-S-Y, Scoggin. It looks like she emailed you at 9:54 on February 20th. "With a smile on my face, I will ask you."

Does director of athletics at the University of Nebraska read all of his own email or is there some

screening process to keep you from having to read --
A. Yes. Yeah. There's screening.
Q. All right. What brought her email to your attention?
A. I don't know.
Q. Somebody who had -- somebody involved in your screening had forwarded --
A. Yeah, forwarded it on.
Q. -- okay. Do you recall whether you responded to Ms. Scoggin before forwarding her email to Mr. Zimmer and Ms. Logston?
A. Did I respond to Ms. Scoggin?
Q. Ms. Scoggin first, yeah.
A. I don't believe so.
Q. Then on 381, it looks like Ms. Scoggin wrote again the next day, the 21st of February, and at that time it looks like you did respond; is that correct?
A. Yeah. So I don't know if there's a timeline between one that is sent to the AD deal and by the time to get through them. Does that make sense?
Q. Yeah.
A. Yeah.
Q. And in 318, plans are made for a meeting with Ms. Logston and Mr. Zimmer; is that right?
A. Correct.

Q. What did Ms. Logston have to do with any of this?

A. So Pat had been the senior women's administrator for a long time and was transitioning into retirement. And we were in the process and we may have, by that point, have hired a new SWA who was much less experienced. And so we felt like since Pat -- I'm trying to think. I think Pat might have been the sport administrator for women's basketball prior to my arrival. I don't know the exact. But we just thought it was unfair for a young new SWA be put in the situation without experience. So Pat -- and she -- I had asked her to stick around a little longer to help me I was since relatively new, so that's why she was involved.

Q. Why did an SWA need to be engaged with this situation that?

A. Well that's typically their role. They're advocating for the female problems, female student athletes, helping us hold ourselves accountable.

Q. Has she had any engagement with Ashley?

A. I don't know.

Q. Why did you need Ashley to sign a FERPA waiver?

A. That was given to us from, again, I'm not

sure who, but so that any information that -- I don't know why other than that's what we were directed to.

Q. If she had signed it, what would you have said that you didn't say due to the fact she had not signed it?

A. I don't know.

Q. So the upshot going this is that the Scoggins wanted Ashley to be reinstated; is that correct?

A. Yes.

Q. And the other upshot was this was an opportunity for you to get more information that was needed; is that right?

MS. SAPP: Objection, form of question, assume facts not in evidence.

A. It was my goal, which is what we did, to let her know that we would support her however we could.

Q. (BY MS. CHALOUPKA) For Ashley?

A. Yes, Ashley. Transfer portal, her dad had some other requests, financial requests and others.

Q. And I'm going to get into the meeting in a second.

A. Okay.

Q. But going into the meeting, one of the other reasons for it was to try to learn more, true?

MS. SAPP: Objection, form of the

question.
A. No.
Q. (BY MS. CHALOUPKA) No?
A. We did request the meeting, she did.
Q. But you didn't have to agree to it, right?
A. We never -- we don't turn down meetings with student athletes. And remember this also, respectfully, was exciting to us because we actually got Ashley to respond.
Q. Was she still a student athlete as of that day?
A. Yes.
Q. What was his status?
A. I don't know what her status was with the team to coaches, but she was a student athlete on scholarship at the University.
Q. And so did you -- with that exact dynamic that you just mentioned, what -- she's still on scholarship. She's still at the University. What implications did that have as you were preparing for this meeting? That's going to the next question I had, so I'll bunch it up. How did that impact your preparation for the meeting?
A. I don't know that there was a whole lot of preparation for the meeting. We were waiting to --

they requested to meet with us and wanted to talk through the details.

Q. Was there anyone else that you spoke with on the issue of Ashley and Coach Love before the Scoggins arrived whether phone, in person, email, et cetera?

MS. SAPP: That day?

MS. CHALOUPKA: Let's say --

A. I don't remember.

Q. (BY MS. CHALOUPKA) -- from the time that you heard from Krissy Scoggin, which was at 6:45 of February 21st until you went into the meeting on the 22nd?

A. I don't recall, but it doesn't mean I don't.

Q. Yeah. Like anything that stands out in your mind.

A. Nothing anything that stands out.

Q. Had there been a finding by the time you started that meeting about whether there was a sexual relationship between Coach Love and Ashley?

A. I don't believe so.

Q. Had anyone alleged that Ashley had violated any rule or regulation of the NCAA?

A. Not of the NCAA that I'm aware of.

Q. Did -- at that point where you're preparing for this meeting, what rights did Ashley have to your

understanding?
A. What do you mean, what rights?
Q. What rights did she have to your understanding as a director of athletics?
A. What legal rights she had? What do you mean, what rights?
Q. Any rights. Right to her --
A. She's a student athlete, an active student athlete that requested a meeting with her mom and dad to discuss what happened in Pennsylvania.
Q. Anything else that you can think of?
A. (Witness nods.)
Q. If Title IX has already said we're not going to the investigate, does that mean there is nothing else the Nebraska needs to do for the protection of the athlete?
MS. SAPP: Objection, form, foundation.
A. No. I mean, I don't think so. But, I mean, I think that's part of what the reason for the meeting was, was to learn.
Q. (BY MS. CHALOUPKA) Did her status change during the meeting with the Scoggins?
A. Did her status change during the meeting?
Q. Correct.

A. No.
Q. How about after the meeting?
A. No.
Q. So what was the role of Coach Williams going to be in this meeting?
A. She was the head coach who was there, and it made sense for her to be there. It was her program.
Q. Sure. What role was Mr. Zimmer to have at this meeting?
A. He was the sport administrator directly and intimately involved in the details.
Q. And we've talked about Logston. What was your role in this meeting?
A. My role as director of athletics is to make sure that we are sending a message that we will do whatever we can't to support her in whatever areas they can think of. But it was also a good tool for me to learn, to hear directly. This is the first time I had any conversation directly from any of the involved parties.
Q. Had you -- other then when you had been to some of the women's games, had you -- had you ever looked at Ashley's stats?
A. No.
Q. Had attended any practices?

A. I think I -- when I first got hired, I went and met with each head coach individually, and sometimes that corresponded with stopping by if they were practicing. So I think it's -- I think I did, but I didn't regularly attend practice, no.

Q. Did you know going into this meeting what Ashley's baseline was in terms of how she normally acts, how she acts if she's stressed, that kind of thing?

A. No.

Q. Did you -- by that point, had you made any inquiries about whether Ashley had been engaged with sports psychology at any point?

A. I did not.

Q. Did you ever suggest to Mr. Zimmer or anyone else, call sports psychology, see if there's someone they had that could attend this meeting, anything like that?

A. No. I don't recall that.

Q. Were you aware that Ashley had reported prior trauma from what Dr. Woods referred to as a power differential between a coach and Ashley?

A. No.

Q. Did -- not Coach Love, but someone before that.

Did anyone at this meeting tell Ashley if the coach was having sex with you, it is not your fault?

