





# STAYING IN BOUNDS

## *An NCAA Model Policy to Prevent Inappropriate Relationships Between Student-Athletes and Athletics Department Personnel*

By Deborah L. Brake, J.D. and Mariah Burton Nelson, MPH, CAE

EXHIBIT
137
4:24-cv-3039







NCAA Inclusion

The mission of the NCAA Committee on Women's Athletics is to provide leadership and assistance to the association in its efforts to provide equitable opportunities, fair treatment and respect for all women in all aspects of intercollegiate athletics. Toward these ends, the committee shall seek to expand and promote opportunities for female student-athletes, administrators and coaches. The committee shall promote governance, administration and conduct of intercollegiate athletics at the institutional, conference and national levels that are inclusive, fair and accessible to women. The committee shall develop programs and resources, which can be of practical use to the association in its effort to achieve these ends.

## ABOUT THE AUTHORS

**Mariah Burton Nelson, MPH, CAE**

*A former Stanford and pro basketball player, Mariah Burton Nelson, MPH, CAE, is a pioneering author and journalist who has published six books and hundreds of articles on women, gender, and sports. She first wrote about inappropriate coach-athlete relationships in a chapter called "My Coach Says He Loves Me" in her 1994 book, The Stronger Women Get, The More Men Love Football.*

**Deborah L. Brake, J.D.**

*Deborah Brake is a Professor of Law and Distinguished Faculty Scholar at the University of Pittsburgh School of Law, where she has taught since 1998. She teaches classes in Constitutional Law, Employment Discrimination Law, and Gender & the Law. Her book, "Getting in the Game: Title IX and the Women's Sports Revolution" was published in August, 2010, by New York University Press. She is a nationally recognized expert on gender discrimination generally, and Title IX specifically. Before becoming a law professor, she was a senior counsel at the National Women's Law Center.*

# Contents


## Chapter One .......... 4
Definitions: Distinguishing Sexual Abuse from Sexual Harassment .......... 4
Why Sexual Abuse Injures Student-Athletes and Teams .......... 7
Male Coaches, Female Student-Athletes (But There are Exceptions) .......... 8
Prevalence .......... 9
Endnotes .......... 10

## Chapter Two .......... 12
How Sexual Abuse Happens and How It Harms .......... 12
Intense Time Together .......... 12
The Crush .......... 13
Transference .......... 13
Which Athletes are Particularly Vulnerable? .......... 14
Gender Dynamics in the Male Coach – Female Athlete Relationship .......... 14
How Coaches See These Relationships .......... 16
Endnotes .......... 17

## Chapter Three .......... 19
Staying on the Sunny-Side of Title IX .......... 19
State Law Incentives for Adopting Amorous Relationship Policies to Protect Student-Athletes .......... 22
The Legal Basis for University Policies on Amorous Relationships with Students .......... 23
Endnotes .......... 23

## Chapter Four .......... 26
A Question of Ethics: Analogizing to Ethical Codes of Conduct in Other Professions .......... 26
Lessons from Amateur Sports .......... 27
Making Policy: Putting the Athletics Department Front and Center .......... 27
The Athletics Department Should Have its Own Policy .......... 28
The Scope of the Policy: Who is Covered and What Types of Relationships .......... 29
The Duration of the Prohibition .......... 31
Enforcement of the Policy and the Consequences of Violating It .......... 32
Educating Athletics department Personnel and Student-Athletes About the Policy .......... 34
Endnotes .......... 34

## Chapter Five .......... 36
The Model Policy .......... 36
Athletics Department Policy on Amorous Relationships .......... 36
Definitions: .......... 36
Scope of the Policy and Its Requirements: .......... 36
Enforcement: .......... 37
Additional Resources .......... 38

# Chapter One

## *Why a Policy on Relationships with Student-Athletes?*[1]

Sexual relationships between coaches and student-athletes have become a serious problem. NCAA member institutions must unambiguously and effectively prohibit such relationships to ensure that sport programs offer a safe and empowering experience for all student-athletes.

This NCAA resource is designed to educate member institutions and their student-athletes about why sexual or romantic relationships between athletics department staff and student-athletes are inappropriate, how to avoid those relationships, and what to do if they occur. When adopted and enforced by institutions of higher learning, this model policy will help create a safe, healthy environment on college campuses. Although most of the examples offered herein refer to coaches, the policy is intended to provide clear guidance for all members of the athletics department (including coaches, administrators, athletics trainers, and other staff), as well as student-athletes and parents.

The model policy is a natural extension of the purpose of the NCAA: to protect student-athletes. In the early 1900s, college football players were being injured and even killed as a result of the sport's popular offense, called "the flying wedge." A public outcry put pressure on universities to abolish or reform football. President Theodore Roosevelt urged college athletics leaders to work together to protect young people from dangerous and exploitive practices. This resulted in the formation of the NCAA in 1906. Since then, the NCAA has enacted many bylaws to curb harmful practices and to promote the educational mission of athletics, including instituting minimum educational standards for recruits, ensuring the academic progress of student-athletes, and instituting maximum practice and competitive limits. Today, the NCAA's stated purpose is to "govern competition in a fair, safe, equitable and sportsmanlike manner, and to integrate intercollegiate athletics into higher education so that the educational experience of the student-athlete is paramount."



This model policy and supporting best practice recommendations are fully in accord with the NCAA's stated purpose. This resource is designed to ensure that student-athletes are safe from sexual advances by coaches or other athletics department employees, and that sexual or romantic relationships do not distract student-athletes or their teams from the educational experience. While our main concern is the safety of students, coaches who violate this ethics policy will find themselves in "unsafe" territory, too. One bad decision to stray "out of bounds" can ultimately destroy a coach's reputation, career, and family. So we ask athletics department staff who read this to consider the fact that by looking out for the safety and welfare of students, they will also be looking out for themselves.

We recommend that institutions of higher learning review this policy; modify it as needed; adopt it, publicize it; and require that staff and student-athletes read it and sign a statement indicating that they will abide by it.

## *Definitions: Distinguishing Sexual Abuse from Sexual Harassment*

The model policy presented here is designed to address sexual or romantic—also termed "amorous"—

relationships between a student-athlete and a coach, or other athletics staff with supervisory responsibility over the student-athlete. As we explain below, these kinds of relationships constitute sexual abuse in sport even where both participants in the relationship claim to consent to the relationship. The model policy is not designed to address sexual harassment in sport, although some relationships may involve both sexual harassment and sexual abuse. The model policy advocated here is designed to supplement, not displace, university or athletics department policies on sexual harassment as they apply to student-athletes. Accordingly, it is helpful from the outset to understand the distinction between sexual harassment and sexual abuse.

Sexual harassment is a legal concept with its origins in federal sex discrimination law. In 1980, the Equal Employment Opportunity Commission (EEOC) produced a set of guidelines for defining and enforcing Title VII of the Civil Rights Act of 1964, the primary federal law that prohibits sex discrimination in the workplace. (In1984, Title VII was expanded to expressly include educational institutions). In these guidelines, the EEOC defines sexual harassment as “unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when:

Submission to such conduct was made either explicitly or implicitly a term or condition of an individual’s employment;

Submission to or rejection of such conduct by an individual was used as the basis for employment decisions affecting such individual, or

Such conduct has the purpose or effect of unreasonably interfering with an individual’s work performance or creating an intimidating, hostile, or offensive working environment.”

The EEOC definition of sexual harassment has largely been adopted and applied to Title IX of the Education Amendments of 1972, which prohibits sex discrimination in federally funded educational institutions, and also encompasses sexual harassment. Sexual harassment can be summarized as unwanted, severe, or pervasive sexual advances that create a hostile or abusive educational or employment environment. The Office for Civil Rights in the U.S. Department of Education, which enforces Title IX, clearly states that “sexual harassment of students engaged in by school employees, other students, or third parties is covered by Title IX.”

Sexual harassment takes many forms. WomenSport International offers these specific (but not exhaustive) examples of unwelcome sexual activity that can meet the definition of sexual harassment:

written or verbal abuse or threats
sexually oriented comments
jokes, lewd comments or sexual innuendoes
taunts about body, dress, marital status or sexuality
shouting and/or bullying
ridiculing or undermining of performance or self-respect
sexual or homophobic graffiti
practical jokes based on sex
intimidating sexual remarks, invitations or familiarity
domination of meetings, training sessions or equipment
condescending or patronizing behavior
physical contact, fondling, pinching or kissing
sex-related vandalism
offensive phone calls or photos
bullying on the basis of sex
Legal issues pertaining to sexual harassment are covered in depth in Chapter Three.

By contrast, in the context of college athletics, the definition of sexual abuse does not depend on any showing that a sexual relationship was unwelcome; it may include, but is not limited to, conduct that is sexual harassment (as where the athlete did not welcome a sexual relationship with the coach). Sexual abuse includes amorous or sexual relationships between a coach or other supervisory staff and student-athletes, even when these

relationships are perceived by both parties to be consensual. Amorous or sexual relationships can be defined as any relationship that includes sexual touching, talking, or flirting; engaging in any form of sex; or otherwise developing a private, personal relationship that goes beyond the context of a staff and student professional relationship.

Unlike sexual harassment, which is demonstrably unwelcome, sexual abuse often involves a slow seduction (or "grooming") whereby one person gradually prepares another to accept "special" attention, and then proceeds with sexual activity. The term sexual abuse is often used in reference to sexual activity between an adult and a minor, but adults can also sexually abuse other adults in contexts where one adult holds power over another.

When sexual abuse involves minors, the public generally deems this heinous behavior because the perpetrator has used his or her position of trust (usually he or she is an acquaintance or family member) to take advantage of, and sexually violate, an innocent child. The public understands that children can be manipulated into "agreeing" to behaviors that are inappropriate and even criminal because they are, relative to adults, powerless.

In the context of sports programs within institutions of higher learning, sexual abuse can occur regardless of the minor/adult status of the student-athlete, and regardless of the age difference between the perpetrator and victims. Whether the student-athlete is 17, 18, 19, 20, 21, or older, she or he is significantly less powerful than a head coach, assistant coach, athletics trainer, sport psychologist, athletics director, or other athletics department staff with supervisory control or authority over student-athletes. It is this power differential that makes such relationships inherently unequal, and when relationships are unequal, the concept of "mutual consent" becomes problematic.

Because of this power differential, any amorous or sexual relationship between coaches and student-athletes constitutes sexual abuse. In other words, the dynamics of the coach-athlete relationship in intercollegiate sport make any sexual contact between a coach and an athlete abusive, regardless of whether it was wanted by the athlete and regardless of whether the athlete is over the age of consent.[2]

Some readers might disagree. Some will argue that coach-athlete liaisons are not "abusive." Some will maintain that (as many coaches have told us) "you can't control the heart," or "you can't legislate against love," or "as long as the two people are adults, no one can stop them from dating."

These comments are self-justifying and, frankly, self-delusional. When coaches enter into sexual relationships with student-athletes, they almost always try to keep these liaisons secret—even if both parties are unmarried—because coaches are well aware that such relationships are inappropriate and unethical. They know deep down that infatuation, sexual attraction, and loving feelings do not, in fact, justify an authority figure in a sports program becoming sexually involved with a young adult who plays sports in that program. This is a violation of professional boundaries, and a violation of trust.

Historically, most universities have not definitively prohibited such behavior. That lack of institutional boundary-setting has allowed coaches with bad boundaries to continue taking advantage of young, vulnerable student-athletes.

We use the phrase "coaches with bad boundaries" deliberately. Coaches and other supervisory athletics department personnel who engage in romantic and sexual relationships with student-athletes are not necessarily pedophiles. They are not necessarily attracted to children, or incorrigible, or uncontrollably driven to have sex with inappropriate partners. Often they are married men who are flattered by the admiration of young women—and make irresponsible decisions about how to handle the strong feelings that can naturally develop among any people who work closely together.

When a powerful coach, athletics director, or trainer pays special attention to them, student-athletes may develop a "crush" on that authority figure, and may eventually crave or even solicit the exact behavior that this policy prohibits. Coaches on the receiving end of such crushes and vulnerable themselves to flattery and sexual desire can, if they're not careful, allow mutual admiration or their own loneliness or insecurity to give way to flirtation, seduction, and sex, which can and often does have a devastating effect on student-athletes and their

teammates.

In other words, coaches are human beings who make mistakes. These mistakes rise to the level of sexual abuse, but these people are not engaging in criminal assault. They do not intend to inflict harm. They are selfish, probably, and insensitive about the consequences of their actions, but they do not think of themselves as sexual abusers. Still, sexual abuse is the appropriate term for this behavior.

In the sporting context, sexual abuse takes the form of a complicated dynamic between two adults, more subtle and problematic than the simple "unwelcome sexual attention" of sexual harassment and less obviously wrong than sexual abuse of children. The parties involved often feel, along with titillation and infatuation, a significant amount of guilt, shame, confusion, and fear of exposure.

Regardless of the strength of the affectionate bond or sexual attraction, coaches should not have romantic or sexual relationships with student-athletes. The role of this model policy is to educate everyone involved (or, preferably, not involved) in such relationships and to establish institutional boundaries that will facilitate better personal and professional boundary-setting on the part of coaches and other athletics department personnel.

## *Why Sexual Abuse Injures Student-Athletes and Teams*

A few examples of collegiate coach-athlete abuse from newspaper accounts and personal interviews demonstrate what form these relationships take, and begin to indicate how damaging they can become:

A track coach spent the night with an athlete in an abandoned house he owned, then, when confronted, justified this as "an all-night counseling session."

A basketball coach demanded sexual favors in exchange for playing time.

A baseball coach jumped off a bridge and drowned after being served with five felony warrants stemming from a sexual relationship with a male student.

A coach seduced an athlete from another college team at a hotel during a road trip.

A male coach tried to seduce lesbian players to "straighten them out."

A molested swimmer committed suicide.

A volleyball player, sexually abused by her high school coach, moved away to college, only to have the high school coach join her college volleyball staff as a volunteer assistant and eventually a paid staff member. The relationship continued until the young woman's teammates confronted the coach with evidence of love letters between the two of them, and the coach finally resigned "for personal reasons." Like many coaches in this sort of situation, he was promptly hired by another university.

A runner, sexually abused by her track coach in high school, moved away from home to college, only to have him pursue her and try to continue the relationship. When she refused, he beat and raped her. She reported him to her parents and the high school, but not to the police—because a college roommate had been raped earlier that year, and the runner had had to testify, and she saw what a grueling, invasive ordeal a rape trial is.

At one major university, a swimming coach married a player, divorced her, and then resigned. He was replaced by a coach who was also asked to resign after having an affair with a swimmer.

What happens when a coach and student-athlete "get involved," "begin dating," or "have an affair"? There are three main consequences:

The student-athlete gets distracted. Her focus shifts from herself, her goals, her team, and her education to her relationship with her coach. When will they manage another secret liaison? Do any teammates suspect? Is he having other affairs too? Will he leave his wife, if he has one? Will they get married some day? Rather than concentrate on her own athletics and academic progress, she concentrates on her attractiveness to the coach. Rather than concentrate on upcoming competitions, she wonders what the hotel sleeping arrangements will be.

When listening to his advice, she gets distracted by the color of his eyes. When criticized, she wonders if he will withdraw his "love." Ordered to protect his secret, she becomes alienated from her teammates and parents.