A. Not that I recall.

Q. Did anyone tell Ashley if your coach was having sex with you, you're not in trouble?

A. No. That wasn't the tenure of the meeting.

Q. Tell what you recall about this meeting. Let me back it up. About how long do you think it lasted?

A. Maybe 30 to 45 minutes.

Q. What do you recall from it?

A. What I recall was Ashley's mom did a lot of the initial talking. Ashley was very quiet. And her mom was apoplectic that this was even an issue. It was none of the university's business if her daughter -- nothing happened, and there is no issue here, and why are we -- why is the University involved here? And she said, it is none of the business -- it is none of the business of any of you in this room who her daughter has a relationship with.

Q. Sexual relationship or relationship?

A. She said relationship --

Q. What else?

A. And that nothing happened in the room.

Q. What else did she say?

A. And her dad wanted her to be back on the team. And I communicated that the decision was made, that the coach has the right with her roster to have on the team who she wants on the team, and Amy has made the decision that she's not on the team, and she's got that authority.

But, we, in athletics will do everything we can to help you. So if you need help with a transfer report or resource like sports psychology, if you need -- and then her dad brought up an issue with her living arrangements, that here roommate she felt uncomfortable with and she felt hostile.

And I agreed in the meeting that we would take care of her lease. So we paid for her to be able to move out where she felt like she was threatened or she didn't like that living arrangement. So other than letting her have a roster spot on the team, we tried to be responsive to every request that they had.

Q. What was the reason that was stated for Ashley being uncomfortable staying with her roommate?

A. I don't remember the details other than she just felt uncomfortable with her, said she did not want to live with her. And her dad said it would be very meaningful if we would allow her to move out. Of course there's a financial cost to them. They didn't

think it was fair that they bear that, so I agreed to pay it.

Q. Did these seem like people who had a lot of money.

MS. SAPP: Objection, foundation.

A. No -- I don't know.

Q. (BY MS. CHALOUPKA) Ashley had applied for some assistance with a vehicle at one point. Do you remember that?

A. To us, she did?

Q. Yeah.

A. I wasn't aware of that, I don't think.

Q. Did -- was it -- you know, were you aware at that time that the roommate was the person that came in the door with the phone out in the door of Coach Love's room and videoing and saying "you're sick, you're sick," things like that?

A. I wasn't aware of those details, but I knew that there was a strained relationship between the two.

Q. And that after -- after the Penn State game that the roommate had made some comment to Ashley about, you know, how this could end Coach Love's career. Were you aware that that had been said by the roommate?

A. No.

Q. Aware that the roommate had sent a text to Ashley that said something to the effect of "you're dead to me"?

MS. SAPP: Objection, form. Foundation, unclear as to timing that happened before.

A. Yeah. I'm not aware.

Q. (BY MS. CHALOUPKA) What else was said that you recall?

A. That seemed to be the primary. I'm would be really frank with you. I was stunned at what I heard from mom.

Q. What's the worst thing she said?

A. That it was none of our business. That if her daughter wants to be in the assistant coach's room after midnight, that's her business. She's an adult and she can make that decision.

Q. What else?

A. That was the thing that was probably most on my -- but, you know, it was -- it started out. I don't believe Ashley talked much. She did -- they did ask her if she -- it seemed by the end that, you know, dad felt a little bit more comfortable that, you know, that we were getting confident that we could help her get into the portal, support her academically and all the other areas and take care of her financial concerns.

So, I think, at the end it felt like it was about everything we could do based on challenging circumstances.

Q. What else do you recall specifically being said whether by Ms. Scoggin or Mr. Scoggin or Ashley?

A. No. That's -- that's primarily what I remember.

Q. Who was in the role of kind of directing the discussion? Was it you or was it Mr. Zimmer, or who was -- seemed to be in that facilitator role?

A. I don't know that anybody -- I think primarily probably Keith. He was the one that was most intimately involved with it. But I don't think there was -- I can't say that Keith was, you know, walking through an agenda. It was not a -- I mean, it was just a conversation and it bounced around.

Q. Did you have the sense that he had had direct communication with either Ms. Scoggin or Mr. Scoggin?

A. Don't know.

Q. What do you recall Coach Williams saying during this?

A. She just spoke specifically to the team and her decision and why it was her decision based on breaking team rules and such that Ashley would not be on the roster anymore, but that she care for her,

appreciated her, and she wanted to support here any way they could outside of -- the message we were trying to send is we will support you any way we can, but we're not going to be able give you a roster spot on women's basketball team.
Q. What do you recall Ms. Logston saying in this meeting.
A. I don't know that Pat -- I'm not saying she didn't say anything, but I don't recall anything she said, so she was probably pretty quiet.
Q. Anything else you recall yourself saying?
A. I think all I said was we'll do everything we can to support you help you.
Q. I don't want to leave this meeting without giving you the chance to empty the bucket of whatever other memories you've got of things that anyone said. Anything else that you can recall that Krissy Scoggin Craig Scoggin, anyone else in the room said during that meeting?
A. Not that I recall.
Q. During those 30 to 40 minutes, was it in your mind in part or in whole that this student athlete maybe have been sexually exploited by a coach under your supervision?
A. I didn't know.

Q. Was it in your mind that maybe it had happened, that's the question?

A. Well, I think -- yeah. Everybody was wondering what actually happened, maybe not specific to that, but even prior.

Q. Was it in your mind that in that moment that Ashley was facing what -- well, first of all, the end of her involvement with this program?

A. Yes.

Q. And that she was facing the end of her involvement with Coach Williams?

A. Yes.

Q. Facing the end of her relationship with this Power 5 program, Power 5 at the time?

A. Yes.

Q. Was it in your mind that she may have been facing the end of her playing career not knowing what was next?

A. Yes. That's not what I was thinking, but, yes, I can -- yeah.

Q. Did you know that she had aspired to coach?

A. I did not.

Q. If Ashley had never disclosed a sexual relationship before, in your mind was it reasonable to expect her to disclose in that setting that she was in

a sexual relationship with Chuck Love?
A. I don't -- that wasn't part of the conversation. It wasn't a meeting to see if she would acknowledge a sexual relationship.
Q. That wasn't my question. If she had never disclosed before, do you think it was reasonable to expect that she would disclose in that setting?
MS. SAPP: Objection, form of the question as to an expectation. He said he didn't have an expectation.
A. I didn't have an expectation.
MS. FROST: Join.
MS. CHALOUPKA: Yeah, and Susan you don't get to do that, but...
MS. SAPP: I'm going to make my objection form and foundation.
MS. CHALOUPKA: Form and foundation will do just fine.
Q. (BY MS. CHALOUPKA) As you sit here now, do you think it was reasonable to think she would have disclosed in that setting?
MS. SAPP: Objection, form of the question, assumes facts not in evidence.
A. It wasn't a meeting that that was a possibility, frankly.