The team gets suspicious. Teammates often intuit that something is going on. They notice the slight shift in the tone of voice when the student-athlete talks about the coach; they observe the meaningful looks between the two of them; they see or hear about suspicious behavior: long "backrubs" or "conversations" in the coach's hotel room with the door shut; the coach and athlete riding alone together in a car; or other behavior that seems just odd enough to unsettle the teammates, and hence the team. Suspecting or discovering a coach-athlete romantic relationship, teammates experience a range of emotions from envy to anger to betrayal. "It's almost a death knell for the team," says pioneering sports psychologist psychologist Bruce Ogilvie.[3]

The student-athlete gets hurt. Psychiatrist Peter Rutter writes in Sex in the Forbidden Zone, "A man in [a] position of trust and authority becomes unavoidably a parent figure and is charged with the ethical responsibilities of the parenting role. Violations of these boundaries are, psychologically speaking, not only rapes but also acts of incest." Once victimized, the young woman "is likely to adapt to the victim role," writes Rutter, "repeating it in other relationships, each time losing more of her self-respect and enthusiasm for life."[4] Too afraid of the authority figures to become angry, she instead suffers from depression, fear, anxiety, shame, and overwhelming guilt.

Ogilvie, who has been called the father of sport psychology, likens the coach to "a substitute father" who has "no right to intrude on young women his own unfulfilled sexual fantasies. The athlete wants a parent, but gets a lover. It's terribly confusing." According to Ogilvie, it's the coach's responsibility to "help the girl grow and make her own decisions. He must not allow sexual feelings to be expressed."

What if the man and young woman both insist that it's true love? If a student-athlete "falls in love with" a coach, and the coach similarly has strong feelings for a student-athlete, why shouldn't they act on those feelings? "I hate to be a judgmental old bastard but I hold that relationship as suspect as hell," said Ogilvie.

A member of the NCAA Committee on Women's Athletics points out an additional problem with such relationships:

> "When a coach enters into a sexual relationship with a player he/she is essentially abdicating his/her role as an educator. A romantic/sexual relationships renders the coach unable to deliver effective educational messages, challenge the student-athlete in an educational manner, and simply be able to act as an educator — a role that is particularly intrinsic in a college coach or administrator's job. For instance, how could you expect a coach who is romantically involved with a player to give the student-athlete appropriate guidance about issues such as academic integrity, roommate conflicts, misconduct, or other situations that demand the guidance of an impartial educator? The coach is employed by an institution of higher learning and consequently is expected (maybe both explicitly and implicitly) to be an educator first and foremost. Participating in a relationship with a student-athlete denies that opportunity for both (and perhaps even all members of the team or other student-athletes)."

Institutions of higher learning cannot prevent people from falling in love. They cannot prevent people from feeling sexually attracted to other people. But coach-athlete sexual or amorous relationships constitute abusive and unethical behavior, and are harmful to the individual and the team. Institutions of higher learning must commit themselves to preventing it.

# *Male Coaches, Female Student-Athletes (But There are Exceptions)*

Coach-athlete sexual relationships in sport are largely, but certainly not exclusively, a problem of male coaches becoming sexually involved with female athletes.[5]

How do we know this? According to the latest study by Vivian Acosta & Linda Carpenter,[6] male athletes are coached by men 98 percent of the time,[7] and female student-athletes are coached by men 57 percent of the time. When both men's teams and women's teams are taken into account, women hold less than 21 percent of head coaching jobs in intercollegiate sports.[8] More than 81 percent of all athletics directors are men. About

72 percent of head athletics trainers are men. In other words, the vast majority of athletics department staff members are male. This is an unintended legacy of Title IX: female student-athletes now get to play, but they often play under male leadership. Based on numbers alone, it should not surprise anyone that male coaches are the ones who usually become sexually involved with student-athletes.[9] Because of the preponderance of heterosexuality alone, we can assume that most of the athletes are female.

However, it is important to note that sexual abuse happens in all gender combinations. Unfortunately, public, family, and college or university reaction sometimes varies according to the gender of those involved. Same-sex relationships, when exposed, may trigger greater alarm and condemnation from the community, whereas male coach/female student-athlete sexual relationships where both parties are above the age of consent may be normalized as "natural" or "romantic" or "no big deal."

When male student-athletes are sexually abused by a male coach, homophobia within men's sports can contribute to a climate of non-recognition and denial.[10] Also problematic: homophobic accusations in women's sports are still being used as a negative recruiting tool, with the implication that unmarried female coaches could be sexual predators. Statements such as, "You wouldn't want your daughter to play for that coach," can be code for a homophobic accusation that a gay coach will somehow endanger a student-athlete. While some lesbian coaches have abused their female athletes (as have some heterosexual male coaches), it is important to differentiate false accusations and character assassination from actual sexual abuse. While homophobia, combined with an effort to gain a recruiting advantage, can slur a lesbian coach as a potential sexual predator, the reality is that the overwhelming majority of sexual abusers in sport are men. For this reason, in this document we sometimes use the term "he" to refer to the coach and "she" to refer to the student-athlete. We reiterate, however, that in doing so we are generalizing to capture the primary gender dynamic of abuse, while acknowledging that there are exceptions. We discuss other, more subtle gender dynamics of sexual abuse in Chapter 2.

## *Prevalence*

No one knows how often coaches become sexually involved with athletes. Part of the problem obtaining data is that existing studies measure different things, involve athletes of varying ages and levels of sport, and are conducted in different geographic locations. Many of the studies lump together sexual harassment and sexual abuse, without clearly delineating the behaviors, actions, and attitudes of the participants. The studies that have been done on this issue are wide-ranging geographically, with some of the most comprehensive ones conducted outside the United States.[11] Indeed the relative lag in U.S.-based research is itself significant, indicative of an ideology that tends to idealize coaches and overlooks or minimizes the harmful aspects of sport, especially when the athletes are adults. Despite its limitations, existing research supports the conclusion that sexual abuse of athletes by coaches is a serious problem.

Piecing together scattered figures from a variety of different studies, Celia Brackenridge, the most-cited and influential researcher on the subject, places the documented prevalence rate for sexual abuse in sport between two and twenty-two percent.[12] This variance reflects the disparate categories of behaviors that researchers examined in these studies. The difficulty of determining prevalence rates is compounded by the gap between athletes' perceptions of what "counts" (as abuse, for example) and researchers' own understandings of what behaviors they are investigating. Athletes do not always (or even most of the time) recognize abusive behavior when they experience it. Even when they do, they are, like other victims of sexual exploitation, understandably ambivalent at best about telling their stories, even anonymously. Experiences of harassment and abuse by coaches are surely under-reported and difficult to detect, even in carefully designed studies.[13]

One of the most comprehensive studies of sexual abuse in sport was done in Canada, with a survey of that country's Olympic athletes about their experiences in sport.[14] In the study, 22 percent of the athletes responding reported that they had engaged in sexual intercourse with an authority figure in sport.[15] Nearly 9 percent of respondents reported experiencing a forcible sexual encounter.[16]

Other studies have found lower but still significant percentages of athletes who have had sexual interactions with their coaches. One of the few studies in the U.S. examined the experiences of female intercollegiate athletes at a major university.[17] In this study, 20 percent of the athletes responding reported that they experienced behaviors from a coach that took the relationship in a non-instructional and potentially intimate direction, such as an invitation to dinner alone at a restaurant or calling the athlete a pet name.[18] Significantly, the vast majority (92 percent) of the respondents who experienced this kind of attention felt positively about it. Only 8 percent reacted negatively. In other words, such advances were not "unwelcome" – a key part of the definition of sexual harassment.[19]

Yet research clearly identifies non-instructional behavior by a coach—such as driving an athlete home alone, sharing a hotel room, taking an athlete out to dinner or the movies alone, inviting an athlete to the coach's home, going to parties together, and drinking alcohol together—as a high risk factor for turning the relationship into a sexual one.[20] The athletes' positive responses to being singled out for non-instructional attention by the coach speaks to the intensity of the coach-athlete bond, and the vulnerability of athletes to coaches' seductions.

In this same study, only two percent of the athletes reported having been subjected to verbal or physical sexual advances by their coach. All of them reported (after the fact) having negative feelings about these more explicit overtures.[21] A similar figure for sexual advances was reported in a study of female athletes in the U.K., where three percent of the athletes in the study reported being on the receiving end of sexual behaviors from a coach (pressure to have sex or contact with breast or genital area).[22] A survey of Danish female athletes found somewhat higher prevalence rates of sexual advances from coaches, with nine percent of the female athletes in the study (from various levels of sport, recreation to elite) having been kissed on the mouth by their coach, and three percent having been sexually propositioned by the coach with the threat of negative action if they refused.[23]

Altogether, existing literature on sexual abuse in sport finds that it is a serious problem. Of particular significance to intercollegiate sports, one of the most robust findings is that the incidence of coach-athlete sexual abuse is higher for elite athletes than it is for athletes at lower, less competitive levels of sport.[24]

Statistics aside, coach-athlete relationships in college settings constitute an open secret. Talk to anyone involved in women's sports. "Everybody knows coaches get involved with players," they'll say. Peter Rutter calls this the "everybody knows" phenomenon. Asked if he knows any male volleyball coaches who have had sex with or married their female athletes, Volleyball Festival founder David Epperson lists, off the top of his head, twelve.[25] One former college student-athlete mentioned in an interview that she had never heard of a coach having sex with an athlete. When told this was unusual, she amended her statement. "Well, we did have an assistant coach who was dating one of the girls. But we didn't think anything of it."

Indeed, coach-athlete relationships are so ingrained in sport cultures that many people "don't think anything of it." One goal of this model policy is to educate staff and students so that people start thinking about it, and start changing the culture.

# *Endnotes*


1 An earlier version of portions of Chapters One and Two first appeared in Mariah Burton Nelson, THE STRONGER WOMEN GET, THE MORE MEN LOVE FOOTBALL (New York: Harcourt Brace 1994).

2 [2] Helen Lenskyj, Unsafe at Home Base: Women's Experiences of Sexual Harassment in University Sport and Physical Education, 1(1) WOMEN IN SPORT & PHYSICAL ACTIVITY J. 19 (Sept. 30, 1992) (describing "sexual liaisons between young female athletes and male coaches" as "commonplace" and "normal," and arguing that such relationships involve an inherent abuse of power).

3 [3] Bruce Ogilvie, personal interview with Mariah Burton Nelson, 1993.

4 [4] Peter Rutter, SEX IN THE FORBIDDEN ZONE: WHEN MEN IN POWER – THERAPISTS, DOCTORS, CLERGY, TEACHERS, AND OTHERS – BETRAY WOMEN'S TRUST (Los Angeles: Jeremy Tarcher, Inc., 1986).

5 [5] Karin Volkwein et al., Sexual Harassment in Sport: Perceptions and Experiences of American Female Student-Athletes, 32 INT'L REV. FOR THE SOCIOLOGY OF SPORT 283, 286 (1997).

6 [6] Linda Jean Carpenter & Vivian Acosta, Women in Intercollegiate Sport: A Longitudinal, National Study Thirty-Three Year Update, 1977-2010, available at

http://www.acostacarpenter.org/2010pdf%20combined%20final.pdf.

7 [7] Id.

8 [8] Id.

9 [9] Celia Brackenridge, "He Owned Me Basically…": Women's Experience of Sexual Abuse in Sport, 32 Int'l Rev. for the Sociology of Sport 115, 116 (1997).

10 Celia H. Brackenridge, Spoilsports: Understanding and Preventing Sexual Exploitation in Sport 67 (London and New York: Routledge 2001).

11 Celia Brackenridge, Dangerous Sports? Risk, Responsibility and Sex Offending in Sport, 9(1) J. of Sexual Aggression 3, 9 (2003) (noting research in Canada, Norway and Australia showing that "sexual exploitation is a serious issue for sport").

12 Celia Brackenridge, et. al., The Characteristics of Sexual Abuse in Sport: A Multidimensional Scaling Analysis of Events Described in Media Reports, 6(4) Int'l J. of Sport & Exercise Psychology 385-406 (2008).

13 Volkwein, Sexual Harassment in Sport, at 284. See also Rhonda Reaves, There's No Crying in Baseball: Sports and the Legal and Social Construction of Gender, 4 J. Gender, Race & Justice 283, 291-92 (2001) (listing reasons to suspect such incidents are under-reported, including: fear of reprisal; uncertainty about the proper boundaries of such relationships; inadequate complaint procedures; and the inadequacy of legal remedies).

14 Sandra Kirby, Lorraine Greaves & Olena Hankivsky, The Dome of Silence 82 (Fernwood Publishing, Zed Books 2000).

15 Id. See also Gretchen A. Kerr & Ashley E. Stirling, Child Protection in Sport: Implications of an Athlete-Centered Philosophy, 60(2) Quest 307–23 (2008) (discussing research in Canada finding sexual abuse in sport to be a significant problem); Jan Toftegaard Stockel, Athlete Perceptions and Experiences of Sexual Abuse in Intimate Coach-Athlete Relationships, in Elite Child Athlete Welfare: International Perspectives 93–100 (Celia H. Brackenridge & Daniel Rhind eds., Brunel Univ. Press 2010) (discussing findings of Danish study that almost one in three athletes surveyed reported having experienced an intimate relationship with a coach).

16 Kirby, The Dome of Silence, at 88.

17 Volkwein, Sexual Harassment in Sport, at 290.

18 Id.

19 Id.

20 Sylvie Parent & Guylaine Demers, Sexual Abuse in Sport: A Model to Prevent and Protect Athletes, 20 Child Abuse Rev. 120 (2011).

21 Volkwein, Sexual Harassment in Sport, at 290.

22 Naomi Fejgin & Ronit Hanegby, Gender and Cultural Bias in Perceptions of Sexual Harassment in Sport, 36 (4) Int'l Rev. for the Sociology of Sport 459 (2001) (citing findings of research by Tomlinson & Yorganci, 1997).

23 Jan Toftegaard Nielsen, The Forbidden Zone: Intimacy, Sexual Relations and Misconduct in the Relationship Between Coaches and Athletes, 36 Int'l Rev. for the Sociology of Sport 165, 169 (2003).

24 Brackenridge, Dangerous Sports, at 9.

25 Nelson, The Stronger Women Get, The More Men Love Football.



# Chapter Two

## *How Sexual Abuse Happens and How It Harms*

Any analysis of sexual abuse should begin with this observation: Human desires for affection, love, power, and sex are natural—and strong. A brief glance at literature, film, and political scandals offers ample evidence that these potent human desires often override rational thought and even common sense. Like other human beings, athletics department staff and the student-athletes they serve are human beings first, with all the frailties that accompany the human condition.

Staff and student-athletes also inhabit a culture and certain conditions that are conducive to sexual abuse. So how do romantic and sexual relationships between staff and students develop?

## *Intense Time Together*

Student-athletes spend a huge amount of time –sometimes as much as thirty hours per week—in the gym, in the pool, in the weight room, on the field, or on the track. That is more time than a student will likely spend with any professor or friend.

During this time, the coach scrutinizes the student-athlete's body: the shape of it, the speed of it, the skill of it. If, as a swimmer, she wears a new suit, he notices its cut, calculating its drag in the water. If, as a gymnast, she starts to fall, he catches her. If, as a runner, she develops a cramp, he may massage her foot, calf, or thigh. If her weight goes from 123 to 126, he will notice, and may ask her to lose three pounds.