Q. (BY MS. CHALOUPKA) Is there anything that Ashley could have said that could have changed the out outcome of that meeting?
A. In terms of being back on the team, or..
Q. Right.
A. At that point, no.
Q. Is there anything that either her mom or her dad could have said that would have changed the outcome and gotten her back on the team?
A. I don't know. I don't know what they could have said that would have changed the outcome.
Q. You told me everything you remember, but I'm just going to check. Did you ever bring the student conduct policy to her attention and offer her a neutral investigation of a claim that she had committed misconduct that may be at the level of removal from the team?
A. No. That was not part of the misconduct policy. It was a coach's decision for rules and team violation.
Q. But that had not been determined, right? You had not actually made that kind of determination?
A. The coach had made that determination.
Q. Are you going to claim that during this meeting there was any threats against the University

made by Ashley's parents? Again, empty your bucket.

A. Yeah. I'm trying to recall. I do know that at the beginning they were aggressive. And, like I said, it was early on when mom was -- they were -- they were aggressive towards the University.

Q. Are you recalling any specific threats that you would testify about if this goes to trial?

A. I can't recall specific threats, no.

Q. After the Scoggins -- well, how did the meeting conclude?

A. My recollection is, is after there was a general conversation. And then when some of the concerns were brought from dad about some of the financial stuff and when we had made those commitments and we just said, you know, not on the team, but all of the resources of the University outside of being a member of the women's basketball team are available to you, and we encourage you to use those, and we will help you. And here's all the teams to reach out to if we can be helpful.

It seemed at least that -- at least my perception was that there was some resolution at least that they understood and it was relatively benign and the -- you know, it wasn't emotional or anything. We moved on.

Q. Nobody yelled FU and stomped out the door and slammed it behind them --
A. That's not what I recall.
Q. After the Scoggins left, did you continue to confer with the other administrators and Coach Amy who were present for the meeting?
A. In that room?
Q. Yeah. Like a debrief or anything like that?
A. Not that I recall.
Q. When they left did the entire group disburse?
A. I think so, yes.
Q. Okay.
A. But I can't speak to what they might have done individually. I don't recall having a meeting to have a meeting about the meeting, no.
Q. Okay. In that school year, was anybody else removed from a program besides Ashley Scoggin?
A. I don't recall.
Q. So one of the people I think you mentioned in -- when we were here in December that had taught you leadership was Coach Osborne born; is that right?
A. That had what?
Q. It was Coach Osborne that had taught you leadership; is that right?
A. Yeah.

Q. Lawrence Phillips was a starter. He was suspended. He was allowed to return by Coach Osborne after an eyewitness assault of a woman, right, true?
A. Yes.
MS. SAPP: Objection, foundation.
Do you know?
A. Well --
Q. (BY MS. CHALOUPKA) Everyone knows.
Ashley was a starter, lies about something, and she was removed, right? Is Coach Williams thus a more effective leader than Coach Osborne?
MS. SAPP: Objection, form. Foundation, calls for speculation.
A. I'd hate to evaluate the two.
Q. (BY MS. CHALOUPKA) Has there ever been a time that anyone sent you a text message about Ashley Scoggin and/or Coach Love?
A. Has anybody ever sent me a text message.
Q. Yeah. An administrator, a Regent, a coach, a buddy, anything like that --
A. Not that I recall.
Q. -- yeah. Have you ever sent a text message; have you ever communicated by text with anybody about this situation?

A. I don't recall.
Q. Did any athletes communicate with you about Ashley or Coach Love?
A. No, not that I recall.
Q. Any athletes communicate with you about coaches behaving inappropriately?
A. Not that I recall.
Q. Did other employees of athletics communicate with you about Ashley?
A. Not that I recall other than, you know, people who were aware of the situation, but nothing formally that I can remember.
Q. Well, if they were communicating that they were aware, what does that mean? If I was watching that kind of communication --
A. Well, there was no specific communication about Ashley with other or people. I mean, it just wasn't a...
Q. Was there ever a time that you talked with Jim (phonetic) Pillin about Coach Love?
A. Not that I recall.
Q. Or about Ashley?
A. Not that I recall.
Q. When did you learn that Coach Love had been changing rooms on many, if not every trip, and that the

players knew about it?
A. That all -- I don't know the exact timing of that, but as all of the details -- I think it was Keith who kind of explained to me the strategy. That Ashley would -- her roommate began having some concerns when every time they would go on the road, she would suggest that she had a former teammate or somebody she knew from junior college or something in that area and she would sneak out after curfew after they had bed check and then presumably go to Chuck's room.
Q. Right. That information came to you from Mr. Zimmer?
A. I believe so.
Q. When did you learn that specific to Coach Love that he had been changing his room on a regular on these road trip?
A. About that same time from Keith that there was a -- yeah. I don't remember exactly, but it was in same the conversation about the details of their strategy.
Q. And that the players were noticing all of this stuff?
A. Something didn't feel right.
Q. And the player's were noticing that he had been changing rooms, right?

A. I don't --

MS. SAPP: Objection, foundation.

If you know.

A. I did not hear that from the players, but I guess --

Q. (BY MS. CHALOUPKA) Well, I mean, you heard it from Keith --

A. Yeah.

Q. -- that the players knew that he was changing rooms?

A. I don't know if the players told Keith that he was changing rooms. Keith told me.

Q. And then that the players had noticed that Ashley was in this pattern?

A. Yes.

Q. Had done this -- I don't know if there's a number, but multiple times on road trips?

A. Correct.

Q. Did the Department of Athletics have a rule about curfews, rooms, things like that on road trips in riding at that time?

A. For the whole athletic department.

Q. For student athletes?

A. No.

Q. If an athlete did not want to go have sex

with the coach, would it be helpful to have something so that she could say, I'll get in trouble if I leave my room?

MS. SAPP: Objection, form. Foundation, calls for speculation.

A. I suppose.

Q. (BY MS. CHALOUPKA) And did you find out whose job it was to check and enforce any curfew rule on night of February 17?

A. I don't know who. It was generally -- it could rotate. Sometimes it could be a student manager. It could be an assistant coach, on rare occasions maybe the head coach.

Q. Did you want to know whose job it was and whether they had done their job?

A. No.

Q. Did it matter whether that person had done their job?

A. Yeah, those functions are typically handled by the team and team rules.

Q. Sure. Would you want to know if this pattern had been going on and somehow bed checks weren't catching it?

A. Yeah. That would be interesting.

Q. Did you ever have a thought in your mind

like, Amy really didn't know that her players were in a pattern of leaving their rooms multiple times?
A. No.
Q. Did not concern you?
A. No.
Q. When did you learn that the -- the entry into Coach Love's room was the result of a student manager obtaining a key under false pretenses.
MS. SAPP: Objection, form of the question. Assumes facts not in evidence.
A. I would say I would assume it would have been around the rest of the details as they continued to materialize.
Q. (BY MS. CHALOUPKA) In the week following concerning --
A. I don't remember a specific, but it would have been part of the same information about her sneaking out of her room and him changing the rooms, yeah.
Q. Who did you think you learned from that the student manager had obtained this key by saying something to the hotel clerk to get the key to Coach Love's room?
A. Keith.
Q. From Mr. Zimmer?