When she makes a mistake he might scream at her: "What in the world were you thinking?" When she succeeds, he might offer praise. Or he might withhold praise. Before a competition he might say, "You can do it." Or he might say (inappropriately), "Do it for me."

Traveling to away games, coaches and student-athletes spend many nights in hotels and find themselves eating breakfast, lunch, and dinner with their athletes rather than with peers. Often coaches have little time for peer relationships, meeting many of their social needs through their student-athletes.

As student-athletes train, succeed, and fail, coaches are right there by their side, sharing their passion and pain, drama and dreams. "That's almost the definition of falling in love," said one swimming association executive in an interview. "Any coach who tells you he hasn't fallen in love with an athlete, or had an athlete fall in love with him, is lying."

The nature of competitive sport provides many opportunities for escalating intimacy between a coach and an athlete. Coaching may properly involve hands-on touching. For the student-athlete who is accustomed to some physical contact with a coach, it can be difficult to discern when physical contact moves from proper sport-related touching and into a sexual realm—and even more difficult to say no.

Sport provides ample opportunities for time with the coach in isolation from a student-athlete's social support network, enabling the coach to intensify the relationship. Research has identified a number of locations with a high risk of sexual advances by a coach, where coaches take advantage of the athlete's isolation from others, including: at away-games; while giving a massage; while an athlete is alone in a car with the coach; and while

an athlete visits the coach at his home.[1] Moreover, the sheer amount of time coaches spend with athletes, especially at elite levels of sport, creates opportunities for escalating intimacy. The introduction of sexuality into the relationship is typically gradual, making it less likely to trigger resistance or even be noticed as a progression.[2]

## *The Crush*

What is a coach-athlete seduction like from a young woman's perspective? Consider this: Powerful men make a big impression on young women.

When the athlete is a young woman and the coach is an older and more accomplished man; when she has physical goals that extend beyond beauty and toward strength; when she is more fascinated by her own bulging muscles than by those of her male peers; when she loves sports and her own athleticism with a passion she can barely contain, an older man's approval means everything. It confirms her rejection of traditional feminine passivity, and what author Naomi Wolf called the beauty myth. It confirms her sexual attractiveness. It confirms her desire for power, and her right to it.

The young woman's gratitude for the man's attention and encouragement is often conceptualized in the only paradigm the culture has given her: A Huge Crush.

She adores this man: her coach, teacher, and mentor. She admires his every move. She endeavors to please him, for pleasing him, she hopes, will lead to success in her chosen field of dreams. To please him is to acquire assurance that her strong body and strong ambitions really are okay. She yearns to bring him close to her. The closer she can bring him, the more powerful and privileged she will feel.

If the coach has read and signed a policy prohibiting coach-athlete sexual or romantic relationships, and if he has received training on setting appropriate boundaries in coach-athlete relationships, he will not act to exploit the young woman's crush. He will continue to nurture her physical, social, and emotional development. His admiration of her youth and beauty will remain private, irrelevant to the task of coaching. Her crush will subside, and she will develop an enduring appreciation and respect for her mentor.

If, on the other hand, he has not encountered any training or any institutional barriers, he may interpret the fondness and excitement between them as irresistible sexual attraction or romantic love. He may rationalize that she is a consenting adult, or at least mature for her age. He may even find support for this view from his peers, some of whom have also seduced young athletes or even married them. He may find a willingness among his peers to look the other way.

## *Transference*

Psychiatrist Daniel Begel writes, "The athlete-coach relationship may be among the most intimate in the lives of both parties. The intense consideration given to the functioning of the athlete's body may rekindle transferences not unlike those in psychotherapy, except that these transferences are usually unexamined."[3]

Transference is the process of redirecting powerful feelings from one person to another. These feelings "are in some ways a re-experiencing of past emotional dynamics within the family, but in other ways they look to future possibilities for developing new and healthier emotional dynamics," says Rutter. "For example, a patient trying to seduce a therapist may be repeating past injuries but is also most likely searching for a response that will discourage this repetition."[4]

Thus the athlete who acts seductive may be reenacting past sexual victimization. Yet when an athlete's intense feelings and desires become fixated on a coach, what she needs from him is love and respect as a person and an athlete, rather than as a sexual object. To be appreciated for one's mind, one's athleticism, one's simple alive self would in fact feel healthy and healing—as long as the coach isn't seducing her or any other athletes on the team.

If the athlete were in therapy and the coach a responsible therapist, the young woman's feelings would be discussed and analyzed. Both parties would acknowledge that despite real mutual affection, the woman's

feelings don't "belong" with the therapist.

Coaches, however, usually lack the training and insight to redirect the athlete's feelings elsewhere. And some do not want to.

Female coaches who have been on the receiving end of girls' affections also admit that these crushes can be tremendously flattering. "They want to hang around in your office when they should be off with their peers," says one former athletics director at the University of Florida and high school coach. "They want to be with you 24 hours a day. It's good for the ego. Maybe that's what happens with the men—their egos get involved."

Counter-transference is what happens when a person in power misdirects intense feelings and desires onto the person he or she is entrusted to care for. In the case of a coach, his feelings are transferred from a parent, lover, or significant other to the athlete, and he interprets these feelings as romantic love.

When athletes do say yes, it is not because they are simply "in love"; the coach-athlete relationship is more complicated than that. Peter Rutter reports that the women he interviewed agreed to sex "as a way of maintaining a relationship that had come to have extraordinary importance in their lives and seemed to them to open up new and boundless possibilities for the future."[5]

This analysis is based upon research, but it may be more complicated than need be. The fundamental reason coaches sexually abuse athletes is because they can. Because no one is stopping them. That is why this policy, and enforcement of this policy, is essential.

## *Which Athletes are Particularly Vulnerable?*

Vigilant athletics administrators and student-athletes will want to pay particular attention to ensure that those coaches who are most likely to abuse athletes are unable to do so, and that those athletes who are the most vulnerable to sexual abuse are protected. For instance, athletes whose self-esteem is intertwined with their athletics identity are especially vulnerable. So are those who crave older-male approval or attention. Fear of losing a "father figure" can make athletes slow to recognize when boundaries have been crossed, and resistant to seeing the coach as acting inappropriately.[6]

Which other athletes are most vulnerable to sexual abuse? Those who...

Like the coach
Feel attracted to the coach
Seek validation from the coach
Have low self-esteem
Have been sexually abused in the past
Feel insecure about their position on the team
Crave approval from men or authority figures

Unfortunately, many if not all young women qualify as vulnerable according to some or all of these measures. In other words, without institutional safeguards, anyone can be vulnerable.

## *Gender Dynamics in the Male Coach – Female Athlete Relationship*

There is no national certification process for coaches. There are optional training and mentoring programs, but entry-level coaches often receive no training and no supervision. A coach can reach the college ranks without having had training in psychology or ethics. He may know nothing about power: how it can be used and abused. He may know little about women, his only athletics training stemming from his own participation.

As an athlete, he may have been a star. Praised for his athletics prowess, he may feel entitled to sexual access to women, as male athletes sometimes do. Male athletes have often been steeped in the milieu of men's locker rooms and a hypermasculine athletics culture that fosters expectations of easy sexual access to women.[7]

If not a star, he may suffer from feelings of failure and emasculation. One way to prove masculinity is to "score" with attractive young women.

Some, though by no means all, men who coach women do so because they cannot obtain more prestigious jobs coaching men. For these men, their masculinity can be threatened by the job itself, their stature among men tainted by their association with "mere" girls. To women's teams, men can bring a deep insecurity.

Sometimes coaches become obsessed with victory. Or they become obsessed with control, commanding their athletes the way military generals command their troops, restricting how much young women eat, or whom they associate with. This insecurity can also be expressed as a need to feel sexually attractive to the young women on the team.

As the gatekeepers of female athletics success, male coaches may at some level feel threatened by that success, or by the increasing female social power it symbolizes. So while a coach may with one hand reach to help a woman free herself of sexist constraints through athletics achievement, he may with the other hand seduce her, thus effectively demoting her to a sexualized, dependent position.

For a coach, the route to power and success is through the accomplishments of his athletes. He cannot win if they do not win. They are the sun to his moon: their light reflects back toward him. If their success makes him feel empowered or excited he may interpret that excitement, that sense of empowerment, as sexual. When limber, lithe young women bring trophies to him, and look at him with adoring eyes, and obey his every command, this can be arousing. It can feel like love.

Which coaches or staff members seem most likely to sexually abuse student-athletes? Those who...
Have a history of "dating," marrying, or getting romantically or sexually involved with athletes;
Have been fired or resigned after such relationships were discovered;
Spend one-on-one time with athletes beyond the sports context; or
Defend coach-athlete relationships as "natural."
Coaching Control, Styles, and Expectations

At the elite level of intercollegiate athletics, coaches have power over student-athletes' lives far exceeding the mechanics of practicing and competing in a sport. A coach's power over athletes can extend to virtually all aspects of the student-athlete's life, in such ways that clear boundaries are hard to delineate. This near total control is rarely questioned.[9] It is especially emblematic of coach-athlete relationships in sport cultures that place a premium on winning over other values, such that the team culture encourages sacrificing the liberty and autonomy of the individual for the good of the team (with "good" defined as winning).[10] In such a relationship, the student-athlete may not readily perceive when appropriate boundaries have been crossed, much less have the fortitude to protest a coach's overreaching.[11]

In the most tangible terms, the student-athlete depends on the coach for: a place on the roster; playing time; training and skills-building opportunities; visibility and references that can lead to professional opportunities; and, in Division I and II programs, scholarships that can mean the difference between being able to afford a college education or not.[12] In exercising this power, the coach commonly exerts broad control over a student-athlete's life, including in such areas as physical fitness, diet, weight, sleep patterns, academic habits, and social life.[13] For intercollegiate athletes, the magnitude of the coach's control will likely exceed that of any other single individual at that student-athlete's institution. For many, it will exceed the extent of control any individual has ever had over them at any point in their lives, with the exception of their parents.

Canadian sociologist Helen Lenskyj has noted that many young athletes have less experience with romantic relationships than peers of their age because sport has been so central to their lives.[14] Lacking experience to give them perspective and understanding, and with weak social networks outside sport, these athletes are ill prepared to negotiate romantic overtures from their coach.

For all these reasons, the coach's status and power loom large in the student-athlete's life. So much so that, as Celia Brackenridge explains, "to the young athlete, the coach is a kind of god and that godlike status can easily

spill over into abusive relationships."[15]

Even without intimidation or coercion, the coach is well positioned to take advantage of the student-athlete's vulnerability in developing a sexual relationship.[16] The student-athlete's dependence on the coach makes it enormously difficult for the athlete to control the boundaries of the relationship or speak up to a coach who oversteps.[17]

The extent of control exerted by coaches over athletes in elite levels of sports is likely the reason why the risk of sexual abuse in sport has been found to increase as the level of athletics competition advances. It is the higher levels of sport where the coach exerts the most control over widest areas of the athlete's life. A similar phenomenon has been found in the workplace. The risk of sexual harassment at work increases in workplaces where the distinction is blurred between the private and public lives of employees.

Because most coaches are men, men set the norms for coaching behavior in sports. Male coaches have a presumptive authority and legitimacy that contributes to the power imbalance in the coach-athlete relationship, laying the ground rules for allegiance to whatever the coach demands.[18]

A coach who requires unquestioning submission to his authority, and who exercises near total control over athletes' lives, has (deliberately or inadvertently) laid the groundwork for sexual abuse.[19] According to Brackenridge, having a male coach with an authoritarian coaching style is a risk factor for coach-athlete sexual abuse.[20] The very language of sport reflects a dependent relationship. Student-athletes will say they run or swim or play basketball "for Coach Jones." That is, not *for* themselves, but *for* the coach.

In the habit of submitting to numerous daily demands, the athlete who is asked for sex—even if she does not feel infatuated or interested—may feel unable to say no to her all-powerful coach. She might even come to believe that if the coach says it's okay, it must be okay.

The distinctive features of the coach-athlete relationship should call into question whether it is possible for an athlete to freely consent to a sexual relationship with the coach. The potential for either the appearance or reality of a *quid pro quo* relationship in which some aspect of the athlete's athletics opportunity depends on her intimate relationship with the coach is virtually unavoidable.[21]

What if she were to say no? How would the coach react? Could she keep playing for that person? If not, would she have to quit the sport? Would her scholarship transfer elsewhere? Is she willing to risk leaving her friends and teammates at her current institution? An athlete would probably review some of these considerations before responding to a coach's advances. At the extreme, "rejection of their coach's sexual overtures could well mean the end of a young woman's athletics career," notes Lenskyj.[22]

In an educational setting, the primary concern should always be for the well-being of the student-athlete. Coach-athlete intimate relationships jeopardize athlete well-being.[23] They also interfere with the sport experiences of the student-athlete's teammates. Surveys of student-athletes find high percentages who say that sexual advances by a coach would interfere with their own ability and with the ability of their teammates to compete successfully in their sport.[24] Student-athletes who become involved in sexual relationships with a coach are often unable to get out of the relationship when they want to, and face a choice between continuing an unwanted relationship and jeopardizing their opportunities in sport.[25]

## *How Coaches See These Relationships*

The perspective of coaches who become sexually involved with athletes has not been studied as much as that of the athletes. These men make for reluctant interviewees, as Mariah Burton Nelson found when she called at least a dozen college coaches who were known sexual abusers. Some agreed to speak with her, but many issued outright denials, refused to take the calls, or even hung up on her. Other research confirms Nelson's assessment: that many coaches exhibit a surprising lack of awareness coach-athlete sexual relationships are problematic. Especially when the athletes are over the age of consent, coaches seem to be much less troubled by these relationships than they should be.

A study of coaches in Denmark found that while 93 percent of them agreed that it was unacceptable for a coach to have an intimate relationship with an athlete under the age of 18, two-thirds (66 percent) of them believed that intimate relationships between coaches and athletes were acceptable if the athlete was 18 or older.[26] In fact, 20 percent of the coaches who responded to the survey acknowledged having had an intimate relationship with an athlete who was 18 or older.[27] Likewise, a study of swimming coaches in England found vastly different opinions about the acceptability of intimate relations between coaches and athletes who were underage (which were uniformly condemned) and athletes who were above the age of consent (which elicited a wide range of opinions).[28] An Israeli study found a similar gap between the views of coaches and athletes with respect to sexual behavior by a coach. A substantially higher percentage of athletes than coaches found sexual conduct by a coach toward an athlete to be sexual harassment. In the study, 80 percent of the athletes believed that a coach's proposal for a sexual encounter (absent threats or rewards offered) was harassing, while only 62 percent of the coaches believed this to be harassment.[29]

In addition to coaches' own lax views of sexual relationships with athletes, research shows that coaches are reluctant to step in when they believe that another coach is involved in an inappropriate relationship with an athlete.[30] This is consistent with literature suggesting that sport governance structures have failed to take seriously the problem of sexual abuse in sport, and have been resistant to policies and prevention efforts to address the problem.[31]

Since coaches often try to justify sexual or romantic relationships with student-athletes, institutional controls become even more important. Yet most college coaches are subject to minimal institutional control. As long as the coach meets expectations for success (usually defined in terms of win-loss records), the coach has enormous institutional autonomy. Compared to teachers and other educators, coaches conduct their interactions with students with little oversight or assessment.[32] A clear and strongly worded institutional policy can begin to rectify this situation.