A. Yeah.
Q. Do you know whom he learned that from?
A. I don't.
Q. Why didn't Coach Williams tell you about that.
MS. SAPP: Objection, foundation. As to someone else's thought.
A. It's just not the general structure. Those are the intimate details of the sport administrator.
Q. (BY MS. CHALOUPKA) Was the student manager paid?
A. I don't know answer to that. Some are. Some aren't. Some might be considered like GAs.
Q. Was the student manage disciplined for his role at least?
A. I can't be sure, but I don't believe so.
Q. Ashley was the only one that was found under the covers in the coach's room, right?
A. Correct.
Q. No other players were, but she is not the only one who lied, is she?
MS. SAPP: Objection, form of the question. Argumentative. Assumes facts not in evidence.
A. I don't know what he told the person at the

front desk. I'm not aware of all the facts about how he obtained the key. I know he obtained the key.
Q. (BY MS. CHALOUPKA) Did you ask?
A. No.
Q. Did you care?
MS. SAPP: Objection, argumentative.
A. Did I care how he obtained the key?
Q. Right.
A. Not really.
Q. What do -- did you give any directives to Coach Williams for discipline of the student manager?
A. No.
Q. Was there an argument for not immediately terminating the student manager?
A. No. Not that I'm aware of.
Q. When did you learn that instead of reporting -- well, pull out Exhibit 421, the student conduct policy.
A. Okay. We'll try this one.
Q. All right. And in the student conduct policy on page 2, we already looked at that bullet point that says one of the purposes of it is to minimize the potential for conflict of interest on the part of the administrators, coaches, student athletes, right?
A. Yup.

Q. And going to the third page, on the third page there's a reference to the head coach for student athlete does not make the suspension decision, right?
A. Yes.
Q. Go to the sixth page. There's language there that says that "Head coaches mainly based on conflict of interest grounds shall not be involved in the inquiry or decision-making involving their teams relative to these matters in this policy." True?
A. Correct.
Q. One more on the next page if you will, page 7, it says that "This section reaffirms the purpose of not having student athletes' coach make a suspension decision."
Have I read that correctly?
A. I'm looking for that one. What is it under, the purpose of the policy or when the contact applies?
Q. The bottom of the page.
A. This section affirms?
Q. Yup. "This section affirms the purpose of not having the student athletes' coach make the suspension decision." Right?
A. Yes.
Q. Four times in this seven-page document this policy recognizes the risk that a head coach is going

to have a conflict of interest, true?
A. Yes.
Q. And four times in seven pages it says head coach stays out of this decision, true?
A. Correct.
Q. But she did not give you the opportunity to make that first preliminary decision about whether the conduct applies until after she had taken investigatory steps herself, true?
MS. SAPP: Objection to the form of the question. Assumes facts not in evidence. There was a teem meeting. He said it ten times, you keep repackaging it as something else.
MS. CHALOUPKA: There was more than that.
Q. (BY MS. CHALOUPKA) But go ahead.
A. Yeah. Like I said, our coaches meet with their terms all the time. I don't know the specifies about what team meeting entailed.
Q. And Ms. Williams did not advise Ashley that she might be a victim as far as you know, true?
MS. SAPP: Objection, form. Foundation.
A. I'm not aware of that.
Q. (BY MS. CHALOUPKA) Nor did she advise the

team that Ashley could be a victim?
MS. SAPP: Objection to form, foundation.
A. I was not -- did not hear your question.
Q. (BY MS. CHALOUPKA) She did not take any steps to prevent Ashley from being shamed, humiliated, anything like that, true?
MS. SAPP: Objection, form. Foundation. Argumentative. Assumes facts not in evidence.
A. I'm not aware of what steps she could or should have taken.
Q. (BY MS. CHALOUPKA) At Nebraska, at least while you were there, was it part of the head coach's job to protect a player from the worst emotions of the team?
A. The worst what?
Q. Emotions of the team.
MS. SAPP: Objection, form. Foundation. Broadly vague lacking specific foundation.
A. Say it again. Is it the coach's job...
Q. (BY MS. CHALOUPKA) Was it part of the coach's job to protect a player even if they're in the wrong from the worst emotions of the team?
MS. SAPP: Same objections.

Q. (BY MS. CHALOUPKA) Is that leadership?
MS. SAPP: Same objections.
A. Yeah. The coaches are the leader of their programs.
Q. (BY MS. CHALOUPKA) Right.
A. And they're doing the best they can to coach and lead their program.
Q. Right. And is it part of their job to protect the players from the worst emotions of the team?
MS. SAPP: Same objections.
A. I don't know exactly what you're trying to -- I mean, is their job to do the best the can to serve the students, of course.
Q. (BY MS. CHALOUPKA)If it was your daughter, you would want the head coach to protect her from being shamed?
A. Oh, from being shamed. Okay. I get what you're saying.
MS. SAPP: Objection, form of the question.
A. As best she can, I suppose.
Q. (BY MS. CHALOUPKA) Because shaming and humiliating by your peers is no way to solve a problem, is it?

MS. SAPP: Objection, form. Foundation. Argumentative.
A. I don't know.
Q. (BY MS. CHALOUPKA) And that's why we have processes and policies, true?
MS. SAPP: Same objections. Same objections.
A. Yeah. I don't that Amy was shaming. I don't believe there was that.
Q. That's not the question I asked. We have processes --
MS. SAPP: Let him finish.
A. You're inferring that she was shaming and she has this policy of shaming the players. We're not shaming the players. It wasn't the players were shaming her. Of course you don't want to have a culture where a coach is -- you're not going to win very many games if that's your culture. Right. So there's nobody shaming. There's no effort to...
Q. (BY MS. CHALOUPKA) You weren't there.
A. That's right.
Q. All you know is what was said to you by Keith Zimmer?
A. That's right.
Q. And all Keith knows is what was said to him

by Coach Amy?
A. That's correct.
Q. What consequence did Amy Williams receive for not letting you decide whether the student conduct policy applied before beginning her own inquiry?
MS. SAPP: Objection, form. Foundation. Assumes facts not in evidence.
A. Zero. Before her team meeting, is that what you're recommending -- or suggesting?
Q. Before any of her inquiry of Ashley personally, of Chuck personally, of her team meeting, any of that?
MS. SAPP: Same objections.
Q. (BY MS. CHALOUPKA) Did she receive any consequence for not first letting you know so you could have that decision?
A. No.
MS. SAPP: Same objection. Inappropriate for the answer, please.
Q. (BY MS. CHALOUPKA) What consequence did Amy receive for not following the requirement in the consensual relationships policy to report these events to HR?
MS. SAPP: Same objections.
A. None.

Q. (BY MS. CHALOUPKA) We've been advised by Layton Brooks that reporting potential violations, the policy is expected as soon as possible. Is that consistent with your understanding of how that policy works?