The following chapters explain the legal and policy basis for athletics department policies prohibiting sexual or romantic relationships between coaches (and other supervisory athletics staff) and student-athletes, and offer a model policy for institutions to adopt.

# *Endnotes*


1 Celia Brackenridge, *Dangerous Sports? Risk, Responsibility and Sex Offending in Sport*, 9(1) J. of Sexual Aggression 3, 8 (2003).

2 Joy D. Bringer et al., *Swimming Coaches' Perceptions of Sexual Exploitation in Sport: A Preliminary Model of Role Conflict and Role Ambiguity*, 20 The Sport Psychologist 645, 474 (2006).

3 Daniel Begel, *An Overview of Sport Psychiatry*, 149 (5) American Journal of Psychiatry 608 (May 1992).

4 Peter Rutter, Sex in the Forbidden Zone: When Men in Power – Therapists, Doctors, Clergy, Teachers, and Others – Betray Women's Trust 51 (Los Angeles: Jeremy Tarcher, Inc., 1986).

5 *Id.* at 51.

6 Celia Brackenridge, *"He Owned Me Basically…": Women's Experience of Sexual Abuse in Sport*, 32 Int'l Rev. for the Sociology of Sport 115, 123 (1997).

7 Anita M. Moorman & Lisa P. Masteralexis, *An Examination of the Legal Framework Between Title VII and Title IX Sexual Harassment Claims in Athletics and Sport Settings: Emerging Challenges for Athletics Personnel and Sport Managers*, 18 J. Legal Aspects Sport 1, 6 (2008); Helen Lenskyj, *Unsafe at Home Base: Women's Experiences of Sexual Harassment in University Sport and Physical Education*, 1(1) Women In Sport & Physical Activity J. 19 (Sept. 30, 1992).

8 Mariah Burton Nelson, The Stronger Women Get, The More Men Love Football 163 (New York: Harcourt Brace 1994).

9 Karin Volkwein et al., *Sexual Harassment in Sport: Perceptions and Experiences of American Female Student-Athletes*, 32 Int'l Rev. for the Sociology of Sport 283, 285 (1997).

10 *Id.*

11 Brackenridge, *"He Owned Me Basically,"* at 122-23.

12 Volkwein, *Sexual Harassment in Sport*, at 284.

13 Alan Tomlinson & Ilkay Yorganci, *Male Coach/Female Athlete Relations: Gender and Power Relations in Competitive Sport*, 21(2) J. of Sport & Social Issues 134, 144 (1997).

14 Lenskyj, *Unsafe at Home Base*.

15 Tomlinson & Yorganci, *Male Coach/Female Athlete Relations*, at 138 (quoting Celia Brackenridge).

16 *Id.* at 147.

17 *Id.* at 149.

18 Kari Fasting & Celia Brackenridge, *Coaches, Sexual Harassment and Education*, 14(1) Sport, Education and Society 21, 32–33 (2009) ("It is difficult to assess whether feminisation of the coaching profession would lead to a less harassing environment. But, since this environment is so closely linked to hegemonic masculinity, and what are often described as traditional male values, we hypothesize that a transformation of the coaching culture, and associated re-scripting of coach behavior, might be easier if more female coaches were involved in sport.").

19 Tomlinson & Yorganci, *Male Coach/Female Athlete Relations*, at 136 (discussing research on "the authoritarian, exploitative, and sometimes abusive practices that male coaches may adopt in 'cross-gender coaching relationships'"); Lenskyj, *Unsafe at Home Base* (citing research showing that male coaches are less likely to adopt a participatory style of coaching and more likely to be authoritarian).

20 Celia H. Brackenridge, Spoilsports: Understanding and Preventing Sexual Exploitation in Sport (London and New York: Routledge 2001). *See also* Marianne Cense & Celia Brackenridge, *Temporal and Developmental Risk Factors for Sexual Harassment and Abuse in Sport*, 7(1) Eur. Phys. Ed. Review 61 (2001) (citing as risk factors for sexual abuse of an athlete by a coach: the coach's authoritarian attitude and exercise of control over matters outside of sport).

21 Lisa Pike Masteralexis, *Sexual Harassment and Athletics: Legal and Policy Implications for Athletic Departments*, 19 J. Sport & Social Issues 141, 150 (1995).

22 Helen Lenskyj, *Sexual Harassment: Female Athletes' Experiences and Coaches' Responsibilities*, Science Periodical on Research and Technology in Sport 12, no. 6, p. B2 (1992).

23 Brackenridge, *"He Owned Me Basically,"* at 122 (discussing the negative consequences to athletes when they are sexually abused by a coach).

24 Volkwein, *Sexual Harassment in Sport*, at 288 (in survey of women playing intercollegiate sports in the U.S., 92 percent agreed that verbal and sexual advances by the coach would interfere with the individual athlete's ability to successfully compete, and 84 percent agreed that such behavior would interfere with the team's ability to compete successfully); Jan Toftegaard Nielsen, *The Forbidden Zone: Intimacy, Sexual Relations and Misconduct in the Relationship Between Coaches and Athletes*, 36 Int'l Rev. for the Sociology of Sport 165, 172 (2003) (reporting results of a survey of student-athletes in Denmark—sample was 2/3 female and 1/3 male—in which 84 percent agreed that a coach kissing the athlete on the mouth would negatively affect the individual athlete's ability to compete successfully, and 86 percent said it would negatively impact the team's ability to compete successfully); Barbara Osborne, *Coaching the Female Athlete*, *in* Psychological Foundations of Sport 428–37 (J.M. Silva & D.E. Stevens eds., Boston, MA: Allyn Bacon 2001) (discussing harms to the team when a coach becomes sexually involved with an athlete); Brackenridge, Spoilsports, at 40, 123 (discussing harms of coach-athlete sexual abuse).

25 Nielsen, *The Forbidden Zone*, at 179–80 (summarizing research finding that most of the athletes who experienced inappropriate behavior from a coach felt unable to do anything about it).

26 *Id.* at 175-76. The study did not break down coach's responses by gender (which would have been interesting), but the sample was predominantly male (83 percent).

27 *Id.* at 176. The most common explanation given by the coach was that it happened with the athlete's consent. A much lower percentage, 3 percent, admitted to having had an intimate relationship with an athlete who was younger than 18 years old. *Id.*

28 Bringer, *Swimming Coaches' Perceptions*, at 467.

29 Naomi Fejgin & Ronit Hanegby, *Gender and Cultural Bias in Perceptions of Sexual Harassment in Sport*, 36 (4) Int'l Rev. for the Sociology of Sport 459, 469 (2001). The gap persisted even when proposals of a sexual encounter were accompanied by promises of threats or rewards (90 percent of the athletes saw this as harassing, but only 72 percent of the coaches).

30 Bringer, *Swimming Coaches' Perceptions*, at 467.

31 Sylvie Parent & Guylaine Demers, *Sexual Abuse in Sport: A Model to Prevent and Protect Athletes*, 20 Child Abuse Rev. 120 (2011) (noting, among reasons for resistance, beliefs that the harms of sexual abuse in sport are overblown and fears that highlighting the problem would create an unfavorable impression and shed negative light on a sport program). Fear of false accusations is also a reason why athletics organizations have resisted taking action, although existing literature suggests that the actual incidence of false accusations of coaching abuse is very rare. Celia Brackenridge et al., *Managing Cases of Abuse in Sport*, 14 Child Abuse Rev. 259, 267 (2005).

32 *Id.* ("Coaches differ from school teachers and other helping professionals in that they rarely have formal and regular opportunities for peer or supervisory assessments of self-reflection.").

# Chapter Three

The Legal Background: Making the Case for Athletics Department Policies Prohibiting Inappropriate Relationships with Student-Athletes

As a legal matter, it is advisable for athletics departments to have clear policies in place barring coach/staff sexual or romantic relationships with student-athletes. Although such relationships are not, in most states, per se illegal, they pose risks of liability that institutions would be better off avoiding. This chapter details the legal background that creates incentives for policy-making in this area.

## *Staying on the Sunny-Side of Title IX*

Sexual relationships between student-athletes and their coaches or other staff do not necessarily violate Title IX. Title IX prohibits sexual harassment in any education program, including sexual harassment of student-athletes by university employees.[1] However, at the college and university level, only sexual conduct that is unwelcome amounts to sexual harassment under the law.[2] In theory, consensual sexual relationships do not implicate Title IX. In reality, however, human relationships are messy, and even purportedly consensual romantic relationships between coaches/staff and student-athletes may lead to complications that can raise problems under Title IX.

As is the case with "consent," the question of whether a sexual relationship was welcomed can be tricky within relationships marked by a disparity in power. The Office for Civil Rights in the Department of Education (OCR), the federal agency charged with enforcing Title IX, has recognized this in its guidance on sexual harassment. In a list of factors that OCR considers in determining whether an allegedly "consensual" sexual relationship between a student and an adult employee was unwelcome, the first factor is:



The nature of the conduct and the relationship of the school employee to the student, including the degree of influence (which could, at least in part, be affected by the student's age, authority, or control the employee has over the student)[3]

All athletics department personnel, and especially coaching staff, have an extraordinary degree of influence over student-athletes at a school. As a result, even relationships that outwardly appear to be consensual may actually be unwelcome. Student-athletes in such relationships would likely have greater leeway than persons with greater institutional power to prove that they did not welcome the sexual or romantic part of the relationship.

The second factor listed in the OCR guidance also points to the significance of relational power disparities in determining whether a sexual relationship was unwelcome for purposes of Title IX. It is:

Whether the student was legally or practically unable to consent to the sexual conduct in question.[4]

The example that immediately follows mentions a student's age or disability as factors that would affect a student's ability to consent, but these examples go to the student's legal capacity for consent, and do not foreclose other factors that might complicate consent as a practical matter. The statement in the OCR Guidance includes a reference to a student's practical inability to consent to sexual conduct. Where a student-athlete relies on athletics staff, including the coach, for support in order to succeed in the program, that student may indeed be practically unable to refuse sexual or romantic overtures from that person.

Together, these two factors demonstrate that OCR would use a high bar for determining whether a student-athlete truly welcomed sexual involvement with a coach or another athletics staff member with control over

that student. Moreover, the relationship would also be deemed unwelcome if the student agreed to it, but did so based on the perception of a quid pro quo relationship between sexual involvement and opportunities or benefits in the athletics program.

If a court or OCR determined that the student-athlete did not welcome the relationship, the institution would run the risk of violating Title IX. The other two elements of a sexual harassment claim, that the conduct created a hostile and abusive environment and that the conduct occurred "because of" the student's sex, would not be difficult to establish.

An important factor in determining whether the harassment created a hostile environment is "[t]he identity of and relationship between the alleged harasser and the subject or subjects of the harassment."[5] OCR identifies this as a factor to be considered, "especially in cases involving allegations of sexual harassment of a student by a school employee," and notes as an example that "due to the power a professor or teacher has over a student, sexually based conduct by that person toward a student is more likely to create a hostile environment than similar conduct by another student."[6] This would be all the more true for sexual conduct by coaches, who typically have even greater power over their student-athletes than a faculty member who has the student in one class. As a result, if a sexual relationship between a coach and a student-athlete were actually unwelcome, it would very likely rise to the level of creating a hostile or abusive educational environment for that student, placing the institution at risk of violating Title IX. Additionally, if some aspect of participation or benefits in the athletics program actually were linked to a student's sexual involvement with the coach or other athletic staff, it would constitute quid pro quo sexual harassment, which also violates Title IX.

The final factor in a sexual harassment claim would be easily established: where conduct involves sexual advances arising out of attraction, courts have presumed that it occurs "because of" the target's sex in the sense meant by a sex discrimination statute such as Title IX.[7] Sexual advances or relationships between student-athletes and athletics department staff, whether between opposite-sex or same-sex persons, would clearly be found to fall within the parameters of Title IX's requirement that the conduct occurred because of the sex of the student-athlete.[8]

Where sexual harassment has occurred, the institution is at risk of being found in violation of Title IX. In a private lawsuit brought by the affected student for monetary damages, the institution would be liable for paying damages if it had actual notice of sexual harassment in its program and responded with deliberate indifference.[9] This is a high standard to meet, but some plaintiffs have been able to establish this level of culpability. Actual notice would likely be met, for example, where university officials saw or heard of behaviors that led them to suspect sexual harassment may have occurred, or where the university hired a coach with a known history of sexual harassment. However, even if actual notice and deliberate indifference could not be established, there could still be a Title IX violation for the existence of sexual harassment in the program, although the remedy would not require the university to pay-out of monetary damages. In its investigations and compliance actions, OCR continues to use the pre-Gebser standard for enforcing the Title IX regulations, so that sex discrimination (including sexual harassment) by a university employee will be treated as a violation of Title IX even if higher-level officials did not have actual notice of it prior to the enforcement action.[10] This is also the standard that would apply in a lawsuit for injunctive (as opposed to monetary) relief (that is, a court order requiring some kind of action or change in conduct, which would also trigger payment of attorney's fees).[11] Of course, it is far better for an institution to prevent sexual harassment in the first place than to find itself under investigation for, and possibly accountable for, sexual harassment in its programs.

The bottom-line is that, although consensual sexual relationships between student-athletes and athletics department staff do not per se violate Title IX, the stark imbalance of institutional power within that relationship creates a real risk that such relationships were not actually welcomed by the student-athletes involved. Where that is indeed the case, the institution may find itself in violation of Title IX.

The case for preventive policies becomes more pressing when considering that romantic relationships are inherently unstable and often change over time. A relationship that starts out fully welcomed by both parties

may later become unwelcome. As the glow of a new relationship wears off, one party or the other may lose interest and decide to move on. In most relationships, this merely involves some awkwardness, as both persons come to terms with the change in the direction of the relationship. However, where one person has much greater institutional power than the other, it can be much more difficult for the person with less power to get out of an unwanted relationship. The literature on coach-athlete sexual abuse has found that athletes who become sexually involved with their coach often find themselves unable to end the relationship when they want to, and face a choice between continuing an unwanted relationship and jeopardizing their opportunities in sport.[12] Where that is the case, there is a potential Title IX violation.

The OCR guidance on sexual harassment explicitly recognizes that a sexual relationship that starts out as welcome may nevertheless lead to sexual harassment if the relationship later becomes unwelcome. As the guidance states, "the fact that a student willingly participated in conduct on one occasion does not prevent him or her from indicating that the same conduct has become unwelcome on a subsequent occasion."[13] Accordingly, even if a relationship between a student-athlete and a coach begins consensually, it might still create a risk of institutional liability for sexual harassment if the student-athlete later decides that she wants to end the relationship, but feels unable to do so.

There are also significant legal risks to the coach if a seemingly consensual relationship with a student-athlete turns sour. Where a sexual relationship occurred, the coach may have difficulty proving it was welcome if the student-athlete contends otherwise. Indeed, some university sexual harassment policies notify covered employees that the existence of a sexual relationship with a student creates a presumption of sexual harassment in violation of university policy, even if the employee claims the relationship was consensual.[14] Under such a policy, the university could impose discipline for sexual harassment, despite the coach's protestations that the student welcomed the relationship.