MS. SAPP: Objection, form, foundation.

A. Yes. Our job is to report as soon as we know something.

Q. (BY MS. CHALOUPKA) And if Amy William knew as early as 7:00 in the morning, but did not contact anyone in administration until 4:30, that's not as soon as possible, is it?

MS. SAPP: Objection, form. Foundation. Argumentative.

A. I'm not aware of the exact timeline of what she knew, when she knew it and what the team meeting entailed.

Q. (BY MS. CHALOUPKA) That's not the question?

MS. SAPP: Well, that's the answer. You get to pick the question, but not the answers.

MS. CHALOUPKA: No. I get to ask for an answer to the question.

Q. (BY MS. CHALOUPKA) If Amy knew as early as 7:00 in the morning, but it was 4:30 in the afternoon

before she made a call to anyone in administration, that is not as soon as possible, is it?

MS. SAPP: Objection, form. Foundation. Assumes facts not in evidence, argumentative.

A. I don't know when she first communicated with somebody in administration.

Q. (BY MS. CHALOUPKA) Well --

A. It wasn't me.

Q. -- I can represent to you that we've have no information to this date indicating that she ever called anyone before she called Keith Zimmer at 4:30 in the afternoon.

A. Okay.

Q. If she knew as early as 7:00 in the morning and her first call to anybody in athletics was at 4:30 in the afternoon, that is not as soon as possible, is it?

MS. SAPP: Same objections, calls for speculation.

A. I don't know what happened between then and 4:30, but I don't want to make a judgment about what as soon as possible is. That's not -- I don't know exactly what, you know...

Q. (BY MS. CHALOUPKA) You made no inquiry about,

what were you doing that made it --
A. No.
Q. -- allegedly impossible for you to call.
You know, she could have even called -- you know, just grab a muffin instead of sitting through breakfast and make a quick call, true?
MS. CHALOUPKA: Objection, form. Foundation. Argumentative.
A. I don't know. There's probably a lot of things she could have done been. I don't want to create a hypothetical.
Q. (BY MS. CHALOUPKA) What consequence did Amy receive for not following the Title IX training requirements to report, not investigate?
MS. SAPP: Same objections.
A. Zero.
Q. (BY MS. CHALOUPKA) When did you learn that team members had acknowledged that Coach Love had been personal and intimate with them in the way that he would talk to them, ask them about their dating lives, things like that?
MS. SAPP: Objection, form. Foundation. Assumes facts not in evidence.
A. I'm not aware of any of that.
Q. (BY MS. CHALOUPKA) So you're learning now?

A. Yup.
Q. When did you learn that team members acknowledged seeing unusual amounts of contact between Coach Love and Ashley Scoggin?
MS. SAPP: Same objections.
A. I'm learning now.
Q. (BY MS. CHALOUPKA) When did you learn the team members reported that to Title IX that Couch Love was, in their opinion, giving Ms. Scoggin preferential treatment in terms of substitutions, playing time, minutes on the court, stuff like that?
MS. SAPP: Same objections.
A. It's the first time I'm hearing of that.
Q. (BY MS. CHALOUPKA) Is all of that within your expectation -- well, let me ask that differently.
Was there -- if she was an athlete and her coach got her into a sexual relationship, did Ashley deserve to be punished for that?
MS. SAPP: Objection, form. Foundation. Assumes facts not in evidence. Vague and ambiguous.
A. So if -- what was the hypothetical again?
Q. (BY MS. CHALOUPKA) Ashley was an athlete if her coach got her into a sexual relationship, did she deserve to be punished for that?

MS. SAPP: Same objections.

A. No.

Q. (BY MS. CHALOUPKA) Now, at some point -- random question here. What hotel does athletics use to house people that it needs to put in a hotel?

A. In Lincoln?

Q. Yeah.

A. I don't know that there's a specific. They move around probably.

Q. Is there a contract with anyone that you're aware of?

A. Not that I'm ware of.

Q. Coach Love has acknowledged that it's not uncommon to get calls from coaches of other programs to give them the heads up that our athlete is going to transfer.

A. Yeah.

Q. Just good athlete, not a good fit for our program or needs more playing time, whatever, benign reasons. And it's not uncommon to get those calls just saying be aware. Is that something that you would agree with as well?

A. Yeah.

Q. Did anyone to your knowledge ever suggest that maybe Nebraska could reach out to another program

and put in a supportive word about Ashley?
A. I believe that's what was communicated in the meeting, that the team would be happy to try to help her get in the portal and find her a new home. But I'm not aware of any specific efforts by anybody.
Q. Yeah. That's what I mean. Just because you get in the portal, doesn't mean --
A. Right.
Q. Yeah. So did anyone ever suggest that, you know, let's pick up the phone and call this coach at X, Y, Z University and see -- you know, let them know we've got a good shooter that's available?
A. I don't know if Amy or any assistant coaches did that.
Q. Did you ever suggest that?
A. No.
Q. After the meeting with the Scoggin family, what communications did you have with Mr. Vaughn about Ashley?
A. I don't recall any specific conversations other than Jaime's role at that time, and compliance would be to help her get the forms filled out to help her -- you know, a compliance effort to find a new home.
Q. Did you learn at some point that she did

decide to transfer?
A. Yes.
Q. How did you learn that?
A. I don't know how I learned it, but I just knew that she had quite a bit of interest when she went into the portal.
Q. Tell me about that?
A. Just that when she went into the portal, there were schools that wanted her to be on their team.
Q. How do you know that?
A. Just, I don't know if it was from Keith or Jaime or who, but that people were interested in her.
Q. How was that interest expressed to Nebraska?
A. I don't know. Typically the coaches work -- you know, if -- well, if it's a -- if it's like it really works, you contact their agent, and if they're not in the portal, that's another story.
Q. This is back in '22.
A. When you're in the portal, you'll have coaches that will reach out directly to Ashley. There might be coaches, I would presume, that reach out to our coaches.
Q. What are you aware of that Mr. Zimmer and Mr. Vaughn would have had personal knowledge of --
A. Oh, I'm not aware of any personal knowledge

of that, any individual specific interest by any specific team.

Q. Any knowledge, you know, anything that either Mr. Zimmer or Mr. Vaughn told you of someone called me or someone emailed me on anything like that?

A. Not that I'm aware of.

Q. I'm not meaning this to sound snippy. How did they know that there was quite bit of interest in Ashley if no one had called them or emailed or direct messaged or whatever?

MS. SAPP: Objection, foundation as to what other people --

A. I don't know. I don't know how they got that information.

Q. (BY MS. CHALOUPKA) Who conducted the internal investigation of this matter after -- after everyone got home from Penn State?

A. I don't know that there's any one specific -- I'm not aware that there was a person in charge. I think it was a collaboration between probably multiple folks, Title IX office, probably HR, general counsel. I don't know exactly how it would work.