Even when sexual relationships are found to be welcomed, there is still a risk of institutional liability based on the negative effects on other students in the program. The impact that even consensual relationships between student-athletes and athletics department staff can have on other student-athletes creates cause for concern under Title IX. Even if a sexual relationship between a coach and a student-athlete is and remains truly welcome, the relationship may nevertheless have a negative impact on that student-athlete's teammates. In one study of intercollegiate athletes, 84% of the athletes surveyed stated that a coach's expression of sexual interest toward an athlete on the team would interfere with the ability of the rest of the team to successfully compete.[15] This was only slightly lower than the 92% in the same survey who stated that a coach's sexual advances toward an student-athlete would impair her individual ability to successfully compete on the team.[16]

Although sexual harassment claims typically involve those students who are the direct targets of sexual conduct, the spillover effects of such conduct on others may also give rise to allegations of sexual harassment. In one Title IX lawsuit, for example, the plaintiff was a high school student-athlete who claimed that she was negatively impacted by the coach's sexual relationship with another girl on the team. Although she lost her case because the court did not find enough evidence that school officials had actual notice of the coach's relationship and its effect on other students, the court did not deny that a sexual relationship between a coach and an athlete could potentially create a hostile environment for the other members of the team.[17] Where other student-athletes on the team are negatively affected by their coach's sexual relationships with their teammates, they may have a plausible claim that the coach's conduct has caused them to experience a sexually hostile environment on the team, amounting to sexual harassment under Title IX. This is especially so where the coach's proclivity for becoming involved with players creates a climate of sexual favoritism and a perception that being treated as a "star" on the team requires sleeping with the coach.[18]

Finally, Title IX may be violated where coaches or other athletics department staff make advances toward student-athletes in order to "test the waters" to see if a romantic relationship with an athlete is "in the cards." Again, although truly welcome relationships between coaches and student-athletes do not per se violate Title IX, a coach's effort to procure such a relationship may well run afoul of the law. Verbal or physical advances that are unwelcome can be the basis for a Title IX violation where they are severe or pervasive enough to create a hostile

or abusive environment for the student-athlete on the receiving end. As noted above, because of the stark difference in institutional power between coaches and athletes, conduct that would be more trivial between persons of equal power is more likely to have a much greater effect on a student-athlete who is propositioned by her coach. Such advances could easily set the stage for claims of hostile environment harassment under Title IX. From an institutional perspective, both to avoid liability and to protect student-athletes, it is far better to ward off such overtures from the outset by making clear as a matter of policy that amorous relationships between coaching staff and athletes, even if truly consensual, are forbidden as a matter of athletics department policy. By setting enforceable expectations of professionalism in staff-athlete relationships, murky questions of unwelcomeness can be avoided altogether, and the risks of a Title IX violation arising out of sexual relationships between athletics department staff and student-athletes can be minimized.

## *State Law Incentives for Adopting Amorous Relationship Policies to Protect Student-Athletes*

State laws vary widely insofar as they may relate to sexual relationships between student-athletes and athletics department staff in higher education. The discussion that follows is by no means a comprehensive examination of the possible legal repercussions of these relationships under the laws of the states. The key point of this section is a much more basic one: in addition to the legal incentives under Title IX for establishing policy in this area, state law too may create incentives for prohibiting amorous relationships between athletics department staff and student-athletes as a matter of university policy.

Personal injury law, typically referred to as "tort law," is generally left to the states. In recent years, tort lawsuits have been brought against colleges and universities alleging a breach of a duty of care to protect their students from harm. State courts vary widely in how they handle these types of cases, and not all courts agree that colleges and universities have an enforceable duty of care to protect students from harm by persons acting outside the scope of their agency duties, as coaches or other staff likely do when they enter into personal relationships that exceed the boundaries of the staff-athlete relationships.[19] However, some state courts have held that colleges and universities have a duty of care to take reasonable steps to protect students from harm by others, based on their special relationship to their students.

There are no reported court decisions in a case involving the precise issue of whether a college or university might be held liable in a tort suit brought by a student-athlete who later suffered harm from an apparently consensual relationship with her coach. However, some courts have taken a broad view of the duty of a university to protect its students from foreseeable harm.[20] In several cases, courts have applied this duty of care to hold institutions responsible for taking reasonable steps to protect student-athletes from foreseeable harm within their athletics programs.[21] These precedents might be used in support of a legal claim against a college or university for harm resulting from a sexual relationship between a student-athlete and coach.[22] Given the uncertainty of the law in this area, and the likelihood of further developments toward recognizing institutional duties to protect students from harm, it is advisable that colleges and universities take reasonable steps to prevent unprofessional and potentially harmful relationships between student-athletes and athletics department staff—especially because, as explained in Chapters 1 and 2, the development of such relationships, and their potentially harmful consequences for athletes, are entirely foreseeable.

In addition to the incentives under state tort law to adopt preventive policies, a few states have specific regulations on amorous relationships in universities between students and supervisory faculty and staff. For example, Oregon's Code of Administrative Regulations provides detailed rules on consensual sexual or romantic relationships between students and supervisory faculty and staff at the University of Oregon, explaining that such relationships are likely to lead to a conflict of interest or abuse of power.[23] Likewise, Florida's regulatory code also discourages amorous relationships between students and faculty and staff with supervisory responsibility over them, and authorizes penalties for employees who fail to avoid such conflicts of interest.[24] And Arizona explicitly includes having a sexual relationship with a student, "whether consensual or nonconsensual," as one of several

possible statutory grounds for the State Board for Private Postsecondary Education to take disciplinary action against an offending faculty member.[25] Sexual relationships with students may also affect a faculty member's tenure status and provide grounds for disciplinary action under state law.[26] In states where faculty/staff sexual relationships with students are discouraged or prohibited, there is an extra incentive on institutions to have clear policies in place setting the boundaries of such relationships. Clear policies on amorous relationships can protect university staff members as well as students by providing notice of expected behavior and of possible grounds for disciplinary action under state law.

## *The Legal Basis for University Policies on Amorous Relationships with Students*

For reasons similar to those detailed above, in recent years, increasing numbers of colleges and universities have adopted university-wide policies prohibiting or discouraging amorous relationships between students and the faculty and staff who supervise them. Although these policies vary in their scope and content, some of them impose disciplinary action on faculty or staff who become sexually or romantically involved with a student in violation of the policy. Others have disclosure and recusal requirements, with penalties for the failure to disclose a relationship in violation of the policy. The surge in university amorous relationship policies has prompted substantial commentary in the legal literature about the legality of disciplinary measures taken against university employees pursuant to these policies, especially at public universities. Some critics have questioned whether such policies violate the individual rights of faculty and staff, including the right to freely associate, the right to privacy, and the liberty to engage in consensual intimate relationships with other adults.[27] However, today, such policies are widely understood to be legally supported, as long as they are well-crafted and provide adequate notice of what is prohibited.[28]

University policies proscribing sexual or romantic relationships with students are a legitimate response to the potential negative effects such relationships have on students, the educational environment, and the university. These harms include the potential for favoritism, actual or perceived conflicts of interest, exploitation of students in an asymmetrical relationship of power, possible legal and reputational risk to the faculty member involved, risks of liability for the university, and ultimately, the integrity and reputation of the university. These interests fully justify whatever intrusion such policies make into the sexual liberties and privacy of faculty and students. As long as such policies provide notice to employees of what conduct is prohibited and the consequences for violating it, and are written in gender-neutral terms and applied even-handedly, they should not be vulnerable to a legal challenge.[29]

While university-wide amorous relationship policies are on firm legal footing, the legal case for the validity of athletics department policies proscribing sexual or romantic relationships between athletics department coaches/staff and student-athletes is even stronger. Student-athletes are much more dependent on coaches and the athletics staff who control their programs than is the case for a student in a typical relationship with a regular faculty member. The intensity of the coach's contact with, and level of control over, the student-athlete is unmatched anywhere else in the university. While the rationales are plenty strong for general university-wide policies to survive a legal challenge, they are even stronger in support of athletics department policies on relationships with student-athletes.

## *Endnotes*

1 Office for Civil Rights, U.S. Department of Education, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties 2 (Jan. 2001) (explaining Title IX's prohibition on sexual harassment in an educational institution's programs and activities, and explaining that this includes extra-curricular and athletic programs).

2 Unwelcomeness is treated differently at earlier levels of education, with a per se rule of unwelcomeness in relationships between elementary students and school employees, and a presumption of unwelcomeness in relationships between secondary students and school employees. Id. at 8.

3 Id.

4 Id.

5 Id. at 6.

6 Id. at 7.

7 See, e.g., Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998).

8 Id.

9 Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274 (1998).

10 OCR, Revised Sexual Harassment Guidance, Preamble, iii-iv; id. at 10.

11 Id.

12 Jan Toftegaard Nielsen, The Forbidden Zone: Intimacy, Sexual Relations and Misconduct in the Relationship Between Coaches and Athletes, 36 Int'l Rev. for the Sociology of Sport 165, 179-80 (2003) (summarizing research finding that most of the athletes who experienced inappropriate behavior from a coach felt unable to do anything about it).

13 OCR, Revised Sexual Harassment Guidance, at 8. See also Office for Civil Rights, U.S. Department of Education, Sexual Harassment: It's Not Academic 5 (Sept. 2008) (available at http://www.ed.gov/ocr) (giving an example of sexual harassment in which the student initially welcomed the sexual conduct, but did not welcome it later).

14 Neal Hutchens, The Legal Effect of College and University Policies Prohibiting Romantic Relationships Between Students and Professors, 32 J. L. & Educ. 411, 415-16, 423-24 (2003).

15 Karin Volkwein et al., Sexual Harassment in Sport: Perceptions and Experiences of American Female Student-Athletes, 32 Int'l Rev. for the Sociology of Sport 283, 288 (1997); see also Nielsen, The Forbidden Zone, at 172 (reporting results of a survey of student-athletes in Denmark—sample was 2/3 female and 1/3 male—in which 85.7% agreed with the statement that if a coach kissed an athlete on the mouth it would negatively impact the team's ability to compete successfully); Barbara Osborne, Coaching the Female Athlete, in Psychological Foundations of Sport 428–37 (J.M. Silva & D.E. Stevens eds., Boston, MA: Allyn Bacon 2001) (discussing the harms to the team when a coach becomes sexually involved with an athlete).

16 Volkwein, Sexual Harassment in Sport, at 288.

17 Henderson v. Walled Lake Consol. Schools, 469 F.3d 479 (6th Cir. 2006).

18 See, e.g., EEOC Guidelines, 45 Fed. Reg. 74, 676–77 (1980) (suggesting a possible theory for why sexual favoritism might violate Title VII of the Civil Rights Act of 1964 and its prohibition of sexual harassment in the workplace); Miller v. Dept. of Corrections, 30 Cal. Rptr. 3d 797 (Cal. 2005) (stating that, while isolated instances of sexual favoritism do not rise to the level of a sexually harassing hostile environment, repeat instances of such conduct might do so, if the message conveyed is that female workers are view by managers as "sexual playthings").

19 For examples of court decisions rejecting a special duty of care on colleges and universities to protect students from harm in other contexts, see, e.g., Bradshaw v. Rawlings, 612 F.2d 135 (3d Cir. 1979); Nero v. Kansas State Univ., 861 P.2d 768 (Kan. 1993).

20 See, e.g., Furek v. Univ. of Delaware, 594 A.2d 506 (Del. 1991); Mullins v. Pine Manor College, 449 N.E.2d 331 (Mass. 1983).

21 See, e.g., Searles v. Trustees of St. Joseph's College, 695 A.2d 1206 (Me. 1997) (a college's legal duty to exercise reasonable care toward its students encompasses a duty to exercise reasonable care for the health and safety of its student-athletes); Davidson v. Univ. of North Carolina, 142 N.C. App. 544, 543 S.E.2d 920 (N.C. Ct. App. 2001) (recognizing a "special relationship" between a university and its athletes that imposes a duty of care to protect athletes from foreseeable harm in the athletic program).

22 For an example of a recent case involving a state tort claim against a college based on a coach's sexual misconduct towards a student-athlete, see Bloomer v. Becker College, Civil Action No. 09-11342 FDS, 2010 WL 3221969 (D. Mass. Aug. 13, 2010). That case involved multiple allegations of coach misconduct, including: touching team members' breasts and buttocks; telling the plaintiff that if she wanted to compete she would "have to relax and drink with him;" offering to drive the plaintiff back to her dorm room after a competition, but then driving her to his house instead and refusing to take her back to her dorm; and forcing the plaintiff into his hotel room and onto the bed during an away-trip. The court finely parsed the claims in the lawsuit, allowing some of the claims to proceed against the college, while dismissing others. The court dismissed the negligence claim against the college that was based on the alleged sexual touching, reasoning that this conduct went beyond the scope of the coach's employment duties. However, the court allowed the claims to proceed against the college based on the coach's driving the plaintiff to the coach's home and, on another occasion, forcing her into his hotel room and onto his bed. For these claims, the court reasoned, the acts occurred "within the time and space parameters of his employment as the equestrian coach." The court also allowed a claim to proceed against the college for negligent retention and supervision of the coach, based on the student's allegation that the college had notice of an earlier episode of sexual misconduct by the coach, but did not prevent him from accompanying the team on overnight trips or otherwise restrict or monitor his activities. The case illustrates the difficulties courts will likely encounter in sorting out institutional tort liability for harms resulting from unprofessional, sexual relationships between student-athletes and athletics staff. It also demonstrates why it is far better for colleges and universities to avoid the legal complications presented by such relationships from the outset.

23 See Or. Admin. Reg. 571-004-0007 (2011). Under this restriction, a faculty member who becomes involved with a student in an instructional context must make prompt and appropriate arrangements to avoid an actual or apparent conflict of interest, and the failure to do so may be grounds for discipline. See also Or. Admin. Reg. 580-021-0320 (2011) (an employee with evaluative, supervisory, or other power over the student may be subject to termination, reprimand, removal, reassignment or suspension for a period not to exceed one year).

24 See Fla. Admin. Code Ann. R. 6C-5.950(1) (2011) (requiring faculty members to avoid such a conflict of interest by "removing himself or herself from evaluative decisions regarding the other individual").

25 Ariz. Rev. Stat. Ann. § 32-3051 (2011).

26 See, e.g., Board of Trustees v. Stubblefield, 94 Cal. Rptr. 318 (Cal. Ct. App. 1971) (holding that a junior college faculty member who was found parked with a female student in a state of undress had exhibited "immoral conduct" under California Education Code, and that this conduct supported the college's decision to dismiss the teacher; "responsible conduct upon the part of a teacher, even at the college level, excludes meretricious relationships with his students").

27 For a critique of university amorous relationship policies based on liberty and privacy concerns, see Gary E. Elliott, Essay: Consensual Relationships and the Constitution: A Case of Liberty Denied, 6 Mich. J. Gender & L. 47 (1999).

28 See, e.g., Neal Hutchens, The Legal Effect of College and University Policies Prohibiting Romantic Relationships Between Students and Professors, 32 J. L. Educ. 411 (2003); Christine Gerdes, The Case for University Consensual Relationship Policies, 49 Wayne L. Rev. 1031 (2004); see also Paul M. Secunda, Getting to the Nexus of the Matter: A Sliding Scale Approach to Faculty-Student Consensual Relationship Policies in Higher Education, 55 Syracuse L. Rev. 55 (2004) (arguing that disciplinary action against public university employees for violating a university amorous relationship policy is legally supportable where the relationship poses a threat to the reputation, effectiveness, or integrity of university or any of its programs). See also Office for Civil Rights, Department of Education, Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12040, n. 41 (1997) ("Of course, nothing in Title IX would prohibit a school from implementing policies prohibiting sexual conduct or sexual relationships between students and adult employees.").