Q. Title IX has said, you know, as we went over before, they had already determined the day after that this was not going to be a Title IX matter, but I know

there was an internal investigation of some sort. Was that run by somebody at athletics in terms of interviewing witnesses, deciding what evidence to look at, that kind of thing?

A. I don't believe so.

Q. Did anyone ask for Coach Love for access to his phone?

A. I'm not aware of the answer to that question.

Q. Was there ever a document that concluded an investigation saying this matter is closed; we found X, Y, Z, anything like that?

A. Not that I'm aware of.

Q. Were findings ever made -- reported to you orally?

A. I don't think so.

Q. Were you interviewed?

A. No.

Q. Were you aware that there was an investigation going on?

A. I wasn't formally aware, but I assumed.

Q. Did you make any inquiries about who's running this investigation, what's it about, anything like that?

A. No.

Q. So between the meetings with the Scoggins and

the middle of March, did you ever consider whether to continue Coach Love's paid suspension?

A. Did I, no. We were being consulted and directed by the people in charge. We were given recommendations.

Q. Sure. But were you making any inquiries, recommendations, anything --

A. No.

Q. -- what was the plan if he didn't resign at some point?

A. Well, I -- I mean, I'm just off the top of my head guessing. He had a contract. That probably expired at some point, I would guess.

Q. Just to run it through the end of the contract and not renew or what's the idea?

A. I don't know. I don't know.

Q. How was it brought to your attention when Ashley submitted a Title IX complaint?

MS. SAPP: Objection, foundation. Form. Assumes facts not in evidence.

A. I'm not sure when she did.

Q. (BY MS. CHALOUPKA) March 11.

A. Of?

Q. '22.

A. '22?

Q. How was it brought to your attention?
A. I don't believe -- I mean, I don't recall a formal notification.
Q. What about an informal notification?
A. I don't know.
Q. Did you ask questions?
A. No.
Q. Were you curious?
MS. SAPP: Objection, form.
A. I wouldn't know what questions to ask.
Q. (BY MS. CHALOUPKA) Did you ask whether it had anything to do with Chuck Love?
A. No.
Q. Did you wonder?
A. I assumed.
Q. So between -- I'm presenting to you that March 11th is when she filed a complaint. Between that day and March -- or I'm sorry -- May 8th, did you ever have thoughts on whether to continue his suspension?
A. I don't recall having those thoughts, no.
Q. Did you have conversations with anybody about whether to continue his suspension, his paid suspension?
A. Not that I recall.
Q. Did you ever make a recommendation for how to

resolve his paid suspension?
A. Not that I recall.
MS. CHALOUPKA: Let me pull out -- this is going to be 341A.
(Exhibit No. 341A marked.)
Q. (BY MS. CHALOUPKA) So have you seen before, I'll say before this litigation, have you seen this document --
A. Yes.
Q. -- in what context have you seen it before this litigation?
A. When -- what do you mean?
Q. In what context have you seen this?
A. When general counsel presented this for us, yeah.
Q. I take it that would have been close in time to the date of the signature?
A. Yes.
Q. And this version of the Separation Agreement is not signed by you. Did you ultimately sign a version?
A. I would assume I did.
Q. How is the figure of $136,000 plus vacation and holiday pay, how was that figure determined?
A. I don't know the answer to that question.

Q. Did you have any personal feelings about offering that amount of money?
A. No.
Q. Do you think that was a positive thing to do?
MS. SAPP: Objection, form of the question.
A. I didn't know what the contractual obligations were. I don't know what the strategy or thinking was.
Q. (BY MS. CHALOUPKA) Did you ever look at Coach Love's contract --
A. I did not.
Q. -- anytime between February 7th and to his departure?
A. I don't believe so.
Q. One of the provisos in there is that Mr. Love acknowledges and agrees that his resignation from University shall not preclude or prevent the University from continuing to investigate, hold any hearings, render findings and conclusions in conjunction with sexual misconduct allegations brought against him by a former student athlete. Would that include the Title IX investigation that was still pending as of the date that those signatures appear?
MS. SAPP: Objection, foundation.

Calls for a legal conclusion.
A. I'm not sure what legally that would include.
Q. (BY MS. CHALOUPKA) Did you have any communication between March 11th and May 17th with the Title IX office?
A. Not that I recall.
Q. I'm going to broaden that just a little bit more. With the Office of Institutional Compliance.
A. Not that I recall.
MS. CHALOUPKA: Let me mark Exhibit 308, please.
(Exhibit No. 308 marked.)
Q. (BY MS. CHALOUPKA) We're close to the end, Mr. Alberts.
A. Okay. No worries. All good.
Q. This was an email from Keith Mann dated May 12th sent to you, sent to Coach Amy, sent to Keith Zimmer, saying that as of that date we're going to remove Coach Love from the Husker.com directory and women's basketball pages.
I take it that until that date, he was still listed on those pages; is that right?
A. Yes.
Q. Why was he left on there until May 12th?
A. I don't know the answer to that.

Q. Ashley was removed from the roster immediately, true, back in February?
A. I believe so, yes.
Q. Did you ever give any instructions before you left Nebraska to restore her image to the website or anything like that?
A. No.
Q. Do you know who at Nebraska would have information about whether that was done after you?
A. I don't know.
Q. Did you evaluate Amy's job performance for the 2021 school year?
A. Yes. But the evaluations are primarily done to sport administrators and they make recommendations to the athletic director.
Q. Did you get any recommendations from Mr. Zimmer relating to Coach Amy for that school year?
A. Yeah. But most of them were directed around competitive success, but I don't recall the specifics --
Q. Her contract provided her a performance bonus, right?
A. Right.
Q. And she received a performance bonus because they made it to the NCAA tournament?

A. Correct.
Q. Any other discussion from Keith about matters that came up in her performance evaluation?
A. Not that I -- not that I can remember.
Q. When, in the school year, do coach performance evaluations take place?
A. Well --
Q. Is it the end of a sport season or is it everybody at the end of the year, is what I'm getting at?
A. If I'm remembering right, it generally needs to all be completed by the end of the academic year. It's all part of the University's HR process. Some sports administrators might get ahead of it because, you know, based on you have fall sports, winter sports, and so you can perhaps get ahead of some of that.
But typically we start getting emails in March saying we're required to get all these turned in, and we've got a lot of stragglers by June. It's just you spend a lot of time evaluating people and it's a lot of work given all the other challenges we have.
Q. That's kind of what I was wondering, is whether it was seasonable to the sport, whether it's contractual --
A. It's handled probably a little bit different

based on the sport administrator. Sometimes it might be more seasonal if it's top of mind. To me, I think, you know, while you have the information it's good. But, you know, it's handled independently per each one.

Q. Am I understanding you correctly that the events involving Coach Love and Ashley Scoggin were not part of Coach Williams' performance evaluation for the '21/'22 school year?

MS. SAPP: Objection, foundation.

If you know.

A. Yeah. I don't know if that's true or not.

Q. (BY MS. CHALOUPKA) Do you remember Keith talking to you about, you know, how her handling of that situation fit into her performance evaluation?