29 Court decisions upholding disciplinary action against university employees pursuant to other university policies fully support the power of universities to sanction faculty for engaging in consensual sexual relationships with students. See, e.g., Trejo v. Shoben, 319 F.3d 878 (7th Cir. 2003) (upholding university's dismissal of professor for making sexually explicit comments, where comments sought to solicit a relationship with a female student); Tonkovich v. Kansas Board of Regents, 159 F.3d 504 (10th Cir. 1998) (upholding discipline of a faculty member for sexual harassment, using broad language affirming the university's power to terminate a professor for having consensual sexual relationships with students); Korf v. Ball State Univ., 726 F.2d 1222 (7th Cir. 1984) (upholding university sanctions against professor for sexual conduct with students); Naragon v. Wharton, 737 F.2d 1403 (5th Cir. 1984) (upholding university's reassignment of graduate student to non-teaching duties for having a sexual relationship with an undergraduate). Moreover, the Supreme Court has repeatedly ruled, in other contexts, that universities have wide latitude to decide matters related to their academic programs. See, e.g., Grutter v. Bollinger, 123 S. Ct. 2325 (2003) (upholding law school affirmative action policy with deference to university control over its educational mission); Board of Regents v. Southworth, 529 U.S. 217, 221 (2000) (upholding university control over use of mandatory student fees and acknowledging autonomy of universities in fulfilling educational mission); Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985) (recognizing that university control over decisions related to educational matters is a "special concern of the First Amendment").



# Chapter Four

The Policy Landscape: Crafting Athletics Department Policy on Inappropriate Relationships Based on Professional Ethics and Student-Athlete Welfare

Having established the legal background of incentives for adopting policies to set boundaries on coach-athlete relationships, and the legality of such policies, we turn to questions about the scope and design of such policies. Policies on coach/staff-athlete relationships should be grounded in two key values: (1) the professional ethics of the coach and other athletics department staff; and (2) the well-being of student-athletes.

## *A Question of Ethics: Analogizing to Ethical Codes of Conduct in Other Professions*

A coach—or other athletics department staff member with supervisory or significant control over the athlete—who enters into a sexual relationship with a student-athlete engages in a breach of trust that exploits the student-athlete's vulnerability in the relationship. Because of the inherent asymmetry of power in the coach-athlete relationship, commentators who study the ethics of coaching have long argued for an ethics-based approach, one that avoids the dangers of "dual relationships" in which the coach, in addition to serving in a professional role, also tries to be a friend or paramour to the athlete.[1] In thinking about the proper contours of this relationship, it is helpful to consider how other professions have grappled with issues of power and dependency in relationships of trust.



In many professional settings involving asymmetrical relationships, sexual relationships are forbidden as a matter of the ethics of the professional and the well-being of people in their care. Such prohibitions apply regardless of consent, in recognition of the inherently problematic nature of consent in such relationships. Examples abound. Lawyers are forbidden from entering into sexual relationships with clients.[2] Doctors and therapists are forbidden from having sex with their patients.[3] Judges are forbidden from entering into any kind of relationship with a party or lawyer appearing before them that would create an actual or perceived conflict of interest, including any kind of sexual relationship with such person.[4] While clergy are not governed by any one uniform code of ethics, it is widely understood that it is unethical for a clergy member to use his or her position in the church to enter into a sexual relationship with a parishioner.[5]

All of these examples involve relationships that are too fraught with power imbalances for consent to be meaningfully and reliably given. While being a coach is, in many respects, different from other professions, it shares the defining features that make consent to enter into a sexual relationship inherently problematic.[6] At the core of the coach-athlete relationship is a duty of care and an imbalance of power. In many respects, the relationship of dependence is even more acute here than it is in these other settings due to the breadth of control that the coach has over the life and education of the student-athlete.

Like other professional settings marked by an imbalance in power and expertise, coupled with great vulnerability and dependence, the ethical standards governing coaches should be designed to safeguard the well-being of persons in their care. This is particularly true for athletics programs in the university context, where the athletes

are also students under the care of an institution of higher learning. In light of the impossibility of meaningful consent to sex within the coach-athlete relationship, it should be recognized as an ethical imperative that coaches should not become sexually or romantically involved with a student-athlete.

Even beyond the issue of consent, "dual relationships" are inherently problematic. It's unrealistic to ask a college student to give her full attention and respect to a coach who may, that morning, have left his towel on her bathroom floor. It is distracting for a college student when the man she loves—and who claims to love her—also has intense, meaningful relationships with her eleven teammates. It's confusing for a college student to be in an intimate relationship with someone who has the authority to insist that she keep doing wind sprints, or who denies her the opportunity to play in a game when she desperately want to. It is hard enough to be coached. We must not expect college students to complicate that relationship with the vagaries of intimacy and sex.

## *Lessons from Amateur Sports*

The world of amateur sports has taken significant strides toward recognizing the conflict of interest that arises when a coach or other sport authority figure oversteps the boundaries of a professional relationship with an athlete. In recent years, the governing bodies and coaching associations of amateur sports have moved to discourage coaches and other authorities in sport from entering into sexual or romantic relationships with athletes, as a matter of ethics and athlete welfare.

In 2007, the International Olympic Committee issued a "Consensus Statement" on sexual harassment and abuse in sport.[7] The statement warns that power differences between athletes and authority figures in sport create the risk of exploitative sexual relationships. It urges all sport organizations to develop policies to protect athletes from sexual abuse and harassment. It defines sexual abuse broadly to include a sexual relationship in which consent is not or cannot be given, and recognizes the dangers sport presents for "manipulation and entrapment" of the athlete. The statement highlights the power difference between authority figures and athletes, and urges coaches and other authority figures to "stay… within the boundaries of a professional relationship with the athlete."[8]

In recent years, a number of sport organizations have taken up the IOC challenge. The U.S. Olympic Committee's Coaching Ethics Code includes, in addition to a provision on sexual harassment, a provision stating that coaches should not have sexual or romantic relationships with athletes because "such relationships are likely to impair judgment or be exploitative."[9] The USOC Coaching Ethics Code is not self-enforcing, however, and leaves it up to member sport organizations to formulate and adopt their own codes of ethics.[10] Still, the USOC ethics code has served as a model for many amateur sports organizations.

Increasingly, national sport governing bodies have acted to adopt coaching ethics codes that are consistent with the USOC ethical standard banning sexual relationships between coaches and athletes. For example, USA Hockey, USA Diving, and USA Fencing all have ethics codes prohibiting coaches from entering into sexual relationships with athletes.[11] Other sport governing bodies, such as USA Gymnastics, also discourage such relationships.[12] In addition, many sport coaches' associations have adopted policies forbidding member coaches from entering into sexual relationships with athletes.[13] While such policies do not always prevent such relationships from forming, they do draw a clear ethical line against coach-athlete intimate relationships, and bar coaches from crossing that line.[14]

Although far from perfect, the amateur sports world has taken important steps to set ethical boundaries for coaches and other sport authority figures to stay within professional boundaries in their relationships with athletes, and to protect athletes from exploitation. The world of intercollegiate athletics has some catching up to do.

## *Making Policy: Putting the Athletics Department Front and Center*

Given the distinctive risks and harms of romantic or sexual relationships between students and staff in the athletics context, it is important for the athletics department to have its own policy, and not merely rely on a general university policy on faculty/staff relationships with students. In designing and adopting a policy

governing relationships between student-athletes and athletics staff, there are a number of decisions to be made in determining how to proceed. This section discusses the choices made in the model policy and the rationales behind them.

## *1. The Athletics Department Should Have its Own Policy*

It might be tempting to leave relationships between student-athletes and athletics department personnel to whatever general university policy, if any, might apply to relationships between students and university employees. Increasingly, many universities have adopted policies designed to protect students from being drawn into sexual relationships in which a power differential between the participants complicates issues of consent. The American Association of University Professors, for example, recommends that universities have policies recognizing that "[s]exual relations between students and faculty members with whom they also have an academic or evaluative relationship are fraught with the potential for exploitation," and ensuring that, "[w]hen a sexual relationship exists, effective steps [are] taken to ensure unbiased evaluation or supervision of the student."[15] However, we strongly recommend that athletics departments adopt their own policies, which may well be stricter than their general university policy on amorous relationships with students.

There is much variety in how universities handle romantic and sexual relationships between students and university employees. These policies tend to fall in one of three categories: absolute prohibitions on such relationships between students and faculty; statements discouraging such relationships; and requirements of disclosure and recusal if such relationships are formed. Such policies are typically designed with faculty foremost in mind, and motivated by concern about how the faculty-student power differential affects the ability of students to consent. Notwithstanding this primary motivation, they are often written broadly enough to cover other university employees besides faculty who have supervisory responsibility over students. Where this is the case, such policies would extend to coaches and other athletics department staff members who supervise student-athletes.

However, even if general university policies on amorous relationships would cover coaches and other athletics staff, they are not designed for, and often fit poorly with, intercollegiate athletics. One problem is that such policies often merely require the relationship to be disclosed, followed by steps taken to recuse the faculty or staff member from further supervisory responsibility over the student. In the athletics setting, and with regard to relationships between a student-athlete and a coach, recusal is not an adequate solution. Indeed, most of the time, recusal is simply not possible without hurting the athlete or the team. While many faculty and staff members within a university might be fungible enough that their role can be filled by someone else in the university without hurting the educational experience of the student, this is not the case for a coach. The role played by coaching staff, in supervising the student-athlete involved and others on the team, is indispensible. Nor does recusal solve the problems of exploitation, the breach of the coach's ethics, and the costs to student-athlete welfare that such relationships entail. As a result, the disclosure/recusal approach, commonly taken in general university policies on this subject, has no proper application to relationships between coaches and student-athletes.

Likewise, policies that merely discourage, without clearly prohibiting, romantic relationships are ill-suited to the athletics department. For the reasons discussed in Chapters 1 and 2, it is not enough to warn of, and discourage, sexual relationships between an athlete and a coach. And the harms—to the student-athlete, to the team, and possibly to the university, in light of the legal complications such relationships pose—are too great to leave to the individuals involved, whose judgment might be clouded by the very intensity of the bond between the coach and the athlete. As explained above, proper ethical boundaries necessitate that these relationships remain off-limits, and are not merely discouraged.

Even if the university policy imposes an absolute bar on romantic or sexual relationships between students and supervisory staff, and would apply to coaches and other athletics staff, it is far preferable for the athletics department to have its own policy. Unless the athletics department "owns" the policy and incorporates it into

its core governance structure, any prohibition of amorous relationships will not likely infiltrate the culture of the athletics program, nor will student-athletes or key staff likely be aware of the policy, or have the motivation to abide by it and enforce it. The athletics department policy should be at least as stringent as a general university policy on amorous relationships with students, but may need to exceed its requirements in order to be responsive to the unique environment of intercollegiate athletics.

## *2. The Scope of the Policy: Who is Covered and What Types of Relationships*

The policy should apply to anyone who serves as a coach in the intercollegiate athletics program. This includes all coaches, whether head coaches or assistants, full-time or part-time, paid or volunteer. For all coaches, entering into a sexual or romantic relationship with a student-athlete is a breach of ethical obligations, and inconsistent with the role of the coach in the coach-athlete relationship. For reasons already explained, such relationships should be strictly prohibited.

In writing a policy on coach-athlete relationships, one question that arises is whether the policy should apply to relationships between coaches and all student-athletes throughout the intercollegiate athletics program or only those coached by that particular coach. Certainly, the case for banning amorous relationships between coaches and athletes is strongest with respect to relationships between student-athletes and the coach of their own team. However, potential conflicts of interest also arise when a coach becomes involved with an athlete on another team in that program. Such relationships can raise concerns about favoritism among teammates on the athlete's own team, knowing that the other coach is a close colleague of their own coach. They also can create uncomfortable feelings among the athletes on the team of the coach who is involved in the relationship, if the athletes suspect that their coach is involved with a student-athlete on another team. Moreover, leaving such relationships unregulated would enable coaches to trade on their power in the program and the unique role of the coach to procure intimate relationships with student-athletes in the athletics program, as long as they were on a different team. Prohibiting sexual or romantic relationships between all coaches and all student-athletes within the program sends a clear message about the proper role of the coach as a professional in the program, and recognizes that athletes are not "fair game" for any athletic coach working at the university. For these reasons, some institutions make it a violation of athletics department policy for a coach to become sexually or romantically involved with any student-athlete.[16] The model policy recommended here likewise prohibits romantic or sexual relationships between all coaches and all student-athletes in the intercollegiate athletics program.

In addition to coaches, other staff in the athletics department should also be covered under the policy, but wide variations in the degrees of authority staff members possess over student-athletes warrant a more nuanced approach to relationships between student-athletes and non-coaching staff. Everyone who works in intercollegiate athletics, by definition, has some degree of responsibility for student-athletes and the programs in which they participate. And yet, there are vast differences in the levels of control and authority that athletics personnel exercise over individual student-athletes and their teams. For example, a graduate student working as an assistant in the fundraising program is in a very different position than an associate athletics director with control over the budget for that student's sport.

Differences in the nature of the jobs defy a cookie-cutter approach to romantic relationships between student-athletes and non-coaching staff. Instead, the appropriateness of the relationship should turn on whether the staff person in question has supervisory authority or control over the student-athlete in question. Where this is the case, the relationship should be disclosed to a designated person in the department. Upon disclosure, appropriate steps should be taken to recuse that staff member from such responsibilities and reassign them so as to avoid any actual or apparent conflict of interest. (For example, if the staff person in question is a trainer, responsibility for training that student should be reassigned to another trainer.)

In terms of the kinds of relationships covered, the policy should apply to sexual, romantic, or dating relationships—that is, "amorous relationships"—even if both participants say that they consented to the relationship. As the above chapters explain, coach-athlete relationships involve a relationship of trust and dependency that complicates questions of consent, and creates a conflict of roles for the coach with risks for everyone involved, including the athlete in question, other members of the team, and the university. As a result, even purportedly consensual sexual or romantic relationships between athletes and coaches are off-limits under the policy. Similarly, consent can be problematic and a conflict of interest arises when athletics staff members are intimately involved with student-athletes over whom they exercise supervisory authority or control. In these relationships too, the policy applies even if the relationship is consensual.

It bears emphasizing, however, that in the event of sexual conduct to which the student-athlete did not consent, other university policies and laws may come into play, wholly apart from, and in addition to, the violation of this policy. As discussed in Chapters 1 and 3, unwelcome sexual conduct by a coach or staff member toward a student-athlete constitutes sexual harassment and should be promptly addressed under applicable university sexual harassment policies. Moreover, if there is reason to believe that a crime may have occurred, such as rape or sexual conduct, immediate steps must be taken to protect the alleged victim and others in the program. University counsel should be contacted immediately and appropriate steps taken, pursuant to State and local law, to notify law enforcement authorities. In addition, allegations of sexual violence and sexual assault must be addressed by the university's internal policies and procedures for handling such matters. The Office for Civil Rights issued a "Dear Colleague" letter to educational institutions on April 4, 2011, that provides detailed guidance on how universities should handle allegations of sexual violence in compliance with Title IX.[17]

Since the model policy covers sexual relationships without regard to consent, there is some potential for overlap between conduct that falls under a sexual harassment policy and conduct that falls under the model policy on amorous relationships. Both the model policy presented here and a sexual harassment policy would apply to unwelcome sexual relationships between student-athletes and athletics department coaches and staff (and again, if such relationships were nonconsensual and involved rape or sexual assault, they would violate criminal law as well.)