A. I do not.

Q. Did Coach Amy retain her players that year?

A. The rest of the players?

Q. Right. In terms of the ones that were not done with their eligibility --

A. Yeah, I think so.

Q. -- did she retain those?

My -- if I did this count correctly, it appeared that 5 out of 15 players that still had eligibility, left the program.

A. Oh.

Q. Yeah. I -- I think.
A. Okay.
Q. I'm looking for some wood to knock.
Was -- was that concerning to you if a basketball coach which has a smaller roster has that level of attrition of players with eligibility?
A. No. It's hard to take a one year in a vacuum. I mean, yeah, if you had trends or half the team was transferring every year, maybe that would be different. But a lot of it's driven by competitive success, and quite frankly they're -- many of the students themselves -- once the portal became a reality and they could freely move, playing -- everybody's searching for playing time. Everyone wants an opportunity.
Q. Sure. Now, time moves fast, and this is 2022 not 2025, even though as I'm saying that, it seems like a very compressed amount of time. And at the end of 2022 has she continued to lose a third of her team -- well, I guess you -- the next year that you were there before you went to A&M, did she lose a third of her team?
A. I don't know the answer to that.
Q. I mean, if 37 football players on the team left in a year, would you be concerned?

A. Not today.
Q. Not today.
Hang on just a second Mr. Alberts and I may -- oh, a few more.
Who's Bret, with one T, Hascall H-A-S-C-A-L-L?
A. Bret at that time, I don't think she's still there, but she was the sports psychologist, the director of support psychology at the University in the athletic department.
Q. Did she have a clinical practice within sports psychology in addition to being the director; as in, did she both administrate that division and --
A. Yes. Yes.
Q. Okay. Did her employment with Nebraska end during you tenure?
A. I don't know. It might have been.
Q. Was there an allegation that Dr. Hascall had -- had had a sexual relationship with another employee of athletics?
A. Not that I'm aware of.
Q. Did -- before you left Nebraska, did athletics receive any inquiries about Mr. Love from prospective employers?
A. Did -- so after he was separated from us?

Q. Correct. Or I'll say after he was suspended did you -- was it ever brought to your attention that Mr. Love has applied for this job or expressed interest and we're calling to do a --
A. Not that I know of.
Q. -- reference check?
Did you ever get calls directly from prospective employers?
A. I don't believe so.
Q. When -- when you went into the hiring process with A&M, were you asked questions about Ashley Scoggin?
A. Yes.
Q. Tell me about that.
A. Well, they didn't ask me it. They asked if there was anything that -- that I -- that there was active litigation, and so I told them about this.
Q. Did they ask other questions about this? Did they ask for information? Did they ask for documents and the like?
A. No, not that I'm aware of.
Q. Did you authorize A&M to communicate with a search firm or anyone like that to communicate directly with anyone else regarding the Ashley Scoggin/Chuck Love situation?

In other words, did you authorizes A&M or search firms or anyone to communicate directly with the Board of Regents, with University counsel, with any other person on that topic?
A. No.
Q. Are you familiar with Husch, H-U-S-C-H, Blackwell, B-L-A-C-K-W-E-L-L?
A. I've heard of them, yeah.
Q. Law firm, right?
A. Yes.
Q. And are you generally familiar that Husch Blackwell has investigated a number of D1 programs on various allegations of violations or misconduct or things like that?
A. Yeah. I'm aware of that, yeah.
MS. CHALOUPKA: Pull out Exhibit 393.
(Exhibit No. 393 marked.)
Q. (BY MS. CHALOUPKA) Mr. Alberts, this is a really long document in its original form. I excerpted it down to a few pages. This is produced by the University and it's dated fall 2022.
One of -- one of the scenarios that I had excerpted in here has an example that says -- this is on the third page of the document that was handed to you. "An assistant coach meets with a softball player

at a local batting cage to work on hits. While there, the assistant coach propositions the player for sexual favors in exchange for increased playing time."

Is -- as an athletic director is this -- do you understand that to be a problematic scenario if that happens?

A. Yes.

Q. Do -- from the training that you've had as an athletic director, is -- are these propositions between coaches and athletes always as blatant as, you know, you need to give me sexual favors or else I'm not going to play you?

MS. SAPP: Objection, foundation.

A. I don't -- I don't have a real understanding of any of that.

Q. (BY MS. CHALOUPKA) How about what you just heard in your training?

MS. SAPP: Same objection.

A. Heard in my training?

Q. (BY MS. CHALOUPKA) Yeah.

A. Yeah. There's different levels of -- some is blatant, yeah, some is -- yeah.

Q. Yeah. After February 18th of 2022, did you ever consider hiring a firm like Husch Blackwell or a similar consultant to conduct an independent

investigation of the women's basketball program?

A. No.

Q. Did anyone else suggest that?

A. Not that I'm aware of.

Q. Was there ever any consideration of just suspending Ashley, like a disciplinary suspension, instead of a full removal?

A. No. I think the judgment was that Amy had the right to create the roster for her team, and she had made the decision based on violation of team rules that Ashley was no longer going to be on the roster.

Q. I want to be clear on this. Did you ever have a direct conversation with Amy about any this?

A. (Witness nodded.)

Q. Everything that you've been sharing about that is through -- is through Keith Zimmer?

A. Yeah. I can't say that I didn't -- I didn't have a formal meeting with Amy. I don't want to say that I never had any -- there was never any conversation about it. But it was -- it was -- she was in the middle of her season and traveling and so, yeah.

Q. Do I -- am I correct in understanding that the only time that you would have talked with -- been in conversation with Amy about this, was actually during that meeting with the Scoggin family?

A. It feels like that to me, yes.
Q. And it wasn't a pre-meeting discussion or post-meeting discussion that you recall?
A. Not that I recall.
Q. Okay. A few questions about NIL. Again, I know time moves fast, and I'm taking you back to NIL as it was nascent in 2022.
What -- while you were still in Nebraska, what part of your job included shepherding the development of NIL?
A. Yeah. So the rules were different then. We -- at that point, we could have no direct involvement in NIL. So everybody created these quasi, you know, collectives essentially to skirt the rules.
And eventually all we could do was, which we did, was to try to create education around it. We did financial literacy. We did some of those types of things. But all of it was handled through a third-party collective that essentially was raising donor dollars to buy and retain talent.
Q. I've taken the deposition of a representative from athletics that is knowledgeable in how this falls, so I have a little background on this.
I hope I am not misstating his testimony when he says that -- that Nebraska was a little slow to

embrace NIL, maybe just because of natural conservativism or modesty of Nebraska, but a little slow to embrace this. It seems to be catching up at this point.

When you were there, did you feel some hesitation?

A. Well, I felt hesitation because the institution is ultimately the institution, but decisions and control were outside the control of the University. So that's -- it's the old booster lacking institutional control from '80s and '90s. So, yeah, there's some -- but that's why we put Jonathan in that role, is we took him out of compliance and had somebody full-time dedicated to the NIL space to try to help us understand how we could more proactively help our student athletes.