Nevertheless, there are sufficient differences between the core conduct governed by a sexual harassment policy and that governed by a policy on amorous relationships so as to create the need for a separate policy on amorous relationships. First and foremost, as explained in Chapter 1, unwelcomeness is a defining element of sexual harassment, while the amorous relationship policy applies to all covered relationships, including those that are welcome and appear to be consensual. Precisely because sexual harassment policies are widely understood to cover only sexual conduct that is unwelcome, we recommend that the model policy on amorous relationships be adopted as a freestanding policy separate from university and athletics department policies on sexual harassment, instead of as one component within a sexual harassment policy. It is crucial that all persons involved understand that the amorous relationship policy applies even when the relationship is consensual and welcome, and is not limited to sexual conduct that is unwelcome and amounts to sexual harassment.

A final question on the scope and coverage of the policy is whether there should be an exception for pre-existing relationships or for where the participants in the relationship are married. The model policy does not include such exceptions, for two reasons. First, where coaches are involved in a pre-existing sexual relationship with a student-athlete that preceded the formation of the coaching relationship on that team, questions of consent may be less complicated, but the complications for the rest of the team and the athletics program, and the role conflict for the coach, remain. (However, it bears mentioning that consent is not always less complicated in a pre-existing relationship, as when the relationship began in a pre-existing coach-athlete relationship, or when the student-athlete was underage.) Moreover, the potential harms to the team and the conflict of interest for the coach are not eliminated if the coach and athlete marry. The prohibition on coach-athlete relationships is too intrinsic to the welfare of the team and the professional limits of the coach-athlete relationship in intercollegiate sport to allow for exceptions for marriage or pre-existing relationships. Coaches should not be sexually or romantically involved with student-athletes in the program, period.

Second, for relationships between student-athletes and non-coaching staff in the athletics department, because the policy takes a disclosure and recusal approach, it does not need to be modified for pre-existing relationships or married couples. Concerns about favoritism and conflicts of interest are not mitigated in these situations, so that disclosure and recusal are a proper response to these relationships too.

## *3. The Duration of the Prohibition*

Another important question in designing an athletics department policy is how long the requirements of the policy should remain in force. Certainly the policy requirements apply to relationships with student-athletes currently in the intercollegiate athletics program, but should they cover only relationships with current student-athletes, or should they remain in force for some period of time after the students graduate, exhaust their eligibility, or otherwise leave the program?

If the prohibition on coach-athlete relationships were to expire immediately once the student-athlete was no longer in the program, coaches could cultivate a romantic connection with a senior on the team, consummate the relationship soon after the student-athlete has competed in her final competition, and still stay within the terms of the policy. Indeed, we know of examples of coaches defending their relationships with former athletes by explaining that they did not get married until May of the athlete's senior year, after she graduated. Not only do such scenarios pose the same complications with consent discussed in Chapter 2, the prospect of developing a university-sanctioned relationship immediately upon the student-athlete's graduation from the program would affect the coach-athlete relationship during the student-athlete's college career, enabling one or both persons to anticipate or hope to turn the relationship into a sexual one as soon as the official coaching relationship ends. In other words, the very prospect of sexual liaisons would compromise the integrity of the coach-athlete relationship. Worse still, if the policy constrained coaches from forming relationships only with current student-athletes, the student-athlete might feel pressured or tempted to quit the program or transfer out, so that she could have an intimate relationship with the coach. It is also important to recognize that the extent of the coach's influence over the student-athlete does not necessarily end once the student-athlete leaves the team. Especially for athletes seeking further opportunities in sport, either as an amateur or professional athlete or through a career in coaching or athletics administration, the coach can continue to play a unique role in helping the athlete pursue those dreams.[18]

In other settings, restrictions on sexual relationships often extend beyond the duration of the formal professional relationship to which they apply. While the durational scope of these policies can vary, such an extension reflects the recognition that the professional relationship would still be poisoned if restrictions on amorous relationships expired immediately when the professional relationship ended. For example, the American Psychological Association's ethical code bars sexual relationships with former patients within two years of the termination of professional services.[19] The American Counseling Association has an even longer ethical bar to sexual or romantic relationships, extending five years from a former client's last professional contact with the counselor.[20] And the American Psychiatric Association ethical code bars sexual activity with patients, explicitly including former patients, without any time limitation.[21]

Likewise, some amateur sports ethics codes extend their prohibitions on coach-athlete sexual relationships to relationships with former athletes. For example, the U.S. Olympic Committee's Coaching Ethics Code states that "[c]oaches should not engage in sexual intimacies with a former athlete for at least two years after cessation or termination of professional services."[22] The USOC Ethics Code also includes a strong statement discouraging sexual relationships with former athletes even after two years:

Because sexual intimacies with a former athlete are so frequently harmful to the athlete…coaches do not engage in sexual intimacies with former athletes even after a two-year interval except in the most unusual circumstances. The coach who engages in such activity after the two years following cessation or termination of the coach-athlete relationship bears the burden of demonstrating that there has been no exploitation, in light of all relevant factors, including:

(1) the amount of time that has passed since the coach-athlete relationship terminated,
(2) the circumstances of termination,
(3) the athlete's personal history,
(4) the athlete's current mental status,
(5) the likelihood of adverse impact on the athlete and others, and
(6) any statements or actions made by the coach during the course of the athlete-coach relationship suggesting or inviting the possibility of a post-termination sexual or romantic relationship with the athlete or coach.[23]

For all these reasons, the model policy recognizes that the prohibition on sexual or romantic relationships between a coach and a student-athlete on that coach's team must not immediately expire once the student-athlete ceases to be a member of the team. At the same time, we acknowledge that there is necessarily some arbitrariness in setting a durational time limit for the policy's restriction. We recognize too that the case for restricting the nature of the relationship between a coach and former student-athlete gradually becomes less persuasive and eventually subsides with the passage of time. Taking all of these considerations into account, and in an effort to strike an appropriate balance, the model policy recommends that the prohibition on coach-athlete sexual relationships extend at least two years beyond the termination of the coach-athlete relationship. For student-athletes and coaches of other teams (that is, where the student-athlete was not coached by that individual), the prohibition on amorous relationships ends once the student-athlete is no longer a participant in the athletics program.

For relationships between non-coaching staff and student-athletes, the durational limitation is built into the policy itself. Since this part of the policy requires disclosure and recusal, it has no application to a student-athlete who is no longer in the program. That is, once the student-athlete has graduated or left the intercollegiate athletics program, athletics department staff will no longer have supervisory control or authority over that person, and hence have no need to disclose the relationship in order to avoid a conflict of interest in their responsibilities.

## *4. Enforcement of the Policy and the Consequences of Violating It*

On paper, a new policy means very little. A policy is only as good as its enforcement, and the commitment it inspires to follow it. For this reason, it is important that violations of the policy have consequences, and that reported violations are promptly investigated and handled appropriately.

Because the integrity of the program is affected whenever an athletics department coach or staff member develops a sexual or romantic relationship with a student-athlete, and because such relationships have consequences for others in the program, anyone in the program should be able to complain of a violation of the policy. Complaints should be directed (or redirected, if the complainant goes to another member of the athletics department first) to a designated compliance officer in the athletics program, with a back-up designee in case the complainant does not feel comfortable going to that person or in the event that the designated person himself or herself is involved in such a relationship. Since a complainant may not feel comfortable going to anyone within athletics department, there should be a way to make a complaint to a university official outside the athletics department. Even without a complaint, any athletics staff member who witnesses or receives information about a relationship that would violate the policy has a duty to report it. The failure to do so should itself be treated as a violation of athletics department policy.

Once on notice of a complaint or information about a violation of the policy, a prompt and fair investigation should follow. The investigation should seek to determine whether an amorous relationship existed in violation of the policy during the relevant time period, and, for non-coaching staff, whether it was disclosed. Since it is no defense that the sexual relationship was welcome or consensual, investigations under this policy will likely be less complex and less adversarial than investigations into alleged sexual harassment or sexual assault. Still, since one or both of the alleged participants in the relationship may deny it or defend it, it is important than

the investigation be conducted with care and in a manner that is likely to ensure compliance. We recommend that the investigation be handled by a person outside of the athletics department, to be designated by the director of the university office on affirmative action/equal opportunity, or another university office accustomed to handling factual investigations. The school may already have a grievance panel or another appropriate judicial panel available to manage this process fairly. It would not inspire confidence for the athletics department to investigate itself. Our recommendation is in keeping with OCR's warning, in the context of investigations into alleged sexual violence, that complaints not be handled internally by the athletics department.[24]

The investigation should result in a determination of whether the policy was violated. This determination should be made based on the "preponderance of the evidence" standard that applies in civil lawsuits, which asks whether, taking into account all of the evidence and determinations of credibility, it is more likely than not that the policy was violated. This is consistent with OCR recommendations, which explicitly disavow higher standards of evidence, such as requiring "clear and convincing" evidence, or proof beyond a reasonable doubt.[25] If a hearing is conducted, it should be handled in accordance with applicable university policies and procedures, and should be consistent with OCR guidance on hearings undertaken pursuant to Title IX grievance procedures.[26]

It is possible that, in the course of investigating a possible violation of this policy, information will come to light indicating violations of other university policy, such as the university policy on sexual harassment. The investigation may even turn up evidence of a possible crime, such as rape or sexual assault. As discussed earlier, the question of consent can be tricky in this context, and relationships that may appear consensual on the surface may not actually be so, upon further scrutiny. Where such evidence arises in the course of an investigation under the policy, appropriate steps must be taken to protect student-athletes and others in the program. Any information suggesting a violation of the university sexual harassment policy should be promptly forwarded to the university officials responsible for enforcing that policy. Any evidence that a crime has been committed should be immediately forwarded to university general counsel, who will determine, consistent with State and local law, whether to notify appropriate law enforcement officials. However, the enforcement of this policy should not be delayed pending the results of any criminal investigation. The 2011 OCR "Dear Colleague" letter on allegations of sexual violence includes additional information on how a university should proceed in handling cases of sexual violence against students that are also the subject of a criminal investigation.[27]

If the investigation determines that a coach or staff member violated the amorous relationship policy, he or she should be subject to disciplinary action, up to and including dismissal. The student-athlete should not be punished or banished from the program, however, in recognition of the educational purpose of the athletics program for student-athletes and the power disparity inherent in such relationships. It is the responsibility of the coach and staff member to stay within ethical boundaries in their relationships with student-athletes. Neither the student-athlete in the relationship, nor any other student, should be punished when a coach or other staff member breeches that boundary. Nor should anyone be punished or subjected to retaliation for reporting a violation or participating in an investigation under the policy in good faith. In fact, if the policy was violated, the student in the relationship should be provided access to confidential counseling services, since the relationship, the potential ending of the relationship, and the disciplinary action against the coach or staff member will likely have an unsettling effect on the student.

One concern typically raised in crafting policies of a sensitive nature is the proper role of confidentiality. Although a person reporting a violation, either as a bystander or a participant in the relationship, may ask for strict confidentiality in reporting what they know, this is often not possible. Although it is easy to understand why someone might want an assurance of confidentiality in such a sensitive situation, strict confidentiality cannot and should not be promised. Once athletics department personnel have knowledge of a violation of the policy, or reasonable grounds to believe that the policy has been violated, they must take action to protect the integrity of the program and enforce the policy. That may require identifying the persons involved in the relationship and persons with information about the relationship on a need to know basis in order to conduct a fair and thorough investigation. Moreover, information may be reported or discovered that shows that the safety or well-being of other students is at risk, requiring the university to take action and making it impossible to keep the initial

information strictly confidential. Instead of promising strict confidentiality, which may not be possible, people handling the complaint and investigation should take care to keep information and identities as confidential as possible without compromising the investigation and enforcement of the policy. What they can promise—and follow through on—is to release sensitive information only on a need to know basis, that is, only as needed to ensure compliance with the policy and safety to others.

A final word is in order about complaints made anonymously. Anonymous complaints are generally disfavored because they can be difficult to investigate, with no way of verifying the credibility of the source of the allegations. And, anonymity can reduce peoples' inhibitions, making them less reliable. However, anonymous reports can also have merit, and there are possible motivations for remaining anonymous that are consistent with being honest. For example, some persons may choose to remain anonymous out of fear of retaliation, fear of other adverse reactions, or fear of being perceived as the one who "outed" the coach and his relationship. Others may have a conflicted sense of loyalty to the coach, a teammate, and the program, and may choose to stay anonymous for that reason. The reality is, some anonymous complaints are legitimate and based in fact. Therefore a university cannot in good faith ignore complaints merely because they are made anonymously, although anonymity may, in some circumstances, impair the ability to fully investigate a reported violation. We urge that all complaints be promptly investigated and taken seriously, even if made anonymously.

## *5. Educating Athletics department Personnel and Student-Athletes About the Policy*

Once the model policy is adopted, it is important to make the policy known to everyone involved, including student-athletes, coaches, non-coaching staff, and, in particular, the key personnel responsible for compliance with the policy. All of these constituents must be informed and educated about the policy.

In furtherance of this goal, we recommend requiring all student-athletes and all coaches to read Chapters 1 and 2 of this resource guide and read the policy adopted by the athletics department (ideally, their readings would be supplemented with an educational training program and discussion of the policy and the issues it addresses), and then having them sign a statement agreeing to abide by the policy. In addition, all non-coaching staff should be informed of and required to read the policy and asked to sign a statement agreeing to comply with it. Administrators with compliance responsibilities should read this entire resource guide and the model policy. The amorous relationship policy should be incorporated into current athletics department policy manuals and all other locations where department policies are kept and made available, including on the department's website. In addition, the policy should be placed in the student-athlete handbook and other places where student-athletes have access to athletics department policy.

The next chapter takes these principles and incorporates them into a model policy that institutions are encouraged to adopt as their own.

## *Endnotes*

1 James E. Hornack & N. Joan Hornak, Coach and Player—Ethics and Dangers of Dual Relationships, 64(5) J. of Phys. Educ., Recreation & Dance 84 (May-June 1993).

2 ABA Model Rule 1.8(j) (prohibiting attorney-client sexual relationships, even if consensual, unless the relationship predated the existence of the attorney-client relationship).

3 See 266 J.A.M.A. 2741 (1991) (American Medical Association Council on Ethical and Judicial Affairs determination that it is unethical for physicians to engage in sexual or romantic relationships with their current patients); Principles of Med. Ethics § 2 (2010) (American Psychiatric Association adopting AMA ethical code in addition to its own ethics code applicable to psychiatry, and stating that "sexual activity with a current or former patient is unethical"); Ethics Code §§ 4.05, 4.07 (American Psychological Association ethical code bars sexual relationships with patients and former patients within two years of termination of professional services); Code of Ethics § A.5(a)-(b) (2005) (American Counseling Association bars sexual or romantic relationships with current clients and former clients within five years following the last professional contact).

4 § 4.09 Social Relationships, in Judicial Conduct and Ethics n.29 (Mathew Bender & Co., inc. 2010) (citing a case in which a judge violated the judicial ethics code by failing to recuse himself in case where he had a sexual relationship with one of the lawyers appearing before him).