Q. And to, at least structurally, to be building the airplane while flying it --

A. That's right.

Q. -- basically?

A. Because the rules kept changing.

Q. And still do.

What was your role in that in the time that you had left in Nebraska --

A. My role.

Q. -- if any?
A. I really wasn't directly involved in NIL, only to try to help find the resources to create some infrastructure so that we -- you know, I needed somebody. Jonathan was interested in it. I needed somebody. We had the students -- you know, the life skills piece, but we needed somebody full time as an attorney diving into and understanding the evolution of it so that we could be well positioned.
Q. So that when the money to be managed by the kids came in, everything was done in compliance with NCAA and so on and so forth?
A. As best as we possibly could.
Q. After the 1890 initiative took over for athletic branch and marketing, in that timeframe would you say that the development of NIL at Nebraska became more energized?
A. Yeah. I think they had -- I think they had a better strategy around it than ABM did. I think ABM was just singularly focused on football.
Q. Did you have any hesitations in working with 1890 --
A. No, not really other than --
Q. -- in terms of how they were structurally --
A. I didn't know how they were operating. That

was part of the concern.

Q. Yeah. And so what -- based on what you were aware of at the time, I take it you were as comfortable as you could be?

A. Yeah.

Q. By May of 2022, as I understand it, there was at least one athlete in each of the 24 sports that was receiving some kind of NIL income. Does that sound familiar?

A. That sounds probably right, yeah.

Q. So between May of 2022 and when you moved on in March of 2023, were there other major developments in NIL that you recall?

A. I don't know all of the exact dates, but we were anticipating the proposed settlement in the House case which was going to allow for direct institutional involvement in the NIL space in direct rev share with student athletes.

You know, the bigger challenge is trying to get the egos of donors out of the way so that you can have an actual coordinated strategy that was statewide rather than a singular one.

So to me that was the main -- I don't know how far we had gone yet with the House settlement and the institutional involvement in all of it. These

dates are all running into each other for me, but I don't think anything significant.

Q. And I'm sure the egos of donors are not an issue at all into Texas.

A. Haven't changed.

Q. Okay. Do you -- in your time as an athletic director -- this is not meant to sound like a duh question, but maybe it is -- have you found the NCAA itself to be a helpful resource when it comes to administering the department of athletics?

A. Yeah. I mean, we're a member institution, and so I think generally it can be helpful.

Q. Do you -- I know that at Nebraska, for example, you had Mr. Vaughn. You know, you have a compliance person here. Were you -- how often were you pulling out a rule looking at something that NCAA had published, et cetera, for guidance, for clarity, things like that?

A. Yeah. I mean --

Q. And by you, I mean the actual you. Not the loyal U.

A. Yeah, I know. Not often. I mean, we have people in those roles and they would send the communication.

Q. They would report to you?

A. I would have a cursory understanding, but I'm not an expert in those areas.

Q. Someone like Mr. Vaughn would report back to you what he'd seen?

A. Yeah, or -- and report to coaches, you know, changes in rules.

Q. In the time that you were in Nebraska, do you ever recall a time that Mr. Vaughn would tell you about a suggestion, an idea, anything like that that you said, I don't want to do that?

A. We didn't normally operate that way. We brought -- individual executive staff members would bring items to a table like this, and we would work through them together. And if we couldn't agree, then I would make the decision. But I didn't unilaterally often. It's just not how we choose to lead.

Q. My question was clumsy on that. If Mr. Vaughn brought you something that came from NCAA, I take it that there was not a time that you would remember where you ever said, find a way to work around this?

A. Yeah. No, I don't --

Q. Okay.

A. -- typically do that.

Q. I can ask a question comprehensively if you

give me -- give me just a couple minutes to talk to my co-counsel.

A. Okay.

THE REPORTER: Going off the record at 11:13 a.m.

(Off the record.)

THE REPORTER: Going back on the report at 11:16 a.m.

Q. (BY MS. CHALOUPKA) I did forget to ask you --

A. Okay.

Q. -- one more question about the student conduct policy. In the time that you were at Nebraska, so July of '21 through March of '24, how many times do you recall that policy being invoked into the process that was ascribed and that being followed?

A. I don't recall any -- any other time.

MS. CHALOUPKA: Okay. I think that's all the other questions I had. So I'm done with 13 minutes to spare unless you have questions.

MS. SAPP: I'll reserve my questions.

Denise, do you have any questions?

MS. FROST: No, I do not.

MS. SAPP: Okay. We would like to read and sign the deposition before it's disseminated, please.

THE REPORTER: Before we go off the record, counsel on Zoom are there any copies that would like to be ordered?

(Ms. Sapp's copy for Mr. Alberts deposition was confirmed in Mr. Vaughn's deposition.)

MS. FROST: I would like to get just a condensed transcript, please.

THE REPORTER: Okay.

MS. CHALOUPKA: And, Denise, I'm going to email you the exhibits that I used between now and when we started with Mr. Vaughn's deposition.

MS. FROST: Awesome. Thank you.

THE REPORTER: Going off the record at 11:18 a.m.

(Proceedings concluded.)

WITNESS CORRECTIONS AND SIGNATURE

Please indicate changes on this sheet of paper, giving the change, page number, line number and reason for the change. Please sign each page of changes.

PAGE/LINE CORRECTION REASON FOR CHANGE

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

Trev Alberts

I, TREV ALBERTS, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

______________________________
TREV ALBERTS

STATE OF TEXAS )
COUNTY OF _____________ )

Before me,_____________, on this day personally appeared TREV ALBERTS, known to me (or proved to me under oath through_____________) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this, ______ day of ______________, 2026.

____________________________
Notary Public, State of Texas

My Commission Expires:____________________________

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

ASHLEY SCOGGIN, )
)
Plaintiff, )
) Case No.
) 4:24-CV-3039
vs. )
)
BOARD OF REGENTS OF THE )
UNIVERSITY OF NEBRASKA, and )
individuals AMY WILLIAMS, TREV)
ALBERTS, and CHUCK LOVE, JR., )
in their individual )
capacities, )
)
Defendants. )
)

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF
TREV ALBERTS
FEBRUARY 19, 2026

I, NILDA CODINA, Notary in and for the State of Texas, hereby certify to the following:

That the witness, TREV ALBERTS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30 (e)(1) that the signature of the deponent:

____X_____was requested by the deponent or a party before the completion of the deposition and returned within 30 days from the date of receipt of the transcript. If returned, the attached Changes and

Signature Page contains any changes and the reason therefor;

___________was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.

Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Subscribed and sworn to on this 10th day of March, 2026.

Nilda Codina

__________________________
NILDA CODINA
Notary in and
for the State of Texas
My Commission No. 12878135-3
Expires: 10/24/2027
ASSOCIATED COURT REPORTERS
Firm Registration No. 29
425 Austin Avenue
Suite 1206
Waco, TX 76701
Phone(254)753-3330