5 Cf. Bradley J.B. Toben & Kris Helge, Sexual Misconduct of Clergypersons with Congregants or Parishioners – Civil and Criminal Liabilities and Responsibilities, forthcoming, Journal of Social Welfare and Family Law, available at http://www.baylor.edu/content/services/document.php/96096.pdf (discussing sexual

relationships between clergypersons and their parishioners as a breach of ethical duty and discussing possible legal claims against clergy who engage in such conduct).

6 See, e.g., Joseph Fischel, Per Se or Power? Age and Sexual Consent, 22 Yale J. L. & Feminism 279 (2010) (arguing that relationships of dependence are more important than age in recognizing the limits of "consent," and explaining, as an example, that he "doubts the integrity of meaningful choice, and the holding open of options, when a...coach makes sexual advances" to an athlete, who would reasonably doubt their ability to say "no").

7 International Olympic Committee Press Release, PR-05-2007, Feb. 8, 2007 (on file with author).

8 Id.

9 United States Olympic Committee Coaching Ethics Code, Ethical Standard 1.1.4 Exploitative Relationships (on file with author); see also id. at Ethical Standards 3.04 ("Coaches do not engage in sexual intimacies with current athletes"), 3.05 ("Coaches do not coach athletes with whom they have engaged in sexual intimacies"), and 3.06 ("Coaches should not engage in sexual intimacies with a former athlete for at least two years after cessation or termination of professional services.").

10 Id. at "Introduction."

11 See, e.g., USA Hockey Coaching Ethics Code, http://www.usahockey.com/uploadedFiles/USAHockey/Menu_Coaching_Ethics/2010_Coaching_Ethics_Code_FINAL.PDF (accessed Aug. 9, 2011) ("Coaches will not exploit or have a sexual or intimate relationship with participants."); USA Diving Code, Part II, Subpart D, Art. 82 ("Coaches Code of Conduct"), 582.4(b)-(d) (June 5, 2008), http://www.usadiving.org/05redesign/resources/Rulebook/USAD02D08-F.pdf (accessed Aug. 9, 2011) ("A coach of a collegiate athlete shall not engage in sexual relations with any collegiate athlete they coach, regardless of the athlete's age."); USA Badminton Coaches Code of Ethics and Conduct, Principle II(G), p.2, http://assets.teamusa.org/assets/documents/attached_file/filename/27112/USAB-Code_of_Ethics___Conduct-v.1.4.pdf (prohibition of "sexual abuse" of athletes, "even when an athlete invites or consents" to such involvement).

12 See, e.g., USA Gymnastics Code of Ethics, http://usagym.org/pages/aboutus/pages/code_of_ethics.html (accessed July 29, 2011) (barring coaches from entering into intimate relationships with athletes unless "the capacity and quality of the athlete's consent to enter that relationship is beyond question"); USFA Sexual Harassment Policy, http://www.rtpnet.org/ncusfa/harrassment.html (posted by the North Carolina Division of USA Fencing) (accessed July 29, 2011) (discouraging consensual sexual relationships between coaches and athletes).

13 See, e.g., American Swimming Coaches Association Code of Ethics and Conduct, Section C Article 4, http://www.swimmingcoach.org/services/code_of_ethics.asp (accessed July 29, 2011) ("[c]oaches of Collegiate age athletes shall not engage in sexual relations with athletes that they coach, even of legal age."); American Volleyball Coaches Association Code of Ethics, II(G). http://www.avca.org/about/code-of-ethics/ (accessed July 29, 2011) (barring "sexual abuse," even if the athlete consents to involvement).

14 See Grant Wahl et al., "Passion Plays," Sports Illustrated, Sept. 10, 2001, http://sportsillustrated.cnn.com/vault/article/magazine/MAG1023662/1/index.htm (accessed July 29, 2011).

15 Further elaboration of the AAUP recommendations can be found on their website, at http://www.aaup.org/AAUP/programs/legal/topics/sex-harass-policies.htm.

16 For example, the University of Vermont has an athleticss department policy banning amorous relationships between all coaches and all student-athletes in the athletics program. University of Vermont, Amorous Relationships with Students, Policy V.3.0.3.2, Oct. 14, 2008 http://www.uvm.edu/policies/general_html/student_relation.pdf (accessed Aug. 22, 2011).

17 Office for Civil Rights, U.S. Dept. of Educ., "Dear Colleague" letter from Assistant Secretary for Civil Rights Russlynn Ali, April 11, 2011, available at http://www.oeosh.ucsb.edu/Policies/2011.04.DearColleague.pdf.

18 As an example of this continuing influence, one Title IX sexual harassment case involved allegations by a former intercollegiate athlete that her coach promised to continue to coach her and to allow her to train with the team, in pursuit of her Olympic aspirations, if she worked as a volunteer assistant coach for the team for one year. She agreed, but alleged that the coach later made unwelcome sexual advances and refused to continue coaching her when she rebuffed him. Klemencic v. Ohio State Univ., 10 F. Supp.2d 911 (S.D. Ohio 1998). Although the court ultimately ruled against her, the case illustrates how a coach may continue to have a high degree of influence and control over an athlete even after the student-athlete has graduated and is no longer an athlete on the team.

19 Ethics Code §§ 4.05, 4.07 (American Psychological Association ethical code barring sexual relationships with patients and former patients within two years of termination of professional services).

20 Code of Ethics § A.5(a)-(b) (2005) (American Counseling Association ethics code, barring sexual or romantic relationships with former clients within five years following the last professional contact).

21 Principles of Med. Ethics § 2 (2010) (American Psychiatric Association ethical code, stating that "sexual activity with a current or former patient is unethical").

22 See United States Olympic Committee Coaching Ethics Code, Ethical Standard §3.06(a) ("Coaches should not engage in sexual intimacies with a former athlete for at least two years after cessation or termination of professional services.").

23 Id. at §3.06(b).

24 Office for Civil Rights, U.S. Department of Education, "Dear Colleague" Letter, April 4, 2011, p.8, n.22.

25 Id. at 11.

26 Id. at 11-12 (explaining that any hearing must be fair to both the complainant and the person accused, with equal rules regarding the opportunity to present evidence, have access to information, meet with a hearing officer, have a representative present, and have an opportunity to appeal).

27 Id. at 10.

# Chapter Five

## *The Model Policy*

We recommend the following model policy as a template for an athletics department policy on coach/staff relationships with student-athletes. Each institution should tailor the policy as necessary to fit the structure of its own athletics department and university, and ensure that it complies with all requirements applicable to the university.

## *Athletics Department Policy on Amorous Relationships*

**Purpose:** The purposes of this policy are: (1) to provide a safe and healthy environment for student-athletes so that they may reach their full potential as students and as athletes; and (2) to ensure that all coaches and other athletics department staff adhere to ethical practices and do not develop inappropriate relationships with student-athletes, regardless of their age or consent.

## *Definitions:*

**COACH:** Any person serving as a head coach, assistant coach, graduate assistant coach, coaching intern, or volunteer coach in the athletics department.

**STAFF:** Any employee or student serving in the athletics department in an administrative, management, or support capacity, or in any capacity in which they supervise student-athletes or have responsibility for the provision of services or other benefits to student-athletes.

Supervisory control or authority: this includes any responsibility with the potential to affect the student-athlete's participation in the athletics program, and includes the provision of direct services and benefits to the student-athlete, such as: training, health services, academic and student life program support, tutoring, counseling, eligibility determinations, program compliance, and control over the student-athlete's team.

**STUDENT-ATHLETE:** Any student of the university who is a member of a varsity athletics team as defined by university and NCAA regulations.

**AMOROUS RELATIONSHIP:** Any sexual, romantic, or dating relationship.

## *Scope of the Policy and Its Requirements:*

**COACHES:** This policy strictly prohibits amorous relationships between any coach and any student-athlete. Every coach has an ethical obligation to maintain a professional relationship with student-athletes and to place the well-being of student-athletes ahead of the coach's personal interests. This responsibility includes the duty to provide a safe and healthy environment for the student-athlete to flourish, and to serve as a role model within the confines of a professional relationship. As a result, no amorous relationship between a coach and a student-athlete—regardless of the perception of consent by one or both participants— can exist without jeopardizing the professionalism of the coach-athlete relationship and creating a significant conflict of interest. The respect and trust the student-athlete places in a coach, and the vulnerability of the student-athlete in that relationship, make "consent" unreliable in this setting. Conflicts of interest are endemic to amorous relationships between coaches and student-athletes, and the costs to the athlete, the team, the athletics program, and the university, necessitate a strict prohibition on amorous relationships between coaches and student-athletes.

Even when the coach has no direct professional responsibility for that student-athlete, other student-athletes may perceive that the student-athlete who has a sexual relationship with a coach may receive preferential

treatment from the coach or the coach's colleagues. Such relationships are incompatible with the ethical obligations of the coach and the integrity of the athletics program. Accordingly, this prohibition applies to relationships between all coaches and all student-athletes in the intercollegiate athletics program.

With respect to a coach and a student-athlete on that coach's team, the prohibition on amorous relationships shall remain in effect for two full years after the end of the final academic year in which the student-athlete was a participant on the team. With respect to a coach and a student-athlete not on that coach's team, the prohibition on amorous relationships shall remain in effect while that student-athlete is a participant in the intercollegiate athletics program.

**OTHER (NON-COACHING) STAFF:** Amorous relationships between student-athletes and non-coaching staff are problematic when the staff member has supervisory control or authority over that student-athlete. For that reason, any amorous relationship between a student-athlete and a staff member with supervisory control or authority over that student-athlete must be disclosed to the associate athletics director for program compliance and the athletics director. (If the relationship involves either of those persons, it must be disclosed to the director of the university affirmative action/equal opportunity office.) Once the relationship is disclosed, the staff member must be recused and their responsibility reassigned so that he or she no longer has supervisory control or authority over that student-athlete. Care must be taken to ensure that the recusal and reassignment of responsibility does not negatively affect the student-athlete's participation or benefits in the athletics or educational programs of the university.

## *Enforcement:*

**REPORTING A VIOLATION:** Any person may allege a violation of this policy by contacting the associate athletics director for program compliance or any other senior athletics department staff, or, if the person does not feel comfortable making the report to a person within the athletics department, to the director of the university affirmative action/equal opportunity office. Any person receiving such a report must immediately notify the Athletics Director. Any coach or staff member with information suggesting a possible violation of the policy must promptly report it to the Athletics Director, and the failure to do so will be considered a violation of athletics department policy. (If the report or information implicates the Athletics Director in a violation of the policy, it should be directed to the director of the university affirmative action/equal opportunity office instead.)

**INVESTIGATION:** Upon receiving such a report or information, the Athletics Director shall immediately notify the director of the university affirmative action/equal opportunity office. Once on notice of a report or information of a possible violation of the policy, the director of the university affirmative action/equal opportunity office shall promptly appoint an investigator outside of the athletics department to conduct a prompt and fair investigation into whether the policy was violated. Such investigation shall include interviews with any coaches, staff, and student-athletes with relevant information, and shall provide any coach or staff member accused of violating the policy with an opportunity to respond to the allegations. In investigating a possible violation of the policy, the standard of proof to be used is whether it is more likely than not that the policy was violated (a "preponderance of the evidence" standard, not the higher standard of proof used in criminal proceedings, "beyond a reasonable doubt"). Using this standard, the investigation will result in a determination of whether the policy was violated.

**COORDINATION OF INFORMATION RELATING TO VIOLATIONS OF OTHER UNIVERSITY POLICY AND/OR CRIMINAL LAW:** If the investigation leads to information suggesting that sexual harassment may have occurred, it shall be promptly forwarded to the appropriate university officials responsible for enforcing the university sexual harassment policy. If the investigation leads to information suggesting potential criminal conduct, it shall be immediately forwarded to university general counsel, who will determine, consistent with State and local law, whether to notify appropriate law enforcement officials. However, the enforcement of this policy shall not be delayed pending the results of a criminal investigation.

**DISCIPLINARY ACTION:** If an investigation determines that a coach or staff member has violated the policy, that coach or staff member shall be subject to disciplinary action, up to and including dismissal. The Athletics

Director, in consultation with the director of the university office of affirmative action/equal opportunity, shall determine the disciplinary action to be imposed. Any disciplinary action shall be taken in accordance with applicable university policy.

**CONFIDENTIALITY:** Complaints, reports and information relating to possible violations of this policy shall be handled as confidentially as possible without jeopardizing the enforcement of the policy, and the ability to conduct a fair investigation, or the safety of student-athletes and other persons connected with the athletics program. Information received in connection with a suspected violation of the policy shall be disseminated only on a "need to know" basis; that is, only when necessary to ensure compliance with the policy and/or to ensure the safety of student-athletes or others who come in contact with the athletics program.

**RETALIATION:** Any retaliation for reporting a violation of this policy, or for participating in good faith in any investigation of a violation of this policy, is strictly prohibited. Any persons taking retaliatory action in violation of this policy shall themselves be subject to discipline, up to and including dismissal.

**EFFECTIVE DATE:** [insert date of adoption]

# *Additional Resources*

**Protecting the Student-athlete Experience – Mariah Burton Nelson**

http://s3.amazonaws.com/ncaa/web_video/TitleIX/2011/Keynote.html

**USOC Policy**

http://www.usacoaching.org/resources/Coaching%20Ethics%20Code_new.pdf

Coach-Athlete Boundary Lines – Athletic Management, Monthly Feature: July 2009

NCAA Equity and Title IX in Intercollegiate Athletics Manual

Coach-Athlete Sexual Relationships, by Pat Griffin, Women's Sports Foundation

Safe4Athletes — http://www.safe4athletes.org/ — Advocates for athlete welfare where every athlete is provided a safe and positive environment free of sexual abuse, bullying and harassment.


NORTHWEST
NCAA
Inclusive cultures celebrate diversity.
As a core value, the NCAA is committed to diversity, inclusion and gender equity among its student-athletes, coaches and administrators. We believe a culture that recognizes, appreciates and nurtures the talents of every individual creates the greatest learning environment – and makes champions of us all!
NCAA is a trademark of the National Collegiate Athletic Association.

# The NCAA salutes the more than 430,000 student-athletes participating in 23 sports at more than 1,000 members institutions

NCAA Publications.com Account 0 Wishlist 0 Cart

Search

Home / Staying In Bounds




# Staying In Bounds

$0.00 USD

SKU:SIB13-pdf

Quantity

– 1 +

Add to cart

BUY IT NOW

Categories: Miscellaneous Research Reports

## Product Description

This NCAA resource is designed to educate member institutions and their student-athletes about why sexual or romantic relationships between athletics department staff and student-athletes are inappropriate, how to avoid those relationships, and what to do if they occur. When adopted and enforced by institutions of higher learning, this model policy will help create a safe, healthy environment on college campuses. Although most of the examples offered herein refer to coaches, the policy is intended to provide clear guidance for all members of the athletics department (including coaches, administrators, athletics trainers, and other staff), as well as student-athletes and parents.

## You May Also Like




Staying In Bounds

$0.00 USD

– 1 +

Add to cart




2014-15 NCAA Sports Medicine Handbook

$13.00 USD

0

## NCAA Publishing

P.O. Box 361147
Indianapolis, IN 46236-5323

## My Account

Profile

Orders

## Quick Links

Privacy Policy

FAQ

Contact




Staying In Bounds

$0.00 USD

NCAA Publications.com

Privacy Policy FAQ Contact

© 2026, Powered by Shopify

0




**Staying In Bounds**

$0.00 USD